IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL HOME LOAN BANK OF PITTSBURGH, | ) ) ) | CIVIL DIVISION |
| Plaintiff, | ) ) ) | No. |
| v. | ) ) ) | |
| | ) | COMPLAINT |
| COUNTRYWIDE SECURITIES CORPORATION, COUNTRYWIDE HOME LOANS, INC., CWALT, INC., CWMBS, INC., COUNTRYWIDE FINANCIAL CORPORATION, MOODY'S CORPORATION, MOODY'S INVESTORS SERVICE, INC., THE MCGRAW-HILL COMPANIES, INC., and FITCH, INC., | ) ) ) ) ) ) ) ) ) ) ) | Filed on behalf of: Plaintiff. |
| Defendants. | ) ) ) | Counsel of Record For this Party: Lynch Weis, LLC Daniel P. Lynch PA ID No. 68280 dlynch@lynchweis.com William J. Wyrick PA ID No. 70656 bwyrick@lynchweis.com 501 Smith Drive, Suite 3 Cranberry Twp., PA 16066 T: (724) 776-8000 F: (724) 776-8001 |
| **JURY TRIAL DEMANDED** | ) | |

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL HOME LOAN BANK OF PITTSBURGH, | ) ) ) | CIVIL DIVISION |
| Plaintiff, | ) ) ) | No. |
| v. | ) ) ) | |
| COUNTRYWIDE SECURITIES CORPORATION, COUNTRYWIDE HOME LOANS, INC., CWALT, INC., CWMBS, INC., COUNTRYWIDE FINANCIAL CORPORATION, MOODY'S CORPORATION, MOODY'S INVESTORS SERVICE, INC., THE MCGRAW-HILL COMPANIES, INC., and FITCH, INC., | ) ) ) ) ) ) ) ) ) ) ) ) | |

Defendants.

## NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Service
The Allegheny County Bar Association
920 City County Building
414 Grant Street
Pittsburgh, PA 15219
(412) 261-5555

81040543. 1

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL HOME LOAN BANK OF PITTSBURGH, | ) ) ) | CIVIL DIVISION |
| Plaintiff, | ) ) ) | No. |
| v. | ) ) ) ) | |
| COUNTRYWIDE SECURITIES CORPORATION, COUNTRYWIDE HOME LOANS, INC., CWALT, INC., CWMBS, INC., COUNTRYWIDE FINANCIAL CORPORATION, MOODY'S CORPORATION, MOODY'S INVESTORS SERVICE, INC., THE MCGRAW-HILL COMPANIES, INC., and FITCH, INC., | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## COMPLAINT

AND NOW, comes the Plaintiff, Federal Home Loan Bank of Pittsburgh ("Pittsburgh FHLB"), by and through its undersigned counsel, Daniel P. Lynch, William J. Wyrick, and the law firm of Lynch Weis, LLC, and files the within Complaint, and in support thereof, states as follows:

## PARTIES

1.     Pittsburgh FHLB is a federally chartered bank, which is owned by its approximately 320 member financial institutions located in Delaware, Pennsylvania, and West Virginia, with headquarters at 601 Grant Street, Pittsburgh, Allegheny County, Pennsylvania 15219.

2.     Defendant Countrywide Securities Corporation ("Countrywide Securities") is a California corporation with headquarters at 4500 Park Granada, Calabasas, California 91302.

81040543. 1

3.     Countrywide Securities acted as a seller and participant in the distribution of all the securities in this action.

4.     Defendant Countrywide Home Loans, Inc. ("Countrywide Home Loans") is a New York corporation whose address is 4500 Park Granada, Calabasas, California 91302.

5.     Countrywide Home Loans acted as a "seller/sponsor" and participant in the distribution of all the securities in this action.

6.     Defendant CWALT, Inc. ("CWALT") is a limited purpose Delaware corporation whose address is 4500 Park Granada, Calabasas, California 91302.

7.     CWALT was the "depositor" and acted as a participant in the distribution of the securities bearing the CUSIPs 021469AC5, 23244EAC1, 23246KAB7, and 02149MAA7.

8.     Defendant CWMBS, Inc. ("CWMBS") is a limited purpose Delaware corporation whose address is 4500 Park Granada, Calabasas, California 91302.

9.     CWMBS was the "depositor" and acted as a participant in the distribution of the securities bearing the CUSIP 17025QAJ6.

10.     Countrywide Financial Corporation ("CFC" and together with Countrywide Securities, Countrywide Home Loans, CWALT, and CWMBS, "Countrywide") is a Delaware corporation, with headquarters at 4500 Park Granada, Calabasas, California 91302.

11.     CFC owned and/or controlled Countrywide Securities, Countrywide Home Loans, CWALT, and CWMBS during the relevant time period.

12.     In July 2008, Bank of America Corporation ("Bank of America") acquired CFC.

13.     In 2009, CFC became known as Bank of America Home Loans, which became a wholly owned subsidiary of Bank of America.

81040543. 1

14.     Defendants Moody's Corporation and its wholly owned subsidiary Moody's Investors Service, Inc. (collectively, "Moody's") are Delaware corporations with their headquarters at 250 Greenwich, New York, New York 10007.

15.     Moody's provides credit rating services and assists in the structuring of mortgage pools and was a participant in the distribution of the securities bearing CUSIPs 23244EAC1, 23246KAB7, 02149MAA7, and 17025QAJ6.

16.     Defendant The McGraw-Hill Companies, Inc. and, at all relevant times, its business division Standard & Poor's Ratings Services (collectively, "S&P) is a New York corporation with headquarters at 1221 Avenue of the Americas, New York, New York 10020.

17.     S&P provides credit rating services and assists in the structuring of mortgage pools and was a participant in the distribution of all of the securities at issue here.

18.     As of January 1, 2009, the rating and structuring business of The McGraw-Hill Companies, Inc. operates as Standard & Poor's Financial Services LLC, a wholly owned subsidiary of The McGraw-Hill Companies, Inc.

19.     Defendant Fitch, Inc. ("Fitch" and together with Moody's and S&P, the "Rating Agencies") is a Delaware corporation with headquarters at One State Street Plaza, New York, New York 10004 and is a wholly owned subsidiary of Fitch Group, which in turn is primarily owned by Fimalac, a French holding company.

20.     Fitch, which is also known as Fitch Ratings, provides credit rating services and assists in the structuring of mortgage pools and.

21.     Fitch was a participant in the distribution of the securities bearing CUSIPs 021469AC5, 23244EAC1, 23246KAB7, and 02149MAA7.

81040543. 1

## JURISDICTION AND VENUE

22.     The claims asserted in this Complaint arise in part under §§ 11, 12, and 15 of the

Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, and 77o, and Pennsylvania statutory and common

law.

23.     The claims under §§ 11, 12 and 15 may be brought in state or federal court, and

when brought in state court are not removable.

24.     Section 22 of the Securities Act states that "[e]xcept as provided in section 16(c),

no case arising under this title and brought in any State court of competent jurisdiction shall be

removed to any court in the United States."

25.     Section 16(c) refers to "covered class actions," but this action is not brought on

behalf of a class.

26.     Accordingly, the present action is not a "covered class action" under Section 16(c)

and is not removable to federal court.

27.     Pittsburgh FHLB is a federally chartered organization that operates nationwide

and is therefore a citizen of every state.

28.     Accordingly, this action does not involve diversity jurisdiction.

29.     Personal jurisdiction over the Defendants is proper under 42 Pa.C.S.A. § 5322 and

42 Pa.C.S.A. § 5301(a)(2)(iii).

30.     Venue in this Court is proper under Rules 1006 and 2179 of the Pennsylvania

Rules of Civil Procedure because the violations of law set forth in this Complaint occurred in this

County, including the dissemination of materially false and misleading statements.

31.     The Defendants conduct or conducted business in this County.

## SUBSTANTIVE ALLEGATIONS

### A.   Introduction

32.    Pittsburgh FHLB is one of twelve Federal Home Loan Banks created by Congress in 1932 to ensure available funding for mortgage loans.

33.    Throughout its existence, the Federal Home Loan Bank System has been a fundamental part of the country's financial system, like the Federal Reserve System or the Federal Deposit Insurance Corporation.

34.    More than 8,000 U.S. lending institutions—about 80% of those eligible—are members of a Federal Home Loan Bank and rely on a Federal Home Loan Bank for funds.

35.    The primary purpose of the Federal Home Loan Banks is to ensure the flow of credit and other services for housing and community development to member financial institutions.

36.    This liquidity serves the public by enhancing the availability of residential mortgage and community investment funds.

37.    As cooperatives, the Federal Home Loan Banks seek to maintain a balance between their public policy mission and their obligation to provide adequate returns on the capital supplied by members.

38.    The Federal Home Loan Banks achieve this balance by delivering low-cost financing, providing members a viable alternative to the secondary mortgage market through their mortgage programs, and through the payment of dividends—at least Pittsburgh FHLB did so until the losses caused by the Defendants and others forced it to suspend the payment of a dividend in late 2008.

7

39.     Each Federal Home Loan Bank also helps members with other local housing and community development needs through self-funded affordable housing programs.

40.     To generate profits that it can use to support affordable housing programs and to provide dividends to its members, Pittsburgh FHLB maintains an investment portfolio that includes investments in bonds known as residential mortgage-backed securities ("MBS").

41.     A residential mortgage-backed security, also called a bond or certificate, represents the right to receive a portion of the cash flows generated by a collection of residential home mortgage loans.

42.     The residential home mortgage loans are selected by a sponsoring entity and placed into a special purpose vehicle called a Trust.

43.     The mortgage loans in the Trust have varying underwriting characteristics such as the type and extent of documentation relied on by the loan originator, loan-to-value ratio (LTV), borrower's credit score (known as the FICO score), the location of the property.

44.     For the most part, Pittsburgh FHLB did not invest in MBS that were backed by subprime mortgage loans.

45.     Because of its mission to provide liquidity to its members, Pittsburgh FHLB had negligible exposure to the subprime market and generally limited its investments in MBS to pools made up of loans to "prime" borrowers—the most creditworthy borrowers—or "Alt-A" borrowers.

46.     "Alt-A" loans are provided to borrowers who have good credit history, but with less than full documentation of employment, income, assets, and/or debt.

81040543. 1

47.     The sponsor of the Trust or the seller of the bonds to be issued by the Trust—the arranger—work with the Rating Agencies to structure the pool of mortgage loans and divide the cash flows from these mortgage loans—the payments of principal and interest—into "tranches."

48.     A pool of mortgage loans is typically structured so that senior tranches receive payments ahead of junior or subordinate tranches, and therefore the junior tranches absorb losses before those losses affect the more senior tranches.

49.     The form of credit support or enhancement described in the preceding paragraph for the senior tranches is known as subordination.

50.     The arranger works with the credit rating agencies to determine the level of credit enhancement for each tranche.

51.     The Rating Agencies then assign a rating to some or all of the tranches, for which they are paid a fee by the arranger.

52.     Bonds with the highest quality are rated AAA by S&P and Fitch and rated Aaa by Moody's. (The highest rating by each of the Rating Agencies will be referred to herein as "AAA.")

53.     Although the rating symbols used by each of the Rating Agencies vary somewhat, generally bonds are rated on a scale that runs from AAA, AA, A, BBB, BB, B, CCC, CC to D.

54.     Bonds that are considered investment grade are rated BBB and above.

55.     Bonds that are considered non-investment grade ("junk bonds") are rated BB and below, and these bonds are considered either speculative or highly speculative ("B" grades), extremely speculative ("C" grades) or in default ("D").

56.     Interest rates generally increase as the rating on the bond decreases to reflect the level of risk assumed by the investor.

81040543. 1

57.     Credit ratings are intended to be comparable across different types of fixed income instruments.

58.     In 1994, a Moody's executive stated that "no matter what types of instruments the ratings apply to, no matter where the issuer resides, and no matter what currency or market in which the security is issued, Moody's ratings are intended to have the same relative meanings in terms of expected credit loss."

59.     Similarly, in a May 29, 2007 publication, S&P stated: "Our ratings represent a uniform measure of credit quality globally and across all types of debt instruments.  In other words, an 'AAA' rated corporate bond should exhibit the same degree of credit quality as an 'AAA' rated securitized issue."

60.     The default rate on investment grade corporate bonds from 1981 to 2008 has averaged about 0.106% with no year higher than 0.41%.

61.     The default rate described in the preceding paragraph is consistent with the charge-off rate for 1-4 family first-lien home mortgage loans made at commercial banks. Between 1992 and 2006 the average charge-off rate was 0.168% and never exceeded 0.348% annually.

62.     In short, a purchaser of an AAA-rated residential MBS should have virtually no risk of incurring any loss.

63.     Even though all the bonds purchased by Pittsburgh FHLB at issue here were backed by "prime" or "Alt-A" loans, were senior securities in the structures devised by the Defendants, and were rated "AAA" by at least two credit rating agencies, Pittsburgh FHLB has been forced to recognize substantial losses on its investments in these bonds and the bonds' current ratings indicate that their credit quality is actually that of junk bonds.

81040543. 1

**B.**     **Pittsburgh FHLB's Purchasing Decisions**

64.     In 2006 and 2007, Pittsburgh FHLB purchased the following Certificates from Countrywide, each identified by the last three or four characters of their respective CUSIPs:

| Issuing Trust & CUSIP | Date Purchased by Pittsburgh FHLB | Underwriters |
|---|---|---|
| Alternative Loan Trust 2006-J3 <br> CUSIP: 021469AC5 ("AC5") | 6/9/2006 | Countrywide, S&P, Fitch |
| Alternative Loan Trust 2007-J6 <br> CUSIP: 23244EAC1 ("EAC1") | 6/28/2007 | Countrywide, S&P, Moody's, Fitch |
| Alternative Loan Trust 2007-1T1 <br> CUSIP: 23246KAB7 ("KAB7") | 1/17/2007 | Countrywide, S&P, Moody's, Fitch |
| Alternative Loan Trust 2007-J1 <br> CUSIP: 02149MAA7 ("MAA7") | 1/31/07 | Countrywide, S&P, Moody's, Fitch |
| CHL Mortgage Pass-Through Trust 2007-J3 <br> CUSIP: 17025QAJ6 ("QAJ6") | 6/28/2007 | Countrywide, S&P, Moody's |

**(i)**     **AC5**

65.     Countrywide, S&P, and Fitch represented that Alternative Loan Trust 2006-J3 consisted of approximately 699 loans with an aggregate principal balance of about $253 million.

66.     Countrywide, S&P, and Fitch divided the loans into 4 groups, each with multiple senior tranches, and with subordinated tranches that would absorb losses before the senior tranches in the groups were affected.

81040543. 1

67.    Pittsburgh FHLB purchased a senior bond, AC5, in the face amount of $56,055,000.  (AC5 Asset Purchase (Exhibit 4).)

68.    The AC5 bond was associated with the loans in Group 1, which Countrywide, S&P, and Fitch represented consisted of 481 loans with average FICO scores of 727 and average LTVs of approximately 72%, which are characteristics of "prime" or "Alt-A" borrowers.

69.    Countrywide, S&P, and Fitch also provided for credit enhancement in the form of subordination that would protect AC5 by absorbing losses representing about 3.5% of the principal balance of the aggregate pool of all 699 loans.

70.    Because of this subordination, and assuming that the losses occurred pro-rata across the loan groups, the losses in Group 1 would have to be about $5.3 million before the bond purchased by Pittsburgh FHLB was affected.

71.    S&P and Fitch rated the bond purchased by Pittsburgh FHLB as AAA.

72.    Based on the representations of Countrywide, S&P, and Fitch, Pittsburgh FHLB believed it had made a safe investment.

73.    However, as of June 25, 2009, the principal balance of the nonperforming mortgage loans (loans more than 30 days delinquent) for Group 1 was 16.9% and seriously delinquent mortgage loans (mortgages more than 90 days delinquent, in bankruptcy, in foreclosure, and that are real estate owned) totaled $12 million, which means that all of the subordination available to protect AC5 from losses has eroded.

74.    Additionally, in 2009, Fitch downgraded AC5 to CC and estimated that approximately 29% of the remaining mortgages will default in the future.

(ii)     **EAC1**

75.     Each Defendant represented that Alternative Loan Trust 2006-J6 consisted of approximately 344 loans with an aggregate principal balance of about $185 million.

76.     Each Defendant placed all the loans into one aggregate pool and divided the pool into several senior tranches, some with their own subordinate tranche, and into subordinated tranches associated with the aggregate pool.

77.     Pittsburgh FHLB purchased a senior bond, EAC1, with a face amount of $59,856,999 on the acquisition date, June 28, 2007.  (EAC1 Asset Purchase (Exhibit 6).)

78.     The EAC1 bond was associated with the aggregate pool consisting of loans with average FICO scores of 726 and average LTVs of approximately 73%, which are characteristics of "prime" or "Alt-A" borrowers.

79.     Working together, the Defendants provided for credit enhancement in the form of subordination that would protect EAC1 by absorbing losses representing about 5.5% of the principal balance of the aggregate pool.

80.     Thus, the entire pool would need to experience losses of approximately $10.2 million before the bond purchased by Pittsburgh FHLB was affected.

81.     S&P, Moody's, and Fitch rated the bond purchased by Pittsburgh FHLB as AAA.

82.     Based on the representations of each of the Defendants, Pittsburgh FHLB believed it had made a safe investment.

83.     However, as of August 25, 2009, the principal balance of the nonperforming loans was 13.7% of the entire pool and the seriously delinquent loans totaled $18.9 million, which means that all of the subordination available to protect EAC1 from losses has eroded.

84.     Additionally, in 2009, Fitch downgraded the EAC1 bond to CC and estimates that approximately 34% of the remaining mortgages will default in the future.

**(iii)    KAB7**

85.     Each Defendant represented that Alternative Loan Trust 2007-1T1 consisted of approximately 733 loans with an aggregate principal balance of about $493 million.

86.     Each Defendant divided the loans into 2 groups, each with multiple senior tranches, and with subordinated tranches that would absorb losses before the tranches in the groups were affected.

87.     Pittsburgh FHLB purchased a super senior bond, KAB7, in the face amount of $50,000,000.  (KAB7 Asset Purchase (Exhibit 8).)

88.     The KAB7 bond was associated with the loans in Group 1, which the Defendants represented consisted of 491 loans with a principal balance of about $335 million and average FICO scores of 708 and average LTVs of approximately 73%, which are characteristics of "prime" or "Alt-A" borrowers.

89.     The Defendants together provided for credit enhancement in the form of subordination that would protect KAB7 by absorbing losses of over 13% of the principal balance of the aggregate pool.

90.     Thus, assuming the losses occurred pro-rata across the groups, Group 1 would have to experience losses of about $25.2 million before the bond purchased by Pittsburgh FHLB was affected.

91.     S&P, Moody's, and Fitch rated the bond purchased by Pittsburgh FHLB as AAA.

92.     Based on the representations of each of the Defendants, Pittsburgh FHLB believed it had made a safe investment.

81040543. 1

93.     However, as of August 25, 2009, the principal balance of the nonperforming mortgage loans for Group 1 was 30.6% and seriously delinquent loans in Group 1 totaled $61.9 million, which means that all of the subordination available to protect KAB7 from losses has eroded.

94.     Additionally, in 2009, Fitch downgraded KAB7 to CC and estimates that approximately 48% of the remaining mortgages will default in the future.

     **(iv)   MAA7**

95.     Each Defendant represented that Alternative Loan Trust 2007-J1 consisted of approximately 1,447 loans with an aggregate principal balance of about $583 million.

96.     Each Defendant divided the loans into groups—Group I and Group II, with Group I divided into Loan Group 1 and Loan Group 2, and Group II consisting of Loan Group 3.

97.     Groups I and II each had their own subordinated bonds applying only to their groups.

98.     Pittsburgh FHLB purchased a super senior bond, MAA7, in the face amount of $125,000,000.  (MAA7 Asset Purchase (Exhibit 10).)

99.     MAA7 was associated with Loan Group 1 (part of Group I), which the Defendants represented consisted of 297 loans with a principal balance of approximately $183 million and average FICO scores of 693 and average LTVs of approximately 69%, which are characteristics of "prime" or "Alt-A" borrowers.

100.    The Defendants together provided for credit enhancement in the form of subordination for MAA7 of 7.2% of the principal balance of Group I (Loan Groups 1 and 2).

101.    Thus, Group I (Loan Groups 1 and 2) would have to experience losses of about $26 million before the bond purchased by Pittsburgh FHLB was affected.

81040543. 1

102.    S&P, Moody's, and Fitch rated the bond purchased by Pittsburgh FHLB as AAA.

103.    Based on the representations of each of the Defendants, Pittsburgh FHLB believed it had made a safe investment.

104.    However, as of August 25, 2009, the principal balance of the nonperforming mortgage loans for Loan Group 1 was 26.1% and seriously delinquent loans totaled $74.1 million for Group I (Loan Group 1 totaled $25.3 million and Loan Group 2 totaled $48.8 million), which means that all of the subordination available to protect MAA7 from losses has eroded.

105.    Additionally, in 2009, Fitch downgraded the MAA7 bond to CC and estimates that approximately 54% of the remaining mortgages will default in the future.

**(v)    QAJ6**

106.    Countrywide, S&P, and Moody's represented that CHL Mortgage Pass-Through Trust 2007-J3 consisted of approximately 336 loans with an aggregate principal balance of about $223 million.

107.    Countrywide, S&P, and Moody's placed all the loans into one aggregate pool and divided the pool into several senior tranches, some with their own supporting tranches, and into subordinated tranches associated with the aggregate pool.

108.    Pittsburgh FHLB purchased a senior bond, QAJ6, in the face amount of $75,095,773. (QAJ6 Asset Purchase (Exhibit 14).)

109.    The QAJ6 bond was associated with the aggregate pool consisting of loans with average FICO scores of 744 and average LTVs of approximately 73%, which are characteristics of "prime" borrowers.

110. Countrywide, S&P, and Moody's provided for credit enhancement in the form of subordination that would protect QAJ6 from losses up to about 4.9% of the principal balance of the aggregate pool.

111. Thus, the aggregate pool would need to experience losses of about $10.5 million before the bond purchased by Pittsburgh FHLB was affected.

112. S&P and Moody's rated the bond purchased by Pittsburgh FHLB as AAA.

113. Based on the representations of Countrywide, S&P and Moody's, Pittsburgh FHLB believed it had made a safe investment.

114. However, as of June 25, 2009, the principal balance of the nonperforming loans in the aggregate pool was 15.7% and seriously delinquent loans totaled $17.7 million, which means that all of the subordination available to protect QAJ6 from losses has eroded.

115. In 2009, S&P downgraded QAJ6 to CCC and Moody's downgraded the bond to Caa1.

116. The mortgage pool associated with QAJ6 is expected to deteriorate further in the future.

## C.    The Credit Rating Process

117. Countrywide worked with Moody's, S&P, and Fitch in an iterative and collaborative process to structure the pools and establish the nature and level of the credit enhancement for the senior tranches.

118. The rating process included two distinct steps:  (1) estimating expected losses or the probability of default and (2) simulating the cash flows.

119. Fitch and S&P evaluate the borrower's ability to meet its financial obligation and therefore the rating is considered an estimate of probability of default.

120.    Moody's estimate the expected loss, which it describes as the probability of default times the loss given default, but as a practical matter, not much difference exists between Moody's methodology and the methodology of Fitch and S&P.

121.    To estimate the expected losses or probability of default, the Rating Agencies used historical data to estimate the likely sensitivity of the expected loss or probability of default to underwriting characteristics of the loan, the experience of the originator and servicer, and the local and national economic conditions.

122.    In making its rating determination, Moody's, for example, in an October 4, 2006 presentation, claimed that "all default scenarios and its impacts on the tranches are taken into account," and that it will capture default, loss, and volatility for all aspects of the underlying loans and properties.

123.    Based on the expected losses or the probability of default, the cash flows available to each of the tranches can be simulated.

124.    Once the cash flows were simulated, the Rating Agencies and Countrywide then determined how much credit enhancement would be made available to each tranche.

125.    The ultimate goal of this iterative and collaborative process was to create a structure that could be sold in the market for the greatest profit possible to Countrywide.

126.    Countrywide pays the Rating Agencies for their structuring help and ratings, and the fees paid to the Rating Agencies for their work on structured finance investments is much greater than the fees they received for rating a corporate bond.

127.    Rating structured financial products was a very lucrative business for the Rating Agencies.

128.   For example, Moody's net income grew from $159 million in 2000 to $705 million in 2006 with 44% of its revenue in 2006 coming from its structured investment product activities.

129.   Therefore, although they publicly present themselves as independent parties serving the interests of investors, the Rating Agencies have the incentive to help create a structure that is the least expensive to Countrywide.

130.   The least expensive structure of mortgage pools is one that has the largest possible percentage of the bonds paying the lowest possible interest rate and the least amount of credit enhancement.

131.   The lowest possible interest rate is assigned to bonds of the highest quality, meaning the least likely to incur losses.

132.   Bonds rated AAA are deemed to be the bonds least likely to incur losses.

133.   Residential MBS are sold to a limited group of institutional investors who either by mandate, in the case of Pittsburgh FHLB, or by policy, will only invest in AAA-rated bonds.

134.   To maximize the profits to Countrywide, therefore, the goal of the structuring process was to create a structure with the greatest possible percentage of AAA-rated bonds and the least amount of credit enhancement.

135.   Each Rating Agency was also aware that if it did not provide an AAA rating on a significant portion of the bonds or if it concluded that it lacked sufficient information to provide a rating, the Rating Agency was likely to lose Countrywide's business to another Rating Agency.

**D.   Underwriting Standards**

136.   Each Defendant represented the underwriting standards for the particular mortgage pools at issue through the registration statement, prospectus, and supplemental prospectus (collectively, "Offering Documents") (Registration Statement No. 333-131630 and

19

Placeholder Prospectus (Exhibit 1), Amendment No. 1 to Registration Statement No. 333-131630

and Placeholder Prospectus (Exhibit 2), AC5 Prospectus Supplement (Exhibit 3), EAC1

Prospectus Supplement (Exhibit 5), KAB7 Prospectus Supplement (Exhibit 7), MAA7

Prospectus Supplement (Exhibit 9), Registration Statement No. 333-140958 and Placeholder

Prospectus (Exhibit 11), Amendment No. 1 to Registration Statement No. 333-140958 and

Placeholder Prospectus (Exhibit 12), and QAJ6 Prospectus Supplement (Exhibit 13)), and

verbally.

137.    According to the Offering Documents, the loans in each pool were originated

primarily by Countrywide Home Loans and American Home Mortgage Corp.

138.    Each Defendant misrepresented the underwriting, lending, and appraisal standards

employed by Countrywide Home Loans and American Home Mortgage Corp.

139.    Each Defendant also omitted material information from the underwriting, lending,

and appraisal standards.

**(i)    Countrywide Home Loans**

140.    The Offering Documents explained that Countrywide Home Loans' underwriting

standards are applied "to evaluate the prospective borrower's credit standing and repayment

ability and the value and adequacy of the mortgaged property as collateral." (Exhibit 3 at S-68 to

S-74; Exhibit 5 at S-42 to S-46; Exhibit 7 at S-37 to S-42; Exhibit 9 at S-59 to S-65; Exhibit 13 at

S-34 to S-36.)

141.    The Offering Documents represented that Countrywide Home Loans "generally

requires a description of income" from applicants and, if required, obtains employment

verification. (*Id.*)

20

142.    The Offering Documents also represented that Countrywide Home Loans also used FICO scores to assess borrower creditworthiness and likelihood of default over a two-year period.

143.    The Offering Documents stated that third parties periodically obtained the data used by Countrywide to complete the underwriting analysis and that in those cases, while the initial determination of whether a mortgage loan complied with Countrywide Home Loans' underwriting standards would not be made by Countrywide Home Loans, Countrywide Home Loans would conduct "a quality review of a sample of the mortgage loans." (*Id.*)

144.    Additionally, the Offering Documents explained the appraisal process.

145.    Countrywide Home Loans required its appraisals to conform to Fannie Mae's and Freddie Mac's standards and to be conducted by independent appraisers.

146.    For Countrywide Home Loans' full documentation loans, the Offering Documents explained that Countrywide Home Loans verified the information in the application submitted by the prospective borrower.

147.    For Countrywide Home Loans' alternative documentation loans, the Offering Documents noted that Countrywide Home Loans allowed documentation of income or assets using different methods than those required under full documentation loans.

148.    For all loans, the Offering Documents represented that Countrywide Home Loans required certain loan-to-value ratios, and limited original principal balance amounts.

**(ii)    American Home Mortgage Corp.**

149.    The Offering Documents represented that American Home's mortgage loans were "purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program

21

(GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home." (Exhibit 3 at S-74 to S-77; Exhibit 5 at S-47 to S-49; Exhibit 9 at S-65 to S-68.)

150.     They further stated that American Home's conforming conventional loans had to be approved by Fannie Mae's and Freddie Mac's automated underwriting systems and that their non-conforming guidelines were similar to Fannie Mae's and Freddie Mac's but did not conform to maximum loan amounts and "in some cases" the underwriting guidelines. (*Id.*)

151.     The Offering Documents represented American Home's underwriting philosophy which was to "weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt." (*Id.*)

152.     The Offering Documents represented that in addition to a potential borrower's credit history and credit score, American Home underwriters closely reviewed the potential borrower's housing payment history.

153.     The Offering Documents also noted that exceptions to the underwriting standards may be permitted "where compensating factors are present." (*Id.*)

154.     The Offering Documents explained that American Home expected its underwriters to exercise professional judgment based on their experience making lending decisions, and that American Home "underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring." (*Id.*)

155.     The Offering Documents further represented that each application was weighed "individually on its own merits and exceptions to American Home's underwriting guidelines are

81040543. 1

allowed if sufficient compensating factors exist to offset any additional risk due to the exception." (*Id.*)

156.    With regard to Alt-A products, the Offering Documents represented that those with less verification documentation "generally have other compensating factors such as higher credit score or lower loan-to-value requirements." (*Id.*)

### (iii)    Underwriting Standards from the Countrywide Prospectuses

157.    Each of the Defendants, through the Offering Documents of all of the Trusts, also disclosed general information regarding underwriting standards used by other loan originators whose loans were included in the Trusts.

158.    The prospectuses represented that the parties who originated the loans employed underwriting standards to "evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the related Property as collateral." (Exhibit 3 at S-77; Exhibit 5 at S-49; Exhibit 7 at S-37 to S-42; Exhibit 9 at S-68 to S-71; Exhibit 13 at S-36.)

159.    The prospectuses represented that the originators required a prospective borrower applying for a loan to fill out a "detailed" application designed to provide the underwriting officer with pertinent credit information. (*Id.*)

160.    The prospectuses represented that the originators generally required a current list of assets and liabilities and a statement of income and expense, as well as an authorization to apply for a credit report.

161.    The prospectuses further explained that in most cases—that is, in the majority of circumstances—the originators obtained employment verification from an independent source (often the employer or through tax documents for self-employed individuals), including, "among

other things," the length of employment, current salary, and whether the employment is likely to continue. (*Id.*)

162.    The prospectuses specifically represented that the originators would make a determination, based on the information provided by the applicant, that "the prospective borrower has sufficient monthly income available to meet monthly housing expenses and other financial obligations and monthly living expenses and to meet the borrower's monthly obligations on the proposed mortgage loan . . . and other expenses related to the mortgaged property such as taxes and hazard insurance." (*Id.*)

163.    The prospectuses also explained that the underwriting standards "may be varied in appropriate cases where factors such as low Loan-to-Value Ratios or other favorable credit factors exist." (*Id.*)

164.    The prospectuses further explained that the loans may be "recently developed" or involve "additional uncertainties" not present in traditional loans, but that they are underwritten "on the basis of a judgment that the borrowers have the ability to make the monthly payments required initially." (*Id.*)

165.    The prospectuses further stated that while a potential borrower's income alone might not be sufficient to make monthly payments as they increase, the loans may be "underwritten primarily upon the basis of Loan-to-Value Ratios or other favorable credit factors." (*Id.*)

166.    Thus, each of the Defendants represented that the originators' decisions to use non-traditional loan types were based on factors beyond income that would provide a reasonable basis to conclude that borrowers could make their monthly payments.

81040543. 1

167. Additionally, the prospectuses explained that an appraisal of the property may be made.

168. The appraisals generally included an inspection of the property, a report on the property's condition and, if applicable, the verification that new construction was completed.

169. The appraisal would also be based on the market value of comparable homes, estimated rental value (where applicable), and cost of replacing the home.

E.   **Credit Ratings**

170. Each Defendant represented in the Offering Documents and verbally that each of the bonds purchased by Pittsburgh FHLB was worthy of being rated "AAA," signifying that the risk of loss was virtually non-existent.

171. By providing a rating, each Defendant represented that they had sufficient reliable facts on which to base a rating.

172. Each Defendant further represented in the Offering Documents that:

> The ratings assigned . . . to mortgage pass through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. [Such] ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates.

(Exhibit 3 at S-146 to S-147; Exhibit 5 at S-105 to S-106; Exhibit 7 at S-115 to S-116; Exhibit 9 at S-187 to S-188; Exhibit 13 at S-98 to S-99.)

F.   **Omissions and Misrepresentations**

173. The Defendants made materially false and misleading representations and omissions concerning information in the Certificates' Offering Documents and concerning the ratings of the Certificates.

174.    The materially false and misleading statements were communicated to and relied on by Pittsburgh FHLB.

175.    The Defendants made the false representations and omissions either knowing of their falsity or with recklessness as to whether the representations were false.

176.    The Defendants made the materially misleading statements and omissions with the intent that Pittsburgh FHLB rely on the statements and for the purpose of inducing Pittsburgh FHLB to buy and retain the Certificates.

177.    The Defendants owed investors, including Pittsburgh FHLB, a duty to disclose all material information, including adverse information, about the Certificates, given Countrywide's knowledge that Pittsburgh FHLB and other investors would depend on the information in the Offering Documents in making their investment decisions.

### (i)    The Offering Documents Contained Material Misrepresentations and Omissions Regarding Underwriting Standards.

178.    The Offering Documents contained materially false and misleading information and/or contained material omissions with respect to underwriting standards.

179.    Defendants omitted from its disclosures that the originators were not following their own underwriting standards and that "exceptions" to the guidelines became the rule.

180.    For example, a June 2009 complaint filed by the Securities and Exchange Commission ("SEC") revealed that Countrywide was aware internally that its own underwriting guidelines were being ignored and that borrowers were lying about their income in the reduced-documentation application process.

181.    In an April 13, 2006 email, Countrywide's former Chairman of the Board and Chief Executive Officer, Angelo Mozilo, wrote other top Countrywide executives identifying

that Countrywide was originating home mortgage loans "through our channels with disregard for process [and] compliance with guidelines."

182.    Mozilo stated that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

183.    Similarly, according to the SEC, the poor quality of the loans originated through Countrywide's exception process became even more obvious in the first quarter of 2007, just as the Defendants were offering and selling KAB7 and MAA7, and before they offered and sold QAJ6 to Pittsburgh FHLB.

184.    In documents distributed at a March 12, 2007 meeting of Countrywide's credit risk committee, Countrywide's Risk Management group reported that almost 12% of the loans Countrywide reviewed in an internal quality control process were rated "severely unsatisfactory" or "high risk."

185.    According to the SEC, the causes for those low ratings were debt to income ratios, loan to value ratios, or FICO scores outside of Countrywide's underwriting guidelines.

186.    Similarly, by the second quarter of 2007, before the Defendants offered and sold QAJ6, Countrywide's Risk Management Group began to report a serious deterioration in the performance of exception loans.

187.    In a December 13, 2007 internal Countrywide memorandum, a Countrywide risk assessment officer noted that Countrywide was not adequately assessing borrower repayment capacity:

> Countrywide had reviewed limited samples of first- and second-trust deed mortgages originated by Countrywide Bank during the fourth quarter of 2006 and the first quarter of 2007 in order to get a sense of the quality of file documentation and underwriting practices, and to assess compliance

27

with internal policies and procedures.  The review resulted in . . . the finding that borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity loans.  More specifically, debt-to-income (DTI) ratios did not consider the impact of principal [negative] amortization or an increase in interest.

188.    Defendants did not disclose any of the material facts described in paragraphs 179-87 to Pittsburgh FHLB.

189.    At the same time, Countrywide officials made public statements to investors that misrepresented the internal information known by the same individuals.

190.    For example, according to the SEC, on September 13, 2006, at a Fixed Income Investor Forum, Countrywide's founder and then chairman and CEO, Mozilo, stated that Countrywide was a "role model to others in terms of responsible lending."

191.    Similarly, according to the SEC, in a March 13, 2007 interview with Maria Bartiromo on CNBC, Mozilo stated that it would be a "mistake" to compare monoline subprime lenders to Countrywide and that the subprime market disruption in the first quarter of 2007 would "be great for Countrywide at the end of the day because all of the irrational competitors will be gone."

192.    According to the SEC, neither Mozilo nor other Countrywide executives revealed the true state of Countrywide's underwriting practices or financial situation to investors.

193.    Indeed, Pittsburgh FHLB was unaware that Countrywide was not following the standards it disclosed in the prospectuses and prospectus supplements.

194.    The loans originated by American Home were also not made according to reasonable underwriting standards.

195.     On information and belief, but unknown to Pittsburgh FHLB at the time, American Home permitted numerous "exceptions" to its underwriting standards so that loans could be closed.

196.     On information and belief, but unknown to Pittsburgh FHLB at the time, a former American Home employee stated that exceptions to underwriting guidelines were made "all the time."

197.     On information and belief, but unknown to Pittsburgh FHLB at the time, before the Defendants offered and sold the bonds to Pittsburgh FHLB, an October 2005 Credit Update presentation stated that American Home's number one policy statement guideline was to "obtain the least amount of documentation."

198.     On information and belief, the same update also addressed the exceptions process and the need to "enhance our exception process."

199.     Similarly, on information and belief, American Home placed restrictions on the due diligence that purchasers could conduct on the loans they sought to purchase.

200.     On information and belief, but unknown to Pittsburgh FHLB at the time, by late 2006, other banks had stopped buying loans from American Home due to the delinquency rates they were seeing in mid-2006.  By late 2006, Washington Mutual had stopped buying loans from American Home, and Wells Fargo rejected blocks of American Home loans.

201.     Overall, Pittsburgh FHLB was not aware at the time of its purchases of the bonds at issue that the originators of the loans had departed from underwriting guidelines described in the Offering Documents.

81040543. 1

202.   However, the default rates that are now evident in the mortgage pools backing the bonds at issue indicate that the failures by the originators did in fact impact the loans in these mortgage pools.

### (ii)   The Defendants Materially Misrepresented the Risk Associated with the Certificates Based on the Ratings Given to Each Certificate.

203.   The Offering Documents contained materially false and misleading information and/or contained material omissions with respect to the ratings of each Certificate.

204.   The Defendants misrepresented that the AAA ratings were an accurate reflection of the credit quality of the bonds.  The Defendants did not reasonably or genuinely believe that the bonds were AAA-quality.  The AAA ratings were without basis in fact.

205.   The Defendants misrepresented that they had sufficient reliable information to rate the bonds and failed to state that they did not have sufficient reliable information to rate the bonds.

206.   The Defendants misrepresented that the ratings addressed the likelihood of investors receiving the payments they expected on the bonds because without sufficient reliable information to rate the bonds they were incapable of making a reasonable assessment of the likelihood of payment.

207.   The Defendants knew these representations were false and misleading or were reckless in not knowing that these statements were false and misleading.

208.   The Defendants knew that loans were being made without full documentation, and that contrary to the represented underwriting standards, compensating factors justifying less than full documentation did not exist.

81040543. 1

209.   The Defendants knew that fraud (by either the borrower, the loan broker, or the loan originator) was increasing, and that without complete and accurate information about the borrower and the loan characteristics their predictive modeling was useless.

210.   As a result, the Defendants knew or were reckless in not knowing that they were incapable of addressing the likelihood that the holders of the certificates would receive the payments they expected, and further failed to reveal that the rating models were unable to properly examine the relevant and necessary factors for rating certificates.

211.   It is now apparent that the predictive modeling used by the Rating Agencies was inadequate to assess the risk of default of the loans in the mortgage pools at issue and that the Defendants knew or should have known of those inadequacies.

212.   Moreover, since the Rating Agencies' predictive modeling was inadequate, Defendants knew or should have known that the level of credit enhancement necessary to give a tranche AAA quality was either inadequate or unknowable.

213.   The inadequacy of the Rating Agencies' predictive models is reflected not only in the downgrades of the bonds at issue here, but also in the number of recent downgrades of other residential MBS.

214.   In 2008, Fitch downgraded 17.9% of all AAA-rated residential MBS compared to an average of 2.8% for the 1991-2007 period.

215.   The downgrades in 2008 were predominantly for bonds issued in 2006 and 2007.

216.   The models used by the Rating Agencies were particularly unable to predict the performance of no documentation or low documentation loans.

81040543. 1

217.   For the bonds at issue, the percentage of underlying loans acquired or originated under low or no documentation programs ranged from 42.48% to as high as 65.48% of the aggregate principal balance outstanding.

218.   None of the Defendants disclosed to Pittsburgh FHLB that they were unable to predict defaults of loans made under low or no documentation programs.

219.   The failure of the Rating Agencies' predictive models cannot be explained by changes in housing prices that were unforeseen or unexpected.

220.   Empirical studies, the results of which have only recently been available, show that ratings did not fully incorporate information on mortgage risk factors that were part of the set of information available to the Rating Agencies at the time of the deal.

221.   In addition, Fitch has admitted that the Alt-A collateral performance is reflective of borrowers who purchased a home they could not afford (a failure on the part of originators to adhere to underwriting standards) or those who engaged in mortgage fraud for the purpose of property speculation (which the no documentation or low documentation programs would fail to detect).

**(iii)   The So-Called Risk Factors Were Misleading.**

222.   The Offering Documents contained materially false and misleading information and/or contained material omissions with respect to the risk factors associated with the Certificates.

223.   Defendants made general statements in the 2006 Offering Documents concerning certain "Risk Factors," but these statements did not disclose or otherwise correct the false and materially misleading information contained in the Offering Documents regarding the underwriting process and standards supposedly adhered to by loan originators, the quality of the underlying loans, and the adequacy of the Rating Agencies' predictive modeling to assess the

32

risk of default and determine the proper level of credit enhancement. (Exhibit 3 at S-22 to S-29; Exhibit 5 at S-17 to S-24.)

224.   For instance, although the Offering Documents made the general statement that credit enhancement may not be sufficient to protect the senior certificates from losses, this disclosure did not indicate that the Rating Agencies would not be conducting or were not able to conduct an adequate analysis of the underlying loans and underwriting process and did not have sufficient reliable information to provide an AAA rating.

225.   This disclosure also did not indicate that the Defendants did not genuinely or reasonably believe that the AAA rating for the bonds purchased by Pittsburgh FHLB was appropriate, or that the Defendants were rating the bonds purchased by Pittsburgh FHLB as AAA even though they did not have a reasonable factual basis to support that rating.

226.   Pittsburgh FHLB is not in the business of performing the predictive modeling conducted by Countrywide and the Rating Agencies.

227.   Pittsburgh FHLB does not receive loan-by-loan detail on the underwriting characteristics of each loan, nor does it maintain a database of historical performance that can be used to predict the probability of default of any particular loan.

228.   Instead, Pittsburgh FHLB is provided with aggregate data about the characteristics of the loans in the pool(s).

229.   For example, Pittsburgh FHLB is provided data about the location of the borrowers, the range of FICO scores, and the range of LTVs, but it is not told whether a particular loan that was originated in California was also made to a borrower with a FICO score of 610 or 750, or whether the LTV on that particular loan was 60% or 85%.

81040543. 1

230.   All of the information, however, described in the preceding paragraph was available to Countrywide and the Rating Agencies.

231.   Therefore, Pittsburgh FHLB necessarily relies on the Defendants to assess and rate the risk of the bonds offered for investment.

232.   When the Defendants assigned the Certificates the highest rating possible, they indicated that the bonds were of the highest quality and with virtually no risk of default.

233.   If the risk factors set forth in the Offering Documents were intended to inform Pittsburgh FHLB that it should not believe that the rating was provided in good faith, then the risk factor disclosures were misleading.

234.   Under the general heading, "Your Yield May Be Affected By The Interest-Only Feature Of Some Of The Mortgage Loans," the Defendants noted that "[i]nterest only loans have only recently been originated in significant volumes.  As a result, the long-term performance characteristics of interest only loans are largely unknown." (Exhibit 3 at S-23; Exhibit 5 at S-18; Exhibit 7 at S-24; Exhibit 9 at S-37; Exhibit 13 at S-20.)

235.   But each of the Defendants also assigned the highest rating of AAA to the Certificates purchased by Pittsburgh FHLB.

236.   By rating the Certificates, the Rating Agencies were representing that the long-term performance characteristics of interest-only loans were known to them, or could reasonably be predicted, or that the lack of information about interest-only loans was not material to their ratings.

237.   By including the ratings in the Offering Documents, Countrywide was representing the same.

81040543. 1

238.    In the 2007 Offering Documents, Defendants disclosed some of the same "Risk

Factors" and inserted some additional risk factors for MAA7 and QAJ6, including a recognition

of recent developments in the subprime residential mortgage market.  (Exhibit 7 at S-24 to S-S-

31; Exhibit 9 at S-36 to S-49; Exhibit 13 at S-19 to S-26.)

239.    Despite the information about recent developments in the subprime mortgage

market described in paragraph 238, Defendants still assigned the Certificates purchased by

Pittsburgh FHLB the highest rating possible, AAA, indicating that these MBS were of the

highest quality with virtually no risk of default.

240.    For QAJ6 only, Defendants noted the increase in delinquencies for earlier

securitizations sponsored by Countrywide Home Loans and directed Pittsburgh FHLB to the

"Static Pool Data" section in the prospectus supplement.  (Exhibit 13 at S-26.)

241.    But the "Static Pool Data" section expressly provides that the static pool data is

not part of the Offering Documents, "the characteristics of the mortgage loans in those

securitized pools differ from the characteristics of the issuing entity's mortgage loans," and these

differences "make it unlikely that the issuing entity's mortgage loans will perform in the same

way that any of those pools have performed."  (Exhibit 13 at S-42.)

242.    The "Risk Factor" described in paragraph 240 therefore did not really disclose

anything to Pittsburgh FHLB.

243.    The risk factors statements described in paragraphs 223-40 created the misleading

impression that the Defendants were disclosing all material risk factors to Pittsburgh FHLB, but

these risk factor statements did not disclose the Defendants' material misrepresentations about

the underwriting standards actually used in making the mortgage loans and about the real credit

quality of the AAA-rated tranches.

### G.   The Impact on Pittsburgh FHLB

244.    Pittsburgh FHLB justifiably relied on each of the Defendants' materially misleading statements and omissions in the Offering Documents and ratings because these misleading statements and omissions were among the only information available to Pittsburgh FHLB, were central to Pittsburgh FHLB's investment decisions, and Pittsburgh FHLB based its investment decisions on these misleading statements and omissions.

245.    The Offering Documents and statements contained therein, and the ratings, indicated the amount of risk associated with the Certificates, as well as the likelihood of expected return on the investment associated with the Certificates.

246.    The Certificates would have been unmarketable and would not have issued but for the Defendants' false and misleading representations and omissions.

247.    Indeed, Pittsburgh FHLB would not have even been able to purchase the Certificates with a lower rating than those given to the Certificates.

248.    The misrepresentations and omissions of material fact made by the Defendants have had a substantial impact on Pittsburgh FHLB.

249.    All of the bonds that Pittsburgh FHLB purchased from Countrywide at issue here have been significantly downgraded from their initial AAA rating.

250.    In fact, according to Fitch, AC5, EAC1, KAB7, and MAA7 all have a CC rating, which indicates that the likelihood of full payment on the bonds is extremely speculative.

251.    S&P has downgraded all the bonds to CCC, which means that the bonds are expected to experience a principal shortfall within twelve months.

252.    Moody's has downgraded EAC1 and QAJ6 to Caa1 and downgraded KAB7 and MAA7 to Caa2.

81040543. 1

253.    For AC5, EAC1, KAB7, and MAA7, Fitch has reported the "bond break loss," which is Fitch's determination of the percentage of remaining principal balances that can be charged off to junior tranches before the bonds begin to incur losses.

254.    Fitch has also reported the estimated current loss for each bond.

255.    For example, Fitch estimates the "bond break loss" of AC4 as 4.07% and estimates the total current loss at 15.70%, which means that the coverage ratio (estimated current loss divided by bond break loss) is 0.26.

256.    Any coverage ratio less than 1.00 means that the bond will incur losses.

257.    Fitch has also projected the defaults on remaining mortgages in the pools supporting the bonds.

258.    The information reported by Fitch, as of August 6, 2009, is summarized below:

| Bond | Rating | Coverage Ratio | Projected Default on Remaining Mortgages |
|------|--------|----------------|------------------------------------------|
| AC5 | CC | 0.26 | 29% |
| EAC1 | CC | 0.39 | 34% |
| KAB7 | CC | 0.33 | 48% |
| MAA7 | CC | 0.32 | 54% |

259.    As reflected by the coverage ratio (estimated current loss divided by bond break loss), which is less than 1.00 in all instances, each of these bonds will incur losses.

260.    In light of the estimates described in paragraphs 253-59, each of the bonds is currently trading well below its par value.

261.    The current price of the bonds as a percentage of par is set forth below:

| AC5 | 58% |
|-----|-----|

37

| EAC1 | 69% |
|------|-----|
| KAB7 | 59% |
| MAA7 | 62% |
| QAJ6 | 68% |

262.    As a result, beginning in the fourth quarter of 2008 and continuing through its most recent reporting period, Pittsburgh FHLB has reported an OTTI adjustment on all of these bonds and, as of June 30, 2009, reported a cumulative credit loss in excess of $9 million and Other Comprehensive Income losses over $100 million.

263.    In addition to the substantial financial losses that Pittsburgh FHLB has experienced and will experience, the Defendants' conduct has also affected the members of Pittsburgh FHLB and their communities.

264.    As mentioned in paragraph 38, because of the conduct of the Defendants (and others), Pittsburgh FHLB announced in late December 2008 that it was suspending its dividends to its members.

265.    Shortly after late December 2008, Pittsburgh FHLB also announced that it was dramatically reducing its funding of its charitable program which provides assistance with closing costs and down payments for certain first-time home buyers.

### Count I – Fraud
### (Defendants Countrywide)

266.    For this claim against Defendants Countrywide, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

267.    Pittsburgh FHLB alleges common law fraud against Countrywide regarding AC5, EAC1, KAB7, MAA7, and QAJ6.

81040543. 1

268.    Countrywide made materially false and misleading representations and omissions concerning information in the Certificates' Offering Documents and concerning the ratings of the Certificates, as set forth with particularity in paragraphs 136-72, 222-43.

269.    These materially false and misleading statements were communicated to, and relied on by, Pittsburgh FHLB.

270.    Countrywide made the false representations and omissions either knowing of their falsity or with recklessness as to whether the representations were false.

271.    Countrywide and the Rating Agencies worked together to structure the tranches and assign them credit ratings.

272.    Countrywide obtained the ratings for the Certificates from the Rating Agencies and then provided the misleading AAA credit ratings to Pittsburgh FHLB, with the Rating Agencies' knowledge, participation, and approval.

273.    Countrywide had the motive and opportunity to commit fraud.

274.    Countrywide earned its fees by selling the MBS.

275.    Countrywide knew that Pittsburgh FHLB would buy only AAA-rated MBS.

276.    In fact, the AAA rating was a condition precedent to the offering of the Certificates.

277.    Consequently, Countrywide needed the Rating Agencies to assign the AAA credit rating to the tranches in order to sell the Certificates to Pittsburgh FHLB, thereby allowing Countrywide to receive its fees.

278.    Countrywide exerted its influence over the Rating Agencies and the issuance of the ratings.

279.    Countrywide then distributed to Pittsburgh FHLB the Offering Documents containing the false and misleading ratings and orally communicated the same to Pittsburgh FHLB.

280.    Countrywide made the materially misleading statements and omissions with the intent that Pittsburgh FHLB rely on the statements and for the purpose of inducing Pittsburgh FHLB to buy and retain the Certificates.

281.    Pittsburgh FHLB justifiably relied on Countrywide's materially misleading statements and omissions in the Offering Documents and ratings because they went to the core of Pittsburgh FHLB's investment decision regarding the Certificates.

282.    Pittsburgh FHLB has suffered damages.

283.    Pittsburgh FHLB's damages are the proximate result of Countrywide's fraudulent conduct, misrepresentations and omissions in an amount to be determined at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Countrywide jointly and severally for all damages sustained as a result of Countrywide's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count II – Fraud
### (Defendants Moody's)

284.    For this claim against Defendant Moody's, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

81040543. 1

285.    Pittsburgh FHLB alleges common law fraud against Moody's regarding EAC1, KAB7, MAA7, and QAJ6.

286.    Moody's worked with Countrywide to structure the tranches and assign them credit ratings.

287.    AAA ratings for the Certificate were obtained directly from Moody's and were then provided to Pittsburgh FHLB, with Moody's knowledge, participation, and approval.

288.    By providing a rating on the bond, Moody's represented that it had sufficient reliable facts to provide a rating.

289.    Moody's omitted to state that it did not have sufficient reliable facts to provide the ratings.

290.    Even as opinions, the ratings were fraudulent because Moody's did not genuinely or reasonably believe the ratings, and/or the ratings were without basis in fact.

291.    Moody's also approved the disclosure in the Offering Documents, as set forth in paragraph 172, that the ratings addressed the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificate.

292.    This representation was false and misleading because Moody's lacked sufficient reliable information to reasonably or genuinely assess the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

293.    As alleged in paragraphs 203-20, Moody's knew or was reckless in not knowing that it lacked sufficient reliable information to assess the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificate.

294.    Moody's had the motive and opportunity to commit fraud.

81040543. 1

295.    Moody's sought Countrywide's business because it received higher-than-usual fees for rating MBS and other structured financial products.

296.    Moody's knew that Pittsburgh FHLB would buy only AAA-rated MBS.

297.    In fact, the AAA rating was a condition precedent to the offering of the Certificates.

298.    Moody's further knew that if it did not offer an AAA rating, Countrywide would take its business elsewhere.

299.    Pittsburgh FHLB justifiably relied on Moody's materially misleading representations and omissions as they went to the core of its investment decision regarding the Certificate.

300.    Pittsburgh FHLB was damaged by its reliance on Moody's misrepresentations and omission of material facts.

301.    Pittsburgh FHLB's injury was the proximate result of Moody's fraudulent conduct, misrepresentations and omissions in an amount to be determined at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Moody's for all damages sustained as a result of Moody's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

81040543. 1

## Count III – Fraud
## (Defendant S&P)

302.   For this claim against Defendant S&P, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

303.   Pittsburgh FHLB alleges common law fraud against S&P regarding AC5, EAC1, KAB7, MAA7, and QAJ6.

304.   S&P worked with Countrywide to structure the tranches and assign them credit ratings.

305.   AAA ratings for the Certificates were obtained directly from S&P and were then provided to Pittsburgh FHLB, with S&P's knowledge, participation, and approval.

306.   By providing a rating on the bonds, S&P represented that it had sufficient reliable facts to provide a rating.

307.   S&P omitted to state that it did not have sufficient reliable facts to provide the ratings.

308.   Even as opinions, the ratings were fraudulent because S&P did not genuinely or reasonably believe the ratings, and/or the ratings were without basis in fact.

309.   S&P also approved the disclosure in the Offering Documents, as set forth in paragraph 172, that the ratings addressed the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

310.   This representation was false and misleading because S&P lacked sufficient reliable information to reasonably or genuinely assess the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

43

81040543. 1

311.  As alleged in paragraphs 203-20, S&P knew or was reckless in not knowing that it lacked sufficient reliable information to assess the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

312.  S&P had the motive and opportunity to commit fraud.

313.  S&P sought Countrywide's business because it received higher-than-usual fees for rating MBS and other structured financial products.

314.  S&P knew that Pittsburgh FHLB would buy only AAA-rated MBS.

315.  In fact, the AAA rating was a condition precedent to the offering of the Certificates.

316.  S&P further knew that if it did not offer an AAA rating, Countrywide would take its business elsewhere.

317.  Pittsburgh FHLB justifiably relied on S&P's materially misleading representations and omissions as they went to the core of its investment decision regarding the Certificates.

318.  Pittsburgh FHLB was damaged by its reliance on S&P's misrepresentations and omission of material facts.

319.  Pittsburgh FHLB's injury was the proximate result of S&P's fraudulent conduct, misrepresentations and omissions in an amount to be determined at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against S&P for all damages sustained as a result of S&P's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

81040543. 1

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count IV – Fraud
### (Defendant Fitch)

320.    For this claim against Defendant Fitch, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

321.    Pittsburgh FHLB alleges common law fraud against Fitch regarding AC5, EAC1, KAB7, and MAA7.

322.    Fitch worked with Countrywide to structure the tranches and assign them credit ratings.

323.    AAA ratings for the Certificates were obtained directly from Fitch and were then provided to Pittsburgh FHLB, with Fitch's knowledge, participation, and approval.

324.    By providing a rating on the bonds, Fitch represented that it had sufficient reliable facts to provide a rating.

325.    Fitch omitted to state that it did not have sufficient reliable facts to provide the ratings.

326.    Even as opinions, the ratings were fraudulent because Fitch did not genuinely or reasonably believe the ratings, and/or the ratings were without basis in fact.

327.    Fitch also approved the disclosure in the Offering Documents, as set forth in paragraph 172, that the ratings addressed the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

328.    This representation was false and misleading because Fitch lacked sufficient reliable information to reasonably or genuinely assess the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

329.     As alleged in paragraphs 203-21, Fitch knew or was reckless in not knowing that it lacked sufficient reliable information to assess the likelihood that Pittsburgh FHLB would receive the payments it expected under the terms of the Certificates.

330.     Fitch had the motive and opportunity to commit fraud.

331.     Fitch sought Countrywide's business because it received higher-than-usual fees for rating MBS and other structured financial products.

332.     Fitch knew that Pittsburgh FHLB would buy only AAA-rated MBS.

333.     In fact, the AAA rating was a condition precedent to the offering of the Certificates.

334.     Fitch further knew that if it did not offer an AAA rating, Countrywide would take its business elsewhere.

335.     Pittsburgh FHLB justifiably relied on Fitch's materially misleading representations and omissions as they went to the core of its investment decision regarding the Certificates.

336.     Pittsburgh FHLB was damaged by its reliance on Fitch's misrepresentations and omission of material facts.

337.     Pittsburgh FHLB's injury was the proximate result of Fitch's fraudulent conduct, misrepresentations and omissions in an amount to be determined at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

•   Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Fitch for all damages sustained as a result of Fitch's wrongdoing, in an amount to be proven at trial, including interest thereon;

•   Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count V – Negligent Misrepresentation
### (Defendants Countrywide)

338.   For this claim against Defendants Countrywide, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

339.   Pittsburgh FHLB alleges negligent misrepresentation against Countrywide regarding AC5, EAC1, KAB7, MAA7, and QAJ6.

340.   Countrywide made materially false and misleading representations and omissions in the Certificates' Offering Documents concerning the underwriting guidelines and concerning the credit quality of the Certificates, as set forth with particularity in paragraphs 136-72, 222-43.

341.   These false and misleading representations and omissions were communicated to, and relied on by, Pittsburgh FHLB.

342.   Countrywide made false and misleading representations in the course of their business as issuers of Certificates and had a pecuniary interest therein.

343.   Countrywide had a duty to conduct a reasonable investigation of the truthfulness of their representations as the information presented concerned the quality of the Certificates.

344.   It was foreseeable to Countrywide that Pittsburgh FHLB, one of the investors, would rely on the information concerning the quality of the Certificates presented by them and the ratings assigned by the Rating Agencies.  The ratings were distributed to a limited audience of institutional investors for the purpose of demonstrating a likelihood of default and/or loss.

345.   Countrywide knew at all times of Pittsburgh FHLB to whom the false and misleading credit ratings would be communicated.

81040543. 1

346.   The credit ratings were solicited and paid for by Countrywide so that Countrywide could offer the Certificates for investment to Pittsburgh FHLB.

347.   The ratings were not offered gratuitously or as a report for a general interest publication.

348.   The ratings on the bonds were not a matter of public interest or concern.

349.   Countrywide understood that the potential investors who would rely on the ratings were a limited number of institutional investors with specific requirements regarding investing only in AAA-rated bonds.

350.   Countrywide knew at all times that Pittsburgh FHLB to whom the false and misleading credit ratings and underwriting standards were communicated, would and did rely on their misrepresentations and omissions, as pled with particularity above.

351.   Pittsburgh FHLB justifiably relied on Countrywide's materially misleading statements and omissions in the Offering Documents and ratings as pled above.

352.   Pittsburgh FHLB suffered injury by acting in justifiable reliance on the misrepresentations and omissions contained in the Offering Documents in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Countrywide, jointly and severally, for all damages sustained as a result of Countrywide's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count VI – Negligent Misrepresentation
### (Defendants Moody's)

353.    For this claim against Moody's, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

354.    Pittsburgh FHLB alleges negligent misrepresentation against Moody's regarding EAC1, KAB7, MAA7, and QAJ6.

355.    Moody's assigned materially false and misleading credit ratings to the Certificate.

356.    This false and misleading information was communicated to, and relied on by, Pittsburgh FHLB.

357.    Moody's made materially false and misleading misrepresentations and omissions concerning the meaning of their ratings and what they purported to measure, which were communicated to Pittsburgh FHLB, as alleged with particularity in paragraphs 170-72, 203-20.

358.    Moody's made false and misleading representations in the course of their business as raters of Certificates and had a pecuniary interest therein.

359.    Moody's had an incentive to ensure that the investments offered in the Certificates received AAA ratings in that Moody's received higher compensation for rating structured investment products and if the bonds had not been rated AAA, Moody's would not have been paid.

360.    Moody's held special expertise in their ability to rate the Certificates and had a duty to conduct a reasonable investigation of the truthfulness of their representations regarding the credit ratings assigned to the Certificates.

81040543. 1

361.  It was foreseeable to Moody's that Pittsburgh FHLB, one of the investors, would rely on the information concerning the credit quality of the Certificates and the ratings assigned by Moody's, as the ratings were distributed to a limited audience of institutional investors for the purpose of demonstrating a likelihood of default and/or loss.

362.  The credit ratings were solicited and paid for by Countrywide so that Countrywide could offer the Certificates for investment to Pittsburgh FHLB.

363.  The ratings were not offered gratuitously or as a report for a general interest publication.

364.  The ratings on the bonds were not a matter of public interest or concern.

365.  Moody's understood that the potential investors who would rely on the ratings were a limited number of institutional investors with specific requirements that restricted them from investing in anything but AAA-rated bonds.

366.  Moody's knew at all times that Pittsburgh FHLB to whom the false and misleading credit ratings and underwriting standards were communicated, would and did rely on their misrepresentations and omissions, as alleged with particularity above.

367.  Pittsburgh FHLB justifiably relied on Moody's materially misleading statements and omissions, as pled with particularity above.

368.  Pittsburgh FHLB suffered injury by acting in justifiable reliance on the misrepresentations and omissions of Moody's in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against Moody's for all damages sustained as a result of Moody's wrongdoing, in an amount to be proven at trial, including interest thereon;

81040543. 1