beneficial owner of the Note is a foreign person and providing the non-U.S. person's name and address. If a Note is held through a securities clearing organization or certain other financial institutions, the organization or institution may provide the relevant signed statement to the withholding agent; in that case, however, the signed statement must be accompanied by an IRS Form W-8BEN or substitute form provided by the non-U.S. Person that owns that interest in the Note. If the interest does not constitute portfolio interest, then it will be subject to U.S. federal income and withholding tax at a rate of 30%, unless reduced or eliminated pursuant to an applicable income tax treaty and the non-U.S. Person provides the issuing entity, or an organization or financial institution described above, with an appropriate statement (for example, an IRS Form W-8BEN), signed under penalties of perjury, to that effect.

If the interests of the beneficial owners of the Notes were deemed to be partnership interests, the partnership would be required, on a quarterly basis, to pay withholding tax equal to the product, for each foreign partner, of the foreign partner's distributive share of "effectively connected" income of the partnership multiplied by the highest rate of tax applicable to that foreign partner. In addition, a corporate foreign partner would be subject to branch profits tax. Each non-foreign partner would be required to certify to the partnership that it is not a foreign person. The tax withheld from each foreign partner would be credited against the foreign partner's U.S. income tax liability.

In addition, if the interests of the beneficial owners of the Notes were deemed to be partnership interests, the amounts distributed on such deemed partnership interests could be subject to a 30% withholding tax (or lower income tax treaty rate) either because the interest on the underlying mortgage loans does not appear to satisfy the requirements to be treated as "portfolio interest" under the Code, or because, even if the interest on the underlying mortgage loans were to be treated as portfolio interest, amounts distributed on such deemed partnership interests could be treated as "guaranteed payments" within the meaning of the partnership provisions of the Code.

If the issuing entity were taxable as a corporation, payments to foreign persons, to the extent treated as dividends, would generally be subject to withholding at the rate of 30%, unless the rate were reduced by an applicable income tax treaty. See "Material Federal Income Tax Consequences--Tax Treatment of Foreign Investors" in the prospectus.

Backup Withholding

Certain beneficial owners of the Notes may be subject to backup withholding with respect to interest paid on the Notes if the Note owner, upon acquisition, fails to supply the Indenture Trustee or broker with the taxpayer's identification number, furnishes an incorrect taxpayer identification number, fails to report interest, dividends, or other "reportable payments" (as defined in the Code) properly, or, under certain circumstances, fails to provide the Indenture Trustee or broker with a certified statement, under penalties of perjury, that the taxpayer is not subject to backup withholding.

The Indenture Trustee will be required to report annually to the IRS, and to each noteholder of record, the amount of interest paid (and OID accrued, if any) on the Notes (and the amount of interest withheld for U.S. federal

S-133

<PAGE>

income taxes, if any) for each calendar year, except as to exempt holders
(generally, holders that are corporations, certain tax-exempt organizations,
or nonresident aliens who provide certification of their status as
nonresidents). As long as the only "noteholder" of record is Cede & Co., as
nominee for DTC, beneficial owners of the Notes and the IRS will receive tax
and other information (including the amount of interest paid on the Notes
owned) from participants, and indirect participants rather than from the
Indenture Trustee. (The Indenture Trustee, however, will respond to requests
for necessary information to enable participants, indirect participants and
certain other persons to complete their reports.) Each non-exempt Note owner
who is a U.S. individual (including a resident alien) will be required to
provide, under penalties of perjury, an IRS Form W-9 containing his or her
name, address, correct federal taxpayer identification number, and a statement
that he or she is not subject to backup withholding. Should a nonexempt Note
owner fail to provide the required certification, the participants or indirect
participants (or the paying agent) will be required to withhold a portion of
the interest (and principal) otherwise payable to the holder, and remit the
withheld amount to the IRS as a credit against the holder's federal income tax
liability.

OTHER TAXES

    The depositor makes no representations regarding the state, local, or
foreign tax consequences of the purchase, ownership, or disposition of the
Notes. All investors are encouraged to consult their tax advisors regarding
the federal, state, local, or foreign income tax consequences of the purchase,
ownership, and disposition of the Notes.

ERISA CONSIDERATIONS

    Fiduciaries of employee benefit plans and certain other retirement plans
and arrangements that are subject to the Employee Retirement Income Security
Act of 1974, as amended ("ERISA") or corresponding provisions of the Code
(including individual retirement accounts and annuities, Keogh plans, and
collective investment funds in which the plans, accounts, annuities, or
arrangements are invested), persons acting on behalf of a plan, and persons
using the assets of a plan, should review carefully with their legal advisors
whether the purchase or holding of the notes could either give rise to a
transaction that is prohibited under ERISA or the Code or cause the collateral
securing the notes to be treated as plan assets for purposes of regulations of
the Department of Labor in 29 C.F.R. ss.2510.3-101 (the "Plan Assets
Regulation").

    General. Section 406 of ERISA and Section 4975 of the Code prohibit
parties in interest or disqualified persons with respect to a plan from
engaging in certain transactions (including loans) involving the plan and its
assets unless a statutory, regulatory, or administrative exemption applies to
the transaction. Section 4975 of the Code imposes certain excise taxes (or, in
some cases, a civil penalty may be assessed pursuant to Section 502(i) of
ERISA) on parties in interest or disqualified persons which engage in
non-exempt prohibited transactions.

    Plan Assets Regulation and the Notes. The United States Department of
Labor has issued the Plan Assets Regulation concerning the definition of what
constitutes the assets of a plan for purposes of ERISA and the prohibited
transaction provisions of the Code. The Plan Assets Regulation describes the
circumstances under which the assets of an entity in which a plan invests will

be considered to be "plan assets" so that any person who exercises control over the assets would be subject to ERISA's fiduciary standards. Under the Plan Assets Regulation, generally, when a plan invests in another entity, the plan's assets do not include, solely by reason of the investment, any of the underlying assets of the entity. However, the Plan Assets Regulation provides that, if a plan acquires an "equity interest" in an entity, the assets of the entity will be treated as assets of the plan investor unless certain exceptions not applicable here apply.

Under the Plan Assets Regulation, the term "equity interest" is defined as any interest in an entity other than an instrument that is treated as indebtedness under "applicable local law" and which has no "substantial equity features." If the Offered Notes are not treated as equity interests in the issuing entity for purposes of the Plan Assets Regulation, a plan's investment in the Offered Notes would not cause the assets of the issuing entity to be deemed plan assets. If the Offered Notes are deemed to be equity interests in the issuing entity, the issuing entity could be considered to hold plan assets because of a plan's investment in the Offered Notes. In that event, the Master Servicer and other persons exercising management or discretionary control over the assets of the issuing entity or providing services with respect to those assets would be deemed to be fiduciaries or other parties in interest with respect to investing plans and thus subject to the prohibited transaction provisions of Section 406 of ERISA and Section 4975

S-134

<PAGE>

of the Code and, in the case of fiduciaries, to the fiduciary responsibility provisions of Title I of ERISA, with respect to transactions involving the issuing entity's assets. We cannot assure you that any statutory, regulatory, or administrative exemption will apply to all prohibited transactions that might arise in connection with the purchase or holding of an equity interest in the issuing entity by a plan. However, based on the features of the Offered Notes, their ratings, and the opinion of Tax Counsel that they will be treated as indebtedness for federal income tax purposes, the issuing entity believes that the Offered Notes should be treated as indebtedness without substantial equity features for ERISA purposes.

Prohibited Transactions. Without regard to whether the Offered Notes are considered to be equity interests in the issuing entity, certain affiliates of the issuing entity might be considered or might become parties in interest or disqualified persons with respect to a plan. In this case, the acquisition and holding of Offered Notes by or on behalf of the plan could be considered to give rise to a prohibited transaction within the meaning of ERISA and the Code, unless they were subject to one or more exemptions such as Prohibited Transaction Class Exemption ("PTCE") 84-14, which exempts certain transactions effected on behalf of a plan by a "qualified professional asset manager"; PTCE 90-1, which exempts certain transactions involving insurance company pooled separate accounts; PTCE 91-38, which exempts certain transactions involving bank collective investment funds; PTCE 95-60, which exempts certain transactions involving insurance company general accounts; or PTCE 96-23, which exempts certain transactions effected on behalf of a plan by certain "in-house asset managers." Each purchaser or transferee of a Offered Note that is a plan investor shall be deemed to have represented that the relevant conditions for exemptive relief under at least one of the foregoing exemptions or a similar exemption have been satisfied. Prospective transferees and purchasers should consider that a prohibited transaction exemption may not apply to all prohibited transactions that may arise in connection with a plan's investment in the Offered Notes.

The issuing entity, the Master Servicer, [a servicer], the Indenture Trustee and the Underwriters of the Offered Notes may be the sponsor of or investment advisor with respect to one or more plans. Because they may receive certain benefits in connection with the sale of the Offered Notes, the purchase of Offered Notes using plan assets over which any of them has investment authority might be deemed to be a violation of the prohibited transaction rules of ERISA and the Code for which no exemption may be available. Accordingly, any plan for which the issuing entity, the Master Servicer, [a servicer], the Indenture Trustee and the Underwriters of the Offered Notes, or any of their respective affiliates:

o.....has investment or administrative discretion with respect to plan assets;

o       has authority or responsibility to give, or regularly gives, investment advice with respect to plan assets, for a fee and pursuant to an agreement or understanding that the advice (i) will serve as a primary basis for investment decisions with respect to plan assets, and (ii) will be based on the particular investment needs for the plan; or

o       is an employer maintaining or contributing to the plan,

are encouraged to discuss with counsel whether an investment in the Offered Notes by the plan may give rise to a violation of ERISA.

  The sale of Offered Notes to a plan is in no respect a representation by the issuing entity or any Underwriter of the Offered Notes that this investment meets all relevant legal requirements with respect to investments by plans generally or any particular plan, or that this investment is appropriate for plans generally or any particular plan.

     Any plan investor proposing to invest in the Offered Notes are encouraged to consult with its counsel to confirm that the investment will not result in a prohibited transaction that is not subject to an exemption and will satisfy the other requirements of ERISA and the Code applicable to plans.


                          METHOD OF DISTRIBUTION

     Subject to the terms and conditions set forth in the Underwriting Agreement among the Depositor, [ ], [ ] and [ ] (collectively, the "Underwriters"), the Depositor has agreed to



                                  S-135
<PAGE>

sell the Offered Notes (the "Underwritten Notes") to the Underwriters, and each Underwriter has severally agreed to purchase from the Depositor the initial Note Principal Balance of each class of Underwritten Notes set forth under its name below.


|                     | [     ]    | [      ]    | [        ] |
|---------------------|------------|-------------|------------|
| Class               |            |             |            |
| -----               | --------- | ---------- | ---------- |
|                     |            |             |            |
| [Class AF-1A]....... |            |             |            |
| [Class AF-1B]....... |            |             |            |
| [Class AF-2]........ |            |             |            |
| [Class AF-3]........ |            |             |            |
| [Class AF-4]........ |            |             |            |
| [Class AF-5A]....... |            |             |            |

```
[Class AF-5B]..........
[Class AF-6]...........
[Class MF-1]...........
[Class MF-2]...........
[Class MF-3]...........
[Class MF-4]...........
[Class MF-5]...........
[Class MF-6]...........
[Class MF-7]...........
[Class MF-8]] .........
[Class BF].............
[Class 2-AV-1].........
[Class 2-AV-2].........
[Class 3-AV-1].........
[Class 3-AV-2].........
[Class 3-AV-3].........
[Class 3-AV-4].........
[Class MV-1]...........
[Class MV-2]...........
[Class MV-3]...........
[Class MV-4]...........
[Class MV-5]...........
[Class MV-6]...........
[Class MV-7]...........
[Class MV-8]] .........
[Class BV].............         ---------   ----------   ----------

            Total...
```

[The Depositor has been advised by each Underwriter that it proposes
initially to offer the Underwritten Notes to certain dealers at the prices set
forth on the cover page less a selling concession not to exceed the percentage
of the Note denomination set forth below, and that each Underwriter may allow,
and the dealers may reallow, a reallowance discount not to exceed the
percentage of the Note denomination set forth below:]

| Class | Selling Concession | Reallowance Discount |
|-------|--------------------|----------------------|
| [Class AF-1A]................ | | |
| [Class AF-1B]................ | | |
| [Class AF-2]................. | | |
| [Class AF-3]................. | | |
| [Class AF-4]................. | | |
| [Class AF-5A]................ | | |

                              S-136
<PAGE>

```
[Class AF-5B]................
[Class AF-6].................
[Class MF-1].................
[Class MF-2].................
[Class MF-3].................
[Class MF-4].................
[Class MF-5].................
[Class MF-6].................
[Class MF-7].................
```

```
[Class MF-8]................
[Class BF]..................
[Class 2-AV-1]..............
[Class 2-AV-2]..............
[Class 3-AV-1]..............
[Class 3-AV-2]..............
[Class 3-AV-3]..............
[Class 3-AV-4]..............
[Class MV-1]................
[Class MV-2]................
[Class MV-3]................
[Class MV-4]................
[Class MV-5]................
[Class MV-6]................
[Class MV-7]................
[Class MV-8]................]
[Class BV]..................
```

[After the initial public offering, the public offering prices, the concessions and the discounts may be changed.]

The Depositor has been advised by each Underwriter that it intends to make a market in the Underwritten Notes purchased by it, but no Underwriter has any obligation to do so. We cannot assure you that a secondary market for the Underwritten Notes (or any particular class thereof) will develop or, if it does develop, that it will continue or that this market will provide sufficient liquidity to noteholders.

Until the distribution of the Underwritten Notes is completed, the rules of the SEC may limit the ability of the Underwriters and certain selling group members to bid for and purchase the Underwritten Notes. As an exception to these rules, the Underwriters are permitted to engage in certain transactions that stabilize the price of the Underwritten Notes. The transactions consist of bids or purchases for the purpose of pegging, fixing or maintaining the price of the Underwritten Notes.

In general, purchases of a security for the purpose of stabilization or to reduce a short position could cause the price of the security to be higher than it might be in the absence of the purchases.

Neither the Depositor nor any of the Underwriters makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the prices of the Underwritten Notes. In addition, neither the Depositor nor any of the Underwriters makes any representation that the Underwriters will engage in these transactions or that the transactions, once commenced, will not be discontinued without notice.

The Depositor has agreed to indemnify the Underwriters against, or make contributions to the Underwriters with respect to, certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act").

S-137

<PAGE>

USE OF PROCEEDS

It is expected that the proceeds to the Depositor from the sale of the Underwritten Notes will be approximately $[ ], before deducting issuance expenses payable by the Depositor, estimated to be approximately $[ ]. The Depositor will apply the net proceeds of the sale of the Offered Notes against the purchase price of the Initial Mortgage Loans on the Closing Date and to deposit the Pre-Funded Amount, if any, in the Pre-Funding Account.

## LEGAL MATTERS

The validity of the Notes, including certain federal income tax consequences with respect thereto, will be passed upon for the Depositor by Sidley Austin LLP, New York, New York. Certain legal matters will be passed upon for the Underwriters by [ ].

## [EXPERTS]

[The consolidated financial statements of [ ] and subsidiaries as of [December 31, 2004 and 2003, and for each of the years in the three-year period ended December 31, 2004], are incorporated by reference in this prospectus supplement and in the registration statement in reliance upon the report of [ ], independent registered public accounting firm, incorporated by reference in this prospectus supplement, and in the registration statement upon the authority of that firm as experts in accounting and auditing.]

S-138

<PAGE>

## RATINGS

It is a condition of the issuance of the Offered Notes that each class of Offered Notes set forth below be assigned the ratings at least as high as those designated below by [Moody's Investors Service, Inc. ("Moody's")] and [Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.("S&P") and together with Moody's, the "Rating Agencies")].

| Class | Moody's Rating | S&P Rating | Class | Moody's Rating | S&P Rating |
|-------|--------|--------|-------|--------|--------|
| [AF-1A] | | | [BF] | | |
| [AF-1B] | | | [2-AV-1] | | |
| [AF-2] | | | [2-AV-2] | | |
| [AF-3] | | | [3-AV-1] | | |
| [AF-4] | | | [3-AV-2] | | |
| [AF-5A] | | | [3-AV-3] | | |
| [AF-5B] | | | [3-AV-4] | | |
| [AF-6] | | | [MV-1] | | |
| [MF-1] | | | [MV-2] | | |
| [MF-2] | | | [MV-3] | | |
| [MF-3] | | | [MV-4] | | |
| [MF-4] | | | [MV-5] | | |
| [MF-5] | | | [MV-6] | | |
| [MF-6] | | | [MV-7] | | |
| [MF-7] | | | [MV-8] | | |
| [MF-8] | | | [BV] | | |

[The ratings assigned to the [Class AF-5B] Notes are without regard to the [Class AF-5B] Policy.] The Depositor has requested that each Rating Agency maintain ongoing surveillance of the ratings assigned to the Offered Notes in accordance with the Rating Agency's policy, but we cannot assure you that a Rating Agency will continue its surveillance of the ratings assigned to the Offered Notes.

The security ratings assigned to the Offered Notes should be evaluated independently from similar ratings on other types of securities. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the Rating Agencies. The ratings on the Offered Notes do not, however, constitute statements regarding the likelihood or frequency of prepayments on the Mortgage Loans, the payment of the Net Rate Carryover or the anticipated yields in light of prepayments.

The Depositor has not requested a rating of any Offered Notes by any rating agency other than [Moody's and S&P]. However, we cannot assure you as to whether any other rating agency will rate the Offered Notes or, if it does, what ratings would be assigned by another rating agency. The ratings assigned by another rating agency to the Offered Notes could be lower than the respective ratings assigned by the Rating Agencies.

S-139

<PAGE>

INDEX OF DEFINED TERMS

[Adjustable Rate Subordinate] Corridor Contract......................S-98
[Class 2-AV] Corridor Contract......................................S-98
[Class 2-AV] Principal Distribution Amount..........................S-76
[Class 2-AV] Principal Distribution Target Amount...................S-76
[Class 3-AV] Corridor Contract......................................S-98
[Class 3-AV] Principal Distribution Amount..........................S-76
[Class 3-AV] Principal Distribution Target Amount...................S-77
[Class 3-AV-1] Acceleration Amount..................................S-77
[Class 3-AV-1] Acceleration Event...................................S-77
[Class 3-AV-1] Target Balance.......................................S-77
[Class AF] Principal Distribution Amount............................S-76
[Class AF-1A] Corridor Contract.....................................S-98
[Class AF-5B] Available Funds.......................................S-108
[Class AF-5B] Insurer...............................................S-105
[Class AF-5B] Policy Premium Rate...................................S-70
[Class AF-5B] Premium...............................................S-70
[Class AF-5B] Reimbursement Amount..................................S-70
[Class AV] Principal Distribution Allocation Amount.................S-76
[Class AV] Principal Distribution Target Amount.....................S-76
Accrual Period......................................................S-70
Adjustable Rate Cumulative Loss Trigger Event.......................S-73
Adjustable Rate Delinquency Trigger Event...........................S-74
Adjustable Rate Loan Group Excess Cashflow..........................S-97
Adjustable Rate Mortgage Loans......................................S-29
Adjustable Rate Notes...............................................S-66
Adjustable Rate OC Floor............................................S-74
Adjustable Rate Overcollateralization Deficiency Amount.............S-74

Adjustable Rate Overcollateralization Target Amount...................S-74
Adjustable Rate Overcollateralized Amount............................S-74
Adjustable Rate Prepayment Vector....................................S-121
Adjustable Rate Senior Enhancement Percentage........................S-75
Adjustable Rate Stepdown Date........................................S-75
Adjustable Rate Subordinate Class Principal Distribution Amount...  S-75
Adjustable Rate Subordinate Notes....................................S-66
Adjustable Rate Trigger Event........................................S-75
Adjusted Net Mortgage Rate...........................................S-68
Adjustment Date......................................................S-30
Advance..............................................................S-63
Alternative Documentation Program....................................S-54
Applied Realized Loss Amount.........................................S-105
ARPV.................................................................S-121
beneficial owner.....................................................S-68
Book-Entry Notes.....................................................S-67
Business Day.........................................................S-68
Carryover Reserve Fund...............................................S-104
Ceiling Rate.........................................................S-99
Class 2-AV Notes.....................................................S-66
Class 3-AV Notes.....................................................S-66
Class AF Notes.......................................................S-66
Class AF-1 Notes.....................................................S-66
Class AF-5 Notes.....................................................S-66
Class AF-5B Policy...................................................S-105
Class AV Notes.......................................................S-66
CLUES Plus Documentation Program.....................................S-54
Collection Account...................................................S-82
Compensating Interest................................................S-63
Corridor Contract....................................................S-98
Corridor Contract Administration Agreement...........................S-98
Corridor Contract Administrator.................................. ....S-98
Corridor Contract Counterparty.................................. ....S-98
Corridor Contract Termination Date.............................. ...S-103
Corridor Contracts...................................................S-98
Countrywide Financial................................................S-59
Countrywide Home Loans............................... ......S-29, S-52, S-59
Countrywide Servicing................................................S-58
CPR..................................................................S-121
Credit Comeback Excess Account......................... ......S-31, S-104
Credit Comeback Excess Amount.......................... ...........S-31
Credit Comeback Excess Cashflow......................................S-96
credit comeback loans................................................S-31
Current Interest.....................................................S-70
Cut-off Date.........................................................S-32
Deficiency Amount....................................................S-107
Definitive Note......................................................S-68
Delay Delivery Mortgage Loans........................................S-118
Deleted Mortgage Loan................................................S-50
Depositor............................................................S-29
Detailed Description.................................................S-29
Determination Date...................................................S-32
Distribution Account.................................................S-84
Distribution Account Deposit Date.............................. ......S-84
Distribution Date...........................................S-68, S-108
DTC..................................................................S-67
Due Dates............................................................S-62
Due for Payment......................................................S-108
Due Period...........................................................S-68
ERISA................................................................S-136

Euroclear....................................................S-67
Excess Corridor Contract Payment.............................S-99
Excess Proceeds..............................................S-68
Expanded Underwriting Guidelines.............................S-55
Expense Fee Rate.............................................S-70

S-140

<PAGE>

Extra Principal Distribution Amount..........................S-77
FICO Credit Scores...........................................S-53
Final Recovery Determination.................................S-68
Five-Year Hybrid Mortgage Loans..............................S-31
Fixed 30-Year Interest-Only Loan......................... ...S-31
Fixed Rate Credit Comeback Loans.............................S-31
Fixed Rate Cumulative Loss Trigger Event.....................S-77
Fixed Rate Delinquency Trigger Event.........................S-78
Fixed Rate Loan Group Excess Cashflow........................S-96
Fixed Rate Mortgage Loans....................................S-29
Fixed Rate Notes.............................................S-66
Fixed Rate OC Floor..........................................S-77
Fixed Rate Overcollateralization Deficiency Amount...........S-78
Fixed Rate Overcollateralization Target Amount...............S-78
Fixed Rate Overcollateralized Amount.........................S-78
Fixed Rate Prepayment Vector................................S-121
Fixed Rate Senior Enhancement Percentage.....................S-78
Fixed Rate Stepdown Date.....................................S-79
Fixed Rate Subordinate Class Principal Distribution Amount...S-79
Fixed Rate Subordinate Notes.................................S-66
Fixed Rate Trigger Event.....................................S-79
FRPV.......................................................S-121
Full Documentation Program...................................S-54
Funding Period...............................................S-51
Global Securities..............................................1
Gross Margin.................................................S-30
Group [2] Sequential Trigger Event...........................S-79
Hybrid Mortgage Loans........................................S-31
Indenture....................................................S-64
Indenture Default...........................................S-113
Indenture Trustee............................................S-48
Indenture Trustee Fee........................................S-86
Indenture Trustee Fee Rate...................................S-70
Initial Cut-off Date.........................................S-29
Initial Cut-off Date Pool Principal Balance..................S-29
Initial Cut-off Date Principal Balance.......................S-29
Initial Mortgage Loans.......................................S-29
Initial Mortgage Pool........................................S-29
Initial Periodic Rate Cap....................................S-31
Insurance Proceeds...........................................S-68
Insured Amounts.............................................S-108
Insured Payments............................................S-108
Interest Carry Forward Amount................................S-70
Interest Determination Date..................................S-70
Interest Funds...............................................S-70
Interest Margin..............................................S-70
Interest Rate................................................S-71
Interest Remittance Amount...................................S-71
issuing entity...............................................S-63
Late Payment Rate...........................................S-108

LIBOR Business Day.................................................S-72
Liquidation Proceeds..............................................S-68
Loan Group........................................................S-29
Loan Group [1]....................................................S-29
Loan Group [2]....................................................S-29
Loan Group [3]....................................................S-29
Loan-to-Value Ratio...............................................S-32
Master Servicer...................................................S-58
Master Servicer Advance Date......................................S-63
Maturity Date....................................................S-120
Maximum Mortgage Rate.............................................S-31
Minimum Mortgage Rate.............................................S-50
Modeling Assumptions.............................................S-122
Moody's....................................................S-5, S-141
Mortgage File.....................................................S-48
Mortgage Index....................................................S-30
Mortgage Loan Purchase and Assignment Agreement...................S-48
Mortgage Loans....................................................S-48
Mortgage Notes....................................................S-29
Mortgage Rate.....................................................S-30
Mortgaged Properties..............................................S-29
NAS Principal Distribution Amount.................................S-80
Net Corridor Contract Payment.....................................S-99
Net Mortgage Rate.................................................S-63
net rate cap......................................................S-23
Net Rate Cap......................................................S-72
Net Rate Carryover................................................S-72
NIM Insurer................................................S-1, S-117
NIM Insurer Default...............................................S-27
No Income/No Asset Documentation Program..........................S-54
Nonpayment.......................................................S-108
Note Owners.......................................................S-67
Note Principal Balance............................................S-69
Notes.............................................................S-66
Notional Balance..................................................S-99
Offered Notes.....................................................S-66
One-Month LIBOR..................................................S-103
Optional Termination Date........................................S-114
Order............................................................S-107
Owner Trust Certificate...........................................S-95
Owner Trustee..............................................S-63, S-64
Owner Trustee Fee.................................................S-86
Participants......................................................S-68
Percentage Interest...............................................S-69
Plan Assets Regulation...........................................S-136
Preference Amount................................................S-108
Preferred Processing Program......................................S-53
Pre-Funded Amount.................................................S-51
Pre-Funding Account...............................................S-51
Prepayment Interest Excess........................................S-62
Prepayment Interest Shortfall.....................................S-63
Prepayment Models................................................S-121
Prepayment Period.................................................S-32
Principal Distribution Amount.....................................S-80
Principal Remittance Amount.......................................S-81
Priority Class...................................................S-114
PTCE.............................................................S-137

<PAGE>

Purchase Price...................................................S-49
Rating Agencies.................................................S-141
Realized Loss...................................................S-81
Record Date.....................................................S-69
Reduced Documentation Program...................................S-54
Reference Bank Rate.............................................S-72
Reference Banks.................................................S-73
Reimbursement Amount...........................................S-108
related subordinate classes.....................................S-20
REO Property....................................................S-63
Replacement Mortgage Loan.......................................S-50
Required Carryover Reserve Fund Deposit........................S-104
Rolling Sixty-Day Delinquency Rate..............................S-81
S&P.......................................................S-5, S-141
Sale and Servicing Agreement....................................S-48
Scheduled Payments..............................................S-30
Securities Act.................................................S-139
Seller..........................................................S-29
Seller Shortfall Interest Requirement...........................S-73
Senior Notes....................................................S-66
Servicing Advances..............................................S-83
Servicing Fee...................................................S-62
Servicing Fee Rate..............................................S-62
significance estimate..........................................S-103
significance percentage........................................S-103
Sixty-Day Delinquency Rate......................................S-81
Standard Underwriting Guidelines................................S-55
Stated Income/Stated Asset Documentation Program................S-54
Stated Principal Balance........................................S-32
Statistical Calculation Date....................................S-29
Statistical Calculation Date Pool Principal Balance.............S-29
Statistical Calculation Pool....................................S-29
Statistical Calculation Pool Mortgage Loans.....................S-29
Streamlined Documentation Program...............................S-54
Strike Rate.....................................................S-99
Subordinate Notes...............................................S-66
subordination...................................................S-20
Subsequent Cut-off Date.........................................S-51
Subsequent Mortgage Loans.......................................S-51
Subsequent Periodic Rate Cap....................................S-31
Subsequent Recoveries...........................................S-69
Subsequent Transfer Date........................................S-51
Tax Counsel....................................................S-133
Three-Year Hybrid Mortgage Loans................................S-31
Trigger Event...................................................S-81
Trust...........................................................S-64
Trust Administrator...............................S-48, S-6.3, S-65
Trust Administrator Fee.........................................S-86
Trust Fund......................................................S-64
Two-Year Hybrid Mortgage Loans..................................S-31
U.S. Person........................................................4
Underwriters...................................................S-137
Underwritten Notes.............................................S-137
Unpaid Realized Loss Amount.....................................S-82

<PAGE>

ANNEX A

A-1

<PAGE>

ANNEX I

## Global Clearance, Settlement and Tax Documentation Procedures

Except in certain limited circumstances, the globally offered CWALT, Inc. Mortgage Backed Notes, Series 200[ ]-[ ], (the "Global Securities") will be available only in book-entry form. Investors in the Global Securities may hold the Global Securities through any of DTC, Clearstream, Luxembourg or Euroclear. The Global Securities will be tradable as home market instruments in both the European and U.S. domestic markets. Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors holding Global Securities through Clearstream, Luxembourg and Euroclear will be conducted in the ordinary way in accordance with their normal rules and operating procedures and in accordance with conventional Eurobond practice (i.e., seven calendar day settlement).

Secondary market trading between investors holding Global Securities through DTC will be conducted according to the rules and procedures applicable to U.S. corporate debt obligations and prior mortgage pass-through note issues.

Secondary cross-market trading between Clearstream, Luxembourg or Euroclear and DTC Participants holding Notes will be effected on a delivery-against-payment basis through the respective Depositaries of Clearstream, Luxembourg and Euroclear (in such capacity) and as DTC Participants.

Non-U.S. holders (as described below) of Global Securities will be subject to U.S. withholding taxes unless the holders meet certain requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their participants.

Initial Settlement

All Global Securities will be held in book-entry form by DTC in the name of Cede & Co. as nominee of DTC. Investors' interests in the Global Securities will be represented through financial institutions acting on their behalf as direct and indirect Participants in DTC. As a result, Clearstream, Luxembourg and Euroclear will hold positions on behalf of their participants through their respective Depositaries, which in turn will hold the positions in accounts as DTC Participants.

Investors electing to hold their Global Securities through DTC will follow the settlement practices applicable to prior mortgage pass-through note issues. Investor securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their Global Securities through Clearstream, Luxembourg or Euroclear accounts will follow the settlement procedures

applicable to conventional Eurobonds, except that there will be no temporary
global security and no "lock-up" or restricted period. Global Securities will
be credited to the securities custody accounts on the settlement date against
payment in same-day funds.

Secondary Market Trading

     Since the purchaser determines the place of delivery, it is important to
establish at the time of the trade where both the purchaser's and seller's
accounts are located to ensure that settlement can be made on the desired
value date.

     Trading between DTC Participants. Secondary market trading between DTC
Participants will be settled using the procedures applicable to prior mortgage
pass-through note issues in same-day funds.


                                    I-1


<PAGE>


     Trading between Clearstream, Luxembourg and/or Euroclear Participants.
Secondary market trading between Clearstream, Luxembourg Participants or
Euroclear Participants will be settled using the procedures applicable to
conventional Eurobonds in same-day funds.

     Trading between DTC Seller and Clearstream, Luxembourg or Euroclear
Purchaser. When Global Securities are to be transferred from the account of a
DTC Participant to the account of a Clearstream, Luxembourg Participant or a
Euroclear Participant, the purchaser will send instructions to Clearstream,
Luxembourg or Euroclear through a Clearstream, Luxembourg Participant or
Euroclear Participant at least one Business Day prior to settlement.
Clearstream, Luxembourg or Euroclear will instruct the respective Depositary,
as the case may be, to receive the Global Securities against payment. Payment
will include interest accrued on the Global Securities from and including the
last coupon payment date to and excluding the settlement date, on the basis of
a 360-day year and either the actual number of days in the related accrual
period or a year consisting of twelve 30-day months, as applicable. For
transactions settling on the 31st of the month, payment will include interest
accrued to and excluding the first day of the following month. Payment will
then be made by the respective Depositary of the DTC Participant's account
against delivery of the Global Securities. After settlement has been
completed, the Global Securities will be credited to the respective clearing
system and by the clearing system, in accordance with its usual procedures, to
the Clearstream, Luxembourg Participant's or Euroclear Participant's account.
The securities credit will appear the next day (European time) and the cash
debt will be back-valued to, and the interest on the Global Securities will
accrue from, the value date (which would be the preceding day when settlement
occurred in New York). If settlement is not completed on the intended value
date (i.e., the trade fails), the Clearstream, Luxembourg or Euroclear cash
debt will be valued instead as of the actual settlement date.

     Clearstream, Luxembourg Participants and Euroclear Participants will
need to make available to the respective clearing systems the funds necessary
to process same-day funds settlement. The most direct means of doing so is to
preposition funds for settlement, either from cash on hand or existing lines
of credit, as they would for any settlement occurring within Clearstream,
Luxembourg or Euroclear. Under this approach, they may take on credit exposure

to Clearstream, Luxembourg or Euroclear until the Global Securities are credited to their accounts one day later.

As an alternative, if Clearstream, Luxembourg or Euroclear has extended a line of credit to them, Clearstream, Luxembourg Participants or Euroclear Participants can elect not to preposition funds and allow that credit line to be drawn upon the finance settlement. Under this procedure, Clearstream, Luxembourg Participants or Euroclear Participants purchasing Global Securities would incur overdraft charges for one day, assuming they cleared the overdraft when the Global Securities were credited to their accounts. However, interest on the Global Securities would accrue from the value date. Therefore, in many cases the investment income on the Global Securities earned during that one-day period may substantially reduce or offset the amount of the overdraft charges, although this result will depend on each Clearstream, Luxembourg Participant's or Euroclear Participant's particular cost of funds.

Since the settlement is taking place during New York business hours, DTC Participants can employ their usual procedures for sending Global Securities to the respective European Depositary for the benefit of Clearstream, Luxembourg Participants or Euroclear Participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC Participants a cross-market transaction will settle no differently than a trade between two DTC Participants.

Trading between Clearstream, Luxembourg or Euroclear Seller and DTC Purchaser. Due to time zone differences in their favor, Clearstream, Luxembourg Participants and Euroclear Participants may employ their customary procedures for transactions in which Global Securities are to be transferred by the respective clearing system, through the respective Depositary, to a DTC Participant. The seller will send instructions to Clearstream, Luxembourg or Euroclear through a Clearstream, Luxembourg Participant or Euroclear Participant at least one Business Day prior to settlement. In these cases Clearstream, Luxembourg or Euroclear will instruct the respective Depositary, as appropriate, to deliver the Global Securities to the DTC Participant's account against payment. Payment will include interest accrued on the Global Securities from and including the last coupon payment to and excluding the settlement date on the basis of a 360-day year and either the actual number of days in the related accrual period or a year consisting of twelve 30-day months, as applicable. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. The payment

I-2

<PAGE>

will then be reflected in the account of the Clearstream, Luxembourg Participant or Euroclear Participant the following day, and receipt of the cash proceeds in the Clearstream, Luxembourg Participant's or Euroclear Participant's account would be back-valued to the value date (which would be the preceding day, when settlement occurred in New York). Should the Clearstream, Luxembourg Participant or Euroclear Participant have a line of credit with its respective clearing system and elect to be in debt in anticipation of receipt of the sale proceeds in its account, the back-valuation will extinguish any overdraft incurred over that one-day period. If settlement is not completed on the intended value date (i.e., the trade fails), receipt of the cash proceeds in the Clearstream, Luxembourg

Participant's or Euroclear Participant's account would instead be valued as of
the actual settlement date.

Finally, day traders that use Clearstream, Luxembourg or Euroclear and
that purchase Global Securities from DTC Participants for delivery to
Clearstream, Luxembourg Participants or Euroclear Participants should note
that these trades would automatically fail on the sale side unless affirmative
action were taken. At least three techniques should be readily available to
eliminate this potential problem:

(a) borrowing through Clearstream, Luxembourg or Euroclear for one
day (until the purchase side of the day trade is reflected in their
Clearstream, Luxembourg or Euroclear accounts) in accordance with the
clearing system's customary procedures;

(b) borrowing the Global Securities in the U.S. from a DTC
Participant no later than one day prior to settlement, which would give
the Global Securities sufficient time to be reflected in their
Clearstream, Luxembourg or Euroclear account in order to settle the sale
side of the trade; or

(c) staggering the value dates for the buy and sell sides of the
trade so that the value date for the purchase from the DTC Participant
is at least one day prior to the value date for the sale to the
Clearstream, Luxembourg Participant or Euroclear Participant.

Certain U.S. Federal Income Tax Documentation Requirements

A beneficial owner of Global Securities holding securities through
Clearstream, Luxembourg or Euroclear (or through DTC if the holder has an
address outside the U.S.) will be subject to the 30% U.S. withholding tax that
generally applies to payments of interest (including original issue discount)
on registered debt issued by U.S. Persons, unless (i) each clearing system,
bank or other financial institution that holds customers' securities in the
ordinary course of its trade or business in the chain of intermediaries
between the beneficial owner and the U.S. entity required to withhold tax
complies with applicable certification requirements and (ii) the beneficial
owner takes one of the following steps to obtain an exemption or reduced tax
rate:

Exemption for non-U.S. Persons or Reduced Rate for non-U.S. Persons
Resident in Treaty Countries (Form W-8BEN). In general, beneficial owners of
Global Securities that are non-U.S. Persons can obtain a complete exemption
from the withholding tax by filing a signed Form W-8BEN Note of Foreign Status
of Beneficial Owners for United States Tax Withholding. Non-U.S. Persons that
are Note Owners residing in a country that has a tax treaty with the United
States also can obtain an exemption or reduced tax rate (depending on the
treaty terms) by filing Form W-8BEN (Note of Foreign Status of Beneficial
Owners for United States Tax Withholding). If the information shown on Form
W-8BEN changes, a new Form W-8BEN must be filed within 30 days of the change.
More complex rules apply if Global Securities are held through a non-U.S.
intermediary (which includes an agent, nominee, custodian, or other person who
holds a Global Security for the account of another) or a non-U.S. flow-through
entity (which includes a partnership, trust, and certain fiscally transparent
entities).

Exemption for non-U.S. Persons with Effectively Connected Income (Form
W-8ECI). In general, a non-U.S. Person, including a non-U.S. corporation or
bank with a U.S. branch, for which the interest income is effectively
connected with its conduct of a trade or business in the United States, can

obtain an exemption from the withholding tax by filing Form W-8ECI (Note of Foreign Person's Claim for Exemption from Withholding On Income Effectively Connected with the Conduct of a Trade or Business in the United States). More complex rules apply where Global Securities are held through a Non-U.S. intermediary or Non-U.S. flow through entity.

I-3

<PAGE>

Exemption for U.S. Persons (Form W-9). U.S. Persons can obtain a complete exemption from the withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

U.S. Federal Income Tax Reporting Procedure. The Note Owner of a Global Security, files by submitting the appropriate form to the person through whom it holds (the clearing agency, in the case of persons holding directly on the books of the clearing agency). Generally, a Form W-8BEN and a Form W-8ECI will remain in effect for a period starting on the date the form is signed and ending on the last day of the third succeeding calendar year unless a change in circumstances makes any information of the form incorrect. In addition, a Form W-8BEN furnished with a U.S. taxpayer identification number will remain in effect until a change in circumstances makes any information of the form incorrect, provided that the withholding agent reports on Form 1042-S at least one payment annually to the beneficial owner who provided the form.

The term "U.S. Person" means:

(1) a citizen or resident of the United States,

(2) a corporation or partnership (including an entity treated as a corporation or partnership for U.S. federal income tax purposes) organized in or under the laws of the United States, any State thereof or the District of Columbia,

(3) an estate the income of which is includible in gross income for United States tax purposes, regardless of its source,

(4) a trust if a court within the United States is able to exercise primary supervision of the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust. This summary does not deal with all aspects of U.S. Federal income tax withholding that may be relevant to foreign holders of the Global Securities. Investors are advised to consult their tax advisors for specific tax advice concerning their holding and disposing of the Global Securities, or

(5) certain eligible trusts that elect to be taxed as U.S. persons.

I-4

<PAGE>

$[            ]
(Approximate)

Mortgage Backed Notes, Series 200[ ]-[ ]


Alternative Loan Trust 200[ ]-[ ]
Issuing Entity



CWALT, INC.
Depositor


[Countrywide Home Loans, Inc. Logo]
Sponsor and Seller


[Countrywide Home Loans Servicing LP]
Master Servicer


----------------

PROSPECTUS SUPPLEMENT

----------------


[Underwriter]
                    [Underwriter]
                                        [Underwriter]


       You should rely only on the information contained or incorporated by
reference in this prospectus supplement and the accompanying prospectus. We
have not authorized anyone to provide you with different information.

       We are not offering the Series 200[ ]-[ ] Mortgage Backed Notes in any
state where the offer is not permitted.

       Dealers will deliver a prospectus supplement and prospectus when acting
as underwriters of the Series 200[ ]-[ ] Mortgage Backed Notes and with
respect to their unsold allotments or subscriptions. In addition, all dealers
selling the Series 200[ ]-[ ] Mortgage Backed Notes will be required to
deliver a prospectus supplement and prospectus for 90 days after the date of
the prospectus supplement.


                    [        ], 200[ ]


<PAGE>


The information in this prospectus is not complete and may be changed. We may

not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting offers to buy these securities in any state where the offer or sale is not permitted.

SUBJECT TO COMPLETION DATED FEBRUARY 7, 2006

PROSPECTUS

CWALT, INC.
Depositor

Mortgage Backed Securities
(Issuable in Series)

--------------------

| | |
|---|---|
| Please carefully consider our discussion of some of the risks of investing in the securities under "Risk Factors" beginning on page 2 | **The Trusts** |
| | Each trust will be established to hold assets in its trust fund transferred to it by CWALT, Inc.  The assets in each trust fund will be specified in the prospectus supplement for the particular trust and will generally consist of: |
| The securities will represent obligations of the related trust fund only and will not represent an interest in or obligation of CWALT, Inc., any seller, servicer, or any of their affiliates. | o  first lien mortgage loans secured by one- to four-family residential properties; |
| | o  mortgage loans secured by first liens on small multifamily residential properties, such as rental apartment buildings or projects containing five to fifty residential units; |
| | o  collections arising from one or more types of the loans described above which are not used to make payments on securities issued by a trust fund, including excess servicing fees and prepayment charges; |
| | o  mortgage pass-through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac; or |
| | o  mortgage-backed securities evidencing an interest in, or secured by, loans of the type that would otherwise be eligible to be loans included in a trust fund and issued by entities other than Ginnie Mae, Fannie Mae or Freddie Mac. |

--------------------

The Securities

CWALT, Inc. will sell either certificates or notes pursuant to a prospectus supplement. The securities will be grouped into one or more series, each having its own distinct designation. Each series will be issued in one or more classes and each class will evidence beneficial ownership of (in the case of certificates) or a right to receive payments supported by (in the case of notes) a specified portion of future payments on the assets in the trust fund that the series relates to. A prospectus supplement for a series will specify all of the terms of the series and of each of the classes in the series.

Credit Enhancement

If the securities have any type of credit enhancement, the prospectus supplement for the related series will describe the credit enhancement. The types of credit enhancement are generally described in this prospectus.

Offers of Securities

The securities may be offered through several different methods, including offerings through underwriters.

---------------

These securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.
[                 ], 2006

<PAGE>

Table of Contents

Important Notice About Information in This
    Prospectus and Each Accompanying
    Prospectus Supplement.........................1
Risk Factors.....................................2
    Limited Source Of Payments -- No
        Recourse To Sellers, Depositor Or
        Servicer..................................2
    Credit Enhancement May Not Be
        Sufficient To Protect You From
        Losses....................................3
    Nature Of Mortgages...........................3
    Your Risk Of Loss May Be Higher Than
        You Expect If Your Securities Are
        Backed By Multifamily Loans...............7
    Impact Of World Events........................7
    You Could Be Adversely Affected By
        Violations Of Environmental Laws..........8
    Ratings Of The Securities Do Not
        Assure Their Payment......................9
    Book-Entry Registration......................10
    Secondary Market For The Securities
        May Not Exist............................10
    Bankruptcy Or Insolvency May Affect
        The Timing And Amount Of
        Distributions On The Securities..........10
    The Principal Amount Of Securities
        May Exceed The Market Value Of
        The Trust Fund Assets....................11
The Trust Fund..................................12
    General......................................12
    The Loans....................................13
    Agency Securities............................16
    Non-Agency Mortgage-Backed
        Securities...............................21
    Substitution of Trust Fund Assets...........22
    Available Information........................23

Incorporation of Certain Documents by
    Reference; Reports Filed
    with the SEC............................23
Reports to Securityholders..................24
Use of Proceeds.............................24
The Depositor...............................24
Loan Program................................25
    Underwriting Standards..................25
    Qualifications of Sellers...............26
    Representations by Sellers; Repurchases.....26
Static Pool Data............................27
Description of the Securities...............28
    General.................................28
    Distributions on Securities.............30
    Advances................................31
    Reports to Securityholders..............32
    Categories of Classes of Securities.........33
    Indices Applicable to Floating Rate
        and Inverse Floating Rate Classes.......36
    Book-Entry Registration of Securities.......39
Credit Enhancement..........................43
    General.................................43
    Subordination...........................44
    Letter of Credit........................45
    Insurance Policies, Surety Bonds
        and Guaranties..........................45
    Overcollateralization and Excess
        Cash Flow...............................45
    Reserve Accounts........................46
    Special Hazard Insurance Policies...........46
    Bankruptcy Bonds........................47
    Pool Insurance Policies.................47
    Financial Instruments...................49
    Cross Support...........................49
Yield, Maturity and Prepayment
    Considerations..........................49
    Prepayments on Loans....................49
    Prepayment Effect on Interest...............50
    Delays in Realization on Property;
        Expenses of Realization.................50
    Optional Purchase.......................51
    Prepayment Standards or Models..............51
    Yield...................................52
The Agreements..............................52
    Assignment of the Trust Fund
        Assets..................................52
    Payments On Loans; Deposits to
        Security Account........................54
    Pre-Funding Account.....................56
    Investments in Amounts Held in Accounts.....57
    Sub-Servicing by Sellers................58
    Collection Procedures...................59
    Hazard Insurance........................59
    Application of Liquidation Proceeds.........61
    Realization Upon Defaulted Loans............62
    Servicing and Other Compensation and
        Payment of Expenses.....................64
    Evidence as to Compliance...............64
    Certain Matters Regarding the Master
        Servicer and the Depositor..............65

Events of Default; Rights Upon
    Event of Default.........................66
    Amendment..................................68
    Termination; Optional Termination..........70
    The Trustee................................70
Certain Legal Aspects of the Loans.............71
    General....................................71
    Foreclosure................................72
    Environmental Risks........................74
    Rights of Redemption.......................75

i

&lt;PAGE&gt;

    Anti-Deficiency Legislation and Other
        Limitations On Lenders.................75
    Due-On-Sale Clauses........................76
    Enforceability of Prepayment and
        Late Payment Fees......................77
    Applicability of Usury Laws................77
    Servicemembers Civil Relief Act............77
    Other Loan Provisions and Lender
        Requirements...........................77
    Consumer Protection Laws...................78
Material Federal Income Tax
    Consequences...............................79
    General....................................79
    Taxation of Debt Securities................80
    Taxation of the REMIC and Its
        Holders................................84
    REMIC Expenses; Single Class REMICs........84
    Taxation of the REMIC......................85
    Taxation of Holders of Residual
        Interests..............................86
    Administrative Matters.....................90
    Tax Status as a Grantor Trust..............90
    Sale or Exchange...........................92
    Miscellaneous Tax Aspects..................93
    Proposed Reporting Regulations.............93
    Tax Treatment of Foreign Investors.........93
    Tax Characterization of the Trust Fund
        as a Partnership.......................94
    Tax Consequences to Holders of the
        Notes..................................94
    Tax Consequences to Holders of the
        Certificates...........................96
Other Tax Considerations.......................100
ERISA Considerations...........................100
Legal Investment...............................103
Method of Distribution.........................104
Legal Matters..................................105
Financial Information..........................105
Rating.........................................105
Index to Defined Terms.........................107

ii

<PAGE>

Important Notice About Information in This Prospectus and Each
Accompanying Prospectus Supplement

Information about each series of securities is contained in two separate
documents:

o        this prospectus, which provides general information, some of which
         may not apply to a particular series; and

o        the accompanying prospectus supplement for a particular series,
         which describes the specific terms of the securities of that
         series.

The prospectus supplement will contain information about a particular
series that supplements the information contained in this prospectus, and you
should rely on that supplementary information in the prospectus supplement.

You should rely only on the information in this prospectus and the
accompanying prospectus supplement. We have not authorized anyone to provide
you with information that is different from that contained in this prospectus
and the accompanying prospectus supplement.

---------------

If you require additional information, the mailing address of our
principal executive offices is CWALT, Inc., 4500 Park Granada, Calabasas,
California 91302 and the telephone number is (818) 225-3000. For other means
of acquiring additional information about us or a series of securities, see
"The Trust Fund -- Available Information" and "-- Incorporation of Certain
Documents by Reference; Reports Filed with the SEC" beginning on page 23.

1

<PAGE>

Risk Factors

You should carefully consider the following information since it
identifies significant risks associated with an investment in the securities.

Limited Source Of Payments --   The applicable prospectus supplement may provide
No Recourse To Sellers,         that securities will be payable from other trust
Depositor Or Servicer           funds in addition to their associated trust fund,
                                but if it does not, they will be payable solely
                                from their associated trust fund. If the trust
                                fund does not have sufficient assets to
                                distribute the full amount due to you as a
                                securityholder, your yield will be impaired, and
                                perhaps even the return of your principal may be
                                impaired, without your having recourse to anyone
                                else. Furthermore, at the times specified in the
                                applicable prospectus supplement, certain assets
                                of the trust fund may be released and paid out
                                to other people, such as the depositor, a
                                servicer, a credit enhancement provider, or any

other person entitled to payments from the trust fund. Those assets will no longer be available to make payments to you. Those payments are generally made after other specified payments that may be set forth in the applicable prospectus supplement have been made.

You will not have any recourse against the depositor or any servicer if you do not receive a required distribution on the securities. Nor will you have recourse against the assets of the trust fund of any other series of securities.

The securities will not represent an interest in the depositor, any servicer, any seller to the depositor, or anyone else except the trust fund. The only obligation of the depositor to a trust fund comes from certain representations and warranties made by it about assets transferred to the trust fund. If these representations and warranties turn out to be untrue, the depositor may be required to repurchase some of the transferred assets. CWALT, Inc., which is the depositor, does not have significant assets and is unlikely to have significant assets in the future. So if the depositor were required to repurchase a loan because of a breach of a representation, its only sources of funds for the repurchase would be:

o    funds obtained from enforcing a corresponding obligation of a seller or originator of the loan, or

o    funds from a reserve fund or similar credit enhancement established to pay for loan repurchases.

The only obligations of the master servicer to a trust fund (other than its master servicing obligations) comes from certain representations and warranties made by it in connection with its loan servicing activities. If these representations and warranties turn out to be untrue, the master servicer may be required to repurchase or substitute for some of the loans. However, the master servicer may not have the financial ability to make the required repurchase or substitution.

The only obligations to a trust fund of a seller of loans to the depositor comes from certain representations and warranties made by it in connection with its sale of the loans and certain document delivery requirements. If these representations and warranties turn out to be untrue, or the seller fails to deliver required documents, it may be

2

<PAGE>

required to repurchase or substitute for some of the loans. However, the seller may not have the financial ability to make the required repurchase or substitution.

**Credit Enhancement May Not Be Sufficient To Protect You From Losses**

Credit enhancement is intended to reduce the effect of loan losses.  But credit enhancements may benefit only some classes of a series of securities and the amount of any credit enhancement will be limited as described in the related prospectus supplement.  Furthermore, the amount of a credit enhancement may decline over time pursuant to a schedule or formula or otherwise, and could be depleted from payments or for other reasons before the securities covered by the credit enhancement are paid in full.  In addition, a credit enhancement may not cover all potential sources of loss.  For example, a credit enhancement may or may not cover fraud or negligence by a loan originator or other parties.  Also, all or a portion of the credit enhancement may be reduced, substituted for, or even eliminated so long as the rating agencies rating the securities indicate that the change in credit enhancement would not cause them to change adversely their rating of the securities.  Consequently, securityholders may suffer losses even though a credit enhancement exists and its provider does not default.

**Nature Of Mortgages Cooperative Loans May Experience Relatively Higher Losses**

Cooperative loans are evidenced by promissory notes secured by security interests in shares issued by private corporations that are entitled to be treated as housing cooperatives under the Internal Revenue Code and in the related proprietary leases or occupancy agreements granting exclusive rights to occupy specific dwelling units in the corporations' buildings.

If there is a blanket mortgage (or mortgages) on the cooperative apartment building and/or underlying land, as is generally the case, the cooperative, as property borrower, is responsible for meeting these mortgage or rental obligations. If the cooperative is unable to meet the payment obligations arising under a blanket mortgage, the mortgagee holding a blanket mortgage could foreclose on that mortgage and terminate all subordinate proprietary leases and occupancy agreements.  A foreclosure by the holder of a blanket mortgage could eliminate or significantly diminish the value of any collateral held by the lender who financed an individual tenant-stockholder of cooperative shares or, in the case of the mortgage loans, the collateral securing the cooperative loans.

If there is an underlying lease of the land, as

is the case in some instances, the cooperative is responsible for meeting the related rental obligations. If the cooperative is unable to meet its obligations arising under its land lease, the holder of the land lease could terminate the land lease and all subordinate proprietary leases and occupancy agreements. The termination of the land lease by its holder could eliminate or significantly diminish the value of any collateral held by the lender who financed an individual tenant-stockholder of the cooperative shares or, in the case of the mortgage loans, the collateral securing the cooperative loans. A land lease also has an expiration date and the inability of the cooperative to extend its term or, in the alternative, to purchase the land could lead to termination of the cooperative's interest in the property and termination of all proprietary leases and occupancy agreements which could eliminate or significantly diminish the value of the related collateral.

In addition, if the corporation issuing the shares related to the cooperative

3

<PAGE>

loans fails to qualify as a cooperative housing corporation under the Internal Revenue Code, the value of the collateral securing the cooperative loan could be significantly impaired because the tenant-stockholders would not be permitted to deduct its proportionate share of certain interest expenses and real estate taxes of the corporation.

The cooperative shares and proprietary lease or occupancy agreement pledged to the lender are, in almost all cases, subject to restrictions on transfer, including obtaining the consent of the cooperative housing corporation prior to the transfer, which may impair the value of the collateral after a default by the borrower due to an inability to find a transferee acceptable to the related housing corporation.

Declines in Property Values May Adversely Affect You

The value of the properties underlying the loans held in the trust fund may decline over time. Among the factors that could adversely affect the value of the properties are:

o   an overall decline in the residential real estate market in the areas in which they are located,

o   a decline in their general condition from the failure of borrowers to maintain their

property adequately, and

o      natural disasters that are not covered by
       insurance, such as earthquakes and floods.

If property values decline, the actual rates of
delinquencies, foreclosures, and losses on all
underlying loans could be higher than those
currently experienced in the mortgage lending
industry in general.  These losses, to the extent
not otherwise covered by a credit enhancement,
will be borne by the holder of one or more
classes of securities.

Delays in Liquidation May          Even if the properties underlying the loans held
Adversely Affect You               in the trust fund provide adequate security for
                                   the loans, substantial delays could occur before
                                   defaulted loans are liquidated and their proceeds
                                   are forwarded to investors.  Property foreclosure
                                   actions are regulated by state statutes and rules
                                   and are subject to many of the delays and
                                   expenses of other lawsuits if defenses or
                                   counterclaims are made, sometimes requiring
                                   several years to complete.  Furthermore, an
                                   action to obtain a deficiency judgment is
                                   regulated by statutes and rules, and the amount
                                   or availability of a deficiency judgment may be
                                   limited by law. In the event of a default by a
                                   borrower, these restrictions may impede the
                                   ability of the servicer to foreclose on or to
                                   sell the mortgaged property or to obtain a
                                   deficiency judgment, to obtain sufficient
                                   proceeds to repay the loan in full.

In addition, the servicer will be entitled to
deduct from liquidation proceeds all expenses
reasonably incurred in attempting to recover on
the defaulted loan, including legal and appraisal
fees and costs, real estate taxes, and property
maintenance and preservation expenses.

In the event that:

o      the mortgaged properties fail to provide
       adequate security

                                   4
<PAGE>

for the related loans,

o      if applicable to a series as specified in
       the related prospectus supplement, excess
       cashflow (if any) and
       overcollateralization (if any) is
       insufficient to cover these shortfalls,

o      if applicable to a series as specified in
       the related prospectus supplement, the

subordination of certain classes are insufficient to cover these shortfalls, and

o       with respect to the securities with the benefit of an insurance policy as specified in the related prospectus supplement, the credit enhancement provider fails to make the required payments under the related insurance policies,

you could lose all or a portion of the money you paid for the securities and could also have a lower yield than anticipated at the time you purchased the securities.

| | |
|---|---|
| Disproportionate Effect of Liquidation Expenses May Adversely Affect You | Liquidation expenses of defaulted loans generally do not vary directly with the outstanding principal balance of the loan at the time of default.  Therefore, if a servicer takes the same steps for a defaulted loan having a small remaining principal balance as it does for a defaulted loan having a large remaining principal balance, the amount realized after expenses is smaller as a percentage of the outstanding principal balance of the small loan than it is for the defaulted loan having a large remaining principal balance. |
| Consumer Protection Laws May Adversely Affect You | Federal, state and local laws extensively regulate various aspects of brokering, originating, servicing and collecting loans secured by consumers" dwellings.  Among other things, these laws may regulate interest rates and other charges, require disclosures, impose financial privacy requirements, mandate specific business practices, and prohibit unfair and deceptive trade practices.  In addition, licensing requirements may be imposed on persons that broker, originate, service or collect loans secured by consumers' dwellings.

Additional requirements may be imposed under federal, state or local laws on so-called "high cost mortgage loans," which typically are defined as loans secured by a consumer's dwelling that have interest rates or origination costs in excess of prescribed levels.  These laws may limit certain loan terms, such as prepayment charges, or the ability of a creditor to refinance a loan unless it is in the borrower's interest.  In addition, certain of these laws may allow claims against loan brokers or originators, including claims based on fraud or misrepresentations, to be asserted against persons acquiring the loans, such as the trust fund. |

The federal laws that may apply to loans held in the trust fund include the following:

o       the Truth in Lending Act and its regulations, which (among other things) require disclosures to borrowers regarding the terms of loans and provide consumers who pledged their principal dwelling as collateral in a non-purchase money

5

<PAGE>

transaction with a right of rescission that generally extends for three days after proper disclosures are given;

o       the Home Ownership and Equity Protection Act and its regulations, which (among other things) imposes additional disclosure requirements and limitations on loan terms with respect to non-purchase money, installment loans secured by the consumer's principal dwelling that have interest rates or origination costs in excess of prescribed levels;

o       the Real Estate Settlement Procedures Act and its regulations, which (among other things) prohibit the payment of referral fees for real estate settlement services (including mortgage lending and brokerage services) and regulate escrow accounts for taxes and insurance and billing inquiries made by borrowers;

o       the Equal Credit Opportunity Act and its regulations, which (among other things) generally prohibit discrimination in any aspect of a credit transaction on certain enumerated basis, such as age, race, color, sex, religion, marital status, national origin or receipt of public assistance; and

o       the Fair Credit Reporting Act, which (among other things) regulates the use of consumer reports obtained from consumer reporting agencies and the reporting of payment histories to consumer reporting agencies.

The penalties for violating these federal, state, or local laws vary depending on the applicable law and the particular facts of the situation. However, private plaintiffs typically may assert claims for actual damages and, in some cases, also may recover civil money penalties or exercise a right to rescind the loan.  Violations of certain laws may limit the ability to collect all or part of the principal or interest on a

loan and, in some cases, borrowers even may be
entitled to a refund of amounts previously paid.
Federal, state and local administrative or law
enforcement agencies also may be entitled to
bring legal actions, including actions for civil
money penalties or restitution, for violations of
certain of these laws.

Depending on the particular alleged misconduct,
it is possible that claims may be asserted
against various participants in secondary market
transactions, including assignees that hold the
loans, such as the trust fund.  Losses on loans
from the application of these federal, state and
local laws that are not otherwise covered by one
or more forms of credit enhancement will be borne
by the holders of one or more classes of
securities.  Additionally, the trust may
experience losses arising from lawsuits related
to alleged violations of these laws, which, if
not covered by one or more forms of credit
enhancement or the related seller, will be borne
by the holders of one or more classes of
securities.

Losses on Balloon          Some of the mortgage loans held in the trust fund
Payment Mortgages          may not be fully amortizing over their terms to
Are Borne by You           maturity and, thus, will require substantial
                           principal payments (that is, balloon payments) at
                           their stated maturity.  Loans with balloon
                           payments involve a greater degree of risk than
                           fully amortizing loans because typically the
                           borrower must be able to refinance

                                            6

<PAGE>

                           the loan or sell the property to make the
                           balloon payment at maturity. The ability of a
                           borrower to do this will depend on factors such
                           as mortgage rates at the time of sale or
                           refinancing, the borrower's equity in the
                           property, the relative strength of the local
                           housing market, the financial condition of the
                           borrower, and tax laws. Losses on these loans
                           that are not otherwise covered by a credit
                           enhancement will be borne by the holders of one
                           or more classes of securities.

Your Risk Of Loss May Be   Multifamily lending may expose the lender to a
Higher Than You Expect If   greater risk of loss than single family
Your Securities Are Backed  residential lending.  Owners of multifamily
By Multifamily Loans        residential properties rely on monthly lease
                           payments from tenants to

                           o      pay for maintenance and other operating
                                  expenses of those properties,

o    fund capital improvements, and

o    service any mortgage loan and any other
     debt that may be secured by those
     properties.

Various factors, many of which are beyond the
control of the owner or operator of a multifamily
property, may affect the economic viability of
that property.

Changes in payment patterns by tenants may result
from a variety of social, legal and economic
factors.  Economic factors include the rate of
inflation, unemployment levels and relative rates
offered for various types of housing.  Shifts in
economic factors may trigger changes in payment
patterns including increased risks of defaults by
tenants and higher vacancy rates.  Adverse
economic conditions, either local or national,
may limit the amount of rent that can be charged
and may result in a reduction in timely lease
payments or a reduction in occupancy levels.
Occupancy and rent levels may also be affected by
construction of additional housing units,
competition and local politics, including rent
stabilization or rent control laws and policies.
In addition, the level of mortgage interest rates
may encourage tenants to purchase single family
housing.  We are unable to determine and have no
basis to predict whether, or to what extent,
economic, legal or social factors will affect
future rental or payment patterns.

The location and construction quality of a
particular building may affect the occupancy
level as well as the rents that may be charged
for individual units.  The characteristics of a
neighborhood may change over time or in relation
to newer developments.  The effects of poor
construction quality will increase over time in
the form of increased maintenance and capital
improvements.  Even good construction will
deteriorate over time if adequate maintenance is
not performed in a timely fashion.

Impact Of World Events        The economic impact of the United States'
                              military operations in Iraq and other parts of
                              the world, as well as the possibility of any
                              terrorist attacks domestically or abroad, is
                              uncertain, but could have a material effect on
                              general economic conditions, consumer confidence,
                              and market liquidity. We can give no assurance as
                              to the effect of these events on consumer
                              confidence and the performance of the loans held
                              by trust fund.  Any

<PAGE>

adverse impact resulting from these events would be borne by the holders of one or more classes of the securities.

United States military operations also increase the likelihood of shortfalls under the Servicemembers Civil Relief Act or similar state laws (referred to as the "Relief Act" ).  The Relief Act provides relief to borrowers who enter active military service and to borrowers in reserve status who are called to active duty after the origination of their loan.  The Relief Act provides generally that these borrowers may not be charged interest on a loan in excess of 6% per annum during the period of the borrower"s active duty.  These shortfalls are not required to be paid by the borrower at any future time and will not be advanced by the servicer, unless otherwise specified in the related prospectus supplement.  To the extent these shortfalls reduce the amount of interest paid to the holders of securities with the benefit of an insurance policy, unless otherwise specified in the related prospectus supplement, they will not be covered by the related insurance policy.  In addition, the Relief Act imposes limitations that would impair the ability of the servicer to foreclose on an affected loan during the borrower's period of active duty status, and, under some circumstances, during an additional period thereafter.

You Could Be Adversely Affected By Violations Of Environmental Laws

Federal, state, and local laws and regulations impose a wide range of requirements on activities that may affect the environment, health, and safety.  In certain circumstances, these laws and regulations impose obligations on "owners" or "operators" of residential properties such as those that secure the loans held in the trust fund.  Failure to comply with these laws and regulations can result in fines and penalties that could be assessed against the trust if it were to be considered an "owner" or "operator" of the related property.  A property "owner" or "operator" can also be held liable for the cost of investigating and remediating contamination, regardless of fault, and for personal injury or property damage arising from exposure to contaminants.

In some states, a lien on the property due to contamination has priority over the lien of an existing mortgage.  Also, a mortgage lender may be held liable as an "owner" or "operator" for costs associated with the release of hazardous substances from a site, or petroleum from an underground storage tank under certain circumstances.  If the trust were to be

considered the "owner" or "operator" of a
property, it will suffer losses as a result of
any liability imposed for environmental hazards
on the property.

8

<PAGE>

Ratings Of The Securities Do      Any class of securities issued under this
Not Assure Their Payment          prospectus and the accompanying prospectus
                                  supplement will be rated in one of the rating
                                  categories which signifies investment grade by at
                                  least one nationally recognized rating agency.  A
                                  rating is based on the adequacy of the value of
                                  the trust assets and any credit enhancement for
                                  that class, and reflects the rating agency's
                                  assessment of how likely it is that holders of
                                  the class of securities will receive the payments
                                  to which they are entitled.  A rating does not
                                  constitute an assessment of how likely it is that
                                  principal prepayments on the underlying loans
                                  will be made, the degree to which the rate of
                                  prepayments might differ from that originally
                                  anticipated, or the likelihood that the
                                  securities will be redeemed early.  A rating is
                                  not a recommendation to purchase, hold, or sell
                                  securities because it does not address the market
                                  price of the securities or the suitability of the
                                  securities for any particular investor.

                                  A rating may not remain in effect for any given
                                  period of time and the rating agency could lower
                                  or withdraw the rating entirely in the future.
                                  For example, the rating agency could lower or
                                  withdraw its rating due to:

                                  o      a decrease in the adequacy of the value of
                                         the trust assets or any related credit
                                         enhancement,

                                  o      an adverse change in the financial or other
                                         condition of a credit enhancement provider,
                                         or

                                  o      a change in the rating of the credit
                                         enhancement provider's long-term debt.

                                  The amount, type, and nature of credit
                                  enhancement established for a class of securities
                                  will be determined on the basis of criteria
                                  established by each rating agency rating classes
                                  of the securities.  These criteria are sometimes
                                  based upon an actuarial analysis of the behavior
                                  of similar loans in a larger group.  That
                                  analysis is often the basis upon which each
                                  rating agency determines the amount of credit
                                  enhancement required for a class.  The historical
                                  data supporting any actuarial analysis may not

accurately reflect future experience, and the data derived from a large pool of similar loans may not accurately predict the delinquency, foreclosure, or loss experience of any particular pool of mortgage loans.  Mortgaged properties may not retain their values.  If residential real estate markets experience an overall decline in property values such that the outstanding principal balances of the loans held in a particular trust fund and any secondary financing on the related mortgaged properties become equal to or greater than the value of the mortgaged properties, the rates of delinquencies, foreclosures, and losses could be higher than those now generally experienced in the mortgage lending industry.  In addition, adverse economic conditions may affect timely payment by mortgagors on their loans whether or not the conditions affect real property values and, accordingly, the rates of delinquencies, foreclosures, and losses in any trust fund. Losses from this that are not covered by a credit enhancement will be borne, at least in part, by the holders of one or more classes of securities.

9

<PAGE>

| | |
|---|---|
| **Book-Entry Registration**<br>   **Limit on Liquidity** | Securities issued in book-entry form may have only limited liquidity in the resale market, since investors may be unwilling to purchase securities for which they cannot obtain physical instruments. |
| **Limit on Ability to**<br>**Transfer or Pledge** | Transactions in book-entry securities can be effected only through The Depository Trust Company, its participating organizations, its indirect participants, and certain banks. Therefore, your ability to transfer or pledge securities issued in book-entry form may be limited. |
| **Delays in Distributions** | You may experience some delay in the receipt of distributions on book-entry securities since the distributions will be forwarded by the trustee to The Depository Trust Company for it to credit the accounts of its participants.  In turn, these participants will then credit the distributions to your account either directly or indirectly through indirect participants. |
| **Secondary Market For The**<br>**Securities May Not Exist** | The related prospectus supplement for each series will specify the classes in which the underwriter intends to make a secondary market, but no underwriter will have any obligation to do so. We can give no assurance that a secondary market for the securities will develop or, if it develops, that it will continue.  Consequently, you may not be able to sell your securities readily or at |

prices that will enable you to realize your
desired yield.  The market values of the
securities are likely to fluctuate. Fluctuations
may be significant and could result in
significant losses to you.

The secondary markets for mortgage backed
securities have experienced periods of
illiquidity and can be expected to do so in the
future. Illiquidity can have a severely adverse
effect on the prices of securities that are
especially sensitive to prepayment, credit or
interest rate risk, or that have been structured
to meet the investment requirements of limited
categories of investors.

Bankruptcy Or Insolvency May
Affect The Timing And Amount
Of Distributions On The
Securities

Each seller and the depositor will take steps to
structure the transfer of the loans held in the
trust fund by the seller to the depositor as a
sale.  The depositor and the trust fund will take
steps to structure the transfer of the loans from
the depositor to the trust fund as a sale.  If
these characterizations are correct, then if the
seller were to become bankrupt, the loans would
not be part of the seller's bankruptcy estate and
would not be available to the seller's
creditors.  On the other hand, if the seller
becomes bankrupt, its bankruptcy trustee or one
of its creditors may attempt to recharacterize
the sale of the loans as a borrowing by the
seller, secured by a pledge of the loans.
Presenting this position to a bankruptcy court
could prevent timely payments on the securities
and even reduce the payments on the securities.
Additionally, if that argument is successful, the
bankruptcy trustee could elect to sell the loans
and pay down the securities early. Thus, you
could lose the right to future payments of
interest, and might suffer reinvestment losses in
a lower interest rate environment.

Similarly, if the characterizations of the
transfers as sales are correct, then if the
depositor were to become bankrupt, the loans
would not be part of the depositor's bankruptcy
estate and would not be available to the
depositor's creditors.  On the other hand, if the
depositor becomes bankrupt, its bankruptcy
trustee or one of its creditors may attempt to
recharacterize the sale of the loans as a
borrowing by the depositor, secured by a pledge
of the loans.  Presenting this position to a
bankruptcy

10

<PAGE>

court could prevent timely payments on the
securities and even reduce the payments on the

securities.

If the master servicer becomes bankrupt, the bankruptcy trustee may have the power to prevent the appointment of a successor master servicer. Any related delays in servicing could result in increased delinquencies or losses on the loans. The period during which cash collections may be commingled with the master servicer's own funds before each distribution date for securities will be specified in the applicable prospectus supplement. If the master servicer becomes bankrupt and cash collections have been commingled with the master servicer's own funds, the trust fund will likely not have a perfected interest in those collections. In this case the trust might be an unsecured creditor of the master servicer as to the commingled funds and could recover only its share as a general creditor, which might be nothing. Collections that are not commingled but still in an account of the master servicer might also be included in the bankruptcy estate of the master servicer even though the trust may have a perfected security interest in them. Their inclusion in the bankruptcy estate of the master servicer may result in delays in payment and failure to pay amounts due on the securities.

Federal and state statutory provisions affording protection or relief to distressed borrowers may affect the ability of the secured mortgage lender to realize upon its security in other situations as well. For example, in a proceeding under the federal Bankruptcy Code, a lender may not foreclose on a mortgaged property without the permission of the bankruptcy court. And in certain instances a bankruptcy court may allow a borrower to reduce the monthly payments, change the rate of interest, and alter the mortgage loan repayment schedule for under-collateralized mortgage loans. The effect of these types of proceedings can be to cause delays in receiving payments on the loans underlying securities and even to reduce the aggregate amount of payments on the loans underlying securities.

**The Principal Amount Of Securities May Exceed The Market Value Of The Trust Fund Assets**

The market value of the assets relating to a series of securities at any time may be less than the principal amount of the securities of that series then outstanding, plus accrued interest. In the case of a series of notes, after an event of default and a sale of the assets relating to a series of securities, the trustee, the master servicer, the credit enhancer, if any, and any other service provider specified in the related prospectus supplement generally will be entitled to receive the proceeds of that sale to the extent of unpaid fees and other amounts owing to

them under the related transaction document prior to distributions to securityholders. Upon any sale of the assets in connection with an event of default, the proceeds may be insufficient to pay in full the principal of and interest on the securities of the related series.

Certain capitalized terms are used in this prospectus to assist you in understanding the terms of the securities. The capitalized terms used in this prospectus are defined on the pages indicated under the caption "Index to Defined Terms" beginning on page 105.

11

<PAGE>

The Trust Fund

General

The securities of each series will represent interests in the assets of the related trust fund, and the notes of each series will be secured by the pledge of the assets of the related trust fund. The trust fund for each series will be held by the trustee for the benefit of the related securityholders. Each trust fund will consist of the trust fund assets (the "Trust Fund Assets") consisting of:

o        a pool comprised of loans as specified in the related prospectus supplement, together with payments relating to those loans as specified in the related prospectus supplement;

o        a pool comprised of collections arising from one or more types of loans that would otherwise be eligible to be loans included in a trust fund;

o        mortgage pass-through securities (the "Agency Securities") issued or guaranteed by Ginnie Mae, Fannie Mae or Freddie Mac or

o        other mortgage pass-through certificates or collateralized mortgage obligations (the "Non-Agency Mortgage-Backed Securities") evidencing an interest in, or secured by, loans of the type that would otherwise be eligible to be loans included in a trust fund.

The pool will be created on the first day of the month of the issuance of the related series of securities or on another date specified in the related prospectus supplement. The securities will be entitled to payment from the assets of the related trust fund or funds or other assets pledged for the benefit of the securityholders, as specified in the related prospectus supplement and will not be entitled to payments in respect of the assets of any other trust fund established by the depositor.*

The Trust Fund Assets will be acquired by the depositor, either directly or through affiliates, from originators or sellers which may be affiliates of the depositor (the "Sellers"), and conveyed without recourse by the depositor to the related trust fund. Loans acquired by the depositor will have been originated in accordance with the underwriting criteria specified below under "Loan Program -- Underwriting Standards" or as otherwise described in the

related prospectus supplement. See "Loan Program -- Underwriting Standards."

The depositor will cause the Trust Fund Assets to be assigned to the trustee named in the related prospectus supplement for the benefit of the holders of the securities of the related series. The master servicer named in the related prospectus supplement will service the Trust Fund Assets, either directly or through other servicing institutions called sub-servicers, pursuant to a Pooling and Servicing Agreement (each, a "Pooling and Servicing Agreement" among the depositor, the master servicer and the trustee with respect to a series consisting of certificates, or a sale and servicing agreement (each, a "Sale and Servicing Agreement") between the trustee and the master servicer with respect to a series consisting of certificates and notes, and will receive a fee for these services. The Pooling and Servicing Agreements and Sale and Servicing Agreements are also referred to as "Master Servicing Agreements") in this prospectus. See "Loan Program" and "The Agreements." With respect to loans serviced by the master servicer through a sub-servicer, the master servicer will remain liable for its servicing obligations under the related Agreement as if the master servicer alone were servicing those loans.

--------------------------
*   Whenever the terms pool, certificates, notes and securities are used in this prospectus, those terms will be considered to apply, unless the context indicates otherwise, to one specific pool and the securities of one series including the certificates representing undivided interests in, and/or notes secured by the assets of, a single trust fund consisting primarily of the loans in that pool. Similarly, the term "Pass- Through Rate" will refer to the pass-through rate borne by the certificates and the term interest rate will refer to the interest rate borne by the notes of one specific series, as applicable, and the term trust fund will refer to one specific trust fund.


                                    12
<PAGE>

If so specified in the related prospectus supplement, a trust fund relating to a series of securities may be a business trust or common law trust formed under the laws of the state specified in the related prospectus supplement pursuant to a trust agreement (each, a "Trust Agreement") between the depositor and the trustee of the trust fund.

As used herein, "Agreement" means, with respect to a series consisting of certificates, the Pooling and Servicing Agreement, and with respect to a series consisting of certificates and notes, the Trust Agreement, the Indenture and the Sale and Servicing Agreement, as the context requires.

With respect to each trust fund, prior to the initial offering of the related series of securities, the trust fund will have no assets or liabilities. No trust fund is expected to engage in any activities other than acquiring, managing and holding of the related Trust Fund Assets and other assets contemplated herein specified and in the related prospectus supplement and the proceeds thereof, issuing securities and making payments and distributions thereon and certain related activities. No trust fund is expected to have any source of capital other than its assets and any related credit enhancement.

The applicable prospectus supplement may provide for additional obligations of the depositor, but if it does not, the only obligations of the

depositor with respect to a series of securities will be to obtain certain representations and warranties from the sellers and to assign to the trustee for that series of securities the depositor's rights with respect to the representations and warranties. See "The Agreements -- Assignment of the Trust Fund Assets." The obligations of the master servicer with respect to the loans will consist principally of its contractual servicing obligations under the related Agreement (including its obligation to enforce the obligations of the sub-servicers or sellers, or both, as more fully described herein under "Loan Program -- Representations by Sellers; Repurchases" and "The Agreements -- Sub-Servicing By Sellers" and "-- Assignment of the Trust Fund Assets") and its obligation, if any, to make certain cash advances in the event of delinquencies in payments on or with respect to the loans in the amounts described herein under "Description of the Securities -- Advances." The obligations of the master servicer to make advances may be subject to limitations, to the extent provided herein and in the related prospectus supplement.

        The following is a brief description of the assets expected to be included in the trust funds. If specific information respecting the Trust Fund Assets is not known at the time the related series of securities initially is offered, more general information of the nature described below will be provided in the related prospectus supplement, and specific information will be set forth in a report on Form 8-K to be filed with the Securities and Exchange Commission (the "SEC") after the initial issuance of the related securities (the "Detailed Description"). A copy of the Agreement with respect to each series of securities will be filed on Form 8-K after the initial issuance of the related securities and will be available for inspection at the corporate trust office of the trustee specified in the related prospectus supplement. A schedule of the loans relating to the series will be attached to the Agreement delivered to the trustee upon delivery of the securities.

        The Loans

        General. Loans will consist of single family loans or multifamily loans. If so specified, the loans may include cooperative apartment loans ("cooperative loans") secured by security interests in shares issued by private, non-profit, cooperative housing corporations ("cooperatives") and in the related proprietary leases or occupancy agreements granting exclusive rights to occupy specific dwelling units in the cooperatives' buildings. As more fully described in the related prospectus supplement, the loans may be "conventional" loans or loans that are insured or guaranteed by a governmental agency such as the Federal Housing Administration (the "FHA") or the Department of Veterans' Affairs (the "VA").

        The applicable prospectus supplement may specify the day on which monthly payments on the loans in a pool will be due, but if it does not, all of the mortgage loans in a pool will have monthly payments due on the first day of each month. The payment terms of the loans to be included in a trust fund will be described in the related prospectus supplement and may include any of the following features or combination thereof or other features described in the related prospectus supplement:

                                        13
<PAGE>


o       Interest may be payable at a fixed rate, a rate adjustable from time
        to time in relation to an index (which will be specified in the
        related prospectus supplement), a rate that is fixed for a period of

time or under certain circumstances and is followed by an adjustable
rate, a rate that otherwise varies from time to time, or a rate that
is convertible from an adjustable rate to a fixed rate.  Changes to
an adjustable rate may be subject to periodic limitations, maximum
rates, minimum rates or a combination of the limitations.  Accrued
interest may be deferred and added to the principal of a loan for
the periods and under the circumstances as may be specified in the
related prospectus supplement.  Loans may provide for the payment of
interest at a rate lower than the specified interest rate borne by
the loan (the "Loan Rate") for a period of time or for the life of
the loan, and the amount of any difference may be contributed from
funds supplied by the seller of the Property or another source.

o     Principal may be payable on a level debt service basis to fully
      amortize the loan over its term, may be calculated on the basis of
      an assumed amortization schedule that is significantly longer than
      the original term to maturity or on an interest rate that is
      different from the Loan Rate or may not be amortized during all or a
      portion of the original term.  Payment of all or a substantial
      portion of the principal may be due on maturity, called balloon
      payments.  Principal may include interest that has been deferred and
      added to the principal balance of the loan.

o     Monthly payments of principal and interest may be fixed for the life of
      the loan, may increase over a specified period of time or may change
      from period to period. The terms of a loan may include limits on
      periodic increases or decreases in the amount of monthly payments and
      may include maximum or minimum amounts of monthly payments.

o     The loans generally may be prepaid at any time.  Prepayments of
      principal may be subject to a prepayment fee, which may be fixed for
      the life of the loan or may decline over time, and may be prohibited
      for the life of the loan or for certain periods, which are called
      lockout periods.  Certain loans may permit prepayments after
      expiration of the applicable lockout period and may require the
      payment of a prepayment fee in connection with any subsequent
      prepayment.  Other loans may permit prepayments without payment of a
      fee unless the prepayment occurs during specified time periods.  The
      loans may include "due-on-sale" clauses that permit the mortgagee to
      demand payment of the entire loan in connection with the sale or
      certain transfers of the related mortgaged property.  Other loans
      may be assumable by persons meeting the then applicable underwriting
      standards of the seller.

      A trust fund may contain buydown loans that include provisions whereby a
third party partially subsidizes the monthly payments of the obligors on the
loans during the early years of the loans, the difference to be made up from a
buydown fund contributed by the third party at the time of origination of the
loan. A buydown fund will be in an amount equal either to the discounted value
or full aggregate amount of future payment subsidies. Thereafter, buydown
funds are applied to the applicable loan upon receipt by the master servicer
of the mortgagor's portion of the monthly payment on the loan. The master
servicer administers the buydown fund to ensure that the monthly allocation
from the buydown fund combined with the monthly payment received from the
mortgagor equals the scheduled monthly payment on the applicable loan. The
underlying assumption of buydown plans is that the income of the mortgagor
will increase during the buydown period as a result of normal increases in
compensation and inflation, so that the mortgagor will be able to meet the
full mortgage payments at the end of the buydown period. To the extent that
this assumption as to increased income is not fulfilled, the possibility of

defaults on buydown loans is increased. The related prospectus supplement will contain information with respect to any Buydown Loan concerning limitations on the interest rate paid by the mortgagor initially, on annual increases in the interest rate and on the length of the buydown period.

The real property which secures repayment of the loans is referred to as the mortgaged properties and is collectively referred to herein as the "Properties." The loans will be secured by mortgages or deeds of trust or other similar security instruments creating a lien on the Properties. The Properties may be located in any one of the fifty states, the District of Columbia, Guam, Puerto Rico or any other territory of the United States.

14

<PAGE>

Loans with certain Loan-to-Value Ratios and/or certain principal balances may be covered wholly or partially by primary mortgage guaranty insurance policies (each, a "Primary Mortgage Insurance Policy"). The existence, extent and duration of any coverage will be described in the applicable prospectus supplement.

The aggregate principal balance of loans secured by Properties that are owner-occupied will be disclosed in the related prospectus supplement. The applicable prospectus supplement may provide for the basis for representations relating to Single Family Properties, but if it does not, the sole basis for a representation that a given percentage of the loans is secured by Single Family Properties that are owner-occupied will be either (i) the making of a representation by the borrower at origination of the loan either that the underlying Property will be used by the borrower for a period of at least six months every year or that the borrower intends to use the Property as a primary residence or (ii) a finding that the address of the underlying Property is the borrower's mailing address.

Single Family Loans. The mortgaged properties relating to single family loans will consist of detached or semi-detached one- to four-family dwelling units, townhouses, rowhouses, individual condominium units, individual units in planned unit developments, manufactured housing that is permanently affixed and treated as real property under local law, and certain other dwelling units ("Single Family Properties"). Single Family Properties may include vacation and second homes, investment properties and leasehold interests. In the case of leasehold interests, the applicable prospectus supplement may provide for the leasehold term, but if it does not, the term of the leasehold will exceed the scheduled maturity of the loan by at least five years.

Multifamily Loans. Mortgaged properties which secure multifamily loans may include small multifamily residential properties such as rental apartment buildings or projects containing five to fifty residential units, including mid-rise and garden apartments. Certain of the multifamily loans may be secured by apartment buildings owned by cooperatives. In those cases, the cooperative owns all the apartment units in the building and all common areas. The cooperative is owned by tenant-stockholders who, through ownership of stock, shares or membership certificates in the corporation, receive proprietary leases or occupancy agreements which confer exclusive rights to occupy specific apartments or units. Generally, a tenant-stockholder of a cooperative must make a monthly payment to the cooperative representing the tenant-stockholder's pro rata share of the cooperative's payments for its mortgage loan, real property taxes, maintenance expenses and other capital or ordinary expenses. Those payments are in addition to any payments of principal

and interest the tenant-stockholder must make on any loans to the
tenant-stockholder secured by its shares in the cooperative. The cooperative
will be directly responsible for building management and, in most cases,
payment of real estate taxes and hazard and liability insurance. A
cooperative's ability to meet debt service obligations on a multifamily loan,
as well as all other operating expenses, will be dependent in large part on
the receipt of maintenance payments from the tenant-stockholders, as well as
any rental income from units the cooperative might control. Unanticipated
expenditures may in some cases have to be paid by special assessments on the
tenant-stockholders. No more than 5% of the aggregate Trust Fund Assets for
any series, as constituted at the time of the applicable cut-off date
(measured by principal balance), will be comprised of multifamily loans.

      Additional Information. Each prospectus supplement will contain
information, as of the date of the prospectus supplement and to the extent
then specifically known to the depositor, with respect to the loans contained
in the related pool, including

o       the aggregate outstanding principal balance and the average outstanding
        principal balance of the loans as of the first day of the month of
        issuance of the related series of certificates or another date specified
        in the related prospectus supplement called a cut-off date,

o       the type of property securing the loans (e.g., single-family residences,
        individual units in condominium apartment buildings or in buildings
        owned by cooperatives, small multifamily properties or other real
        property),

o       the original terms to maturity of the loans,

o       the ranges of the principal balances of the loans,

                                      15
<PAGE>


o       the earliest origination date and latest maturity date of any of the
        loans,

o       the ranges of the Loan-to-Value Ratios of the loans at origination,

o       the Loan Rates or range of Loan Rates borne by the loans, and

o       the geographical distribution of the loans.

      If specific information respecting the loans is not known to the
depositor at the time the related securities are initially offered, more
general information of the nature described above will be provided in the
detailed description of Trust Fund Assets.

      The "Loan-to-Value Ratio" of a loan at any given time is the fraction,
expressed as a percentage, the numerator of which is the original principal
balance of the related loan and the denominator of which is the collateral
value of the related Property. The "Collateral Value" of the Property, other
than with respect to certain loans the proceeds of which were used to
refinance an existing mortgage loan (each, a "Refinance Loan"), will be
calculated as described in the prospectus supplement, but if there is no
description in the prospectus supplement, it is the lesser of (a) the
appraised value determined in an appraisal obtained by the originator at

origination of the loan and (b) the sales price for the Property. In the case of Refinance Loans, the "Collateral Value" of the related Property will be calculated as described in the prospectus supplement, but if there is no description in the prospectus supplement, it is generally the appraised value thereof determined in an appraisal obtained at the time of refinancing.

We can give no assurance that values of the Properties have remained or will remain at their levels on the dates of origination of the related loans. If the residential real estate market should experience an overall decline in property values such that the outstanding principal balances of the loans, and any secondary financing on the Properties, in a particular pool become equal to or greater than the value of the Properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry. In addition, adverse economic conditions and other factors (which may or may not affect real property values) may affect the timely payment by borrowers of scheduled payments of principal and interest on the loans and, accordingly, the actual rates of delinquencies, foreclosures and losses with respect to any pool. To the extent that the losses are not covered by subordination provisions or alternative arrangements, the losses will be borne, at least in part, by the holders of the securities of the related series.

Agency Securities

Government National Mortgage Association. Ginnie Mae is a wholly-owned corporate instrumentality of the United States with the United States Department of Housing and Urban Development. Section 306(g) of Title II of the National Housing Act of 1934, as amended, authorizes Ginnie Mae to guarantee the timely payment of the principal of and interest on certificates that represent an interest in a pool of mortgage loans insured by the FHA under the National Housing Act of 1934 or Title V of the Housing Act of 1949, or partially guaranteed by the VA under the Servicemen's Readjustment Act of 1944, as amended, or Chapter 37 of Title 38, United States Code.

Section 306(g) of the National Housing Act of 1934 provides that "the full faith and credit of the United States is pledged to the payment of all amounts which may be required to be paid under any guaranty under this subsection." In order to meet its obligations under that guaranty, Ginnie Mae may, under Section 306(d) of the National Housing Act of 1934, borrow from the United States Treasury in an unlimited amount which is at any time sufficient to enable Ginnie Mae to perform its obligations under its guarantee.

Ginnie Mae Certificates. Each Ginnie Mae certificate held in a trust fund will be a "fully modified pass-through" mortgage backed certificate issued and serviced by a Ginnie Mae issuer approved by Ginnie Mae or by Fannie Mae as a seller-servicer of FHA loans or VA loans. The Ginnie Mae certificates may be issued under either the Ginnie Mae I program or the Ginnie Mae II program. The mortgage loans underlying the Ginnie Mae certificates will consist of FHA loans or VA loans. Each mortgage loan is secured by a one-to four-family or multifamily residential property. Ginnie Mae will approve the issuance of each Ginnie Mae certificate in

16

<PAGE>

accordance with a guaranty agreement between Ginnie Mae and the Ginnie Mae issuer. Pursuant to its guaranty agreement, a Ginnie Mae issuer will be required to advance its own funds in order to make timely payments of all amounts due on each Ginnie Mae certificate if the payments received by the

Ginnie Mae issuer on the FHA loans or VA loans underlying each Ginnie Mae
certificate are less than the amounts due on each Ginnie Mae certificate.

The full and timely payment of principal of and interest on each Ginnie
Mae certificate will be guaranteed by Ginnie Mae, which obligation is backed
by the full faith and credit of the United States. Each Ginnie Mae certificate
will have an original maturity of not more than 30 years (but may have
original maturities of substantially less than 30 years). Each Ginnie Mae
certificate will be based on and backed by a pool of FHA loans or VA loans
secured by one to four-family residential properties and will provide for the
payment by or on behalf of the Ginnie Mae issuer to the registered holder of
the Ginnie Mae certificate of scheduled monthly payments of principal and
interest equal to the registered holder's proportionate interest in the
aggregate amount of the monthly principal and interest payment on each FHA
loan or VA loan underlying the Ginnie Mae certificate, less the applicable
servicing and guaranty fee, which together equal the difference between the
interest on the FHA loan or VA loan and the pass-through rate on the Ginnie
Mae certificate. In addition, each payment will include proportionate
pass-through payments of any prepayments of principal on the FHA loans or VA
loans underlying the Ginnie Mae certificate and liquidation proceeds upon a
foreclosure or other disposition of the FHA loans or VA loans.

If a Ginnie Mae issuer is unable to make the payments on a Ginnie Mae
certificate as it becomes due, it must promptly notify Ginnie Mae and request
Ginnie Mae to make the payment. Upon notification and request, Ginnie Mae will
make the payments directly to the registered holder of the Ginnie Mae
certificate. If no payment is made by a Ginnie Mae issuer and the Ginnie Mae
issuer fails to notify and request Ginnie Mae to make the payment, the holder
of the Ginnie Mae certificate will have recourse only against Ginnie Mae to
obtain the payment. The trustee or its nominee, as registered holder of the
Ginnie Mae certificates held in a trust fund, will have the right to proceed
directly against Ginnie Mae under the terms of the guaranty agreements
relating to the Ginnie Mae certificates for any amounts that are not paid when
due.

All mortgage loans underlying a particular Ginnie Mae I certificate must
have the same interest rate over the term of the loan, except in pools of
mortgage loans secured by manufactured homes. The interest rate on the Ginnie
Mae I certificate will equal the interest rate on the mortgage loans included
in the pool of mortgage loans underlying the Ginnie Mae I certificate, less
one-half percentage point per annum of the unpaid principal balance of the
mortgage loans.

Mortgage loans underlying a particular Ginnie Mae II certificate may
have per annum interest rates that vary from each other by up to one
percentage point. The interest rate on each Ginnie Mae II certificate will be
between one half percentage point and one and one-half percentage points lower
than the highest interest rate on the mortgage loans included in the pool of
mortgage loans underlying the Ginnie Mae II certificate, except for pools of
mortgage loans secured by manufactured homes.

Regular monthly installment payments on each Ginnie Mae certificate held
in a trust fund will be comprised of interest due as specified on the Ginnie
Mae certificate plus the scheduled principal payments on the FHA loans or VA
loans underlying the Ginnie Mae certificate due on the first day of the month
in which the scheduled monthly installments on the Ginnie Mae certificate are
due. The regular monthly installments on each Ginnie Mae certificate are
required to be paid to the trustee as registered holder by the 15th day of
each month in the case of a Ginnie Mae I certificate and are required to be
mailed to the trustee by the 20th day of each month in the case of a Ginnie

Mae II certificate. Any principal prepayments on any FHA loans or VA loans underlying a Ginnie Mae certificate held in a trust fund or any other early recovery of principal on the loans will be passed through to the trustee as the registered holder of the Ginnie Mae certificate.

Ginnie Mae certificates may be backed by graduated payment mortgage loans or by buydown loans for which funds will have been provided (and deposited into escrow accounts) for application to the payment of a portion of the borrowers' monthly payments during the early years of the mortgage loan. Payments due the registered holders of Ginnie Mae certificates backed by pools containing buydown loans will be computed in the same manner as payments derived from other Ginnie Mae certificates and will include amounts to be collected from both the borrower and the related escrow account. The graduated payment mortgage loans will provide for graduated interest payments that, during the early years of the mortgage loans, will be less than the amount of stated

17

<PAGE>

interest on the mortgage loans. The interest not so paid will be added to the principal of the graduated payment mortgage loans and, together with interest on them, will be paid in subsequent years. The obligations of Ginnie Mae and of a Ginnie Mae issuer will be the same irrespective of whether the Ginnie Mae certificates are backed by graduated payment mortgage loans or buydown loans. No statistics comparable to the FHA's prepayment experience on level payment, non-buydown mortgage loans are available for graduated payment or buydown loans. Ginnie Mae certificates related to a series of certificates may be held in book-entry form.

The Ginnie Mae certificates included in a trust fund, and the related underlying mortgage loans, may have characteristics and terms different from those described above. Any different characteristics and terms will be described in the related prospectus supplement.

Federal Home Loan Mortgage Corporation. Freddie Mac is a corporate instrumentality of the United States created pursuant to Title III of the Emergency Home Finance Act of 1970, as amended. The common stock of Freddie Mac is owned by the Federal Home Loan Banks and its preferred stock is owned by stockholders of the Federal Home Loan Banks. Freddie Mac was established primarily to increase the availability of mortgage credit to finance urgently needed housing. It seeks to provide an enhanced degree of liquidity for residential mortgage investments primarily by assisting in the development of secondary markets for conventional mortgages. The principal activity of Freddie Mac currently consists of the purchase of first lien conventional mortgage loans or participation interests in mortgage loans and the sale of the mortgage loans or participations so purchased in the form of mortgage securities, primarily mortgage participation certificates issued and either guaranteed as to timely payment of interest or guaranteed as to timely payment of interest and ultimate payment of principal by Freddie Mac. Freddie Mac is confined to purchasing, so far as practicable, mortgage loans that it deems to be of such quality, type and class as to meet generally the purchase standards imposed by private institutional mortgage investors.

Freddie Mac Certificates. Each Freddie Mac certificate represents an undivided interest in a pool of mortgage loans that may consist of first lien conventional loans, FHA loans or VA loans. Freddie Mac certificates are sold under the terms of a Mortgage Participation Certificate Agreement. A Freddie Mac certificate may be issued under either Freddie Mac's Cash Program or

Guarantor Program.

Mortgage loans underlying the Freddie Mac certificates held by a trust fund will consist of mortgage loans with original terms to maturity of between 10 and 40 years. Each mortgage loan must meet the applicable standards set forth in the Emergency Home Finance Act of 1970. A Freddie Mac certificate group may include whole loans, participation interests in whole loans and undivided interests in whole loans and participations comprising another Freddie Mac certificate group. Under the Guarantor Program, a Freddie Mac certificate group may include only whole loans or participation interests in whole loans.

Freddie Mac guarantees to each registered holder of a Freddie Mac certificate the timely payment of interest on the underlying mortgage loans to the extent of the applicable certificate interest rate on the registered holder's pro rata share of the unpaid principal balance outstanding on the underlying mortgage loans in the Freddie Mac certificate group represented by the Freddie Mac certificate, whether or not received. Freddie Mac also guarantees to each registered holder of a Freddie Mac certificate collection by the holder of all principal on the underlying mortgage loans, without any offset or deduction, to the extent of the holder's pro rata share of it, but does not, except if and to the extent specified in the related prospectus supplement for a series of certificates, guarantee the timely payment of scheduled principal. Under Freddie Mac's Gold PC Program, Freddie Mac guarantees the timely payment of principal based on the difference between the pool factor published in the month preceding the month of distribution and the pool factor published in the month of distribution. Pursuant to its guaranties, Freddie Mac indemnifies holders of Freddie Mac certificates against any diminution in principal from charges for property repairs, maintenance and foreclosure. Freddie Mac may remit the amount due on account of its guaranty of collection of principal at any time after default on an underlying mortgage loan, but not later than 30 days following foreclosure sale, 30 days following payment of the claim by any mortgage insurer or 30 days following the expiration of any right of redemption, whichever occurs later, but in any event no later than one year after demand has been made upon the mortgagor for accelerated payment of principal. In taking actions regarding the collection of principal after default on the mortgage loans underlying Freddie Mac certificates, including the timing of demand for acceleration, Freddie Mac reserves the right to exercise its judgment with respect to the mortgage loans in the same manner as for mortgage loans that it has purchased but not sold. The length of time necessary for Freddie Mac

18

<PAGE>

to determine that a mortgage loan should be accelerated varies with the particular circumstances of each mortgagor, and Freddie Mac has not adopted standards which require that the demand be made within any specified period.

Freddie Mac certificates are not guaranteed by the United States or by any Federal Home Loan Bank and do not constitute debts or obligations of the United States or any Federal Home Loan Bank. The obligations of Freddie Mac under its guaranty are obligations solely of Freddie Mac and are not backed by, or entitled to, the full faith and credit of the United States. If Freddie Mac were unable to satisfy its obligations, distributions to holders of Freddie Mac certificates would consist solely of payments and other recoveries on the underlying mortgage loans and, accordingly, monthly distributions to holders of Freddie Mac certificates would be affected by delinquent payments

and defaults on the mortgage loans.

Registered holders of Freddie Mac certificates are entitled to receive their monthly pro rata share of all principal payments on the underlying mortgage loans received by Freddie Mac, including any scheduled principal payments, full and partial prepayments of principal and principal received by Freddie Mac by virtue of condemnation, insurance, liquidation or foreclosure, and repurchases of the mortgage loans by Freddie Mac or their seller. Freddie Mac is required to remit each registered Freddie Mac certificateholder's pro rata share of principal payments on the underlying mortgage loans, interest at the Freddie Mac pass-through rate and any other sums such as prepayment fees, within 60 days of the date on which the payments are deemed to have been received by Freddie Mac.

Under Freddie Mac's Cash Program, there is no limitation on the amount by which interest rates on the mortgage loans underlying a Freddie Mac certificate may exceed the pass-through rate on the Freddie Mac certificate. Under that program, Freddie Mac purchases groups of whole mortgage loans from sellers at specified percentages of their unpaid principal balances, adjusted for accrued or prepaid interest, which when applied to the interest rate of the mortgage loans and participations purchased results in the yield required by Freddie Mac. The required yield, which includes a minimum servicing fee retained by the servicer, is calculated using the outstanding principal balance. The range of interest rates on the mortgage loans and participations in a Freddie Mac certificate group under the Cash Program will vary since mortgage loans and participations are purchased and assigned to a Freddie Mac certificate group based upon their yield to Freddie Mac rather than on the interest rate on the underlying mortgage loans. Under Freddie Mac's Guarantor Program, the pass-through rate on a Freddie Mac certificate is established based upon the lowest interest rate on the underlying mortgage loans, minus a minimum servicing fee and the amount of Freddie Mac's management and guaranty income as agreed upon between the seller and Freddie Mac.

Freddie Mac certificates duly presented for registration of ownership on or before the last business day of a month are registered effective as of the first day of the month. The first remittance to a registered holder of a Freddie Mac certificate will be distributed so as to be received normally by the 15th day of the second month following the month in which the purchaser became a registered holder of the Freddie Mac certificate. Thereafter, the remittance will be distributed monthly to the registered holder so as to be received normally by the 15th day of each month. The Federal Reserve Bank of New York maintains book-entry accounts for Freddie Mac certificates sold by Freddie Mac on or after January 2, 1985, and makes payments of principal and interest each month to their registered holders in accordance with the holders' instructions.

Federal National Mortgage Association. Fannie Mae is a federally chartered and privately owned corporation organized and existing under the Federal National Mortgage Association Charter Act, as amended. Fannie Mae was originally established in 1938 as a United States government agency to provide supplemental liquidity to the mortgage market and was transformed into a stockholder owned and privately-managed corporation by legislation enacted in 1968.

Fannie Mae provides funds to the mortgage market primarily by purchasing mortgage loans from lenders, thereby replenishing their funds for additional lending. Fannie Mae acquires funds to purchase mortgage loans from many capital market investors that may not ordinarily invest in mortgages, thereby expanding the total amount of funds available for housing. Operating nationwide, Fannie Mae helps to redistribute mortgage funds from

capital-surplus to capital-short areas.

<PAGE>

      Fannie Mae Certificates. These are guaranteed mortgage pass-through
certificates issued and guaranteed as to timely payment of principal and
interest by Fannie Mae representing fractional undivided interests in a pool
of mortgage loans formed by Fannie Mae. Each mortgage loan must meet the
applicable standards of the Fannie Mae purchase program. Mortgage loans
comprising a pool are either provided by Fannie Mae from its own portfolio or
purchased pursuant to the criteria of the Fannie Mae purchase program.

      Mortgage loans underlying Fannie Mae certificates held by a trust fund
will consist of conventional mortgage loans, FHA loans or VA loans. Original
maturities of substantially all of the conventional, level payment mortgage
loans underlying a Fannie Mae certificate are expected to be between either 8
to 15 years or 20 to 40 years. The original maturities of substantially all of
the fixed rate, level payment FHA loans or VA loans are expected to be 30
years. Mortgage loans underlying a Fannie Mae certificate may have annual
interest rates that vary by as much as two percentage points from each other.
The rate of interest payable on a Fannie Mae certificate is equal to the
lowest interest rate of any mortgage loan in the related pool, less a
specified minimum annual percentage representing servicing compensation and
Fannie Mae's guaranty fee. Under a regular servicing option, the annual
interest rates on the mortgage loans underlying a Fannie Mae certificate will
be between 50 basis points and 250 basis points greater than is its annual
pass through rate. Under this option the mortgagee or each other servicer
assumes the entire risk of foreclosure losses. Under a special servicing
option, the annual interest rates on the mortgage loans underlying a Fannie
Mae certificate will generally be between 55 basis points and 255 basis points
greater than the annual Fannie Mae certificate pass-through rate. Under this
option Fannie Mae assumes the entire risk for foreclosure losses. If specified
in the related prospectus supplement, Fannie Mae certificates may be backed by
adjustable rate mortgages.

      Fannie Mae guarantees to each registered holder of a Fannie Mae
certificate that it will distribute amounts representing the holder's
proportionate share of scheduled principal and interest payments at the
applicable pass through rate provided for by the Fannie Mae certificate on the
underlying mortgage loans, whether or not received, and the holder's
proportionate share of the full principal amount of any foreclosed or other
finally liquidated mortgage loan, whether or not the principal amount is
actually recovered. The obligations of Fannie Mae under its guaranties are
obligations solely of Fannie Mae and are not backed by, or entitled to, the
full faith and credit of the United States. Although the Secretary of the
Treasury of the United States has discretionary authority to lend Fannie Mae
up to $2.25 billion outstanding at any time, neither the United States nor any
of its agencies is obligated to finance Fannie Mae's operations or to assist
Fannie Mae in any other manner. If Fannie Mae were unable to satisfy its
obligations, distributions to holders of Fannie Mae certificates would consist
solely of payments and other recoveries on the underlying mortgage loans and,
accordingly, monthly distributions to holders of Fannie Mae certificates would
be affected by delinquent payments and defaults on the mortgage loans.

      Except for Fannie Mae certificates backed by pools containing graduated
payment mortgage loans or mortgage loans secured by multifamily projects,
Fannie Mae certificates evidencing interests in pools of mortgage loans formed

on or after May 1, 1985 are available in book-entry form only. Distributions of principal and interest on each Fannie Mae certificate will be made by Fannie Mae on the 25th day of each month to the persons in whose name the Fannie Mae certificate is entered in the books of the Federal Reserve Banks or registered on the Fannie Mae certificate register as of the close of business on the last day of the preceding month. Distributions on Fannie Mae certificates issued in book-entry form will be made by wire. Distributions on fully registered Fannie Mae certificates will be made by check.

The Fannie Mae certificates included in a trust fund, and the related underlying mortgage loans, may have characteristics and terms different from those described above. Any different characteristics and terms will be described in the related prospectus supplement.

Stripped Mortgage-Backed Securities. Agency Securities may consist of one or more stripped mortgage-backed securities, each as described in this prospectus and in the related prospectus supplement. Each Agency Security will represent an undivided interest in all or part of either the principal distributions (but not the interest distributions) or the interest distributions (but not the principal distributions), or in some specified portion of the principal and interest distributions (but not all the distributions) on certain Freddie Mac, Fannie Mae or Ginnie Mae certificates. The underlying securities will be held under a trust agreement by Freddie Mac, Fannie Mae or Ginnie Mae, each as trustee, or by another trustee named in the related prospectus supplement. The applicable prospectus supplement may specify that Freddie Mac, Fannie Mae or Ginnie Mae will not guarantee each stripped Agency

20

<PAGE>

Security to the same extent it guarantees the underlying securities backing the stripped Agency Security, but if it does not, then Freddie Mac, Fannie Mae or Ginnie Mae will guarantee each stripped Agency Security to the same extent it guarantees the underlying securities backing the stripped Agency Security.

Other Agency Securities. If specified in the related prospectus supplement, a trust fund may include other mortgage pass-through certificates issued or guaranteed by Ginnie Mae, Fannie Mae or Freddie Mac. The characteristics of those mortgage pass-through certificates will be described in the prospectus supplement. If so specified, a combination of different types of Agency Securities may be held in a trust fund.

Non-Agency Mortgage-Backed Securities

Non-Agency Mortgage-Backed Securities may consist of mortgage pass-through certificates or participation certificates evidencing an undivided interest in a pool of mortgage loans or collateralized mortgage obligations secured by mortgage loans. Non-Agency Mortgage-Backed Securities may include stripped mortgage-backed securities representing an undivided interest in all or a part of either the principal distributions (but not the interest distributions) or the interest distributions (but not the principal distributions) or in some specified portion of the principal and interest distributions (but not all the distributions) on certain mortgage loans. Non-Agency Mortgage-Backed Securities will have been issued pursuant to a pooling and servicing agreement, an indenture or similar agreement. The applicable prospectus supplement may provide that the seller/servicer of the underlying mortgage loans will not have entered into a pooling and servicing

agreement with a private trustee, but if it does not, the seller/servicer of the underlying mortgage loans will have entered into the pooling and servicing agreement with a private trustee. The private trustee or its agent, or a custodian, will possess the mortgage loans underlying the Non-Agency Mortgage-Backed Security. Mortgage loans underlying a Non-Agency Mortgage-Backed Security will be serviced by a private servicer directly or by one or more subservicers who may be subject to the supervision of the private servicer.

The issuer of the Non-Agency Mortgage-Backed Securities will be a financial institution or other entity engaged generally in the business of mortgage lending, a public agency or instrumentality of a state, local or federal government, or a limited purpose corporation organized for the purpose of, among other things, establishing trusts and acquiring and selling housing loans to the trusts and selling beneficial interests in the trusts. If so specified in the related prospectus supplement, the issuer of Non-Agency Mortgage-Backed Securities may be an affiliate of the depositor. The obligations of the issuer of Non-Agency Mortgage-Backed Securities will generally be limited to certain representations and warranties with respect to the assets conveyed by it to the related trust fund. The issuer of Non-Agency Mortgage-Backed Securities will not have guaranteed any of the assets conveyed to the related trust fund or any of the Non-Agency Mortgage-Backed Securities issued under the pooling and servicing agreement. Additionally, although the mortgage loans underlying the Non-Agency Mortgage-Backed Securities may be guaranteed by an agency or instrumentality of the United States, the Non-Agency Mortgage-Backed Securities themselves will not be so guaranteed.

Distributions of principal and interest will be made on the Non-Agency Mortgage-Backed Securities on the dates specified in the related prospectus supplement. The Non-Agency Mortgage-Backed Securities may be entitled to receive nominal or no principal distributions or nominal or no interest distributions. Principal and interest distributions will be made on the Non-Agency Mortgage-Backed Securities by the private trustee or the private servicer. The issuer of Non-Agency Mortgage-Backed Securities or the private servicer may have the right to repurchase assets underlying the Non-Agency Mortgage-Backed Securities after a certain date or under other circumstances specified in the related prospectus supplement.

The mortgage loans underlying the Non-Agency Mortgage-Backed Securities may consist of fixed rate, level payment, fully amortizing loans or graduated payment mortgage loans, buydown loans, adjustable rate mortgage loans or loans having balloon or other special payment features. The mortgage loans may be secured by first liens on single family residences, multifamily residential properties, such as rental apartment buildings or projects containing five to fifty residential units, or an assignment of the proprietary lease or occupancy agreement relating to a specific dwelling within a cooperative and the related shares issued by the cooperative.

The prospectus supplement for a series for which the trust fund includes Non-Agency Mortgage-Backed Securities will specify

21

<PAGE>

o    the aggregate approximate principal amount and type of the
     Non-Agency Mortgage-Backed Securities to be included in the trust
     fund;