[Pursuant to the Corridor Contract Administration Agreement, on or prior to each Distribution Date, the Corridor Contract Administrator will allocate any payment received from the Corridor Contract Counterparty with respect to each Corridor Contract and the Distribution Date (other than any termination payment, which will be allocated as described below):

o   first, to the Indenture Trustee, up to the amount that would be payable under each Corridor Contract if clause (ii) of the preceding sentence were equal to the lesser of the Corridor Contract Notional Balance for the Distribution Date and the aggregate Note Principal Balance of the related class or classes of Notes immediately prior to the Distribution Date, referred to as a "Net Corridor Contract Payment," and

o   second, to Countrywide Home Loans, any remainder, referred to as an "Excess Corridor Contract Payment."]

Excess Corridor Contract Payments will not be available to cover Net Rate Carryover on the Notes.

The "Notional Balance," the "Strike Rate" and the "Ceiling Rate" for the [Class AF-1A] Corridor Contract for each Distribution Date are as described in the following table:

| Month of Distribution Date | Notional Balance ($) | Strike Rate | Ceiling Rate | Month of Distribution Date |
|---|---|---|---|---|
| | | | | |

[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]

S-98

<PAGE>

The "Notional Balance," "Strike Rate" and "Ceiling Rate" for the [Class 2-AV] Corridor Contract for each Distribution Date are as described in the following table:

| Month of Distribution Date | Notional Balance ($) | Strike Rate | Ceiling Rate | Month of Distribution Date |
|---|---|---|---|---|
| | | | | |

[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]


S-99

<PAGE>


    The "Notional Balance," "Strike Rate" and "Ceiling Rate" for the [Class 3-AV] Corridor Contract for each Distribution Date are as described in the following table:


<TABLE>
<CAPTION>

| <S> | <C> | <C> | <C> | <C> |
|---|---|---|---|---|
| Month of Distribution Date | Balance ($) | Strike Rate | Ceiling Rate | Month of Distribution Date |
| ----------------- | -------------- | --------- | ---------- | ----------------- |

</TABLE>


[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]


S-100

<PAGE>


    The "Notional Balance," "Strike Rate" and "Ceiling Rate" for the [Adjustable Rate Subordinate] Corridor Contract for each Distribution Date are as described in the following table:


<TABLE>
<CAPTION>

| <S> | <C> | <C> | <C> | <C> |
|---|---|---|---|---|
| Month of Distribution Date | Notional Balance ($) | Strike Rate | Ceiling Rate | Month of Distribution Date |
| ----------------- | -------------- | --------- | ---------- | ----------------- |

</TABLE>


[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]

S-101

<PAGE>

Each Corridor Contract is scheduled to remain in effect until the Distribution Date set forth below:

| Corridor Contract | Corridor Contract Termination Date |
|-------------------|------------------------------------|
| [Class AF-1A] Corridor Contract | [   ] 20[   ] |
| [Class 2-AV] Corridor Contract | [   ] 20[   ] |
| [Class 3-AV] Corridor Contract | [   ] 20[   ] |
| [Adjustable Rate Subordinate] Corridor Contract | [   ] 20[   ] |

[Each Corridor Contract will be subject to early termination only in limited circumstances. These circumstances generally include certain insolvency or bankruptcy events in relation to the Corridor Contract Counterparty or the Corridor Contract Administrator, the failure by the Corridor Contract Counterparty (three business days after notice of the failure is received by the Corridor Contract Counterparty) to make a payment due under the Corridor Contract and the Corridor Contract becoming illegal or subject to certain kinds of taxation.]

[If any Corridor Contract is terminated, the Corridor Contract Counterparty may owe a termination payment, payable in a lump sum. Any termination payment will be allocated by the Corridor Contract Administrator between the Indenture Trustee and [Countrywide Home Loans], based on, with respect to the Indenture Trustee, a fraction, the numerator of which is the lesser of (x) the related Corridor Contract Notional Balance at the time of termination and (y) the aggregate Note Principal Balance of the related class or classes of Notes at the time of termination, and the denominator of which is the related Corridor Contract Notional Balance at the time of termination, and with respect to Countrywide Home Loans, a fraction, the numerator of which is the excess, if any, of (x) the related Corridor Contract Notional Balance at the time of termination over (y) the aggregate Note Principal Balance of the related class or classes of Notes at the time of termination, and the denominator of which is the Corridor Contract Notional Balance at the time of termination. The portion of any termination payment that is allocated to the issuing entity will be held by the Indenture Trustee until the applicable Corridor Contract Termination Date to pay any Net Rate Carryover on the related class or classes of Notes. However, if a termination occurs, we cannot assure you that a termination payment will be owing to the Indenture Trustee. The Sale and Servicing Agreement does not provide for the substitution of a replacement corridor contract in the event of a termination of an existing Corridor Contract or in any other circumstance.]

The significance percentage for each Corridor Contract is [less than 10% and in the aggregate, the significance percentage of for all of the Corridor Contracts with the Corridor Contract Counterparty is less than 10%]. The "significance percentage" for each Corridor Contract is the percentage that the significance estimate of the Corridor Contract represents of the aggregate Class Principal Balances of the Notes related to the Corridor Contract. The

"significance estimate" of each Corridor Contract is determined based on a reasonable good-faith estimate of the maximum probable exposure of the Corridor Contract, made in substantially the same manner as that used in Countrywide Home Loans' internal risk management process in respect of similar instruments.

[Insert Description of the Corridor Contract Counterparty - Detail to be based on Significance Percentage determination above]

The Notes do not represent an obligation of the Corridor Contract Counterparty or the Corridor Contract Administrator. The holders of the Notes are not parties to or beneficiaries under any Corridor Contract or the Corridor Contract Administration Agreement and will not have any right to proceed directly against the Corridor Contract Counterparty in respect of its obligations under any Corridor Contract or against the Corridor Contract Administrator in respect of its obligations under the Corridor Contract Administration Agreement.

Each Corridor Contract will be filed with the SEC as an Exhibit to a Current Report on Form 8-K after the Closing Date.

[Calculation of One-Month LIBOR

On each Interest Determination Date, the Indenture Trustee will determine the London interbank offered rate for [one-month] United States dollar deposits ("One-Month LIBOR") for the Accrual Period on the basis of the rate as it is quoted on the Bloomberg Terminal for that Interest Determination Date. If the rate is not quoted on the Bloomberg Terminal (or if the service is no longer offered, another service for displaying LIBOR or comparable

S-102

<PAGE>

rates as may be reasonably selected by the Indenture Trustee), One-Month LIBOR for the applicable Accrual Period will be the Reference Bank Rate as defined in this prospectus supplement. If these quotations cannot be obtained and the Reference Bank Rate is not available, One-Month LIBOR will be the One-Month LIBOR applicable to the preceding Accrual Period.

The establishment of One-Month LIBOR on each Interest Determination Date by the Indenture Trustee and the Indenture Trustee's calculation of the rate of interest applicable to the [Adjustable Rate Notes] for the related Accrual Period will (in the absence of manifest error) be final and binding.]

[Carryover Reserve Fund

The Sale and Servicing Agreement establishes an account (the "Carryover Reserve Fund"), which is held in trust by the Indenture Trustee on behalf of the holders of the interest-bearing notes. On the Closing Date, [Countrywide Home Loans] will deposit $[ ] in the Carryover Reserve Fund.

On each Distribution Date, the Indenture Trustee will deposit in the Carryover Reserve Fund amounts allocated to the issuing entity in respect of the Corridor Contracts. On each Distribution Date, the amounts allocated to the issuing entity in respect of each applicable Corridor Contract will be distributed to the related [Adjustable Rate Notes] to pay any Net Rate Carryover on the related [Adjustable Rate Notes] as described under "-- Distributions -- Distributions of Funds from the Corridor Contracts" above.

On each Distribution Date, to the extent that Fixed Rate Loan Group

Excess Cashflow is available as described under "-- Overcollateralization
Provisions -- Fixed Rate Loan Group Excess Cashflow" above or Adjustable Rate
Loan Group Excess Cashflow is available as described under "--
Overcollateralization Provisions -- Adjustable Rate Loan Group Excess
Cashflow" above, the Indenture Trustee will deposit in the Carryover Reserve
Fund the amount needed to pay any Net Rate Carryover as described under "--
Overcollateralization Provisions" above.

        On each Distribution Date, to the extent that Fixed Rate Loan Group
Excess Cashflow is available as described under "-- Overcollateralization
Provisions -- Fixed Rate Loan Group Excess Cashflow" above or Adjustable Rate
Loan Group Excess Cashflow is available as described under "--
Overcollateralization Provisions -- Adjustable Rate Loan Group Excess
Cashflow" above, the Indenture Trustee will deposit in the Carryover Reserve
Fund an amount equal to the excess, if any, of (i) $[ ] over (ii) the amount
of funds on deposit in the Carryover Reserve Fund following all other deposits
to, and withdrawals from, the Carryover Reserve Fund on the Distribution Date
(the "Required Carryover Reserve Fund Deposit").]

[Credit Comeback Excess Account

        The Sale and Servicing Agreement will require the Indenture Trustee to
establish a reserve account (the "Credit Comeback Excess Account"), which is
held in trust by the Indenture Trustee on behalf of the holders of the [Fixed
Rate Notes].

        On each Distribution Date, the Indenture Trustee will deposit in the
Credit Comeback Excess Account, all Credit Comeback Excess Amounts received
during the related Due Period. On each Distribution Date, all Credit Comeback
Excess Amounts received during the related Due Period will be distributed to
the [Fixed Rate Notes] to restore overcollateralization and to cover any
Unpaid Realized Loss Amounts as described under "--Overcollateralization
Provisions -- Fixed Rate Loan Group Excess Cashflow." Any Credit Comeback
Excess Amounts remaining after the application of the Credit Comeback Excess
Amounts as described under "--Overcollateralization Provisions -- Fixed Rate
Loan Group Excess Cashflow" will be distributed to the holder of the Owner
Trust Certificate and will not be available thereafter.]

[Applied Realized Loss Amounts

        If on any Distribution Date, after giving effect to the distributions
described above, the aggregate Note Principal Balance of the [Class AF] and
[Fixed Rate Subordinate Notes] exceeds the sum of the aggregate Stated

                                     S-103

<PAGE>

Principal Balance of the Mortgage Loans in Loan Group [1] and the amount on
deposit in the Pre-Funding Account in respect of Loan Group [1], the amount of
the excess will be applied to reduce the Note Principal Balances of the [Class
BF], [Class MF-8], [Class MF-7], [Class MF-6], [Class MF-5], [Class MF-4],
[Class MF-3], [Class MF-2] and [Class MF-1] Notes, in that order, in each case
until the Note Principal Balance of the class has been reduced to zero.

        If on any Distribution Date, after giving effect to the distributions
described above, the aggregate Note Principal Balance of the [Class AV] Notes
and [Adjustable Rate Subordinate Notes] exceeds the sum of the aggregate
Stated Principal Balance of the Mortgage Loans in Loan Group [2] and Loan
Group [3] and the amount on deposit in the Pre-Funding Account in respect of
Loan Group [2] and Loan Group [3], the amount of the excess will be applied to
reduce the Note Principal Balances of the [Class BV], [Class MV-8], [Class

MV-7], [Class MV-6], [Class MV-5], [Class MV-4], [Class MV-3], [Class MV-2] and [Class MV-1] Notes, in that order, in each case until the Note Principal Balance of the class has been reduced to zero, after which, the Note Principal Balance of the [Class 2-AV-2] Notes will be reduced by the amount by which the aggregate Note Principal Balance of the [Class 2-AV] Notes exceeds the sum of the aggregate Stated Principal Balance of the Mortgage Loans in Group [2] and the amount on deposit in the Pre-Funding Account in respect of Loan Group [2], until the Note Principal Balance of the [Class 2-AV-2] Notes has been reduced to zero. A reduction described in this paragraph or the immediately preceding paragraph is referred to as an "Applied Realized Loss Amount." Applied Realized Loss Amounts will not be allocated to the Senior Notes (other than the [Class 2-AV-2] Notes).

Interest on any class of Notes, the Note Principal Balance of which has been reduced through the application of Applied Realized Loss Amounts as described above will accrue for the related class of Notes on the Note Principal Balance as so reduced unless the Note Principal Balance is subsequently increased due to the allocation of Subsequent Recoveries to the Note Principal Balance of the class as described in the definition of "Note Principal Balance" described in this prospectus supplement under "-- Glossary of Terms -- Definitions related to Distribution Dates and Collections."]

[[Class AF-5B] Note Guaranty Insurance Policy

On the Closing Date, [ ] (the "[Class AF-5B] Insurer") will issue the [Class AF-5B] Policy in favor of the Indenture Trustee on behalf of the [Class AF-5B] noteholders. The following summary of the provisions of the [Class AF-5B] Policy does not purport to be complete and is qualified in its entirety by reference to the [Class AF-5B] Policy. The [Class AF-5B] Policy will be filed with the SEC as an Exhibit to a Current Report on Form 8-K after the Closing Date.

The [Class AF-5B] Insurer, will issue a note guaranty insurance policy (the "Class AF-5B Policy") for the benefit of the holders of the [Class AF-5B] Notes. The [Class AF-5B] Insurer, in consideration of the payment of a premium and subject to the terms of the [Class AF-5B] Policy, unconditionally and irrevocably guarantees the payment of Insured Amounts to the Indenture Trustee on behalf of the holders of the [Class AF-5B] Notes and payments of Preference Amounts as described below. The [Class AF-5B] Insurer will pay Insured Amounts which are Due for Payment to the Indenture Trustee on the later of:

o  [the Distribution Date the Insured Amount is distributable to the holders of the [Class AF-5B] Notes under the Sale and Servicing Agreement, and]

o  [the second Business Day following the Business Day the [Class AF-5B] Insurer shall have received telephonic or telegraphic notice, subsequently confirmed in writing, the original of which is sent by registered or certified mail, from the Indenture Trustee, specifying that an Insured Amount is due in accordance with the terms of the [Class AF-5B] Policy; provided that, if the notice is received after 12:00 noon, New York City time, on any Business Day, it shall be deemed to be received on the following Business Day. ]

If any notice is not in proper form or is otherwise insufficient for the purpose of making a claim under the [Class AF-5B] Policy, it shall be deemed not to have been received for purposes of this paragraph, and the [Class

<PAGE>

AF-5B] Insurer shall promptly so advise the Indenture Trustee and the Indenture Trustee may submit an amended or corrected notice.

The [Class AF-5B] Insurer's obligation under the [Class AF-5B] Policy will be discharged to the extent that funds are received by the Indenture Trustee for payment to the holders of the [Class AF-5B] Notes whether or not those funds are properly paid by the Indenture Trustee. Payments of Insured Amounts will be made only at the time set forth in the [Class AF-5B] Policy, and no accelerated payments of Insured Amounts will be made regardless of any acceleration of the [Class AF-5B] Notes, unless the acceleration is at the sole option of the [Class AF-5B] Insurer.

For purposes of the [Class AF-5B] Policy, a holder does not and may not include any of the Indenture Trustee, the Sellers, the Depositor or the Master Servicer.

The [Class AF-5B] Policy will not cover:

o  shortfalls, if any, attributable, to Prepayment Interest Shortfalls;

o  any interest shortfalls resulting from the application of the Relief Act or similar state or local laws, or any Net Rate Carryover; or

o  any shortfalls, if any, attributable to the liability of the issuing entity, the Indenture Trustee or any holder of a [Class AF-5B] Note for withholding taxes, if any (including interest and penalties in respect of any liability for withholding taxes).]

[In addition, the [Class AF-5B] Policy:

o  does not cover any risk other than Nonpayment, including the failure of the Indenture Trustee to make any payment required under the Sale and Servicing Agreement to the holders of the [Class AF-5B] Notes;

o  does not guarantee to the holders of the [Class AF-5B] Notes any particular rate of --- principal payment; and

o  does not provide credit enhancement for any class of Notes other than the [Class --- AF-5B] Notes.

No person other than the Indenture Trustee shall be entitled to present the notice under the [Class AF-5B] Policy.

In the absence of payments under the [Class AF-5B] Policy, holders of the [Class AF-5B] Notes will directly bear the credit risks associated with their Notes.

The [Class AF-5B] Insurer will be subrogated to the rights of each holder of the [Class AF-5B] Notes to the extent of any payment by the [Class AF-5B] Insurer under the [Class AF-5B] Policy.

The [Class AF-5B] Insurer agrees that if it shall be subrogated to the rights of the holders of the [Class AF-5B] Notes, no recovery of the payment will occur unless the full amount of the holders' allocable distributions for the Distribution Date can be made. In so doing, the [Class AF-5B] Insurer does not waive its rights to seek full payment of all Reimbursement Amounts owed to it under the Sale and Servicing Agreement.

The [Class AF-5B] Policy and the obligations of the [Class AF-5B] Insurer thereunder will terminate without any action on the part of the [Class AF-5B] Insurer or any other person on the date following the later to occur of (i) the date that is one year and one day following the date on which all

amounts required to be paid on the [Class AF-5B] Notes have been paid in full and (ii) if any proceeding referenced in the immediately following paragraph has been commenced on or prior to the date specified in clause (i) of this paragraph, the 30th day after the entry of a final, nonappealable order in resolution or settlement of the proceeding. Upon termination of the [Class AF-5B] Policy, the Indenture Trustee will forthwith deliver the original of the [Class AF-5B] Policy to the [Class AF-5B] Insurer.


S-105

<PAGE>

     Pursuant to the [Class AF-5B] Policy, the [Class AF-5B] Insurer will pay any Preference Amount when due to be paid pursuant to the Order (as defined below), but in any event no earlier than the third Business Day following receipt by the [Class AF-5B] Insurer of:

          (i) a certified copy of a final, non-appealable order of a court or other body exercising jurisdiction in the insolvency proceeding to the effect that the Indenture Trustee, or holder of a [Class AF-5B] Note, as applicable, is required to return the Preference Amount paid during the term of the [Class AF-5B] Policy because the payments were avoided as a preferential transfer or otherwise rescinded or required to be restored by the Indenture Trustee or holder of a [Class AF-5B] Note (the "Order"),

          (ii) a notice by or on behalf of the Indenture Trustee or holder of a [Class AF-5B] Note that the Order has been entered and is not subject to any stay,

          (iii) an assignment, in form and substance satisfactory to the [Class AF-5B] Insurer, duly executed and delivered by the Indenture Trustee or holder of a [Class AF-5B] Note, irrevocably assigning to the [Class AF-5B] Insurer all rights and claims of the Indenture Trustee or the holder relating to or arising under the Sale and Servicing Agreement against the estate of the issuing entity or otherwise with respect to the Preference Amount and

          (iv) a notice (in the form provided in the [Class AF-5B] Policy) appropriately completed and executed by the Indenture Trustee; provided, that if the documents are received after 12:00 noon, New York City time on any Business Day, they will be deemed to be received the following Business Day; provided further, that the [Class AF-5B] Insurer shall not be obligated to make any payment in respect of any Preference Amount representing a payment of principal on the [Class AF-5B] Notes prior to the time the [Class AF-5B] Insurer would have been required to make a payment in respect of the principal pursuant to the [Class AF-5B] Policy.

     The payment shall be disbursed to the receiver, conservator, debtor-in-possession or Indenture Trustee in bankruptcy named in the Order, and not to the Indenture Trustee or to the holders of the [Class AF-5B] Notes directly, unless a holder of a [Class AF-5B] Note has made a payment of the Preference Amount to the court or the receiver, conservator, debtor-in-possession or Indenture Trustee in bankruptcy named in the Order, in which case the [Class AF-5B] Insurer will pay to the Indenture Trustee on behalf of the holder, subject to the delivery of (a) the items referred to in clauses (i), (ii), (iii) and (iv) above to the [Class AF-5B] Insurer and (b) evidence satisfactory to the [Class AF-5B] Insurer that payment has been made to the court or receiver, conservator, debtor-in-possession or Indenture Trustee in bankruptcy named in the Order.

As used in the [Class AF-5B] Policy, the following terms shall have the following meanings:

"Deficiency Amount" with respect to:

(A) each Distribution Date prior to the Maturity Date for the [Class AF-5B] Notes, means an amount equal to the sum of (i) the excess, if any, of (a) the amount of Current Interest on the [Class AF-5B] Notes net of any interest shortfalls resulting from Prepayment Interest Shortfalls and any interest shortfalls resulting from the application of the Relief Act, or similar state or local laws over (b) the [Class AF-5B] Available Funds for that Distribution Date, and (ii) for any Distribution Date after the Note Principal Balance of the [Fixed Rate Subordinate Notes] has been reduced to zero, the excess, if any of (a) the Note Principal Balance of the [Class AF-5B] Notes over (b) the sum of the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group [1] and the amount on deposit in the Pre-Funding Account in respect of Loan Group [1], in each case taking into account all distributions to be made on the Distribution Date;

(B) the Maturity Date for the [Class AF-5B] Notes, means an amount equal to the sum of (i) the excess, if any, of (a) the amount of Current Interest on the [Class AF-5B] Notes net of any interest shortfalls resulting from Prepayment Interest Shortfalls and any interest shortfalls resulting from application of the Relief Act, or similar state or local laws over (b) the [Class AF-5B] Available Funds for that Distribution Date and (ii) the Note Principal Balance of the [Class AF-5B] Notes on the Maturity Date for the [Class AF-5B] Notes (after taking

S-106

<PAGE>

into account all distributions of [Class AF-5B] Available Funds to be made to the [Class AF-5B] Notes on the Distribution Date); and

(C) for the [Class AF-5B] Notes and any date on which the acceleration of the Notes has been directed or consented to by the [Class AF-5B] Insurer, means the excess of (i) the amount required to pay the Note Principal Balance of the [Class AF-5B] Notes in full, together with accrued and unpaid interest thereon through the date of payment of the [Class AF-5B] Notes and (ii) the [Class AF-5B] Available Funds for that Distribution Date.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banking or savings and loan institutions in the State of California, the State of New York or the cities in which the Corporate Trust Office of the Indenture Trustee is located, are authorized or obligated by law or executive order to be closed.

"[Class AF-5B] Available Funds" means, with respect to any Distribution Date, funds allocated from amounts available pursuant to the Sale and Servicing Agreement to make distributions on the [Class AF-5B] Notes on the Distribution Date, other than any Insured Amounts.

"Distribution Date" means the [ ]th day of any month, or if the [ ]th day is not a Business Day, the Business Day immediately following the [ ]th day, commencing in [ ] 200[ ].

"Due for Payment" means with respect to an Insured Amount, the Distribution Date on which Insured Amounts are due and payable pursuant to the

terms of the Sale and Servicing Agreement.

"Insured Amounts" means, with respect to any Distribution Date, the Deficiency Amount for the Distribution Date.

"Insured Payments" means, with respect to any Distribution Date, the aggregate amount actually paid by the [Class AF-5B] Insurer to the Indenture Trustee in respect of (i) Insured Amounts for a Distribution Date and (ii) Preference Amounts for any given Business Day.

"Late Payment Rate" means, with respect to any Distribution Date, the lesser of (i) the greater of (a) the rate of interest, as it is publicly announced by Citibank, N.A. at its principal office in New York, New York as its prime rate (any change in the prime rate of interest to be effective on the date the change is announced by Citibank, N.A.) plus [ ]% and (b) the then applicable highest rate of interest on the [Class AF-5B] Notes and (ii) the maximum rate permissible under applicable usury or similar laws limiting interest rates. The Late Payment Rate shall be computed on the basis of the actual number of days elapsed over a year of 360 days.

"Nonpayment" means, with respect to any Distribution Date, an Insured Amount is Due for Payment but has not been paid pursuant to the Sale and Servicing Agreement.

"Preference Amount" means any amount payable on the [Class AF-5B] Notes, which has become Due for Payment and which was made to a holder of a [Class AF-5B] Note by or on behalf of the issuing entity, which has been deemed a preferential transfer and theretofore recovered from its holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction.

"Reimbursement Amount" means, with respect to any Distribution Date, (i) all Insured Payments paid by the [Class AF-5B] Insurer, but for which the [Class AF-5B] Insurer has not been reimbursed prior to the Distribution Date, plus (ii) interest accrued on the Insured Payments not previously repaid calculated at the Late Payment Rate, from the date the Insured Payments were made.

Capitalized terms used herein as defined terms and not otherwise defined herein shall have the meaning assigned to them in the Sale and Servicing Agreement, without regard to any amendment or modification thereof, unless the amendment or modification has been approved in writing by the [Class AF-5B] Insurer.

S-107

<PAGE>

The [Class AF-5B] Policy is not cancelable. The premium on the [Class AF-5B] Policy is not refundable for any reason including payment, or provision being made for payment, prior to maturity of the [Class AF-5B] Notes. [The Sale and Servicing Agreement does not provide for any substitution of the [Class AF-5B] Policy.

The [Class AF-5B] Policy is issued under and shall be construed under, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

THE INSURANCE PROVIDED BY THE [CLASS AF-5B] POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.]

[The [Class AF-5B] Insurer

     The following information has been supplied by [ ], the [Class AF-5B] Insurer, for inclusion in this prospectus supplement. No representation is made by the Sellers, the Master Servicer, the Indenture Trustee, the Underwriters or any of their affiliates as to the accuracy or completeness of the information.]

[Item 1114 Disclosure to be provided by Insurer]

Reports to Noteholders
     On each Distribution Date, the Indenture Trustee will forward by first class mail to each noteholder, the [Class AF-5B] Insurer, the Master Servicer and the Depositor a statement generally setting forth, among other information:

     (1) the amount of the related distribution to holders of the Offered Notes allocable to principal, separately identifying:

     (a) the aggregate amount of any Principal Prepayments included therein, and

     (b) the aggregate of all Scheduled Payments of principal included therein,

     (2) the amount of the distribution to holders of the Offered Notes allocable to interest,

     (3) the Interest Carry Forward Amounts for each class of Offered Notes (if any),

     (4) the Note Principal Balance of each class of Offered Notes after giving effect to (i) all distributions allocable to principal on the Distribution Date, (ii) the allocation of any Applied Realized Loss Amounts for the Distribution Date and (iii) the allocation of any Subsequent Recoveries for the Distribution Date,

     (5) the aggregate Stated Principal Balance of the Mortgage Loans in each Loan Group for the following Distribution Date,

     (6) the amount of the Servicing Fees paid to or retained by the Master Servicer for the related Due Period,

     (7) the Interest Rate for each class of Offered Notes for the Distribution Date,

     (8) the amount of Advances for each Loan Group included in the distribution on the Distribution Date,

     (9) the number and aggregate principal amounts of Mortgage Loans in each Loan Group:
     (a)   delinquent (exclusive of related Mortgage Loans in foreclosure):

<PAGE>

     30 to 59 days,

```
                    60 to 89 days and
                    90 or more days, and

         (b)    in foreclosure and delinquent:
                    30 to 59 days,
                    60 to 89 days and
                    90 or more days,
```

in each case as of the close of business on the last day of the calendar month preceding the Distribution Date,

    (10) with respect to any Mortgage Loan in each Loan Group that became an REO Property during the preceding calendar month, the loan number and Stated Principal Balance for the Distribution Date of the Mortgage Loan and the date of acquisition thereof,

    (11) [whether a Fixed Rate Trigger Event, an Adjustable Rate Trigger Event or a Group [2] Sequential Trigger Event is in effect,]

    (12) the total number and Stated Principal Balance of any REO Properties in each Loan Group as of the close of business on the Determination Date preceding the Distribution Date,

    (13) [any Net Rate Carryover paid and all remaining Net Rate Carryover remaining on each class of Notes on the Distribution Date,]

    (14) the amounts, if any, due to the trust fund, and the amounts received, in respect of each Corridor Contract for the Distribution Date,

    (15) the amount of Realized Losses and Subsequent Recoveries applied to the [Class 2-AV-2] Notes, the [Fixed Rate Subordinate Notes] and the [Adjustable Rate Subordinate Notes] for the Distribution Date,

    (16) all payments made by the Master Servicer in respect of Compensating Interest for the Distribution Date, and

    (17) [all amounts paid to the [Class AF-5B] Insurer in respect of any premiums payable with respect to the [Class AF-5B] Policy and in respect of the [Class AF-5B] Reimbursement Amount for the Distribution Date].

The monthly statement is prepared by the Indenture Trustee based on information provided by the Master Servicer. The Indenture Trustee is not responsible for recomputing, recalculating or verifying the information provided to it by the Master Servicer and will be permitted to conclusively rely on any information provided to it by the Master Servicer. The report to noteholders may include additional or other information of a similar nature to that specified above.

The Indenture Trustee may, at its option, make the statements described above available to noteholders and the [Class AF-5B] Insurer on the Indenture Trustee's website (assistance in using the website service may be obtained by calling the Indenture Trustee's customer service desk at (800) 254-2826). In addition, within 60 days after the end of each calendar year, the Indenture Trustee will prepare and deliver to each noteholder of record during the previous calendar year a statement containing information necessary to enable noteholders to prepare their tax returns. The statements will not have been examined and reported upon by an independent public accountant.

S-109

<PAGE>

Amendment

Sale and Servicing Agreement and Indenture

The Sale and Servicing Agreement and the Indenture may be amended by the parties to those agreements [with the consent of the NIM Insurer] but without the consent of any of the noteholders, for any of the purposes set forth under "The Agreements -- Amendment" in the prospectus. In addition, the Sale and Servicing Agreement and the Indenture may be amended by the parties to those agreements and the holders of a majority in interest of each class of Notes affected thereby for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of those agreements or of modifying in any manner the rights of the noteholders; provided, however, that no amendment may:

(1) reduce in any manner the amount of, or delay the timing of, payments required to be distributed on any Note without the consent of the holder of the Note,

(2) adversely affect in any material respect the interests of the holders of any class of Notes in a manner other than as set forth in clause (1) above, without the consent of the holders of Notes of the class evidencing, as to that class, Percentage Interests aggregating [66-2/3]%,

(3) reduce the aforesaid percentage of aggregate outstanding principal amounts of Notes of each class, the holders of which are required to consent to an amendment, without the consent of the holders of all Notes of the class, or

(4) [adversely affect in any material respects the rights or interests of the Class AF-5B Insurer without its consent, which consent shall not be unreasonably withheld.]

Trust Agreement

The Trust Agreement may be amended by the Depositor, the Trust Administrator and the Owner Trustee, with the consent of the holder of the Owner Trust Certificate and with prior written notice to the Rating Agencies, but without the consent of any of the Noteholders or the Indenture Trustee, (i) to cure any ambiguity, (ii) to conform the provisions of th Trust Agreement to the information contained in the prospectus or to correct or supplement any provision herein, (iii) to make any other provision with respect to matters or questions arising under the Trust Agreement or (iv) to add, delete, or amend any provision in order to comply with any requirements imposed by the Code, ERISA and their related regulations; provided, however, that such action will not, as evidenced by an opinion of counsel, adversely affect in any material respect the interests of any noteholder or certificateholder or adversely affect the tax status of the issuing entity. An amendment will not be deemed to adversely affect in any material respect the interests of any noteholder or certificateholder and no opinion referred to in the preceding proviso will be required to be delivered if the Person requesting the amendment obtains a letter from each Rating Agencies stating that the amendment would not result in the downgrading or withdrawal of the respective ratings then assigned to each applicable class of Notes. The Trust Agreement may also be amended from time to time by the Depositor, the Trust Administrator and the Owner Trustee, with the prior written consent of the Rating Agencies, the holders of Notes evidencing more than 66?% of the Note Principal Balance of the Notes and the holder of the Owner Trust Certificate,

for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Trust Agreement or modifying in any manner the rights of the holder of the Owner Trust Certificate; provided, however, that no such amendment will, as evidenced by an Opinion of Counsel, adversely affect the tax status of the issuing entity; and provided, further, that no such amendment will (a) increase or reduce in any manner the amount of, or delay the timing of, collections of payments on the Collateral or payments that will be required to be made for the benefit of the Noteholders or the holder of the Owner Trust Certificate or (b) reduce the aforesaid percentage of the Note Principal Balance of the Notes required to consent to or to waive the requirement for any holder of the Owner Trust Certificate to consent to any such amendment, in either case of clause (a) or (b) without the consent of the holders of all the outstanding Notes and the holder of the Owner Trust Certificate.

S-110

<PAGE>

Voting Rights

    As of any date of determination:

o  holders of the [Class PF] and [Class PV] Notes will each be allocated 1% of all voting rights in respect of the Notes (collectively, the "Voting Rights") (for a total of 5% of the Voting Rights), and

o  holders of the other classes of Notes will be allocated the remaining Voting Rights in proportion to their respective outstanding Note Principal Balances.

    Voting Rights will be allocated among the Notes of each class in accordance with their respective Percentage Interests. [However, on any date on which any [Class AF-5B] Notes are outstanding or any amounts are owed the [Class AF-5B] Insurer under the Sale and Servicing Agreement, the [Class AF-5B] Insurer will have all of the Voting Rights of the [Class AF-5B] Notes unless the [Class AF-5B] Insurer fails to make a required payment under the [Class AF-5B] Policy, a proceeding in bankruptcy shall have been instituted by the [Class AF-5B] Insurer, or a decree or order for relief shall have been issued in respect of a proceeding in bankruptcy against the [Class AF-5B] Insurer and shall remain unstayed for a period of 60 consecutive days.]

Optional Purchase of Defaulted Loans

    As to any Mortgage Loan that is delinquent in payment by [150] days or more, the Master Servicer may, at its option but subject to certain conditions specified in the Sale and Servicing Agreement, purchase the Mortgage Loan at a price equal to 100% of the Stated Principal Balance thereof plus accrued interest thereon at the applicable Net Mortgage Rate from the date through which interest was last paid by the related mortgagor or advanced to the first day of the month in which the amount is to be distributed to noteholders. The Master Servicer must exercise this right on or before the last day of the calendar month in which the related Mortgage Loan became [150] days delinquent.

[Master] Servicer Defaults

    [Master] Servicer Defaults will consist of:

        (1) any failure by the [Master] Servicer to deposit in the Collection Account or the Distribution Account the required amounts or

remit to the Indenture Trustee any payment (including an Advance required to be made under the terms of the Sale and Servicing Agreement) which continues unremedied for five calendar days (or in the case of an Advance, one Business Day) after written notice of the failure shall have been given to the [Master] Servicer by the Indenture Trustee, the NIM Insurer or the Depositor, or to the Indenture Trustee, the NIM Insurer and the [Master] Servicer by the holders of Notes evidencing not less than 25% of the Voting Rights,

(2) any failure by the [Master] Servicer to observe or perform in any material respect any other of its covenants or agreements, or any breach of a representation or warranty made by the [Master] Servicer, in the Sale and Servicing Agreement, which in each case continues unremedied for 60 days after the giving of written notice of the failure to the [Master] Servicer by the Indenture Trustee, the NIM Insurer or the Depositor, or to the Indenture Trustee by the holders of Notes evidencing not less than 25% of the Voting Rights,

(3) a decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the [Master] Servicer and the decree or order shall have remained in force undischarged or unstayed for a period of 60 consecutive days,

S-111

<PAGE>

(4) the [Master] Servicer shall consent to the appointment of a receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the [Master] Servicer or all or substantially all of the property of the [Master] Servicer,

(5) the [Master] Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of, or commence a voluntary case under, any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations, or

(6) the [Master] Servicer shall fail to reimburse, in full, the Indenture Trustee not later than 6:00 p.m., New York City time, on the Business Day following the related Distribution Date for any Advance made by the Indenture Trustee together with accrued and unpaid interest.]

Rights Upon [Master] Servicer Default

[So long as a [Master] Servicer Default under the Sale and Servicing Agreement remains unremedied, subject to the rights of the NIM Insurer, the Indenture Trustee shall, but only upon the receipt of instructions from the NIM Insurer or from holders of Notes having not less than 25% of the Voting Rights (subject to the consent of the [Class AF-5B] Insurer, which consent shall not be unreasonably withheld) terminate all of the rights and obligations of the [Master] Servicer under the Sale and Servicing Agreement and in and to the Mortgage Loans, whereupon the Indenture Trustee will succeed to all of the responsibilities and duties of the [Master] Servicer under the Sale and Servicing Agreement, including the obligation to make Advances. We

cannot assure you that termination of the rights and obligations of the
[Master] Servicer under the Sale and Servicing Agreement would not adversely
affect the servicing of the Mortgage Loans, including the delinquency
experience of the Mortgage Loans.]

     [No noteholder, solely by virtue of the holder's status as a noteholder,
will have any right under the Sale and Servicing Agreement to institute any
proceeding with respect thereto, unless the holder previously has given to the
Indenture Trustee written notice of the continuation of a [Master] Servicer
Default and unless the holders of Notes having not less than 25% of the Voting
Rights have made a written request to the Indenture Trustee to institute the
proceeding in its own name as Indenture Trustee thereunder and have offered to
the Indenture Trustee reasonable indemnity and the Indenture Trustee for 60
days has neglected or refused to institute the proceeding and in which case
the rights of the noteholders shall be subject to the rights of the NIM
Insurer.]

     [Within 60 days after the occurrence of any [Master] Servicer Default,
the Indenture Trustee shall transmit by mail to all holders of the Notes
notice of each [Master] Servicer Default known to the Indenture Trustee,
except for any [Master] Servicer Default that has been cured or waived.]

Events of Default Under the Indenture

     An "Indenture Default" is any event of default under the Indenture,
which generally consist of: (i) a default for one month or more in the payment
of any Current Interest due on any class of Notes outstanding; (ii) a default
in the payment of the entire principal of any Note when the same becomes due
and payable under the Indenture or on the applicable maturity date; (iii) a
default in the observance or performance of any covenant or agreement of the
issuing entity made in the Indenture and the continuation of any such default
for a period of 30 days after notice thereof is given to the Owner Trustee as
provided in the Indenture; (iv) any representation or warranty made by the
issuing entity in the Indenture or in any certificate delivered pursuant
thereto or in connection therewith having been incorrect in a material respect
when made, and such breach not having been cured within 30 days after notice
thereof is given to the Owner Trustee as provided in the Indenture; or (v)
certain events of bankruptcy, insolvency, receivership or liquidation of the
issuing entity.

     If an Indenture Default occurs and is continuing, the Indenture Trustee
or Holders of a majority by Note Principal Amount of the Priority Class or
Priority Classes of Notes then outstanding may declare the principal of the
Notes to be immediately due and payable. Such declaration may, under certain
circumstances, be rescinded by the Holders of a majority by Note Principal
Amount of such Priority Class or Priority Classes of Notes. The "Priority
Class" is the class or classes of Notes then outstanding having the highest
priority of payment of interest.

                                   S-112
<PAGE>


     If the Notes are declared immediately due and payable following an
Indenture Default, the Indenture Trustee may, as directed, institute
proceedings to collect amounts due or foreclose on collateral pledged to
secure the Notes, exercise remedies as a secured party, sell the assets of the
issuing entity pledged to secure the Notes, or elect to maintain possession of
such assets and continue to apply collections on such assets as if there had
been no declaration of acceleration. However, the Indenture Trustee is
prohibited from selling the assets of the issuing entity following an

Indenture Default, other than a default in the payment of any principal of or a default for one month or more in the payment of any interest on any class of Notes, unless (i) the holders of all outstanding Notes consent to such sale, (ii) the proceeds of the sale are sufficient to pay in full the principal of and the accrued interest on such outstanding Notes at the date of such sale or (iii) the Indenture Trustee determines, based on information provided by the Trust Administrator, that the proceeds of the property of the issuing entity would not be sufficient on an ongoing basis to make all payments on the Notes as such payments would have become due if such obligations had not been declared due and payable, and the Indenture Trustee obtains the consent of the holders of 66?% of the aggregate Note Principal Amount of the Notes. If the collateral securing the Notes is sold following an Indenture Default, proceeds of such sale, after deduction of the expenses of such sale, will be applied in the order of priority provided in "--Distributions" above.

        If an Indenture Default occurs and is continuing, the Indenture Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders of the Notes, if the Indenture Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities that might be incurred by it in complying with such request. Subject to the provisions for indemnification and certain limitations contained in the Indenture, the holders of a majority in principal amount of the outstanding Notes will have the right to direct the time, method and place of conducting any proceeding or any remedy available to the Indenture Trustee, and the holders of a majority in principal amount of the Notes then outstanding may, in certain cases, waive any default with respect thereto, except a default in the payment of principal or interest or a default in respect of a covenant or provision of the Indenture that cannot be modified without the waiver or consent of all the holders of the outstanding Notes.

        Except as described above in the case of an Indenture Default, no noteholder will have the right to institute any proceeding with respect to the Indenture, unless (i) such holder previously has given to the Indenture Trustee written notice of a continuing Indenture Default, (ii) the holders of not less than 25% of the Note Principal Balance of the outstanding Notes have made written request to the Indenture Trustee to institute such proceeding in its own name as the Indenture Trustee, (iii) such holder or holders have offered the Indenture Trustee reasonable indemnity, (iv) the Indenture Trustee has, for 60 days after receipt of such notice, request and offer of indemnity, failed to institute such proceeding and (v) no direction inconsistent with such written request has been given to the Indenture Trustee during such 60-day period by the Holders of a majority in principal amount of such outstanding Notes.

        None of the Indenture Trustee, the Master Servicer, the Trust Administrator nor the Owner Trustee in their respective individual capacities, nor the holder of the Owner Trust Certificate, nor any of their respective owners, beneficiaries, agents, officers, directors, employees, affiliates, successors or assigns will, except as expressly set forth in the transaction documents, be personally liable for the payment of the principal of or interest on the Notes or for the agreements of the issuing entity contained in the Indenture.

Optional Termination

        The [Master Servicer] will have the right to purchase all remaining Mortgage Loans and REO Properties in the issuing entity and thereby effect early retirement of all the Notes, on any Distribution Date on or after the first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans and REO Properties in the issuing entity is less than or equal to [ ]% of the sum of the Initial Cut-off Date Pool Principal Balance and the

original Pre-Funded Amount (the "Optional Termination Date"). [The Master Servicer is an affiliate of the Sellers and the Depositor.]

[In the event the option is exercised by [the Master Servicer], the purchase will be made at a price equal to the sum of:

      (1) 100% of the Stated Principal Balance of each Mortgage Loan in the issuing entity (other than in respect of REO Property) plus accrued interest thereon at the applicable Net Mortgage Rate, and

S-113

<PAGE>

      (2) the appraised value of any REO Property (up to the Stated Principal Balance of the related Mortgage Loan) in the issuing entity;

provided, however, that (i) unless the NIM Insurer otherwise consents, the purchase price will in no event be less than an amount that would result in a final distribution on any NIM Insurer guaranteed notes that is sufficient (x) to pay the notes in full and (y) to pay any amounts due and payable to the NIM Insurer pursuant to the indenture related to the notes and (ii) unless the [Class AF-5B] Insurer otherwise consents, the purchase price will in no event be less than an amount that would result in a final distribution to the [Class AF-5B] Notes and the [Class AF-5B] Insurer, respectively, that is sufficient (x) to pay the [Class AF-5B] Notes in full and (y) to pay any amounts due and payable to the [Class AF-5B] Insurer pursuant to the Sale and Servicing Agreement.]

[The NIM Insurer may also have the right to purchase all remaining Mortgage Loans and REO Properties in the issuing entity at the price set forth above (plus any unreimbursed Servicing Advances, and the principal portion of any unreimbursed Advances, made on the Mortgage Loans prior to the exercise of the option), subject to the same restrictions. The identity of any NIM Insurer is not known as of the date of this prospectus supplement. It is possible that the NIM Insurer will be an affiliate of the [Class AF-5B] Insurer or one of the Underwriters.]

Notice of any termination, specifying the Distribution Date on which related noteholders may surrender their Notes for payment of the final distribution and cancellation, will be given promptly by the Indenture Trustee by letter to related noteholders mailed not earlier than the 10th day and no later than the 15th day of the month immediately preceding the month of the final distribution. The notice will specify (a) the Distribution Date upon which final distribution on related Notes will be made upon presentation and surrender of the Notes at the office therein designated, (b) the amount of the final distribution, (c) the location of the office or agency at which the presentation and surrender must be made, and (d) that the Record Date otherwise applicable to the Distribution Date is not applicable, distributions being made only upon presentation and surrender of the Notes at the office therein specified.

In the event a notice of termination is given, the Master Servicer will cause all funds in the Collection Account to be remitted to the Indenture Trustee for deposit in the Distribution Account on the Business Day prior to the applicable Distribution Date in an amount equal to the final distribution in respect of the Notes. At or prior to the time of making the final payment on the Notes, the Master Servicer as agent of the Indenture Trustee will sell all of the assets of the issuing entity to [the Master Servicer or the NIM Insurer, as applicable,] for cash. Proceeds from a purchase will be distributed to the noteholders and the [Class AF-5B] Insurer in the priority

described above under "-- Distributions" and "-- Overcollateralization Provisions" and will reflect the current Note Principal Balance and other entitlements of each class at the time of liquidation. As a result, if any Applied Realized Loss Amounts have been allocated to any class or classes of Notes, any Unpaid Realized Loss Amounts would be paid in the order and priority set forth above under "-- Overcollateralization Provisions."

The proceeds from any sale in connection the exercise of the option may not be sufficient to distribute the full amount to which each class of Notes is entitled if the purchase price is based in part on the appraised value of any REO Property and that appraised value is less than the Stated Principal Balance of the related Mortgage Loan. Any purchase of the Mortgage Loans and REO Properties will result in a redemption of the Notes. At the time of the making of the final payment on the Notes, the Indenture Trustee shall distribute or credit, or cause to be distributed or credited, to the holder of the Owner Trust Certificate all cash on hand related to the Owner Trust Certificate, and the issuing entity will terminate at that time. Once the issuing entity has been terminated, noteholders will not be entitled to receive any amounts that are recovered subsequent to the termination.

Certain Matters related to the Master Servicer, the Depositor, the Sellers and [the NIM Insurer]

The prospectus describes the indemnification to which the Master Servicer and the Depositor (and their respective directors, officers, employees and agents) are entitled and also describes the limitations on any liability of the Master Servicer and the Depositor (and their respective directors, officers, employees and agents) to the issuing entity. See "The Agreements -- Certain Matters Regarding the Master Servicer and the Depositor" in the prospectus. The Sale and Servicing Agreement provides that these same provisions regarding indemnification and exculpation apply to each Seller [and any NIM Insurer].

S-114

<PAGE>

The Indenture Trustee

[ ] will be the Indenture Trustee under the Indenture. [[ ] has been, and currently is, serving as indenture trustee and trustee for numerous securitization transactions and programs involving pools of residential mortgages.] [[ ] is one of the largest corporate trust providers of trust services on securitization transactions.] The Depositor and [Countrywide Home Loans] may maintain other banking relationships in the ordinary course of business with the Indenture Trustee. The Offered Notes may be surrendered at the Corporate Trust Office of the Indenture Trustee located at [ ] or another addresses as the Indenture Trustee may designate from time to time.

The Indenture Trustee will be liable for its own grossly negligent action, its own gross negligent failure to act or its own misconduct, its grossly negligent failure to perform its obligations in compliance with the Indenture or the Sale and Servicing Agreement, or any liability that would be imposed by reason of its willful misfeasance or bad faith. However, the Indenture Trustee will not be liable, individually or as Indenture Trustee,

   o  for an error of judgment made in good faith by a responsible officer of
      the Indenture Trustee, unless the Indenture Trustee was grossly
      negligent or acted in bad faith or with willful misfeasance,

   o  with respect to any action taken, suffered or omitted to be taken by it

in good faith in accordance with the direction of the holders of each Class of Notes evidencing not less than 25% of the Voting Rights of the Class relating to the time, method and place of conducting any proceeding for any remedy available to the Indenture Trustee, or exercising any trust or power conferred upon the Indenture Trustee under the Indenture or the Sale and Servicing Agreement,

o   for any action taken or suffered or omitted by it under the Indenture or the Sale and Servicing Agreement in good faith and in accordance with an opinion of counsel, or

o   for any loss on any investment of funds pursuant to the Indenture or the Sale and Servicing Agreement (other than as issuer of the investment security).

The Indenture Trustee is also entitled to rely without further investigation upon any resolution, officer's note, note of auditors or any other note, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

The Indenture provides that the Indenture Trustee and any successor Indenture Trustee will, at all times, be a corporation or association organized and doing business under the laws of a state or the United States of America, authorized under the laws of the United States of America to exercise corporate trust powers, having a combined capital and surplus of at least $[50,000,000], subject to supervision or examination by federal or state authority and with a credit rating that would not cause any of the Rating Agencies to reduce their respective ratings of any Class of Notes (without regard to the [Class AF-5B] Policy, in the case of the [Class AF-5B] Notes) below the ratings issued on the Closing Date (or having provided security from time to time as is sufficient to avoid the reduction). If the Indenture Trustee no longer meets the foregoing requirements, the Indenture Trustee has agreed to resign immediately.

The Indenture Trustee may at any time resign by giving written notice of resignation to the Depositor, the Master Servicer, each Rating Agency and the noteholders, not less than 60 days before the specified resignation date. The resignation shall not be effective until a successor Indenture Trustee has been appointed. If a successor Indenture Trustee has not been appointed within 30 days after the Indenture Trustee gives notice of resignation, the resigning Indenture Trustee may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee.

The Depositor, [the NIM Insurer] or the Master Servicer may remove the Indenture Trustee and appoint a successor Indenture Trustee [reasonably acceptable to the NIM Insurer] if:

S-115

<PAGE>

o   the Indenture Trustee ceases to meet the eligibility requirements described above and fails to resign after written request to do so is delivered to the Indenture Trustee by [the NIM Insurer or] the Depositor,

o   the Indenture Trustee becomes incapable of acting, or is adjudged as bankrupt or insolvent, or a receiver of the Indenture Trustee or of its property is appointed, or any public officer takes charge or control of the Indenture Trustee or of its property or affairs for the purpose of

rehabilitation, conservation or liquidation, or

o (iii)(A) a tax is imposed with respect to the issuing entity by any
state in which the Indenture Trustee or the issuing entity is located,
(B) the imposition of the tax would be avoided by the appointment of a
different Indenture Trustee and (C) the Indenture Trustee fails to
indemnify the issuing entity against the tax.

In addition, the holders of Notes evidencing at least 51% of the Voting
Rights of each Class of Notes may at any time remove the Indenture Trustee and
appoint a successor Indenture Trustee. Notice of any removal of the Indenture
Trustee shall be given to each Rating Agency by the successor Indenture
Trustee.

Any resignation or removal of the Indenture Trustee and appointment of a
successor Indenture Trustee pursuant to any of the provisions described above
will become effective upon acceptance of appointment by the successor
Indenture Trustee.

A successor Indenture Trustee will not be appointed unless the successor
Indenture Trustee meets the eligibility requirements described above, [is
reasonably acceptable to the NIM Insurer] and its appointment does not
adversely affect the then-current ratings of the Notes (without regard to the
[Class AF-5B] Policy, in the case of the [Class AF-5B] Notes).

Ownership of the Owner Trust Certificate

On the Closing Date, the Owner Trust Certificate will be acquired by [CW
Securities Holdings, Inc., an affiliate of the Depositor, the Sellers and the
Master Servicer]. [CW Securities Holdings, Inc.] may retain the Owner Trust
Certificate or transfer it in other transactions.

Restrictions on Investment, Suitability Requirements

An investment in the Notes may not be appropriate for all investors due
to tax, ERISA or other legal requirements. Investors should review the
disclosure included in this prospectus supplement and the prospectus under
"Material Federal Income Tax Consequences," "ERISA Considerations" and "Legal
Matters" prior to any acquisition and are encouraged to consult with their
advisors prior to purchasing the Notes.

[Rights of the NIM Insurer Under the Sale and
Servicing Agreement and the Indenture

After the Closing Date, a separate trust or trusts (or other form of
entity) may be established to issue net interest margin securities secured by
all or a portion of the [Class PF] and [Class PV] Notes and the Owner Trust
Certificate. Those net interest margin securities may or may not have the
benefit of a financial guaranty insurance policy. The insurer or insurers (the
"NIM Insurer") that would issue a policy will be a third party beneficiary of
the Sale and Servicing Agreement and the Indenture and will have a number of
rights under the Sale and Servicing Agreement and the Indenture, which will
include the following:

o the right to consent to the Master Servicer's exercise of its discretion
to waive assumption fees, late payment or other charges in connection
with a Mortgage Loan or to arrange for the extension of due dates for
payments due on a mortgage note for no more than 270 days, if the
waivers or extensions relate to more than 5% of the Mortgage Loans;

o the right to direct the Indenture Trustee to terminate all of the rights
and obligations of the Master Servicer under the Sale and Servicing

Agreement relating to the issuing entity and the assets of the issuing entity following the occurrence of a Master Servicer Default under the Sale and Servicing Agreement;

S-116

<PAGE>

o  the right to approve or reject the appointment of any successor servicer other than the Indenture Trustee, if the Master Servicer is required to be replaced and the Indenture Trustee is unwilling or unable to act as successor servicer;

o  the right to consent to any amendment to the Sale and Servicing Agreement; and

o  each of the rights under "Risk Factors--Rights of the NIM Insurer" in this prospectus supplement. ]

You should note the rights that the NIM Insurer would have and carefully evaluate its potential impact on your investment. ]

YIELD, PREPAYMENT AND MATURITY CONSIDERATIONS

General

The weighted average life of, and the yield to maturity on, each class of Offered Notes generally will be directly related to the rate of payment of principal (including prepayments) of the Mortgage Loans in the related Loan Group or Loan Groups. The actual rate of principal prepayments on the mortgage loans is influenced by a variety of economic, tax, geographic, demographic, social, legal and other factors and has fluctuated considerably in recent years. In addition, the rate of principal prepayments may differ among pools of mortgage loans at any time because of specific factors relating to the mortgage loans in the particular pool, including, among other things, the age of the mortgage loans, the geographic locations of the properties securing the loans, the extent of the mortgagor's equity in the properties, and changes in the mortgagors' housing needs, job transfers and employment status. Furthermore, as described under "The Mortgage Pool -- Assignment of the Mortgage Loans" with respect to up to 50% of the Initial Mortgage Loans in each loan group and 90% of the Subsequent Mortgage Loans in each loan group (the "Delay Delivery Mortgage Loans"), the Depositor may deliver the related Mortgage Files after the Closing Date. Should a Seller fail to deliver to the Depositor or other designee of the Depositor all or a portion of the Mortgage Files relating to Mortgage Loans sold by it, or, at the Depositor's direction, to the Indenture Trustee within the time periods described under "The Mortgage Pool -- Assignment of the Mortgage Loans" [Countrywide Home Loans] will be required to use its best efforts to deliver a Substitute Mortgage Loan for the related Delay Delivery Mortgage Loan or repurchase the related Delay Delivery Mortgage Loan. Any repurchases pursuant to this provision would also have the effect of accelerating the rate of prepayments on the Mortgage Loans. In addition, no less than approximately [ ]%, [ ]% and [ ]% of the Mortgage Loans in the Statistical Calculation Pool in respect of Loan Group [1], Loan Group [2] and Loan Group [3], respectively, in each case by principal balance of the Mortgage Loans in the Statistical Calculation Pool in respect of the related Loan Group, require the payment of a prepayment charge in connection with certain prepayments, generally [no later than the first five years in the case of the Mortgage Loans in Loan Group [1] or two or three years in the case of the Mortgage Loans in Loan Group [2] and Loan Group [3]], in each case following origination of the related Mortgage Loan. [These charges, if

enforced by the Master Servicer, may affect the rate of prepayments on the Mortgage Loans.]

[In addition, no less than approximately [ ]%, [ ]% and [ ]% of the Mortgage Loans in the Statistical Calculation Pool in respect of Loan Group [1], Loan Group [2] and Loan Group [3], respectively, in each case by principal balance of the Mortgage Loans in the Statistical Calculation Pool in respect of the related Loan Group provide for only payments of interest and do not provide for any payments of principal for an extended period following their origination. These Mortgage Loans may involve a greater degree of risk because, if the related mortgagor defaults, the outstanding principal balance of the Mortgage Loans will be higher than for amortizing Mortgage Loans. During their interest only periods, these Mortgage Loans may be less likely to prepay as the interest only feature may reduce the perceived benefits of refinancing due to the smaller monthly payment. However, as an interest only mortgage loan approaches the end of its interest only period, it may be more likely to be prepaid, even if market interest rates at the time are only slightly higher or lower than the interest rate on the interest only mortgage loans as the related borrowers seek to avoid increases in their respective monthly mortgage payment.]

The timing of changes in the rate of prepayments may significantly affect the actual yield to investors who purchase the Offered Notes at prices other than par, even if the average rate of principal prepayments is consistent

S-117

<PAGE>

with the expectations of investors. In general, the earlier the payment of principal of the Mortgage Loans the greater the effect on an investor's yield to maturity. As a result, the effect on an investor's yield of principal prepayments occurring at a rate higher (or lower) than the rate anticipated by the investor during the period immediately following the issuance of the Offered Notes may not be offset by a subsequent like reduction (or increase) in the rate of principal prepayments. Investors must make their own decisions as to the appropriate prepayment assumptions to be used in deciding whether to purchase any of the Offered Notes. The Depositor does not make any representations or warranties as to the rate of prepayment or the factors to be considered in connection with these determinations.

[The [Class AF-6] Notes will not be entitled to distributions of principal until the Distribution Date in [ ] 200[ ] (except as otherwise described in this prospectus supplement). Thereafter, the relative entitlement of the [Class AF-6] Notes to payments in respect of principal is subject to increase in accordance with the calculation of the NAS Principal Distribution Amount. See "Description of the Notes -- Distributions" in this prospectus supplement.]

Prepayments and Yields for the Offered Notes

The extent to which the yield to maturity of the Offered Notes may vary from the anticipated yield will depend upon the degree to which it is purchased at a discount or premium and, correspondingly, the degree to which the timing of payments thereon is sensitive to prepayments, liquidations and purchases of the Mortgage Loans in the related Loan Group or Loan Groups. In particular, in the case of an Offered Note purchased at a discount, an investor should consider the risk that a slower than anticipated rate of principal payments, liquidations and purchases of the applicable Mortgage Loans could result in an actual yield to the investor that is lower than the

anticipated yield and, in the case of an Offered Note purchased at a premium, the risk that a faster than anticipated rate of principal payments, liquidations and purchases of the Mortgage Loans could result in an actual yield to the investor that is lower than the anticipated yield.

[In general with respect to fixed rate mortgage loans, if prevailing interest rates fall significantly below the interest rates on fixed rate mortgage loans, these mortgage loans are likely to be subject to higher prepayment rates than if prevailing rates remain at or above the interest rates on these mortgage loans. Conversely, if prevailing interest rates rise appreciably above the interest rates on fixed rate mortgage loans, the fixed rate mortgage loans are likely to experience a lower prepayment rate than if prevailing rates remain at or below the interest rates on these mortgage loans. In the event that Mortgage Loans in Loan Group [1] with higher Mortgage Rates prepay at rates higher than other Mortgage Loans in Loan Group [1], the applicable Net Rate Cap may be lower than otherwise would be the case. As a result, the interest payable on the related Offered Notes on a Distribution Date could be reduced because of the imposition of the applicable Net Rate Cap. We cannot give any assurance as to the level of prepayment that the Mortgage Loans in Loan Group [1] will experience.

[As is the case with fixed rate mortgage loans, adjustable rate mortgage loans may be subject to a greater rate of principal prepayments in a declining interest rate environment. For example, if prevailing interest rates fall significantly, adjustable rate mortgage loans could be subject to higher prepayment rates than if prevailing interest rates remain constant because the availability of fixed rate mortgage loans at lower interest rates may encourage mortgagors to refinance their adjustable rate mortgage loans to a lower fixed interest rate. Prepayments on the Hybrid Mortgage Loans may differ as they approach their respective initial Adjustment Dates and prepayments on Mortgage Loans with interest-only terms may differ as they approach the ends of their interest-only periods. We can give no assurance as to the level of prepayment that the Adjustable Rate Mortgage Loans will experience.]

[Although the Mortgage Rates on the Adjustable Rate Mortgage Loans are subject to adjustment, the Mortgage Rates adjust less frequently than the Interest Rates on the [Class AV] Notes and the [Adjustable Rate Subordinate Notes] and adjust by reference to the Mortgage Index. Changes in [One-Month LIBOR] may not correlate with changes in the Mortgage Index and also may not correlate with prevailing interest rates. It is possible that an increased level of [One-Month LIBOR] could occur simultaneously with a lower level of prevailing interest rates which would be expected to result in faster prepayments, thereby reducing the weighted average lives of the related Notes. The Mortgage Rate applicable to all or substantially all of the Adjustable Rate Mortgage Loans and any Adjustment Date will be based on the Mortgage Index value most recently announced generally as of a date [45 days prior to the Adjustment Date]. Thus, if the Mortgage Index value with respect to an Adjustable Rate Mortgage Loan rises, the lag in time before the corresponding Mortgage Rate increases will, all other things being equal, slow

S-118

<PAGE>

the upward adjustment of the applicable Net Rate Cap. In addition, it is expected that a substantial portion of the Adjustable Rate Mortgage Loans will have Mortgage Rates which will not adjust for a substantial period of time after origination. See "The Mortgage Pool" in this prospectus supplement.]

[The portion of any proceeds of the Corridor Contracts that will be payable to the issuing entity under the Corridor Contract Administration Agreement are intended to provide the [Class AF-1A], [Class 2-AV], [Class

3-AV] and the [Adjustable Rate Subordinate Notes] some protection against any Net Rate Carryover. However, payments that will be allocated to the issuing entity in respect of each Corridor Contract will be allocated based on the lesser of their respective Corridor Contract Notional Balances and the aggregate Note Principal Balance of the related class(es) of Notes, and not on the actual Stated Principal Balances of the Mortgage Loans. Therefore, the Corridor Contracts may not provide sufficient funds to cover any Net Rate Carryover. In addition, payments under the Corridor Contracts are limited to a corridor of specified rates, which is substantially higher than the rate of [One-Month LIBOR] as of the date of this prospectus supplement and are only available to the Notes to the extent described under "Description of the Notes -- The Corridor Contracts" above.]

[Although amounts allocated to the issuing entity in respect of the Corridor Contracts will be available to pay Net Rate Carryover on the related Notes to the extent described under "Description of the Notes -- Distributions -- Distributions of Funds from the Corridor Contracts" above, on or prior to their respective Corridor Contract Termination Dates, we cannot assure you that funds will be available or sufficient to pay these amounts. The ratings assigned to the Offered Notes do not address the likelihood of the payment of Net Rate Carryover.]

The effective yield to the holders of the [Fixed Rate Notes] will be lower than the yield otherwise produced by the applicable rate at which interest is passed through to these holders and the purchase price of the Notes because monthly distributions will not be payable to the holders until the [ th] day (or, if the [ th] day is not a Business Day, the following Business Day) of the month following the month in which interest accrues on the related Mortgage Loans (without any additional distribution of interest or earnings thereon in respect of the delay).

Maturity Date

The "Maturity Date" for the Notes has been determined to be the Distribution Date in [ ] 20[ ] which is the Distribution Date occurring [ ] months following the final payment on the Mortgage Loans assuming that, among other things,

o  no prepayments are received on the Mortgage Loans and

o  scheduled monthly payments of principal of and interest on each of the Mortgage Loans are timely received.

The actual final Distribution Date with respect to each class of these Notes could occur significantly earlier than the Maturity Date because:

o  prepayments are likely to occur which will be applied to the payment of the Note Principal Balances thereof, and

o  the [Master Servicer] may purchase all the Mortgage Loans in the issuing entity when the aggregate Stated Principal Balance of the Mortgage Loans and REO Properties in the issuing entity is less than or equal to [ ]% of the sum of [the Initial Cut-off Date Pool Principal Balance and the original Pre-Funded Amount].

Prepayment Model

Prepayments on mortgage loans are commonly measured relative to a prepayment model or standard. The prepayment models used in this prospectus supplement ("Prepayment Models") are based on an assumed rate of prepayment each month of the then unpaid principal balance of a pool of mortgage loans similar to the Mortgage Loans in each Loan Group. [For the Fixed Rate Mortgage

Loans, the Prepayment Model used in this prospectus supplement (the "Fixed Rate Prepayment Vector" or "FRPV") is a prepayment assumption which represents an

S-119

<PAGE>

assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of mortgage loans for the life of the mortgage loans. For example, a 100% FRPV assumes a constant prepayment rate ("CPR") of 2.0% per annum of the then outstanding principal balance of the Fixed Rate Mortgage Loans in the first month of the life of the Mortgage Loans and an additional 2.0% per annum (i.e., 1/10 of the final per annum rate) in each month thereafter up to and including the tenth month. Beginning in the eleventh month and in each month thereafter during the life of the Fixed Rate Mortgage Loans, a 100% FRPV assumes a CPR of 20% per annum.]

[For the Adjustable Rate Mortgage Loans, the Prepayment Model used in this prospectus supplement ("Adjustable Rate Prepayment Vector" or "ARPV") represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of mortgage loans for the life of the mortgage loans. For the Adjustable Rate Mortgage Loans with original months to reset terms less than or equal to 30 months as of the Initial Cut-off Date, 100% ARPV assumes 6% CPR in month 1, an additional 1/11th of 26% CPR for each month thereafter, increasing to 32% CPR in month 12 and remaining constant at 32% CPR until month 24, increasing to and remaining constant at 60% CPR from month 25 until month 28 decreasing 1/12th of 28% CPR for each month thereafter, decreasing to 32% CPR in month 40 and remaining constant at 32% CPR from month 41 and thereafter; provided, however, the prepayment rate will not exceed 85% CPR in any period for any given percentage of ARPV. For the Adjustable Rate Mortgage Loans with original months to reset terms greater than 30 months as of the Initial Cut-off Date, 100% ARPV assumes 6% CPR in month 1, an additional 1/11th of 26% CPR for each month thereafter, increasing to 32% CPR in month 12 and remaining constant at 32% CPR until month 36, increasing to and remaining constant at 60% CPR from month 37 until month 40, decreasing 1/12th of 28% CPR for each month thereafter, decreasing to 32% CPR in month 52 and remaining constant at 32% CPR from month 53 and thereafter; provided, however, the prepayment rate will not exceed 85% CPR in any period for any given percentage of ARPV. As used in the tables, 100% of the Prepayment Model means 100% FRPV and 100% ARPV, as applicable.]

We cannot assure you, however, that prepayments on the Mortgage Loans will conform to any level of the Prepayment Model, and no representation is made that the Mortgage Loans will prepay at the prepayment rates shown or any other prepayment rate. The rate of principal payments on mortgage loans is influenced by a variety of economic, geographic, social and other factors, including the level of interest rates. Other factors affecting prepayment of mortgage loans include changes in obligors' housing needs, job transfers and unemployment. In the case of mortgage loans in general, if prevailing interest rates fall significantly below the interest rates on the mortgage loans, the mortgage loans are likely to be subject to higher prepayment rates than if prevailing interest rates remain at or above the rates borne by the mortgage loans. Conversely, if prevailing interest rates rise above the interest on the mortgage loans, the rate of prepayment would be expected to decrease.

Decrement Tables; Weighted Average Lives

The tables below set forth the percentages of the initial Note Principal Balance of each class of Offered Notes outstanding at the respective percentages of the Prepayment Model that will be outstanding as of the twelfth

Distribution Date and every twelfth Distribution Date thereafter. Those percentages have been rounded to the nearest whole percentages, [and an asterisk (*) indicates a percentage less than 0.5% and greater than 0%]. In addition, the tables below set forth the weighted average lives of each class of Offered Notes to maturity and to optional termination at the respective percentages of the Prepayment Model. Each weighted average life of any Note presented below is determined by (a) multiplying the amount of each principal payment by the number of years from the date of issuance to the related Distribution Date, (b) adding the results, and (c) dividing the sum by the initial respective Note Principal Balance for the class of Notes.

The following tables have been prepared on the basis of the following assumptions (collectively, the "Modeling Assumptions"):

(1) the Mortgage Loans prepay at the indicated percentage of the related Prepayment Model,

(2) distributions on the Notes are received, in cash, on the [ th] day of each month, commencing in [ ] 200[ ], in accordance with the payment priorities defined in this prospectus supplement,

S-120

<PAGE>

(3) no defaults or delinquencies in, or modifications, waivers or amendments respecting, the payment by the mortgagors of principal and interest on the Mortgage Loans occur,

(4) Scheduled Payments are assumed to be received on the first day of each month commencing in [ ] 200[ ], and prepayments represent payment in full of individual Mortgage Loans and are assumed to be received on the last day of each month, commencing in [ ] 200[ ], and include 30 days' interest thereon,

(5) [the level of the Mortgage Index remains constant at [ ]% per annum, and the level of [One-Month LIBOR] remains constant at [ ]% per annum,]

(6) the Interest Margins or fixed rates for the Offered Notes remain constant at the rates applicable on or prior to the Optional Termination Date and the Interest Margins or fixed rates for the Offered Notes are adjusted accordingly on any Distribution Date after the Optional Termination Date,

(7)   the Notes are issued on [          ] 200[    ],

(8) [the Mortgage Rate for each Adjustable Rate Mortgage Loan is adjusted on its next Adjustment Date (and on subsequent Adjustment Dates, if necessary) to equal the sum of

(a) the assumed level of the Mortgage Index, and

(b) the respective Gross Margin (which sum is subject to the applicable periodic adjustment caps and floors and the applicable lifetime adjustment caps and floors),]

(9) except as indicated with respect to the weighted average lives to maturity, the optional termination is exercised on the Optional Termination Date,

> (10) the scheduled monthly payment for each Mortgage Loan, [except for the interest-only Mortgage Loans during their respective interest-only periods,] is calculated based on its principal balance, mortgage rate and remaining amortization term to maturity so that each Mortgage Loan will amortize in amounts sufficient to repay the remaining principal balance of the Mortgage Loan by its remaining term to maturity (except in the case of balloon loans), as indicated in the table below,

> (11) [any Mortgage Loan with a remaining interest-only term greater than zero does not amortize during the remaining interest-only term, and at the end of the remaining interest-only term, will amortize in amounts sufficient to repay the current balance of any Mortgage Loan over the remaining term to maturity calculated at the expiration of the remaining interest-only term based on the applicable amortization method,]

> (12) [scheduled monthly payments on each Adjustable Rate Mortgage Loan will be adjusted in the month immediately following each related interest adjustment date (as necessary) for the Mortgage Loan to equal the fully amortizing payment described above,]

> (13) [the scheduled amortization for all Mortgage Loans is based upon their respective gross interest rates and the interest rate on each Fixed Rate Credit Comeback Loan will be deemed to be reduced by [ ]% on the Due Date following the end of each of the first four annual periods after the origination date, irrespective of whether the borrower qualifies for the reduction by having a good payment history],

> (14) all of the Pre-Funded Amount, if any, is used to purchase Subsequent Mortgage Loans for inclusion on the Closing Date, and

> (15) each Loan Group consists of Mortgage Loans having the approximate characteristics described below:

S-121

<PAGE>

<TABLE>
<CAPTION>

Loan Group [1] Mortgage Loans

| <S> | <C> | <C> | <C> | <C> | <C> |
|---|---|---|---|---|---|
| Principal Balance($) | Adjusted Net Mortgage Rate (%) (1) | Gross Mortgage Rate (%) (2) | Remaining Amortization Term (months) | Remaining Term to Maturity (months) | Origi Inter Only (mont |
| --------------- | --------------- | ------------- | -------------- | ----------- | ------ |

</TABLE>

_____
(1)   [In the above table, the Adjusted Net Mortgage Rate
      percentages that include Fixed Rate Credit Comeback Loans have been
      calculated without subtracting any Credit Comeback Excess Amounts.
      However, for purposes of actual payments to be made on the Notes,

including the calculation of each applicable Net Rate Cap as well as
other Mortgage Rate calculations, the Gross Mortgage Rate for each Fixed
Rate Credit Comeback Loan will be deemed to be reduced by [ ]% on the
Due Date following the end of each of the first four annual periods
after the origination date, irrespective of whether the borrower
qualifies for the reduction by having a good payment history.]

(2)    [In the above table, the Gross Mortgage Rate percentages that include
       Fixed Rate Credit Comeback Loans have been calculated without
       subtracting any Credit Comeback Excess Amounts. However, for purposes of
       actual payments to be made on the Notes, including the calculation of
       each applicable Net Rate Cap as well as other Mortgage Rate
       calculations, the Gross Mortgage Rate for each Fixed Rate Credit
       Comeback Loan will be deemed to be reduced by [ ]% on the Due Date
       following the end of each of the first four annual periods after the
       origination date, irrespective of whether the borrower qualifies for the
       reduction by having a good payment history.]


                              S-122
<PAGE>




<TABLE>
<CAPTION>

                                             Loan Group [2] Mortgage Loans

 <S>                    <C>        <C>        <C>           <C>        <C>
                        Adjusted                           Remaining  Original
                        Net        Gross      Remaining     Term to    Interest-
 Principal Balance      Mortgage   Mortgage   Amortization  Maturity   Only Term
      ($)               Rate (%)   Rate (%)   Term (months) (months)   (months)  (
 ------------------     ---------- ---------- ------------- ---------- --------- --



<CAPTION>
 <S>                    <C>         <C>         <C>           <C>

                                                Months to     Reset
                                    Life Floor  Next Rate     Frequency
 Principal Balance                              Adjustment    (months)
      ($)               Life Cap (%)   (%)
 ------------------     ------------ ----------- -----------   ---------

</TABLE>


                              S-123
<PAGE>


<TABLE>
<CAPTION>
                                             Loan Group [3] Mortgage Loans

```
<S>                        <C>         <C>        <C>            <C>        <C>
                           Adjusted                              Remaining  Original
                           Net                     Gross                     Term to    Interest-
Principal Balance          Mortgage    Mortgage   Remaining      Maturity   Only Term
     ($)                   Rate (%)    Rate (%)   Amortization   (months)   (months)   (
                                                  Term (months)
-------------------        ----------- ---------- -------------- ---------- --------- --
```

```
<CAPTION>
 <S>                        <C>          <C>           <C>            <C>
                                                      Months to      Reset
Principal Balance          Life Cap (%)  Life Floor   Next Rate      Frequency
     ($)                                    (%)       Adjustment     (months)
-------------------        ------------- ----------- -----------    ---------
```

</TABLE>

                                    S-124
<PAGE>


      Percentages of the Initial Certificate Principal Balances of the Offered
         Certificates at the Respective Percentages of the Prepayment Model


<TABLE>
<CAPTION>
                                   [Class AF-1A] and [Class AF-1B]
                          -------------------------------------------    ---
Distribution Date          [ ]%     [ ]%     [ ]%     [ ]%     [ ]%     [ ]
-----------------          ----     ----     ----     ----     ----     ---
<S>                        <C>      <C>      <C>      <C>      <C>      <C>
Initial Percentage.........100%     100%     100%     100%     100%     100
[    ] [    ], 20[   ].......
[    ] [    ], 20[   ].......
[    ] [    ], 20[   ].......
[    ] [    ], 20[   ].......
[    ] [    ], 20[   ].......

Weighted Average Life to
Optional Termination (in
years).....................
Weighted Average Life to
Maturity (in years).........
</TABLE>


<TABLE>
<CAPTION>
                                         [Class AF-3]
                          -------------------------------------------    ---
Distribution Date          [ ]%     [ ]%     [ ]%     [ ]%     [ ]%     [ ]
-----------------          ----     ----     ----     ----     ----     ---
<S>                        <C>      <C>      <C>      <C>      <C>      <C>
```

```
Initial Percentage...........      100%      100%      100%      100%      100%      100
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......

Weighted Average Life to
Optional Termination (in
years).......................
Weighted Average Life to
Maturity (in years).........
</TABLE>
```

S-125

```
<PAGE>

<TABLE>
<CAPTION>
                                    [Class AF-5A] and [Class AF-5B]
                                  ------------------------------------      ---
Distribution Date                 [ ]%      [ ]%      [ ]%      [ ]%      [ ]%      [ ]
-----------------                 ----      ----      ----      ----      ----      ---
<S>                               <C>       <C>       <C>       <C>       <C>       <C>
Initial Percentage...........     100%      100%      100%      100%      100%      100
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......

Weighted Average Life to
Optional Termination (in
years).......................
Weighted Average Life to
Maturity (in years).........
</TABLE>


<TABLE>
<CAPTION>
                                         [Class MF-1]
                                  ------------------------------------      ---
Distribution Date                 [ ]%      [ ]%      [ ]%      [ ]%      [ ]%      [ ]
-----------------                 ----      ----      ----      ----      ----      ---
<S>                               <C>       <C>       <C>       <C>       <C>       <C>
Initial Percentage...........     100%      100%      100%      100%      100%      100
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......

Weighted Average Life to
Optional Termination (in
years).......................
Weighted Average Life to
Maturity (in years).........
</TABLE>
```

```
<TABLE>
<CAPTION>
                                                 [Class MF-3]
                                    ---------------------------------------  ---
Distribution Date                   [ ]%   [ ]%   [ ]%   [ ]%   [ ]%     [ ]
-----------------                   ----   ----   ----   ----   ----     ---
<S>                                 <C>    <C>    <C>    <C>    <C>      <C>
Initial Percentage...........       100%   100%   100%   100%   100%     100
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......

Weighted Average Life to
Optional Termination (in
years).....................
Weighted Average Life to
Maturity (in years)........
</TABLE>
```

                                    S-126

```
<PAGE>

<TABLE>
<CAPTION>
                                                 [Class MF-5]
                                    ---------------------------------------  ---
Distribution Date                   [ ]%   [ ]%   [ ]%   [ ]%   [ ]%     [ ]
-----------------                   ----   ----   ----   ----   ----     ---
<S>                                 <C>    <C>    <C>    <C>    <C>      <C>
Initial Percentage...........       100%   100%   100%   100%   100%     100
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......

Weighted Average Life to
Optional Termination (in
years).....................
Weighted Average Life to
Maturity (in years)........
</TABLE>


<TABLE>
<CAPTION>
                                                 [Class MF-7]
                                    ---------------------------------------  ---
Distribution Date                   [ ]%   [ ]%   [ ]%   [ ]%   [ ]%     [ ]
-----------------                   ----   ----   ----   ----   ----     ---
<S>                                 <C>    <C>    <C>    <C>    <C>      <C>
Initial Percentage...........       100%   100%   100%   100%   100%     100
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
```

```
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......

Weighted Average Life to
Optional Termination (in
years).....................
Weighted Average Life to
Maturity (in years)........
</TABLE>
```

```
<TABLE>
<CAPTION>
                                        [Class BF]                          [C
                            -------------------------------------       ---
Distribution Date           [ ]%     [ ]%     [ ]%     [ ]%     [ ]%     [ ]
-----------------           ----     ----     ----     ----     ----     ---
<S>                         <C>      <C>      <C>      <C>      <C>      <C>
Initial Percentage..........100%     100%     100%     100%     100%     100
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......

Weighted Average Life to
Optional Termination (in
years).....................
Weighted Average Life to
Maturity (in years)........
</TABLE>
```

S-127

`<PAGE>`

```
<TABLE>
<CAPTION>
                                        [Class 3-AV-1]                      ---
                            -------------------------------------       ---
Distribution Date           [ ]%     [ ]%     [ ]%     [ ]%     [ ]%     [ ]
-----------------           ----     ----     ----     ----     ----     ---
<S>                         <C>      <C>      <C>      <C>      <C>      <C>
Initial Percentage..........100%     100%     100%     100%     100%     100
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......

Weighted Average Life to
Optional Termination (in
years).....................
Weighted Average Life to
Maturity (in years)........
</TABLE>
```

```
<TABLE>
<CAPTION>
                                            [Class 3-AV-3]
                                 ----------------------------------------        ---
Distribution Date                [  ]%     [  ]%     [  ]%     [  ]%     [  ]%     [ ]
-----------------                ----      ----      ----      ----      ----      ---
<S>                              <C>       <C>       <C>       <C>       <C>       <C>
Initial Percentage...........    100%      100%      100%      100%      100%      100
[   ] [   ], 20[   ].......
[   ] [   ], 20[   ].......
[   ] [   ], 20[   ].......
[   ] [   ], 20[   ].......
[   ] [   ], 20[   ].......

Weighted Average Life to
Optional Termination (in
years)......................
Weighted Average Life to
Maturity (in years)........
</TABLE>




<TABLE>
<CAPTION>
                                            [Class MV-1]
                                 ----------------------------------------        ---
Distribution Date                [  ]%     [  ]%     [  ]%     [  ]%     [  ]%     [ ]
-----------------                ----      ----      ----      ----      ----      ---
<S>                              <C>       <C>       <C>       <C>       <C>       <C>
Initial Percentage...........    100%      100%      100%      100%      100%      100
[   ] [   ], 20[   ].......
[   ] [   ], 20[   ].......
[   ] [   ], 20[   ].......
[   ] [   ], 20[   ].......
[   ] [   ], 20[   ].......

Weighted Average Life to
Optional Termination (in
years)......................
Weighted Average Life to
Maturity (in years)........
</TABLE>




                                         S-128

<PAGE>




<TABLE>
<CAPTION>
                                            [Class MV-3]
                                 ----------------------------------------        ---
Distribution Date                [  ]%     [  ]%     [  ]%     [  ]%     [  ]%     [ ]
-----------------                ----      ----      ----      ----      ----      ---
<S>                              <C>       <C>       <C>       <C>       <C>       <C>
Initial Percentage...........    100%      100%      100%      100%      100%      100
[   ] [   ], 20[   ].......
```

```
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......

Weighted Average Life to
Optional Termination (in
years)....................
Weighted Average Life to
Maturity (in years)........
</TABLE>


<TABLE>
<CAPTION>
                                      [Class MV-5]
                          ---------------------------------------   ---
Distribution Date         [ ]%    [ ]%    [ ]%    [ ]%    [ ]%      [ ]
-----------------         ----    ----    ----    ----    ----      ---
<S>                       <C>     <C>     <C>     <C>     <C>       <C>
Initial Percentage.........  100%    100%    100%    100%    100%      100
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......

Weighted Average Life to
Optional Termination (in
years)....................
Weighted Average Life to
Maturity (in years)........
</TABLE>


<TABLE>
<CAPTION>
                                      [Class MV-7]
                          ---------------------------------------   ---
Distribution Date         [ ]%    [ ]%    [ ]%    [ ]%    [ ]%      [ ]
-----------------         ----    ----    ----    ----    ----      ---
<S>                       <C>     <C>     <C>     <C>     <C>       <C>
Initial Percentage.........  100%    100%    100%    100%    100%      100
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......

Weighted Average Life to
Optional Termination (in
years)....................
Weighted Average Life to
Maturity (in years)........
</TABLE>
```

S-129

```
<PAGE>
```

```
<TABLE>
<CAPTION>
                                         [Class BV]
                            -------------------------------------
Distribution Date           [ ]%    [ ]%    [ ]%    [ ]%    [ ]%
-----------------           ----    ----    ----    ----    ----
<S>                         <C>     <C>     <C>     <C>     <C>
Initial Percentage..........100%    100%    100%    100%    100%
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......
[    ] [    ], 20[    ].......

Weighted Average Life to
Optional Termination (in
years).....................
Weighted Average Life to
Maturity (in years)........
</TABLE>
```


          [THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]


                                    S-130
```
<PAGE>
```


                              LEGAL PROCEEDINGS

     There are no legal proceedings against [Countrywide Home Loans], the
Depositor, the Indenture Trustee, the issuing entity or the Master Servicer,
or to which any of their respective properties are subject, that is material
to the noteholders, nor is the Depositor aware of any proceedings of this type
contemplated by governmental authorities.

                  MATERIAL FEDERAL INCOME TAX CONSEQUENCES

General

     The following discussion, which summarizes the material U.S. federal
income tax aspects of the purchase, ownership and disposition of the Notes, is
based on the provisions of the Internal Revenue Code of 1986, as amended (the
"Code"), the Treasury Regulations thereunder, and published rulings and court
decisions in effect as of the date hereof, all of which are subject to change,
possibly retroactively. This discussion does not address every aspect of the
U.S. federal income tax laws which may be relevant to beneficial owners of the
Notes in light of their personal circumstances or to certain types of
beneficial owners of the Notes subject to special treatment under the U.S.
federal income tax laws (for example, banks and life insurance companies).
Investors are encouraged to consult their tax advisors regarding the U.S.
federal, state, local, foreign, and any other tax consequences to them of
investing in the Notes.

Characterization of the Notes as Indebtedness

        In the opinion of [Sidley Austin LLP] [Thacher Proffitt & Wood LLP],
special tax counsel to the depositor ("Tax Counsel"), the Notes will be
treated as debt to a noteholder other than the owner of the Owner Trust
Certificate for U.S. federal income tax purposes. This opinion is based on the
application of current law to the facts as established by the Indenture and
other relevant documents and assumes compliance with the Indenture as in
effect on the date the Notes are issued.

        Although the non-tax treatment of the transaction will differ from the
tax treatment, this will not cause the Notes to be treated as other than
indebtedness for federal income tax purposes. Under the Indenture, the issuing
entity and the noteholders, by accepting the Notes, and each Note owner by
acquiring a beneficial interest in a Note, agree to treat the Notes as
indebtedness secured by the mortgage loans for U.S. federal income tax
purposes. Different criteria are used to determine the non-tax accounting
characterization of the transaction, however.

        In general, for U.S. federal income tax purposes, whether a transaction
constitutes a sale of property or a loan, the repayment of which is secured by
property, is a question of fact, the resolution of which is based upon the
economic substance of the transaction rather than its form or label. Although
the Internal Revenue Service ("IRS") and the courts have set forth several
factors to be taken into account in determining whether the substance of a
transaction is a sale of property or a secured loan, the primary factor in
making this determination is whether the transferee has assumed the risk of
loss or other economic burdens relating to the property and has obtained the
benefits of ownership thereof. Tax Counsel has analyzed and relied on several
factors in reaching its opinion that the weight of the benefits and burdens of
ownership of the mortgage loans has not been transferred to the beneficial
owners of the Notes.

        In some instances, courts have held that a taxpayer is bound by the
particular form it has chosen for a transaction, even if the substance of the
transaction does not accord with its form. Tax Counsel has advised that the
rationale of those cases will not apply to this transaction, because the form
of the transaction as reflected in the operative provisions of the documents
either accords with the characterization of the Notes as debt or otherwise
makes the rationale of those cases inapplicable to this situation.

                                    S-131

<PAGE>


Classification of the Issuing Entity as a Partnership or a Corporation

        Tax Counsel is of the opinion that neither the issuing entity nor any
portion of the issuing entity will be treated as a corporation or publicly
traded partnership taxable as a corporation. See "Material Federal Income Tax
Consequences" in the prospectus. The opinion of Tax Counsel, however, is not
binding on the courts or the IRS. It is possible the IRS could assert that,
for purposes of the Code, the transaction contemplated by this prospectus
supplement and the accompanying prospectus with respect to the Notes
constitutes a sale of the mortgage loans to the issuing entity and a sale of
interests in the issuing entity to the investors (that is, the IRS could
assert that the transaction is actually a sale to the investors of beneficial
ownership in the underlying mortgage loans). Similarly, the IRS could assert
that the issuing entity is properly treated as a corporation or partnership
and that the investors are properly treated as stockholders or partners.

If it were determined that this transaction created an entity classified as a corporation (including a publicly traded partnership taxable as a corporation), the issuing entity would be subject to U.S. federal corporate income tax on the income it derives from the mortgage loans, which would reduce the amounts available for payment to the beneficial owners of the Notes. Cash payments to the beneficial owners of the Notes generally would be treated as dividends for tax purposes to the extent of such corporation's earnings and profits.

If the issuing entity were to be treated as a partnership between the beneficial owners of the Notes and the holder of the Owner Trust Certificate, the partnership itself would not be subject to U.S. federal income tax (unless it was characterized as a publicly traded partnership taxable as a corporation); rather, the owner of the Owner Trust Certificate and each investor would be taxed individually on their respective distributive shares of the partnership's income, gain, loss, deductions, and credits. In addition, as a partner, the amount and timing of the investor's items of income and deductions could differ from the amount and timing of the investor's items of income and deduction as a debt holder.

Possible Classification of the Issuing Entity as a Taxable Mortgage Pool

Section 7701(i) of the Code provides that any entity (or a portion of an entity) that is a "taxable mortgage pool" will be classified as a taxable corporation and will not be permitted to file a consolidated U.S. federal income tax return with another corporation. Any entity (or a portion of any entity) will be a taxable mortgage pool if (i) substantially all of its assets consist of debt instruments, more than 50% of which are real estate mortgages, (ii) the entity is the obligor under debt obligations with two or more maturities, and (iii) under the entity's debt obligations (or an underlying arrangement), payments on the debt obligations bear a relationship to the debt instruments held by the entity.

Assuming that all of the provisions of the Sale and Servicing Agreement and the Trust Agreement, as in effect on the date of issuance, are complied with, Tax Counsel is of the opinion that neither the issuing entity nor any portion of the issuing entity will be a taxable mortgage pool under Section 7701(i) of the Code. The opinion of Tax Counsel, however, is not binding on the IRS or the courts. If the IRS were to contend successfully that the arrangement created by the Sale and Servicing Agreement and the Trust Agreement is a taxable mortgage pool, the arrangement would be subject to U.S. federal corporate income tax on its taxable income generated by ownership of the mortgage loans. That tax would reduce amounts available for payments to beneficial owners of the Notes. The amount of the tax would depend upon whether payments to beneficial owners of the Notes would be deductible as interest expense in computing the taxable income of such an arrangement as a taxable mortgage pool.

Taxation of Interest Income of Beneficial Owners of Notes

Assuming that the interest is "unconditionally payable," the interest on the Notes will be taxable as ordinary income and includible in the income of the beneficial owners of the Notes in accordance with their usual methods of accounting. See "Material Federal Income Tax Consequences" in the prospectus. Although it is not anticipated that the Notes will be issued at a greater than de minimis discount, under certain Treasury regulations (the "OID Regulations") it is possible that the Notes could nevertheless be deemed to have been issued with original issue discount ("OID") if the interest on the Notes were not treated as "unconditionally payable." In that case, all of the taxable income to be recognized with respect to the Notes would be OID and includible in the income of the beneficial owners of the Notes as it accrued

regardless of the beneficial owner's normal accounting method. Thus,

S-132

<PAGE>

the beneficial owner would be taxable on such income before actually receiving it. Such OID, however, would not be includible again when the interest was actually received. See "Material Federal Income Tax Consequences--Taxation of Debt Securities; Interest and Acquisition Discount" in the prospectus for a discussion of the application of the OID rules if the Notes are in fact issued at a greater than de minimis discount or are treated as having been issued with OID under the OID Regulations. If the Notes were treated as being issued with OID, then for purposes of calculating the amount of OID accruing in each accrual period, it is likely that the Notes would be treated as Pay-Through Securities.

Foreign Investors

     In general, subject to certain exceptions, interest (including OID) paid (or accrued) to a noteholder who is a non-U.S. Person will be considered "portfolio interest" and generally will not be subject to United States federal income tax and withholding tax, provided, that (i) the interest is not effectively connected with the conduct of a trade or business within the United States by the non-U.S. Person, and (ii) the non-U.S. Person provides the issuing entity or other person who is otherwise required to withhold U.S. tax with respect to the Note with an appropriate statement (on IRS Form W-8BEN or other similar form), signed under penalties of perjury, certifying that the beneficial owner of the Note is a foreign person and providing the non-U.S. person's name and address. If a Note is held through a securities clearing organization or certain other financial institutions, the organization or institution may provide the relevant signed statement to the withholding agent; in that case, however, the signed statement must be accompanied by an IRS Form W-8BEN or substitute form provided by the non-U.S. Person that owns that interest in the Note. If the interest does not constitute portfolio interest, then it will be subject to U.S. federal income and withholding tax at a rate of 30%, unless reduced or eliminated pursuant to an applicable income tax treaty and the non-U.S. Person provides the issuing entity, or an organization or financial institution described above, with an appropriate statement (for example, an IRS Form W-8BEN), signed under penalties of perjury, to that effect.

     If the interests of the beneficial owners of the Notes were deemed to be partnership interests, the partnership would be required, on a quarterly basis, to pay withholding tax equal to the product, for each foreign partner, of the foreign partner's distributive share of "effectively connected" income of the partnership multiplied by the highest rate of tax applicable to that foreign partner. In addition, a corporate foreign partner would be subject to branch profits tax. Each non-foreign partner would be required to certify to the partnership that it is not a foreign person. The tax withheld from each foreign partner would be credited against the foreign partner's U.S. income tax liability.

     In addition, if the interests of the beneficial owners of the Notes were deemed to be partnership interests, the amounts distributed on such deemed partnership interests could be subject to a 30% withholding tax (or lower income tax treaty rate) either because the interest on the underlying mortgage loans does not appear to satisfy the requirements to be treated as "portfolio interest" under the Code, or because, even if the interest on the underlying mortgage loans were to be treated as portfolio interest, amounts distributed on such deemed partnership interests could be treated as "guaranteed payments"

within the meaning of the partnership provisions of the Code.

     If the issuing entity were taxable as a corporation, payments to foreign persons, to the extent treated as dividends, would generally be subject to withholding at the rate of 30%, unless the rate were reduced by an applicable income tax treaty. See "Material Federal Income Tax Consequences--Tax Treatment of Foreign Investors" in the prospectus.

Backup Withholding

     Certain beneficial owners of the Notes may be subject to backup withholding with respect to interest paid on the Notes if the Note owner, upon acquisition, fails to supply the Indenture Trustee or broker with the taxpayer's identification number, furnishes an incorrect taxpayer identification number, fails to report interest, dividends, or other "reportable payments" (as defined in the Code) properly, or, under certain circumstances, fails to provide the Indenture Trustee or broker with a certified statement, under penalties of perjury, that the taxpayer is not subject to backup withholding.

     The Indenture Trustee will be required to report annually to the IRS, and to each noteholder of record, the amount of interest paid (and OID accrued, if any) on the Notes (and the amount of interest withheld for U.S. federal

                                   S-133
<PAGE>

income taxes, if any) for each calendar year, except as to exempt holders (generally, holders that are corporations, certain tax-exempt organizations, or nonresident aliens who provide certification of their status as nonresidents). As long as the only "noteholder" of record is Cede & Co., as nominee for DTC, beneficial owners of the Notes and the IRS will receive tax and other information (including the amount of interest paid on the Notes owned) from participants, and indirect participants rather than from the Indenture Trustee. (The Indenture Trustee, however, will respond to requests for necessary information to enable participants, indirect participants and certain other persons to complete their reports.) Each non-exempt Note owner who is a U.S. individual (including a resident alien) will be required to provide, under penalties of perjury, an IRS Form W-9 containing his or her name, address, correct federal taxpayer identification number, and a statement that he or she is not subject to backup withholding. Should a nonexempt Note owner fail to provide the required certification, the participants or indirect participants (or the paying agent) will be required to withhold a portion of the interest (and principal) otherwise payable to the holder, and remit the withheld amount to the IRS as a credit against the holder's federal income tax liability.

                               OTHER TAXES

     The depositor makes no representations regarding the state, local, or foreign tax consequences of the purchase, ownership, or disposition of the Notes. All investors are encouraged to consult their tax advisors regarding the federal, state, local, or foreign income tax consequences of the purchase, ownership, and disposition of the Notes.

                           ERISA CONSIDERATIONS

     Fiduciaries of employee benefit plans and certain other retirement plans and arrangements that are subject to the Employee Retirement Income Security

Act of 1974, as amended ("ERISA") or corresponding provisions of the Code
(including individual retirement accounts and annuities, Keogh plans, and
collective investment funds in which the plans, accounts, annuities, or
arrangements are invested), persons acting on behalf of a plan, and persons
using the assets of a plan, should review carefully with their legal advisors
whether the purchase or holding of the notes could either give rise to a
transaction that is prohibited under ERISA or the Code or cause the collateral
securing the notes to be treated as plan assets for purposes of regulations of
the Department of Labor in 29 C.F.R. ss.2510.3-101 (the "Plan Assets
Regulation").

     General. Section 406 of ERISA and Section 4975 of the Code prohibit
parties in interest or disqualified persons with respect to a plan from
engaging in certain transactions (including loans) involving the plan and its
assets unless a statutory, regulatory, or administrative exemption applies to
the transaction. Section 4975 of the Code imposes certain excise taxes (or, in
some cases, a civil penalty may be assessed pursuant to Section 502(i) of
ERISA) on parties in interest or disqualified persons which engage in
non-exempt prohibited transactions.

     Plan Assets Regulation and the Notes. The United States Department of
Labor has issued the Plan Assets Regulation concerning the definition of what
constitutes the assets of a plan for purposes of ERISA and the prohibited
transaction provisions of the Code. The Plan Assets Regulation describes the
circumstances under which the assets of an entity in which a plan invests will
be considered to be "plan assets" so that any person who exercises control
over the assets would be subject to ERISA's fiduciary standards. Under the
Plan Assets Regulation, generally, when a plan invests in another entity, the
plan's assets do not include, solely by reason of the investment, any of the
underlying assets of the entity. However, the Plan Assets Regulation provides
that, if a plan acquires an "equity interest" in an entity, the assets of the
entity will be treated as assets of the plan investor unless certain
exceptions not applicable here apply.

     Under the Plan Assets Regulation, the term "equity interest" is defined
as any interest in an entity other than an instrument that is treated as
indebtedness under "applicable local law" and which has no "substantial equity
features." If the Offered Notes are not treated as equity interests in the
issuing entity for purposes of the Plan Assets Regulation, a plan's investment
in the Offered Notes would not cause the assets of the issuing entity to be
deemed plan assets. If the Offered Notes are deemed to be equity interests in
the issuing entity, the issuing entity could be considered to hold plan assets
because of a plan's investment in the Offered Notes. In that event, the Master
Servicer and other persons exercising management or discretionary control over
the assets of the issuing entity or providing services with respect to those
assets would be deemed to be fiduciaries or other parties in interest with
respect to investing plans and thus subject to the prohibited transaction
provisions of Section 406 of ERISA and Section 4975

                                   S-134
<PAGE>

of the Code and, in the case of fiduciaries, to the fiduciary responsibility
provisions of Title I of ERISA, with respect to transactions involving the
issuing entity's assets. We cannot assure you that any statutory, regulatory,
or administrative exemption will apply to all prohibited transactions that
might arise in connection with the purchase or holding of an equity interest
in the issuing entity by a plan. However, based on the features of the Offered
Notes, their ratings, and the opinion of Tax Counsel that they will be treated
as indebtedness for federal income tax purposes, the issuing entity believes
that the Offered Notes should be treated as indebtedness without substantial

equity features for ERISA purposes.

Prohibited Transactions. Without regard to whether the Offered Notes are considered to be equity interests in the issuing entity, certain affiliates of the issuing entity might be considered or might become parties in interest or disqualified persons with respect to a plan. In this case, the acquisition and holding of Offered Notes by or on behalf of the plan could be considered to give rise to a prohibited transaction within the meaning of ERISA and the Code, unless they were subject to one or more exemptions such as Prohibited Transaction Class Exemption ("PTCE") 84-14, which exempts certain transactions effected on behalf of a plan by a "qualified professional asset manager"; PTCE 90-1, which exempts certain transactions involving insurance company pooled separate accounts; PTCE 91-38, which exempts certain transactions involving bank collective investment funds; PTCE 95-60, which exempts certain transactions involving insurance company general accounts; or PTCE 96-23, which exempts certain transactions effected on behalf of a plan by certain "in-house asset managers." Each purchaser or transferee of a Offered Note that is a plan investor shall be deemed to have represented that the relevant conditions for exemptive relief under at least one of the foregoing exemptions or a similar exemption have been satisfied. Prospective transferees and purchasers should consider that a prohibited transaction exemption may not apply to all prohibited transactions that may arise in connection with a plan's investment in the Offered Notes.

The issuing entity, the Master Servicer, [a servicer], the Indenture Trustee and the Underwriters of the Offered Notes may be the sponsor of or investment advisor with respect to one or more plans. Because they may receive certain benefits in connection with the sale of the Offered Notes, the purchase of Offered Notes using plan assets over which any of them has investment authority might be deemed to be a violation of the prohibited transaction rules of ERISA and the Code for which no exemption may be available. Accordingly, any plan for which the issuing entity, the Master Servicer, [a servicer], the Indenture Trustee and the Underwriters of the Offered Notes, or any of their respective affiliates:

o.....has investment or administrative discretion with respect to plan assets;

o       has authority or responsibility to give, or regularly gives, investment advice with respect to plan assets, for a fee and pursuant to an agreement or understanding that the advice (i) will serve as a primary basis for investment decisions with respect to plan assets, and (ii) will be based on the particular investment needs for the plan; or

o       is an employer maintaining or contributing to the plan,

are encouraged to discuss with counsel whether an investment in the Offered Notes by the plan may give rise to a violation of ERISA.
  The sale of Offered Notes to a plan is in no respect a representation by the issuing entity or any Underwriter of the Offered Notes that this investment meets all relevant legal requirements with respect to investments by plans generally or any particular plan, or that this investment is appropriate for plans generally or any particular plan.
  Any plan investor proposing to invest in the Offered Notes are encouraged to consult with its counsel to confirm that the investment will not result in a prohibited transaction that is not subject to an exemption and will satisfy the other requirements of ERISA and the Code applicable to plans.

METHOD OF DISTRIBUTION

Subject to the terms and conditions set forth in the Underwriting Agreement among the Depositor, [ ], [ ] and [ ] (collectively, the "Underwriters"), the Depositor has agreed to

S-135
<PAGE>

sell the Offered Notes (the "Underwritten Notes") to the Underwriters, and
each Underwriter has severally agreed to purchase from the Depositor the
initial Note Principal Balance of each class of Underwritten Notes set forth
under its name below.

```
        Class                    [       ]  [         ]  [        ]
        -----                    ---------  ----------   ----------

        [Class AF-1A]..........
        [Class AF-1B]..........
        [Class AF-2]...........
        [Class AF-3]...........
        [Class AF-4]...........
        [Class AF-5A]..........
        [Class AF-5B]..........
        [Class AF-6]...........
        [Class MF-1]...........
        [Class MF-2]...........
        [Class MF-3]...........
        [Class MF-4]...........
        [Class MF-5]...........
        [Class MF-6]...........
        [Class MF-7]...........
        [Class MF-8]] .........
        [Class BF].............
        [Class 2-AV-1].........
        [Class 2-AV-2].........
        [Class 3-AV-1].........
        [Class 3-AV-2].........
        [Class 3-AV-3].........
        [Class 3-AV-4].........
        [Class MV-1]...........
        [Class MV-2]...........
        [Class MV-3]...........
        [Class MV-4]...........
        [Class MV-5]...........
        [Class MV-6]...........
        [Class MV-7]...........
        [Class MV-8]] .........
        [Class BV].............
                                 ---------  ----------   ----------
              Total...
```

        [The Depositor has been advised by each Underwriter that it proposes
initially to offer the Underwritten Notes to certain dealers at the prices set
forth on the cover page less a selling concession not to exceed the percentage
of the Note denomination set forth below, and that each Underwriter may allow,
and the dealers may reallow, a reallowance discount not to exceed the
percentage of the Note denomination set forth below:]

```
                                        Selling    Reallowance
        Class                         Concession    Discount
        -----                         ----------   -----------
        [Class AF-1A]................
```

```
[Class AF-1B]................
[Class AF-2]................
[Class AF-3]................
[Class AF-4]................
[Class AF-5A]................
```

S-136

<PAGE>

```
[Class AF-5B]................
[Class AF-6]................
[Class MF-1]................
[Class MF-2]................
[Class MF-3]................
[Class MF-4]................
[Class MF-5]................
[Class MF-6]................
[Class MF-7]................
[Class MF-8]................
[Class BF]................
[Class 2-AV-1]................
[Class 2-AV-2]................
[Class 3-AV-1]................
[Class 3-AV-2]................
[Class 3-AV-3]................
[Class 3-AV-4]................
[Class MV-1]................
[Class MV-2]................
[Class MV-3]................
[Class MV-4]................
[Class MV-5]................
[Class MV-6]................
[Class MV-7]................
[Class MV-8]................]
[Class BV]................
```

[After the initial public offering, the public offering prices, the concessions and the discounts may be changed.]

The Depositor has been advised by each Underwriter that it intends to make a market in the Underwritten Notes purchased by it, but no Underwriter has any obligation to do so. We cannot assure you that a secondary market for the Underwritten Notes (or any particular class thereof) will develop or, if it does develop, that it will continue or that this market will provide sufficient liquidity to noteholders.

Until the distribution of the Underwritten Notes is completed, the rules of the SEC may limit the ability of the Underwriters and certain selling group members to bid for and purchase the Underwritten Notes. As an exception to these rules, the Underwriters are permitted to engage in certain transactions that stabilize the price of the Underwritten Notes. The transactions consist of bids or purchases for the purpose of pegging, fixing or maintaining the price of the Underwritten Notes.

In general, purchases of a security for the purpose of stabilization or to reduce a short position could cause the price of the security to be higher than it might be in the absence of the purchases.

Neither the Depositor nor any of the Underwriters makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the prices of the

Underwritten Notes. In addition, neither the Depositor nor any of the Underwriters makes any representation that the Underwriters will engage in these transactions or that the transactions, once commenced, will not be discontinued without notice.

The Depositor has agreed to indemnify the Underwriters against, or make contributions to the Underwriters with respect to, certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act").

S-137

<PAGE>

USE OF PROCEEDS

It is expected that the proceeds to the Depositor from the sale of the Underwritten Notes will be approximately $[ ], before deducting issuance expenses payable by the Depositor, estimated to be approximately $[ ]. The Depositor will apply the net proceeds of the sale of the Offered Notes against the purchase price of the Initial Mortgage Loans on the Closing Date and to deposit the Pre-Funded Amount, if any, in the Pre-Funding Account.

LEGAL MATTERS

The validity of the Notes, including certain federal income tax consequences with respect thereto, will be passed upon for the Depositor by Sidley Austin LLP, New York, New York. Certain legal matters will be passed upon for the Underwriters by [ ].

[EXPERTS]

[The consolidated financial statements of [ ] and subsidiaries as of [December 31, 2004 and 2003, and for each of the years in the three-year period ended December 31, 2004], are incorporated by reference in this prospectus supplement and in the registration statement in reliance upon the report of [ ], independent registered public accounting firm, incorporated by reference in this prospectus supplement, and in the registration statement upon the authority of that firm as experts in accounting and auditing.]

S-138

<PAGE>

RATINGS

It is a condition of the issuance of the Offered Notes that each class of Offered Notes set forth below be assigned the ratings at least as high as those designated below by [Moody's Investors Service, Inc. ("Moody's")] and [Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.("S&P") and together with Moody's, the "Rating Agencies")].

| Class | Moody's Rating | S&P Rating | Class | Moody's Rating | S&P Rating |
|-------|--------|--------|-------|--------|--------|
| [AF-1A] | | | [BF] | | |
| [AF-1B] | | | [2-AV-1] | | |
| [AF-2] | | | [2-AV-2] | | |

| | |
|---|---|
| [AF-3] | [3-AV-1] |
| [AF-4] | [3-AV-2] |
| [AF-5A] | [3-AV-3] |
| [AF-5B] | [3-AV-4] |
| [AF-6] | [MV-1] |
| [MF-1] | [MV-2] |
| [MF-2] | [MV-3] |
| [MF-3] | [MV-4] |
| [MF-4] | [MV-5] |
| [MF-5] | [MV-6] |
| [MF-6] | [MV-7] |
| [MF-7] | [MV-8] |
| [MF-8] | [BV] |

[The ratings assigned to the [Class AF-5B] Notes are without regard to the [Class AF-5B] Policy.] The Depositor has requested that each Rating Agency maintain ongoing surveillance of the ratings assigned to the Offered Notes in accordance with the Rating Agency's policy, but we cannot assure you that a Rating Agency will continue its surveillance of the ratings assigned to the Offered Notes.

The security ratings assigned to the Offered Notes should be evaluated independently from similar ratings on other types of securities. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the Rating Agencies. The ratings on the Offered Notes do not, however, constitute statements regarding the likelihood or frequency of prepayments on the Mortgage Loans, the payment of the Net Rate Carryover or the anticipated yields in light of prepayments.

The Depositor has not requested a rating of any Offered Notes by any rating agency other than [Moody's and S&P]. However, we cannot assure you as to whether any other rating agency will rate the Offered Notes or, if it does, what ratings would be assigned by another rating agency. The ratings assigned by another rating agency to the Offered Notes could be lower than the respective ratings assigned by the Rating Agencies.

S-139

<PAGE>

INDEX OF DEFINED TERMS

[Adjustable Rate Subordinate] Corridor Contract......................S-98
[Class 2-AV] Corridor Contract......................................S-98
[Class 2-AV] Principal Distribution Amount..........................S-76
[Class 2-AV] Principal Distribution Target Amount...................S-76
[Class 3-AV] Corridor Contract......................................S-98
[Class 3-AV] Principal Distribution Amount..........................S-76
[Class 3-AV] Principal Distribution Target Amount...................S-77
[Class 3-AV-1] Acceleration Amount..................................S-77
[Class 3-AV-1] Acceleration Event...................................S-77
[Class 3-AV-1] Target Balance.......................................S-77
[Class AF] Principal Distribution Amount............................S-76
[Class AF-1A] Corridor Contract.....................................S-98
[Class AF-5B] Available Funds.......................................S-108
[Class AF-5B] Insurer...............................................S-105

[Class AF-5B] Policy Premium Rate.....................................S-70
[Class AF-5B] Premium.................................................S-70
[Class AF-5B] Reimbursement Amount...................................S-70
[Class AV] Principal Distribution Allocation Amount..................S-76
[Class AV] Principal Distribution Target Amount......................S-76
Accrual Period.......................................................S-70
Adjustable Rate Cumulative Loss Trigger Event........................S-73
Adjustable Rate Delinquency Trigger Event............................S-74
Adjustable Rate Loan Group Excess Cashflow...........................S-97
Adjustable Rate Mortgage Loans.......................................S-29
Adjustable Rate Notes................................................S-66
Adjustable Rate OC Floor.............................................S-74
Adjustable Rate Overcollateralization Deficiency Amount..............S-74
Adjustable Rate Overcollateralization Target Amount..................S-74
Adjustable Rate Overcollateralized Amount............................S-74
Adjustable Rate Prepayment Vector...................................S-121
Adjustable Rate Senior Enhancement Percentage........................S-75
Adjustable Rate Stepdown Date........................................S-75
Adjustable Rate Subordinate Class Principal Distribution Amount...   S-75
Adjustable Rate Subordinate Notes....................................S-66
Adjustable Rate Trigger Event........................................S-75
Adjusted Net Mortgage Rate...........................................S-68
Adjustment Date......................................................S-30
Advance..............................................................S-63
Alternative Documentation Program....................................S-54
Applied Realized Loss Amount........................................S-105
ARPV................................................................S-121
beneficial owner.....................................................S-68
Book-Entry Notes.....................................................S-67
Business Day.........................................................S-68
Carryover Reserve Fund..............................................S-104
Ceiling Rate.........................................................S-99
Class 2-AV Notes.....................................................S-66
Class 3-AV Notes.....................................................S-66
Class AF Notes.......................................................S-66
Class AF-1 Notes.....................................................S-66
Class AF-5 Notes.....................................................S-66
Class AF-5B Policy..................................................S-105
Class AV Notes.......................................................S-66
CLUES Plus Documentation Program.....................................S-54
Collection Account...................................................S-82
Compensating Interest................................................S-63
Corridor Contract....................................................S-98
Corridor Contract Administration Agreement....................... ....S-98
Corridor Contract Administrator......................................S-98
Corridor Contract Counterparty.......................................S-98
Corridor Contract Termination Date..................................S-103
Corridor Contracts...................................................S-98
Countrywide Financial............................................ ....S-59
Countrywide Home Loans...............................  ...S-29, S-52, S-59
Countrywide Servicing................................................S-58
CPR.................................................. ........... ...S-121
Credit Comeback Excess Account.......................... ......S-31, S-104
Credit Comeback Excess Amount........................................S-31
Credit Comeback Excess Cashflow......................................S-96
credit comeback loans................................................S-31
Current Interest.....................................................S-70
Cut-off Date.........................................................S-32
Deficiency Amount...................................................S-107
Definitive Note......................................................S-68
Delay Delivery Mortgage Loans.......................................S-118
Deleted Mortgage Loan................................................S-50

Depositor....................................................S-29
Detailed Description.........................................S-29
Determination Date...........................................S-32
Distribution Account.........................................S-84
Distribution Account Deposit Date............... ............S-84
Distribution Date....................................S-68, S-108
DTC..........................................................S-67
Due Dates....................................................S-62
Due for Payment.............................................S-108
Due Period...................................................S-68
ERISA.......................................................S-136
Euroclear....................................................S-67
Excess Corridor Contract Payment.............................S-99
Excess Proceeds..............................................S-68
Expanded Underwriting Guidelines.............................S-55
Expense Fee Rate.............................................S-70

S-140

<PAGE>

Extra Principal Distribution Amount..........................S-77
FICO Credit Scores...........................................S-53
Final Recovery Determination.................................S-68
Five-Year Hybrid Mortgage Loans..............................S-31
Fixed 30-Year Interest-Only Loan.................... .... ...S-31
Fixed Rate Credit Comeback Loans.............................S-31
Fixed Rate Cumulative Loss Trigger Event.....................S-77
Fixed Rate Delinquency Trigger Event.........................S-78
Fixed Rate Loan Group Excess Cashflow........................S-96
Fixed Rate Mortgage Loans....................................S-29
Fixed Rate Notes.............................................S-66
Fixed Rate OC Floor..........................................S-77
Fixed Rate Overcollateralization Deficiency Amount...........S-78
Fixed Rate Overcollateralization Target Amount...............S-78
Fixed Rate Overcollateralized Amount.........................S-78
Fixed Rate Prepayment Vector................................S-121
Fixed Rate Senior Enhancement Percentage.....................S-78
Fixed Rate Stepdown Date.....................................S-79
Fixed Rate Subordinate Class Principal Distribution Amount...S-79
Fixed Rate Subordinate Notes.................................S-66
Fixed Rate Trigger Event.....................................S-79
FRPV........................................................S-121
Full Documentation Program...................................S-54
Funding Period...............................................S-51
Global Securities..............................................1
Gross Margin.................................................S-30
Group [2] Sequential Trigger Event...........................S-79
Hybrid Mortgage Loans........................................S-31
Indenture....................................................S-64
Indenture Default...........................................S-113
Indenture Trustee............................................S-48
Indenture Trustee Fee........................................S-86
Indenture Trustee Fee Rate...................................S-70
Initial Cut-off Date.........................................S-29
Initial Cut-off Date Pool Principal Balance..................S-29
Initial Cut-off Date Principal Balance.......................S-29
Initial Mortgage Loans.......................................S-29
Initial Mortgage Pool........................................S-29
Initial Periodic Rate Cap....................................S-31
Insurance Proceeds...........................................S-68
Insured Amounts.............................................S-108

Insured Payments...................................................S-108
Interest Carry Forward Amount......................................S-70
Interest Determination Date........................................S-70
Interest Funds................. ....................................S-70
Interest Margin....................................................S-70
Interest Rate......................................................S-71
Interest Remittance Amount.........................................S-71
issuing entity.....................................................S-63
Late Payment Rate..................................................S-108
LIBOR Business Day.................................................S-72
Liquidation Proceeds...............................................S-68
Loan Group.........................................................S-29
Loan Group [1].....................................................S-29
Loan Group [2].....................................................S-29
Loan Group [3].....................................................S-29
Loan-to-Value Ratio................................................S-32
Master Servicer....................................................S-58
Master Servicer Advance Date.......................................S-63
Maturity Date......................................................S-120
Maximum Mortgage Rate..............................................S-31
Minimum Mortgage Rate..............................................S-50
Modeling Assumptions...............................................S-122
Moody's............................................................S-5, S-141
Mortgage File......................................................S-48
Mortgage Index.....................................................S-30
Mortgage Loan Purchase and Assignment Agreement....................S-48
Mortgage Loans.....................................................S-48
Mortgage Notes.....................................................S-29
Mortgage Rate......................................................S-30
Mortgaged Properties...............................................S-29
NAS Principal Distribution Amount..................................S-80
Net Corridor Contract Payment......................................S-99
Net Mortgage Rate..................................................S-63
net rate cap.......................................................S-23
Net Rate Cap.......................................................S-72
Net Rate Carryover.................................................S-72
NIM Insurer........................................................S-1, S-117
NIM Insurer Default................................................S-27
No Income/No Asset Documentation Program...........................S-54
Nonpayment.........................................................S-108
Note Owners........................................................S-67
Note Principal Balance.............................................S-69
Notes..............................................................S-66
Notional Balance...................................................S-99
Offered Notes......................................................S-66
One-Month LIBOR....................................................S-103
Optional Termination Date..........................................S-114
Order..............................................................S-107
Owner Trust Certificate............................................S-95
Owner Trustee......................................................S-63, S-64
Owner Trustee Fee..................................................S-86
Participants.......................................................S-68
Percentage Interest................................................S-69
Plan Assets Regulation.............................................S-136
Preference Amount..................................................S-108
Preferred Processing Program.......................................S-53
Pre-Funded Amount..................................................S-51
Pre-Funding Account................................................S-51
Prepayment Interest Excess.........................................S-62
Prepayment Interest Shortfall......................................S-63
Prepayment Models..................................................S-121
Prepayment Period..................................................S-32

Principal Distribution Amount........................................S-80
Principal Remittance Amount..........................................S-81
Priority Class......................................................S-114
PTCE................................................................S-137


                                  S-141

<PAGE>

Purchase Price.......................................................S-49
Rating Agencies.....................................................S-141
Realized Loss........................................................S-81
Record Date..........................................................S-69
Reduced Documentation Program........................................S-54
Reference Bank Rate..................................................S-72
Reference Banks......................................................S-73
Reimbursement Amount................................................S-108
related subordinate classes..........................................S-20
REO Property.........................................................S-63
Replacement Mortgage Loan............................................S-50
Required Carryover Reserve Fund Deposit.............................S-104
Rolling Sixty-Day Delinquency Rate...................................S-81
S&P.........................................................S-5, S-141
Sale and Servicing Agreement.........................................S-48
Scheduled Payments...................................................S-30
Securities Act......................................................S-139
Seller...............................................................S-29
Seller Shortfall Interest Requirement................................S-73
Senior Notes.........................................................S-66
Servicing Advances...................................................S-83
Servicing Fee........................................................S-62
Servicing Fee Rate...................................................S-62
significance estimate...............................................S-103
significance percentage.............................................S-103
Sixty-Day Delinquency Rate...........................................S-81
Standard Underwriting Guidelines.....................................S-55
Stated Income/Stated Asset Documentation Program.....................S-54
Stated Principal Balance.............................................S-32
Statistical Calculation Date.........................................S-29
Statistical Calculation Date Pool Principal Balance..................S-29
Statistical Calculation Pool.........................................S-29
Statistical Calculation Pool Mortgage Loans..........................S-29
Streamlined Documentation Program....................................S-54
Strike Rate..........................................................S-99
Subordinate Notes....................................................S-66
subordination........................................................S-20
Subsequent Cut-off Date..............................................S-51
Subsequent Mortgage Loans............................................S-51
Subsequent Periodic Rate Cap.........................................S-31
Subsequent Recoveries................................................S-69
Subsequent Transfer Date.............................................S-51
Tax Counsel.........................................................S-133
Three-Year Hybrid Mortgage Loans.....................................S-31
Trigger Event........................................................S-81
Trust................................................................S-64
Trust Administrator...........................................S-48, S-6.3, S-65
Trust Administrator Fee..............................................S-86
Trust Fund...........................................................S-64
Two-Year Hybrid Mortgage Loans.......................................S-31
U.S. Person............................................................4
Underwriters........................................................S-137
Underwritten Notes..................................................S-137