## FICO Credit Scores[1]

| Range of FICO Credit Scores | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 581 – 600 | 1 | $ 175,968 | 0.70% | 175,968 | 5.250 | 101 | 592 | 87.6 |
| 601 – 620 | 1 | 756,393 | 3.00 | 756,393 | 5.375 | 172 | 615 | 65.0 |
| 621 – 640 | 1 | 405,769 | 1.61 | 405,769 | 5.500 | 171 | 634 | 73.0 |
| 641 – 660 | 5 | 2,714,898 | 10.77 | 542,980 | 5.466 | 172 | 651 | 69.6 |
| 661 – 680 | 1 | 971,131 | 3.85 | 971,131 | 5.625 | 172 | 668 | 65.4 |
| 681 – 700 | 7 | 3,226,720 | 12.80 | 460,960 | 5.348 | 172 | 696 | 62.4 |
| 701 – 720 | 3 | 1,855,773 | 7.36 | 618,591 | 5.087 | 162 | 711 | 43.7 |
| 721 – 740 | 1 | 773,957 | 3.07 | 773,957 | 5.625 | 171 | 737 | 80.0 |
| 741 – 760 | 10 | 6,165,714 | 24.45 | 616,571 | 5.304 | 170 | 746 | 58.1 |
| 761 – 780 | 6 | 4,430,965 | 17.57 | 738,494 | 5.581 | 168 | 768 | 70.9 |
| 781 – 800 | 5 | 3,266,663 | 12.96 | 653,333 | 5.421 | 171 | 790 | 56.9 |
| 801 – 820 | 1 | 470,209 | 1.86 | 470,209 | 5.500 | 164 | 811 | 61.0 |
| Total | 42 | $ 25,214,162 | 100.00% | | | | | |

(1)  As of the cut-off date, the weighted average FICO Credit Score of the mortgagors related to the mortgage loans in loan group 2 was approximately 727.

## Documentation Program for Mortgage Loans

| Type of Program | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Full/Alternative | 32 | $ 19,035,682 | 75.50% | 594,865 | 5.388 | 169 | 718 | 63.1 |
| Preferred | 5 | $3,787,592 | 15.02 | 757,518 | 5.526 | 169 | 779 | 58.9 |
| Reduced | 5 | $2,390,888 | 9.48 | 478,178 | 5.361 | 171 | 721 | 64.7 |
| Total | 42 | $ 25,214,162 | 100.00% | | | | | |

## Original Loan-to-Value Ratios[1][2]

| Range of Original Loan-to-Value Ratios (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0.01 - 50.00 | 7 | $ 5,248,891 | 20.82% | 749,842 | 5.254 | 168 | 743 | 33.8 |
| 50.01 - 55.00 | 2 | 1,173,583 | 4.65 | 586,791 | 5.480 | 174 | 710 | 53.5 |
| 55.01 - 60.00 | 2 | 1,033,605 | 4.10 | 516,802 | 5.405 | 173 | 721 | 58.9 |
| 60.01 - 65.00 | 4 | 2,571,719 | 10.20 | 642,930 | 5.463 | 169 | 696 | 63.9 |
| 65.01 - 70.00 | 9 | 7,260,034 | 28.79 | 806,670 | 5.409 | 170 | 737 | 68.2 |
| 70.01 - 75.00 | 6 | 2,559,090 | 10.15 | 426,515 | 5.441 | 166 | 719 | 74.4 |
| 75.01 - 80.00 | 11 | 5,191,272 | 20.59 | 471,934 | 5.497 | 172 | 728 | 79.3 |
| 85.01 - 90.00 | 1 | 175,968 | 0.70 | 175,968 | 5.250 | 101 | 592 | 87.6 |
| Total | 42 | $ 25,214,162 | 100.00% | | | | | |

(1) As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 2 was approximately 62.59%.
(2) Does not take into account any secondary financing on the mortgage loans in loan group 2 that may exist at the time of origination.

## Geographic Distribution of Mortgaged Properties[1]

| State | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1 | $ 428,222 | 1.70% | 428,222 | 5.500 | 171 | 658 | 79.9 |
| Arizona | 6 | 3,283,151 | 13.02 | 547,192 | 5.498 | 173 | 750 | 72.6 |
| California | 11 | 8,355,060 | 33.14 | 759,551 | 5.412 | 170 | 742 | 60.7 |
| Colorado | 1 | 446,794 | 1.77 | 446,794 | 5.250 | 172 | 712 | 41.9 |
| Delaware | 2 | 1,270,492 | 5.04 | 635,246 | 5.455 | 171 | 756 | 45.7 |
| Florida | 8 | 4,479,514 | 17.77 | 559,939 | 5.521 | 170 | 732 | 71.2 |
| Georgia | 2 | 988,212 | 3.92 | 494,106 | 4.706 | 149 | 711 | 29.0 |
| Idaho | 1 | 974,014 | 3.86 | 974,014 | 5.250 | 173 | 748 | 40.6 |
| Kentucky | 1 | 756,393 | 3.00 | 756,393 | 5.375 | 172 | 615 | 65.0 |
| Michigan | 2 | 1,434,409 | 5.69 | 717,204 | 5.504 | 173 | 678 | 69.7 |
| North Carolina | 1 | 398,657 | 1.58 | 398,657 | 4.750 | 148 | 756 | 65.5 |
| Oregon | 3 | 1,319,181 | 5.23 | 439,727 | 5.550 | 173 | 734 | 64.4 |
| South Carolina | 1 | 452,917 | 1.80 | 452,917 | 5.250 | 173 | 658 | 51.7 |
| Texas | 1 | 175,968 | 0.70 | 175,968 | 5.250 | 101 | 592 | 87.6 |
| Washington | 1 | 451,179 | 1.79 | 451,179 | 5.375 | 173 | 655 | 79.9 |
| **Total** | **42** | **$ 25,214,162** | **100.00%** | | | | | |

(1) As of the cut-off date, no more than approximately 7.45% of the mortgage loans in loan group 2 were secured by mortgaged properties located in any one postal zip code area.

## Purpose of Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Refinance (rate/term) | 13 | $ 9,340,878 | 37.05% | 718,529 | 5.448 | 170 | 731 | 56.0 |
| Refinance (cash-out) | 15 | 8,478,681 | 33.63 | 565,245 | 5.308 | 167 | 713 | 65.2 |
| Purchase | 14 | 7,394,603 | 29.33 | 528,186 | 5.465 | 171 | 740 | 68.0 |
| **Total** | **42** | **$ 25,214,162** | **100.00%** | | | | | |

## Types of Mortgaged Properties

| Property Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Single Family Residence | 23 | $ 15,155,873 | 60.11% | 658,951 | 5.396 | 170 | 722 | 57.9 |
| Planned Unit Development | 10 | 5,077,891 | 20.14 | 507,789 | 5.428 | 165 | 728 | 65.4 |
| High-Rise Condominium | 4 | 2,594,424 | 10.29 | 648,606 | 5.536 | 171 | 735 | 76.5 |
| Low-Rise Condominium | 3 | 1,443,543 | 5.73 | 481,181 | 5.438 | 168 | 763 | 72.8 |
| 2-4 Family Residence | 1 | 872,667 | 3.46 | 872,667 | 5.000 | 172 | 742 | 69.2 |
| Manufactured | 1 | 69,764 | 0.28 | 69,764 | 5.500 | 175 | 691 | 74.8 |
| Total | 42 | $ 25,214,162 | 100.00% | | | | | |

## Occupancy Types[1]

| Occupancy Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Secondary Residence | 20 | $ 12,768,364 | 50.64% | 638,418 | 5.470 | 170 | 737 | 67.1 |
| Primary Residence | 17 | 9,704,107 | 38.49 | 570,830 | 5.387 | 168 | 713 | 60.5 |
| Investment Property | 5 | 2,741,691 | 10.87 | 548,338 | 5.173 | 169 | 734 | 49.2 |
| Total | 42 | $ 25,214,162 | 100.00% | | | | | |

(1)  Based upon representations of the related borrowers at the time of origination.

## Remaining Terms to Maturity[1]

| Remaining Term to Maturity (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 175 | 7 | $ 3,559,994 | 14.12% | 508,571 | 5.425 | 175 | 737 | 66.1 |
| 174 | 2 | 1,256,247 | 4.98 | 628,123 | 5.572 | 174 | 731 | 65.4 |
| 173 | 4 | 2,511,391 | 9.96 | 627,848 | 5.304 | 173 | 724 | 56.0 |
| 172 | 9 | 6,471,493 | 25.67 | 719,055 | 5.367 | 172 | 707 | 60.6 |
| 171 | 5 | 2,696,222 | 10.69 | 539,244 | 5.507 | 171 | 691 | 74.4 |
| 170 | 3 | 2,909,401 | 11.54 | 969,800 | 5.625 | 170 | 740 | 71.9 |
| 169 | 1 | 1,437,119 | 5.70 | 1,437,119 | 5.500 | 169 | 788 | 37.5 |
| 168 | 1 | 435,015 | 1.73 | 435,015 | 5.500 | 168 | 763 | 66.4 |
| 164 | 3 | 1,468,169 | 5.82 | 489,390 | 5.500 | 164 | 763 | 67.3 |
| 162 | 1 | 543,762 | 2.16 | 543,762 | 5.500 | 162 | 771 | 75.0 |
| 149 | 1 | 873,398 | 3.46 | 873,398 | 4.750 | 149 | 707 | 22.4 |
| 148 | 1 | 398,657 | 1.58 | 398,657 | 4.750 | 148 | 756 | 65.5 |
| 147 | 2 | 414,392 | 1.64 | 207,196 | 5.008 | 147 | 749 | 76.3 |
| 144 | 1 | 62,934 | 0.25 | 62,934 | 5.125 | 144 | 789 | 43.2 |
| 101 | 1 | 175,968 | 0.70 | 175,968 | 5.250 | 101 | 592 | 87.6 |
| Total | 42 | $ 25,214,162 | 100.00% | | | | | |

(1) As of the cut-off date, the weighted average remaining term to maturity of the mortgage loans in loan group 2 was approximately 169 months.

## Interest-Only Periods at Origination

| Interest Only Period (months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Current Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| N/A | 42 | $ 25,214,162 | 100.00% | 600,337 | 5.406 | 169 | 727 | 62.6 |
| Total | 42 | $ 25,214,162 | 100.00% | | | | | |

**Prepayment Charge Periods at Origination**

| Prepayment Charge Period (months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Current Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| N/A ............................ | 42 | $ 25,214,162 | 100.00% | 600,337 | 5.406 | 169 | 727 | 62.6 |
| Total ........................... | 42 | $ 25,214,162 | 100.00% | | | | | |

**Loan Group 3**

**Mortgage Rates[1]**

| Range of Mortgage Rates (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 3 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 5.501 – 6.000 | 30 | $ 20,046,116 | 71.30% | 668,204 | 5.860 | 174 | 729 | 68.2 |
| 6.001 – 6.500 | 26 | 7,398,486 | 26.31 | 284,557 | 6.319 | 164 | 721 | 67.4 |
| 6.501 – 7.000 | 6 | 672,110 | 2.39 | 112,018 | 6.700 | 160 | 668 | 69.6 |
| Total | 62 | $ 28,116,712 | 100.00% | | | | | |

(1) The lender acquired mortgage insurance mortgage loans in loan group 3 are shown in the preceding table at the mortgage rates inclusive of the interest premium charge by the related lenders.  As of the cut-off date, the weighted average mortgage rate of the mortgage loans in loan group 3 (net of such premiums) was approximately 5.996% per annum.  Without the adjustment, the weighted average mortgage rate on the mortgage loans in loan group 2 was approximately 6.001% per annum.

**Current Mortgage Loan Principal Balances[1]**

| Range of Current Mortgage Loan Principal Balances ($) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 3 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0.01 - 50,000.00 | 5 | $ 189,105 | 0.67% | 37,821 | 6.561 | 154 | 697 | 87.2 |
| 50,000.01 - 100,000.00 | 11 | 780,014 | 2.77 | 70,910 | 6.473 | 154 | 735 | 71.2 |
| 100,000.01 - 150,000.00 | 5 | 616,580 | 2.19 | 123,316 | 6.287 | 144 | 730 | 66.6 |
| 150,000.01 - 200,000.00 | 1 | 179,058 | 0.64 | 179,058 | 5.750 | 143 | 696 | 54.9 |
| 250,000.01 - 300,000.00 | 1 | 267,356 | 0.95 | 267,356 | 6.250 | 117 | 774 | 75.2 |
| 300,000.01 - 350,000.00 | 2 | 664,169 | 2.36 | 332,084 | 6.310 | 160 | 693 | 77.4 |
| 350,000.01 - 400,000.00 | 2 | 722,450 | 2.57 | 361,225 | 6.562 | 162 | 611 | 80.5 |
| 400,000.01 - 450,000.00 | 2 | 831,445 | 2.96 | 415,722 | 5.937 | 167 | 692 | 80.0 |
| 450,000.01 - 500,000.00 | 8 | 3,839,791 | 13.66 | 479,974 | 6.030 | 172 | 695 | 69.8 |
| 500,000.01 - 550,000.00 | 5 | 2,619,075 | 9.32 | 523,815 | 5.873 | 175 | 757 | 67.6 |
| 550,000.01 - 600,000.00 | 1 | 585,911 | 2.08 | 585,911 | 6.000 | 178 | 691 | 71.5 |
| 600,000.01 - 650,000.00 | 3 | 1,909,114 | 6.79 | 636,371 | 5.999 | 173 | 745 | 63.7 |
| 650,000.01 - 700,000.00 | 3 | 2,040,483 | 7.26 | 680,161 | 6.082 | 174 | 730 | 67.3 |
| 700,000.01 - 750,000.00 | 1 | 724,461 | 2.58 | 724,461 | 5.750 | 174 | 795 | 75.0 |
| 750,000.01 - 1,000,000.00 | 8 | 7,126,486 | 25.35 | 890,811 | 5.993 | 174 | 740 | 63.6 |
| 1,000,000.01 - 1,500,000.00 | 4 | 5,021,214 | 17.86 | 1,255,303 | 5.815 | 176 | 719 | 67.7 |
| Total | 62 | $ 28,116,712 | 100.00% | | | | | |

(1) As of the cut-off date, the average current mortgage loan principal balance of the mortgage loans in loan group 3 was approximately $453,495.

## FICO Credit Scores[1]

| Range of FICO Credit Scores | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 3 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 541 – 560 | 1 | $ 490,231 | 1.74% | 490,231 | 6.500 | 162 | 557 | 75.0 |
| 561 – 580 | 1 | 316,399 | 1.13 | 316,399 | 6.375 | 159 | 569 | 80.0 |
| 581 – 600 | 1 | 360,572 | 1.28 | 360,572 | 6.625 | 163 | 595 | 70.9 |
| 621 – 640 | 3 | 905,295 | 3.22 | 301,765 | 6.489 | 161 | 629 | 81.4 |
| 641 – 660 | 2 | 1,115,272 | 3.97 | 557,636 | 5.778 | 170 | 642 | 67.4 |
| 661 – 680 | 7 | 2,678,451 | 9.53 | 382,636 | 5.944 | 170 | 672 | 60.8 |
| 681 – 700 | 5 | 1,281,652 | 4.56 | 256,330 | 5.995 | 166 | 688 | 72.2 |
| 701 – 720 | 5 | 3,234,083 | 11.50 | 646,817 | 5.953 | 174 | 710 | 65.9 |
| 721 – 740 | 13 | 6,012,937 | 21.39 | 462,534 | 5.964 | 172 | 727 | 66.4 |
| 741 – 760 | 5 | 3,219,042 | 11.45 | 643,808 | 5.834 | 175 | 750 | 72.6 |
| 761 – 780 | 10 | 4,155,689 | 14.78 | 415,569 | 6.081 | 171 | 770 | 63.1 |
| 781 – 800 | 5 | 2,799,930 | 9.96 | 559,986 | 5.906 | 175 | 796 | 75.1 |
| 801 – 820 | 4 | 1,547,160 | 5.50 | 386,790 | 6.147 | 170 | 805 | 66.1 |
| **Total** | **62** | **$ 28,116,712** | **100.00%** | | | | | |

(1) As of the cut-off date, the weighted average FICO Credit Score of the mortgagors related to the mortgage loans in loan group 3 was approximately 725.

## Documentation Program for Mortgage Loans

| Type of Program | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 3 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Full/Alternative | 23 | $ 13,097,870 | 46.58% | 569,473 | 5.900 | 175 | 737 | 72.5 |
| Reduced | 27 | 12,042,975 | 42.83 | 446,036 | 6.083 | 170 | 712 | 62.4 |
| Preferred | 2 | 1,492,685 | 5.31 | 746,343 | 5.913 | 172 | 763 | 67.4 |
| No Income/No Asset | 6 | 642,040 | 2.28 | 107,007 | 6.518 | 160 | 659 | 69.8 |
| No Ratio | 3 | 573,786 | 2.04 | 191,262 | 6.122 | 161 | 682 | 81.3 |
| Stated Income/Stated Asset | 1 | 267,356 | 0.95 | 267,356 | 6.250 | 117 | 774 | 75.2 |
| **Total** | **62** | **$ 28,116,712** | **100.00%** | | | | | |

**Original Loan-to-Value Ratios[1][2]**

| Range of Original Loan-to-Value Ratios (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 3 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0.01 - 50.00 | 5 | $ 1,584,422 | 5.64% | 316,884 | 6.145 | 173 | 736 | 36.9 |
| 50.01 - 55.00 | 1 | 179,058 | 0.64 | 179,058 | 5.750 | 143 | 696 | 54.9 |
| 55.01 - 60.00 | 7 | 5,236,413 | 18.62 | 748,059 | 6.004 | 173 | 729 | 58.2 |
| 60.01 - 65.00 | 6 | 4,604,239 | 16.38 | 767,373 | 5.915 | 175 | 738 | 63.7 |
| 65.01 - 70.00 | 5 | 3,087,700 | 10.98 | 617,540 | 5.902 | 170 | 684 | 68.5 |
| 70.01 - 75.00 | 15 | 6,253,592 | 22.24 | 416,906 | 6.077 | 171 | 726 | 73.5 |
| 75.01 - 80.00 | 17 | 6,514,669 | 23.17 | 383,216 | 5.953 | 170 | 736 | 79.2 |
| 85.01 - 90.00 | 4 | 576,335 | 2.05 | 144,084 | 6.500 | 159 | 672 | 90.0 |
| 90.01 - 95.00 | 2 | 80,283 | 0.29 | 40,142 | 6.570 | 152 | 702 | 95.0 |
| **Total** | **62** | **$ 28,116,712** | **100.00%** | | | | | |

(1) As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 3 was approximately 68.03%.
(2) Does not take into account any secondary financing on the mortgage loans in loan group 3 that may exist at the time of origination.

## Geographic Distribution of Mortgaged Properties[1]

| State | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 3 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Alabama | 3 | $ 842,591 | 3.00% | 280,864 | 6.152 | 162 | 744 | 77.5 |
| Arkansas | 1 | 802,087 | 2.85 | 802,087 | 5.750 | 176 | 734 | 80.0 |
| Arizona | 5 | 2,567,662 | 9.13 | 513,532 | 5.812 | 170 | 749 | 73.8 |
| California | 16 | 9,295,874 | 33.06 | 580,992 | 6.012 | 172 | 721 | 66.3 |
| Colorado | 1 | 267,356 | 0.95 | 267,356 | 6.250 | 117 | 774 | 75.2 |
| Florida | 5 | 3,385,193 | 12.04 | 677,039 | 6.112 | 170 | 698 | 64.4 |
| Georgia | 1 | 489,554 | 1.74 | 489,554 | 6.000 | 174 | 731 | 64.6 |
| Hawaii | 2 | 1,396,338 | 4.97 | 698,169 | 6.250 | 176 | 785 | 46.7 |
| Illinois | 3 | 1,217,364 | 4.33 | 405,788 | 5.828 | 169 | 649 | 68.4 |
| Indiana | 2 | 90,568 | 0.32 | 45,284 | 6.598 | 151 | 809 | 78.2 |
| Massachusetts | 1 | 316,399 | 1.13 | 316,399 | 6.375 | 159 | 569 | 80.0 |
| Maryland | 2 | 137,124 | 0.49 | 68,562 | 6.375 | 153 | 676 | 77.8 |
| Michigan | 4 | 2,366,188 | 8.42 | 591,547 | 5.830 | 178 | 727 | 66.6 |
| Missouri | 1 | 45,870 | 0.16 | 45,870 | 6.750 | 156 | 672 | 79.4 |
| Nevada | 2 | 736,679 | 2.62 | 368,339 | 6.152 | 177 | 768 | 80.0 |
| Ohio | 1 | 59,859 | 0.21 | 59,859 | 6.375 | 153 | 684 | 72.1 |
| Oregon | 1 | 107,024 | 0.38 | 107,024 | 6.250 | 113 | 731 | 70.0 |
| Pennsylvania | 1 | 77,882 | 0.28 | 77,882 | 6.500 | 156 | 736 | 90.0 |
| Texas | 8 | 3,277,197 | 11.66 | 409,650 | 5.969 | 174 | 740 | 69.8 |
| Virginia | 1 | 520,680 | 1.85 | 520,680 | 5.750 | 173 | 747 | 72.7 |
| Wyoming | 1 | 117,222 | 0.42 | 117,222 | 6.500 | 153 | 753 | 90.0 |
| Total | 62 | $ 28,116,712 | 100.00% | | | | | |

(1) As of the cut-off date, no more than approximately 5.90% of the mortgage loans in loan group 3 were secured by mortgaged properties located in any one postal zip code area.

## Purpose of Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 3 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Purchase | 24 | $ 10,054,576 | 35.76% | 418,941 | 6.010 | 172 | 751 | 72.3 |
| Refinance (cash-out) | 20 | 9,346,299 | 33.24 | 467,315 | 6.047 | 172 | 719 | 61.5 |
| Refinance (rate/term) | 18 | 8,715,836 | 31.00 | 484,213 | 5.940 | 170 | 703 | 70.2 |
| Total | 62 | $ 28,116,712 | 100.00% | | | | | |

## Types of Mortgaged Properties

| Property Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 3 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Single Family Residence | 35 | $ 15,182,411 | 54.00% | 433,783 | 6.013 | 171 | 721 | 68.0 |
| Planned Unit Development | 14 | 8,664,829 | 30.82 | 618,916 | 6.002 | 173 | 733 | 69.9 |
| Low-Rise Condominium | 6 | 3,024,126 | 10.76 | 504,021 | 5.889 | 172 | 713 | 60.0 |
| High-Rise Condominium | 2 | 868,450 | 3.09 | 434,225 | 5.950 | 168 | 770 | 73.6 |
| 2-4 Family Residence | 5 | 376,897 | 1.34 | 75,379 | 6.487 | 154 | 738 | 77.3 |
| Total | 62 | $ 28,116,712 | 100.00% | | | | | |

## Occupancy Types[1]

| Occupancy Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 3 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Primary Residence | 44 | $ 23,688,154 | 84.25% | 538,367 | 5.954 | 172 | 726 | 67.8 |
| Investment Property | 14 | 2,520,068 | 8.96 | 180,005 | 6.468 | 159 | 691 | 67.6 |
| Secondary Residence | 4 | 1,908,490 | 6.79 | 477,123 | 5.968 | 172 | 767 | 71.7 |
| Total | 62 | $ 28,116,712 | 100.00% | | | | | |

(1) Based upon representations of the related borrowers at the time of origination.

## Remaining Terms to Maturity[1]

| Remaining Term to Maturity (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 3 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 179 | 5 | $ 4,268,025 | 15.18% | 853,605 | 5.943 | 179 | 748 | 61.6 |
| 178 | 2 | 2,015,877 | 7.17 | 1,007,939 | 5.911 | 178 | 712 | 63.3 |
| 177 | 4 | 2,531,354 | 9.00 | 632,839 | 5.925 | 177 | 767 | 72.0 |
| 176 | 2 | 1,272,407 | 4.53 | 636,203 | 5.796 | 176 | 725 | 71.9 |
| 175 | 5 | 3,767,463 | 13.40 | 753,493 | 5.854 | 175 | 759 | 73.3 |
| 174 | 3 | 1,747,392 | 6.21 | 582,464 | 5.820 | 174 | 742 | 59.9 |
| 173 | 3 | 1,840,994 | 6.55 | 613,665 | 5.969 | 173 | 754 | 62.8 |
| 172 | 1 | 972,005 | 3.46 | 972,005 | 6.000 | 172 | 772 | 64.5 |
| 171 | 4 | 2,904,134 | 10.33 | 726,034 | 5.890 | 171 | 664 | 70.3 |
| 170 | 1 | 669,120 | 2.38 | 669,120 | 6.250 | 170 | 707 | 63.0 |
| 169 | 1 | 472,529 | 1.68 | 472,529 | 5.750 | 169 | 727 | 80.0 |
| 163 | 2 | 773,797 | 2.75 | 386,899 | 6.291 | 163 | 641 | 75.8 |
| 162 | 5 | 1,488,409 | 5.29 | 297,682 | 6.524 | 162 | 623 | 76.5 |
| 161 | 1 | 872,485 | 3.10 | 872,485 | 6.375 | 161 | 723 | 55.3 |
| 160 | 2 | 391,368 | 1.39 | 195,684 | 6.264 | 160 | 791 | 75.5 |
| 159 | 2 | 372,161 | 1.32 | 186,080 | 6.469 | 159 | 600 | 79.3 |
| 158 | 1 | 50,719 | 0.18 | 50,719 | 6.375 | 158 | 659 | 38.2 |
| 156 | 2 | 123,753 | 0.44 | 61,876 | 6.593 | 156 | 712 | 86.1 |
| 154 | 3 | 299,975 | 1.07 | 99,992 | 6.435 | 154 | 751 | 61.8 |
| 153 | 5 | 375,701 | 1.34 | 75,140 | 6.491 | 153 | 719 | 82.6 |
| 150 | 1 | 35,557 | 0.13 | 35,557 | 6.500 | 150 | 729 | 95.0 |
| 145 | 1 | 52,216 | 0.19 | 52,216 | 6.500 | 145 | 737 | 80.0 |
| 144 | 1 | 146,803 | 0.52 | 146,803 | 5.875 | 144 | 676 | 58.6 |
| 143 | 2 | 278,735 | 0.99 | 139,368 | 5.795 | 143 | 706 | 63.9 |
| 142 | 1 | 19,353 | 0.07 | 19,353 | 6.500 | 142 | 774 | 90.0 |
| 117 | 1 | 267,356 | 0.95 | 267,356 | 6.250 | 117 | 774 | 75.2 |
| 113 | 1 | 107,024 | 0.38 | 107,024 | 6.250 | 113 | 731 | 70.0 |
| Total | 62 | $ 28,116,712 | 100.00% | | | | | |

(1)   As of the cut-off date, the weighted average remaining term to maturity of the mortgage loans in loan group 3 was approximately 171 months.

**Interest-Only Periods at Origination**

| Interest Only Period (months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 3 | Average Principal Balance Outstanding ($) | Weighted Average Current Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| N/A ............................. | 62 | $ 28,116,712 | 100.00% | 453,495 | 6.001 | 171 | 725 | 68.0 |
| Total ....................... | 62 | $ 28,116,712 | 100.00% | | | | | |

**Prepayment Charge Periods at Origination**

| Prepayment Charge Period (months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 3 | Average Principal Balance Outstanding ($) | Weighted Average Current Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| N/A ............................. | 62 | $ 28,116,712 | 100.00% | 453,495 | 6.001 | 171 | 725 | 68.0 |
| Total ....................... | 62 | $ 28,116,712 | 100.00% | | | | | |

**Loan Group 4**

**Mortgage Rates[1]**

| Range of Mortgage Rates (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 5.501 – 6.000 | 42 | $ 18,668,242 | 36.70% | 444,482 | 5.874 | 234 | 724 | 67.4 |
| 6.001 – 6.500 | 59 | 27,565,705 | 54.20 | 467,215 | 6.305 | 236 | 714 | 70.7 |
| 6.501 – 7.000 | 9 | 3,724,755 | 7.32 | 413,862 | 6.712 | 236 | 691 | 74.9 |
| 7.001 – 7.500 | 1 | 135,847 | 0.27 | 135,847 | 7.500 | 236 | 689 | 74.0 |
| 7.501 – 8.000 | 2 | 312,680 | 0.61 | 156,340 | 7.944 | 235 | 668 | 74.4 |
| 8.501 – 9.000 | 1 | 455,226 | 0.90 | 455,226 | 9.000 | 236 | 743 | 89.8 |
| Total | 114 | $ 50,862,454 | 100.00% | | | | | |

(1) As of the cut-off date, the weighted average mortgage rate of the mortgage loans in loan group 4 was approximately 6.214% per annum.

**Current Mortgage Loan Principal Balances[1]**

| Range of Current Mortgage Loan Principal Balances ($) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 50,000.01 – 100,000.00 | 7 | $ 533,669 | 1.05% | 76,238 | 6.208 | 227 | 701 | 52.8 |
| 100,000.01 – 150,000.00 | 8 | 1,013,449 | 1.99 | 126,681 | 6.537 | 233 | 653 | 75.5 |
| 150,000.01 – 200,000.00 | 7 | 1,168,513 | 2.30 | 166,930 | 6.359 | 234 | 687 | 67.0 |
| 200,000.01 – 250,000.00 | 1 | 206,998 | 0.41 | 206,998 | 6.625 | 233 | 727 | 54.6 |
| 250,000.01 – 300,000.00 | 1 | 294,370 | 0.58 | 294,370 | 6.500 | 231 | 685 | 77.9 |
| 300,000.01 – 350,000.00 | 1 | 335,644 | 0.66 | 335,644 | 6.225 | 234 | 646 | 71.6 |
| 350,000.01 – 400,000.00 | 3 | 1,158,658 | 2.28 | 386,219 | 6.294 | 234 | 738 | 73.3 |
| 400,000.01 – 450,000.00 | 19 | 8,263,960 | 16.25 | 434,945 | 6.195 | 236 | 697 | 73.2 |
| 450,000.01 – 500,000.00 | 21 | 10,046,826 | 19.75 | 478,420 | 6.336 | 237 | 703 | 71.5 |
| 500,000.01 – 550,000.00 | 17 | 8,851,324 | 17.40 | 520,666 | 6.144 | 236 | 735 | 69.4 |
| 550,000.01 – 600,000.00 | 12 | 6,959,856 | 13.68 | 579,988 | 6.221 | 235 | 716 | 71.8 |
| 600,000.01 – 650,000.00 | 4 | 2,533,898 | 4.98 | 633,474 | 5.907 | 235 | 750 | 70.2 |
| 650,000.01 – 700,000.00 | 7 | 4,791,226 | 9.42 | 684,461 | 6.142 | 231 | 749 | 60.5 |
| 700,000.01 - 750,000.00 | 1 | 720,000 | 1.42 | 720,000 | 6.375 | 240 | 668 | 80.0 |
| 750,000.01 - 1,000,000.00 | 5 | 3,984,064 | 7.83 | 796,813 | 6.151 | 236 | 721 | 68.4 |
| Total | 114 | $ 50,862,454 | 100.00% | | | | | |

(1) As of the cut-off date, the average current mortgage loan principal balance of the mortgage loans in loan group 4 was approximately $446,162.

## FICO Credit Scores[1]

| Range of FICO Credit Scores | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 601 – 620 | 2 | $   567,080 | 1.11% | 283,540 | 5.863 | 230 | 619 | 82.2 |
| 621 – 640 | 11 | 3,934,064 | 7.73 | 357,642 | 6.303 | 237 | 627 | 70.8 |
| 641 – 660 | 9 | 3,743,890 | 7.36 | 415,988 | 6.110 | 235 | 651 | 67.3 |
| 661 – 680 | 13 | 4,429,917 | 8.71 | 340,763 | 6.443 | 236 | 671 | 76.0 |
| 681 – 700 | 16 | 7,519,478 | 14.78 | 469,967 | 6.232 | 236 | 693 | 73.0 |
| 701 – 720 | 17 | 7,651,806 | 15.04 | 450,106 | 6.217 | 236 | 711 | 70.1 |
| 721 – 740 | 11 | 4,247,379 | 8.35 | 386,125 | 6.146 | 234 | 731 | 66.7 |
| 741 – 760 | 13 | 7,494,414 | 14.73 | 576,493 | 6.176 | 236 | 748 | 67.4 |
| 761 – 780 | 12 | 6,288,357 | 12.36 | 524,030 | 6.113 | 236 | 774 | 65.4 |
| 781 – 800 | 9 | 4,472,334 | 8.79 | 496,926 | 6.255 | 229 | 792 | 72.4 |
| 801 – 820 | 1 | 513,736 | 1.01 | 513,736 | 6.375 | 239 | 808 | 79.2 |
| **Total** | **114** | **$  50,862,454** | **100.00%** | | | | | |

(1)  As of the cut-off date, the weighted average FICO Credit Score of the mortgagors related to the mortgage loans in loan group 4 was approximately 716.

## Documentation Program for Mortgage Loans

| Type of Program | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Full/Alternative | 51 | $  23,637,442 | 46.47% | 463,479 | 6.185 | 235 | 704 | 72.4 |
| Preferred | 31 | 17,502,819 | 34.41 | 564,607 | 6.097 | 236 | 744 | 66.0 |
| Reduced | 24 | 8,218,453 | 16.16 | 342,436 | 6.519 | 235 | 694 | 72.7 |
| Stated Income/Stated Asset | 3 | 876,414 | 1.72 | 292,138 | 6.293 | 235 | 710 | 64.9 |
| No Ratio | 3 | 447,079 | 0.88 | 149,026 | 6.627 | 232 | 699 | 72.9 |
| No Income/No Asset | 2 | 180,248 | 0.35 | 90,124 | 6.103 | 231 | 669 | 48.0 |
| **Total** | **114** | **$  50,862,454** | **100.00%** | | | | | |

## Original Loan-to-Value Ratios[1][2]

| Range of Original Loan-to-Value Ratios (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0.01 - 50.00 | 9 | $ 3,234,334 | 6.36% | 359,370 | 5.950 | 236 | 712 | 38.4 |
| 50.01 - 55.00 | 5 | 2,281,979 | 4.49 | 456,396 | 6.235 | 235 | 735 | 53.7 |
| 55.01 - 60.00 | 9 | 4,582,060 | 9.01 | 509,118 | 6.074 | 236 | 739 | 57.7 |
| 60.01 - 65.00 | 8 | 4,081,602 | 8.02 | 510,200 | 6.289 | 236 | 712 | 63.4 |
| 65.01 - 70.00 | 17 | 7,246,703 | 14.25 | 426,277 | 6.115 | 235 | 725 | 67.8 |
| 70.01 - 75.00 | 17 | 6,251,404 | 12.29 | 367,730 | 6.228 | 231 | 705 | 72.6 |
| 75.01 - 80.00 | 45 | 21,687,399 | 42.64 | 481,942 | 6.237 | 236 | 714 | 79.0 |
| 85.01 - 90.00 | 4 | 1,496,975 | 2.94 | 374,244 | 7.056 | 236 | 673 | 89.9 |
| Total | 114 | $ 50,862,454 | 100.00% | | | | | |

(1)  As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 4 was approximately 70.04%.

(2)  Does not take into account any secondary financing on the mortgage loans in loan group 4 that may exist at the time of origination.

Geographic Distribution of Mortgaged Properties[1]

| State | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1 | $ 696,007 | 1.37% | 696,007 | 6.125 | 238 | 770 | 66.7 |
| Arizona | 3 | 1,773,084 | 3.49 | 591,028 | 6.311 | 234 | 745 | 69.2 |
| California | 39 | 19,972,121 | 39.27 | 512,106 | 6.274 | 235 | 737 | 67.9 |
| Colorado | 1 | 54,135 | 0.11 | 54,135 | 5.875 | 233 | 696 | 38.1 |
| Connecticut | 1 | 475,961 | 0.94 | 475,961 | 6.750 | 236 | 723 | 80.0 |
| District of Columbia | 1 | 498,934 | 0.98 | 498,934 | 6.125 | 239 | 626 | 73.5 |
| Florida | 15 | 5,019,259 | 9.87 | 334,617 | 6.220 | 233 | 696 | 71.6 |
| Georgia | 3 | 1,152,562 | 2.27 | 384,187 | 6.004 | 237 | 739 | 78.4 |
| Hawaii | 1 | 720,000 | 1.42 | 720,000 | 6.375 | 240 | 668 | 80.0 |
| Iowa | 1 | 139,170 | 0.27 | 139,170 | 7.875 | 237 | 670 | 79.9 |
| Idaho | 2 | 777,958 | 1.53 | 388,979 | 6.350 | 238 | 741 | 72.7 |
| Illinois | 1 | 157,871 | 0.31 | 157,871 | 6.750 | 238 | 703 | 70.5 |
| Indiana | 2 | 894,015 | 1.76 | 447,008 | 6.258 | 236 | 640 | 83.2 |
| Massachusetts | 4 | 1,793,000 | 3.53 | 448,250 | 6.264 | 236 | 668 | 56.5 |
| Maryland | 1 | 438,854 | 0.86 | 438,854 | 5.750 | 230 | 620 | 80.0 |
| Maine | 1 | 442,083 | 0.87 | 442,083 | 6.375 | 239 | 682 | 79.9 |
| Michigan | 1 | 379,450 | 0.75 | 379,450 | 6.000 | 234 | 779 | 74.8 |
| Minnesota | 2 | 572,754 | 1.13 | 286,377 | 5.843 | 233 | 641 | 78.2 |
| Missouri | 1 | 553,354 | 1.09 | 553,354 | 6.000 | 229 | 732 | 80.0 |
| North Carolina | 3 | 1,713,778 | 3.37 | 571,259 | 6.176 | 238 | 725 | 52.1 |
| New Hampshire | 1 | 98,212 | 0.19 | 98,212 | 5.875 | 232 | 623 | 33.3 |
| Nevada | 5 | 2,636,008 | 5.18 | 527,202 | 6.041 | 236 | 712 | 76.5 |
| New York | 2 | 1,119,884 | 2.20 | 559,942 | 6.303 | 238 | 726 | 78.4 |
| Ohio | 3 | 315,448 | 0.62 | 105,149 | 6.313 | 231 | 662 | 76.5 |
| Oklahoma | 2 | 1,196,134 | 2.35 | 598,067 | 6.295 | 237 | 679 | 79.0 |
| Oregon | 4 | 1,346,636 | 2.65 | 336,659 | 6.199 | 234 | 726 | 76.0 |
| Pennsylvania | 1 | 518,858 | 1.02 | 518,858 | 5.875 | 239 | 730 | 78.8 |
| Rhode Island | 1 | 180,500 | 0.35 | 180,500 | 5.875 | 238 | 718 | 67.2 |
| South Carolina | 2 | 1,184,236 | 2.33 | 592,118 | 6.051 | 238 | 706 | 56.8 |
| Tennessee | 2 | 982,712 | 1.93 | 491,356 | 6.185 | 237 | 722 | 68.5 |
| Texas | 4 | 1,742,376 | 3.43 | 435,594 | 5.997 | 236 | 675 | 74.2 |
| Washington | 1 | 790,957 | 1.56 | 790,957 | 6.250 | 237 | 699 | 80.0 |

| State | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Wisconsin................. | 1 | 84,084 | 0.17 | 84,084 | 6.125 | 235 | 726 | 28.3 |
| Wyoming................. | 1 | 442,059 | 0.87 | 442,059 | 5.625 | 234 | 684 | 56.1 |
| **Total**................. | **114** | **$ 50,862,454** | **100.00%** | | | | | |

(1)  As of the cut-off date, no more than approximately 2.38% of the mortgage loans in loan group 4 were secured by mortgaged properties located in any one postal zip code area.

## Purpose of Mortgage Loans

| Loan Purpose | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Refinance (cash-out)............. | 75 | $ 31,782,758 | 62.49% | 423,770 | 6.225 | 235 | 711 | 69.3 |
| Refinance (rate/term)............. | 31 | 14,799,237 | 29.10 | 477,395 | 6.241 | 236 | 727 | 71.0 |
| Purchase................. | 8 | 4,280,459 | 8.42 | 535,057 | 6.039 | 235 | 714 | 72.2 |
| **Total**................. | **114** | **$ 50,862,454** | **100.00%** | | | | | |

## Types of Mortgaged Properties

| Property Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Single Family Residence............. | 79 | $ 33,728,259 | 66.31% | 426,940 | 6.204 | 235 | 708 | 68.5 |
| Planned Unit Development............. | 27 | 14,358,185 | 28.23 | 531,785 | 6.168 | 236 | 724 | 72.2 |
| Low-Rise Condominium............. | 5 | 1,885,965 | 3.71 | 377,193 | 6.892 | 236 | 782 | 81.3 |
| High-Rise Condominium............. | 1 | 639,561 | 1.26 | 639,561 | 5.625 | 233 | 757 | 73.5 |
| 2-4 Family Residence............. | 2 | 250,485 | 0.49 | 125,242 | 6.611 | 238 | 724 | 66.6 |
| **Total**................. | **114** | **$ 50,862,454** | **100.00%** | | | | | |

## Occupancy Types[1]

| Occupancy Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Primary Residence | 101 | $ 46,231,407 | 90.89% | 457,737 | 6.214 | 235 | 714 | 70.7 |
| Secondary Residence | 7 | 3,313,748 | 6.52 | 473,393 | 6.039 | 235 | 735 | 60.9 |
| Investment Property | 6 | 1,317,299 | 2.59 | 219,550 | 6.653 | 236 | 741 | 68.1 |
| Total | 114 | $ 50,862,454 | 100.00% | | | | | |

(1)  Based upon representations of the related borrowers at the time of origination.

## Remaining Terms to Maturity[1]

| Remaining Term to Maturity (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 240 | 6 | $ 3,422,960 | 6.73% | 570,493 | 6.351 | 240 | 691 | 72.7 |
| 239 | 9 | 4,517,766 | 8.88 | 501,974 | 6.112 | 239 | 717 | 78.6 |
| 238 | 17 | 8,411,037 | 16.54 | 494,767 | 6.242 | 238 | 730 | 68.5 |
| 237 | 14 | 7,186,465 | 14.13 | 513,319 | 6.310 | 237 | 713 | 67.8 |
| 236 | 18 | 8,589,224 | 16.89 | 477,179 | 6.437 | 236 | 725 | 72.4 |
| 235 | 11 | 5,064,963 | 9.96 | 460,451 | 6.068 | 235 | 722 | 66.4 |
| 234 | 13 | 4,617,365 | 9.08 | 355,182 | 6.095 | 234 | 678 | 63.3 |
| 233 | 4 | 1,772,279 | 3.48 | 443,070 | 5.995 | 233 | 721 | 61.2 |
| 232 | 3 | 675,606 | 1.33 | 225,202 | 6.297 | 232 | 689 | 61.0 |
| 231 | 6 | 1,368,604 | 2.69 | 228,101 | 6.140 | 231 | 699 | 77.8 |
| 230 | 6 | 3,063,648 | 6.02 | 510,608 | 5.940 | 230 | 735 | 75.6 |
| 229 | 3 | 1,205,903 | 2.37 | 401,968 | 5.966 | 229 | 698 | 72.4 |
| 226 | 1 | 65,972 | 0.13 | 65,972 | 6.500 | 226 | 672 | 80.0 |
| 225 | 1 | 153,564 | 0.30 | 153,564 | 5.875 | 225 | 728 | 66.3 |
| 191 | 1 | 690,481 | 1.36 | 690,481 | 6.250 | 191 | 794 | 71.2 |
| 185 | 1 | 56,616 | 0.11 | 56,616 | 6.375 | 185 | 708 | 75.0 |
| Total | 114 | $ 50,862,454 | 100.00% | | | | | |

(1)  As of the cut-off date, the weighted average remaining term to maturity of the mortgage loans in loan group 4 was approximately 235 months.

## Interest-Only Periods at Origination

| Interest Only Period (months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Current Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| N/A ............... | 114 | $ 50,862,454 | 100.00% | 446,162 | 6.214 | 235 | 716 | 70.0 |
| **Total** ............... | **114** | **$ 50,862,454** | **100.00%** | | | | | |

## Prepayment Charge Periods at Origination

| Prepayment Charge Period (months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 4 | Average Principal Balance Outstanding ($) | Weighted Average Current Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| N/A ............... | 101 | $ 47,112,912 | 92.63% | 466,464 | 6.219 | 235 | 718 | 70.3 |
| 12 ............... | 3 | 383,900 | 0.75 | 127,967 | 6.002 | 235 | 681 | 59.0 |
| 36 ............... | 10 | 3,365,643 | 6.62 | 336,564 | 6.164 | 233 | 698 | 67.5 |
| **Total** ............... | **114** | **$ 50,862,454** | **100.00%** | | | | | |

**Assignment of the Mortgage Loans**

Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each mortgage loan and all right, title and interest in and to all other assets included in Alternative Loan Trust 2006-J3, including all principal and interest received on or with respect to the mortgage loans, but not any principal and interest due on or before the cut-off date.

In connection with the transfer and assignment of a mortgage loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things,

- the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost;

- the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument;

- an assignment in recordable form of the mortgage or a copy of such assignment;

- the original or a copy of the title policy with respect to the related mortgaged property; and

- if applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor).

With respect to up to 50% of the mortgage loans in each loan group, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date. Assignments of the mortgage loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states such as California where in the opinion of counsel recording is not required to protect the trustee's interests in the mortgage loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller.

The trustee will hold the mortgage loan documents in trust for the benefit of the holders of the certificates in accordance with its customary procedures, including storing the documents in fire-resistant facilities. The trustee will review each mortgage file relating to the mortgage loans within 90 days of the closing date (or promptly after the trustee's receipt of any document permitted to be delivered after the closing date), and if any document in a mortgage file is found to be missing or defective in a material respect and Countrywide Home Loans does not cure the defect within 90 days of notice of the defect from the trustee (or within such longer period not to exceed 720 days after the closing date as provided in the pooling and servicing agreement in the case of missing documents not returned from the public recording office), Countrywide Home Loans will be obligated to repurchase the related mortgage loan from the issuing entity at the purchase price described in the prospectus under *"Loan Program – Representations by Sellers; Repurchases."* Rather than repurchase the mortgage loan as provided above, Countrywide Home Loans may remove the mortgage loan (referred to as a deleted mortgage loan) from the issuing entity and substitute in its place another mortgage loan (referred to as a replacement mortgage loan); however, such a substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the trustee to the effect that such a substitution will not

disqualify any REMIC or result in a prohibited transaction tax under the Internal Revenue Code of 1986, as amended (the "Code"). Any replacement mortgage loan generally will, on the date of substitution, among other characteristics set forth in the pooling and servicing agreement,

- have a principal balance, after deduction of all scheduled payments due in the month of substitution, not in excess of, and not more than 10% less than, the Stated Principal Balance of the deleted mortgage loan (the amount of any shortfall to be deposited by Countrywide Home Loans in the Certificate Account and held for distribution to the certificateholders on the related Distribution Date (referred to as a "Substitution Adjustment Amount")),

- have a mortgage rate not lower than, and not more than 1% per annum higher than, that of the deleted mortgage loan,

- have a Loan-to-Value Ratio not higher than that of the deleted mortgage loan,

- have a remaining term to maturity not greater than (and not more than one year less than) that of the deleted mortgage loan, and

- comply with all of the representations and warranties set forth in the pooling and servicing agreement as of the date of substitution.

This cure, repurchase or substitution obligation constitutes the sole remedy available to certificateholders or the trustee for omission of, or a material defect in, a mortgage loan document.

Notwithstanding the foregoing, in lieu of providing the duly executed assignment of the mortgage to the trustee or copies thereof and the original recorded assignment or assignments of the mortgage together with all interim recorded assignments of such mortgage or copies thereof, above, the depositor may at its discretion provide evidence that the related mortgage is held through the MERS® System. In addition, the mortgages for some or all of the mortgage loans in the issuing entity that are not already held through the MERS® System may, at the discretion of the master servicer, in the future be held through the MERS® System. For any mortgage held through the MERS® System, the mortgage is recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, as nominee for the owner of the mortgage loan, and subsequent assignments of the mortgage were, or in the future may be, at the discretion of the master servicer, registered electronically through the MERS® System. For each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan.

**Underwriting Process – Countrywide Home Loans, Inc.**

*General*

Approximately 13.19%, 48.51%, 32.74% and 81.23% of the mortgage loan in loan group 1, loan group 2, loan group 3 and loan group 4, respectively, in each case by aggregate Stated Principal Balance of the mortgage loans in such loan group as of the cut-off date were originated by Countrywide Home Loans, Inc. or acquired by Countrywide Home Loans from correspondent lenders using Countrywide Home Loans' underwriting guidelines.  Countrywide Home Loans has been originating mortgage loans since 1969.

*General*

A portion of the mortgage loans in the issuing entity will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards. Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations. Except as otherwise provided in this prospectus supplement, the underwriting procedures are consistent with those identified under *" Loan Program — Standards"* in the prospectus.

As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

In assessing a prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit Scores. "FICO Credit Scores" are statistical credit scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history. FICO Credit Scores were not developed to predict the likelihood of default on mortgage loans and, accordingly, may not be indicative of the ability of a mortgagor to repay its mortgage loan. FICO Credit Scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit Scores, which indicate a more favorable credit history, and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years may be eligible for Countrywide Home Loans' processing program (the "Preferred Processing Program"). Approximately 7.11%, 15.02%, 5.31% and 34.41% of the mortgage loans in loan group 1, loan group 2, loan group 3 and loan group 4, respectively, by aggregate Stated Principal Balance of the mortgage loans in that loan group as of the cut-off date, have been underwritten pursuant to Countrywide Home Loans' Preferred Processing Program. Countrywide Home Loans may waive some documentation requirements for mortgage loans originated under the Preferred Processing Program.

Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself.

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

Countrywide Home Loans may provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%. Countrywide Home Loans' underwriting guidelines do not prohibit or otherwise restrict a mortgagor from obtaining secondary financing from lenders other than Countrywide Home Loans, whether at origination of the mortgage loan or thereafter.

The nature of the information that a borrower is required to disclose and whether the information is verified depends, in part, on the documentation program used in the origination process. In general under the Full Documentation Loan Program (the "Full Documentation Program"), each prospective borrower is required to complete an application which includes information with respect to the applicant's assets, liabilities, income, credit history, employment history and other personal information. Self-employed individuals are generally required to submit their two most recent federal income tax returns. Under the Full Documentation Program, the underwriter verifies the information contained in the application relating to employment, income, assets or mortgages.

A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both. Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "Alternative Documentation Program"), a Reduced Documentation Loan Program (the "Reduced Documentation Program"), a CLUES Plus Documentation Loan Program (the "CLUES Plus Documentation Program"), a No Income/No Asset Documentation Loan Program (the "No Income/No Asset Documentation Program"), a Stated Income/Stated Asset Documentation Loan Program (the "Stated Income/Stated Asset Documentation Program") and a Streamlined Documentation Loan Program (the "Streamlined Documentation Program").

For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loans obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable

homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

Countrywide Home Loans requires title insurance on all of its mortgage loans secured by first liens on real property. Countrywide Home Loans also requires that fire and extended coverage casualty insurance be maintained on the mortgaged property in an amount at least equal to the principal balance of the related single-family mortgage loan or the replacement cost of the mortgaged property, whichever is less.

In addition to Countrywide Home Loans' standard underwriting guidelines (the "Standard Underwriting Guidelines"), which are consistent in many respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie Mac, Countrywide Home Loans uses underwriting guidelines featuring expanded criteria (the "Expanded Underwriting Guidelines"). The Standard Underwriting Guidelines and the Expanded Underwriting Guidelines are described further under the next two headings.

*Standard Underwriting Guidelines*

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.

For cash-out refinance mortgage loans, Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 75% and original principal balances ranging up to $650,000. The maximum "cash-out" amount permitted is $200,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan. As used in this prospectus supplement, a refinance mortgage loan is classified as a cash-out refinance mortgage loan by Countrywide Home Loans if the borrower retains an amount greater than the lesser of 2% of the entire amount of the proceeds from the refinancing of the existing loan, or $2,000.

Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 80% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).  On second homes, Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii).  Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 75% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

In connection with the Standard Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Program, the CLUES Plus Documentation Program or the Streamlined Documentation Program.

The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived.  Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95.00%.

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

*Expanded Underwriting Guidelines*

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

For cash-out refinance mortgage loans, Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 90% and original principal balances ranging up to $1,500,000. The maximum "cash-out" amount permitted is $400,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan.

Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 100% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).  On second homes, Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii).  Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines.

The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some mortgage loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The maximum Loan-to-Value Ratio, including secondary financing, for those mortgage loans ranges up to 85%.

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.  The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%.  Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Expanded Underwriting Guidelines, Countrywide Home Loans may also provide mortgage loans to borrowers who are not U.S. citizens, including permanent and non-permanent residents. The borrower is required to have a valid U.S. social security number or a certificate of foreign status (IRS form W-8). The borrower's income and assets must be verified under the Full Documentation Program or the Alternative Documentation Program. The maximum Loan-to-Value Ratio, including secondary financing, is 80%.

**Underwriting Process – American Home Mortgage Corp.**

*General*

American Home Mortgage Corp. ("American Home") is a New York corporation.  American Home conducts lending through retail and wholesale loan production offices and its correspondent channel as well as its direct-to-consumer channel supported by American Home's call center.  American Home operates more than 600 retail and wholesale loan production offices located in 45 states and the District of Columbia and makes loans throughout all 50 states and the District of Columbia.  American Home has been originating mortgage loans since its incorporation in 1988, and has been originating fixed-rate mortgage loans since such date. The principal executive offices of American Home are located at 538 Broadhollow Road, Melville, New York 11747.

The following table reflects American Home's originations of first-lien, fixed-rate mortgage loans for the past three years and for the quarter ended March 31, 2006:

| | Year Ended December 31, 2003 | Year Ended December 31, 2004 | Year Ended December 31, 2005 | Quarter Ended March 31, 2006 |
|---|---|---|---|---|
| Number of Loans | 74,462 | 59,576 | 97,645 | 29,781 |
| Principal Balance | $12,969,494,087 | $10,586,364,298 | $19,633,708,424 | $5,920,875,964 |

American Home is not aware of any material legal proceedings pending against it or against any of its property, including any proceedings known to be contemplated by governmental authorities material to the holders of the Certificates.

*Underwriting Criteria*

The following information generally describes American Home's underwriting guidelines with respect to mortgage loans originated pursuant to its "conforming" or "prime" underwriting guidelines and its Alt-A underwriting guidelines.

The mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration ("FHA"), the U.S. Department of Veterans Affairs ("VA"), the U.S. Department of Agriculture Guaranteed Rural Housing Program ("GRH"), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home. Conforming conventional loans must generally be approved by the Desktop Underwriter and Loan Prospector automated underwriting systems of Fannie Mae and Freddie Mac. FHA and VA loans are generally approved by these same automated underwriting systems.

American Home's non-conforming underwriting guidelines are similar to those of the government sponsored enterprises Fannie Mae and Freddie Mac, but these loans are "non-conforming" in that they may not conform to the maximum loan amounts and in some cases to the underwriting guidelines of Fannie Mae and Freddie Mac. These non-conforming loans do not conform to and are not insurable by the Federal Housing Administration nor can they be guaranteed by the U.S. Department of Veterans Affairs.

American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations.  Exceptions to the underwriting standards may be permitted where compensating factors are present.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgage property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources.  With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes. Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

Non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac, in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. For these Alt-A products, the borrower may not be required to verify employment income, assets required to close or both. For some other Alt-A products, the borrower is not required to provide any information regarding employment income, assets required to close or both. Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

American Home obtains a credit report for each borrower that summarizes each borrower's credit history. The credit report contains information from the three major credit repositories, Equifax, Experian and TransUnion. These companies have developed scoring models to identify the comparative risk of delinquency among applicants based on characteristics within the applicant's credit report. A borrower's credit score represents a comprehensive view of the borrower's credit history risk factors and is indicative of whether a borrower is likely to default on a loan. Some of the factors used to calculate credit scores are a borrower's incidents of previous delinquency, the number of credit accounts a borrower has, the amount of available credit that a borrower has utilized, the source of a borrower's existing credit, and recent attempts by a borrower to obtain additional credit. Applicants who have higher credit scores will, as a group, have fewer defaults than those who have lower credit scores. The minimum credit score allowed by American Home non-conforming loan guidelines for these loans is 620 and the average is typically over 700. For American Home Alt-A products, the minimum credit score is generally 580. If the borrowers do not have a credit score they must have an alternative credit history showing at least three trade lines with no payments over 60 days past due in the last twelve months.

In addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history. In general, for non-conforming loans the borrower should not have made any mortgage payments over 30 days after the due date for the most recent twelve months. In general, for Alt-A loans, the borrower may have no more than one payment that was made over 30 days after the due date for the most recent twelve months.

In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter, Freddie Mac's Loan Prospector automated underwriting systems, a customized form of Fannie Mae's Desktop Underwriter called Custom Desktop Underwriter, or they have been manually underwritten by American Home's underwriters. American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter.

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value. American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction, loans on second homes or loans on investment properties. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher coverage levels.  For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting.  Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation.   Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

**Underwriting Process – General**

The mortgage loans that will be transferred to the issuing entity, other than those originated by Countrywide Home Loans, Inc. or American Home Mortgage Corp., or acquired by Countrywide Home Loans, Inc., or American Home Mortgage Corp. from correspondent lenders or other third party originators who applied the related underwriting guidelines set forth above, have been originated or acquired in accordance with the procedures set forth in the prospectus under *"Loan Program– Standards."*

**Servicing of Mortgage Loans**

**General**

The master servicer will master service all of the mortgage loans in accordance with the terms set forth in the pooling and servicing agreement.  The master servicer has agreed to service and administer the mortgage loans in accordance with customary and usual standards of practice of prudent mortgage loan lenders.  The master servicer has also agreed to represent and protect the interest of the trustee in the

mortgage loans in the same manner as it currently protects its own interest in mortgage loans in its own portfolio in any claim, proceeding or litigation regarding a mortgage loan.  The master servicer is permitted to make a modification, waiver or amendment of a mortgage loan so long as the modification, waiver or amendment would comply with the general servicing standard described above, not cause any REMIC to fail to qualify as a REMIC, not result in the imposition of certain taxes and not extend the due date for a payment due on the related mortgage note for a period greater than 180 days.  A modification, waiver or amendment may initially result in a reduction in the payments made under a mortgage loan, but it is expected that a modification, waiver or amendment will increase the payments made under the mortgage loan over the life of the mortgage loan.

The master servicer may perform any of its obligations under the pooling and servicing agreement through one or more subservicers, which may include Countrywide Home Loans.  Set forth below are the direct servicers as of the date of this prospectus supplement of the mortgage loans in each loan group by aggregate Stated Principal Balance of the mortgage loans in that loan group as of the cut-off date:

| Primary Servicer | Loan Group | % of Mortgage Loans in that Loan Group |
|---|---|---|
| Countrywide Home Loans | 1 | 100.00% |
| | 2 | 94.89% |
| | 3 | 96.05% |
| | 4 | 100.00% |
| SunTrust Mortgage Incorporated | 2 | 3.49% |
| National City Mortgage Co. | 3 | 3.95% |

**Countrywide Home Loans Servicing LP**

The principal executive offices of Countrywide Home Loans Servicing LP ("Countrywide Servicing") are located at 7105 Corporate Drive, Plano, Texas 75024.  Countrywide Servicing is a Texas limited partnership directly owned by Countrywide GP, Inc. and Countrywide LP, Inc., each a Nevada corporation and a direct wholly owned subsidiary of Countrywide Home Loans. Countrywide GP, Inc. owns a 0.1% interest in Countrywide Servicing and is the general partner. Countrywide LP, Inc. owns a 99.9% interest in Countrywide Servicing and is a limited partner.

Countrywide Home Loans established Countrywide Servicing in February 2000 to service mortgage loans originated by Countrywide Home Loans that would otherwise have been serviced by Countrywide Home Loans. In January and February, 2001, Countrywide Home Loans transferred to Countrywide Servicing all of its rights and obligations relating to mortgage loans serviced on behalf of Fannie Mae and Freddie Mac, respectively. In October 2001, Countrywide Home Loans transferred to Countrywide Servicing all of its rights and obligations relating to the bulk of its non-agency loan servicing portfolio (other than the servicing of home equity lines of credit), including with respect to those mortgage loans (other than home equity lines of credit) formerly serviced by Countrywide Home Loans and securitized by certain of its affiliates. While Countrywide Home Loans expects to continue to directly service a portion of its loan portfolio, it is expected that the servicing rights for most newly originated Countrywide Home Loans mortgage loans will be transferred to Countrywide Servicing upon sale or securitization of the related mortgage loans. Countrywide Servicing is engaged in the business of servicing mortgage loans and will not originate or acquire loans, an activity that will continue to be performed by Countrywide Home Loans. In addition to acquiring mortgage servicing rights from Countrywide Home Loans, it is expected that Countrywide Servicing will service mortgage loans for non-Countrywide Home Loans affiliated parties as well as subservice mortgage loans on behalf of other master servicers.

In connection with the establishment of Countrywide Servicing, certain employees of Countrywide Home Loans became employees of Countrywide Servicing. Countrywide Servicing has engaged Countrywide Home Loans as a subservicer to perform certain loan servicing activities on its behalf.

Countrywide Servicing is an approved mortgage loan servicer for Fannie Mae, Freddie Mac, Ginnie Mae, HUD and VA and is licensed to service mortgage loans in those states where a license is required. Its loan servicing activities are guaranteed by Countrywide Financial and/or Countrywide Home Loans (when required by the owner of the mortgage loans).

**Countrywide Home Loans**

Countrywide Home Loans, Inc., a New York corporation ("Countrywide Home Loans"), is the sponsor for the transaction and also a seller.  Countrywide Home Loans is a direct wholly owned subsidiary of Countrywide Financial Corporation, a Delaware corporation ("Countrywide Financial"). The principal executive offices of Countrywide Home Loans are located at 4500 Park Granada, Calabasas, California 91302. Countrywide Home Loans is engaged primarily in the mortgage banking business, and as part of that business, originates, purchases, sells and services mortgage loans. Countrywide Home Loans originates mortgage loans through a retail branch system and through mortgage loan brokers and correspondents nationwide. Mortgage loans originated by Countrywide Home Loans are principally first-lien, fixed or adjustable rate mortgage loans secured by single-family residences.

Countrywide Home Loans has historically sold substantially all the mortgage loans that it has originated and purchased, generally through securitizations. Countrywide Home Loans does not always sell mortgage loans immediately after origination or acquisition, but may decide to sell certain mortgage loans in later periods as part of its overall management of interest rate risk.  Countrywide Home Loans has been involved in the securitization of mortgage loans since 1969 when it was approved as a Federal National Mortgage Association seller/servicer.  Countrywide Home Loans reviews the structure of its securitizations and discusses the structure with the related underwriters.

Except as otherwise indicated, reference in the remainder of this prospectus supplement to "Countrywide Home Loans" should be read to include Countrywide Home Loans and its consolidated subsidiaries, including Countrywide Servicing.

Countrywide Home Loans services substantially all of the mortgage loans it originates or acquires.  In addition, Countrywide Home Loans has purchased in bulk the rights to service mortgage loans originated by other lenders. Countrywide Home Loans has in the past and may in the future sell to mortgage bankers and other institutions a portion of its portfolio of loan servicing rights. As of December 31, 2002, December 31, 2003, December 31, 2004, December 31, 2005 and March 31, 2006, Countrywide Home Loans provided servicing for mortgage loans with an aggregate principal balance of approximately $452.405 billion, $644.855 billion, $838.322 billion, $1,111.090 billion and $1,152.651 billion, respectively, substantially all of which were being serviced for unaffiliated persons.

**Mortgage Loan Production**

The following table sets forth, by number and dollar amount of mortgage loans, Countrywide Home Loans' residential mortgage loan production for the periods indicated.

| | Ten Months Ended December 31, 2001 | Years Ended December 31, | | | | Three Months Ended March 31, 2006 |
|---|---|---|---|---|---|---|
| | | 2002 | 2003 | 2004 | 2005 | |
| | | (Dollars in millions, except average loan amount) | | | | |
| **Conventional Conforming Loans** | | | | | | |
| Number of Loans.................................. | 504,975 | 999,448 | 1,517,743 | 846,395 | 809,630 | 164,665 |
| Volume of Loans.................................. $ | 76,432 | $ 150,110 | $ 235,868 | $ 138,845 | $ 167,675 | $ 32,068 |
| Percent of Total Dollar Volume ......... | 61.7% | 59.6% | 54.2% | 38.2% | 34.1% | 31.0% |
| **Conventional Non-conforming Loans** | | | | | | |
| Number of Loans.................................. | 137,593 | 277,626 | 554,571 | 509,711 | 826,178 | 155,746 |
| Volume of Loans.................................. $ | 22,209 | $ 61,627 | $ 136,664 | $ 140,580 | $ 225,217 | $ 48,204 |
| Percent of Total Dollar Volume ......... | 17.9% | 24.5% | 31.4% | 38.7% | 45.9% | 46.6% |
| **FHA/VA Loans** | | | | | | |
| Number of Loans.................................. | 118,734 | 157,626 | 196,063 | 105,562 | 80,528 | 20,487 |
| Volume of Loans.................................. $ | 14,109 | $ 19,093 | $ 24,402 | $ 13,247 | $ 10,712 | $ 2,878 |
| Percent of Total Dollar Volume ......... | 11.4% | 7.6% | 5.6% | 3.6% | 2.2% | 2.8% |
| **Prime Home Equity Loans** | | | | | | |
| Number of Loans.................................. | 164,503 | 316,049 | 453,817 | 587,046 | 683,887 | 165,076 |
| Volume of Loans.................................. $ | 5,639 | $ 11,650 | $ 18,103 | $ 30,893 | $ 42,706 | $ 11,063 |
| Percent of Total Dollar Volume ......... | 4.5% | 4.6% | 4.2% | 8.5% | 8.7% | 10.7% |
| **Nonprime Mortgage Loans** | | | | | | |
| Number of Loans.................................. | 43,359 | 63,195 | 124,205 | 250,030 | 278,112 | 59,226 |
| Volume of Loans.................................. $ | 5,580 | $ 9,421 | $ 19,827 | $ 39,441 | $ 44,637 | $ 9,205 |
| Percent of Total Dollar Volume ......... | 4.5% | 3.7% | 4.6% | 11.0% | 9.1% | 8.9% |
| **Total Loans** | | | | | | |
| Number of Loans.................................. | 969,164 | 1,813,944 | 2,846,399 | 2,298,744 | 2,678,335 | 565,200 |
| Volume of Loans.................................. $ | 123,969 | $ 251,901 | $ 434,864 | $ 363,006 | $ 490,947 | $ 103,418 |
| Average Loan Amount ......................... $ | 128,000 | $ 139,000 | $ 153,000 | $ 158,000 | $ 183,000 | $ 183,000 |
| Non-Purchase Transactions(1) .............. | 63% | 66% | 72% | 51% | 53% | 55% |
| Adjustable-Rate Loans(1)...................... | 12% | 14% | 21% | 52% | 52% | 50% |

The table title, spanning the header, reads: **Consolidated Mortgage Loan Production**

_____

(1) Percentage of total mortgage loan production based on dollar volume.

## Loan Servicing

Countrywide Servicing has established standard policies for the servicing and collection of mortgages. Servicing includes, but is not limited to:

- collecting, aggregating and remitting mortgage loan payments;

- accounting for principal and interest;

- holding escrow (impound) funds for payment of taxes and insurance;

- making inspections as required of the mortgaged properties;

- preparation of tax related information in connection with the mortgage loans;

- supervision of delinquent mortgage loans;

- loss mitigation efforts;

- foreclosure proceedings and, if applicable, the disposition of mortgaged properties; and

- generally administering the mortgage loans, for which it receives servicing fees.

Billing statements with respect to mortgage loans are mailed monthly by Countrywide Servicing. The statement details all debits and credits and specifies the payment due.  Notice of changes in the applicable loan rate are provided by Countrywide Servicing to the mortgagor with these statements.

**Collection Procedures**

When a mortgagor fails to make a payment on a mortgage loan, Countrywide Servicing attempts to cause the deficiency to be cured by corresponding with the mortgagor. In most cases, deficiencies are cured promptly. Pursuant to Countrywide Servicing's servicing procedures, Countrywide Servicing generally mails to the mortgagor a notice of intent to foreclose after the loan becomes 61 days past due (three payments due but not received) and, generally within 59 days thereafter, if the loan remains delinquent, institutes appropriate legal action to foreclose on the mortgaged property. Foreclosure proceedings may be terminated if the delinquency is cured. Mortgage loans to borrowers in bankruptcy proceedings may be restructured in accordance with law and with a view to maximizing recovery of the loans, including any deficiencies.

Once foreclosure is initiated by Countrywide Servicing, a foreclosure tracking system is used to monitor the progress of the proceedings. The system includes state-specific parameters to monitor whether proceedings are progressing within the time frame typical for the state in which the mortgaged property is located. During the foreclosure proceeding, Countrywide Servicing determines the amount of the foreclosure bid and whether to liquidate the mortgage loan.

If foreclosed, the mortgaged property is sold at a public or private sale and may be purchased by Countrywide Servicing. After foreclosure, Countrywide Servicing may liquidate the mortgaged property and charge-off the loan balance which was not recovered through liquidation proceeds.

Servicing and charge-off policies and collection practices with respect to mortgage loans may change over time in accordance with, among other things, Countrywide Servicing's business judgment, changes in the servicing portfolio and applicable laws and regulations.

**Servicing Compensation and Payment of Expenses**

The Expense Fees with respect to the mortgage pool are payable out of the interest payments on each mortgage loan. The Expense Fee Rate for the mortgage loans in all the loan groups varies from mortgage loan to mortgage loan.  As of the cut-off date, the weighted average Expense Fee Rate for the mortgage loans in loan group 1, loan group 2, loan group 3 and loan group 4 will be a per annum rate equal to approximately 0.235%, 0.216%, 0.223% and 0.211%, respectively.  The Expense Fees consist of:

- the master servicing fee payable to the master servicer in respect of its master servicing activities (the "master servicing fee");

- fees payable to the trustee in respect of its activities as trustee under the pooling and servicing agreement; and

- lender-paid mortgage insurance premiums, if any.

The master servicing fee for the mortgage loans in loan group 1, loan group 2, loan group 3 and loan group 4 will be either 0.200% or 0.250% per annum (the "Master Servicer Fee Rate") of the Stated Principal Balance of each mortgage loan in the related loan group, as applicable.  As of the cut-off date,

the weighted average master servicing fee rate for the mortgage loans in loan group 1, loan group 2, loan group 3 and loan group 4 will be approximately 0.226%, 0.205%, 0.209% and 0.202% per annum, respectively.

The master servicer is obligated to pay some but not all ongoing expenses associated with the issuing entity and incurred by the master servicer in connection with its responsibilities under the pooling and servicing agreement and those amounts will be paid by the master servicer out of the master servicing fee. The amount of the master servicing fee is subject to adjustment with respect to prepaid mortgage loans, as described under *"— Adjustment to Servicing Compensation in Connection with Certain Prepaid Mortgage Loans."* The master servicer is also entitled to receive, as additional servicing compensation, all late payment fees, assumption fees and other similar charges and all reinvestment income earned on amounts on deposit in the Certificate Account and Distribution Account and Expense Proceeds with respect to the mortgage loans as described under *"Description of the Certificates —Fees and Expenses."*

The net mortgage rate of a mortgage loan is its mortgage rate (net of the interest premium charged by the related lender for the lender paid mortgage insurance) less the sum of the related master servicing fee and the trustee fee on the mortgage loan (expressed as a per annum percentage of its Stated Principal Balance).

**Adjustment to Servicing Compensation in Connection with Certain Prepaid Mortgage Loans**

When a borrower prepays a mortgage loan between Due Dates, the borrower is required to pay interest on the amount prepaid only to the date of prepayment and not thereafter. Except with respect to the month of the cut-off date, with respect to the mortgage loans directly serviced by Countrywide Servicing as set forth in the table under *"— General"* above), principal prepayments by borrowers received by Countrywide Servicing from the first day through the fifteenth day of a calendar month will be distributed to certificateholders on the Distribution Date in the same month in which the prepayments on these mortgage loans are received and, accordingly, no shortfall in the amount of interest to be distributed to certificateholders with respect to the prepaid mortgage loans results. Conversely, principal prepayments on these mortgage loans received by Countrywide Servicing from the sixteenth day (or, in the case of the first Distribution Date, from April 1, 2006) through the last day of a calendar month and principal prepayments on the mortgage loans not directly serviced by Countrywide Servicing as set in the table under *"— General"* above), will be distributed to certificateholders on the Distribution Date in the month following the month of receipt and, accordingly, a shortfall in the amount of interest to be distributed to certificateholders with respect to the prepaid mortgage loans would result. Pursuant to the pooling and servicing agreement, the master servicing fee for any month will be reduced, but not by more than an amount equal to the product of one-twelfth of 0.125% and the aggregate Stated Principal Balance of the mortgage loans in such loan group as of the first day of the prior month ("Compensating Interest"), by an amount sufficient to pass through to certificateholders the full amount of interest to which they would be entitled for each prepaid mortgage loan on the related Distribution Date.

If shortfalls in interest as a result of prepayments in any Prepayment Period exceed the Compensating Interest for the related Distribution Date, the amount of interest distributed to certificateholders will be reduced by the amount of the excess. See *"Description of the Certificates – Interest"* in this prospectus supplement.

**Advances**

Subject to the following limitations, the master servicer will be required to advance before each Distribution Date, from its own funds or funds in the Certificate Account that do not constitute Available Funds for that Distribution Date, an amount equal to:

- the aggregate of payments of principal and interest on the mortgage loans (net of the master servicing fee) which were due on the related Due Date and which were delinquent on the related Determination Date; and

- an amount equivalent to interest (net of the master servicing fee rate) on each mortgage loan as to which the related mortgaged property has been acquired by the issuing entity through foreclosure or deed-in-lieu of foreclosure (net of any net income on the property).

The "Determination Date" is the 22nd day of each month or, if that day is not a business day, the preceding business day; provided that the Determination Date in each month will be at least two business days before the related Distribution Date.

Advances are intended to maintain a regular flow of scheduled interest and principal payments on the certificates rather than to guarantee or insure against losses. The master servicer is obligated to make advances with respect to delinquent payments of principal of or interest on each mortgage loan to the extent that the advances are, in its reasonable judgment, recoverable from future payments and collections or insurance payments or proceeds of liquidation of the related mortgage loan. If the master servicer determines on any Determination Date to make an advance, the advance will be included with the distribution to certificateholders on the related Distribution Date. Any failure by the master servicer to make a deposit in the Certificate Account as required under the pooling and servicing agreement, including any failure to make an advance, will constitute an event of default under the pooling and servicing agreement if the failure remains unremedied for five days after written notice of the event of default. If the master servicer is terminated as a result of the occurrence of an event of default, the trustee or the successor master servicer will be obligated to make any advance, in accordance with the terms of the pooling and servicing agreement.

An advance will be reimbursed from the payments on the mortgage loan with respect to which the advance was made.  However, if an advance is determined to be nonrecoverable and the master servicer delivers an officer's certificate to the trustee indicating that the advance is nonrecoverable, the master servicer will be entitled to withdraw from the Certificate Account an amount equal to the nonrecoverable advance.  Reimbursement for advances and nonrecoverable advances will be made prior to distributions on the certificates.

**Certain Modifications and Refinancings**

Countrywide Home Loans will be permitted under the pooling and servicing agreement to solicit borrowers for reductions to the mortgage rates of their respective mortgage loans. If a borrower requests such a reduction, the master servicer will be permitted to agree to the rate reduction provided that Countrywide Home Loans purchases the mortgage loan from the issuing entity immediately following the modification. Any purchase of a mortgage loan subject to a modification will be for a price equal to 100% of the Stated Principal Balance of that mortgage loan, plus accrued and unpaid interest on the mortgage loan up to the next Due Date at the applicable net mortgage rate, net of any unreimbursed advances of principal and interest on the mortgage loan made by the master servicer. Countrywide Home Loans will remit the purchase price to the master servicer for deposit into the Certificate Account within one business day of the purchase of that mortgage loan. Purchases of mortgage loans may occur when prevailing interest rates are below the interest rates on the mortgage loans and mortgagors request modifications as an alternative to refinancings. Countrywide Home Loans will indemnify the issuing entity against liability for any prohibited transactions taxes and related interest, additions or penalties incurred by any REMIC as a result of any modification or purchase.

## The Issuing Entity

In connection with the issuance of the certificates, the depositor has formed Alternative Loan Trust 2006-J3, a common law trust created under the laws of the State of New York, pursuant to the pooling and servicing agreement.  Alternative Loan Trust 2006-J3 is referred to in this prospectus supplement as the "issuing entity" and is referred to in the prospectus as the "trust" or "trust fund".  The trustee serves as trustee of the issuing entity and acts on behalf of the issuing entity as the issuing entity does not have any directors, officers or employees.  The fiscal year end of the issuing entity is December 31.

The issuing entity's activities are limited to the transactions and activities entered into in connection with the securitization described in this prospectus supplement, and except for those activities, the issuing entity is not authorized and has no power to borrow money or issue debt, merge with another entity, reorganize, liquidate or sell assets or engage in any business or activities.  Consequently, the issuing entity is not permitted to hold any assets, or incur any liabilities, other than those described in this prospectus supplement. Since the issuing entity is created pursuant to the pooling and servicing agreement, the issuing entity and its permissible activities can only be amended or modified by amending the pooling and servicing agreement.

Because the issuing entity is a common law trust, it may not be eligible for relief under the federal bankruptcy laws, unless it can be characterized as a *"business trust"* for purposes of the federal bankruptcy laws.  Bankruptcy courts look at various considerations in making this determination, so it is not possible to predict with any certainty whether or not the issuing entity would be characterized as a "business trust."

## Static Pool Data

Certain static pool data with respect to the delinquency, cumulative loss and prepayment data for Countrywide Home Loans is available online at http://www.countrywidedealsdata.com?CWDD=01200604.  This static pool data is not deemed part of the prospectus or the registration statement of which the prospectus is a part to the extent that the static pool data relates to:

- prior securitized pools of Countrywide Home Loans that do not include the mortgage loans and that were established before January 1, 2006; or

- in the case of information regarding the mortgage loans, information about the mortgage loans for periods before January 1, 2006.

We cannot assure you that the prepayment, loss or delinquency experience of the mortgage loans sold to the issuing entity will be comparable to the historical prepayment, loss or delinquency experience of any of the other securitized pools sponsored by the Countrywide Home Loans.  In this regard, you should note how the characteristics of the mortgage loans in those securitized pools differ from the characteristics of the issuing entity's mortgage loans.  Such differences, along with the varying economic conditions to which those securitized pools were subject, may make it unlikely that the issuing entity's mortgage loans will perform in the same way that any of those pools has performed.

## Description of the Certificates

**General**

      The certificates will be issued pursuant to the pooling and servicing agreement.  We summarize below the material terms and provisions pursuant to which the certificates will be issued.  The summaries are subject to, and are qualified in their entirety by reference to, the provisions of the pooling and servicing agreement.  When particular provisions or terms used in the pooling and servicing agreement are referred to, the actual provisions (including definitions of terms) are incorporated by reference.  We will file a final copy of the pooling and servicing agreement after the issuing entity issues the certificates.

      The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of CWALT, Inc., Countrywide Home Loans, Inc. (or any other seller), Countrywide Home Loans Servicing LP or any of their affiliates.

      The Mortgage Pass-Through Certificates, Series 2006-J3 will consist of the Class 1-A-1, Class 1-A-2, Class 1-A-3, Class 1-A-4, Class 1-A-5, Class 1-A-6, Class 2-A-1, Class 3-A-1, Class 4-A-1, Class 4-A-2, Class 1-X, Class 2-X, Class 3-X, Class 4-X, Class PO-1, Class PO-2, Class PO-4, Class A-R, Class M, Class B-1, Class B-2, Class B-3, Class B-4, Class B-5 and Class P Certificates.  Only the classes of certificates listed on the cover page hereof are offered by this prospectus supplement.

      When describing the certificates in this prospectus supplement, we use the following terms:

| Designation | Classes of Certificates |
|---|---|
| Group 1 Senior Certificates | Class 1-A-1, Class 1-A-2, Class 1-A-3, Class 1-A-4, Class 1-A-5, Class 1-A-6, Class 1-X, Class PO-1 and Class A-R Certificates |
| Group 2 Senior Certificates | Class 2-A-1, Class 2-X and Class PO-2 Certificates |
| Group 3 Senior Certificates | Class 3-A-1 and Class 3-X Certificates |
| Group 4 Senior Certificates | Class 4-A-1, Class 4-A-2 , Class 4-X and Class PO-4 Certificates |
| Senior Certificate Group | Each of the Group 1 Senior Certificates, Group 2 Senior Certificates, Group 3 Senior Certificates and Group 4 Senior Certificates |
| Senior Certificates | Group 1 Senior Certificates, Group 2 Senior Certificates, Group 3 Senior Certificates and Group 4 Senior Certificates |
| Subordinated Certificates | Class M and Class B Certificates |
| LIBOR Certificates | Class 1-A-1 and Class 1-A-2 Certificates |
| Class X Certificates | Class 1-X, Class 2-X, Class 3-X and Class 4-X Certificates |
| Class PO Certificates | Class PO-1, Class PO-2, and Class PO-4 Certificates |
| Class B Certificates | Class B-1, Class B-2,  Class B-3, Class B-4 and Class B-5 Certificates |

| Designation | Classes of Certificates |
|---|---|
| Notional Amount Certificates | Class 1-A-2 and Class X Certificates |
| Offered Certificates | Senior Certificates, Class M, Class B-1 and Class B-2 Certificates |

The certificates are generally referred to as the following types:

| Class | Type |
|---|---|
| Class 1-A-1 | Senior/Floating Pass-Through Rate |
| Class 1-A-2 | Senior/Inverse Floating Pass-Through Rate/Notional Amount/Interest Only |
| Class 1-A-3 | Senior/Fixed Pass-Through Rate |
| Class 1-A-4 | Senior/Fixed Pass-Through Rate |
| Class 1-A-5 | Senior/Fixed Pass-Through Rate |
| Class 1-A-6 | Senior/NAS/Fixed Pass-Through Rate |
| Class 2-A-1 | Senior/Fixed Pass-Through Rate |
| Class 3-A-1 | Senior/Fixed Pass-Through Rate |
| Class 4-A-1 | Senior/Fixed Pass-Through Rate |
| Class 4-A-2 | Senior/Fixed Pass-Through Rate |
| Class 1-X | Senior/Notional Amount/Interest Only/Variable Pass-Through Rate |
| Class 2-X | Senior/Notional Amount/Interest Only/Variable Pass-Through Rate |
| Class 3-X | Senior/Notional Amount/Interest Only/Variable Pass-Through Rate |
| Class 4-X | Senior/Notional Amount/Interest Only/Variable Pass-Through Rate |
| Class PO-1 | Senior/Principal Only |
| Class PO-2 | Senior/Principal Only |
| Class PO-4 | Senior/Principal Only |
| Class A-R | Senior/Residual |
| Subordinated Certificates | Subordinate/Variable Pass-Through Rate |
| Class P | Prepayment Charges |

The Class B-3, Class B-4, Class B-5 and Class P Certificates are not being offered by this prospectus supplement.  Any information presented in this prospectus supplement with respect to the Class B-3, Class B-4, Class B-5 and Class P Certificates is provided only to permit a better understanding of the offered certificates.  The initial Class Certificate Balances and initial notional amounts are set forth in the *"Summary — Description of the Certificates."*

The senior certificates will have an initial aggregate class certificate balance of approximately $246,436,422, and will evidence in the aggregate an initial beneficial ownership interest of approximately 96.50% in the issuing entity.  The subordinated certificates will each evidence the initial beneficial ownership interest in the issuing entity set forth below:

|  | Initial Beneficial |
|---|---|
| **Class of Subordinated Certificates** | **Ownership Interest** |
| Class M ................................................ | 1.75% |
| Class B-1 .............................................. | 0.60% |
| Class B-2 .............................................. | 0.40% |
| Class B-3 .............................................. | 0.30% |
| Class B-4 .............................................. | 0.25% |
| Class B-5 .............................................. | 0.20% |

**Calculation of Class Certificate Balance**

The "Class Certificate Balance" of any class of certificates (other than the notional amount certificates) as of any Distribution Date is the initial Class Certificate Balance of the class *reduced by* the sum of:

- all amounts previously distributed to holders of certificates of the class as payments of principal,

- the amount of Realized Losses allocated to the class, and

- in the case of any class of subordinated certificates, any amounts allocated to the class in reduction of its Class Certificate Balance in respect of payments of Class PO Deferred Amounts, as described under "— *Allocation of Losses*,"

The Class Certificate Balance of each class of certificates to which Realized Losses have been allocated will be increased sequentially in the order of distribution priority (from highest to lowest) by the amount of Subsequent Recoveries on the mortgage loans in a loan group distributed as principal to any related class of certificates, but not by more than the amount of Realized Losses previously allocated to reduce the Class Certificate Balance of that class of certificates.  See *"The Agreements – Realization Upon Defaulted Loans"* in the prospectus.

In addition, the Class Certificate Balance of the class of subordinated certificates then outstanding with the highest numerical class designation will be reduced if and to the extent that the aggregate of the Class Certificate Balances of all classes of certificates, following all distributions and the allocation of all Realized Losses on any Distribution Date, exceeds the aggregate Stated Principal Balance of the mortgage loans as of the Due Date occurring in the month of that Distribution Date (after giving effect to principal prepayments received in the related Prepayment Period).

**Notional Amount Certificates**

The Class 1-A-2, Class 1-X, Class 2-X, Class 3-X and Class 4-X Certificates are notional amount certificates.

The notional amount of the Class 1-A-2 Certificates for any Distribution Date will be equal to the Class Certificate Balance of the Class 1-A-1 Certificates immediately prior to such Distribution Date.

The notional amount of the Class 1-X Certificates for any Distribution Date will be equal to the aggregate Stated Principal Balance of the Non-Discount mortgage loans in loan group 1 as of the Due Date in the preceding calendar month (after giving effect to prepayments received in the Prepayment Period related to that preceding Due Date).

The notional amount of the Class 2-X Certificates for any Distribution Date will be equal to the aggregate Stated Principal Balance of the Non-Discount mortgage loans in loan group 2 as of the Due Date in the preceding calendar month (after giving effect to prepayments received in the Prepayment Period related to that preceding Due Date).

The notional amount of the Class 3-X Certificates for any Distribution Date will be equal to the aggregate Stated Principal Balance of the Non-Discount mortgage loans in loan group 3 as of the Due Date in the preceding calendar month (after giving effect to prepayments received in the Prepayment Period related to that preceding Due Date).

The notional amount of the Class 4-X Certificates for any Distribution Date will be equal to the aggregate Stated Principal Balance of the Non-Discount mortgage loans in loan group 4 as of the Due Date in the preceding calendar month (after giving effect to prepayments received in the Prepayment Period related to that preceding Due Date).

**Book-Entry Certificates; Denominations**

The offered certificates, other than the Class A-R Certificates, will be issued as book-entry certificates.  The Class A-R Certificates will be issued as two certificates in a fully registered certificated form in an aggregate denomination of $100.  Each class of book-entry certificates will be issued as one or more certificates that, in the aggregate, will equal the aggregate initial Class Certificate Balance of each class of certificates and which will be held by a depository, initially a nominee of The Depository Trust Company. Beneficial interests in the book-entry certificates will be held indirectly by investors through the book-entry facilities of the depository as described in this prospectus supplement. Investors may hold the beneficial interests in the book-entry certificates (other than the Class 1-A-4 and Class 4-A-2 Certificates) in minimum denominations representing an original principal amount or notional amount of $25,000 and in integral multiples of $1,000 in excess thereof.  Investors may hold the beneficial interests in the Class 1-A-4 and Class 4-A-2 Certificates in minimum denominations representing an original principal amount of $1,000 and in integral multiples of $1,000 in excess thereof. One investor of each class of book-entry certificates may hold a beneficial interest therein that is not an integral multiple of $1,000.  The depositor has been informed by the depository that its nominee will be CEDE & Co. ("CEDE").  Accordingly, CEDE is expected to be the holder of record of the book-entry certificates. Except as described in the prospectus under *"Description of the Securities — Book-Entry Registration of Securities,"* no beneficial owner acquiring a book-entry certificate will be entitled to receive a physical certificate representing the certificate.

Unless and until definitive certificates are issued, it is anticipated that the only certificateholder of the book-entry certificates will be CEDE, as nominee of the depository. Beneficial owners of the book-entry certificates will not be certificateholders, as that term is used in the pooling and servicing agreement. Beneficial owners are only permitted to exercise the rights of certificateholders indirectly through financial intermediaries and the depository. Monthly and annual reports on the issuing entity provided to CEDE, as nominee of the depository, may be made available to beneficial owners upon request, in accordance with the rules, regulations and procedures creating and affecting the depository, and to the financial intermediaries to whose depository accounts the book-entry certificates of the beneficial owners are credited.

For a description of the procedures generally applicable to the book-entry certificates, see *"Description of the Securities — Book-Entry Registration of Securities"* in the prospectus.

Although The Depository Trust Company has agreed to the foregoing procedures in order to facilitate transfers of certificates among participants of The Depository Trust Company, they are under no obligation to perform or continue to perform such procedures and such procedures may be discontinued at any time.

**Determination of LIBOR**

The LIBOR Certificates will bear interest during their initial interest accrual period at the applicable initial pass-through rates set forth in the table under *"— Interest"* below, and during each interest accrual period thereafter at the applicable rate determined as described in the table under *"— Interest"* below.

LIBOR applicable to an interest accrual period for the LIBOR Certificates will be determined on the second business day prior to the commencement of that interest accrual period (a "LIBOR Determination Date"). On each LIBOR Determination Date, the trustee, as Calculation Agent, will establish LIBOR for the related interest accrual period on the basis of the rate for one‑month deposits in U.S. dollars quoted on the Bloomberg Terminal for that LIBOR Determination Date.

If on any LIBOR Determination Date, the calculation agent is unable to calculate LIBOR in accordance with the method set forth in the immediately preceding paragraph, LIBOR for the next interest accrual period shall be calculated in accordance with the method described in the prospectus under *"Description of the Securities — Indices Applicable to Floating Rate and Inverse Floating Rate Classes — LIBOR."*

If on the initial LIBOR Determination Date, the calculation agent is required but unable to determine LIBOR in the manner provided in this prospectus supplement, LIBOR for the next interest accrual period will be 4.95%.

**Payments on Mortgage Loans; Accounts**

*Certificate Account*. On or before the closing date, the master servicer will establish an account (the "Certificate Account"), which will be maintained in trust for the benefit of the certificateholders. The Certificate Account will be established by the master servicer initially at Countrywide Bank, N.A., which is an affiliate of the depositor, the sellers and the master servicer. The master servicer will deposit or cause to be deposited in the Certificate Account, within two business days after receipt (or, on a daily basis, if the long-term credit rating of Countrywide Home Loans has been reduced below the rating specified in the pooling and servicing agreement) the following payments and collections remitted by subservicers or received by it in respect of mortgage loans subsequent to the cut-off date (other than in respect of principal and interest due on the mortgage loans on or before the cut-off date) and the following amounts required to be deposited under the pooling and servicing agreement:

- all payments on account of principal on the mortgage loans, including principal prepayments;

- all payments on account of interest on the mortgage loans, net of the related master servicing fee (as adjusted by Compensating Interest payments) and any lender paid mortgage insurance premiums;

- all payments on account of prepayment charges on the mortgage loans;

- all insurance proceeds, Subsequent Recoveries and liquidation proceeds, other than

proceeds to be applied to the restoration or repair of a mortgaged property or released to the mortgagor in accordance with the master servicer's normal servicing procedures;

- any amount required to be deposited by the master servicer pursuant to the pooling and servicing agreement in connection with any losses on permitted investments for which it is responsible;

- any amounts received by the master servicer with respect to primary mortgage insurance and in respect of net monthly rental income from REO Property;

- all substitution adjustment amounts; and

- all advances made by the master servicer.

Prior to their deposit into the Certificate Account, payments and collections on the mortgage loans will be commingled with payments and collections on other mortgage loans and other funds of the master servicer. For a discussion of the risks that arise from the commingling of payments and collections, see "*Risk Factors — Bankruptcy Or Insolvency May Affect The Timing And Amount Of Distributions On The Securities*" in the prospectus.

The master servicer may from time to time make withdrawals from the Certificate Account for the following purposes:

- to pay to the master servicer the master servicing fee and the additional servicing compensation (to the extent not previously retained by the master servicer) described above under *"Servicing of Mortgage Loans—Servicing Compensation and Payment of Expenses"*;

- to reimburse each of the master servicer and the trustee for unreimbursed Advances made by it, which right of reimbursement pursuant to this subclause being limited to amounts received on the mortgage loan(s) in respect of which any such Advance was made;

- to reimburse each of the master servicer and the trustee for any nonrecoverable advance previously made by it (and prior to the reimbursement, the master servicer will deliver to the trustee an officer's certificate indicating the amount of the nonrecoverable Advance and identifying the related mortgage loan(s), and their respective portions of the nonrecoverable advance);

- to reimburse the master servicer for insured expenses from the related insurance proceeds;

- to reimburse the master servicer for (a) any unreimbursed customary, reasonable and necessary "out of pocket" costs and expenses incurred in the performance by the master servicer of its servicing obligations, including, but not limited to, the cost of (i) the preservation, restoration and protection of a mortgaged property, (ii) any enforcement or judicial proceedings, including foreclosures, (iii) the management and liquidation of any REO Property and (iv) maintaining any required insurance policies (collectively, "Servicing Advances"), which right of reimbursement pursuant to this clause is limited to amounts received representing late recoveries of the payments of these costs and expenses (or liquidation proceeds or Subsequent Recoveries, purchase proceeds or repurchase proceeds with respect thereto);

- to pay to the purchaser, with respect to each mortgage loan or property acquired in respect thereof that it has purchased as required under the pooling and servicing agreement, all amounts received on such mortgage loan after the date of such purchase;

- to reimburse the sellers and the master servicer for expenses incurred by any of them and reimbursable pursuant to the pooling and servicing agreement;

- to withdraw any amount deposited in the Certificate Account and not required to be deposited in the Certificate Account;

- to withdraw an amount equal to the sum of (a) the related Available Funds, (b) any prepayment charges received and (c) the trustee fee for such Distribution Date and remit such amount to the trustee for deposit in the Distribution Account; and

- to clear and terminate the Certificate Account upon termination of the pooling and servicing agreement.

The master servicer is required to maintain separate accounting, on a mortgage loan by mortgage loan basis, for the purpose of justifying any withdrawal from the Certificate Account described in the first six bullet points above.

*Distribution Account*.  On or before the business day immediately preceding each Distribution Date, the master servicer will withdraw from the Certificate Account the amount of Available Funds for each loan group, the prepayment charges collected and the trustee fee and will deposit those amounts in an account established and maintained with the trustee on behalf of the certificateholders (the "Distribution Account").  The trustee will, promptly upon receipt, deposit in the Distribution Account and retain therein:

- the aggregate amount remitted by the master servicer to the trustee; and

- any amount required to be deposited by the master servicer in connection with any losses on investment of funds in the Distribution Account.

The trustee will withdraw funds from the Distribution Account for distribution to the certificateholders as described below under *"— Priority of Distributions Among Certificates"* and may from time to time make withdrawals from the Distribution Account:

- to pay the trustee fee to the trustee;

- to pay to the master servicer, as additional servicing compensation, earnings on or investment income with respect to funds in or credited to the Distribution Account;

- to withdraw any amount deposited in the Distribution Account and not required to be deposited therein (which withdrawal may be at the direction of the master servicer through delivery of a written notice to the trustee describing the amounts deposited in error); and

- to clear and terminate the Distribution Account upon the termination of the pooling and servicing agreement.

There is no independent verification of the transaction accounts or the transaction activity with respect to the Distribution Account.

Prior to each Determination Date, the master servicer is required to provide the trustee a report containing the data and information concerning the mortgage loans that is required by the trustee to prepare the monthly statement to certificateholders for the related Distribution Date.  See *" — Reports to Certificateholders"* in this prospectus supplement.  The trustee is not responsible for recomputing, recalculating or verifying the information provided to it by the master servicer in that report and will be permitted to conclusively rely on any information provided to it by the master servicer.

## Investments of Amounts Held in Accounts

*The Certificate Account and the Distribution Account*.  All funds in the Certificate Account and the Distribution Account will be invested in permitted investments at the direction, and for the benefit and risk, of the master servicer.  All income and gain net of any losses realized from the investment will be for the benefit of the master servicer as additional servicing compensation and will be remitted to it monthly as described herein.

The amount of any losses incurred in the Certificate Account or the Distribution Account in respect of the investments will be deposited by the master servicer in the Certificate Account or paid to the trustee for deposit into the Distribution Account out of the master servicer's own funds immediately as realized.  The trustee will not be liable for the amount of any loss incurred in respect of any investment or lack of investment of funds held in the Certificate Account or the Distribution Account and made in accordance with the pooling and servicing agreement.

*The Corridor Contract Reserve Fund.*  Funds in the Corridor Contract Reserve Fund in the supplemental interest trust may be invested in permitted investments at the direction of Countrywide Securities Corporation.  If the trustee of the supplemental interest trust does not receive written directions regarding investment, it will invest all funds in the Corridor Contract Reserve Fund in respect of amounts received under each Corridor Contract in the Bank of New York cash reserves.  Any net investment earnings will be retained in the Corridor Contract Reserve Fund until withdrawn upon the earlier of the reduction of the aggregate Class Certificate Balance of the Class 1-A-1 Certificates to zero and the termination of the pooling and servicing agreement.  Any losses incurred in the Corridor Contract Reserve Fund in respect of the investment will be charged against amounts on deposit in the Corridor Contract Reserve Fund (or the investments) immediately as realized.  The trustee will not be liable for the amount of any loss incurred in respect of any investment or lack of investment of funds held in the Corridor Contract Reserve Fund and made in accordance with the pooling and servicing agreement.

**Fees and Expenses**

The following summarizes the related fees and expenses to be paid from the assets of the issuing entity and the source of payments for the fees and expenses:

| Type / Recipient (1) | Amount | General Purpose | Source (2) | Frequency |
|---|---|---|---|---|
| *Fees* | | | | |
| Master Servicing Fee / Master Servicer | The master servicer will be paid a monthly fee (referred to as the master servicing fee) with respect to each mortgage loan. The master servicing fee for the mortgage loans in each loan group will equal one-twelfth of the Stated Principal Balance of each mortgage loan in that loan group multiplied by the Master Servicer Fee Rate (3). As of the cut-off date, the weighted average master servicing fee rate for the loans in loan group 1, loan group 2, loan group 3 and loan group 4 will be approximately 0.226%, 0.205%, 0.209% and 0.202% per annum, respectively. | Compensation | Amounts on deposit in the Certificate Account representing payments of interest and application of liquidation proceeds with respect to that mortgage loan | Monthly |
| | • All late payment fees, assumption fees and other similar charges (excluding prepayment charges) | Compensation | Payments made by obligors with respect to the mortgage loans | Time to time |
| | • All investment income earned on amounts on deposit in the Certificate Account and Distribution Account. | Compensation | Investment income related to the Certificate Account and the Distribution Account | Monthly |
| | • Excess Proceeds (4) | Compensation | Liquidation proceeds and Subsequent Recoveries | Time to time |
| Trustee Fee (the "Trustee Fee") / Trustee | One-twelfth of the Trustee Fee Rate multiplied by the aggregate Stated Principal Balance of the outstanding mortgage loans. (5) | Compensation | Amounts on deposit in the Certificate Account or the Distribution Account | Monthly |
| *Expenses* | | | | |
| Insured expenses / Master Servicer | Expenses incurred by the master servicer | Reimbursement of Expenses | To the extent the expenses are covered by an insurance policy with respect to the mortgage loan | Time to time |

| Type / Recipient (1) | Amount | General Purpose | Source (2) | Frequency |
|---|---|---|---|---|
| Servicing Advances / Master Servicer | To the extent of funds available, the amount of any Servicing Advances. | Reimbursement of Expenses | With respect to each mortgage loan, late recoveries of the payments of the costs and expenses, liquidation proceeds, Subsequent Recoveries, purchase proceeds or repurchase proceeds for that mortgage loan (6) | Time to time |
| Indemnification expenses / the sellers, the master servicer and the depositor | Amounts for which the sellers, the master servicer and depositor are entitled to indemnification (7) | Indemnification | Amounts on deposit on the Certificate Account | Monthly |

(1)   If the trustee succeeds to the position of master servicer, it will be entitled to receive the same fees and expenses of the master servicer described in this prospectus supplement.  Any increase in the fees and expenses described in this prospectus supplement would require an amendment to the pooling and servicing agreement.  See *"The Agreements— Amendment"* in the prospectus.

(2)   Unless otherwise specified, the fees and expenses shown in this table are paid (or retained by the master servicer in the case of amounts owed to the master servicer) prior to distributions on the certificates.

(3)   The Master Servicer Fee Rate for each mortgage loan will be either 0.200% or 0.250% per annum.  The amount of the monthly servicing fee is subject to adjustment with respect to mortgage loans that are prepaid in full, as described in this prospectus supplement under *"Servicing of Mortgage Loans — Adjustment to Servicing Fee in Connection with Certain Prepaid Mortgage Loans."*

(4)   "Excess Proceeds" with respect to a liquidated mortgage loan means the amount, if any, by which the sum of any net liquidation proceeds and Subsequent Recoveries exceed the sum of (i) the unpaid principal balance of the mortgage loan plus (ii) accrued interest on the mortgage loan at the mortgage rate during each Due Period as to which interest was not paid or advanced on the mortgage loan.

(5)   The *"trustee fee rate"* is equal to 0.009% per annum.

(6)   Reimbursement of Servicing Advances for a mortgage loan is limited to the late recoveries of the payments of the costs and expenses, liquidation proceeds, Subsequent Recoveries, purchase proceeds or repurchase proceeds for that mortgage loan.

(7)   Each of the sellers, the master servicer, and the depositor are entitled to indemnification of certain expenses as described in this prospectus supplement under *"— Certain Matters Regarding the Master Servicer, the Depositor and the Sellers."*

S-94