**Miscellaneous Tax Aspects**

*Backup Withholding.*  Subject to the discussion below with respect to trust funds for which a partnership election is made, a Holder, other than a holder of a Residual Interest, may, under certain circumstances, be subject to "backup withholding" with respect to distributions or the proceeds of a sale of securities to or through brokers that represent interest or original issue discount on the securities.  This withholding generally applies if the holder of a security

- fails to furnish the trustee with its taxpayer identification number ("TIN");

- furnishes the trustee an incorrect TIN;

- fails to report properly interest, dividends or other "reportable payments" as defined in the Code; or

- under certain circumstances, fails to provide the trustee or the holder's securities broker with a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that the holder is not subject to backup withholding.

Backup withholding will not apply, however, with respect to certain payments made to Holders, including payments to certain exempt recipients (such as exempt organizations) and to certain Nonresidents (as defined below).  Holders are encouraged to consult their tax advisers as to their qualification for exemption from backup withholding and the procedure for obtaining the exemption.

The trustee will report to the Holders and to the servicer for each calendar year the amount of any "reportable payments" during the year and the amount of tax withheld, if any, with respect to payments on the securities.

**New Reporting Regulations**

In January 2006 the IRS and Treasury Department finalized new rules concerning the reporting of tax information with respect to "Widely Held Mortgage Trusts."  Under these new rules, the trustee may be compelled, or have an opportunity, to adopt new ways of calculating and reporting tax items (such as OID, market discount, sale proceeds and premium) to the Holders of Pass-Through Securities, which changes may affect the timing of when a Holder reports those items.

**Tax Treatment of Foreign Investors**

Subject to the discussion below with respect to trust funds for which a partnership election is made, under the Code, unless interest (including OID) paid on a security (other than a Residual Interest) is considered to be "effectively connected" with a trade or business conducted in the United States by a nonresident alien individual, foreign partnership or foreign corporation ("Nonresidents"), the interest will normally qualify as portfolio interest (except where the recipient is a holder, directly or by attribution, of 10% or more of the capital or profits interest in the issuer, or the recipient is a controlled foreign corporation to which the issuer is a related person) and will be exempt from federal income tax.  Upon receipt of appropriate ownership statements, the issuer normally will be relieved of obligations to withhold tax from the interest payments.  These provisions supersede the generally applicable provisions of United States law that would otherwise require the issuer to withhold at a 30% rate (unless the rate were reduced or eliminated by an applicable income tax treaty) on, among other things, interest and other fixed or determinable, annual or periodic income paid to Nonresidents.

Interest and OID of Holders who are foreign persons are not subject to withholding if they are effectively connected with a United States business conducted by the Holder.  They will, however, generally be subject to the regular United States income tax.

Payments to holders of Residual Interests who are foreign persons will generally be treated as interest for purposes of the 30% (or lower treaty rate) United States withholding tax. Holders should assume that the income does not qualify for exemption from United States withholding tax as "portfolio interest." It is clear that, to the extent that a payment represents a portion of REMIC taxable income that constitutes excess inclusion income, a holder of a Residual Interest will not be entitled to an exemption from or reduction of the 30% (or lower treaty rate) withholding tax rule. If the payments are subject to United States withholding tax, they generally will be taken into account for withholding tax purposes only when paid or distributed (or when the Residual Interest is disposed of). The Treasury has statutory authority, however, to promulgate regulations which would require the amounts to be taken into account at an earlier time in order to prevent the avoidance of tax. The regulations could, for example, require withholding prior to the distribution of cash in the case of Residual Interests that do not have significant value. Under the REMIC Regulations, if a Residual Interest has tax avoidance potential, a transfer of a Residual Interest to a Nonresident will be disregarded for all federal tax purposes. A Residual Interest has tax avoidance potential unless, at the time of the transfer the transferor reasonably expects that the REMIC will distribute to the transferee of the Residual Interest amounts that will equal at least 30% of each excess inclusion, and that the amounts will be distributed at or after the time at which the excess inclusions accrue and not later than the calendar year following the calendar year of accrual. If a Nonresident transfers a Residual Interest to a United States person, and if the transfer has the effect of allowing the transferor to avoid tax on accrued excess inclusions, then the transfer is disregarded and the transferor continues to be treated as the owner of the Residual Interest for purposes of the withholding tax provisions of the Code. See "— Excess Inclusions."

### Tax Characterization of the Trust Fund as a Partnership

Tax Counsel will deliver its opinion that a trust fund for which a partnership election is made will not be a corporation or publicly traded partnership taxable as a corporation for federal income tax purposes. This opinion will be based on the assumption that the terms of the Trust Agreement and related documents will be complied with, and on counsel's conclusions that the nature of the income of the trust fund will exempt it from the rule that certain publicly traded partnerships are taxable as corporations or the issuance of the securities has been structured as a private placement under an IRS safe harbor, so that the trust fund will not be characterized as a publicly traded partnership taxable as a corporation.

If the trust fund were taxable as a corporation for federal income tax purposes, the trust fund would be subject to corporate income tax on its taxable income. The trust fund's taxable income would include all its income, possibly reduced by its interest expense on the notes. That corporate income tax could materially reduce cash available to make payments on the notes and distributions on the certificates, and certificateholders could be liable for that tax that is unpaid by the trust fund.

### Tax Consequences to Holders of the Notes

*Treatment of the Notes as Indebtedness.* The trust fund will agree, and the noteholders will agree by their purchase of notes, to treat the notes as debt for federal income tax purposes. Unless otherwise specified in the related prospectus supplement, in the opinion of Tax Counsel, the notes will be classified as debt for federal income tax purposes. The discussion below assumes this characterization of the notes is correct.

*OID, Indexed Securities, etc.* The discussion below assumes that all payments on the notes are denominated in U.S. dollars, and that the notes are not Indexed securities or Strip notes. Moreover, the discussion assumes that the interest formula for the notes meets the requirements for "qualified stated interest" under the OID regulations, and that any OID on the notes (that is, any excess of the principal amount of the notes over their issue price) does not exceed a de minimis amount (that is, 0.25% of their principal amount multiplied by the number of full years included in their term), all within the meaning of the OID regulations. If these conditions are not satisfied with respect to any given series of notes, additional tax considerations with respect to the notes will be disclosed in the applicable prospectus supplement.

*Interest Income on the Notes.* Based on the above assumptions, except as discussed in the following paragraph, the notes will not be considered issued with OID. The stated interest thereon will be taxable to a noteholder as ordinary interest income when received or accrued in accordance with the noteholder's method of tax accounting. Under the OID regulations, a holder of a note issued with a de minimis amount of OID must include the

OID in income, on a pro rata basis, as principal payments are made on the note.  It is believed that any prepayment premium paid as a result of a mandatory redemption will be taxable as contingent interest when it becomes fixed and unconditionally payable.  A purchaser who buys a note for more or less than its principal amount will generally be subject, respectively, to the premium amortization or market discount rules of the Code.

A holder of a note that has a fixed maturity date of not more than one year from the issue date of the note (a "Short-Term Note") may be subject to special rules.  An accrual basis holder of a Short-Term Note (and certain cash method holders, including regulated investment companies, as set forth in Section 1281 of the Code) generally would be required to report interest income as interest accrues on a straight-line basis over the term of each interest period.  Other cash basis holders of a Short-Term Note would, in general, be required to report interest income as interest is paid (or, if earlier, upon the taxable disposition of the Short-Term Note).  However, a cash basis holder of a Short-Term Note reporting interest income as it is paid may be required to defer a portion of any interest expense otherwise deductible on indebtedness incurred to purchase or carry the Short-Term Note until the taxable disposition of the Short-Term Note.  A cash basis taxpayer may elect under Section 1281 of the Code to accrue interest income on all nongovernment debt obligations with a term of one year or less, in which case the taxpayer would include interest on the Short-Term Note in income as it accrues, but would not be subject to the interest expense deferral rule referred to in the preceding sentence.  Certain special rules apply if a Short-Term Note is purchased for more or less than its principal amount.

*Sale or Other Disposition.*  If a noteholder sells a note, the holder will recognize gain or loss in an amount equal to the difference between the amount realized on the sale and the holder's adjusted tax basis in the note.  The adjusted tax basis of a note to a particular noteholder will equal the holder's cost for the note, increased by any market discount, acquisition discount, OID and gain previously included by the noteholder in income with respect to the note and decreased by the amount of bond premium (if any) previously amortized and by the amount of principal payments previously received by the noteholder with respect to the note.  That gain or loss will be capital gain or loss if the note was held as a capital asset, except for gain representing accrued interest and accrued market discount not previously included in income.  Capital losses generally may be used only to offset capital gains.

*Foreign Holders.*  Interest payments made (or accrued) to a noteholder who is a nonresident alien, foreign corporation or other non-United States person (a "foreign person") generally will be considered "portfolio interest," and generally will not be subject to United States federal income tax and withholding tax, if the interest is not effectively connected with the conduct of a trade or business within the United States by the foreign person and the foreign person

- is not actually or constructively a "10 percent shareholder" of the trust fund or the seller (including a holder of 10% of the outstanding securities) or a "controlled foreign corporation" with respect to which the trust fund or the seller is a "related person" within the meaning of the Code and

- provides the owner trustee or other person who is otherwise required to withhold U.S. tax with respect to the notes (the "Withholding Agent") with an appropriate statement, signed under penalties of perjury, certifying that the beneficial owner who is an individual or corporation for federal income tax purposes of the note is a foreign person and providing the foreign person's name and address.

Generally, this statement is made on an IRS Form W-8BEN ("W-8BEN"), which is effective for the remainder of the year of signature plus three full calendar years unless a change in circumstances makes any information on the form incorrect.  Notwithstanding the preceding sentence, a W-8BEN with a U.S. taxpayer identification number will remain effective until a change in circumstances makes any information on the form incorrect, provided that the Withholding Agent reports at least one payment annually to the beneficial owner on IRS Form 1042-S.  The beneficial owner must inform the Withholding Agent within 30 days of any change and furnish a new W-8BEN.  A noteholder who is not an individual or corporation (or an entity treated as a corporation for federal income tax purposes) holding the Notes on its own behalf may have substantially increased reporting requirements.  In particular, in the case of notes held by a foreign partnership (or foreign trust), the partners (or beneficiaries) rather than the partnership (or trust) will be required to provide the certification discussed above, and the partnership (or trust) will be required to provide certain additional information.

If a note is held through a securities clearing organization or certain other financial institutions, the organization or institution may provide the relevant signed statement to the withholding agent; in that case, however, the signed statement must be accompanied by a Form W-8BEN or substitute form provided by the foreign person that owns the note. If the interest is not portfolio interest, then it will be subject to United States federal income and withholding tax at a rate of 30 percent, unless reduced or eliminated pursuant to an applicable tax treaty.

Any capital gain realized on the sale, redemption, retirement or other taxable disposition of a note by a foreign person will be exempt from United States federal income and withholding tax, provided that the gain is not effectively connected with the conduct of a trade or business in the United States by the foreign person and in the case of an individual foreign person, the foreign person is not present in the United States for 183 days or more in the taxable year.

*Backup Withholding.*  Each holder of a note (other than an exempt holder such as a corporation, tax-exempt organization, qualified pension and profit-sharing trust, individual retirement account or nonresident alien who provides certification as to status as a nonresident) will be required to provide, under penalties of perjury, a certificate containing the holder's name, address, correct federal taxpayer identification number and a statement that the holder is not subject to backup withholding.  Should a nonexempt noteholder fail to provide the required certification, the trust fund will be required to withhold on the amount otherwise payable to the holder, and remit the withheld amount to the IRS as a credit against the holder's federal income tax liability.

*Possible Alternative Treatments of the Notes.*  If, contrary to the opinion of Tax Counsel, the IRS successfully asserted that one or more of the notes did not represent debt for federal income tax purposes, the notes might be treated as equity interests in the trust fund.  If so treated, the trust fund might be taxable as a corporation with the adverse consequences described above (and the taxable corporation would not be able to reduce its taxable income by deductions for interest expense on notes recharacterized as equity).  Alternatively, and most likely in the view of special counsel to the depositor, the trust fund might be treated as a publicly traded partnership that would not be taxable as a corporation because it would meet certain qualifying income tests.  Nonetheless, treatment of the notes as equity interests in that publicly traded partnership could have adverse tax consequences to certain holders.  For example, income to certain tax-exempt entities (including pension funds) would be "unrelated business taxable income," income to foreign holders generally would be subject to U.S. tax and U.S. tax return filing and withholding requirements, and individual holders might be subject to certain limitations on their ability to deduct their share of the trust fund's expenses.

**Tax Consequences to Holders of the Certificates**

*Treatment of the Trust Fund as a Partnership.*  The trust fund and the master servicer will agree, and the certificateholders will agree by their purchase of certificates, to treat the trust fund as a partnership for purposes of federal and state income tax, franchise tax and any other tax measured in whole or in part by income, with the assets of the partnership being the assets held by the trust fund, the partners of the partnership being the certificateholders, and the notes being debt of the partnership.  However, the proper characterization of the arrangement involving the trust fund, the certificates, the notes, the trust fund and the servicer is not clear because there is no authority on transactions closely comparable to that contemplated herein.

A variety of alternative characterizations are possible.  For example, because the certificates have certain features characteristic of debt, the certificates might be considered debt of the trust fund.  That characterization would not result in materially adverse tax consequences to certificateholders as compared to the consequences from treatment of the certificates as equity in a partnership, described below.  The following discussion assumes that the certificates represent equity interests in a partnership.

*Indexed Securities, etc.*  The following discussion assumes that all payments on the certificates are denominated in U.S. dollars, none of the certificates are Indexed securities or Strip certificates, and that a series of securities includes a single class of certificates.  If these conditions are not satisfied with respect to any given series of certificates, additional tax considerations with respect to the certificates will be disclosed in the applicable prospectus supplement.

*Partnership Taxation.*  As a partnership, the trust fund will not be subject to federal income tax.  Rather, each certificateholder will be required to separately take into account the holder's distributive share of income, gains, losses, deductions and credits of the trust fund.  The trust fund's income will consist primarily of interest and finance charges earned on the loans (including appropriate adjustments for market discount, OID and bond premium) and any gain upon collection or disposition of loans.  The trust fund's deductions will consist primarily of interest accruing with respect to the notes, servicing and other fees, and losses or deductions upon collection or disposition of loans.

The tax items of a partnership are allocable to the partners in accordance with the Code, Treasury regulations and the partnership agreement (here, the Trust Agreement and related documents).  The Trust Agreement will provide, in general, that the certificateholders will be allocated taxable income of the trust fund for each month equal to the sum of (i) the interest that accrues on the certificates in accordance with their terms for that month, including interest accruing at the Pass-Through Rate for the month and interest on amounts previously due on the certificates but not yet distributed; (ii) any trust fund income attributable to discount on the Loans that corresponds to any excess of the principal amount of the certificates over their initial issue price; (iii) prepayment premium payable to the certificateholders for the month; and (iv) any other amounts of income payable to the certificateholders for the month.  That allocation will be reduced by any amortization by the trust fund of premium on loans that corresponds to any excess of the issue price of certificates over their principal amount.  All remaining taxable income of the trust fund will be allocated to the depositor.  Based on the economic arrangement of the parties, this approach for allocating trust fund income should be permissible under applicable Treasury regulations, although we can give no assurance that the IRS would not require a greater amount of income to be allocated to certificateholders.  Moreover, even under the foregoing method of allocation, certificateholders may be allocated income equal to the entire Pass-Through Rate plus the other items described above even though the trust fund might not have sufficient cash to make current cash distributions of that amount.  Thus, cash basis holders will in effect be required to report income from the certificates on the accrual basis and certificateholders may become liable for taxes on trust fund income even if they have not received cash from the trust fund to pay those taxes.  In addition, because tax allocations and tax reporting will be done on a uniform basis for all certificateholders but certificateholders may be purchasing certificates at different times and at different prices, certificateholders may be required to report on their tax returns taxable income that is greater or less than the amount reported to them by the trust fund.

All of the taxable income allocated to a certificateholder that is a pension, profit sharing or employee benefit plan or other tax-exempt entity (including an individual retirement account) will constitute "unrelated business taxable income" generally taxable to that holder under the Code.

An individual taxpayer's share of expenses of the trust fund (including fees to the servicer but not interest expense) would be miscellaneous itemized deductions.  Those deductions might be disallowed to the individual in whole or in part and might result in the holder being taxed on an amount of income that exceeds the amount of cash actually distributed to the holder over the life of the trust fund.

The trust fund intends to make all tax calculations relating to income and allocations to certificateholders on an aggregate basis.  If the IRS were to require that those calculations be made separately for each loan, the trust fund might be required to incur additional expense but it is believed that there would not be a material adverse effect on certificateholders.

*Discount and Premium.*  It is believed that the loans were not issued with OID, and, therefore, the trust fund should not have OID income.  However, the purchase price paid by the trust fund for the loans may be greater or less than the remaining principal balance of the loans at the time of purchase.  If so, the loan will have been acquired at a premium or discount, as the case may be.  (As indicated above, the trust fund will make this calculation on an aggregate basis, but might be required to recompute it on a loan by loan basis.)

If the trust fund acquires the loans at a market discount or premium, the trust fund will elect to include that discount in income currently as it accrues over the life of the loans or to offset that premium against interest income on the loans.  As indicated above, a portion of the market discount income or premium deduction may be allocated to certificateholders.

*Section 708 Termination.*  Pursuant to Code Section 708, a sale or exchange of 50% or more of the capital and profits in a partnership would cause a deemed contribution of assets of the partnership (the "old partnership") to a new partnership (the "new partnership") in exchange for interests in the new partnership.  Those interests would be deemed distributed to the partners of the old partnership in liquidation thereof, which would not constitute a sale or exchange.  Accordingly, if the trust fund were characterized as a partnership, then even if a sale of certificates terminated the partnership under Code Section 708, the holder's basis in its certificates would remain the same.

*Disposition of Certificates.*  Generally, capital gain or loss will be recognized on a sale of certificates in an amount equal to the difference between the amount realized and the seller's tax basis in the certificates sold.  A certificateholder's tax basis in a certificate will generally equal the holder's cost increased by the holder's share of trust fund income (includible in income) and decreased by any distributions received with respect to that certificate.  In addition, both the tax basis in the certificates and the amount realized on a sale of a certificate would include the holder's share of the notes and other liabilities of the trust fund.  A holder acquiring certificates at different prices may be required to maintain a single aggregate adjusted tax basis in the certificates, and, upon sale or other disposition of some of the certificates, allocate a portion of that aggregate tax basis to the certificates sold (rather than maintaining a separate tax basis in each certificate for purposes of computing gain or loss on a sale of that certificate).

Any gain on the sale of a certificate attributable to the holder's share of unrecognized accrued market discount on the loans would generally be treated as ordinary income to the holder and would give rise to special tax reporting requirements.  The trust fund does not expect to have any other assets that would give rise to those special reporting requirements.  Thus, to avoid those special reporting requirements, the trust fund will elect to include market discount in income as it accrues.

If a certificateholder is required to recognize an aggregate amount of income (not including income attributable to disallowed itemized deductions described above) over the life of the certificates that exceeds the aggregate cash distributions with respect thereto, that excess will generally give rise to a capital loss upon the retirement of the certificates.

*Allocations Among Transferors and Transferees.*  In general, the trust fund's taxable income and losses will be determined monthly and the tax items for a particular calendar month will be apportioned among the certificateholders in proportion to the principal amount of certificates owned by them as of the close of the last day of that month.  As a result, a holder purchasing certificates may be allocated tax items (which will affect its tax liability and tax basis) attributable to periods before the actual transaction.

The use of a monthly convention may not be permitted by existing regulations.  If a monthly convention is not allowed (or only applies to transfers of less than all of the partner's interest), taxable income or losses of the trust fund might be reallocated among the certificateholders.  The trust fund's method of allocation between transferors and transferees may be revised to conform to a method permitted by future regulations.

*Section 754 Election.*  In the event that a certificateholder sells its certificates at a profit (loss), the purchasing certificateholder will have a higher (lower) basis in the certificates than the selling certificateholder had.  The tax basis of the trust fund's assets will not be adjusted to reflect that higher (or lower) basis unless the trust fund were to file an election under Section 754 of the Code.  In order to avoid the administrative complexities that would be involved in keeping accurate accounting records, as well as potentially onerous information reporting requirements, the trust fund will not make that election.  As a result, certificateholders might be allocated a greater or lesser amount of trust fund income than would be appropriate based on their own purchase price for certificates.

*Administrative Matters.*  The owner trustee is required to keep or have kept complete and accurate books of the trust fund.  Those books will be maintained for financial reporting and tax purposes on an accrual basis and the fiscal year of the trust fund will be the calendar year.  The trustee will file a partnership information return (IRS Form 1065) with the IRS for each taxable year of the trust fund and will report each certificateholder's allocable share of items of trust fund income and expense to holders and the IRS on Schedule K-1.  The trust fund will provide the Schedule K-l information to nominees that fail to provide the trust fund with the information statement described below and those nominees will be required to forward that information to the beneficial owners of the

certificates.  Generally, holders must file tax returns that are consistent with the information return filed by the trust fund or be subject to penalties unless the holder notifies the IRS of all those inconsistencies.

Under Section 6031 of the Code, any person that holds certificates as a nominee at any time during a calendar year is required to furnish the trust fund with a statement containing certain information on the nominee, the beneficial owners and the certificates so held.  That information includes (i) the name, address and taxpayer identification number of the nominee and (ii) as to each beneficial owner (x) the name, address and identification number of the person, (y) whether the person is a United States person, a tax-exempt entity or a foreign government, an international organization, or any wholly owned agency or instrumentality of either of the foregoing, and (z) certain information on certificates that were held, bought or sold on behalf of the person throughout the year.  In addition, brokers and financial institutions that hold certificates through a nominee are required to furnish directly to the trust fund information as to themselves and their ownership of certificates.  A clearing agency registered under Section 17A of the Securities Exchange Act of 1934, as amended is not required to furnish that information statement to the trust fund.  The information referred to above for any calendar year must be furnished to the trust fund on or before the following January 31.  Nominees, brokers and financial institutions that fail to provide the trust fund with the information described above may be subject to penalties.

The depositor will be designated as the tax matters partner in the related Trust Agreement and, as such, will be responsible for representing the certificateholders in any dispute with the IRS.  The Code provides for administrative examination of a partnership as if the partnership were a separate and distinct taxpayer.  Generally, the statute of limitations for partnership items does not expire before three years after the date on which the partnership information return is filed.  Any adverse determination following an audit of the return of the trust fund by the appropriate taxing authorities could result in an adjustment of the returns of the certificateholders, and, under certain circumstances, a certificateholder may be precluded from separately litigating a proposed adjustment to the items of the trust fund.  An adjustment could also result in an audit of a certificateholder's returns and adjustments of items not related to the income and losses of the trust fund.

*Tax Consequences to Foreign Certificateholders.*  It is not clear whether the trust fund would be considered to be engaged in a trade or business in the United States for purposes of federal withholding taxes with respect to non-U.S. Persons because there is no clear authority dealing with that issue under facts substantially similar to those described herein.  Although it is not expected that the trust fund would be engaged in a trade or business in the United States for those purposes, the trust fund will withhold as if it were so engaged in order to protect the trust fund from possible adverse consequences of a failure to withhold.  The trust fund expects to withhold on the portion of its taxable income, as calculated for this purpose which may exceed the distributions to certificateholders, that is allocable to foreign certificateholders pursuant to Section 1446 of the Code, as if the income were effectively connected to a U.S. trade or business.  Subsequent adoption of Treasury regulations or the issuance of other administrative pronouncements may require the trust fund to change its withholding procedures.  In determining a holder's withholding status, the trust fund may rely on IRS Form W-8BEN, IRS Form W-9 or the holder's certification of nonforeign status signed under penalties of perjury.  A holder who is not an individual or corporation (or an entity treated as a corporation for federal income tax purposes) holding the Notes on its own behalf may have substantially increased reporting requirements.  In particular, if the holder is a foreign partnership (or foreign trust), the partners (or beneficiaries) rather than the partnership (or trust) will be required to provide the certification discussed above, and the partnership (or trust) will be required to provide certain additional information.

Each foreign holder might be required to file a U.S. individual or corporate income tax return (including, in the case of a corporation, the branch profits tax) on its share of the trust fund's income.  Each foreign holder must obtain a taxpayer identification number from the IRS and submit that number in order to assure appropriate crediting of the taxes withheld.  A foreign holder generally would be entitled to file with the IRS a claim for refund with respect to taxes withheld by the trust fund taking the position that no taxes were due because the trust fund was not engaged in a U.S. trade or business.  However, interest payments made (or accrued) to a certificateholder who is a foreign person generally will be considered guaranteed payments to the extent the payments are determined without regard to the income of the trust fund.  If these interest payments are properly characterized as guaranteed payments, then the interest will not be considered "portfolio interest." As a result, certificateholders will be subject to United States federal income tax and withholding tax at a rate of 30 percent, unless reduced or eliminated pursuant to an applicable treaty.  In that case, a foreign holder would only be entitled to claim a refund for that portion of the taxes in excess of the taxes that should be withheld with respect to the guaranteed payments.

*Backup Withholding.* Distributions made on the certificates and proceeds from the sale of the certificates will be subject to a "backup" withholding tax if, in general, the certificateholder fails to comply with certain identification procedures, unless the holder is an exempt recipient under applicable provisions of the Code.

## Other Tax Considerations

In addition to the federal income tax consequences described in "Federal Income Tax Consequences," potential investors should consider the state, local and foreign tax consequences of the acquisition, ownership, and disposition of the securities. State and local tax law may differ substantially from the corresponding federal law, and this discussion does not purport to describe any aspect of the tax laws of any state or locality. Therefore, potential investors are encouraged to consult their own tax advisors with respect to the various state, local and foreign tax consequences of an investment in the securities.

## ERISA Considerations

The Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code impose requirements on employee benefit plans (and on certain other retirement plans and arrangements, including individual retirement accounts and annuities and Keogh plans as well as collective investment funds and separate accounts in which those plans, accounts or arrangements are invested) (collectively, "Plans") subject to ERISA or to Section 4975 of the Code and on persons who bear specified relationships to Plans ("Parties in Interest") or are fiduciaries with respect to those Plans. Generally, ERISA applies to investments made by Plans. Among other things, ERISA requires that the assets of Plans be held in trust and that the trustee, or other duly authorized fiduciary, have exclusive authority and discretion to manage and control the assets of Plans. ERISA also imposes certain duties on persons who are fiduciaries of Plans. Under ERISA, any person who exercises any authority or control respecting the management or disposition of the assets of a Plan is considered to be a fiduciary of the Plan (subject to certain exceptions not here relevant). Certain employee benefit plans, such as governmental plans (as defined in ERISA Section 3(32)) and, if no election has been made under Section 410(d) of the Code, church plans (as defined in ERISA Section 3(33)), are not subject to requirements imposed by ERISA and Section 4975 of the Code. Accordingly, assets of those plans may be invested in securities without regard to the considerations described above and below, subject to the provisions of other applicable law. Any plan which is qualified and exempt from taxation under Code Sections 401(a) and 501(a) is subject to the prohibited transaction rules set forth in Code Section 503.

On November 13, 1986, the United States Department of Labor (the "DOL") issued final regulations concerning the definition of what constitutes the assets of a Plan. (Labor Reg. Section 2510.3-101 (the "Plan Assets Regulation")). Under this regulation, the underlying assets and properties of corporations, partnerships and certain other entities in which a Plan makes an "equity" investment could be deemed for purposes of ERISA to be assets of the investing Plan in certain circumstances. Under the Plan Assets Regulation, the term "equity interest" is defined as any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and has no "substantial equity features." If securities are not treated as equity interests in the issuer for purposes of the Plan Assets Regulation, a Plan's investment in the securities would not cause the assets of the issuer to be deemed plan assets. If the securities are deemed to be equity interests in the issuer, the issuer could be considered to hold plan assets because of a Plan's investment in those securities. In that event, the master servicer and other persons exercising management or discretionary control over the assets of the issuer or providing services with respect to those assets could be deemed to be fiduciaries or other parties in interest with respect to investing Plans and thus subject to the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code and, in the case of fiduciaries, to the fiduciary responsibility provisions of Title I of ERISA, with respect to transactions involving the issuer's assets. Trust certificates are "equity interests" for purposes of the Plan Asset Regulation.

In addition to the imposition of general fiduciary standards of investment prudence and diversification, ERISA and Section 4975 of the Code prohibit a broad range of transactions involving assets of a Plan and persons ("Parties in Interest") having certain specified relationships to a Plan and impose additional prohibitions where Parties in Interest are fiduciaries with respect to that Plan. Because the loans may be deemed assets of each Plan that purchases equity securities, an investment in equity securities by a Plan might be a prohibited transaction under ERISA Sections 406 and 407 and subject to an excise tax under Code Section 4975 unless a statutory, regulatory or administrative exemption applies.

Without regard to whether securities are considered to be equity interest in the issuer, certain affiliates of the issuer might be considered or might become Parties in Interest with respect to a Plan.  In this case, the acquisition or holding of the securities by or on behalf of the Plan could constitute or give rise to a prohibited transaction, within the meaning of ERISA and Section 4975 of the Code, unless they were subject to one or more exemptions.  Depending on the relevant facts and circumstances, certain prohibited transaction exemptions may apply to the purchase or holding of the securities — for example, Prohibited Transaction Class Exemption ("PTCE") 96-23, which exempts certain transactions effected on behalf of a Plan by an "in-house asset manager"; PTCE 95-60, which exempts certain transactions by insurance company general accounts; PTCE 91-38, which exempts certain transactions by bank collective investment funds; PTCE 90-1, which exempts certain transactions by insurance company pooled separate accounts; or PTCE 84-14, which exempts certain transactions effected on behalf of a Plan by a "qualified professional asset manager".  We can give no assurance that any of these exemptions will apply with respect to any Plan's investment in securities, or that such an exemption, if it did apply, would apply to all prohibited transactions that may occur in connection with the investment.  Furthermore, these exemptions would not apply to transactions involved in operation of the trust if, as described above, the assets of the trust were considered to include plan assets.

The DOL has granted to certain underwriters individual administrative exemptions (the "Underwriter Exemptions") from certain of the prohibited transaction rules of ERISA and the related excise tax provisions of Section 4975 of the Code with respect to the initial purchase, the holding and the subsequent resale by Plans of securities, including certificates, underwritten or privately placed by that underwriter or its affiliate or by a syndicate managed by that underwriter or its affiliate and issued by entities that hold investment pools consisting of certain secured receivables, loans and other obligations and the servicing, operation and management of the investment pools, provided the conditions and requirements of the Underwriter Exemptions are met.  The Exemption also permits the entity to hold an interest-rate swap or yield supplement agreement if it meets requirements set forth in the Exemption.

While each Underwriter Exemption is an individual exemption separately granted to a specific underwriter, the terms and conditions which generally apply to the Underwriter Exemptions are substantially identical, and include the following:

(1)  the acquisition of the securities by a Plan is on terms (including the price for the securities) that are at least as favorable to the Plan as they would be in an arm's-length transaction with an unrelated party;

(2)  the securities acquired by the Plan have received a rating at the time of the acquisition that is one of the four highest generic rating categories from Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), Moody's Investors Service, Inc. ("Moody's"), or Fitch Ratings, Inc. ("Fitch") (each, a "Rating Agency");

(3)  the trustee is not an affiliate of any other member of the Restricted Group, as defined below (other than an underwriter);

(4)  the sum of all payments made to and retained by the underwriters in connection with the distribution of the securities represents not more than reasonable compensation for underwriting the securities; the sum of all payments made to and retained by the seller pursuant to the assignment of the loans to the issuer represents not more than the fair market value of the loans; the sum of all payments made to and retained by the servicer and any sub-servicer represents not more than reasonable compensation for the person's services under the agreement pursuant to which the loans are pooled and reimbursements of the person's reasonable expenses in connection therewith; and

(5)  the Plan investing in the certificates is an "accredited investor" as defined in Rule 501(a)(1) of Regulation D of the SEC under the Securities Act.

The issuer must also meet the following requirements:

>  (i)   the corpus of the issuer must consist solely of assets of the type that have been included in other investment pools;

>  (ii)   securities in those other investment pools must have been rated in one of the four highest rating categories of S&P, Moody's, or Fitch for at least one year prior to the Plan's acquisition of securities; and

>  (iii) securities evidencing interests in those other investment pools must have been purchased by investors other than Plans for at least one year prior to any Plan's acquisition of securities.

Moreover, the Underwriter Exemptions generally provide relief from certain self-dealing/conflict of interest prohibited transactions that may occur when a Plan fiduciary causes a Plan to acquire securities of an issuer holding receivables as to which the fiduciary (or its affiliate) is an obligor, provided that, among other requirements:

- in the case of an acquisition in connection with the initial issuance of certificates, at least fifty percent (50%) of each class of certificates in which Plans have invested, and at least fifty percent (50%) of aggregate interests in the issuer are acquired by persons independent of the Restricted Group;

- the fiduciary (or its affiliate) is an obligor with respect to not more than five percent (5%) of the fair market value of the obligations contained in the investment pool;

- the Plan's investment in securities of any class does not exceed twenty-five percent (25%) of all of the securities of that class outstanding at the time of the acquisition;

- immediately after the acquisition, no more than twenty-five percent (25%) of the assets of any Plan with respect to which the person is a fiduciary is invested in securities representing an interest in one or more issuers containing assets sold or serviced by the same entity; and

- the Plan is not sponsored by a member of the Restricted Group, as defined below.

The Underwriter Exemptions provide only limited relief to Plans sponsored by the seller, an underwriter, the trustee, the master servicer, any provider of credit support to the trust, any counterparty to a swap contained in the trust, any obligor with respect to loans included in the investment pool constituting more than five percent (5%) of the aggregate unamortized principal balance of the assets in the trust fund, or any affiliate of those parties (the "Restricted Group").

The Underwriter Exemptions provide exemptive relief to certain mortgage-backed and asset-backed securities transactions using pre-funding accounts.  Mortgage loans or other secured receivables (the "obligations") supporting payments to securityholders, and having a value equal to no more than twenty-five percent (25%) of the total principal amount of the securities being offered by the issuer, may be transferred to the issuer within a 90-day or three-month period following the closing date, instead of being required to be either identified or transferred on or before the closing date.  The relief is available when the prefunding account satisfies certain conditions.

The rating of a security may change.  If a class of securities no longer has a required rating from at least one Rating Agency, the security will no longer be eligible for relief under the Underwriter Exemption (although a Plan that had purchased the security when it had a permitted rating would not be required by the Underwriter Exemption to dispose of it.) A certificate that satisfies the requirements of the Underwriter Exemptions other than the rating requirement may be eligible for purchase by an insurance company investing assets of its general account that include plan assets when the requirements of Sections I and III of Prohibited Transaction Class Exemption 95-60 are met.

The prospectus supplement for each series of securities will indicate the classes of securities, if any, offered thereby as to which it is expected that an Underwriter Exemption will apply.

Any Plan fiduciary which proposes to cause a Plan to purchase securities are encouraged to consult with its counsel concerning the impact of ERISA and the Code, the applicability of the Underwriter Exemptions, the effect of the Plan Assets Regulation, and the potential consequences in their specific circumstances, prior to making that investment.  Moreover, each Plan fiduciary should determine whether under the general fiduciary standards of investment prudence and diversification an investment in the securities is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio.

The sale of certificates to a Plan is in no respect a representation by the issuer or any underwriter of the Certificates that this investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that this investment is appropriate for Plans generally or any particular Plan.

## Legal Investment

The prospectus supplement for each series of securities will specify which, if any, of the classes of securities offered thereby constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984 ("SMMEA").  Classes of securities that qualify as "mortgage related securities" will be legal investments for persons, trusts, corporations, partnerships, associations, business trusts, and business entities (including depository institutions, life insurance companies and pension funds) created pursuant to or existing under the laws of the United States or of any state (including the District of Columbia and Puerto Rico) whose authorized investments are subject to state regulations to the same extent as, under applicable law, obligations issued by or guaranteed as to principal and interest by the United States or those entities.  Under SMMEA, if a state enacts legislation prior to October 4, 1991 specifically limiting the legal investment authority of those entities with respect to "mortgage related securities", securities will constitute legal investments for entities subject to the legislation only to the extent provided therein.  Approximately twenty-one states adopted the legislation prior to the October 4, 1991 deadline.  SMMEA provides, however, that in no event will the enactment of that legislation affect the validity of any contractual commitment to purchase, hold or invest in securities, or require the sale or other disposition of securities, so long as the contractual commitment was made or the securities were acquired prior to the enactment of the legislation.

SMMEA also amended the legal investment authority of federally-chartered depository institutions as follows:  federal savings and loan associations and federal savings banks may invest in, sell or otherwise deal in securities without limitations as to the percentage of their assets represented thereby, federal credit unions may invest in mortgage related securities, and national banks may purchase securities for their own account without regard to the limitations generally applicable to investment securities set forth in 12 U.S.C. 24 (Seventh), subject in each case to that regulations that the applicable federal authority may prescribe.  In this connection, federal credit unions should review the National Credit Union Administration ("NCUA") Letter to Credit Unions No. 96, as modified by Letter to Credit Unions No. 108, which includes guidelines to assist federal credit unions in making investment decisions for mortgage related securities and the NCUA's regulation "Investment and Deposit Activities" (12 C.F.R. Part 703), which sets forth certain restrictions on investment by federal credit unions in mortgage related securities (in each case whether or not the class of securities under consideration for purchase constituted a "mortgage related security").  The NCUA issued final regulations effective December 2, 1991 that restrict and in some instances prohibit the investment by Federal Credit Unions in certain types of mortgage related securities.

All depository institutions considering an investment in the securities (whether or not the class of securities under consideration for purchase constitutes a "mortgage related security") should review the Federal Financial Institutions Examination Council's Supervisory Policy Statement on the Securities Activities (to the extent adopted by their respective regulators) (the "Policy Statement") setting forth, in relevant part, certain securities trading and sales practices deemed unsuitable for an institution's investment portfolio, and guidelines for (and restrictions on) investing in mortgage derivative products, including "mortgage related securities", which are "high-risk mortgage securities" as defined in the Policy Statement.  According to the Policy Statement, those "high-risk mortgage securities" include securities not entitled to distributions allocated to principal or interest, or Subordinate Securities. Under the Policy Statement, it is the responsibility of each depository institution to determine, prior to purchase (and

at stated intervals thereafter), whether a particular mortgage derivative product is a "high-risk mortgage security", and whether the purchase (or retention) of that product would be consistent with the Policy Statement.

The foregoing does not take into consideration the applicability of statutes, rules, regulations, orders guidelines or agreements generally governing investments made by a particular investor, including, but not limited to "prudent investor" provisions, percentage-of-assets limits and provisions which may restrict or prohibit investment in securities which are not "interest bearing" or "income paying," or in securities which are issued in book-entry form.

There may be other restrictions on the ability of certain investors, including depository institutions, either to purchase securities or to purchase securities representing more than a specified percentage of the investor's assets. Investors are encouraged to consult their own legal advisors in determining whether and to what extent the securities constitute legal investments for those investors.

**Method of Distribution**

Securities are being offered hereby in series from time to time (each series evidencing or relating to a separate trust fund) through any of the following methods:

- by negotiated firm commitment or best efforts underwriting and public reoffering by underwriters, including in a resecuritization of any securities of any series by the depositor or any of its affiliates;

- by agency placements through one or more placement agents primarily with institutional investors and dealers; and

- by placement directly by the depositor with institutional investors.

A prospectus supplement will be prepared for each series which will describe the method of offering being used for that series and will set forth the identity of any underwriters thereof and either the price at which the series is being offered, the nature and amount of any underwriting discounts or additional compensation to those underwriters and the proceeds of the offering to the depositor, or the method by which the price at which the underwriters will sell the securities will be determined. Each prospectus supplement for an underwritten offering will also contain information regarding the nature of the underwriters' obligations, any material relationship between the depositor and any underwriter and, where appropriate, information regarding any discounts or concessions to be allowed or reallowed to dealers or others and any arrangements to stabilize the market for the securities so offered. In firm commitment underwritten offerings, the underwriters will be obligated to purchase all of the securities of the series if any of those securities are purchased. Securities may be acquired by the underwriters for their own accounts and may be resold from time to time in one or more transactions, including negotiated transactions, at a fixed public offering price or at varying prices determined at the time of sale.

Underwriters and agents may be entitled under agreements entered into with the depositor to indemnification by the depositor against certain civil liabilities, including liabilities under the Securities Act, or to contribution with respect to payments which the underwriters or agents may be required to make in respect thereof.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each underwriter will be required to represent and agree with the depositor that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") and with respect to any class of securities with a minimum denomination of less than $100,000, it has not made and will not make an offer of securities to the public in that Relevant Member State prior to the publication of a prospectus in relation to the securities which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of securities to the public in that Relevant Member State at any time:

      (a)      to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

      (b)      to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

      (c)      in any other circumstances which do not require the publication by the depositor of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of securities to the public" in relation to any class of securities of a series, which class has a minimum denomination of less than $100,000, in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the securities to be offered so as to enable an investor to decide to purchase or subscribe the securities, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State, and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

If a series is offered other than through underwriters, the prospectus supplement relating thereto will contain information regarding the nature of the offering and any agreements to be entered into between the depositor and purchasers of securities of the series.

## Legal Matters

The validity of the securities of each series, including certain federal income tax consequences with respect thereto, will be passed upon for the depositor by Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019, or by Thacher Proffitt & Wood LLP, Two World Financial Center, New York, New York 10281, as specified in the prospectus supplement.

## Financial Information

A new trust fund will be formed with respect to each series of securities and no trust fund will engage in any business activities or have any assets or obligations prior to the issuance of the related series of securities. Accordingly, no financial statements with respect to any trust fund will be included in this prospectus or in the related prospectus supplement.

## Rating

It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies (each, a "Rating Agency") specified in the related prospectus supplement.

The rating would be based on, among other things, the adequacy of the value of the Trust Fund Assets and any credit enhancement with respect to the class and will reflect the Rating Agency's assessment solely of the likelihood that holders of a class of securities of the class will receive payments to which the securityholders are entitled under the related Agreement.  The rating will not constitute an assessment of the likelihood that principal prepayments on the related loans will be made, the degree to which the rate of the prepayments might differ from that originally anticipated or the likelihood of early optional termination of the series of securities.  The rating should not be deemed a recommendation to purchase, hold or sell securities, inasmuch as it does not address market price or suitability for a particular investor.  Each security rating should be evaluated independently of any other security rating.  The rating will not address the possibility that prepayment at higher or lower rates than anticipated by an investor may cause the investor to experience a lower than anticipated yield or that an investor purchasing a security at a significant premium might fail to recoup its initial investment under certain prepayment scenarios.

We can give no assurance that any the rating will remain in effect for any given period of time or that it may not be lowered or withdrawn entirely by the Rating Agency in the future if in its judgment circumstances in the future so warrant.  In addition to being lowered or withdrawn due to any erosion in the adequacy of the value of the Trust Fund Assets or any credit enhancement with respect to a series, the rating might also be lowered or withdrawn among other reasons, because of an adverse change in the financial or other condition of a credit enhancement provider or a change in the rating of the credit enhancement provider's long term debt.

The amount, type and nature of credit enhancement, if any, established with respect to a series of securities will be determined on the basis of criteria established by each Rating Agency rating classes of the series.  The criteria are sometimes based upon an actuarial analysis of the behavior of mortgage loans in a larger group.  The analysis is often the basis upon which each Rating Agency determines the amount of credit enhancement required with respect to each the class.  We can give no assurance that the historical data supporting the actuarial analysis will accurately reflect future experience nor assurance that the data derived from a large pool of mortgage loans accurately predicts the delinquency, foreclosure or loss experience of any particular pool of loans.  We can give no assurance that values of any Properties have remained or will remain at their levels on the respective dates of origination of the related loans.  If the residential real estate markets should experience an overall decline in property values such that the outstanding principal balances of the loans in a particular trust fund and any secondary financing on the related Properties become equal to or greater than the value of the Properties, the rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry.  In addition, adverse economic conditions (which may or may not affect real property values) may affect the timely payment by mortgagors of scheduled payments of principal and interest on the loans and, accordingly, the rates of delinquencies, foreclosures and losses with respect to any trust fund.  To the extent that those losses are not covered by credit enhancement, the losses will be borne, at least in part, by the holders of one or more classes of the securities of the related series.

## Index to Defined Terms

Accretion Directed................................................34
Accrual ...............................................................36
Adjustable Rate .................................................35
Agency Securities..............................................12
Agreement ..........................................................13
AMT ...................................................................89
Asset Conservation Act .....................................74
Available Funds..................................................30
beneficial owner.................................................39
Book-Entry Securities........................................39
Callable...............................................................36
Capitalized Interest Account..............................56
Cash Flow Bond Method ...................................91
CERCLA .............................................................74
CI.........................................................................41
Class Security Balance .......................................30
Clearstream, Luxembourg ..................................41
Code.....................................................................80
COFI securities ...................................................38
Collateral Value .................................................16
Companion Class.................................................34
Component Securities..........................................34
Contingent Regulations.......................................81
Cooperative..........................................................42
cooperative loans................................................13
cooperatives........................................................13
Cut-off Date Principal Balance..........................28
DBC......................................................................41
Debt securities.....................................................80
Definitive Security..............................................39
depositor ..............................................................24
Detailed Description............................................13
Disqualified Organization...................................88
DOL....................................................................100
DTC......................................................................39
Eleventh District.................................................37
ERISA ...............................................................100
Euroclear..............................................................39
Euroclear Operator .............................................41
Euroclear Participants.........................................41
European Depositaries.........................................39
excess servicing ..................................................91
Exchange Act.......................................................23
FHA......................................................................13
FHLBSF...............................................................37
Final Bond Premium Regulations......................84
Financial Intermediary........................................40
Fitch...................................................................101
Fixed Rate............................................................35
Floating Rate .......................................................35
foreign person......................................................95
Funding Period ....................................................56
Garn-St Germain Act...........................................76

Improper Knowledge...........................................88
Indenture..............................................................28
Indirect Participants............................................40
Insurance Proceeds..............................................55
Insured Expenses.................................................54
Interest Only........................................................35
Interest Weighted Securities...............................83
Inverse Floating Rate..........................................35
IRS.......................................................................81
L/C Bank.............................................................45
L/C Percentage ...................................................45
Liquidation Expenses .........................................55
Liquidation Proceeds ..........................................55
Loan Rate.............................................................14
Loan-to-Value Ratio ...........................................16
Master Servicing Agreement ..............................12
Master Servicing Fee ..........................................64
Moody's.............................................................101
Mortgage..............................................................52
mortgage related security..................................103
NAS......................................................................34
National Cost of Funds Index .............................38
NCUA.................................................................103
New CI .................................................................41
new partnership ...................................................98
Non-Accelerated Senior .....................................34
Non-Agency Mortgage-Backed Securities .........12
Noneconomic Residual Interest..........................88
Nonresidents........................................................93
Notional Amount Securities ...............................34
obligations.........................................................102
Offshore Location...............................................89
OID......................................................................80
OID Regulations .................................................80
old partnership ....................................................98
OTS......................................................................38
PACs....................................................................34
Partial Accrual ....................................................35
Participants ..........................................................40
Parties in Interest..............................................100
Pass-Through Securities .....................................90
Pay-Through Security..........................................82
Permitted Investments.........................................57
Plan Assets Regulation .....................................100
Planned Principal Class.......................................34
Plans..................................................................100
Policy Statement................................................103
Pool Insurance Policy .........................................47
Pool Insurer.........................................................47
Pooling and Servicing Agreement ......................12
Pre-Funded Amount ............................................56
Pre-Funding Account...........................................56
Prepayment Assumption......................................82

Primary Mortgage Insurance Policy ......................15
Prime Rate ............................................................39
Principal Only.......................................................35
Principal Prepayments ...........................................31
Properties.............................................................14
PTCE ..................................................................101
Purchase Price ......................................................27
Rating Agency ............................................101, 105
Ratio Strip Securities ............................................91
RCRA...................................................................74
Record Date..........................................................29
Reference Bank Rate .............................................36
Refinance Loan.....................................................16
Regular Interest Securities.....................................80
Relevant Depositary ..............................................39
Relevant Implementation Date ............................104
Relevant Member State ........................................104
Relief Act.........................................................7, 77
REMIC..........................................................29, 80
Residual Interest ...................................................86
Restricted Group .................................................102
Retained Interest...................................................28
Rules....................................................................40
S&P ...................................................................101
Sale and Servicing Agreement...............................12
Scheduled Principal Class .....................................34
SEC......................................................................13
secured creditor exemption....................................74
Securities Act........................................................23
Security Account ..................................................54

Security Owners ...................................................39
Security Register...................................................29
Sellers..................................................................12
Senior Securities...................................................44
Sequential Pay ......................................................34
Servicing Fee........................................................90
Short-Term Note....................................................95
Single Family Properties .......................................15
SMMEA .............................................................103
Strip ....................................................................35
Stripped Securities................................................90
Subordinate Securities...........................................44
Subsequent Loans..................................................56
Super Senior .........................................................35
Support Class........................................................35
TACs ...................................................................35
Targeted Principal Class........................................35
Tax Counsel..........................................................79
Terms and Conditions............................................42
Title V..................................................................77
Trust Agreement ...................................................13
Trust Fund Assets..................................................12
UCC.....................................................................73
Underwriter Exemptions......................................101
VA.......................................................................13
VA Guaranty.........................................................63
Variable Rate........................................................35
Voting Rights........................................................66
W-8BEN................................................................95
Withholding Agent ................................................95

[This Page Intentionally Left Blank]

[This Page Intentionally Left Blank]

# Alternative Loan Trust 2006-J3
**Issuer**

# CWALT, INC.
**Depositor**



**HOME LOANS**
**Sponsor and Seller**

## Countrywide Home Loans Servicing LP
**Master Servicer**

## $253,461,322
**(Approximate)**

## Mortgage Pass-Through Certificates, Series 2006-J3

————————————

**Prospectus Supplement**

————————————

# Countrywide Securities Corporation

You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. We have not authorized anyone to provide you with different information.

We are not offering the Series 2006-J3 Mortgage Pass-Through Certificates in any state where the offer is not permitted.

Dealers will deliver a prospectus supplement and prospectus when acting as underwriters of the Series 2006-J3 Mortgage Pass-Through Certificates and with respect to their unsold allotments or subscriptions. In addition, all dealers selling the Series 2006-J3 Mortgage Pass-Through Certificates will be required to deliver a prospectus supplement and prospectus until 90 days after the date of this prospectus supplement.

April 27, 2006

# EXHIBIT 4

| **ASSET**<br><br>**PURCHASE** | Settlement Date<br>**6/14/2006** | | FHLB Trader<br>**Cathy Hewlett** | |
|---|---|---|---|---|
| | Trade Date<br>**6/9/2006** | | Broker<br>**John B/Countrywide** | |
| | Customer Ref   /   Citibank Ref | | Date<br>6/9/2006 | Time<br>11:50 a.m. |
| | Input by | Authorized by | Control<br># | |

| Description:   SEQ          WA_30          B09 | Par/Original Face |
|---|---|
| **CWALT 06-J3**   $o\ 153939$ | **56,055,000.00** |
| | MAY FACTOR |
| **1A3** | **0.992774953** |

| Rate | Maturity | Issue | 1st Payment |
|---|---|---|---|
| **6** | **5.25/2036** | **4/1/2006** | |

Current Face

**55,650,000.00**

Price

**99.31640625**

| Yield | Day Count |
|---|---|
| **6.17** | **30/360** |

Principal

**55,269,580.08**

| Broker/Delivery Instructions          Broker #          **2086** |
|---|

# of Days          13

Interest          **120,575.00**

**Countrywide    Joe Pennisi  (212) 421-2050**

Total

Settle via          **DTC**

**55,390,155.08**

| Money<br>Market Code _____ | Entered by _____ | CUSIP | **021469AC5** |
|---|---|---|---|
| GL Group _____ | Date _____ | | |
| FAS 115   **HTM** | Position ID _____ | | |

| | Debt | | Debt | | Debt | Debt | Debt |
|---|---|---|---|---|---|---|---|
| Type | 1yr | 2YR | 3 yr | 4yr | 5yr | 3NC1 | 7NC3 |
| Amount | 4 | 6 | 4 | 9 | 10 | 8 | 11 |
| Cusip / Hedge ID | 3133XFVT0/3133XFJX5 | | 3133XFLG9/3133XFLE4 | | 3133XFJY3 | 3133XFQN9 | 3133XFW44 |

| CWA06J03,1A3 | PREPAY MODEL AA_30 | | | | CMO — ALTA |
|---|---|---|---|---|---|
| AVG LIFE   -300 | BASE   +300 | WAM  357   WAC 6.40 | | | Original |
| .96 | 5.45      6.11 | 30 YR ALT A | | | Accounting |
| | +122/CVE/100PPC/3.71 YR AL | | | | MDO (2 copies) |

MCB0617

# EXHIBIT 5

**PROSPECTUS SUPPLEMENT**
(To Prospectus dated August 29, 2006)

# $185,251,552
**(Approximate)**

# CWALT, INC.
**Depositor**



**HOME LOANS**
**Sponsor and Seller**

## Countrywide Home Loans Servicing LP
**Master Servicer**

## Alternative Loan Trust 2006-J6
**Issuing Entity**

## Mortgage Pass-Through Certificates, Series 2006-J6
**Distributions payable monthly, beginning October 25, 2006**

The issuing entity will issue certificates, including the following classes of certificates, that are offered pursuant to this prospectus supplement and the accompanying prospectus:

| | Initial Class Certificate Balance/Initial Notional Amount(1) | Pass-Through Rate(2) | | Initial Class Certificate Balance/Initial Notional Amount(1) | Pass-Through Rate(2) |
|---|---|---|---|---|---|
| Class A-1 | $61,000,000 | Floating | Class X | $185,515,866(3) | Variable |
| Class A-2 | $61,000,000(3) | Floating | Class PO | $      66,952 | (4) |
| Class A-3 | $65,500,000 | 6.00% | Class A-R | $            100 | 6.00% |
| Class A-4 | $11,750,000 | 6.00% | Class M | $   5,523,500 | 6.00% |
| Class A-5 | $35,900,000 | 6.00% | Class B-1 | $   1,498,000 | 6.00% |
| Class A-6 | $ 2,100,000 | 6.00% | Class B-2 | $   1,217,000 | 6.00% |
| Class A-7 | $    696,000 | 6.00% | | | |

**Consider carefully the risk factors beginning on page S-17 in this prospectus supplement and on page 2 in the prospectus.**

The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of CWALT, Inc., Countrywide Home Loans, Inc. or any of their affiliates.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

(1) This amount is subject to a permitted variance in the aggregate of plus or minus 5%.

(2) The classes of certificates offered by this prospectus supplement together with their pass through rates, the method of calculating their pass through rates and their initial ratings are listed in the tables under "Summary — Description of the Certificates" beginning on page S-7 of this prospectus supplement.

(3) The Class A-2 and Class X Certificates are interest only notional amount certificates. The initial notional amounts of the Class A-2 and Class X Certificates are set forth in the table but are not included in the aggregate certificate balance of all the certificates offered.

(4) The Class PO Certificates are principal only certificates and will not accrue interest.

This prospectus supplement and the accompanying prospectus relate only to the offering of the certificates listed above and not to the other classes of certificates that will be issued by the issuing entity. The certificates represent interests in a pool consisting of 30-year conventional fixed rate mortgage loans secured by first liens on one- to four-family residential properties.

Credit enhancement for the offered certificates consists of subordination.

The credit enhancement for each class of certificates varies. Not all credit enhancement is available for every class. The credit enhancement for the certificates is described in more detail in this prospectus supplement.

The Class A-1 Certificates also will have the benefit of an interest rate corridor contract.

**These securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of this prospectus supplement or the prospectus. Any representation to the contrary is a criminal offense.**

Countrywide Securities Corporation will offer the classes of certificates listed above to the public at varying prices to be determined at the time of sale. The proceeds to the depositor from the sale of these classes of certificates are expected to be approximately $185,785,614, plus accrued interest, before deducting expenses. The offered certificates will be purchased by Countrywide Securities Corporation on or about September 29, 2006. See "Method of Distribution" in this prospectus supplement. The offered certificates (other than the Class A-R Certificates) will be available for delivery to investors in book-entry form through the facilities of the Depository Trust Company and the Euroclear System.

## Countrywide Securities Corporation

September 26, 2006

## Table of Contents

**Prospectus Supplement**                    **Page**                                                          **Page**

Summary...................................................... S-4
Risk Factors ............................................... S-17
The Mortgage Pool ..................................... S-24
    General ................................................ S-24
    Assignment of the Mortgage Loans................ S-39
    Conveyance of Supplemental Mortgage
        Loans ........................................... S-40
    Underwriting Process – Countrywide Home
        Loans, Inc. ................................... S-42
    Underwriting Process – American Home
        Mortgage Corp........................... S-47
    Underwriting Process – General ..................... S-49
Servicing of Mortgage Loans ............................. S-49
    General ................................................ S-49
    Countrywide Home Loans Servicing LP ......... S-50
    Countrywide Home Loans................................ S-50
    Mortgage Loan Production ............................ S-51
    Loan Servicing........................................ S-52
    Collection Procedures..................................... S-52
    Servicing Compensation and Payment of
        Expenses ..................................... S-53
    Adjustment to Servicing Compensation in
        Connection with Certain Prepaid
        Mortgage Loans........................... S-53
    Advances .............................................. S-54
    Certain Modifications and Refinancings ......... S-54
The Issuing Entity........................................... S-55
Static Pool Data .............................................. S-55
Description of the Certificates ............................ S-55
    General ................................................ S-55
    Calculation of Class Certificate Balance ......... S-57
    Notional Amount Certificates........................ S-57
    Book-Entry Certificates; Denominations......... S-58
    Determination of LIBOR.............................. S-62
    Payments on Mortgage Loans; Accounts ........ S-62
    Investments of Amounts Held in Accounts ..... S-64
    Fees and Expenses ..................................... S-66
    Distributions .......................................... S-68
    Priority of Distributions Among Certificates... S-68
    Interest ................................................ S-69
    Allocation of Net Interest Shortfalls............... S-70
    The Corridor Contract ................................ S-71
    The Corridor Contract Reserve Fund.............. S-73
    Principal................................................ S-73
    Allocation of Losses .................................. S-80
    Reports to Certificateholders ......................... S-81
    Structuring Assumptions .............................. S-81
    Optional Purchase of Defaulted Loans and
        Certain Delinquent Loans............... S-83
    Optional Termination ................................ S-83
    Events of Default; Remedies ......................... S-84

Certain Matters Regarding the Master
    Servicer, the Depositor and the Sellers ....... S-85
The Trustee .................................................... S-85
Voting Rights................................................. S-86
Restrictions on Transfer of the Class A-R
    Certificates........................................ S-86
Ownership of the Residual Certificates .......... S-86
Restrictions on Investment, Suitability
    Requirements..................................... S-87
Yield, Prepayment and Maturity
    Considerations.................................... S-87
General .......................................................... S-87
Prepayment Considerations and Risks............. S-87
Mandatory Prepayment.................................. S-89
Sensitivity of the Inverse Floating Rate
    Certificates........................................ S-89
Sensitivity of the Class X Certificates ........... S-90
Sensitivity of the Class PO Certificates .......... S-91
Weighted Average Lives of the Offered
    Certificates........................................ S-92
Decrement Tables.......................................... S-92
Last Scheduled Distribution Date ................... S-97
The Subordinated Certificates ........................ S-97
Credit Enhancement ...................................... S-98
    Subordination ...................................... S-98
Use of Proceeds.............................................. S-98
Legal Proceedings.......................................... S-98
Material Federal Income Tax Consequences....... S-98
Other Taxes................................................. S-102
ERISA Considerations.................................. S-103
Method of Distribution ................................. S-105
Legal Matters............................................... S-105
Ratings......................................................... S-105
Global Clearance, Settlement And Tax
    Documentation Procedures...................... S-107
    Initial Settlement................................. S-107
    Secondary Market Trading ...................... S-107
    Certain U.S. Federal Income Tax
        Documentation Requirements.......... S-109

**Prospectus**                                                    **Page**

Important Notice About Information in
   This Prospectus and Each Accompanying
   Prospectus Supplement ........................................1
Risk Factors ....................................................2
The Trust Fund ...............................................12
Use of Proceeds ..............................................24
The Depositor ................................................24
Loan Program ................................................25
Static Pool Data .............................................27
Description of the Securities.................................28
Credit Enhancement ........................................43
Yield, Maturity and Prepayment Considerations.....49
The Agreements...............................................52
Certain Legal Aspects of the Loans.......................71
Material Federal Income Tax Consequences...........79
Other Tax Considerations.................................100
ERISA Considerations....................................100
Legal Investment ...........................................104
Method of Distribution ...................................105
Legal Matters...............................................106
Financial Information .....................................106
Rating ........................................................106
Index to Defined Terms ..................................108

## Summary

**This summary highlights selected information from this document and does not contain all of the information that you need to consider in making your investment decision. To understand all of the terms of an offering of the certificates, read carefully this entire document and the accompanying prospectus.**

**While this summary contains an overview of certain calculations, cash flow priorities and other information to aid your understanding, you should read carefully the full description of these calculations, cash flow priorities and other information in this prospectus supplement and the accompanying prospectus before making any investment decision.**

### Issuing Entity

Alternative Loan Trust 2006-J6, a common law trust formed under the laws of the State of New York.

*See "The Issuing Entity" in this prospectus supplement.*

### Depositor

CWALT, Inc., a Delaware corporation, is a limited purpose finance subsidiary of Countrywide Financial Corporation. Its address is 4500 Park Granada, Calabasas, California 91302, and its telephone number is (818) 225-3000.

*See "The Depositor" in the prospectus.*

### Sponsor and Sellers

Countrywide Home Loans, Inc. will be the sponsor of the transaction and a seller of a portion of the mortgage loans. The remainder of the mortgage loans will be sold directly to the depositor by one or more special purpose entities that were established by Countrywide Financial Corporation or one of its subsidiaries, which acquired the mortgage loans they are selling directly from Countrywide Home Loans, Inc.

*See "Servicing of Mortgage Loans — Countrywide Home Loans" in this prospectus supplement.*

### Originators

The sponsor originated approximately 6.61% of the initial mortgage loans. Additionally, approximately 52.92% of the initial mortgage loans were originated by American Home Mortgage Corp. The remainder of the initial mortgage loans were originated by various other originators, which, individually, originated less than 10% of the initial mortgage loans. No originator will have originated 50.00% or more of the mortgage loans in the final mortgage pool.

*See "The Mortgage Pool — Underwriting Process— Countrywide Home Loans" and "The Mortgage Pool — Underwriting Process — American Home Mortgage Corp." in this prospectus supplement.*

### Master Servicer

Countrywide Home Loans Servicing LP.

*See "Servicing of Mortgage Loans — Countrywide Home Loans Servicing LP" in this prospectus supplement.*

### Servicers

Countrywide Home Loans Servicing LP is servicing approximately 97.75% of the initial mortgage loans. The remainder of the initial mortgage loans are being serviced by various other servicers. All of the supplemental mortgage loans will be serviced by Countrywide Home Loans Servicing LP.

*See "Servicing of Mortgage Loans —Countrywide Home Loans Servicing LP."*

### Trustee

The Bank of New York.

*See "Description of the Certificates — The Trustee" in this prospectus supplement.*

### Pooling and Servicing Agreement

The pooling and servicing agreement among the sellers, the master servicer, the depositor and the trustee, under which the issuing entity will be formed.

### Cut-off Date

For any mortgage loan conveyed to the issuing entity on the closing date, the later of September 1, 2006 and the date of origination of that mortgage loan (referred to as the "initial cut-off date").

For any mortgage loan conveyed to the issuing entity after the closing date, the later of the origination date of that mortgage loan and the first day of the month of the conveyance to the issuing entity.

**Closing Date**

On or about September 29, 2006.

**Pre-Funding**

If the aggregate stated principal balance as of the initial cut-off date of the mortgage loans conveyed to the issuing entity on the closing date is less than $187,217,508, an account (the "pre-funding account") will be established with the trustee on the closing date and funded in an amount equal to the difference (referred to as the "pre-funded amount").

*Pre-Funded Amount:*

As of the date of this prospectus supplement, the pre-funded amount to be deposited in the pre-funding account is expected to be approximately $34,910,520.

*Funding Period:*

If there is a pre-funded amount deposited into the pre-funding account on the closing date, the funding period will begin on the closing date and end on the earlier of (x) the date the amount in the pre-funding account is less than $150,000 and (y) October 31, 2006.

*Use of Pre-Funded Amount:*

Any pre-funded amount deposited in the pre-funding account on the closing date is expected to be used to purchase supplemental mortgage loans. Any pre-funded amount not used during the funding period to purchase supplemental mortgage loans will be distributed to holders of the senior certificates as a prepayment of principal on the distribution date immediately following the end of the funding period.

*Capitalized Interest Account*

Because some of the mortgage loans may not be acquired by the issuing entity until after the closing date, there may not be sufficient interest collections from the mortgage loans to pay all of the interest due on the certificates on the first and possibly second distribution dates. If the pre-funding account is funded, a capitalized interest account will be

established and funded on the closing date to cover those shortfalls.

*Restrictions on Supplemental Mortgage Loan Purchases:*

Purchases of supplemental mortgage loans are subject to the same criteria as the initial mortgage loans and additional restrictions related to the composition of the mortgage loan group following the acquisition of the supplemental mortgage loans, as described in this prospectus supplement.

**The Mortgage Loans**

The mortgage loans will consist of 30-year conventional, fixed-rate mortgage loans secured by first liens on one- to four- family residential properties.

The mortgage loans for which statistical information is presented in this prospectus supplement are referred to as the initial mortgage loans. The statistical information presented in this prospectus supplement regarding the initial mortgage loans is as of the initial cut-off date. The depositor believes that the information set forth in this prospectus supplement regarding the initial mortgage loans as of the initial cut-off date is representative of the characteristics of the mortgage loans that will be delivered on the closing date (the initial mortgage loans and any additional mortgage loans delivered on the closing date are referred to as the "Closing Date Mortgage Loans"). However, the statistical information presented in this prospectus supplement does not reflect all of the mortgage loans that may be included in the issuing entity. Supplemental mortgage loans may be included during the funding period. Further, certain initial mortgage loans may prepay or may be determined not to meet the eligibility requirements for inclusion in the final mortgage pool. A limited number of mortgage loans may be substituted for the mortgage loans that are described in this prospectus supplement. Any substitution will not result in a material difference in the closing date mortgage pool although the cut-off date information regarding the actual mortgage loans may vary somewhat from the information regarding the initial mortgage loans presented in this prospectus supplement.

As of the initial cut-off date, the initial mortgage loans in the mortgage pool had the following characteristics:

| | |
|---|---|
| Aggregate Current Principal Balance | $152,306,988 |
| Geographic Concentrations in excess of 10%: | |
| California | 39.15% |
| Florida | 12.24% |
| Weighted Average Original LTV Ratio | 73.48% |
| Weighted Average Mortgage Rate | 6.770% |
| Range of Mortgage Rates | 6.125% to 7.375% |
| Average Current Principal Balance | $442,753 |
| Range of Current Principal Balances | $47,853 to $2,800,000 |
| Weighted Average Remaining Term to Maturity | 358 months |
| Weighted Average FICO Credit Score | 726 |

See "The Mortgage Pool" in this prospectus supplement.

## Description of the Certificates

The issuing entity will issue the following classes of certificates:

| Class | Initial Class Certificate Balance/Initial Notional Amount (1) | Type | Initial Rating Fitch (2) | Initial Rating Moody's (2) | Initial Rating S&P (2) |
|---|---|---|---|---|---|
| *Offered Certificates* | | | | | |
| Class A-1 | $ 61,000,000 | Senior/Floating Pass-Through Rate | AAA | Aaa | AAA |
| Class A-2 | $ 61,000,000 | Senior/Inverse Floating Pass-Through Rate/Notional Amount/Interest Only | AAA | Aaa | AAA |
| Class A-3 | $ 65,500,000 | Senior/Fixed Pass-Through Rate | AAA | Aaa | AAA |
| Class A-4 | $ 11,750,000 | Senior/Fixed Pass-Through Rate/Super Senior | AAA | Aaa | AAA |
| Class A-5 | $ 35,900,000 | Senior/Fixed Pass-Through Rate/NAS/Super Senior | AAA | Aaa | AAA |
| Class A-6 | $ 2,100,000 | Senior/Fixed Pass-Through Rate/NAS/Support | AAA | Aa1 | AAA |
| Class A-7 | $ 696,000 | Senior/Fixed Pass-Through Rate/Support | AAA | Aa1 | AAA |
| Class X | $ 185,515,866 | Senior/Notional Amount/Variable Pass-Through Rate/Interest-Only | AAA | Aaa | AAA |
| Class PO | $ 66,952 | Senior/Principal Only | AAA | Aaa | AAA |
| Class A-R | $ 100 | Senior/Fixed Pass-Through Rate/Residual | AAA | Aaa | AAA |
| Class M | $ 5,523,500 | Subordinate/Fixed Pass-Through Rate | AA | N/R | N/R |
| Class B-1 | $ 1,498,000 | Subordinate/Fixed Pass-Through Rate | A | N/R | N/R |
| Class B-2 | $ 1,217,000 | Subordinate/Fixed Pass-Through Rate | BBB | N/R | N/R |
| *Non-Offered Certificates (3)* | | | | | |
| Class B-3 | $ 749,000 | Subordinate/Fixed Pass-Through Rate | | | |
| Class B-4 | $ 655,300 | Subordinate/Fixed Pass-Through Rate | | | |
| Class B-5 | $ 561,655 | Subordinate/Fixed Pass-Through Rate | | | |
| Class P | $100 (4) | Prepayment Charges | | | |

_____

(1)   This amount is subject to a permitted variance in the aggregate of plus or minus 5% depending on the amount of mortgage loans actually delivered on the closing date.

(2) The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings ("Fitch"), Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P"). "N/R" indicates that the agency was not asked to rate the certificates. The Class B-3, Class B-4 and Class B-5 Certificates are not offered by this prospectus supplement, so ratings for those classes of certificates have not been provided. A rating is not a recommendation to buy, sell or hold securities. These ratings may be lowered or withdrawn at any time by either of the rating agencies. *See "Ratings" in this prospectus supplement.*

(3) The Class B-3, Class B-4, Class B-5 and Class P Certificates are not offered by this prospectus supplement. Any information contained in this prospectus supplement with respect to the Class B-3, Class B-4, Class B-5 and Class P Certificates is provided only to permit a better understanding of the offered certificates.

(4) The Class P Certificates also have a notional amount equal to the aggregate stated principal balance as of the cut-off date of the mortgage loans that require the payment of a prepayment charge.

The certificates also will have the following characteristics:

| Class | Pass-Through Rate | Interest Accrual Period | Interest Accrual Convention |
|---|---|---|---|
| *Offered Certificates* | | | |
| Class A-1 | LIBOR + 0.50% (1) | (2) | 30/360 (4) |
| Class A-2 | 5.50% - LIBOR (1) | (2) | 30/360 (4) |
| Class A-3 | 6.00% | calendar month (3) | 30/360 (4) |
| Class A-4 | 6.00% | calendar month (3) | 30/360 (4) |
| Class A-5 | 6.00% | calendar month (3) | 30/360 (4) |
| Class A-6 | 6.00% | calendar month (3) | 30/360 (4) |
| Class A-7 | 6.00% | calendar month (3) | 30/360 (4) |
| Class PO | (5) | N/A | N/A |
| Class X | (6) | calendar month (3) | 30/360 (4) |
| Class A-R | 6.00% | calendar month (3) | 30/360 (4) |
| Class M | 6.00% | calendar month (3) | 30/360 (4) |
| Class B-1 | 6.00% | calendar month (3) | 30/360 (4) |
| Class B-2 | 6.00% | calendar month (3) | 30/360 (4) |
| | | | |
| *Non-Offered Certificates* | | | |
| Class B-3 | 6.00% | calendar month (3) | 30/360 (4) |
| Class B-4 | 6.00% | calendar month (3) | 30/360 (4) |
| Class B-5 | 6.00% | calendar month (3) | 30/360 (4) |
| Class P | N/A | N/A | N/A |

(1) The pass-through rates on the LIBOR Certificates may adjust monthly based on the level of one-month LIBOR, subject to a cap. LIBOR for the related interest accrual period is calculated as described in this prospectus supplement under *"Description of the Certificates – Determination of LIBOR."*

(2) The interest accrual period for any distribution date will be the one-month period commencing on the 25th day of the month prior to the month in which that distribution date occurs and ending on the 24th day of the month of that distribution date.

(3) The interest accrual period for any distribution date will be the calendar month before the month of that distribution date.

(4) Interest will accrue at the rate described in this table on the basis of a 360 day year divided into twelve 30 day months.

(5) The Class PO Certificates are principal only certificates and are not entitled to any distributions of interest. See *"Description of the Certificates"* in this prospectus supplement.

(6) The pass-through rate for the Class X Certificates for the interest accrual period related to any distribution date will be equal to the weighted average of the net mortgage rates of the non-discount mortgage loans, weighted on the basis of the stated principal balance thereof as of the due date in the preceding calendar month (after giving effect to prepayments received in the prepayment period related to such prior due date) *less* 6.00%. *See "Description of the Certificates — Interest" in this prospectus supplement.*

### Designations

We sometimes use the following designations to refer to the specified classes of certificates in order to aid your understanding of the offered certificates.

| Designation | Classes of Certificates |
|---|---|
| Senior Certificates | Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class PO, Class X and Class A-R Certificates |
| Subordinated Certificates | Class M and Class B Certificates |
| Class A Certificates | Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6 and Class A-7 Certificates |
| Class B Certificates | Class B-1, Class B-2, Class B-3, Class B-4 and Class B-5 Certificates |
| Notional Amount Certificates | Class A-2 and Class X Certificates |
| LIBOR Certificates | Class A-1 and Class A-2 Certificates |
| Offered Certificates | Senior Certificates, Class M, Class B-1 and Class B-2 Certificates |

### Record Date

The last business day of the month preceding the month of that distribution date.

### Denominations

*Offered Certificates other than the Class A-4 and Class A-R Certificates:*

$25,000 and multiples of $1 in excess thereof.

*Class A-4 Certificates:*

$1,000 and multiples of $1 in excess thereof.

*Class A-R Certificates:*

Two certificates of $99.99 and $0.01, respectively.

### Registration of Certificates

*Offered Certificates other than the Class A-R Certificates:*

Book-entry form. Persons acquiring beneficial ownership interests in the offered certificates (other than the Class A-R Certificates) will hold their beneficial interests through The Depository Trust Company, in the United States, or Clearstream, Luxembourg or the Euroclear System, in Europe.

*Class A-R Certificates:*

Fully registered certificated form. The Class A-R Certificates will be subject to certain restrictions on transfer described in this prospectus supplement and as more fully provided for in the pooling and servicing agreement.

*See "Description of the Certificates — Book-Entry Certificates, Denominations" and "— Restrictions on Transfer of the Class A-R Certificates" in this prospectus supplement.*

### Distribution Dates

Beginning on October 25, 2006, and thereafter on the 25th day of each calendar month, or if the 25th is not a business day, the next business day.

### Last Scheduled Distribution Date

The last scheduled distribution date for the certificates is the distribution date in September 2036. Since the rate of distributions in reduction of the class certificate balance or notional amount of each class of offered certificates will depend on the rate of payment (including prepayments) of the mortgage loans, the class certificate balance or notional amount of any class could be reduced to zero significantly earlier or later than the last scheduled distribution date. *See "Yield, Prepayment and Maturity Considerations – Last Scheduled Distribution Date" in this prospectus supplement.*

### Interest Payments

The related interest accrual period, interest accrual convention and pass-through rate for each class of interest-bearing certificates is shown in the table on page S-8.

On each distribution date, to the extent funds are available, each class of interest-bearing certificates will be entitled to receive:

- interest accrued at the applicable pass-through rate during the related interest accrual period on the class certificate balance or notional amount, as applicable, immediately prior to that distribution date; and

- any interest remaining unpaid from prior distribution dates; less

- any net interest shortfalls allocated to that class for that distribution date.

The Class PO Certificates do not bear interest.

*See "Description of the Certificates — Interest" in this prospectus supplement.*

### Allocation of Net Interest Shortfalls

For any distribution date, the interest entitlement for each class of certificates will be reduced by the amount of net interest shortfalls experienced by the mortgage loans resulting from:

- prepayments on the mortgage loans; and

- reductions in the interest rate on the related mortgage loans due to Servicemembers Relief Act reductions or debt service reductions.

Net interest shortfalls on any distribution date will be allocated pro rata among all interest-bearing senior and subordinate classes entitled to receive distributions of interest on that distribution date, based on their respective entitlements, in each case before taking into account any reduction in the amounts from net interest shortfalls.

If on any distribution date, available funds are not sufficient to make a full distribution of the interest entitlement on the certificates in the order described below under *"— Priority of Distributions Among Certificates",* interest will be distributed on each class of certificates, pro rata, based on their respective entitlements.  Any unpaid interest amount will be carried forward and added to the amount holders of each affected class of certificates  will be entitled to receive on the next distribution date.

*See "Description of the Certificates — Interest" and "—Allocation of Interest Shortfalls" in this prospectus supplement.*

### Corridor Contract

A supplemental interest trust created under the pooling and servicing agreement will have the benefit of an interest rate corridor contract with respect to the Class A-1 Certificates.

On or prior to the corridor contract termination date, amounts received by the trustee, on behalf of the supplemental interest trust, in respect of the corridor contract will be available as described in this prospectus supplement to make payments of the yield supplement amount to the Class A-1 Certificates if LIBOR (as calculated for the interest accrual period related to that distribution date) exceeds 5.50%, with a ceiling of 9.00%.

### Principal Payments

On each distribution date, certificateholders will only receive a distribution of principal on their certificates if there is cash available on that date for the payment of principal according to the principal distribution rules described in this prospectus supplement.

Generally, all payments and other amounts in respect of principal of the mortgage loans will be allocated between the Class PO Certificates, on the one hand, and the senior certificates (other than the notional amount certificates and the Class PO Certificates) and the subordinated certificates, on the other hand, in each case based on the applicable PO percentage and the applicable non-PO percentage, respectively, of those amounts.  The non-PO percentage with respect to any mortgage loan with a net mortgage rate less than 6.00% will be equal to the net mortgage rate divided by 6.00% and the PO percentage of that mortgage loan will be equal to 100% minus that non-PO percentage.  With respect to a mortgage loan with a net mortgage rate equal to or greater than 6.00%, the non-PO percentage will be 100% and the PO percentage will be 0%.  The applicable non-PO percentage of those amounts will be allocated to the senior certificates (other than the notional amount certificates and the Class PO Certificates) as set forth below, and any remainder of the non-PO amount is allocated to the subordinated certificates:

- in the case of scheduled principal collections on the mortgage loans, the amount allocated to the senior certificates is based on the ratio of the aggregate class certificate balance of the senior certificates to the aggregate class certificate balance of all certificates, other than the Class PO Certificates; and

- in the case of principal prepayments, the amount allocated to the senior certificates is based on a fixed percentage (equal to 100%) until the fifth anniversary of the first distribution date, at which time the percentage will step down as described herein, if the specified conditions are met.

Notwithstanding the foregoing, no decrease in the senior prepayment percentage will occur unless certain conditions related to the loss and delinquency performance of the mortgage loans are satisfied.

Principal will be distributed on each class of certificates entitled to receive principal payments as described below under "—*Amounts Available for Distributions on the Certificates*."

The Class X Certificates do not have a class certificate balance and are not entitled to distributions of principal but will bear interest during each interest accrual period on its notional amount.

See *"Description of the Certificates — Principal" in this prospectus supplement.*

### *Amounts Available for Distributions on the Certificates*

The amount available for distributions on the certificates on any distribution date will generally consist of the following amounts (after the fees and expenses described under the next heading are subtracted):

- all scheduled installments of interest and principal due and received on the mortgage loans in the applicable period, together with any advances with respect to them;

- all proceeds of any primary mortgage guaranty insurance policies and any other insurance policies with respect to the mortgage loans, to the extent the proceeds are not applied to the restoration of the related mortgaged property or released to the borrower in accordance with the master servicer's normal servicing procedures;

- net proceeds from the liquidation of defaulted mortgage loans during the applicable period, by foreclosure or otherwise during the calendar month preceding the month of the distribution date (to the extent the amounts do not exceed the unpaid principal balance of the mortgage loan, plus accrued interest);

- subsequent recoveries with respect to mortgage loans;

- partial or full prepayments collected during the applicable period, together with interest paid in connection with the prepayment (other than certain excess amounts payable to the master servicer) and the compensating interest; and

- any substitution adjustment amounts or purchase price in respect of a deleted mortgage loan or a mortgage loan repurchased by a seller or originator or purchased by the master servicer during the applicable period.

Fees and Expenses

The amounts available for distributions on the certificates on any distribution date generally will not include the following amounts:

- the master servicing fee and additional servicing compensation (as described in this prospectus supplement under *"Servicing of Mortgage Loans— Servicing Compensation and Payment of Expenses"* and *"Description of the Certificates —Priority of Distributions Among Certificates"*) due to the master servicer;

- the trustee fee due to the trustee;

- lender paid mortgage insurance premiums, if any;

- the amounts in reimbursement for advances previously made and other amounts as to which the master servicer and the trustee are entitled to be reimbursed from the Certificate Account pursuant to the pooling and servicing agreement;

- all prepayment charges (which are distributable only to the Class P Certificates); and

- all other amounts for which the depositor, a seller or the master servicer is entitled to be reimbursed.

Any amounts paid from amounts collected with respect to the mortgage loans will reduce the amount that could have been distributed to the certificateholders.

### *Servicing Compensation*

*Master Servicing Fee:*

The master servicer will be paid a monthly fee (referred to as the master servicing fee) with respect to each mortgage loan.  The master servicing fee will

equal one-twelfth of the stated principal balance of each mortgage loan multiplied by the master servicer fee rate for that mortgage loan. The master servicer fee rate for each mortgage loan will range from 0.200% to 0.250% per annum. As of the initial cut-off date, the weighted average master servicing fee rate will be approximately 0.212% per annum. The amount of the master servicing fee is subject to adjustment with respect to certain prepaid mortgage loans, as described under *"Servicing of Mortgage Loans—Adjustment to Servicing Compensation in Connection with Certain Prepaid Mortgage Loans"* in this prospectus supplement.

*Additional Servicing Compensation:*

The master servicer is also entitled to receive, as additional servicing compensation, all late payment fees, assumption fees and other similar charges (excluding prepayment charges) and all reinvestment income earned on amounts on deposit in certain of the issuing entity's accounts and excess proceeds with respect to mortgage loans as described under *"Description of the Certificates —Priority of Distributions Among Certificates"*.

*Source and Priority of Distributions:*

The master servicing fee and any additional servicing compensation described above will be paid to the master servicer from collections on the mortgage loans prior to any distributions on the certificates.

See *"Servicing of Mortgage Loans — Servicing Compensation and Payment of Expenses" and "Description of the Certificates —Priority of Distributions Among Certificates" in this prospectus supplement.*

### Priority of Distributions

Priority of Distributions Among Certificates

In general, on any distribution date, available funds will be distributed in the following order:

- to interest on each interest-bearing class of senior certificates, pro rata, based on their respective interest entitlements;

- to principal of the classes of senior certificates then entitled to receive distributions of principal, in the order and subject to the priorities set forth below;

- to any deferred amounts payable on the Class PO Certificates, but only from amounts that would otherwise be distributed on that distribution date as principal of the subordinated certificates;

- to interest on and then principal of each class of subordinated certificates, in the order of their seniority, beginning with the Class M Certificates, in each case subject to the limitations set forth below; and

- any remaining available amounts to the Class A-R Certificates.

Principal

On each distribution date, the non-PO formula principal amount will be distributed as described above under "—*Priority of Distributions Among Certificates*" first as principal of the senior certificates (other than the notional amount certificates and the Class PO Certificates) in an amount up to the amounts specified below, and second as principal of the subordinated certificates, in an amount up to the subordinated principal distribution amount.

*Senior Certificates (other than the notional amount certificates and the Class PO Certificates):*

On each distribution date, the non-PO formula principal amount, up to the amount of the senior principal distribution amount, will be distributed as principal of the following classes of senior certificates, in the following order of priority:

- to the Class A-R Certificates, until its class certificate balance is reduced to zero;

- concurrently, to the Class A-5 and Class A-6 Certificates, pro rata, the priority amount (which is zero for the first five years and will increase as described under *"Description of the Certificates—Principal"* in this prospectus supplement), until their respective class certificate balances are reduced to zero;

- in an amount up to $1,000 on each distribution date, to the Class A-1 Certificates, until its class certificate balance is reduced to zero;

- in an amount up to $627,000 on each distribution date, to the Class A-3 Certificates, until its class certificate balance is reduced to zero;

- sequentially, to the Class A-1 and Class A-3 Certificates, in that order, until their respective class certificate balances are reduced to zero;

- concurrently, to the Class A-4 and Class A-7 Certificates, pro rata, until their respective class certificate balances are reduced to zero; and

- concurrently, to the Class A-5 and Class A-6 Certificates, pro rata, without regard to the priority amount, until their respective class certificate balances are reduced to zero.

*Class PO Certificates:*

On each distribution date, principal will be distributed to the Class PO Certificates in an amount equal to the lesser of (x) the PO formula principal amount for that distribution date and (y) the product of:

- available funds remaining after distribution of interest on the senior certificates; and

- a fraction, the numerator of which is the PO formula principal amount and the denominator of which is the sum of the PO formula principal amount and the senior principal distribution amount.

*Subordinated Certificates; Applicable Credit Support Percentage Trigger:*

On each distribution date, to the extent of available funds available therefor, the non-PO formula principal amount, up to the subordinated principal distribution amount, will be distributed as principal of the subordinated certificates in order of their distribution priority, beginning with the Class M Certificates, until their respective class certificate balances are reduced to zero. Each class of subordinated certificates will be entitled to receive its pro rata share of the subordinated principal distribution amount (based on its respective class certificate balance); provided, that if the applicable credit support percentage of a class of subordinated certificates (other than the class of subordinated certificates then outstanding with the highest distribution priority) is less than the original applicable credit support percentage for that class (referred to as a "restricted class"), each restricted class will not receive distributions of partial principal prepayments and prepayments in full. Instead, the portion of the partial principal prepayments and prepayments in full otherwise distributable to the restricted classes will be allocated to those classes of

subordinated certificates that are not restricted classes, pro rata, based upon their respective class certificate balances, and distributed in the sequential order described above.

***Allocation of Realized Losses***

On each distribution date, the amount of any realized losses on the mortgage loans will be allocated as follows:

- the PO percentage of any realized losses on a discount mortgage loan will be allocated to the Class PO Certificates; provided, however, that on or before the senior credit support depletion date, (i) those realized losses will be treated as Class PO Deferred Amounts and will be paid on the Class PO Certificates (to the extent funds are available from amounts otherwise allocable to the subordinated principal distribution amount) before distributions of principal on the subordinated certificates and (ii) the class certificate balance of the class of subordinated certificates then outstanding with the lowest distribution priority will be reduced by the amount of any payments of Class PO Deferred Amounts; and

- the non-PO percentage of any realized losses will be allocated in the following order of priority:

  - first, to the subordinated certificates in the reverse order of their priority of distribution, beginning with the class of subordinated certificates outstanding with the lowest distribution priority until their respective class certificate balances are reduced to zero: and

  - second, concurrently to the Class A Certificates, pro rata, until their respective class certificate balances are reduced to zero, except that realized losses that would otherwise be allocated to the Class A-4 and Class A-5 Certificates will instead be allocated to the Class A-7 and Class A-6 Certificates, respectively, until their respective class certificate balances are reduced to zero.

In addition, if, on any distribution date, following all distributions and the allocation of realized losses, the aggregate class certificate balance of all classes of certificates exceeds the pool principal balance, then the class certificate balance of the class of subordinated certificates then outstanding with the

lowest distribution priority will be reduced by the amount of the excess.

### Credit Enhancement

The issuance of senior certificates and subordinated certificates by the issuing entity is designed to increase the likelihood that senior certificateholders will receive regular distributions of interest and principal.

#### Subordination

The senior certificates will have a distribution priority over the classes of subordinated certificates. Among the subordinated certificates offered by this prospectus supplement, the Class M Certificates will have a distribution priority over the Class B Certificates.  Within the Class B Certificates, each class of certificates will have a distribution priority over those classes of certificates, if any, with a higher numerical designation.

Subordination is designed to provide the holders of certificates with a higher distribution priority with protection against losses realized when the remaining unpaid principal balance of a mortgage loan exceeds the proceeds recovered upon the liquidation of that mortgage loan. In general, this loss protection is accomplished by allocating the realized losses on the mortgage loans, first to the subordinated certificates, beginning with the class of subordinated certificates then outstanding with the lowest distribution priority, and second to the senior certificates (other than the notional amount certificates) in accordance with the priorities set forth above under "— *Allocation of Losses.*"

Further, the class certificate balance of the class of subordinated certificates then outstanding with the lowest distribution priority will be reduced by the amount of distributions on the Class PO Certificates in reimbursement for the Class PO deferred amounts as described above under "— *Allocation of Losses.*"

Additionally, as described above under "—*Principal Payments,*" unless certain conditions are met, the senior prepayment percentage (which determines the allocation of principal prepayments between the senior certificates and the subordinated certificates) will exceed the senior percentage (which represents the senior certificates (other than the notional amount certificates and the Class PO Certificates) as a percentage of all the certificates (other than the notional amount certificates and the Class PO Certificates)) for the first 9 years after the closing date.  This disproportionate allocation of unscheduled

payments of principal will have the effect of accelerating the amortization of the senior certificates which receive these unscheduled payments of principal while, in the absence of realized losses, increasing the interest in the principal balance of the mortgage pool evidenced by the subordinated certificates. Increasing the respective interest of the subordinated certificates relative to that of the senior certificates is intended to preserve the availability of the subordination provided by the subordinated certificates.

*See "Description of the Certificates — Allocation of Losses" in this prospectus supplement and "Credit Enhancement — Subordination" in this prospectus supplement and in the prospectus.*

### Advances

The master servicer will make cash advances with respect to delinquent payments of principal and interest on the mortgage loans to the extent the master servicer reasonably believes that the cash advances can be repaid from future payments on the mortgage loans.  These cash advances are only intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses.

*See "Servicing of Mortgage Loans — Advances" in this prospectus supplement.*

### Repurchase, Substitution and Purchase of Mortgage Loans

The sellers may be required to repurchase, or substitute with a replacement mortgage loan, any mortgage loan as to which there exists deficient documentation or as to which there has been an uncured breach of any representation or warranty relating to the characteristics of the mortgage loans that materially and adversely affects the interests of the certificateholders in that mortgage loan.

The master servicer may purchase from the issuing entity any mortgage loan that is delinquent in payment by 151 days or more.  In addition, if a mortgage loan becomes subject to a repurchase obligation of an unaffiliated seller to Countrywide Home Loans due to a delinquency on a scheduled payment due on or prior to the second day of the month following the closing date (or, in the case of such a mortgage loan that does not have a scheduled payment due until after the initial cut-off date, a delinquency on a scheduled payment due on or prior to the first scheduled payment owing to the issuing entity), the master servicer will have the option to purchase that mortgage loan until the 270th day

following the date on which that mortgage loan becomes subject to that seller's repurchase obligation.

Countrywide Home Loans, Inc. also will be obligated to purchase any mortgage loan with respect to which it has modified the mortgage rate at the request of the borrower. *See "Servicing of Mortgage Loans — Certain Modifications and Refinancings" in this prospectus supplement.*

The purchase price for any mortgage loans repurchased or purchased by a seller or the master servicer will be generally equal to the stated principal balance of the mortgage loan plus interest accrued at the applicable mortgage rate (and in the case of purchases by the master servicer, less the master servicing fee rate).

*See "The Mortgage Pool — General", "— Assignment of the Mortgage Loans" and "Description of the Certificates — Optional Purchase of Defaulted Loans and Certain Delinquent Loans" in this prospectus supplement and "Loan Program — Representations by Sellers; Repurchases" in the prospectus.*

### Optional Termination

The master servicer may purchase all of the remaining assets of the issuing entity and retire all the outstanding classes of certificates on or after the distribution date on which the aggregate stated principal balance of the mortgage loans and any related real estate owned by the issuing entity is less than or equal to 10% of the sum of (x) the aggregate stated principal balance of the closing date mortgage loans as of the initial cut-off date and (y) any pre-funded amounts.

*See "Description of the Certificates — Optional Termination" in this prospectus supplement.*

### Tax Status

For federal income tax purposes, the issuing entity (exclusive of the pre-funding account and the capitalized interest account) will consist of one or more REMICs: one or more underlying REMICs (if any) and the master REMIC. The assets of the lowest underlying REMIC in this tiered structure (or the master REMIC if there are no underlying REMICs) will consist of the mortgage loans and any other assets designated in the pooling and servicing agreement. The master REMIC will issue the several classes of certificates, which, other than the Class A-R Certificates, will represent the regular interests

in the master REMIC. The Class A-1 Certificates will also represent the right to receive yield supplement amounts from a supplemental interest trust that holds the corridor contract and the corridor contract reserve fund. The Class A-R Certificates will represent ownership of both the residual interest in the master REMIC and the residual interests in any underlying REMICs.

*See "Material Federal Income Tax Consequences" in this prospectus supplement and in the prospectus.*

### ERISA Considerations

The offered certificates (other than the Class A-R Certificates) may be purchased by a pension or other benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986, as amended, or by an entity investing the assets of such a benefit plan, so long as certain conditions are met. The Class A-1 Certificates may not be acquired or held by a person investing assets of any such plans or arrangements before the termination of the corridor contract, unless such acquisition or holding is eligible for the exemptive relief available under one of the class exemptions or a statutory exemption described in this prospectus supplement under *"ERISA Considerations — ERISA Considerations With Respect to the Corridor Contract."*

*See "ERISA Considerations" in this prospectus supplement and in the prospectus.*

### Legal Investment

The senior certificates and the Class M Certificates will be "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984 as long as they are rated in one of the two highest rating categories by at least one nationally recognized statistical rating organization. None of the other classes of offered certificates will be "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984.

See "Legal Investment" in the prospectus.



**Summary of Transaction Parties**

**Corridor Contract Counterparty**
Bank of America N.A.

Corridor Contract Payments

**Supplemental Interest Trust**

Yield Supplement Amounts

**Certificateholders**

**Sponsor and Seller**
Countrywide Home Loans, Inc.

Mortgage Loans

**Depositor**
CWALT, Inc.

Mortgage Loans

**Issuing Entity**
Alternative Loan Trust 2006-J6
**Trustee**
The Bank of New York

Distributions

Mortgage Loans

**Other Sellers**
Special Purpose Entities

Mortgage Loans

Mortgage Loans

**Master Servicer and Servicer**
Countrywide Home Loans Servicing LP

Mortgage Loan Servicing

S-16

**Risk Factors**

**The following information, which you should carefully consider, identifies significant sources of risk associated with an investment in the certificates. You should also carefully consider the information under "Risk Factors" beginning on page 2 in the prospectus.**

**Your Yield Will Be Affected By Prepayments**

Borrowers may, at their option, prepay their mortgage loans in whole or in part at any time. We cannot predict the rate at which borrowers will repay their mortgage loans. The prepayment experience of the mortgage loans may be affected by many factors, including:

- general economic conditions,

- the level of prevailing interest rates,

- the availability of alternative financing,

- the applicability of prepayment charges, and

- homeowner mobility.

A prepayment of a mortgage loan, however, will result in a prepayment on the certificates.

The rate and timing of prepayment of the mortgage loans will affect the yields to maturity and weighted average lives of the certificates. You will bear any reinvestment risks from faster or slower prepayments of mortgage loans.

- If you purchase principal only certificates or you purchase your certificates at a discount and principal is repaid slower than you anticipate, then your yield may be lower than you anticipate.

- If you purchase notional amount certificates or certificates at a premium and principal is repaid faster than you anticipate, then your yield may be lower than you anticipate.

- If you purchase notional amount certificates and principal is repaid faster than you anticipated, you may lose your initial investment.

- Approximately 1.63% of the initial mortgage loans by aggregate stated principal balance of the initial mortgage loans as of the initial cut-off date require (and certain of the other mortgage loans may require) the mortgagor to pay a charge if the mortgagor prepays the mortgage loan during a period of three or five years after the mortgage loan was originated.  A prepayment charge may discourage a mortgagor from prepaying the mortgage loan during the applicable period.  Prepayment charges will be distributed to the Class P Certificates and will not be available for distribution to the holders of other classes of certificates.

- In addition, the yields to maturity and weighted average lives of the certificates will be affected by any prepayment

resulting from the distribution of amounts (if any) on deposit in the pre-funding account.

- The Class PO Certificates will likely receive a prepayment of principal on either the first or second distribution date.

*See "Yield, Prepayment and Maturity Considerations" in this prospectus supplement for a description of factors that may influence the rate and timing of prepayments on the mortgage loans.*

**Your Yield Will Be Affected By The Interest Only Feature Of Some Of The Mortgage Loans**

Approximately 55.37% of the initial mortgage loans, by aggregate stated principal balance of the initial mortgage loans as of the initial cut-off date, require (and certain of the other mortgage loans may require) monthly payments of only accrued interest for the first ten years after origination.  The borrower is not required to pay any principal on the borrower's loan during this interest only period but thereafter is required to make monthly payments sufficient to amortize the loan over its remaining term.  These loans are sometimes referred to as interest only loans.  Interest only loans have only recently been originated in significant volumes.  As a result, the long-term performance characteristics of interest only loans are largely unknown.

Because interest only loans initially require only the payment of interest, a borrower may be able to borrow a larger amount than would have been the case for a fully amortizing mortgage loan. Interest only loans may have risks and payment characteristics that are not present with fully amortizing mortgage loans, including the following:

- no principal distributions will be made to certificateholders from interest only loans during their interest only period except in the case of a prepayment, which may extend the weighted average lives of the certificates,

- during the interest only period, interest only loans may be less likely to be prepaid since the perceived benefits of refinancing may be less than with a fully amortizing mortgage loan,

- as the end of the interest only period approaches, an interest only loan may be more likely to be refinanced in order to avoid the increase in the monthly payment required to amortize the loan over its remaining term,

- interest only loans may be more likely to default than fully amortizing loans at the end of the interest only period due to the increased monthly payment required to amortize the loan over its remaining term, and

- if an interest only loan defaults, the severity of loss may be greater due to the larger unpaid principal balance.

*See "Description of the Certificates — Interest" and "Yield, Prepayment and Maturity Considerations" in this prospectus supplement for more information.*

**The Yields On The LIBOR Certificates Will Be Affected By The Level Of LIBOR**

The pass-through rate on the Class A-1 Certificates will be based on LIBOR plus a margin, subject to a cap.  The pass-through rate on the Class A-2 Certificates will be based on a fixed rate minus LIBOR.  The yields on the LIBOR Certificates will be affected by the level of LIBOR.  If the level of LIBOR is different than the level you expect, then the yield on your LIBOR Certificates may be lower than you expect.  The pass-through rate on the Class A-2 Certificates may be as little as 0%.

**Your Yield Will Be Affected By How Distributions Are Allocated To The Certificates**

The timing of principal payments on the certificates will be affected by a number of factors, including:

- the extent of prepayments on the mortgage loans,

- how payments of principal are allocated among the classes of certificates as specified on page S-73,

- whether the master servicer exercises its right, in its sole discretion, to terminate the issuing entity,

- whether the master servicer exercises its option to purchase defaulted mortgage loans or certain delinquent mortgage loans,

- the rate and timing of payment defaults and losses on the mortgage loans,

- repurchases of mortgage loans for material breaches of representations and warranties; and

- if funds are required to be deposited in the pre-funding account on the closing date, by the availability of supplemental mortgage loans.

Because distributions on the certificates are dependent upon the payments on the mortgage loans, we cannot guarantee the amount of any particular payment or the amount of time that will elapse before the issuing entity is terminated.

The master servicer is permitted to purchase certain delinquent mortgage loans from the issuing entity as described under "*Description of the Certificates—Optional Purchase of Defaulted Loans and Certain Delinquent Loans*" in this prospectus supplement.  Many factors could affect the decision of the master servicer to exercise its option to purchase a mortgage loan that is eligible for purchase, including the master servicer's financial ability, the impact on the holders of the certificates and the state of the business relationship between the master servicer and the underlying seller, including whether the underlying seller of that mortgage loan is willing or able to purchase that mortgage loan. The master servicer is not required to take your interests into account when deciding whether or not to exercise the option.

*See "Description of the Certificates — Principal," and "— Optional Termination" in this prospectus supplement for a description of the manner in which principal will be paid to the certificates. See "Description of the Certificates—Optional Purchase of Defaulted Loans and Certain Delinquent Loans" in this prospectus supplement for a description of the master servicer's option to purchase certain mortgage loans.. See "The Mortgage Pool — Assignment of the Mortgage Loans" in this prospectus supplement for more information regarding the repurchase or substitution of mortgage loans.*

**Subordinated Certificates Have A Greater Risk Of Loss Because Of Subordination:  Credit Enhancement May Not Be Sufficient To Protect Senior Certificates From Losses**

The certificates are not insured by any financial guaranty insurance policy. The subordination features are intended to enhance the likelihood that the senior certificateholders will receive regular payments of interest and principal.

**Subordination**.  Credit enhancement will be provided for the certificates, first, by the right of the holders of more senior classes of certificates to receive payments of principal before the classes subordinated to them and, second, by the allocation of realized losses to subordinated classes in the reverse order of their priority of distribution. This form of credit enhancement uses collections on the mortgage loans otherwise payable to holders of subordinated classes to pay amounts due on more senior classes. Collections otherwise payable to subordinated classes comprise the sole source of funds from which this type of credit enhancement is provided. Realized losses are allocated first to the subordinated certificates in the reverse order of their priority of distribution, beginning with the subordinated certificates then outstanding with the lowest distribution priority, until the principal balance of each class of subordinated certificates has been reduced to zero.  Accordingly, if the aggregate principal balance of each subordinated class were to be reduced to zero, delinquencies and defaults on the mortgage loans would reduce the amount of funds available for monthly distributions to holders of the senior certificates.  Realized losses allocable to the senior certificates (other than the notional amount certificates and the Class PO Certificates) will be allocated among the classes of senior certificates on a pro rata basis.  However, realized losses that would otherwise be allocated to the Class A-4 and Class A-5 Certificates will instead be allocated to the Class A-7 and Class A-6 Certificates, respectively, until their respective class certificate balances are reduced to zero.  Investors in the classes of super senior certificates should note that the initial class certificate balance of the applicable class of senior support certificates is substantially lower than the initial class certificate balance of the related class of super senior certificates, and consequently, the senior support certificates will be able to absorb only a limited amount of realized losses that are otherwise allocable to the related class of super senior certificates.  Among the subordinated certificates, the Class M Certificates are the least subordinated, that is, they have the highest distribution priority.  The distribution priority for the Class B-1, Class B-2, Class B-3, Class B-4 and Class B-5 Certificates is in that numerical order.

*See "Description of the Certificates — Allocation of Losses" in this prospectus supplement, and "Credit Enhancement — Subordination" in this prospectus supplement and in the prospectus.*

**Certain Interest Shortfalls Will Be Allocated To The Certificates Which Could Result In Shortfalls On The Payments Of The Certificates**

When a borrower makes a full or partial prepayment on a mortgage loan, the amount of interest that the borrower is required to pay may be less than the amount of interest holders of certificates would otherwise be entitled to receive with respect to the mortgage loan. The master servicer is required to reduce the master servicing fee to offset this shortfall, but the reduction for any distribution date is limited to an amount equal to the product of one-twelfth of 0.125% and the aggregate stated principal balance of the mortgage loans. If the aggregate amount of interest shortfalls resulting from prepayments on the mortgage loans exceeds the amount of the reduction in the master servicing fee, the interest entitlement for each class of certificates will be reduced proportionately by the amount of this excess.

In addition, your certificates may be subject to certain shortfalls in interest collections arising from the application of the Servicemembers Civil Relief Act and similar state laws (referred to as the Relief Act). The Relief Act limits the interest charged on a mortgage loan for certain borrowers in excess of 6% per annum during the period of the borrower's active duty. These shortfalls are not required to be paid by the borrower at any future time, will not be offset by a reduction in the master servicing fee and will reduce the accrued interest on each class of certificates on a pro rata basis.  In addition, pursuant to the laws of various states, under certain circumstances, payments on mortgage loans by residents in such states who are called into active duty with the National Guard or the reserves will be deferred.  These state laws may also limit the ability of the servicer to foreclose on the related mortgaged property.  This could result in delays or reductions in payment and increased losses on the mortgage loans which would be borne by the certificateholders.  *See "Risk Factors — Impact of World Events" in the prospectus.*

**Possible Prepayment On The Senior Certificates Due To Inability To Acquire Supplemental Mortgage Loans**

The ability of the issuing entity to acquire supplemental mortgage loans depends on the ability of Countrywide Home Loans to originate or acquire mortgage loans during the period ending no later than the last day of the calendar month following the month in which the closing date occurs that meet the eligibility criteria for supplemental mortgage loans described in this prospectus supplement. The ability of Countrywide Home Loans to originate or acquire eligible supplemental mortgage loans will be affected by a number of factors including prevailing interest rates, employment levels and economic conditions, generally.

If any of the amounts on deposit in the pre-funding account allocated to purchase supplemental mortgage loans cannot be used for that purpose, those amounts will be distributed to holders of the senior certificates as a prepayment of principal no later than the second distribution date.

The ability of the issuing entity to acquire supplemental mortgage loans with particular characteristics will also affect the size of the

principal prepayment to the Class PO Certificates. It is expected that there will be some principal prepayment on the Class PO Certificates on either the first or second distribution date.

See *"Description of the Certificates — Principal"* in this prospectus supplement.

**Certificates May Not Be Appropriate For Some Investors**

The offered certificates may not be an appropriate investment for investors who do not have sufficient resources or expertise to evaluate the particular characteristics of each applicable class of offered certificates. This may be the case because, among other things:

- the yield to maturity of offered certificates purchased at a price other than par will be sensitive to the uncertain rate and timing of principal prepayments on the mortgage loans;

- the rate of principal distributions on, and the weighted average lives of, the offered certificates will be sensitive to the uncertain rate and timing of principal prepayments on the mortgage loans and the priority of principal distributions among the classes of certificates. Accordingly, the offered certificates may be an inappropriate investment if you require a distribution of a particular amount of principal on a specific date or an otherwise predictable stream of distributions;

- you may not be able to reinvest distributions on an offered certificate (which, in general, are expected to be greater during periods of relatively low interest rates) at a rate at least as high as the pass-through rate applicable to your certificate; or

- a secondary market for the offered certificates may not develop or provide certificateholders with liquidity of investment.

**The Class A-1 Certificates Involve Counterparty Risk**

Although the Class A-1 Certificates may receive the yield supplement amount, collections on the mortgage loans cannot support those payments.  Payments of those amounts are *solely* dependent upon the performance of the corridor contract counterparty under the corridor contract.  The likelihood of receipt of those amounts is not covered by the ratings of the Class A-1 Certificates.  Thus, the payment of those amounts involves counterparty risk.

Investors in the Class A-1 Certificates should note that the long–term ratings of the corridor contract counterparty are lower than "AAA".

See *"Description of the Certificates — The Corridor Contracts"* in this prospectus supplement.

**Geographic Concentration Increases Risk That Certificate Yields Could Be Impaired**

The table under *"The Mortgage Pool — State Distribution of Mortgaged Properties"* in the prospectus supplement sets forth the geographic concentration of the mortgaged properties, including the percentage by principal balance of the initial mortgage loans in the mortgage pool secured by mortgaged property located in California and Florida.  Homes in California are more susceptible than homes located in other parts of the country to certain types of uninsurable hazards, such as earthquakes, floods, mudslides and other natural disasters.  Homes in Florida and other parts of the southeastern United States are more likely to suffer uninsurable damage from tropical storms and hurricanes than other parts of the country.  In addition,

- economic conditions in states with significant concentrations (which may or may not affect real property values) may affect the ability of borrowers to repay their loans on time;

- declines in the residential real estate market in states with significant concentrations may reduce the values of properties located in those states, which would result in an increase in the loan-to-value ratios; and

- any increase in the market value of properties located in states with concentrations would reduce the loan-to-value ratios and could, therefore, make alternative sources of financing available to the borrowers at lower interest rates, which could result in an increased rate of prepayment of the mortgage loans.

**Inability To Replace Master Servicer Could Affect Collections And Recoveries On The Mortgage Loans**

The structure of the master servicing fee might affect the ability to find a replacement master servicer.  Although the trustee is required to replace the master servicer if the master servicer is terminated or resigns, if the trustee is unwilling (including, for example, because the master servicing fee is insufficient) or unable (including, for example, because the trustee does not have the systems to service mortgage loans), it may be necessary to appoint a replacement master servicer.  Because the master servicing fee is structured as a percentage of the stated principal balance of each mortgage loan, it may be difficult to replace the master servicer at a time when the balance of the mortgage loans has been significantly reduced because the fee may be insufficient to cover the costs associated with servicing the mortgage loans and related REO Properties remaining in the pool.  The performance of the mortgage loans may be negatively impacted, beyond the expected transition period during a servicing transfer, if a replacement master servicer is not retained within a reasonable amount of time.

**Hurricane Katrina May Pose Special Risks**

At the end of August 2005, Hurricane Katrina caused catastrophic damage to areas in the Gulf Coast region of the United States.

Countrywide Home Loans will represent and warrant as of the closing date that each mortgaged property (including each mortgaged property located in the areas affected by Hurricane Katrina) is free of material damage and in good repair.  In the event of a breach of that representation and warranty, Countrywide Home Loans will be obligated to repurchase or substitute for the related mortgage loan.  A repurchase would have the effect of increasing the rate of principal payment on the certificates.  Any damage to a mortgaged property that secures a mortgage loan in the issuing entity occurring after the closing date as a result of any other casualty event will not cause a breach of this representation and warranty.

The full economic impact of Hurricane Katrina is uncertain but may affect the ability of borrowers to make payments on their mortgage loans.  Initial economic effects appear to include:

- localized areas of nearly complete destruction of the economic infrastructure and cessation of economic activity,

- regional interruptions in travel and transportation, tourism and economic activity generally, and

- nationwide decreases in petroleum availability with a corresponding increase in price.

We have no way to determine whether other effects will arise, how long any of these effects may last, or how these effects may impact the performance of the mortgage loans.  Any impact of these events on the performance of the mortgage loans may increase the amount of losses borne by the holders of the certificates or impact the weighted average lives of the certificates.

**Some of the statements contained in or incorporated by reference in this prospectus supplement and the accompanying prospectus consist of forward-looking statements relating to future economic performance or projections and other financial items. These statements can be identified by the use of forward-looking words such as "may," "will," "should," "expects," "believes," "anticipates," "estimates," or other comparable words. Forward-looking statements are subject to a variety of risks and uncertainties that could cause actual results to differ from the projected results. Those risks and uncertainties include, among others, general economic and business conditions, regulatory initiatives and compliance with governmental regulations, customer preferences and various other matters, many of which are beyond our control. Because we cannot predict the future, what actually happens may be very different from what we predict in our forward-looking statements.**

## The Mortgage Pool

**General**

The depositor, CWALT, Inc., will purchase the mortgage loans in the mortgage pool from Countrywide Home Loans, Inc. ("Countrywide Home Loans") and one or more other sellers affiliated with Countrywide Financial Corporation (each of which is referred to as a seller and, together they are referred to as the "sellers"), pursuant to a

pooling and servicing agreement (the "pooling and servicing agreement") dated as of September 1, 2006 among the sellers, Countrywide Home Loans Servicing LP, as master servicer, the depositor and The Bank of New York, as trustee, and will cause the mortgage loans to be assigned to the trustee for the benefit of the holders of the certificates.  The mortgage loans that are purchased by the depositor and assigned to the trustee on the closing date and that are listed in the tables in this section are referred to as the Initial Mortgage Loans.  The Initial Mortgage Loans, together with any other mortgage loans that are purchased by the depositor and assigned to the trustee on the closing date, are referred to as the Closing Date Mortgage Loans.  Each seller, other than Countrywide Home Loans, will be a special purpose entity established by Countrywide Financial Corporation or one or more of its subsidiaries, which will sell mortgage loans previously acquired from Countrywide Home Loans.

Under the pooling and servicing agreement, Countrywide Home Loans will make certain representations, warranties and covenants to the depositor relating to, among other things, the due execution and enforceability of the pooling and servicing agreement and certain characteristics of the mortgage loans.  In addition, each of the sellers will represent and warrant that, prior to the sale of the related mortgage loans to the depositor, the applicable seller had good title to the mortgage loans sold by it, was the sole owner of those mortgage loans free and clear of any pledge, lien, encumbrance or other security interest and had full right and authority, subject to no interest or participation of, or agreement with, any other party, to sell and assign those mortgage loans pursuant to the pooling and servicing agreement.  Subject to the limitations described in the next sentence and under *"— Assignment of the Mortgage Loans,"* Countrywide Home Loans (or the related seller, in the case of the representation regarding good title) will be obligated to repurchase or substitute a similar mortgage loan for any mortgage loan as to which there exists deficient documentation or as to which there has been an uncured breach of any representation or warranty relating to the characteristics of the mortgage loans that materially and adversely affects the interests of the certificateholders in that mortgage loan.  Countrywide Home Loans will represent and warrant to the depositor in the pooling and servicing agreement that the mortgage loans were selected from among the outstanding one- to four-family mortgage loans in Countrywide Home Loans' portfolio as to which the representations and warranties set forth in the pooling and servicing agreement can be made and that the selection was not made in a manner intended to affect the interests of the certificateholders adversely.  *See "Loan Program — Representations by Sellers; Repurchases"* in the prospectus.

Under the pooling and servicing agreement, the depositor will assign all its right, title and interest in the representations, warranties and covenants (including the sellers' repurchase or substitution obligation) to the trustee for the benefit of the certificateholders.  The depositor will represent that following the transfer of the mortgage loans to it by the sellers, the depositor had good title to the mortgage loans and that each of the mortgage notes was subject to no offsets,  defenses or counterclaims.  The depositor will make no other representations or warranties with respect to the mortgage loans and will have no obligation to repurchase or substitute mortgage loans with deficient documentation or which are otherwise defective. The sellers are selling the mortgage loans without recourse and will have no obligation with respect to the certificates in their respective capacities as sellers other than the repurchase or substitution obligation described above. The obligations of the master servicer, with respect to the certificates, are limited to the master servicer's contractual servicing obligations under the pooling and servicing agreement.

The statistical information with respect to the Initial Mortgage Loans set forth in this prospectus supplement is based on the Stated Principal Balances of the Initial Mortgage Loans as of the later of (x) September 1, 2006 and (y) the date of origination of each mortgage loan (referred to as the "initial cut-off date").  The depositor believes that the information set forth in this prospectus supplement regarding the Initial Mortgage Loans as of the initial cut-off date is representative of the characteristics of the mortgage loans that will be delivered on the closing date. However, certain Initial Mortgage Loans may prepay or may be determined not to meet the eligibility requirements for inclusion in the final mortgage pool.  A limited number of mortgage loans may be substituted for the Initial Mortgage Loans described in this prospectus supplement and mortgage loans may be added because of pre-funding, although any addition or substitution will not result in a material difference in the mortgage pool on the closing date or the final mortgage pool at the end of the Funding Period.  As a result, the initial cut-off date information regarding the actual mortgage loans delivered on the closing date and the final mortgage pool at the end of the Funding Period may vary somewhat from the initial cut-off date information regarding the Initial Mortgage Loans presented in this prospectus supplement.

As of the initial cut-off date, the aggregate Stated Principal Balance of the Initial Mortgage Loans was approximately $152,306,988 (which is referred to as the "Initial Cut-off Date Pool Principal Balance"). All of the Mortgage Loans to be included in the issuing entity will be evidenced by promissory notes secured by first lien deeds of trust, security deeds or mortgages on one- to four-family residential properties. All of the Initial Mortgage Loans have original terms to maturity of 30 years.

Approximately 6.61% of the Initial Mortgage Loans, by aggregate Stated Principal Balance of the Initial Mortgage Loans as of the initial cut-off date, were originated or acquired by Countrywide Home Loans, Inc. Additionally, approximately 52.92% of the Initial Mortgage Loans, by aggregate Stated Principal Balance of the Initial Mortgage Loans as of the initial cut-off date, were originated by American Home Mortgage Corp. No originator will have originated 50.00% or more of the mortgage loans in the final mortgage pool by aggregate Stated Principal Balance of the mortgage loans as of the related cut-off date.

Whenever reference is made in this prospectus supplement to a percentage of some or all of the Initial Mortgage Loans, that percentage is determined on the basis of the Stated Principal Balance of such Initial Mortgage Loans as of the initial cut-off date, unless otherwise specified. The Initial Cut-off Date Pool Principal Balance of the mortgage loans set forth above is subject to a variance of plus or minus five percent.

Approximately 55.37% of the aggregate Stated Principal Balance of the Initial Mortgage Loans as of the initial cut-off date only require the related mortgagor to pay interest on the principal balance of the mortgage loan for the first ten years after its origination, but require that the entire principal balance of the mortgage loan be fully amortized over the related remaining term of the mortgage loan following such interest only period. The remaining Initial Mortgage Loans will provide for the amortization of the amount financed over a series of substantially equal monthly payments. Further, 3 Initial Mortgage Loans representing approximately 0.37% of the Initial Cut-off Date Pool Principal Balance, provide for monthly payments of principal based on an amortization schedule significantly longer than the remaining term of those mortgage loans and a disproportionate principal payment at their stated maturities (the "balloon loans"). Substantially all of the Initial Mortgage Loans will provide that payments are due on the first day of each month (the "Due Date").

Scheduled monthly payments made by the mortgagors on the mortgage loans (referred to as scheduled payments) either earlier or later than their scheduled Due Dates will not affect the amortization schedule or the relative application of the payments to principal and interest. Except for 6 Initial Mortgage Loans constituting not more than 1.63% of the Initial Cut-off Date Pool Principal Balance, the mortgagors may prepay their mortgage loans at any time without charge. The prepayment charge period for those mortgage loans will be three or five years from origination. The holders of the Class P Certificates will be entitled to all prepayment charges received on those mortgage loans and those amounts will not be available for distribution on the other classes of certificates. Under certain circumstances, as described in the pooling and servicing agreement, the master servicer may waive the payment of any otherwise applicable prepayment charges. Investors should conduct their own analysis of the effect, if any, that the prepayment charges, and decisions by the master servicer with respect to the waiver thereof, may have on the prepayment performance of the mortgage loans. The depositor makes no representation as to the effect that the prepayment charges, and decisions by the master servicer with respect to the waiver thereof, may have on the prepayment performance of the mortgage loans.

The earliest first payment date of any Initial Mortgage Loan was on or after February 1, 2006.

The latest stated maturity date of any Initial Mortgage Loan will be August 1, 2036. The earliest stated maturity date of any Initial Mortgage Loan will be January 1, 2036.

As of the initial cut-off date, no Initial Mortgage Loan was delinquent 30 or more days. In the twelve month period prior to the initial cut-off date, no Initial Mortgage Loan has been delinquent 30 or more days.

Delinquencies with respect to the mortgage loans will be recognized in accordance with the methodology used by the Mortgage Bankers Association of America. Under this methodology, a mortgage loan is considered "30 days delinquent" if the borrower fails to make a scheduled monthly payment prior to the close of business on the day immediately preceding the Due Date for the next scheduled monthly payment. A similar methodology is used for

determining whether a mortgage loan is 60 days delinquent.  For example, a mortgage loan will be considered 30 days delinquent if the borrower fails to make a scheduled monthly payment originally due on March 1 by the close of business on March 31, and it will be considered 60 days delinquent if the borrower fails to make that scheduled monthly payment by April 30.

As of the initial cut-off date, no Initial Mortgage Loan was subject to a buydown agreement.  No Initial Mortgage Loan provides for deferred interest or negative amortization.

No Initial Mortgage Loan had a Loan-to-Value Ratio at origination or on the closing date of more than 100.00%.  Generally, each mortgage loan with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac. The policy provides coverage in an amount equal to a specified percentage times the sum of the remaining principal balance of the related mortgage loan, the accrued interest thereon and the related foreclosure expenses. The specified coverage percentage for mortgage loans with terms to maturity between 25 and 30 years is generally,

- 12% for Loan-to-Value Ratios between 80.01% and 85.00%,

- 25% for Loan-to-Value Ratios between 85.01% and 90.00%,

- 30% for Loan-to-Value Ratios between 90.01% and 95.00%, and

- 35% for Loan-to-Value Ratios between 95.01% and 100%.

The specified coverage percentage for mortgage loans with terms to maturity of up to 20 years ranges from:

- 6% to 12% for Loan-to-Value Ratios between 80.01% and 85.00%,

- 12% to 20% for Loan-to-Value Ratios between 85.01% and 90.00%, and

- 20% to 25% for Loan-to-Value Ratios between 90.01% and 95.00%.

The required coverage percentage of mortgage insurance is determined by the type, term and Loan-to-Value Ratio of the mortgage loan and may also vary based on occupancy type.  However, under certain circumstances, the specified coverage level may vary from the foregoing.  With respect to one Initial Mortgage Loan representing approximately 0.42% of the Initial Cut-off Date Pool Principal Balance, the lender (rather than the borrower) acquired the primary mortgage guaranty insurance and charged the related borrower an interest premium. Except for these lender acquired mortgage insurance mortgage loans, no primary mortgage guaranty insurance policy will be required with respect to any mortgage loan if maintaining the policy is prohibited by applicable law or after the date on which the related Loan-to-Value Ratio is 80% or less or, based on a new appraisal, the principal balance of the mortgage loan represents 80% or less of the new appraised value.

The "Loan-to-Value Ratio" of a mortgage loan at any given time is a fraction, expressed as a percentage, the numerator of which is the principal balance of the related mortgage loan at the date of determination and the denominator of which is,

- in the case of a purchase, the lesser of the selling price of the mortgaged property or its appraised value at the time of sale, or

- in the case of a refinance, the appraised value of the mortgaged property at the time of the refinance, except in the case of a mortgage loan underwritten pursuant to Countrywide Home Loans' Streamlined Documentation Program as described under *"—Underwriting Process."*