With respect to mortgage loans originated pursuant to the Streamlined Documentation Program,

- if the loan-to-value ratio at the time of the origination of the mortgage loan being refinanced was 80% or less and the loan amount of the new loan being originated is $650,000 or less, then the "Loan-to-Value Ratio" will be the ratio of the principal amount of the new mortgage loan being originated divided by the appraised value of the related mortgaged property at the time of the origination of the mortgage loan being refinanced, as reconfirmed by Countrywide Home Loans using an automated property valuation system; or

- if the loan-to-value ratio at the time of the origination of the mortgage loan being refinanced was greater than 80% or the loan amount of the new loan being originated is greater than $650,000, then the "Loan-to-Value Ratio" will be the ratio of the principal amount of the new mortgage loan being originated divided by the appraised value of the related mortgaged property as determined by an appraisal obtained by Countrywide Home Loans at the time of the origination of the new mortgage loan. See *"— Underwriting Process"* in this prospectus supplement.

No assurance can be given that the value of any mortgaged property has remained or will remain at the level that existed on the appraisal or sales date. If residential real estate values generally or in a particular geographic area decline, the Loan-to-Value Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to the mortgage loans.

The "Combined Loan-to-Value Ratio" of a mortgage loan originated by Countrywide Home Loans is a fraction, expressed as a percentage, the numerator of which is the sum of (i) the principal balance of the mortgage loan at origination and (ii) the outstanding principal balance at origination of the mortgage loan of any junior mortgage loan(s) originated by Countrywide Home Loans contemporaneously with the origination of the senior mortgage loan (or, in the case of any open-ended junior revolving home equity line of credit, the maximum available line of credit with respect to that junior mortgage loan), and the denominator of which is the same denominator used in the calculation of Loan-to-Value Ratio as described above.  If a mortgage loan was originated by Countrywide Home Loans in connection with the refinancing of an existing mortgage loan, the numerator of the Combined Loan-to-Value Ratio for that mortgage loan will also include the outstanding principal balance at origination of any junior mortgage loan(s) originated by Countrywide Home Loans during the 12 months following the origination of the mortgage loan being refinanced.

The "Combined Loan-to-Value Ratio" of a mortgage loan not originated by Countrywide Home Loans is the Loan-to-Value Ratio of that mortgage loan and accordingly does not reflect the presence or amount of any junior mortgage loan secured by the same mortgaged property.

The following information sets forth certain characteristics of the Initial Mortgage Loans as of the initial cut-off date. Other than with respect to rates of interest, percentages (approximate) are stated by Stated Principal Balance of the Initial Mortgage Loans as of the initial cut-off date and, due to rounding, may not total 100%.

**Mortgage Rates[1]**

| Range of Mortgage Rates (%) | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 6.001 – 6.500 | 62 | $ 32,378,631 | 21.26% | 522,236 | 6.431 | 358 | 724 | 70.42 |
| 6.501 – 7.000 | 215 | 104,493,286 | 68.61 | 486,015 | 6.809 | 358 | 728 | 73.71 |
| 7.001 – 7.500 | 67 | 15,435,071 | 10.13 | 230,374 | 7.217 | 358 | 722 | 78.37 |
| **Total** | **344** | **$ 152,306,988** | **100.00%** | | | | | |

(1)  The lender acquired mortgage insurance mortgage loans are shown in the preceding table at the mortgage rates inclusive of the interest premium charge by the related lenders.  As of the initial cut-off date, the weighted average mortgage rate of the Initial Mortgage Loans (net of such premiums) was approximately 6.765% per annum.  Without the adjustment, the weighted average mortgage rate on the Initial Mortgage Loans in loan group 1 was approximately 6.770% per annum.

S-29

**Current Mortgage Loan Principal Balances**[1]

| Range of Current Mortgage Loan Principal Balances ($) | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate(%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0.01 - 50,000.00 ............... | 1 | $ 47,853 | 0.03% | 47,853 | 7.375 | 356 | 684 | 75.00 |
| 50,000.01 - 100,000.00 ....... | 10 | 762,014 | 0.50 | 76,201 | 7.059 | 356 | 715 | 71.00 |
| 100,000.01 - 150,000.00 ....... | 27 | 3,393,590 | 2.23 | 125,689 | 6.968 | 357 | 700 | 72.16 |
| 150,000.01 - 200,000.00 ....... | 31 | 5,511,991 | 3.62 | 177,806 | 6.888 | 357 | 714 | 74.11 |
| 200,000.01 - 250,000.00 ....... | 21 | 4,672,790 | 3.07 | 222,514 | 6.954 | 358 | 708 | 76.66 |
| 250,000.01 - 300,000.00 ....... | 30 | 8,229,459 | 5.40 | 274,315 | 6.940 | 358 | 729 | 75.68 |
| 300,000.01 - 350,000.00 ....... | 24 | 7,943,482 | 5.22 | 330,978 | 6.857 | 358 | 745 | 71.30 |
| 350,000.01 - 400,000.00 ....... | 17 | 6,319,853 | 4.15 | 371,756 | 6.866 | 358 | 723 | 75.05 |
| 400,000.01 - 450,000.00 ....... | 22 | 9,563,747 | 6.28 | 434,716 | 6.762 | 358 | 731 | 76.13 |
| 450,000.01 - 500,000.00 ....... | 44 | 20,943,961 | 13.75 | 475,999 | 6.744 | 358 | 736 | 73.17 |
| 500,000.01 - 550,000.00 ....... | 30 | 15,885,963 | 10.43 | 529,532 | 6.693 | 358 | 736 | 73.54 |
| 550,000.01 - 600,000.00 ....... | 18 | 10,481,003 | 6.88 | 582,278 | 6.786 | 358 | 727 | 78.08 |
| 600,000.01 - 650,000.00 ....... | 15 | 9,493,020 | 6.23 | 632,868 | 6.725 | 358 | 717 | 74.42 |
| 650,000.01 - 700,000.00 ....... | 12 | 8,201,803 | 5.39 | 683,484 | 6.710 | 358 | 730 | 73.01 |
| 700,000.01 - 750,000.00 ....... | 4 | 2,837,375 | 1.86 | 709,344 | 6.531 | 358 | 703 | 71.49 |
| 750,000.01 - 1,000,000.00 ....... | 32 | 27,406,137 | 17.99 | 856,442 | 6.667 | 358 | 729 | 70.63 |
| 1,000,000.01 - 1,500,000.00 ....... | 2 | 2,489,934 | 1.63 | 1,244,967 | 6.652 | 357 | 755 | 77.72 |
| 1,500,000.01 - 2,000,000.00 ....... | 3 | 5,323,015 | 3.49 | 1,774,338 | 6.960 | 357 | 692 | 65.85 |
| Greater than 2,000,000.01 ....... | 1 | 2,800,000 | 1.84 | 2,800,000 | 6.875 | 358 | 682 | 80.00 |
| Total ............... | 344 | $ 152,306,988 | 100.00% | | | | | |

(1)  As of the initial cut-off date, the average current mortgage loan principal balance of the Initial Mortgage Loans was approximately $442,753.

## FICO Credit Scores[1]

| Range of FICO Credit Scores | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 601 – 620 | 1 | $ 118,400 | 0.08% | 118,400 | 7.000 | 357 | 609 | 80.00 |
| 621 – 640 | 11 | 2,554,749 | 1.68 | 232,250 | 6.983 | 358 | 634 | 78.11 |
| 641 – 660 | 24 | 9,176,221 | 6.02 | 382,343 | 6.729 | 358 | 650 | 78.43 |
| 661 – 680 | 25 | 10,466,094 | 6.87 | 418,644 | 6.798 | 358 | 672 | 73.19 |
| 681 – 700 | 48 | 24,571,203 | 16.13 | 511,900 | 6.771 | 358 | 689 | 72.19 |
| 701 – 720 | 57 | 24,813,054 | 16.29 | 435,317 | 6.749 | 358 | 709 | 74.29 |
| 721 – 740 | 42 | 16,567,767 | 10.88 | 394,471 | 6.802 | 358 | 729 | 74.29 |
| 741 – 760 | 36 | 20,840,899 | 13.68 | 578,914 | 6.733 | 358 | 751 | 73.24 |
| 761 – 780 | 55 | 24,408,547 | 16.03 | 443,792 | 6.773 | 358 | 770 | 74.27 |
| 781 – 800 | 32 | 13,369,061 | 8.78 | 417,783 | 6.755 | 358 | 789 | 68.60 |
| 801 – 820 | 13 | 5,420,994 | 3.56 | 417,000 | 6.845 | 358 | 805 | 72.48 |
| Total | 344 | $ 152,306,988 | 100.00% | | | | | |

(1) As of the initial cut-off date, the weighted average FICO Credit Score of the mortgagors related to the Initial Mortgage Loans was approximately 726.

**Documentation Programs**

| Documentation Program | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Reduced | 205 | $ 87,765,682 | 57.62% | 428,125 | 6.771 | 358 | 730 | 72.83 |
| Full/Alternative | 98 | 47,638,017 | 31.28 | 486,102 | 6.756 | 358 | 713 | 74.30 |
| Stated Income/Stated Asset | 21 | 10,469,193 | 6.87 | 498,533 | 6.744 | 358 | 748 | 74.09 |
| No Income/No Asset | 10 | 2,391,628 | 1.57 | 239,163 | 7.119 | 358 | 738 | 77.56 |
| No Ratio | 7 | 1,877,408 | 1.23 | 268,201 | 6.956 | 359 | 761 | 69.35 |
| Preferred | 2 | 1,686,900 | 1.11 | 843,450 | 6.750 | 358 | 752 | 77.25 |
| FULL–DU[1] | 1 | 478,160 | 0.31 | 478,160 | 6.240 | 357 | 703 | 80.00 |
| **Total** | **344** | **$ 152,306,988** | **100.00%** | | | | | |

(1) Fannie Mae Desktop Underwriter is an automated underwriting system (AUS).

**Original Loan-to-Value Ratios[1][2]**

| Range of Original Loan-to-Value Ratios (%) | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0.01 – 50.00 | 20 | $ 8,178,975 | 5.37% | 408,949 | 6.722 | 358 | 741 | 42.69 |
| 50.01 – 55.00 | 9 | 3,535,865 | 2.32 | 392,874 | 6.740 | 358 | 766 | 53.52 |
| 55.01 – 60.00 | 13 | 6,546,142 | 4.30 | 503,549 | 6.769 | 357 | 733 | 57.81 |
| 60.01 – 65.00 | 27 | 13,957,292 | 9.16 | 516,937 | 6.661 | 358 | 730 | 63.25 |
| 65.01 – 70.00 | 27 | 11,922,026 | 7.83 | 441,557 | 6.754 | 358 | 729 | 68.96 |
| 70.01 – 75.00 | 40 | 19,028,733 | 12.49 | 475,718 | 6.779 | 358 | 721 | 74.36 |
| 75.01 – 80.00 | 193 | 84,447,682 | 55.45 | 437,553 | 6.779 | 358 | 723 | 79.59 |
| 80.01 – 85.00 | 2 | 709,250 | 0.47 | 354,625 | 6.738 | 359 | 710 | 83.94 |
| 85.01 – 90.00 | 7 | 1,702,144 | 1.12 | 243,163 | 7.050 | 358 | 741 | 89.76 |
| 90.01 – 95.00 | 4 | 1,296,055 | 0.85 | 324,014 | 7.315 | 357 | 721 | 94.99 |
| 95.01 – 100.00 | 2 | 982,824 | 0.65 | 491,412 | 6.963 | 357 | 768 | 100.00 |
| **Total** | **344** | **$ 152,306,988** | **100.00%** | | | | | |

(1) As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans was approximately 73.48%.
(2) Does not take into account any secondary financing on the Initial Mortgage Loans that may exist at the time of origination.

## Original Combined Loan-to-Value Ratios[1][2]

| Range of Original Combined Loan-to-Value Ratios (%) | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0.01 – 50.00 | 20 | $ 8,178,975 | 5.37% | 408,949 | 6.722 | 358 | 741 | 42.72 |
| 50.01 – 55.00 | 9 | 3,535,865 | 2.32 | 392,874 | 6.740 | 358 | 766 | 53.54 |
| 55.01 – 60.00 | 12 | 6,152,352 | 4.04 | 512,696 | 6.794 | 357 | 734 | 58.13 |
| 60.01 – 65.00 | 21 | 10,876,972 | 7.14 | 517,951 | 6.652 | 358 | 723 | 63.16 |
| 65.01 – 70.00 | 20 | 9,576,001 | 6.29 | 478,800 | 6.761 | 358 | 724 | 68.88 |
| 70.01 – 75.00 | 27 | 12,173,572 | 7.99 | 450,873 | 6.757 | 358 | 723 | 74.22 |
| 75.01 – 80.00 | 96 | 47,448,664 | 31.15 | 494,257 | 6.764 | 358 | 727 | 79.37 |
| 80.01 – 85.00 | 14 | 7,668,832 | 5.04 | 547,774 | 6.753 | 358 | 702 | 83.20 |
| 85.01 – 90.00 | 57 | 25,890,212 | 17.00 | 454,214 | 6.745 | 358 | 723 | 89.45 |
| 90.01 – 95.00 | 23 | 7,647,977 | 5.02 | 332,521 | 6.876 | 358 | 738 | 94.78 |
| 95.01 – 100.00 | 43 | 12,647,940 | 8.30 | 294,138 | 6.936 | 358 | 724 | 99.84 |
| 100.01 – 105.00 | 2 | 509,625 | 0.33 | 254,812 | 6.897 | 358 | 710 | 100.63 |
| Total | 344 | $ 152,306,988 | 100.00% | | | | | |

(1) As of the initial cut-off date, the weighted average original Combined Loan-to-Value Ratio of the Initial Mortgage Loans was approximately 78.17%.
(2) Takes into account any secondary financing on the Initial Mortgage Loans that may exist at the time of origination.

## Geographic Distribution of Mortgaged Properties[1]

| State | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Alabama | 2 | $ 686,411 | 0.45% | 343,205 | 6.798 | 357 | 698 | 80.00 |
| Arizona | 15 | 6,983,791 | 4.59 | 465,586 | 6.845 | 358 | 731 | 75.28 |
| Arkansas | 2 | 195,265 | 0.13 | 97,633 | 7.196 | 354 | 705 | 80.00 |
| California | 114 | 59,627,817 | 39.15 | 523,051 | 6.716 | 358 | 736 | 71.41 |
| Colorado | 15 | 5,794,509 | 3.80 | 386,301 | 6.756 | 358 | 739 | 73.73 |
| Connecticut | 5 | 1,402,009 | 0.92 | 280,402 | 6.849 | 358 | 713 | 75.14 |
| Delaware | 1 | 484,163 | 0.32 | 484,163 | 6.750 | 358 | 698 | 58.00 |
| District of Columbia | 1 | 547,900 | 0.36 | 547,900 | 6.750 | 358 | 802 | 80.00 |
| Florida | 44 | 18,643,983 | 12.24 | 423,727 | 6.842 | 358 | 718 | 72.77 |
| Georgia | 17 | 4,766,406 | 3.13 | 280,377 | 6.859 | 358 | 712 | 76.71 |
| Hawaii | 2 | 1,256,609 | 0.83 | 628,304 | 6.450 | 358 | 682 | 74.33 |
| Idaho | 1 | 478,160 | 0.31 | 478,160 | 6.240 | 357 | 703 | 80.00 |
| Illinois | 1 | 453,600 | 0.30 | 453,600 | 7.125 | 359 | 775 | 79.99 |
| Indiana | 1 | 50,186 | 0.03 | 50,186 | 6.875 | 354 | 668 | 80.00 |
| Kansas | 1 | 519,848 | 0.34 | 519,848 | 6.750 | 358 | 703 | 79.99 |
| Kentucky | 2 | 278,808 | 0.18 | 139,404 | 7.074 | 357 | 700 | 77.35 |
| Louisiana | 4 | 1,259,754 | 0.83 | 314,938 | 6.867 | 358 | 695 | 81.19 |
| Maine | 2 | 424,137 | 0.28 | 212,068 | 6.892 | 358 | 691 | 71.86 |
| Maryland | 17 | 7,965,472 | 5.23 | 468,557 | 6.658 | 358 | 697 | 76.01 |
| Massachusetts | 4 | 1,886,135 | 1.24 | 471,534 | 6.676 | 358 | 690 | 79.70 |
| Michigan | 5 | 1,357,147 | 0.89 | 271,429 | 6.859 | 358 | 719 | 69.71 |
| Minnesota | 1 | 666,100 | 0.44 | 666,100 | 6.500 | 359 | 740 | 80.00 |
| Missouri | 3 | 1,923,980 | 1.26 | 641,327 | 6.846 | 358 | 744 | 80.96 |
| Montana | 2 | 1,334,914 | 0.88 | 667,457 | 7.041 | 359 | 744 | 76.63 |
| Nevada | 11 | 4,599,026 | 3.02 | 418,093 | 6.787 | 358 | 739 | 75.00 |
| New Jersey | 3 | 2,320,500 | 1.52 | 773,500 | 6.591 | 357 | 743 | 77.38 |
| New Mexico | 1 | 225,000 | 0.15 | 225,000 | 7.125 | 358 | 640 | 90.00 |
| New York | 9 | 6,060,904 | 3.98 | 673,434 | 6.844 | 357 | 710 | 68.36 |
| North Carolina | 7 | 2,903,124 | 1.91 | 414,732 | 6.957 | 358 | 729 | 82.27 |
| Ohio | 2 | 934,742 | 0.61 | 467,371 | 6.694 | 358 | 682 | 80.18 |
| Oregon | 8 | 2,063,928 | 1.36 | 257,991 | 6.783 | 358 | 769 | 73.15 |
| Pennsylvania | 3 | 1,110,853 | 0.73 | 370,284 | 6.758 | 358 | 667 | 77.50 |
| Rhode Island | 1 | 464,938 | 0.31 | 464,938 | 6.750 | 358 | 763 | 80.00 |
| South Carolina | 7 | 1,879,503 | 1.23 | 268,500 | 6.974 | 357 | 725 | 77.07 |

| State | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Tennessee | 1 | 89,000 | 0.06 | 89,000 | 6.750 | 356 | 776 | 80.00 |
| Texas | 4 | 439,924 | 0.29 | 109,981 | 6.962 | 358 | 738 | 76.10 |
| Utah | 3 | 497,085 | 0.33 | 165,695 | 6.911 | 358 | 764 | 86.34 |
| Virginia | 12 | 5,264,028 | 3.46 | 438,669 | 6.812 | 358 | 723 | 76.66 |
| Washington | 8 | 3,944,130 | 2.59 | 493,016 | 6.791 | 358 | 713 | 65.90 |
| West Virginia | 1 | 212,000 | 0.14 | 212,000 | 7.375 | 359 | 632 | 80.00 |
| Wyoming | 1 | 311,200 | 0.20 | 311,200 | 7.125 | 359 | 807 | 80.00 |
| Total | 344 | $ 152,306,988 | 100.00% | | | | | |

(1) As of the initial cut-off date, no more than approximately 1.838% of the Initial Mortgage Loans were secured by mortgaged properties located in any one postal zip code area.

## Loan Purpose

| Loan Purpose | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Purchase | 187 | $ 84,429,468 | 55.43% | 451,494 | 6.791 | 358 | 734 | 76.85 |
| Refinance (cash-out) | 109 | 46,409,005 | 30.47 | 425,771 | 6.776 | 358 | 713 | 68.89 |
| Refinance (rate/term) | 48 | 21,468,515 | 14.10 | 447,261 | 6.679 | 358 | 724 | 70.16 |
| Total | 344 | $ 152,306,988 | 100.00% | | | | | |

## Types of Mortgaged Properties

| Property Type | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Single Family Residence | 196 | $ 93,267,209 | 61.24% | 475,853 | 6.759 | 358 | 723 | 72.99 |
| Planned Unit Development | 104 | 43,151,855 | 28.33 | 414,922 | 6.797 | 358 | 732 | 74.12 |
| Low-Rise Condominium | 31 | 11,412,671 | 7.49 | 368,151 | 6.736 | 358 | 734 | 75.06 |
| 2-4 Family Residence | 11 | 3,569,018 | 2.34 | 324,456 | 6.853 | 357 | 719 | 74.52 |
| High-Rise Condominium | 2 | 906,235 | 0.60 | 453,118 | 6.750 | 357 | 793 | 70.17 |
| Total | 344 | $ 152,306,988 | 100.00% | | | | | |

## Occupancy Types[1]

| Occupancy Type | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Primary Residence | 295 | $ 134,951,486 | 88.60% | 457,463 | 6.757 | 358 | 725 | 73.61 |
| Secondary Residence | 21 | 12,474,708 | 8.19 | 594,034 | 6.814 | 358 | 734 | 73.45 |
| Investment Property | 28 | 4,880,795 | 3.20 | 174,314 | 7.030 | 356 | 735 | 70.00 |
| Total | 344 | $ 152,306,988 | 100.00% | | | | | |

(1)   Based upon representations of the related borrowers at the time of origination.

## Remaining Terms to Maturity[1]

| Remaining Term to Maturity (Months) | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate(%) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|
| 359 | 87 | $ 38,463,385 | 25.25% | 442,108 | 6.851 | 727 | 73.71 |
| 358 | 185 | 89,772,292 | 58.94 | 485,256 | 6.725 | 728 | 73.10 |
| 357 | 33 | 15,203,698 | 9.98 | 460,718 | 6.677 | 726 | 75.44 |
| 356 | 23 | 4,087,040 | 2.68 | 177,697 | 7.063 | 702 | 78.12 |
| 355 | 8 | 1,759,024 | 1.15 | 219,878 | 6.975 | 742 | 75.58 |
| 354 | 3 | 2,253,322 | 1.48 | 751,107 | 6.961 | 699 | 59.83 |
| 353 | 2 | 374,818 | 0.25 | 187,409 | 7.338 | 680 | 79.14 |
| 352 | 3 | 393,411 | 0.26 | 131,137 | 7.162 | 719 | 77.03 |
| Total | 344 | $ 152,306,988 | 100.00% | | | | |

(1) As of the initial cut-off date, the weighted average remaining term to maturity of the Initial Mortgage Loans was approximately 358 months.

## Interest-Only Periods at Origination

| Interest-Only Period (months) | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0 | 152 | $ 67,970,621 | 44.63% | 447,175 | 6.714 | 358 | 728 | 72.15 |
| 120 | 192 | 84,336,368 | 55.37 | 439,252 | 6.815 | 358 | 725 | 74.55 |
| Total | 344 | $ 152,306,988 | 100.00% | | | | | |

**Prepayment Charge Periods at Origination**

| Prepayment Charge Period (months) | Number of Initial Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Initial Mortgage Loans | Average Principal Balance Outstanding ($) | Weighted Average Current Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0 | 338 | $ 149,818,625 | 98.37% | 443,250 | 6.774 | 358 | 726 | 73.39 |
| 36 | 4 | 1,577,579 | 1.04 | 394,395 | 6.395 | 356 | 746 | 79.83 |
| 60 | 2 | 910,783 | 0.60 | 455,392 | 6.875 | 359 | 710 | 77.38 |
| **Total** | **344** | **$ 152,306,988** | **100.00%** | | | | | |

**Assignment of the Mortgage Loans**

Pursuant to the pooling and servicing agreement, on the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each Closing Date Mortgage Loan and all right, title and interest in and to all other assets included in Alternative Loan Trust 2006-J6, including all principal and interest received on or with respect to the Closing Date Mortgage Loans, but not any principal and interest due on or before the initial cut-off date and amounts on deposit in the Pre-Funding Account and Capitalized Interest Account on the closing date.

In connection with the transfer and assignment of a mortgage loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things,

- the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost;

- the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument;

- an assignment in recordable form of the mortgage or a copy of such assignment;

- the original or a copy of the title policy with respect to the related mortgaged property; and

- if applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor).

With respect to up to 50% of the Closing Date Mortgage Loans, the depositor may deliver all or a portion of each related mortgage file to the trustee not later than thirty days after the closing date and not later than twenty days after the relevant Supplemental Transfer Date (as defined below) with respect to up to 90% of the Supplemental Mortgage Loans (as defined below) conveyed on such Supplemental Transfer Date. Assignments of the mortgage loans to the trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states where, in the opinion of counsel, recording is not required to protect the trustee's interests in the mortgage loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or any seller or a transferor, as the case may be. The depositor believes that substantially all of the assignments will not be recorded based on an opinion of counsel.

The trustee will hold the mortgage loan documents in trust for the benefit of the holders of the certificates in accordance with its customary procedures, including storing the documents in fire-resistant facilities. The trustee will review each mortgage file relating to the Closing Date Mortgage Loans within 90 days of the closing date (or promptly after the trustee's receipt of any document permitted to be delivered after the closing date) and, with respect to the documents relating to the Supplemental Mortgage Loans, promptly after the trustee's receipt thereof after the related Supplemental Transfer Date as described above. If any document in a mortgage file is found to be missing or defective in a material respect and Countrywide Home Loans does not cure the defect within 90 days of notice of the defect from the trustee (or within such longer period not to exceed 720 days after the closing date as provided in the pooling and servicing agreement in the case of missing documents not returned from the public recording office), Countrywide Home Loans will be obligated to repurchase the related mortgage loan from the issuing entity at the purchase price described in the prospectus under *"Loan Program – Representations by Sellers; Repurchases."* Rather than repurchase the mortgage loan as provided above, Countrywide Home Loans may remove the mortgage loan (referred to as a deleted mortgage loan) from the issuing entity and substitute in its place another mortgage loan (referred to as a replacement mortgage loan); however, such a substitution is permitted only within two years of the closing date and may not be made unless an opinion of counsel is provided to the trustee to the effect that such a substitution will not disqualify any REMIC or result in a prohibited transaction tax under the

Internal Revenue Code of 1986, as amended (the "Code"). Any replacement mortgage loan generally will, on the date of substitution, among other characteristics set forth in the pooling and servicing agreement,

- have a principal balance, after deduction of all scheduled payments due in the month of substitution, not in excess of, and not more than 10% less than, the Stated Principal Balance of the deleted mortgage loan (the amount of any shortfall to be deposited by Countrywide Home Loans in the Certificate Account and held for distribution to the certificateholders on the related Distribution Date (referred to as a "Substitution Adjustment Amount")),

- have a mortgage rate not lower than, and not more than 1% per annum higher than, that of the deleted mortgage loan,

- have a Loan-to-Value Ratio not higher than that of the deleted mortgage loan,

- have a remaining term to maturity not greater than (and not more than one year less than) that of the deleted mortgage loan, and

- comply with all of the representations and warranties set forth in the pooling and servicing agreement as of the date of substitution.

This cure, repurchase or substitution obligation constitutes the sole remedy available to certificateholders or the trustee for omission of, or a material defect in, a mortgage loan document.

Notwithstanding the foregoing, in lieu of providing the duly executed assignment of the mortgage to the trustee or copies thereof and the original recorded assignment or assignments of the mortgage together with all interim recorded assignments of such mortgage or copies thereof, above, the depositor may at its discretion provide evidence that the related mortgage is held through the MERS® System. In addition, the mortgages for some or all of the mortgage loans in the issuing entity that are not already held through the MERS® System may, at the discretion of the master servicer, in the future be held through the MERS® System. For any mortgage held through the MERS® System, the mortgage is recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, as nominee for the owner of the mortgage loan, and subsequent assignments of the mortgage were, or in the future may be, at the discretion of the master servicer, registered electronically through the MERS® System. For each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan.

**Conveyance of Supplemental Mortgage Loans**

If the aggregate Stated Principal Balance of the Closing Date Mortgage Loans as of the initial cut-off date is less than $187,217,508, an account (the "Pre-funding Account") will be established with the trustee on the closing date and funded in an amount equal to the excess of the related amount (the "Pre-funded Amount") set forth above over the balance of the aggregate Stated Principal Balance of the Closing Date Mortgage Loans as of the initial cut-off date. As of the date of this prospectus supplement, the Pre-funded Amount is expected to be approximately $34,910,520, but the amount actually deposited in the Pre-funding Account on the closing date will equal the excess, if any, of the aggregate Class Certificate Balance of the certificates as of the closing date, over the aggregate Stated Principal Balance of the Closing Date Mortgage Loans as of the initial cut-off date. Amounts on deposit in Pre-funding Account may be used to purchase mortgage loans after the closing date to be included in the aggregate Stated Principal Balance of the mortgage loans. Such mortgage loans are referred to as Supplemental Mortgage Loans.

Any investment income earned from amounts in the Pre-funding Account will be paid to the depositor and will not be available for payments on the certificates. During the period from the closing date to the earlier of the date on which the amount in the Pre-funding Account allocated to purchase Supplemental Mortgage Loans is less than $150,000 and October 31, 2006 (the "Funding Period"), the depositor is expected to purchase Supplemental Mortgage Loans from one or more of the sellers and sell those Supplemental Mortgage Loans to the issuing entity as described below. The purchase price for each Supplemental Mortgage Loan purchased by the trust after the closing

date will equal the Stated Principal Balance of the Supplemental Mortgage Loan as of the later of the first day of the month of the transfer to the issuing entity and the date of origination of that mortgage loan (the related "Supplemental Cut-off Date") and will be paid from the Pre-funding Account. Accordingly, the purchase of Supplemental Mortgage Loans will decrease the amount on deposit in the Pre-funding Account and increase the Stated Principal Balance of the mortgage loans.

Because some of the mortgage loans may not be acquired by the issuing entity until after the closing date, there may not be sufficient interest collections from the Initial Mortgage Loans to pay all the interest due on the certificates on the first and possibly the second Distribution Dates. A capitalized interest account (the "Capitalized Interest Account") will be established and funded on the closing date from which funds (together with any investment earnings thereon) will be drawn upon to offset any interest shortfall on the Distribution Date during and, if necessary, immediately following the Funding Period as a result of the supplemental loan mechanism. Any amounts remaining in the Capitalized Interest Account after making distributions of interest on the first Distribution Date following the end of the Funding Period will be paid to Countrywide Home Loans and will not thereafter be available for distribution to certificateholders.

Amounts on deposit in the Pre-funding Account and the Capitalized Interest Account will be invested in permitted investments. The Pre-funding Account and the Capitalized Interest Account will not be assets of any REMIC.

Pursuant to the pooling and servicing agreement and a supplemental transfer agreement (a "Supplemental Transfer Agreement") to be executed by the applicable seller, the depositor and the trustee, the conveyance of Supplemental Mortgage Loans may be made on any business day during the Funding Period (a "Supplemental Transfer Date"), subject to the fulfillment of certain conditions in the pooling and servicing agreement, including that the Supplemental Mortgage Loans conveyed on the related Supplemental Transfer Date satisfy the same representations and warranties in the pooling and servicing agreement applicable to all of the mortgage loans, and that, as of the Supplemental Cut-off Date:

- the Supplemental Mortgage Loans conveyed on that Supplemental Transfer Date were selected in a manner reasonably believed not to be adverse to the interests of the certificateholders,

- the trustee receives an opinion of counsel with respect to the validity of the conveyance of the Supplemental Mortgage Loans conveyed on that Supplemental Transfer Date,

- the Supplemental Mortgage Loans conveyed on that Supplemental Transfer Date were originated in accordance with the underwriting standards described in this prospectus supplement,

- the aggregate of the PO Percentages of the Stated Principal Balances of all Supplemental Mortgage Loans (also referred to as the PO Sublimit) shall be no greater than approximately $3,029,

- the conveyance of the Supplemental Mortgage Loans on that Supplemental Transfer Date will not result in a reduction or withdrawal of any ratings assigned to the offered certificates, and

- following the conveyance of the Supplemental Mortgage Loans on that Supplemental Transfer Date to the issuing entity, the characteristics of the mortgage pool will not vary by more than the permitted variance specified below from the characteristics listed below; provided that for the purpose of making such calculations, the characteristics for any Initial Closing Date Mortgage Loan will be taken as of the initial cut-off date and the characteristics for any Supplemental Mortgage Loan will be taken as of the related Supplemental Cut-off Date:

| Characteristic | | Permitted Variance or Range |
|---|---|---|
| Average Stated Principal Balance ........................................... | $360,000 | 10% |
| Weighted Average Mortgage Rate ........................................... | 6.82% | 10 bps |
| Weighted Average Original Loan-to-Value Ratio .................. | 73.00% | 5% |
| Weighted Average Remaining Term to Maturity.................... | 358 months | 2 months |
| Weighted Average FICO Credit Score.................................... | 726 | 5 points |

**Underwriting Process – Countrywide Home Loans, Inc.**

*General*

Approximately 6.61% of the Initial Cut-off Date Pool Principal Balance were originated by Countrywide Home Loans, Inc. or acquired by Countrywide Home Loans from correspondent lenders using Countrywide Home Loans' underwriting guidelines (the "Countrywide Initial Mortgage loans"). Countrywide Home Loans has been originating mortgage loans since 1969.

As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

In assessing a prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit Scores. "FICO Credit Scores" are statistical credit scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history. FICO Credit Scores were not developed to predict the likelihood of default on mortgage loans and, accordingly, may not be indicative of the ability of a mortgagor to repay its mortgage loan. FICO Credit Scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit Scores, which indicate a more favorable credit history, and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years may be eligible for Countrywide Home Loans' processing program (the "Preferred Processing Program"). None of the Countrywide Initial Mortgage loans have been underwritten pursuant to Countrywide Home Loans' Preferred Processing Program. Countrywide Home Loans may waive some documentation requirements for mortgage loans originated under the Preferred Processing Program.

Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself.

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

Countrywide Home Loans may provide secondary financing to a mortgagor contemporaneously with the origination of a mortgage loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%. Countrywide Home Loans' underwriting guidelines do not prohibit or otherwise restrict a mortgagor from obtaining secondary financing from lenders other than Countrywide Home Loans, whether at origination of the mortgage loan or thereafter.

The nature of the information that a borrower is required to disclose and whether the information is verified depends, in part, on the documentation program used in the origination process. In general under the Full Documentation Loan Program (the "Full Documentation Program"), each prospective borrower is required to complete an application which includes information with respect to the applicant's assets, liabilities, income, credit history, employment history and other personal information. Self-employed individuals are generally required to submit their two most recent federal income tax returns. Under the Full Documentation Program, the underwriter verifies the information contained in the application relating to employment, income, assets or mortgages.

A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both. Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "Alternative Documentation Program"), a Reduced Documentation Loan Program (the "Reduced Documentation Program"), a CLUES Plus Documentation Loan Program (the "CLUES Plus Documentation Program"), a No Income/No Asset Documentation Loan Program (the "No Income/No Asset Documentation Program"), a Stated Income/Stated Asset Documentation Loan Program (the "Stated Income/Stated Asset Documentation Program") and a Streamlined Documentation Loan Program (the "Streamlined Documentation Program").

For all mortgage loans originated or acquired by Countrywide Home Loans, Countrywide Home Loans obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

Countrywide Home Loans requires title insurance on all of its mortgage loans secured by first liens on real property. Countrywide Home Loans also requires that fire and extended coverage casualty insurance be maintained on the mortgaged property in an amount at least equal to the principal balance of the related single-family mortgage loan or the replacement cost of the mortgaged property, whichever is less.

In addition to Countrywide Home Loans' standard underwriting guidelines (the "Standard Underwriting Guidelines"), which are consistent in many respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie Mac, Countrywide Home Loans uses underwriting guidelines featuring expanded criteria (the "Expanded Underwriting Guidelines"). The Standard Underwriting Guidelines and the Expanded Underwriting Guidelines are described further under the next two headings.

*Standard Underwriting Guidelines*

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.

For cash-out refinance mortgage loans, Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 75% and original principal balances ranging up to $650,000. The maximum "cash-out" amount permitted is $200,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan. As used in this prospectus supplement, a refinance mortgage loan is classified as a cash-out refinance mortgage loan by Countrywide Home Loans if the borrower retains an amount greater than the lesser of 2% of the entire amount of the proceeds from the refinancing of the existing loan, or $2,000.

Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 80% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii). On second homes, Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii). Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 75% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

In connection with the Standard Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Program, the CLUES Plus Documentation Program or the Streamlined Documentation Program.

The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the

information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

*Expanded Underwriting Guidelines*

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

For cash-out refinance mortgage loans, Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 90% and original principal balances ranging up to $1,500,000. The maximum "cash-out" amount permitted is $400,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan.

Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 100% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii). On second homes, Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii). Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to

$645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines.

The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some mortgage loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The maximum Loan-to-Value Ratio, including secondary financing, for those mortgage loans ranges up to 85%.

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income.  The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%.  Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Expanded Underwriting Guidelines, Countrywide Home Loans may also provide mortgage loans to borrowers who are not U.S. citizens, including permanent and non-permanent residents. The borrower is required to have a valid U.S. social security number or a certificate of foreign status (IRS form W-8). The borrower's income and assets must be verified under the Full Documentation Program or the Alternative Documentation Program. The maximum Loan-to-Value Ratio, including secondary financing, is 80%.

**Underwriting Process – American Home Mortgage Corp.**

Approximately 52.92% of the Initial Cut-off Date Pool Principal Balance were originated by American Home Mortgage Corp. or acquired by American Home Mortgage Corp. generally in accordance with the underwriting guidelines described in this prospectus supplement.

*General*

American Home Mortgage Corp. ("American Home") is a New York corporation.  American Home conducts lending through retail and wholesale loan production offices and its correspondent channel as well as its direct-to-consumer channel supported by American Home's call center.  American Home operates more than 600 retail and wholesale loan production offices located in 45 states and the District of Columbia and makes loans throughout all 50 states and the District of Columbia.  American Home has been originating mortgage loans since its incorporation in 1988, and has been originating fixed-rate mortgage loans since such date.

The following table reflects American Home's originations of first-lien, fixed-rate mortgage loans for the past three years and for the six months ended June 30, 2006:

|  | Year Ended December 31, 2003 | Year Ended December 31, 2004 | Year Ended December 31, 2005 | Six Months Ended June 30, 2006 |
|---|---|---|---|---|
| Number of Loans | 74,462 | 59,576 | 97,645 | 58,847 |
| Principal Balance | $12,969,494,087 | $10,586,364,298 | $19,633,708,424 | $11,900,231,912 |

American Home is not aware of any material legal proceedings pending against it or against any of its property, including any proceedings known to be contemplated by governmental authorities material to the holders of the offered certificates.

*Underwriting Criteria*

The following information generally describes American Home's underwriting guidelines with respect to mortgage loans originated pursuant to its "conforming" or "prime" underwriting guidelines and its Alt-A underwriting guidelines.

The mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home. Conforming conventional loans must generally be approved by the Desktop Underwriter and Loan Prospector automated underwriting systems of Fannie Mae and Freddie Mac. FHA and VA loans are generally approved by these same automated underwriting systems.

American Home's non-conforming underwriting guidelines are similar to those of the government sponsored enterprises Fannie Mae and Freddie Mac, but these loans are "non-conforming" in that they may not conform to the maximum loan amounts and in some cases to the underwriting guidelines of Fannie Mae and Freddie Mac. These non-conforming loans do not conform to and are not insurable by the Federal Housing Administration nor can they be guaranteed by the U.S. Department of Veterans Affairs.

American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations.  Exceptions to the underwriting standards may be permitted where compensating factors are present.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgage property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources.

With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes.  Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

Non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac, in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. For these Alt-A products, the borrower may not be required to verify employment income, assets required to close or both.  For some other Alt-A products, the borrower is not required to provide any information regarding employment income, assets required to close or both.  Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

American Home obtains a credit report for each borrower that summarizes each borrower's credit history. The credit report contains information from the three major credit repositories, Equifax, Experian and TransUnion. These companies have developed scoring models to identify the comparative risk of delinquency among applicants based on characteristics within the applicant's credit report.  A borrower's credit score represents a comprehensive view of the borrower's credit history risk factors and is indicative of whether a borrower is likely to default on a loan. Some of the factors used to calculate credit scores are a borrower's incidents of previous delinquency, the number of credit accounts a borrower has, the amount of available credit that a borrower has utilized, the source of a borrower's existing credit, and recent attempts by a borrower to obtain additional credit. Applicants who have higher credit scores will, as a group, have fewer defaults than those who have lower credit scores. The minimum credit score allowed by American Home non-conforming loan guidelines for these loans is 620 and the average is typically over 700.  For American Home Alt-A products, the minimum credit score is generally 580. If the borrowers do not have a credit score they must have an alternative credit history showing at least three trade lines with no payments over 60 days past due in the last twelve months.

In addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history. In general, for non-conforming loans the borrower should not have made any mortgage payments over 30 days after the due date for the most recent twelve months. In general, for Alt-A loans, the borrower may have no more than one payment that was made over 30 days after the due date for the most recent twelve months.

In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter, Freddie Mac's Loan Prospector automated underwriting systems, a customized form of Fannie Mae's Desktop Underwriter called Custom Desktop Underwriter, or they have been manually underwritten by American Home's underwriters. American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis.  Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform

on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter.

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value. American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction, loans on second homes or loans on investment properties. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher coverage levels. For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

**Underwriting Process – General**

The mortgage loans that will be transferred to the issuing entity, other than those originated by Countrywide Home Loans, Inc. or American Home, or acquired by Countrywide Home Loans, Inc. or American Home from correspondent lenders or other third party originators who applied the related underwriting guidelines set forth above, have been originated or acquired in accordance with the procedures set forth in the prospectus under "*Loan Program–Underwriting Standards*."

## Servicing of Mortgage Loans

**General**

The master servicer will master service all of the mortgage loans in accordance with the terms set forth in the pooling and servicing agreement. The master servicer has agreed to service and administer the mortgage loans in accordance with customary and usual standards of practice of prudent mortgage loan lenders. The master servicer has also agreed to represent and protect the interest of the trustee in the mortgage loans in the same manner as it currently protects its own interest in mortgage loans in its own portfolio in any claim, proceeding or litigation regarding a mortgage loan. The master servicer is permitted to make a modification, waiver or amendment of a mortgage loan so long as the modification, waiver or amendment would comply with the general servicing standard described above, not cause any REMIC to fail to qualify as a REMIC, not result in the imposition of certain taxes and not extend the due date for a payment due on the related mortgage note for a period greater than 180 days. A modification, waiver or amendment may initially result in a reduction in the payments made under a mortgage loan, but it is expected that a modification, waiver or amendment will increase the payments made under the mortgage loan over the life of the mortgage loan.

The master servicer may perform any of its obligations under the pooling and servicing agreement through one or more subservicers, which may include Countrywide Home Loans. Set forth below are the direct servicers of

the Initial Mortgage Loans by aggregate Stated Principal Balance of the Initial Mortgage loans as of the initial cut-off date:

| Primary Servicer | % of Initial Mortgage Loans |
|---|---|
| Countrywide Home Loans | 97.75% |
| SunTrust Mortgage Incorporated | 2.25% |

In addition, Countrywide Home Loans will be the direct servicer of all of the Supplemental Mortgage Loans.

**Countrywide Home Loans Servicing LP**

The principal executive offices of Countrywide Home Loans Servicing LP ("Countrywide Servicing") are located at 7105 Corporate Drive, Plano, Texas 75024. Countrywide Servicing is a Texas limited partnership directly owned by Countrywide GP, Inc. and Countrywide LP, Inc., each a Nevada corporation and a direct wholly owned subsidiary of Countrywide Home Loans.  Countrywide GP, Inc. owns a 0.1% interest in Countrywide Servicing and is the general partner. Countrywide LP, Inc. owns a 99.9% interest in Countrywide Servicing and is a limited partner.

Countrywide Home Loans established Countrywide Servicing in February 2000 to service mortgage loans originated by Countrywide Home Loans that would otherwise have been serviced by Countrywide Home Loans. In January and February 2001, Countrywide Home Loans transferred to Countrywide Servicing all of its rights and obligations relating to mortgage loans serviced on behalf of Fannie Mae and Freddie Mac, respectively. In October 2001, Countrywide Home Loans transferred to Countrywide Servicing all of its rights and obligations relating to the bulk of its non-agency loan servicing portfolio (other than the servicing of home equity lines of credit), including with respect to those mortgage loans (other than home equity lines of credit) formerly serviced by Countrywide Home Loans and securitized by certain of its affiliates.  While Countrywide Home Loans expects to continue to directly service a portion of its loan portfolio, it is expected that the servicing rights for most newly originated Countrywide Home Loans mortgage loans will be transferred to Countrywide Servicing upon sale or securitization of the related mortgage loans. Countrywide Servicing is engaged in the business of servicing mortgage loans and will not originate or acquire loans, an activity that will continue to be performed by Countrywide Home Loans. In addition to acquiring mortgage servicing rights from Countrywide Home Loans, it is expected that Countrywide Servicing will service mortgage loans for non-Countrywide Home Loans affiliated parties as well as subservice mortgage loans on behalf of other master servicers.

In connection with the establishment of Countrywide Servicing, certain employees of Countrywide Home Loans became employees of Countrywide Servicing. Countrywide Servicing has engaged Countrywide Home Loans as a subservicer to perform certain loan servicing activities on its behalf.

Countrywide Servicing is an approved mortgage loan servicer for Fannie Mae, Freddie Mac, Ginnie Mae, HUD and VA and is licensed to service mortgage loans in those states where a license is required. Its loan servicing activities are guaranteed by Countrywide Financial and Countrywide Home Loans (when required by the owner of the mortgage loans).

**Countrywide Home Loans**

Countrywide Home Loans, Inc., a New York corporation ("Countrywide Home Loans"), is the sponsor for the transaction and also a seller.  Countrywide Home Loans is a direct wholly owned subsidiary of Countrywide Financial Corporation, a Delaware corporation ("Countrywide Financial"). The principal executive offices of Countrywide Home Loans are located at 4500 Park Granada, Calabasas, California 91302. Countrywide Home Loans is engaged primarily in the mortgage banking business, and as part of that business, originates, purchases, sells and services mortgage loans. Countrywide Home Loans originates mortgage loans through a retail branch system and through mortgage loan brokers and correspondents nationwide. Mortgage loans originated by

Countrywide Home Loans are principally first-lien, fixed or adjustable rate mortgage loans secured by single-family residences.

Countrywide Home Loans has historically sold substantially all the mortgage loans that it has originated and purchased, generally through securitizations. Countrywide Home Loans does not always sell mortgage loans immediately after origination or acquisition, but may decide to sell certain mortgage loans in later periods as part of its overall management of interest rate risk.  Countrywide Home Loans has been involved in the securitization of mortgage loans since 1969 when it was approved as a Federal National Mortgage Association seller/servicer. Countrywide Home Loans reviews the structure of its securitizations and discusses the structure with the related underwriters.

Except as otherwise indicated, reference in the remainder of this prospectus supplement to "Countrywide Home Loans" should be read to include Countrywide Home Loans and its consolidated subsidiaries, including Countrywide Servicing.  Countrywide Home Loans services substantially all of the mortgage loans it originates or acquires. In addition, Countrywide Home Loans has purchased in bulk the rights to service mortgage loans originated by other lenders. Countrywide Home Loans has in the past and may in the future sell to mortgage bankers and other institutions a portion of its portfolio of loan servicing rights.  As of December 31, 2002, December 31, 2003, December 31, 2004, December 31, 2005 and June 30, 2006, Countrywide Home Loans provided servicing for mortgage loans with an aggregate principal balance of approximately $452.405 billion, $644.855 billion, $838.322 billion, $1,111.090 billion and $1,196.720 billion, respectively, substantially all of which were being serviced for unaffiliated persons.

## Mortgage Loan Production

The following table sets forth, by number and dollar amount of mortgage loans, Countrywide Home Loans' residential mortgage loan production for the periods indicated.

| | Consolidated Mortgage Loan Production | | | | | |
|---|---|---|---|---|---|---|
| | Ten Months Ended December 31, 2001 | Years Ended December 31, | | | | Six Months Ended June 30, 2006 |
| | | 2002 | 2003 | 2004 | 2005 | |
| | | (Dollars in millions, except average loan amount) | | | | |
| **Conventional Conforming Loans** | | | | | | |
| Number of Loans | 504,975 | 999,448 | 1,517,743 | 846,395 | 809,630 | 353,101 |
| Volume of Loans | $ 76,432 | $ 150,110 | $ 235,868 | $ 138,845 | $ 167,675 | $ 69,363 |
| Percent of Total Dollar Volume | 61.7% | 59.6% | 54.2% | 38.2% | 34.1% | 31.5% |
| **Conventional Non-conforming Loans** | | | | | | |
| Number of Loans | 137,593 | 277,626 | 554,571 | 509,711 | 826,178 | 322,108 |
| Volume of Loans | $ 22,209 | $ 61,627 | $ 136,664 | $ 140,580 | $ 225,217 | $ 100,537 |
| Percent of Total Dollar Volume | 17.9% | 24.5% | 31.4% | 38.7% | 45.9% | 45.7% |
| **FHA/VA Loans** | | | | | | |
| Number of Loans | 118,734 | 157,626 | 196,063 | 105,562 | 80,528 | 43,381 |
| Volume of Loans | $ 14,109 | $ 19,093 | $ 24,402 | $ 13,247 | $ 10,712 | $ 6,192 |
| Percent of Total Dollar Volume | 11.4% | 7.6% | 5.6% | 3.6% | 2.2% | 2.8% |
| **Prime Home Equity Loans** | | | | | | |
| Number of Loans | 164,503 | 316,049 | 453,817 | 587,046 | 683,887 | 348,542 |
| Volume of Loans | $ 5,639 | $ 11,650 | $ 18,103 | $ 30,893 | $ 42,706 | $ 23,524 |
| Percent of Total Dollar Volume | 4.5% | 4.6% | 4.2% | 8.5% | 8.7% | 10.7% |
| **Nonprime Mortgage Loans** | | | | | | |
| Number of Loans | 43,359 | 63,195 | 124,205 | 250,030 | 278,112 | 127,162 |
| Volume of Loans | $ 5,580 | $ 9,421 | $ 19,827 | $ 39,441 | $ 44,637 | $ 20,411 |
| Percent of Total Dollar Volume | 4.5% | 3.7% | 4.6% | 11.0% | 9.1% | 9.3% |
| **Total Loans** | | | | | | |
| Number of Loans | 969,164 | 1,813,944 | 2,846,399 | 2,298,744 | 2,678,335 | 1,194,294 |
| Volume of Loans | $ 123,969 | $ 251,901 | $ 434,864 | $ 363,006 | $ 490,947 | $ 220,027 |
| Average Loan Amount | $ 128,000 | $ 139,000 | $ 153,000 | $ 158,000 | $ 183,000 | $ 184,000 |
| Non-Purchase Transactions(1) | 63% | 66% | 72% | 51% | 53% | 54% |
| Adjustable-Rate Loans(1) | 12% | 14% | 21% | 52% | 52% | 49% |

(1)   Percentage of total mortgage loan production (excluding commercial real estate loans) based on dollar volume.

**Loan Servicing**

Countrywide Servicing has established standard policies for the servicing and collection of mortgages. Servicing includes, but is not limited to:

- collecting, aggregating and remitting mortgage loan payments;

- accounting for principal and interest;

- holding escrow (impound) funds for payment of taxes and insurance;

- making inspections as required of the mortgaged properties;

- preparation of tax related information in connection with the mortgage loans;

- supervision of delinquent mortgage loans;

- loss mitigation efforts;

- foreclosure proceedings and, if applicable, the disposition of mortgaged properties; and

- generally administering the mortgage loans, for which it receives servicing fees.

Billing statements with respect to mortgage loans are mailed monthly by Countrywide Servicing. The statement details all debits and credits and specifies the payment due. Notice of changes in the applicable loan rate are provided by Countrywide Servicing to the mortgagor with these statements.

**Collection Procedures**

When a mortgagor fails to make a payment on a mortgage loan, Countrywide Servicing attempts to cause the deficiency to be cured by corresponding with the mortgagor. In most cases, deficiencies are cured promptly. Pursuant to Countrywide Servicing's servicing procedures, Countrywide Servicing generally mails to the mortgagor a notice of intent to foreclose after the loan becomes 61 days past due (three payments due but not received) and, generally within 59 days thereafter, if the loan remains delinquent, institutes appropriate legal action to foreclose on the mortgaged property. Foreclosure proceedings may be terminated if the delinquency is cured. Mortgage loans to borrowers in bankruptcy proceedings may be restructured in accordance with law and with a view to maximizing recovery of the loans, including any deficiencies.

Once foreclosure is initiated by Countrywide Servicing, a foreclosure tracking system is used to monitor the progress of the proceedings. The system includes state-specific parameters to monitor whether proceedings are progressing within the time frame typical for the state in which the mortgaged property is located. During the foreclosure proceeding, Countrywide Servicing determines the amount of the foreclosure bid and whether to liquidate the mortgage loan.

If foreclosed, the mortgaged property is sold at a public or private sale and may be purchased by Countrywide Servicing. After foreclosure, Countrywide Servicing may liquidate the mortgaged property and charge-off the loan balance which was not recovered through liquidation proceeds.

Servicing and charge-off policies and collection practices with respect to mortgage loans may change over time in accordance with, among other things, Countrywide Servicing's business judgment, changes in the servicing portfolio and applicable laws and regulations.

**Servicing Compensation and Payment of Expenses**

The Expense Fees with respect to the mortgage pool are payable out of the interest payments on each mortgage loan.  The Expense Fee Rate for the mortgage loans varies from mortgage loan to mortgage loan.  As of the initial cut-off date, the weighted average Expense Fee Rate for the Initial Mortgage Loans will be a per annum rate equal to 0.226%.  The Expense Fees consist of:

- the master servicing fee payable to the master servicer in respect of its master servicing activities (the "Master Servicing Fee");

- fees payable to the trustee in respect of its activities as trustee under the pooling and servicing agreement; and

- lender paid mortgage insurance premiums, if any.

The master servicing fee for the mortgage loans will range from 0.200% to 0.250% per annum of the Stated Principal Balance of each mortgage loan.  As of the initial cut-off date, the weighted average master servicing fee for the Initial Mortgage Loans will be 0.212% per annum.

The master servicer is obligated to pay some but not all ongoing expenses associated with the issuing entity and incurred by the master servicer in connection with its responsibilities under the pooling and servicing agreement and those amounts will be paid by the master servicer out of the master servicing fee.  The amount of the master servicing fee is subject to adjustment with respect to prepaid mortgage loans, as described under *"— Adjustment to Servicing Compensation in Connection with Certain Prepaid Mortgage Loans."* The master servicer is also entitled to receive, as additional servicing compensation, all late payment fees, prepayment charges, assumption fees and other similar charges and all reinvestment income earned on amounts on deposit in the Certificate Account and Distribution Account and Excess Proceeds with respect to mortgage loans as described under *"Description of the Certificates —Fees and Expenses"*.

The net mortgage rate of a mortgage loan is its mortgage rate (net of the interest premium charged by the related lenders for the lender acquired mortgage insurance mortgage loans, if any) less the sum of the master servicing fee and the trustee fee on the mortgage loan (expressed as a per annum percentage of its Stated Principal Balance).

**Adjustment to Servicing Compensation in Connection with Certain Prepaid Mortgage Loans**

When a borrower prepays a mortgage loan between Due Dates, the borrower is required to pay interest on the amount prepaid only to the date of prepayment and not thereafter.  Except with respect to the month of the cut-off date, with respect to the mortgage loans directly serviced by Countrywide Servicing as set forth in the table under *"— General"* above), principal prepayments by borrowers received by Countrywide Servicing from the first day through the fifteenth day of a calendar month will be distributed to certificateholders on the Distribution Date in the same month in which the prepayments on these mortgage loans are received and, accordingly, no shortfall in the amount of interest to be distributed to certificateholders with respect to the prepaid mortgage loans results.  Conversely, principal prepayments on these mortgage loans received by Countrywide Servicing from the sixteenth day (or, in the case of the first Distribution Date, from September 1, 2006) through the last day of a calendar month and principal prepayments on the mortgage loans not directly serviced by Countrywide Servicing as set in the table under *"— General"* above), will be distributed to certificateholders on the Distribution Date in the month following the month of receipt and, accordingly, a shortfall in the amount of interest to be distributed to certificateholders with respect to the prepaid mortgage loans would result.  Pursuant to the pooling and servicing agreement, the master servicing fee for any month will be reduced, but not by more than an amount equal to the product of one-twelfth of 0.125% and the aggregate Stated Principal Balance of the mortgage loans ("Compensating Interest"), by an amount sufficient to pass through to certificateholders the full amount of interest to which they would be entitled for each prepaid mortgage loan on the related Distribution Date.

If shortfalls in interest as a result of prepayments in any Prepayment Period exceed the Compensating Interest for the related Distribution Date, the amount of interest distributed to certificateholders will be reduced by the amount of the excess.  *See "Description of the Certificates — Interest" in this prospectus supplement.*

**Advances**

Subject to the following limitations, the master servicer will be required to advance before each Distribution Date, from its own funds or funds in the Certificate Account that do not constitute Available Funds for that Distribution Date, an amount equal to:

- the aggregate of payments of principal and interest on the mortgage loans (net of the master servicing fee) which were due on the related Due Date and which were delinquent on the related Determination Date; and

- an amount equivalent to interest (net of the master servicing fee rate) on each mortgage loan as to which the related mortgaged property has been acquired by the issuing entity through foreclosure or deed-in-lieu of foreclosure (net of any net income on the property).

The "Determination Date" is the 22nd day of each month or, if that day is not a business day, the preceding business day; provided that the Determination Date in each month will be at least two business days before the related Distribution Date.

Advances are intended to maintain a regular flow of scheduled interest and principal payments on the certificates rather than to guarantee or insure against losses. The master servicer is obligated to make advances with respect to delinquent payments of principal of or interest on each mortgage loan to the extent that the advances are, in its reasonable judgment, recoverable from future payments and collections or insurance payments or proceeds of liquidation of the related mortgage loan. If the master servicer determines on any Determination Date to make an advance, the advance will be included with the distribution to certificateholders on the related Distribution Date. Any failure by the master servicer to make a deposit in the Certificate Account as required under the pooling and servicing agreement, including any failure to make an advance, will constitute an event of default under the pooling and servicing agreement if the failure remains unremedied for five days after written notice of the event of default. If the master servicer is terminated as a result of the occurrence of an event of default, the trustee or the successor master servicer will be obligated to make any advance, in accordance with the terms of the pooling and servicing agreement.

An advance will be reimbursed from the payments on the mortgage loan with respect to which the advance was made.  However, if an advance is determined to be nonrecoverable and the master servicer delivers an officer's certificate to the trustee indicating that the advance is nonrecoverable, the master servicer will be entitled to withdraw from the Certificate Account an amount equal to the nonrecoverable advance.  Reimbursement for advances and nonrecoverable advances will be made prior to distributions on the certificates.

**Certain Modifications and Refinancings**

Countrywide Home Loans will be permitted under the pooling and servicing agreement to solicit borrowers for reductions to the mortgage rates of their respective mortgage loans. If a borrower requests such a reduction, the master servicer will be permitted to agree to the rate reduction provided that Countrywide Home Loans purchases the mortgage loan from the issuing entity immediately following the modification. Any purchase of a mortgage loan subject to a modification will be for a price equal to 100% of the Stated Principal Balance of that mortgage loan, plus accrued and unpaid interest on the mortgage loan up to the next Due Date at the applicable net mortgage rate, net of any unreimbursed advances of principal and interest on the mortgage loan made by the master servicer. Countrywide Home Loans will remit the purchase price to the master servicer for deposit into the Certificate Account within one business day of the purchase of that mortgage loan. Purchases of mortgage loans may occur when prevailing interest rates are below the interest rates on the mortgage loans and mortgagors request modifications as an alternative to refinancings. Countrywide Home Loans will indemnify the issuing entity against liability for any prohibited transactions taxes and related interest, additions or penalties incurred by any REMIC as a result of any modification or purchase.

## The Issuing Entity

In connection with the issuance of the certificates, the depositor has formed Alternative Loan Trust 2006-J6, a common law trust created under the laws of the State of New York, pursuant to the pooling and servicing agreement. Alternative Loan Trust 2006-J6 is referred to in this prospectus supplement as the "issuing entity" and is referred to in the prospectus as the "trust" or "trust fund".  The trustee serves as trustee of the issuing entity and acts on behalf of the issuing entity as the issuing entity does not have any directors, officers or employees.  The fiscal year end of the issuing entity is December 31.

The issuing entity's activities are limited to the transactions and activities entered into in connection with the securitization described in this prospectus supplement, and except for those activities, the issuing entity is not authorized and has no power to borrow money or issue debt, merge with another entity, reorganize, liquidate or sell assets or engage in any business or activities.  Consequently, the issuing entity is not permitted to hold any assets, or incur any liabilities, other than those described in this prospectus supplement. Since the issuing entity is created pursuant to the pooling and servicing agreement, the issuing entity and its permissible activities can only be amended or modified by amending the pooling and servicing agreement.

Because the issuing entity is a common law trust, it may not be eligible for relief under the federal bankruptcy laws, unless it can be characterized as a "business trust" for purposes of the federal bankruptcy laws. Bankruptcy courts look at various considerations in making this determination, so it is not possible to predict with any certainty whether or not the issuing entity would be characterized as a "business trust."

## Static Pool Data

Certain static pool data with respect to the delinquency, cumulative loss and prepayment data for Countrywide Home Loans is available online at http://www.countrywidedealsdata.com?CWDD=01200608.  This static pool data is not deemed part of the prospectus or the registration statement of which the prospectus is a part to the extent that the static pool data relates to:

- prior securitized pools of Countrywide Home Loans that do not include the mortgage loans and that were established before January 1, 2006; or

- in the case of information regarding the mortgage loans, information about the mortgage loans for periods before January 1, 2006.

We cannot assure you that the prepayment, loss or delinquency experience of the mortgage loans sold to the issuing entity will be comparable to the historical prepayment, loss or delinquency experience of any of the other securitized pools sponsored by the Countrywide Home Loans.  In this regard, you should note how the characteristics of the mortgage loans in those securitized pools differ from the characteristics of the issuing entity's mortgage loans.  Such differences, along with the varying economic conditions to which those securitized pools were subject, make it unlikely that the issuing entity's mortgage loans will perform in the same way that any of those pools has performed.

## Description of the Certificates

### General

The certificates will be issued pursuant to the pooling and servicing agreement. We summarize below the material terms and provisions pursuant to which the certificates will be issued. The summaries are subject to, and are qualified in their entirety by reference to, the provisions of the pooling and servicing agreement. When particular provisions or terms used in the pooling and servicing agreement are referred to, the actual provisions (including definitions of terms) are incorporated by reference. We will file a final copy of the pooling and servicing agreement after the issuing entity issues the certificates.

The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of CWALT, Inc., Countrywide Home Loans, Inc. (or any other seller), Countrywide Home Loans Servicing LP or any of their affiliates.

The Mortgage Pass-Through Certificates, Series 2006-J6, will consist of the Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class X, Class PO, Class A-R, Class M, Class B-1, Class B-2, Class B-3, Class B-4, Class B-5 and Class P Certificates. Only the classes of certificates listed on the cover page are being offered by this prospectus supplement.

When describing the certificates in this prospectus supplement, we use the following terms:

| Designation | Classes of Certificates |
|---|---|
| Senior Certificates | Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class X, Class PO and Class A-R Certificates |
| Subordinated Certificates | Class M and Class B Certificates |
| Class A Certificates | Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6 and Class A-7 Certificates |
| Class B Certificates | Class B-1, Class B-2, Class B-3, Class B-4 and Class B-5 Certificates |
| Notional Amount Certificates | Class A-2 and Class X Certificates |
| LIBOR Certificates | Class A-1 and Class A-2 Certificates |
| Offered Certificates | Senior Certificates, Class M, Class B-1 and Class B-2 Certificates |

The certificates are generally referred to as the following types:

| Class | Type |
|---|---|
| Class A-1 Certificates | Senior/Floating Pass-Through Rate |
| Class A-2 Certificates | Senior/Inverse Floating Pass-Through Rate/Notional Amount/Interest Only |
| Class A-3 Certificates | Senior/Fixed Pass-Through Rate |
| Class A-4 Certificates | Senior/Fixed Pass-Through Rate/Super Senior |
| Class A-5 Certificates | Senior/Fixed Pass-Through Rate/NAS/Super Senior |
| Class A-6 Certificates | Senior/Fixed Pass-Through Rate/NAS/Support |
| Class A-7 Certificates | Senior/Fixed Pass-Through Rate/Support |
| Class X Certificates | Senior/Notional Amount/Variable Pass-Through Rate/Interest-Only |
| Class PO Certificates | Senior/Principal Only |
| Class A-R Certificates | Senior/Fixed Pass-Through Rate/Residual |
| Subordinated Certificates | Subordinate/Fixed Pass-Through Rate |
| Class P | Prepayment Charges |

The Class B-3, Class B-4, Class B-5 and Class P Certificates are not being offered by this prospectus supplement. Any information presented in this prospectus supplement with respect to the Class B-3, Class B-4, Class B-5 and Class P Certificates is provided only to permit a better understanding of the offered certificates. The

initial Class Certificate Balances and initial notional amounts are set forth in the *"Summary—Description of the Certificates."*

The senior certificates will have an initial aggregate class certificate balance of approximately $177,013,052, and will evidence in the aggregate an initial beneficial ownership interest of approximately 94.55% in the issuing entity.  The subordinated certificates will each evidence the initial beneficial ownership interest in the issuing entity set forth below:

| Class of Subordinated Certificates | Initial Beneficial Ownership Interest |
|---|---|
| Class M ................................................ | 2.95% |
| Class B-1 .............................................. | 0.80% |
| Class B-2 .............................................. | 0.65% |
| Class B-3 .............................................. | 0.40% |
| Class B-4 .............................................. | 0.35% |
| Class B-5 .............................................. | 0.30% |

**Calculation of Class Certificate Balance**

The "Class Certificate Balance" of any class of certificates (other than the notional amount certificates) as of any Distribution Date is the initial Class Certificate Balance of the class *reduced* by the sum of:

- all amounts previously distributed to holders of certificates of the class as payments of principal,

- the amount of Realized Losses allocated to the class, and

- in the case of any class of subordinated certificates, any amounts allocated to the class in reduction of its Class Certificate Balance in respect of payments of Class PO Deferred Amounts, as described under *"— Allocation of Losses,"*

provided, however, that the Class Certificate Balance of each class of certificates to which Realized Losses have been allocated will be increased sequentially in the order of distribution priority (from highest to lowest) by the amount of Subsequent Recoveries distributed as principal to any class of certificates, but not by more than the amount of Realized Losses previously allocated to reduce the Class Certificate Balance of that class of certificates.

In addition, the Class Certificate Balance of the class of subordinated certificates then outstanding with the lowest distribution priority will be reduced if and to the extent that the aggregate of the Class Certificate Balances of all classes of certificates, following all distributions and the allocation of all Realized Losses on any Distribution Date, exceeds the aggregate Stated Principal Balance of the mortgage loans as of the Due Date occurring in the month of that Distribution Date (after giving effect to principal prepayments received in the related Prepayment Period).

**Notional Amount Certificates**

The Class A-2 and Class X Certificates are notional amount certificates.

The notional amount of the Class A-2 Certificates for any Distribution Date will equal the Class Certificate Balance of the Class A-1 Certificates immediately prior to such Distribution Date.

The notional amount of the Class X Certificates for any Distribution Date will equal the aggregate Stated Principal Balance of the Non-Discount mortgage loans as of the Due Date in the preceding calendar month (after giving effect to prepayments received in the Prepayment Period related to such prior Due Date).

**Book-Entry Certificates; Denominations**

The offered certificates (other than the Class A-R Certificates) will be book-entry certificates (the "Book-Entry Certificates"). The Class A-R Certificates will be issued as two certificates in fully registered certificated form in an aggregate denomination of $100.  Persons acquiring beneficial ownership interests in the Book-Entry Certificates ("Certificate Owners") will elect to hold their Book-Entry Certificates through the Depository Trust Company ("DTC") in the United States, or Clearstream, Luxembourg (as defined in this prospectus supplement) or the Euroclear System ("Euroclear"), in Europe, if they are participants of such systems, or indirectly through organizations which are participants in such systems. Each class of Book-Entry Certificates will be issued in one or more certificates that will equal the aggregate principal balance of the applicable Class of the Book-Entry Certificates and will initially be registered in the name of Cede & Co., the nominee of DTC. Clearstream, Luxembourg and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream Banking's and Euroclear's names on the books of their respective depositaries which in turn will hold such positions in customers' securities accounts in the depositaries' names on the books of DTC. Citibank will act as depositary for Clearstream, Luxembourg and Chase will act as depositary for Euroclear (in such capacities, individually the "Relevant Depositary" and collectively the "European Depositaries").  Investors may hold such beneficial interests in the Book-Entry Certificates (other than the Class A-4 Certificates) in minimum denominations representing an original principal amount or notional amount of $25,000 and in integral multiples of $1 in excess thereof.  Investors may hold such beneficial interests in the Class A-4 Certificates in minimum denominations representing an original principal amount or notional amount of $1,000 and in integral multiples of $1 in excess thereof.  Except as described below, no person acquiring a beneficial ownership in a Book-Entry Certificate (each, a "beneficial owner") will be entitled to receive a physical certificate representing such person's beneficial ownership interest in such Book-Entry Certificate (a "Definitive Certificate"). Unless and until Definitive Certificates are issued, it is anticipated that the only certificateholder of the Book-Entry Certificates will be Cede & Co., as nominee of DTC. Certificate Owners will not be certificateholders as that term is used in the pooling and servicing agreement. Certificate Owners are only permitted to exercise their rights indirectly through the participating organizations that utilize the services of DTC, including securities brokers and dealers, banks and trust companies and clearing corporations and certain other organizations ("Participants") and DTC.

The beneficial owner's ownership of a Book-Entry Certificate will be recorded on the records of the brokerage firm, bank, thrift institution or other financial intermediary (each, a "Financial Intermediary") that maintains the beneficial owner's account for such purpose. In turn, the Financial Intermediary's ownership of such Book-Entry Certificate will be recorded on the records of DTC (or of a participating firm that acts as agent for the Financial Intermediary, whose interest will in turn be recorded on the records of DTC, if the beneficial owner's Financial Intermediary is not a DTC participant and on the records of Clearstream, Luxembourg or Euroclear, as appropriate).

Certificate Owners will receive all distributions of principal of, and interest on, the Offered Certificates from the trustee through DTC and DTC participants. While the Offered Certificates are outstanding (except under the circumstances described below), under the rules, regulations and procedures creating and affecting DTC and its operations (the "Rules"), DTC is required to make book-entry transfers among Participants on whose behalf it acts with respect to the Offered Certificates and is required to receive and transmit distributions of principal of, and interest on, the Offered Certificates. Participants and organizations which have indirect access to the DTC system, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly ("Indirect Participants"), with whom Certificate Owners have accounts with respect to Offered Certificates are similarly required to make book-entry transfers and receive and transmit such distributions on behalf of their respective Certificate Owners. Accordingly, although Certificate Owners will not possess certificates, the Rules provide a mechanism by which Certificate Owners will receive distributions and will be able to transfer their interest.

Certificate Owners will not receive or be entitled to receive certificates representing their respective interests in the Offered Certificates, except under the limited circumstances described below. Unless and until Definitive Certificates are issued, Certificate Owners who are not Participants may transfer ownership of Offered Certificates only through Participants and Indirect Participants by instructing such Participants and Indirect Participants to transfer Book-Entry Certificates, by book-entry transfer, through DTC for the account of the purchasers of such Book-Entry Certificates, which account is maintained with their respective Participants. Under

the Rules and in accordance with DTC's normal procedures, transfers of ownership of Book-Entry Certificates will be executed through DTC and the accounts of the respective Participants at DTC will be debited and credited. Similarly, the Participants and Indirect Participants will make debits or credits, as the case may be, on their records on behalf of the selling and purchasing Certificate Owners.

Because of time zone differences, credits of securities received in Clearstream, Luxembourg or Euroclear as a result of a transaction with a Participant will be made during, subsequent securities settlement processing and dated the business day following, the DTC settlement date. Such credits or any transactions in such securities, settled during such processing will be reported to the relevant Euroclear or Clearstream, Luxembourg Participants on such business day. Cash received in Clearstream, Luxembourg or Euroclear, as a result of sales of securities by or through a Clearstream, Luxembourg Participant or Euroclear Participant to a DTC Participant, will be received with value on the DTC settlement date but will be available in the relevant Clearstream, Luxembourg or Euroclear cash account only as of the business day following settlement in DTC. For information with respect to tax documentation procedures, relating to the Offered Certificates, see "Material Federal Income Tax Consequences — Tax Treatment of Foreign Investors" in the prospectus and "Global, Clearance, Settlement And Tax Documentation Procedures — Material U.S. Federal Income Tax Documentation Requirements" in Annex I hereto.

Transfers between Participants will occur in accordance with DTC rules. Transfers between Clearstream, Luxembourg Participants and Euroclear Participants will occur in accordance with their respective rules and operating procedures.

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream, Luxembourg Participants or Euroclear Participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by the Relevant Depositary; however, such cross market transactions will require delivery of instructions to the relevant European international clearing system by the counterpart in such system in accordance with its rules and procedures and within its established deadlines (European time). The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to the Relevant Depositary to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC. Clearstream, Luxembourg Participants and Euroclear Participants may not deliver instructions directly to the European Depositaries.

DTC, which is a New York-chartered limited purpose trust company, performs services for its participants, some of which (and/or their representatives) own DTC. In accordance with its normal procedures, DTC is expected to record the positions held by each DTC participant in the Book-Entry Certificates, whether held for its own account or as a nominee for another person. In general, beneficial ownership of Book-Entry Certificates will be subject to the rules, regulations and procedures governing DTC and DTC participants as in effect from time to time.

Clearstream Banking, société anonyme, 67 Bd Grande-Duchesse Charlotte, L-2967 Luxembourg ("Clearstream, Luxembourg"), was incorporated in 1970 as "Clearstream, Luxembourg S.A." a company with limited liability under Luxembourg law (a société anonyme). Clearstream, Luxembourg S.A. subsequently changed its name to Cedelbank. On 10 January 2000, Cedelbank's parent company, Clearstream, Luxembourg International, société anonyme ("CI") merged its clearing, settlement and custody business with that of Deutsche Borse Clearing AG ("DBC"). The merger involved the transfer by CI of substantially all of its assets and liabilities (including its shares in CB) to a new Luxembourg company, New Clearstream, Luxembourg International, société anonyme ("New CI"), which is 50% owned by CI and 50% owned by DBC's parent company Deutsche Borse AG. The shareholders of these two entities are banks, securities dealers and financial institutions. Clearstream, Luxembourg International currently has 92 shareholders, including U.S. financial institutions or their subsidiaries. No single entity may own more than 5 percent of Clearstream, Luxembourg International's stock.

Further to the merger, the Board of Directors of New Clearstream, Luxembourg International decided to re-name the companies in the group in order to give them a cohesive brand name. The new brand name that was chosen is "Clearstream" With effect from January 14, 2000 New CI has been renamed "Clearstream International, société anonyme." On January 18, 2000, Cedelbank was renamed "Clearstream Banking, société anonyme" and Clearstream, Luxembourg Global Services was renamed "Clearstream Services, société anonyme."

On January 17, 2000 DBC was renamed "Clearstream Banking AG." This means that there are now two entities in the corporate group headed by Clearstream International which share the name "Clearstream Banking," the entity previously named "Cedelbank" and the entity previously named "Deutsche Borse Clearing AG."

Clearstream, Luxembourg holds securities for its customers and facilitates the clearance and settlement of securities transactions between Clearstream, Luxembourg customers through electronic book-entry changes in accounts of Clearstream, Luxembourg customers, thereby eliminating the need for physical movement of certificates. Transactions may be settled by Clearstream, Luxembourg in any of 36 currencies, including United States Dollars. Clearstream, Luxembourg provides to its customers, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream, Luxembourg also deals with domestic securities markets in over 30 countries through established depository and custodial relationships. Clearstream, Luxembourg is registered as a bank in Luxembourg, and as such is subject to regulation by the Commission de Surveillance du Secteur Financier, "CSSF," which supervises Luxembourg banks. Clearstream, Luxembourg's customers are world-wide financial institutions including underwriters, securities brokers and dealers, banks, trust companies and clearing corporations. Clearstream, Luxembourg's U.S. customers are limited to securities brokers and dealers, and banks. Currently, Clearstream, Luxembourg has approximately 2,000 customers located in over 80 countries, including all major European countries, Canada, and the United States. Indirect access to Clearstream, Luxembourg is available to other institutions that clear through or maintain a custodial relationship with an account holder of Clearstream, Luxembourg. Clearstream, Luxembourg has established an electronic bridge with Euroclear Bank S.A./N.V. as the Operator of the Euroclear System (the "Euroclear Operator") in Brussels to facilitate settlement of trades between Clearstream, Luxembourg and the Euroclear Operator.

Euroclear was created in 1968 to hold securities for participants of Euroclear ("Euroclear Participants") and to clear and settle transactions between Euroclear Participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. Transactions may now be settled in any of 32 currencies, including United States dollars. Euroclear includes various other services, including securities lending and borrowing and interfaces with domestic markets in several countries generally similar to the arrangements for cross-market transfers with DTC described above. Euroclear is operated by the Brussels, Belgium office of the Euroclear Operator, under contract with Euroclear Clearance Systems S.C., a Belgian cooperative corporation (the "Cooperative"). All operations are conducted by the Euroclear Operator, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear Operator, not the Cooperative. The Cooperative establishes policy for Euroclear on behalf of Euroclear Participants. Euroclear Participants include banks (including central banks), securities brokers and dealers and other professional financial intermediaries. Indirect access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear Participant, either directly or indirectly.

The Euroclear Operator has a banking license from the Belgian Banking and Finance Commission. This license authorizes the Euroclear Operator to carry out banking activities on a global basis.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System and applicable Belgian law (collectively, the "Terms and Conditions"). The Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Terms and Conditions only on behalf of Euroclear Participants, and has no record of or relationship with persons holding through Euroclear Participants.

Distributions on the Book-Entry Certificates will be made on each Distribution Date by the trustee to DTC. DTC will be responsible for crediting the amount of such payments to the accounts of the applicable DTC participants in accordance with DTC's normal procedures. Each DTC participant will be responsible for disbursing such payments to the beneficial owners of the Book-Entry Certificates that it represents and to each Financial Intermediary for which it acts as agent. Each such Financial Intermediary will be responsible for disbursing funds to the beneficial owners of the Book-Entry Certificates that it represents.

Under a book-entry format, beneficial owners of the Book-Entry Certificates may experience some delay in their receipt of payments, since such payments will be forwarded by the trustee to Cede & Co. Distributions with respect to Offered Certificates held through Clearstream, Luxembourg or Euroclear will be credited to the cash accounts of Clearstream, Luxembourg Participants or Euroclear Participants in accordance with the relevant system's rules and procedures, to the extent received by the Relevant Depositary. Such distributions will be subject to tax reporting in accordance with relevant United States tax laws and regulations.  See "*Material Federal Income Tax Consequences — Tax Treatment of Foreign Investors*" and "*Miscellaneous Tax Aspects — Backup Withholding*" in the prospectus.  Because DTC can only act on behalf of Financial Intermediaries, the ability of a beneficial owner to pledge Book-Entry Certificates to persons or entities that do not participate in the depository system, or otherwise take actions in respect of such Book-Entry Certificates, may be limited due to the lack of physical certificates for such Book-Entry Certificates. In addition, issuance of the Book-Entry Certificates in book-entry form may reduce the liquidity of such Certificates in the secondary market since certain potential investors may be unwilling to purchase certificates for which they cannot obtain physical certificates.

Monthly and annual reports on the issuing entity provided by the master servicer to Cede & Co., as nominee of DTC, may be made available to beneficial owners upon request, in accordance with the rules, regulations and procedures creating and affecting DTC or the Relevant Depositary, and to the Financial Intermediaries to whose DTC accounts the Book-Entry Certificates of such beneficial owners are credited.

DTC has advised the depositor and the trustee that, unless and until Definitive Certificates are issued, DTC will take any action permitted to be taken by the holders of the Book-Entry Certificates under the pooling and servicing agreement only at the direction of one or more Financial Intermediaries to whose DTC accounts the Book-Entry Certificates are credited, to the extent that such actions are taken on behalf of Financial Intermediaries whose holdings include such Book-Entry Certificates. Clearstream, Luxembourg or the Euroclear Operator, as the case may be, will take any other action permitted to be taken by a holder of a Book-Entry Certificate under the pooling and servicing agreement on behalf of a Clearstream, Luxembourg Participant or Euroclear Participant only in accordance with its relevant rules and procedures and subject to the ability of the Relevant Depositary to effect such actions on its behalf through DTC. DTC may take actions, at the direction of the related Participants, with respect to some Book-Entry Certificates which conflict with actions taken with respect to other Book-Entry Certificates.

Definitive Certificates will be issued to beneficial owners of the Book-Entry Certificates, or their nominees, rather than to DTC, only if (a) DTC or the depositor advises the trustee in writing that DTC is no longer willing, qualified or able to discharge properly its responsibilities as nominee and depositary with respect to the Book-Entry Certificates and the depositor or the trustee is unable to locate a qualified successor, (b) the beneficial owners having not less than 51% of the voting rights (as defined in the pooling and servicing agreement) of a class at their sole option and expense, elect to remove their Book-Entry Certificates from DTC or (c) after the occurrence of an event of default (as defined in the pooling and servicing agreement), beneficial owners having not less than 51% of the voting rights evidenced by the Offered Certificates advise the trustee and DTC through the Financial Intermediaries and the DTC participants in writing that the continuation of a book-entry system through DTC (or a successor thereto) is no longer in the best interests of beneficial owners of such class.

Upon the occurrence of any of the events described in the immediately preceding paragraph, the trustee will be required to notify all beneficial owners of the occurrence of such event and the availability through DTC of Definitive Certificates. Upon surrender by DTC of the global certificate or certificates representing the Book-Entry Certificates and instructions for re-registration, the trustee will issue Definitive Certificates, and thereafter the trustee will recognize the holders of such Definitive Certificates as holders of the related offered certificates under the pooling and servicing agreement.

Although DTC, Clearstream, Luxembourg and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of Certificates among participants of DTC, Clearstream, Luxembourg and Euroclear, they are under no obligation to perform or continue to perform such procedures and such procedures may be discontinued at any time.

For a description of the procedures generally applicable to Book-Entry Certificates, see "*Description of the Securities – Book-Entry Registration of Securities*" in the prospectus..

**Determination of LIBOR**

The LIBOR Certificates will bear interest during their initial interest accrual period at the applicable initial pass-through rates set forth in the table under *"— Interest"* below, and during each interest accrual period thereafter at the applicable rate determined as described in the table under *"— Interest"* below.

LIBOR applicable to an interest accrual period for the LIBOR Certificates will be determined on the second business day prior to the commencement of that interest accrual period (a "LIBOR Determination Date"). On each LIBOR Determination Date, the trustee, as Calculation Agent, will establish LIBOR for the related interest accrual period on the basis of the rate for one-month deposits in U.S. dollars quoted on the Bloomberg Terminal for that LIBOR Determination Date.

If on any LIBOR Determination Date, the calculation agent is unable to calculate LIBOR in accordance with the method set forth in the immediately preceding paragraph, LIBOR for the next interest accrual period shall be calculated in accordance with the method described in the prospectus under *"Description of the Securities — Indices Applicable to Floating Rate and Inverse Floating Rate Classes — LIBOR."*

If on the initial LIBOR Determination Date, the calculation agent is required but unable to determine LIBOR in the manner provided in this prospectus supplement, LIBOR for the next interest accrual period will be 5.33%.

**Payments on Mortgage Loans; Accounts**

*Certificate Account.*  On or before the closing date, the master servicer will establish an account (the "Certificate Account"), which will be maintained in trust for the benefit of the certificateholders.  The Certificate Account will be established by the master servicer initially at Countrywide Bank, N.A., which is an affiliate of the depositor, the sellers and the master servicer.  The master servicer will deposit or cause to be deposited in the Certificate Account, within two business days after receipt (or, on a daily basis, if the long term credit rating of Countrywide Home Loans has been reduced below the rating specified in the pooling and servicing agreement) the following payments and collections remitted by subservicers or received by it in respect of mortgage loans subsequent to the cut-off date (other than in respect of principal and interest due on the mortgage loans on or before the cut-off date) and the following amounts required to be deposited under the pooling and servicing agreement:

- all payments on account of principal on the mortgage loans, including principal prepayments;

- all payments on account of interest on the mortgage loans, net of the related master servicing fee (as adjusted by Compensating Interest payments) and any lender paid mortgage insurance premiums;

- all payments on account of prepayment charges on the mortgage loans;

- all insurance proceeds, Subsequent Recoveries and liquidation proceeds, other than proceeds to be applied to the restoration or repair of a mortgaged property or released to the mortgagor in accordance with the master servicer's normal servicing procedures;

- any amount required to be deposited by the master servicer pursuant to the pooling and servicing agreement in connection with any losses on permitted investments for which it is responsible;

- any amounts received by the master servicer with respect to primary mortgage insurance and in respect of net monthly rental income from any mortgaged property that the master servicer or its designee has acquired through foreclosure or deed-in-lieu of foreclosure in connection with a defaulted Mortgage Loan ("REO Property");

- all substitution adjustment amounts; and

- all Advances made by the master servicer.

Prior to their deposit into the Certificate Account, payments and collections on the mortgage loans will be commingled with payments and collections on other mortgage loans and other funds of the master servicer.  For a discussion of the risks that arise from the commingling of payments and collections, see "*Risk Factors — Bankruptcy Or Insolvency May Affect The Timing And Amount Of Distributions On The Securities*" in the prospectus.

The master servicer may from time to time make withdrawals from the Certificate Account for the following purposes:

- to pay to the master servicer the master servicing fee and the additional servicing compensation (to the extent not previously retained by the master servicer) described above under "*Servicing of Mortgage Loans—Servicing Compensation and Payment of Expenses*";

- to reimburse each of the master servicer and the trustee for unreimbursed Advances made by it, which right of reimbursement pursuant to this subclause being limited to amounts received on the mortgage loan(s) in respect of which any such Advance was made;

- to reimburse each of the master servicer and the trustee for any nonrecoverable advance previously made by it (and prior to the reimbursement, the master servicer will deliver to the trustee an officer's certificate indicating the amount of the nonrecoverable Advance and identifying the related mortgage loan(s), and their respective portions of the nonrecoverable advance);

- to reimburse the master servicer for insured expenses from the related insurance proceeds;

- to reimburse the master servicer for (a) any unreimbursed customary, reasonable and necessary "out of pocket" costs and expenses incurred in the performance by the master servicer of its servicing obligations, including, but not limited to, the cost of (i) the preservation, restoration and protection of a mortgaged property, (ii) any enforcement or judicial proceedings, including foreclosures, (iii) the management and liquidation of any REO Property and (iv) maintaining any required insurance policies (collectively, "Servicing Advances"), which right of reimbursement pursuant to this clause is limited to amounts received representing late recoveries of the payments of these costs and expenses (or liquidation proceeds or Subsequent Recoveries, purchase proceeds or repurchase proceeds with respect thereto);

- to pay to the purchaser, with respect to each mortgage loan or property acquired in respect thereof that it has purchased as required under the pooling and servicing agreement, all amounts received on such mortgage loan after the date of such purchase;

- to reimburse the sellers and the master servicer for expenses incurred by any of them and reimbursable pursuant to the pooling and servicing agreement;

- to withdraw any amount deposited in the Certificate Account and not required to be deposited in the Certificate Account;

- to withdraw an amount equal to the sum of (a) the Available Funds, (b) any prepayment charges received and (c) the trustee fee for such Distribution Date and remit such amount to the trustee for deposit in the Distribution Account; and

- to clear and terminate the Certificate Account upon termination of the pooling and servicing agreement.

The master servicer is required to maintain separate accounting, on a mortgage loan by mortgage loan basis, for the purpose of justifying any withdrawal from the Certificate Account described in the first six bullet points above.

*Distribution Account.*  On or before the business day immediately preceding each Distribution Date, the master servicer will withdraw from the Certificate Account the amount of Available Funds, the prepayment charges collected and the trustee fee and will deposit those amounts in an account established and maintained with the trustee on behalf of the certificateholders (the "Distribution Account").  Upon termination of the Funding Period, the trustee will deposit into the Distribution Account any amounts remaining in the Pre-Funding Account, other than the investment earnings, for distribution to the certificateholders  The trustee will, promptly upon receipt, deposit in the Distribution Account and retain therein:

- the aggregate amount remitted by the master servicer to the trustee; and

- any amount required to be deposited by the master servicer in connection with any losses on investment of funds in the Distribution Account.

The trustee will withdraw funds from the Distribution Account for distribution to the certificateholders as described below under *"— Priority of Distributions Among Certificates"* and may from time to time make withdrawals from the Distribution Account:

- to pay the trustee fee to the trustee;

- to pay to the master servicer, as additional servicing compensation, earnings on or investment income with respect to funds in or credited to the Distribution Account;

- to withdraw any amount deposited in the Distribution Account and not required to be deposited therein (which withdrawal may be at the direction of the master servicer through delivery of a written notice to the trustee describing the amounts deposited in error); and

- to clear and terminate the Distribution Account upon the termination of the pooling and servicing agreement.

There is no independent verification of the transaction accounts or the transaction activity with respect to the Distribution Account.

Prior to each Determination Date, the master servicer is required to provide the trustee a report containing the data and information concerning the mortgage loans that is required by the trustee to prepare the monthly statement to certificateholders for the related Distribution Date.  See " — *Reports to Certificateholders*" in this prospectus supplement.  The trustee is not responsible for recomputing, recalculating or verifying the information provided to it by the master servicer in that report and will be permitted to conclusively rely on any information provided to it by the master servicer.

**Investments of Amounts Held in Accounts**

*The Certificate Account, the Distribution Account, the Pre-funding Account and the Capitalized Interest Account*.  All funds in the Certificate Account, the Distribution Account, the Pre-funding Account and the Capitalized Interest Account will be invested in permitted investments at the direction of the master servicer.  In the case of:

- the Certificate Account and the Distribution Account, all income and gain net of any losses realized from the investment will be for the benefit of the master servicer as additional servicing compensation and will be remitted to it monthly as described herein;

- the Pre-funding Account, all income and gain net of any losses realized from the investment will be for the benefit of the depositor and will be remitted to the depositor as described herein; and

- the Capitalized Interest Account, any amounts remaining after making distributions of interest on the first Distribution Date following the end of the Funding Period will be paid to the depositor and will not thereafter be available for distribution to certificateholders.

The amount of any losses incurred in the Certificate Account or the Distribution Account in respect of the investments will be deposited by the master servicer in the Certificate Account or paid to the trustee for deposit into the Distribution Account out of the master servicer's own funds immediately as realized.  The amount of any losses incurred in the Pre-funding Account or the Capitalized Interest Account in respect of the investments will be deposited by the depositor into the Pre-funding Account or the Capitalized Interest Account, as applicable out of the depositor's own funds immediately as realized  The trustee will not be liable for the amount of any loss incurred in respect of any investment or lack of investment of funds held in the Certificate Account, the Distribution Account, the Pre-funding Account or the Capitalized Interest Account and made in accordance with the pooling and servicing agreement.

*The Corridor Contract Reserve Fund.*  Funds in the Corridor Contract Reserve Fund may not be invested.

**Fees and Expenses**

The following summarizes the related fees and expenses to be paid from the assets of the issuing entity and the source of payments for the fees and expenses:

| Type / Recipient (1) | Amount | General Purpose | Source (2) | Frequency |
|---|---|---|---|---|
| *Fees* | | | | |
| Master Servicing Fee / Master Servicer | The master servicer will be paid a monthly fee (referred to as the master servicing fee) with respect to each mortgage loan.  The master servicing fee for the mortgage loans will equal one-twelfth of the Stated Principal Balance of the mortgage loan multiplied by the Master Servicer Fee Rate (3).  As of the initial cut-off date, the weighted average master servicing fee rate for the loans will be 0.212% per annum. | Compensation | Amounts on deposit in the Certificate Account representing payments of interest and application of liquidation proceeds with respect to that mortgage loan | Monthly |
| | • All late payment fees, assumption fees and other similar charges (excluding prepayment charges) | Compensation | Payments made by obligors with respect to the mortgage loans | Time to time |
| | • All investment income earned on amounts on deposit in the Certificate Account and Distribution Account. | Compensation | Investment income related to the Certificate Account and the Distribution Account | Monthly |
| | • Excess Proceeds (4) | Compensation | Liquidation proceeds and Subsequent Recoveries | Time to time |
| Trustee Fee (the "Trustee Fee") / Trustee | One-twelfth of the Trustee Fee Rate multiplied by the aggregate Stated Principal Balance of the outstanding mortgage loans. (5) | Compensation | Amounts on deposit in the Certificate Account or the Distribution Account | Monthly |
| *Expenses* | | | | |
| Insured expenses / Master Servicer | Expenses incurred by the Master Servicer | Reimbursement of Expenses | To the extent the expenses are covered by an insurance policy with respect to the mortgage loan | Time to time |
| Servicing Advances / Master Servicer | To the extent of funds available, the amount of any Servicing Advances. | Reimbursement of Expenses | With respect to each Mortgage Loan, late recoveries of the payments of the costs and expenses, liquidation proceeds, Subsequent Recoveries, purchase proceeds or repurchase proceeds for that Mortgage Loan (6) | Time to time |

S-66

| Type / Recipient (1) | Amount | General Purpose | Source (2) | Frequency |
|---|---|---|---|---|
| Indemnification expenses / the sellers, the master servicer and the depositor | Amounts for which the sellers, the master servicer and depositor are entitled to indemnification (7) | Indemnification | Amounts on deposit on the Certificate Account | Monthly |

(1)  If the trustee succeeds to the position of master servicer, it will be entitled to receive the same fees and expenses of the master servicer described in this prospectus supplement. Any increase in the fees and expenses described in this prospectus supplement would require an amendment to the pooling and servicing agreement. See *"The Agreements—Amendment"* in the prospectus.

(2)  Unless otherwise specified, the fees and expenses shown in this table are paid (or retained by the master servicer in the case of amounts owed to the master servicer) prior to distributions on the certificates.

(3)  The Master Servicer Fee Rate for each mortgage loan will range from 0.200% to 0.250% per annum. The amount of the monthly servicing fee is subject to adjustment with respect to mortgage loans that are prepaid in full, as described in this prospectus supplement under *"Servicing of Mortgage Loans — Adjustment to Servicing Fee in Connection with Certain Prepaid Mortgage Loans."*

(4)  "Excess Proceeds" with respect to a liquidated Mortgage Loan means the amount, if any, by which the sum of any net liquidation proceeds and Subsequent Recoveries exceed the sum of (i) the unpaid principal balance of the Mortgage Loan plus (ii) accrued interest on the Mortgage Loan at the Mortgage Rate during each Due Period as to which interest was not paid or advanced on the Mortgage Loan.

(5)  The *"Trustee Fee Rate"* is equal to 0.009% per annum.

(6)  Reimbursement of Servicing Advances for a Mortgage Loan is limited to the late recoveries of the payments of the costs and expenses, liquidation proceeds, Subsequent Recoveries, purchase proceeds or repurchase proceeds for that Mortgage Loan.

(7)  Each of the sellers, the master servicer, and the depositor are entitled to indemnification of certain expenses as described in this prospectus supplement under "*— Certain Matters Regarding the Master Servicer, the Depositor and the Sellers."*

**Distributions**

Distributions on the certificates will be made by the trustee on the 25th day of each month or, if that day is not a business day, on the first business day thereafter, commencing in October 2006 (each, a "Distribution Date"), to the persons in whose names the certificates are registered at the close of business on the Record Date.  The "Record Date" for any Distribution Date will be the last business day of the calendar month immediately prior to the month in which that Distribution Date occurs.

Distributions on each Distribution Date will be made by check mailed to the address of the person entitled to it as it appears on the applicable certificate register or, in the case of a certificateholder who holds 100% of a class of certificates or who holds certificates with an aggregate initial certificate balance of $1,000,000 or more or who holds a notional amount certificate and who has so notified the trustee in writing in accordance with the pooling and servicing agreement, by wire transfer in immediately available funds to the account of the certificateholder at a bank or other depository institution having appropriate wire transfer facilities; provided, however, that the final distribution in retirement of the certificates will be made only upon presentment and surrender of the certificates at the corporate trust office of the trustee.

**Priority of Distributions Among Certificates**

As more fully described in this prospectus supplement, distributions will be made on each Distribution Date from Available Funds in the following order of priority:

- to interest on each interest-bearing class of senior certificates, pro rata, based on their respective interest entitlements;

- to principal of the classes of senior certificates then entitled to receive distributions of principal, in the order and subject to the priorities set forth under *"Description of the Certificates — Principal"* in this prospectus supplement in each case in an aggregate amount up to the maximum amount of principal to be distributed on the classes on the Distribution Date;

- to any Class PO Deferred Amounts with respect to the Class PO Certificates, but only from amounts that would otherwise be distributed on the Distribution Date as principal of the subordinated certificates;

- to interest on and then principal of each class of subordinated certificates, in the order of their numerical class designations, beginning with the Class M Certificates, in each case subject to the limitations set forth under *"Description of the Certificates — Interest"* and *"— Principal"* in this prospectus supplement; and

- any remaining available amounts to the Class A-R Certificates.

"Available Funds" for any Distribution Date will be equal to the sum of:

- all scheduled installments of interest (net of the related Expense Fees and premiums in respect of lender paid primary mortgage insurance on a mortgage loan) and principal due on the Due Date in the month in which the Distribution Date occurs and received before the related Determination Date, together with any advances with respect to them;

- all proceeds of any primary mortgage guaranty insurance policies and any other insurance policies with respect to the mortgage loans, to the extent the proceeds are not applied to the restoration of the related mortgaged property or released to the mortgagor in accordance with the master servicer's normal servicing procedures and all other cash amounts received and retained in connection with (a) the liquidation of defaulted mortgage loans, by foreclosure or otherwise during the calendar month preceding the month of the Distribution Date (in each case, net of unreimbursed expenses incurred in connection with a liquidation or foreclosure and unreimbursed advances, if any) and (b) any Subsequent Recoveries;

- all partial or full prepayments received during the related Prepayment Period, together with all interest paid in connection with those payments, other than certain excess amounts and Compensating Interest;

- amounts received with respect to the Distribution Date as the Substitution Adjustment Amount or purchase price in respect of a deleted mortgage loan or a mortgage loan repurchased by the related seller or the master servicer as of the Distribution Date; and

- for each Distribution Date during, and the Distribution Date immediately after the Funding Period, any amounts required pursuant to the pooling and servicing agreement to be deposited from the Capitalized Interest Account, and for the first Distribution Date following the Funding Period, any amounts remaining in the Pre-funding Account after the end of the Funding Period (net of any investment income thereon).

reduced by amounts in reimbursement for advances previously made and other amounts as to which the master servicer is entitled to be reimbursed from the Certificate Account pursuant to the pooling and servicing agreement.

**Interest**

*Pass-Through Rates.* The classes of offered certificates will have the respective pass-through rates set forth on the cover page hereof or as described below.

LIBOR Certificates.

Each class of LIBOR Certificates will bear interest during its initial interest accrual period at the Initial Pass-Through Rate set forth below, and will bear interest during each interest accrual period thereafter, subject to the applicable Maximum and Minimum Pass-Through Rates, at the per annum rate determined by reference to LIBOR as described below:

| Class | Initial Pass-Through Rate | Maximum/Minimum Pass-Through Rate | Formula for Calculation of Class Pass-Through Rate |
|---|---|---|---|
| Class A-1 .......... | 5.83% | 6.00% /0.50% | LIBOR + 0.50% |
| Class A-2 .......... | 0.17% | 5.50% / 0.00% | 5.50% - LIBOR |

Class X Certificates

The pass-through rate of the Class X Certificates for the Interest Accrual Period for any Distribution Date will equal the excess of (a) the weighted average of the net mortgage rates of the Non-Discount mortgage loans, weighted on the basis of the Stated Principal Balance thereof as of the Due Date in the preceding calendar month (after giving effect to prepayments received in the Prepayment Period related to such prior Due Date), over (b) 6.00%. The pass-through rate for the Class X Certificates for the Interest Accrual Period for the first Distribution Date is expected to be approximately 0.59496% per annum.

*Interest Entitlement.* With respect to each Distribution Date for all of the interest- bearing certificates (other than the LIBOR Certificates), the interest accrual period will be the calendar month preceding the month of the Distribution Date. The interest accrual period for the LIBOR Certificates will be the one-month period commencing on the 25th day of the month before the month in which that Distribution Date occurs and ending on the 24th day of the month in which the Distribution Date occurs. Each interest accrual period will be deemed to consist of 30 days. Interest will be calculated and payable on the basis of a 360-day year divided into twelve 30-day months.

On each Distribution Date, to the extent of funds available therefor, each interest-bearing class of certificates will be entitled to receive an amount allocable to interest for the related interest accrual period. This interest entitlement for any interest-bearing class will be equal to the sum of:

- interest at the applicable pass-through rate on the related Class Certificate Balance or notional amount, as the case may be, immediately prior to that Distribution Date; and

- the sum of the amounts, if any, by which the amount described in the immediately preceding bullet point on each prior Distribution Date exceeded the amount actually distributed as interest on the prior Distribution Dates and not subsequently distributed (which are called unpaid interest amounts).

For each Distribution Date, on or prior to the Corridor Contract Termination Date, on which LIBOR exceeds 5.50%, in addition to the interest distribution amount described above, the Class A-1 Certificates will also be entitled to receive the yield supplement amount from payments distributed to the trustee with respect to the Corridor Contract.  See *"—The Corridor Contract"* in this prospectus supplement.

The Class PO Certificates are principal only certificates and will not bear interest.

**Allocation of Net Interest Shortfalls**

The interest entitlement described above for each class of certificates for any Distribution Date will be reduced by the amount of "Net Interest Shortfalls" for the Distribution Date. With respect to any Distribution Date, the "Net Interest Shortfall" is equal to the sum of:

- any net prepayment interest shortfalls for the Distribution Date, and

- the amount of interest that would otherwise have been received with respect to any mortgage loan that was the subject of a Relief Act Reduction or a Debt Service Reduction.

With respect to any Distribution Date, a "net prepayment interest shortfall" is the amount by which the aggregate of prepayment interest shortfalls experienced by the mortgage loans exceeds the Compensating Interest for that Distribution Date.

A "prepayment interest shortfall" is the amount by which interest paid by a borrower in connection with a prepayment of principal on a mortgage loan during the portion of the related Prepayment Period occurring in the calendar month preceding the month of the Distribution Date is less than one month's interest at the related mortgage rate less the master servicing fee rate on the Stated Principal Balance of the mortgage loan.

A "Relief Act Reduction" is a reduction in the amount of the monthly interest payment on a mortgage loan pursuant to the Servicemembers Civil Relief Act or similar state laws.  See *"The Agreements —Certain Legal Aspects of the Loans — Servicemembers Civil Relief Act"* in the prospectus.

A "Debt Service Reduction" is the modification of the terms of a mortgage loan in the course of a borrower's bankruptcy proceeding, allowing for the reduction of the amount of the monthly payment on the related mortgage loan.

Net Interest Shortfalls on any Distribution Date will be allocated pro rata among all classes of senior and subordinated certificates entitled to receive distributions of interest on such Distribution Date, based on the amount of interest each such class of certificates would otherwise be entitled to receive on such Distribution Date, in each case before taking into account any reduction in such amounts from Net Interest Shortfalls.

If on a particular Distribution Date, Available Funds in the Certificate Account applied in the order described above under *"— Priority of Distributions Among Certificates"* are not sufficient to make a full distribution of the interest entitlement on the certificates, interest will be distributed on each class of certificates of equal priority based on the amount of interest it would otherwise have been entitled to receive in the absence of the shortfall. Any unpaid interest amount will be carried forward and added to the amount holders of each class of certificates will be entitled to receive on the next Distribution Date. A shortfall could occur, for example, if losses realized on the mortgage loans were exceptionally high or were concentrated in a particular month. Any unpaid interest amount so carried forward will not bear interest.

**The Corridor Contract**

The Class A-1 Certificates will have the benefit of an interest rate corridor contract (the "Corridor Contract"). The Corridor Contract will be evidenced by a confirmation between Bank of America, N.A. ("BANA" or the "Corridor Contract Counterparty") and The Bank of New York, as supplemental interest trustee (in such capacity, the "supplemental interest trustee").

The Corridor Contract will be an asset of a separate trust (the "supplemental interest trust") created under the pooling and servicing agreement for the benefit of the Class A-1 Certificates.

Pursuant to the Corridor Contract, the terms of an ISDA Master Agreement were incorporated into the confirmation of the Corridor Contract, as if such an ISDA Master Agreement had been executed by the supplemental interest trustee and the Corridor Contract Counterparty on the date that the Corridor Contract was executed. The Corridor Contract is also subject to certain ISDA definitions, as published by the International Swaps and Derivatives Association, Inc.

With respect to the Corridor Contract and any Distribution Date to and including the Distribution Date in February 2009 (the "Corridor Contract Termination Date"), the amount payable by the Corridor Contract Counterparty under the Corridor Contract will equal the product of (i) the excess, if any, of (x) the lesser of (A) One-Month LIBOR (as determined by the Corridor Contract Counterparty) and (B) 9.00% over (y) 5.50%, (ii) the Corridor Contract Notional Balance for such Distribution Date and (iii) (x) the number of days in the related interest accrual period (calculated on the basis of a 360-day year consisting of twelve 30-day months divided by (y) 360.

On or prior to the Corridor Contract Termination Date, amounts (if any) received under the Corridor Contract by the supplemental interest trustee for the benefit of the supplemental interest trust will be used to pay the Yield Supplement Amount, as described below under "— *The Corridor Contract Reserve Fund*." Amounts received on the Corridor Contract will not be available to make distributions on any class of certificates other than the Class A-1 Certificates.

The Corridor Contract Notional Balance is based on the mortgage loans having a constant prepayment rate equal to 20.0% CPR.

The "Corridor Contract Notional Balance" is as described in the following table:

| Month of Distribution Date | Corridor Contract Notional Balance ($) | Month of Distribution Date | Corridor Contract Notional Balance ($) |
|---|---|---|---|
| October 2006....... | 61,000,000.00 | February 2008..... | 21,969,057.48 |
| November 2006... | 58,106,468.68 | March 2008......... | 19,995,461.02 |
| December 2006... | 55,278,792.95 | April 2008........... | 18,070,694.19 |
| January 2007....... | 52,515,845.51 | May 2008............ | 16,193,847.65 |
| February 2007........ | 49,816,421.83 | June 2008............ | 14,364,028.97 |
| March 2007........ | 47,179,339.75 | July 2008 ............ | 12,580,362.26 |
| April 2007 ............ | 44,603,439.06 | August 2008........ | 10,841,987.93 |
| May 2007 ............ | 42,087,581.07 | September 2008 .. | 9,148,062.36 |
| June 2007 ............ | 39,630,648.23 | October 2008 ...... | 7,497,757.57 |
| July 2007............. | 37,231,543.74 | November 2008 .. | 5,890,261.01 |
| August 2007 ........ | 34,889,191.17 | December 2008... | 4,324,775.18 |
| September 2007... | 32,602,534.06 | January 2009....... | 2,800,517.44 |
| October 2007....... | 30,370,535.57 | February 2009..... | 1,316,719.66 |
| November 2007... | 28,192,178.12 | March 2009 and | |
| December 2007 ... | 26,066,463.02 | thereafter............. | 0.00 |
| January 2008 ....... | 23,992,410.12 | | |

The Corridor Contract is scheduled to remain in effect up to the Corridor Contract Termination Date. The Corridor Contract will be subject to early termination only in limited circumstances. These circumstances generally include certain insolvency or bankruptcy events in relation to the Corridor Contract Counterparty, the failure by the Corridor Contract Counterparty (within three business days after notice of the failure is received by the Corridor Contract Counterparty) to make a payment due under the Corridor Contract or the Corridor Contract becoming illegal or subject to certain kinds of taxation.

It will be an additional termination event under the Corridor Contract if the Corridor Contract Counterparty has failed to deliver any information, report, certification or accountants' consent when and as required under the Securities Exchange Act of 1934, as amended (the "Exchange Act") and Item 1115(b)(1) or (b)(2) of the Asset Backed Securities Regulation, 17 C.F.R. §§229.1100-229.1123 ("Regulation AB") with respect to certain reporting obligations of the depositor with respect to the issuing entity, which continues unremedied for the time period provided in the Corridor Contract, and the Corridor Contract Counterparty fails to transfer the Corridor Contract, at its sole cost and expense, in whole, but not in part, to a counterparty that, (i) has agreed to deliver any information, report, certification or accountants' consent when and as required under the Exchange Act and Regulation AB with respect to certain reporting obligations of the depositor and the issuing entity, (ii) satisfies any rating requirement set forth in the Corridor Contract, and (iii) is approved by the depositor (which approval shall not be unreasonably withheld and any rating agency, if applicable.

If the Corridor Contract is terminated early, the Corridor Contract Counterparty may owe a termination payment, payable in a lump sum. Any termination payment received from the Corridor Contract Counterparty will be paid to the trustee on behalf of the supplemental interest trust and will be deposited into the Corridor Contract Reserve Fund and applied on future Distribution Dates to pay any Yield Supplement Amount on the related class of certificates, until the Corridor Contract Termination Date. However, if a termination occurs, there can be no assurance that a termination payment will be paid to the trustee.

The pooling and servicing agreement does not provide for the substitution of a replacement Corridor Contract in the event of a termination of the Corridor Contract or in any other circumstance.

The significance percentage for the Corridor Contract is less than 10%. The "significance percentage" for the Corridor Contract is the percentage that the significance estimate of the Corridor Contract represents of the Class Certificate Balance of the related class of certificates. The "significance estimate" of a Corridor Contract is determined based on a reasonable good-faith estimate of the maximum probable exposure of the Corridor Contract, made in substantially the same manner as that used in Countrywide Home Loans' internal risk management process in respect of similar instruments.

BANA is a national banking association organized under the laws of the United States, with its principal executive offices located in Charlotte, North Carolina. BANA is a wholly owned indirect subsidiary of Bank of America Corporation, which is a bank holding company and a financial holding company, with its principal executive offices located in Charlotte, North Carolina. On January 1, 2006, Bank of America Corporation completed a merger with MBNA Corporation. BANA is engaged in a general consumer banking, commercial banking and trust business, offering a wide range of commercial, corporate, international, financial market, retail and fiduciary banking services. Moody's currently rates BANA's long-term debt as "Aa1" and its short-term debt as "P-1." S&P currently rates the BANA's long-term debt as "AA" and its short-term debt as "A-1+." Fitch currently rates BANA's long-term debt as "AA-" and its short-term debt as "F1+." No assurances can be given that the current ratings of BANA's instruments will be maintained.

The offered certificates do not represent an obligation of the Corridor Contract Counterparty. The holders of the offered certificates are not parties to or beneficiaries under the Corridor Contract and will not have any right to proceed directly against the Corridor Contract Counterparty in respect of its obligations under the Corridor Contract.

The Corridor Contract will be filed with the Securities and Exchange Commission as an Exhibit to a Current Report on Form 8-K after the closing date.

**The Corridor Contract Reserve Fund**

The pooling and servicing agreement will require the supplemental interest trustee to establish an account (the "Corridor Contract Reserve Fund"), which will be held in trust in the supplemental interest trust by the supplemental interest trustee, on behalf of the holders of the Class A-1 Certificates.  On the closing date, the depositor will cause $1,000 to be deposited in the Corridor Contract Reserve Fund.  The Corridor Contract Reserve Fund will not be an asset of any REMIC or the issuing entity.

On each Distribution Date, the supplemental interest trustee will deposit in the Corridor Contract Reserve Fund any amounts received in respect of the Corridor Contract for the related interest accrual period. On each Distribution Date, such amounts received in respect of the Corridor Contract will be distributed to the Class A-1 Certificates to the extent necessary to pay the current Yield Supplement Amount and any Yield Supplement Amount remaining unpaid from prior Distribution Dates.  Any remaining amounts will remain on deposit in the Corridor Contract Reserve Fund.  On the Distribution Date immediately following the earlier of (i) the Corridor Contract Termination Date and (ii) the date on which the Class Certificate Balance of the Class A-1 Certificates has been reduced to zero, all amounts remaining in the Corridor Contract Reserve Fund will be distributed to Countrywide Home Loans.

For any Distribution Date, on or prior to the Corridor Contract Termination Date, on which LIBOR exceeds 5.50%, the " Class A-1 Yield Supplement Amount" will be an amount equal to interest for the related interest accrual period on the Class Certificate Balance of the Class A-1 Certificates immediately prior to such Distribution Date at a rate equal to the excess of (i) the lesser of LIBOR and 9.00% over (ii) 5.50%.

**Principal**

*General*.  All payments and other amounts received in respect of principal of the mortgage loans will be allocated as described under *"— Priority of Distributions Among Certificates"* between the Class PO Certificates, on the one hand, and the senior certificates (other than the notional amount certificates and the Class PO Certificates) and the subordinated certificates, on the other hand, in each case based on the applicable PO Percentage and the applicable Non-PO Percentage, respectively, of those amounts.

The Non-PO Percentage with respect to any mortgage loan with a net mortgage rate less than 6.00% (each a "Discount mortgage loan") will be equal to the net mortgage rate divided by 6.00%. The Non-PO Percentage with respect to any mortgage loan with a net mortgage rate equal to or greater than 6.00% (each a "Non-Discount mortgage loan") will be 100%. The PO Percentage with respect to any Discount mortgage loan will be equal to (6.00% minus the net mortgage rate) divided by 6.00%. The PO Percentage with respect to any Non-Discount mortgage loan will be 0%.

*Non-PO Formula Principal Amount*.  On each Distribution Date, the Non-PO Formula Principal Amount will be distributed as principal of the senior certificates (other than the notional amount certificates and the Class PO Certificates) in an amount up to the Senior Principal Distribution Amount and as principal of the subordinated certificates, in an amount up to the Subordinated Principal Distribution Amount.

The "Non-PO Formula Principal Amount" for any Distribution Date will equal the sum of:

(i)    the sum of the applicable Non-PO Percentage of,

    (a)   all monthly payments of principal due on each mortgage loan on the related Due Date,

    (b)   the principal portion of the purchase price of each mortgage loan that was repurchased by the related seller or another person pursuant to the pooling and servicing agreement as of the Distribution Date,

    (c)   the Substitution Adjustment Amount in connection with any deleted mortgage loan received with respect to the Distribution Date,

(d) any insurance proceeds or liquidation proceeds allocable to recoveries of principal of mortgage loans that are not yet Liquidated Mortgage Loans received during the calendar month preceding the month of the Distribution Date,

(e) with respect to each mortgage loan that became a Liquidated Mortgage Loan during the calendar month preceding the month of the Distribution Date, the amount of the liquidation proceeds allocable to principal received with respect to the mortgage loan, and

(f) all partial and full principal prepayments by borrowers received during the related Prepayment Period,

(ii) (A) any Subsequent Recoveries received during the calendar month preceding the month of the Distribution Date, or (B) with respect to Subsequent Recoveries attributable to a Discount mortgage loan which incurred a Realized Loss after the Senior Credit Support Depletion Date, the Non-PO Percentage of any Subsequent Recoveries received during the calendar month preceding the month of such Distribution Date; and

(iii) on the first Distribution Date after the Funding Period, any amounts remaining in the Pre-funding Account and not allocated to the Class PO Certificates.

*Senior Principal Distribution Amount.* On each Distribution Date, the Non-PO Formula Principal Amount, up to the amount of the Senior Principal Distribution Amount for the Distribution Date, will be distributed as principal of the following classes of senior certificates in the following order of priority:

1. to the Class A-R Certificates, until its Class Certificate Balance is reduced to zero;

2. concurrently, to the Class A-5 and Class A-6 Certificates, pro rata, the Priority Amount, until their respective Class Certificate Balances are reduced to zero;

3. in an amount up to $1,000 on each Distribution Date, to the Class A-1 Certificates, until its Class Certificate Balance is reduced to zero;

4. in an amount up to $627,000 on each Distribution Date, to the Class A-3 Certificates, until its Class Certificate Balance is reduced to zero;

5. sequentially, to the Class A-1 and Class A-3 Certificates, in that order, until their respective Class Certificate Balances are reduced to zero;

6. concurrently, to the Class A-4 and Class A-7 Certificates, pro rata, until their respective Class Certificate Balances are reduced to zero; and

7. concurrently, to the Class A-5 and Class A-6 Certificates, pro rata, without regard to the Priority Amount, until their respective Class Certificate Balances are reduced to zero.

Notwithstanding the foregoing, on each Distribution Date after the Senior Credit Support Depletion Date, the Non-PO Formula Principal Amount will be distributed, concurrently, as principal of the classes of senior certificates (other than the notional amount certificates and the Class PO Certificates), pro rata, in accordance with their respective Class Certificate Balances immediately prior to that Distribution Date.

If on any Distribution Date the allocation to the classes of senior certificates (other than the notional amount certificates and the Class PO Certificates) then entitled to distributions of principal would reduce the outstanding Class Certificate Balance of the class or classes below zero, the distribution to the classes of certificates of the Senior Percentage and Senior Prepayment Percentage of the related principal amounts for the Distribution Date will be limited to the percentage necessary to reduce the related Class Certificate Balances to zero.

The capitalized terms used herein shall have the following meanings:

"Priority Amount" for any Distribution Date will equal the sum of (i) the product of (A) the Scheduled Principal Distribution Amount, (B) the Shift Percentage and (C) the Priority Percentage and (ii) the product of (A) the Unscheduled Principal Distribution Amount, (B) the Shift Percentage and (C) the Priority Percentage.

"Priority Percentage" for any Distribution Date will equal the percentage equivalent of a fraction, the numerator of which is the aggregate Class Certificate Balance of the Class A-5 and Class A-6 Certificates immediately prior to such Distribution Date, and the denominator of which is the aggregate Class Certificate Balance of the certificates (other than the Class PO Certificates and the notional amount certificates) immediately prior to that Distribution Date.

"Scheduled Principal Distribution Amount" for any Distribution Date will equal the Non-PO Percentage of all amounts described in subclauses (a) through (d) of clause (i) of the definition of Non-PO Formula Principal Amount for such Distribution Date.

"Unscheduled Principal Distribution Amount" for any Distribution Date will equal the sum of (i) with respect to each mortgage loan that became a Liquidated Mortgage Loan during the calendar month preceding the month of such Distribution Date, the applicable Non-PO Percentage of the Liquidation Proceeds allocable to principal received with respect to such mortgage loan, (ii) the applicable Non-PO Percentage of the amount described in subclause (f) of clause (i) of the definition of Non-PO Formula Principal Amount for such Distribution Date and (iii) any Subsequent Recoveries described in clause (ii) of the definition of Non-PO Formula Principal Amount for such Distribution Date.

"Shift Percentage" for any Distribution Date occurring during the five years beginning on the first Distribution Date will equal 0%. Thereafter, the Shift Percentage for any Distribution Date occurring on or after the fifth anniversary of the first Distribution Date will be as follows: for any Distribution Date in the first year thereafter, 30%; for any Distribution Date in the second year thereafter, 40%; for any Distribution Date in the third year thereafter, 60%; for any Distribution Date in the fourth year thereafter, 80%; and for any Distribution Date thereafter, 100%.

"Due Date" means, with respect to a mortgage loan, the day of the calendar month on which scheduled payments are due on that mortgage loan.  With respect to any Distribution Date, the related Due Date is the first day of the calendar month in which that Distribution Date occurs.

"Prepayment Period" means for any Distribution Date and related Due Date (a) with respect to the mortgage loans directly serviced by Countrywide Servicing, the period from the sixteenth day of the calendar month immediately preceding the month in which the Distribution Date occurs (or in the case of the first Distribution Date, from September 1, 2006) through the fifteenth day of the following calendar month and (b) with respect to the remaining mortgage loans, the calendar month immediately preceding the month in which the Distribution Date occurs.

The "Senior Principal Distribution Amount" for any Distribution Date will equal the sum of

- the Senior Percentage of the applicable Non-PO Percentage of all amounts described in subclauses (a) through (d) of clause (i) of the definition of Non-PO Formula Principal Amount for that Distribution Date,

- for each mortgage loan that became a Liquidated Mortgage Loan during the calendar month preceding the month of the Distribution Date, the lesser of

  - the Senior Percentage of the applicable Non-PO Percentage of the Stated Principal Balance of the mortgage loan, and

  - the Senior Prepayment Percentage of the applicable Non-PO Percentage of the amount of the liquidation proceeds allocable to principal received on the mortgage loan, and

- the sum of

  - the Senior Prepayment Percentage of the applicable Non-PO Percentage of amounts described in subclause (f) of clause (i) of the definition of Non-PO Formula Principal Amount for that Distribution Date,

  - the Senior Prepayment Percentage of any Subsequent Recoveries described in clause (ii) of the definition of Non-PO Formula Principal Amount for the Distribution Date, and

  - the amount, if any, on deposit in the Pre-funding Account at the end of the Funding Period not allocable to the Class PO Certificates.

"Stated Principal Balance" means for any mortgage loan and Due Date, the unpaid principal balance of the mortgage loan as of that Due Date, as specified in its amortization schedule at that time (before any adjustment to the amortization schedule for any moratorium or similar waiver or grace period), after giving effect to:

- the payment of principal due on the Due Date and irrespective of any delinquency in payment by the related borrower;

- liquidation proceeds received through the end of the prior calendar month and allocable to principal;

- prepayments of principal received through the last day of the related Prepayment Period; and

- any Deficient Valuation previously applied to reduce the unpaid principal balance of the mortgage loan.

"Deficient Valuation" means for any mortgage loan, a valuation by a court of competent jurisdiction of the mortgaged property in an amount less than the then-outstanding indebtedness under such mortgage loan, or any reduction in the amount of principal to be paid in connection with any scheduled payment that results in a permanent forgiveness of principal, which valuation or reduction results from an order of such court which is final and non-appealable in a proceeding under the federal bankruptcy code.

The "pool principal balance" equals the aggregate of the Stated Principal Balances of the mortgage loans.

The "Senior Percentage" for any Distribution Date is the percentage equivalent of a fraction, not to exceed 100%, the numerator of which is the aggregate of the Class Certificate Balances of each class of senior certificates (other than the notional amount certificates and the Class PO Certificates) immediately before the Distribution Date and the denominator of which is the aggregate of the Class Certificate Balances of all classes of certificates (other than the notional amount certificates and the Class PO Certificates) immediately before the Distribution Date. The "Subordinated Percentage" for any Distribution Date will be calculated as the difference between 100% and the Senior Percentage for the Distribution Date.

The "Senior Prepayment Percentage" for any Distribution Date occurring during the five years beginning on the first Distribution Date will equal 100%. Thereafter, the Senior Prepayment Percentage will be subject to gradual reduction as described in the following paragraphs. This disproportionate allocation of unscheduled payments of principal will have the effect of accelerating the amortization of the senior certificates (other than the notional amount certificates and the Class PO Certificates) which receive these unscheduled payments of principal while, in the absence of Realized Losses, increasing the interest in the pool principal balance evidenced by the subordinated certificates. Increasing the respective interest of the subordinated certificates relative to that of the senior certificates is intended to preserve the availability of the subordination provided by the subordinated certificates.

The "Subordinated Prepayment Percentage" as of any Distribution Date will be calculated as the difference between 100% and the Senior Prepayment Percentage.

The Senior Prepayment Percentage for any Distribution Date occurring on or after the fifth anniversary of the first Distribution Date will be as follows:

- for any Distribution Date in the first year thereafter, the Senior Percentage plus 70% of the Subordinated Percentage for the Distribution Date;

- for any Distribution Date in the second year thereafter, the Senior Percentage plus 60% of the Subordinated Percentage for the Distribution Date;

- for any Distribution Date in the third year thereafter, the Senior Percentage plus 40% of the Subordinated Percentage for the Distribution Date;

- for any Distribution Date in the fourth year thereafter, the Senior Percentage plus 20% of the Subordinated Percentage for the Distribution Date; and

- for any Distribution Date thereafter, the Senior Percentage for the Distribution Date;

provided, however, that if on any Distribution Date the Senior Percentage exceeds the initial Senior Percentage, then the Senior Prepayment Percentage for that Distribution Date will equal 100%.

Notwithstanding the foregoing, no decrease in the Senior Prepayment Percentage will occur unless both of the step down conditions listed below are satisfied:

- the outstanding principal balance of all mortgage loans delinquent 60 days or more (including mortgage loans in foreclosure, real estate owned by the issuing entity and mortgage loans the mortgagors of which are in bankruptcy) (averaged over the preceding six month period), as a percentage of the aggregate Class Certificate Balance of the subordinated certificates immediately prior to the Distribution Date, does not equal or exceed 50%, and

- cumulative Realized Losses on the mortgage loans do not exceed:

  - commencing with the Distribution Date on the fifth anniversary of the first Distribution Date, 30% of the aggregate Class Certificate Balance of the subordinated certificates as of the closing date,

  - commencing with the Distribution Date on the sixth anniversary of the first Distribution Date, 35% of the aggregate Class Certificate Balance of the subordinated certificates as of the closing date,

  - commencing with the Distribution Date on the seventh anniversary of the first Distribution Date, 40% of the aggregate Class Certificate Balance of the subordinated certificates as of the closing date,

  - commencing with the Distribution Date on the eighth anniversary of the first Distribution Date, 45% of the aggregate Class Certificate Balance of the subordinated certificates as of the closing date, and

  - commencing with the Distribution Date on the ninth anniversary of the first Distribution Date, 50% of the aggregate Class Certificate Balance of the subordinated certificates as of the closing date.