*Subordinated Principal Distribution Amount*.  On each Distribution Date, to the extent of Available Funds therefor, the Non-PO Formula Principal Amount, up to the amount of the Subordinated Principal Distribution Amount for the Distribution Date, will be distributed as principal of the subordinated certificates.  Except as provided in the next paragraph, each class of subordinated certificates will be entitled to receive its pro rata share of the Subordinated Principal Distribution Amount (based on its respective Class Certificate Balance), in each case to the extent of the amount available from Available Funds for distribution of principal. Distributions of principal of the subordinated certificates will be made sequentially to the classes of subordinated certificates in the order of their numerical class designations, beginning with the Class M Certificates, until their respective Class Certificate Balances are reduced to zero.

With respect to each class of subordinated certificates (other than the class of subordinated certificates then outstanding with the highest priority of distribution), if on any Distribution Date the Applicable Credit Support Percentage is less than the Original Applicable Credit Support Percentage, no distribution of partial principal prepayments and principal prepayments in full will be made to any of those classes (the "Restricted Classes").  The amount of partial principal prepayments and principal prepayments in full otherwise distributable to the Restricted Classes will be allocated among the remaining classes of subordinated certificates, pro rata, based upon their respective Class Certificate Balances, and distributed in the sequential order described above.

For any Distribution Date and any class of subordinated certificates, the "Applicable Credit Support Percentage" is equal to the sum of the related Class Subordination Percentages of the subject class and all classes of subordinated certificates which have lower distribution priorities than such class.

For any Distribution Date and any class of subordinated certificates, the "Original Applicable Credit Support Percentage" is equal to the Applicable Credit Support Percentage for such class on the date of issuance of the certificates.

The "Class Subordination Percentage" with respect to any Distribution Date and each class of subordinated certificates will equal the fraction (expressed as a percentage) the numerator of which is the Class Certificate Balance of the class of subordinated certificates immediately before the Distribution Date and the denominator of which is the aggregate of the Class Certificate Balances of all classes of certificates immediately before the Distribution Date.

On the date of issuance of the certificates, the characteristics listed below are expected to be as follows:

| | Beneficial Interest in Issuing Entity | Initial Credit Enhancement Level | Original Applicable Credit Support Percentage |
|---|---|---|---|
| Senior Certificates ............................ | 94.55% | 5.45% | N/A |
| Class M............................................ | 2.95% | 2.50% | 5.45% |
| Class B-1 ......................................... | 0.80% | 1.70% | 2.50% |
| Class B-2 ......................................... | 0.65% | 1.05% | 1.70% |
| Class B-3 ......................................... | 0.40% | 0.65% | 1.05% |
| Class B-4 ......................................... | 0.35% | 0.30% | 0.65% |
| Class B-5 ......................................... | 0.30% | 0.00% | 0.30% |

For purposes of calculating the Applicable Credit Support Percentages of the subordinated certificates, the Class M Certificates will be considered to have a lower numerical class designation and a higher distribution priority than each other class of subordinated certificates.  Within the Class B Certificates, the distribution priorities are in numerical order.

The "Subordinated Principal Distribution Amount" for any Distribution Date will equal:

- *the sum of*

    - the Subordinated Percentage of the applicable Non-PO Percentage of all amounts described in subclauses (a) through (d) of clause (i) of the definition of Non-PO Formula Principal Amount for that Distribution Date,

    - for each mortgage loan that became a Liquidated Mortgage Loan during the calendar month preceding the month of the Distribution Date, the applicable Non-PO Percentage of the remaining liquidation proceeds allocable to principal received on the mortgage loan, after application of the amounts pursuant to the second bulleted item of the definition of Senior Principal Distribution Amount up to the Subordinated Percentage of the applicable Non-PO Percentage of the Stated Principal Balance of the mortgage loan,

    - the Subordinated Prepayment Percentage of the applicable Non-PO Percentage of the amounts described in subclause (f) of clause (i) of the definition of Non-PO Formula Principal Amount for that Distribution Date, and

    - the Subordinated Prepayment Percentage of any Subsequent Recoveries described in clause (ii) of the definition of Non-PO Formula Principal Amount for that Distribution Date,

- *reduced by* the amount of any payments in respect of Class PO Deferred Amounts on the related Distribution Date.

*Class PO Principal Distribution Amount*.  On each Distribution Date, distributions of principal of the Class PO Certificates will be made in an amount equal to the lesser of (x) the PO Formula Principal Amount for that Distribution Date and (y) the product of:

- Available Funds remaining after distribution of interest on the senior certificates, and

- a fraction, the numerator of which is the PO Formula Principal Amount and the denominator of which is the sum of the PO Formula Principal Amount and the Senior Principal Distribution Amount.

If the Class PO Principal Distribution Amount on a Distribution Date is calculated as provided in clause (y) above, principal distributions to holders of the senior certificates (other than the notional amount certificates and the Class PO Certificates) will be in an amount equal to the product of Available Funds remaining after distribution of interest on the senior certificates and a fraction, the numerator of which is the Senior Principal Distribution Amount and the denominator of which is the sum of the Senior Principal Distribution Amount and the PO Formula Principal Amount.

The "PO Formula Principal Amount" for any Distribution Date will equal the sum of:

- the sum of the applicable PO Percentage of

    - all monthly payments of principal due on each mortgage loan on the related Due Date,

    - the principal portion of the purchase price of each mortgage loan that was repurchased by the related seller or another person pursuant to the pooling and servicing agreement as of that Distribution Date,

    - the substitution adjustment amount in connection with any deleted mortgage loan received for that Distribution Date,

- any insurance proceeds or liquidation proceeds allocable to recoveries of principal of mortgage loans that are not yet Liquidated Mortgage Loans received during the calendar month preceding the month of that Distribution Date,

- for each mortgage loan that became a Liquidated Mortgage Loan during the calendar month preceding the month of that Distribution Date, the amount of liquidation proceeds allocable to principal received on the mortgage loan, and

- all partial and full principal prepayments by borrowers received during the related prepayment period,

- with respect to Subsequent Recoveries attributable to a Discount mortgage loan which incurred a Realized Loss after the Senior Credit Support Depletion Date, the PO Percentage of any Subsequent Recoveries received during the calendar month preceding the month of that Distribution Date; and

- the amount, if any, on deposit in the Pre-funding Account at the end of the Funding Period that is allocable to the Class PO Certificates.

On the first Distribution Date following the end of the Funding Period, the Class PO Certificates will receive a prepayment in the amount equal to the excess of (x) the PO Sublimit over (y) the aggregate of the PO Percentage of the Stated Principal Balances of the Supplemental Mortgage Loans during the Funding Period. The "PO Sublimit" is a portion of the amount deposited in the Pre-funding Account on the closing date which is equal to $3,029.

*Residual Certificates*. The Class A-R Certificates will remain outstanding for so long as the issuing entity shall exist, whether or not the Class A-R Certificates are receiving current distributions of principal or interest. In addition to distributions of interest and principal as described above, on each Distribution Date, the holders of the Class A-R Certificates will be entitled to receive certain amounts as described in the pooling and servicing agreement. It is not anticipated that there will be any significant amounts remaining for that distribution.

**Allocation of Losses**

On each Distribution Date, the applicable PO Percentage of any Realized Loss on a Discount mortgage loan will be allocated to the Class PO Certificates until their Class Certificate Balance is reduced to zero. The amount of any Realized Loss allocated to the Class PO Certificates on or before the Senior Credit Support Depletion Date will be treated as a Class PO Deferred Amount. To the extent funds are available on the Distribution Date or on any future Distribution Date from amounts that would otherwise be allocable to the Subordinated Principal Distribution Amount, Class PO Deferred Amounts will be paid on the Class PO Certificates before distributions of principal on the subordinated certificates. Any distribution of Available Funds in respect of unpaid Class PO Deferred Amounts will not further reduce the Class Certificate Balance of the Class PO Certificates. The Class PO Deferred Amounts will not bear interest. The Class Certificate Balance of the class of subordinated certificates then outstanding with the highest numerical class designation will be reduced by the amount of any payments in respect of Class PO Deferred Amounts. After the Senior Credit Support Depletion Date, no new Class PO Deferred Amounts will be created.

On each Distribution Date, the applicable Non-PO Percentage of any Realized Loss will be allocated:

- first, to the subordinated certificates, in the reverse order of their numerical class designations (beginning with the class of subordinated certificates then outstanding with the highest numerical class designation), in each case until the Class Certificate Balance of the respective class of certificates has been reduced to zero, and

- second, to the senior certificates (other than the notional amount certificates and the Class PO Certificates), pro rata, based upon their respective Class Certificate Balances, except that the applicable Non-PO Percentage of any Realized Losses that would otherwise be allocated to the Class A-4 and

Class A-5 Certificates will instead be allocated to the Class A-7 and Class A-6 Certificates, respectively, until their respective Class Certificate Balances are reduced to zero.

For purposes of allocating losses to the subordinated certificates, the Class M Certificates will be considered to have a lower numerical class designation and a higher distribution priority than each other class of subordinated certificates.  Within the Class B Certificates, the distribution priorities are in numerical order.

The Senior Credit Support Depletion Date is the date on which the Class Certificate Balance of each class of subordinated certificates has been reduced to zero.

Because principal distributions are paid to some classes of certificates (other than the notional amount certificates and the Class PO Certificates) before other classes of certificates, holders of the certificates that are entitled to receive principal later bear a greater risk of being allocated Realized Losses on the mortgage loans than holders of classes that are entitled to receive principal earlier.

In general, a "Realized Loss" means, for a Liquidated Mortgage Loan, the amount by which the remaining unpaid principal balance of the mortgage loan exceeds the amount of liquidation proceeds applied to the principal balance of the related mortgage loan.  See *"Credit Enhancement — Subordination"* in this prospectus supplement and in the prospectus.

A "Liquidated Mortgage Loan" is a defaulted mortgage loan as to which the master servicer has determined that all recoverable liquidation and insurance proceeds have been received.

"Subsequent Recoveries" are unexpected recoveries, net of reimbursable expenses, with respect to a Liquidated Mortgage Loan that resulted in a Realized Loss in a month prior to the month of receipt of such recoveries.

**Reports to Certificateholders**

The trustee may, at its option, make the information described in the prospectus under *"Description of the Securities — Reports to Securityholders"* available to certificateholders on the trustee's website (assistance in using the website service may be obtained by calling the trustee's customer service desk at (800) 254-2826). Parties that are unable to use the above distribution option are entitled to have a copy mailed to them via electronic mail by notifying the trustee at its corporate trust office.

Any monthly statement prepared by the trustee is based on information provided by the master servicer. The trustee is not responsible for recomputing, recalculating or verifying the information provided to it by the master servicer and will be permitted to conclusively rely on any information provided to it by the master servicer. The report to certificateholders may include additional or other information of a similar nature to that specified in the prospectus.

**Structuring Assumptions**

Unless otherwise specified, the information set forth in the tables under *"Yield, Prepayment and Maturity Considerations"* in this prospectus supplement has been prepared on the basis of the following assumed characteristics of the mortgage loans and the following additional assumptions, which combined are the structuring assumptions:

- the mortgage pool consists of nine mortgage loans with the following characteristics:

**Initial Mortgage Loans**

| Principal Balance ($) | Mortgage Rate (%) | Net Mortgage Rate (%) | Original Term to Maturity (In Months) | Remaining Term to Maturity (In Months) | Remaining Amortization Term (In Months) | Remaining Interest-Only Term (In Months) |
|---|---|---|---|---|---|---|
| 215,000.00 | 6.2500000000 | 5.9910000000 | 360 | 358 | 240 | 118 |
| 84,121,367.80 | 6.8168768241 | 6.5934774954 | 360 | 358 | 240 | 118 |
| 1,350,986.26 | 6.4793953863 | 5.7175385837 | 360 | 358 | 358 | N/A |
| 66,048,550.74 | 6.7164100124 | 6.4978672352 | 360 | 358 | 358 | N/A |
| 571,083.57 | 7.0243340305 | 6.7653340305 | 360 | 359 | 479 | N/A |

**Supplemental Mortgage Loans**

| Principal Balance ($) | Mortgage Rate (%) | Net Mortgage Rate (%) | Original Term to Maturity (In Months) | Remaining Term to Maturity (In Months) | Remaining Amortization Term (In Months) | Remaining Interest-Only Term (In Months) |
|---|---|---|---|---|---|---|
| 11,798,009.64 | 7.0561023300 | 6.7971023300 | 360 | 359 | 240 | 119 |
| 135,655.07 | 6.1250000000 | 5.8660000000 | 360 | 359 | 359 | N/A |
| 22,601,654.80 | 7.0264975008 | 6.7749372215 | 360 | 359 | 359 | N/A |
| 375,200.00 | 6.8192963753 | 6.5602963753 | 360 | 360 | 360 | N/A |

- the mortgage loans prepay at the specified *constant* percentages of the Prepayment Assumption,

- no defaults in the payment by mortgagors of principal of and interest on the mortgage loans are experienced,

- the scheduled monthly payment for each mortgage loan (except for the interest-only mortgage loans during their interest-only periods and the balloon mortgage loans), has been calculated such that each mortgage loan will amortize in amounts sufficient to repay the current balance of the mortgage loan by its respective remaining term to maturity,

- the balloon loans will amortize over their respective remaining amortization terms with the final balloon payment being paid at the end of their respective remaining terms to maturity,

- any mortgage loan with a remaining interest-only term greater than zero does not amortize during the remaining interest-only term. At the end of the remaining interest-only term, any such mortgage loan will amortize in amounts sufficient to repay the current balance of any mortgage loan over the remaining term to maturity calculated at the expiration of the remaining interest-only term,

- scheduled payments on the mortgage loans are received on the first day of each month commencing in the calendar month following the closing date and are computed before giving effect to prepayments received on the last day of the prior month,

- the net mortgage rate is equal to the mortgage rate *minus* the sum of the master servicing fee and the trustee fee, and where applicable, amounts in respect of lender paid primary mortgage insurance on a mortgage loan (expressed as a per annum percentage of its Stated Principal Balance),

- prepayments are allocated as described in this prospectus supplement without giving effect to loss and delinquency tests,

- there are no Net Interest Shortfalls and prepayments represent prepayments in full of individual mortgage loans and are received on the last day of each month, commencing in the calendar month of the closing date,

- the initial Class Certificate Balance or initial notional amount, as applicable, of each class of certificates is as set forth on the cover page hereof or as described under *"Summary—Description of the Certificates"* in this prospectus supplement,

- interest accrues on each interest-bearing class of certificates at the applicable interest rate set forth on the cover page hereof, or as described in this prospectus supplement,

- distributions in respect of the certificates are received in cash on the 25th day of each month commencing in the calendar month following the closing date,

- the closing date of the sale of the certificates is September 29, 2006,

- the Class P Certificates have an Initial Class Certificate Balance of $0,

- no seller is required to repurchase or substitute for any mortgage loan,

- the master servicer does not exercise the option to repurchase the mortgage loans described under *"— Optional Purchase of Defaulted Loans and Certain Delinquent Loans"* and *"— Optional Termination",* and

- no class of certificates becomes a Restricted Class.

Prepayments of mortgage loans commonly are measured relative to a prepayment standard or model. The model used in this prospectus supplement assumes a constant prepayment rate ("CPR") or an assumed rate of prepayment each month of the then outstanding principal balance of a pool of new mortgage loans.  A 100% prepayment assumption (the "Prepayment Assumption") assumes a CPR of 8.0% per annum of the then outstanding principal balance of the applicable mortgage loans in the first month of the life of the mortgage loans and an additional approximately 1.0909090909% (precisely 12%/11) per annum in the second through eleventh months. Beginning in the twelfth month and in each month thereafter during the life of the mortgage loans, a 100% Prepayment Assumption assumes a CPR of 20.0% per annum each month.  There is no assurance that prepayments will occur at any of the Prepayment Assumption rate or at any other constant rate.

While it is assumed that each of the mortgage loans prepays at the specified constant percentages of the Prepayment Assumption, this is not likely to be the case. Moreover, discrepancies may exist between the characteristics of the actual mortgage loans which will be delivered to the trustee and characteristics of the mortgage loans used in preparing the tables.

### Optional Purchase of Defaulted Loans and Certain Delinquent Loans

The master servicer may, at its option but subject to the conditions set forth in the pooling and servicing agreement, purchase from the issuing entity any mortgage loan which is delinquent in payment by 151 days or more. In addition, if a mortgage loan becomes subject to a repurchase obligation of an unaffiliated seller to Countrywide Home Loans due to a delinquency on a scheduled payment due on or prior to the second day of the month following the closing date (or, in the case of such a mortgage loan that does not have a scheduled payment due until after the cut-off date, a delinquency on a scheduled payment due on or prior to the first scheduled payment owing to the issuing entity), the master servicer will have the option to purchase that mortgage loan until the 270th day following the date on which that mortgage loan becomes subject to that seller's repurchase obligation.

### Optional Termination

The master servicer will have the right to purchase all remaining mortgage loans and mortgaged property that the master servicer or its designee has acquired through foreclosure or deed-in-lieu of foreclosure in connection with a defaulted mortgage loan ("REO Property") in the issuing entity and thereby effect early retirement of all the certificates, on any Distribution Date on or after the first Distribution Date on which the aggregate Stated Principal Balance of the mortgage loans and REO Properties in the issuing entity is less than or equal to 10% of the sum of (a)

the aggregate Stated Principal Balance of the Closing Date Mortgage Loans as of the initial cut-off date and (b) any amount deposited in the Pre-funding Account on the closing date.  The master servicer is an affiliate of the sellers and the depositor.

In the event the option is exercised by the master servicer, the purchase will be made at a price equal to the sum of:

- 100% of the Stated Principal Balance of each mortgage loan in the issuing entity (other than in respect of REO Property) plus accrued interest thereon at the applicable net mortgage rate, and

- the appraised value of any REO Property (up to the Stated Principal Balance of the related mortgage loan) in the issuing entity.

Notice of any termination, specifying the Distribution Date on which certificateholders may surrender their certificates for payment of the final distribution and cancellation, will be given promptly by the trustee by letter to related certificateholders mailed not earlier than the 10th day and no later than the 15th day of the month immediately preceding the month of the final distribution.  The notice will specify (a) the Distribution Date upon which final distribution on the certificates will be made upon presentation and surrender of the certificates at the office therein designated, (b) the amount of the final distribution, (c) the location of the office or agency at which the presentation and surrender must be made, and (d) that the Record Date otherwise applicable to the Distribution Date is not applicable, distributions being made only upon presentation and surrender of the certificates at the office therein specified.

In the event a notice of termination is given, the master servicer will cause all funds in the Certificate Account to be remitted to the trustee for deposit in the Distribution Account on the Business Day prior to the applicable Distribution Date in an amount equal to the final distribution in respect of the certificates.  At or prior to the time of making the final payment on the certificates, the master servicer as agent of the trustee will sell all of the assets of the issuing entity to the master servicer for cash.  Proceeds from a purchase will be distributed to the certificateholders in the priority described above under "— *Distributions*" and will reflect the current Class Certificate Balance and other entitlements of each class at the time of liquidation.

The proceeds from any sale in connection the exercise of the option may not be sufficient to distribute the full amount to which each class of certificates is entitled if the purchase price is based in part on the appraised value of any REO Property and that appraised value is less than the Stated Principal Balance of the related mortgage loan. Any purchase of the mortgage loans and REO Properties will result in an early retirement of the certificates.  At the time of the making of the final payment on the certificates, the trustee shall distribute or credit, or cause to be distributed or credited, to the holder of the Class A-R Certificates all cash on hand related to the Class A-R Certificates, and the issuing entity will terminate at that time.  Once the issuing entity has been terminated, certificateholders will not be entitled to receive any amounts that are recovered subsequent to the termination.

**Events of Default; Remedies**

In addition to the Events of Default described in the prospectus, an Event of Default will consist of the failure by the master servicer to reimburse, in full, the trustee not later than 6:00 p.m., New York City time, on the Business Day following the related Distribution Date for any Advance made by the trustee together with accrued and unpaid interest.  If the master servicer fails to make the required reimbursement, so long as the Event of Default has not been remedied, the trustee, but not the certificateholders, may terminate the master servicer, and the trustee may do so without the consent of the certificateholders.  Additionally, if the master servicer fails to provide certain information or perform certain duties related to the depositor's reporting obligations under the Exchange Act, with respect to the issuing entity, the depositor, may, without the consent of any of the certificateholders terminate the master servicer.

**Certain Matters Regarding the Master Servicer, the Depositor and the Sellers**

The prospectus describes the indemnification to which the master servicer and the depositor (and their respective directors, officers, employees and agents) are entitled and also describes the limitations on any liability of the master servicer and the depositor (and their respective directors, officers, employees and agents) to the issuing entity. See *"The Agreements — Certain Matters Regarding the Master Servicer and the Depositor"* in the prospectus. The pooling and servicing agreement provides that these same provisions regarding indemnification and exculpation apply to each seller.

**The Trustee**

The Bank of New York will be the trustee under the pooling and servicing agreement. The Bank of New York has been, and currently is, serving as indenture trustee and trustee for numerous securitization transactions and programs involving pools of residential mortgages. The depositor, Countrywide Home Loans and any affiliated seller may maintain other banking relationships in the ordinary course of business with the trustee. The offered certificates may be surrendered at the corporate trust office of the trustee located at 101 Barclay Street, 8W, New York, New York 10286, Attention: Corporate Trust Administration or another address that the trustee may designate from time to time.

The trustee will be liable for its own negligent action, its own negligent failure to act or its own willful misconduct. However, the trustee will not be liable, individually or as trustee,

- for an error of judgment made in good faith by a responsible officer of the trustee, unless the trustee was negligent in ascertaining the pertinent facts,

- with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the holders of certificates evidencing not less than 25% of the Voting Rights of the certificates relating to the time, method and place of conducting any proceeding for any remedy available to the trustee, or exercising any trust or power conferred upon the trustee under the pooling and servicing agreement,

- for any action taken, suffered or omitted by it under the pooling and servicing agreement in good faith and in accordance with an opinion of counsel or believed by the trustee to be authorized or within the discretion or rights or powers that it has under the pooling and servicing agreement, or

- for any loss on any investment of funds pursuant to the pooling and servicing agreement (other than as issuer of the investment security).

The trustee is also entitled to rely without further investigation upon any resolution, officer's certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

The trustee and any successor trustee will, at all times, be a corporation or association organized and doing business under the laws of a state or the United States of America, authorized under the laws of the United States of America to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000, subject to supervision or examination by a federal or state authority and with a credit rating that would not cause any of the Rating Agencies to reduce or withdraw their respective then-current ratings of any class of certificates (or having provided security from time to time as is sufficient to avoid the reduction). If the trustee no longer meets the foregoing requirements, the trustee has agreed to resign immediately.

The trustee may at any time resign by giving written notice of resignation to the depositor, the master servicer, each Rating Agency and the certificateholders, not less than 60 days before the specified resignation date. The resignation shall not be effective until a successor trustee has been appointed. If a successor trustee has not

been appointed within 30 days after the trustee gives notice of resignation, the resigning trustee may petition any court of competent jurisdiction for the appointment of a successor trustee.

The depositor or the master servicer may remove the trustee and appoint a successor trustee if:

- the trustee ceases to meet the eligibility requirements described above and fails to resign after written request to do so is delivered to the trustee by the depositor,

- the trustee becomes incapable of acting, or is adjudged as bankrupt or insolvent, or a receiver of the trustee or of its property is appointed, or any public officer takes charge or control of the trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, or

- a tax is imposed with respect to the issuing entity by any state in which the trustee or the issuing entity is located and the imposition of the tax would be avoided by the appointment of a different trustee.

If the trustee fails to provide certain information or perform certain duties related to the depositor's reporting obligations under the Exchange Act with respect to the issuing entity, the depositor may terminate the trustee without the consent of any of the certificateholders.  In addition, the holders of certificates evidencing at least 51% of the Voting Rights of the certificates may at any time remove the trustee and appoint a successor trustee. Notice of any removal of the trustee shall be given by the successor trustee to each Rating Agency.

Any resignation or removal of the trustee and appointment of a successor trustee pursuant to any of the provisions described above will become effective upon acceptance of appointment by the successor trustee.

A successor trustee will not be appointed unless the successor trustee meets the eligibility requirements described above and its appointment does not adversely affect the then-current ratings of the certificates.

## Voting Rights

As of any date of determination:

- the notional amount certificates will be allocated 1% of all voting rights in respect of the certificates (collectively, the "Voting Rights") for a total of 2% of the Voting Rights, and

- the other classes of certificates will be allocated the remaining Voting Rights in proportion to their respective outstanding Class Certificate Balances.

Voting Rights allocated to a class of certificates will be allocated among the certificates of that class in accordance with their respective percentage interests.

## Restrictions on Transfer of the Class A-R Certificates

The Class A-R Certificates will be subject to the restrictions on transfer described in the prospectus under "*Material Federal Income Tax Consequences —Taxation of the REMIC and Its Holders," "—Taxation of Holders of Residual Interests — Restrictions on Ownership and Transfer of Residual Interests*," and "*— Tax Treatment of Foreign Investors*."  The Class A-R Certificates (in addition to other ERISA restricted classes of certificates, as described in the pooling and servicing agreement) may not be acquired by a Plan.  See "*ERISA Considerations*" in this prospectus supplement.  The Class A-R Certificates will contain a legend describing the foregoing restrictions.

## Ownership of the Residual Certificates

On the Closing Date, the Class A-R Certificates (except as described below) will be acquired by Countrywide Securities Corporation, an affiliate of the depositor, the sellers and the master servicer.

The trustee will be initially designated as "tax matters person" under the pooling and servicing agreement and in that capacity will hold a Class A-R Certificate in the amount of $0.01. As the tax matters person, the trustee will be the primary representative of the issuing entity with respect to any tax administrative or judicial matter. As trustee, the trustee will be responsible for making a REMIC election with respect to each REMIC created under the pooling and servicing agreement and for preparing and filing tax returns with respect to each REMIC.

### Restrictions on Investment, Suitability Requirements

An investment in the certificates may not be appropriate for all investors due to tax, ERISA or other legal requirements. Investors should review the disclosure included in this prospectus supplement and the prospectus under *"Material Federal Income Tax Consequences," "ERISA Considerations"* and *"Legal Matters"* prior to any acquisition and are encouraged to consult with their advisors prior to purchasing the certificates.

## Yield, Prepayment and Maturity Considerations

### General

The effective yield to the holders of each interest-bearing class of certificates (other than the LIBOR Certificates) will be lower than the yield otherwise produced by the applicable rate at which interest is passed through to the holders and the purchase price of the certificates because monthly distributions will not be payable to the holders until the 25th day (or, if that day is not a business day, the following business day) of the month following the month in which interest accrues on the mortgage loans (without any additional distribution of interest or earnings on them for the delay).

Delinquencies on the mortgage loans that are not advanced by or on behalf of the master servicer (because amounts, if advanced, would be nonrecoverable), will adversely affect the yield on the certificates. Because of the priority of distributions, shortfalls resulting from delinquencies not so advanced will be borne first by the subordinated certificates, in the reverse order of their numerical class designations, and then by the senior certificates. If, as a result of the shortfalls, the aggregate of the Class Certificate Balances of all classes of certificates exceeds the pool principal balance, the Class Certificate Balance of the class of subordinated certificates then outstanding with the highest numerical class designation will be reduced by the amount of the excess.

Net Interest Shortfalls will adversely affect the yields on the certificates. In addition, all losses initially will be borne by the subordinated certificates, in the reverse order of their distribution priorities (either directly or through distributions in respect of Class PO Deferred Amounts on the Class PO Certificates). Moreover, since the Subordinated Principal Distribution Amount for each Distribution Date will be reduced by the amount of any distributions on the Distribution Date in respect of Class PO Deferred Amounts, the amount distributable as principal on each Distribution Date to each class of subordinated certificates then entitled to a distribution of principal will be less than it otherwise would be in the absence of the Class PO Deferred Amounts. As a result, the yields on the offered certificates will depend on the rate and timing of Realized Losses.

For purposes of allocating losses and shortfalls resulting from delinquencies to the subordinated certificates, the Class M Certificates will be considered to have a lower numerical class designation and a higher distribution priority than each other class of subordinated certificates. Within the Class B Certificates, the distribution priorities are in numerical order.

### Prepayment Considerations and Risks

The rate of principal payments on the certificates, the aggregate amount of distributions on the certificates and the yield to maturity of the certificates will be related to the rate and timing of payments of principal on the mortgage loans. The rate of principal payments on the mortgage loans will in turn be affected by the amortization schedules of the mortgage loans and by the rate of principal prepayments, including for this purpose, prepayments resulting from refinancing, liquidations of the mortgage loans due to defaults, casualties, condemnations and repurchases by the sellers or master servicer. Except for 6 Initial Mortgage Loans which have a prepayment charge

if the related mortgagor prepays such mortgage loan during a period of three or five years after origination, the mortgage loans may be prepaid by the mortgagors at any time without a prepayment charge.  Because certain of the mortgage loans contain prepayment charges, the rate of principal prepayments may be less than the rate of principal prepayments for mortgage loans that did not have prepayment charges.  The holders of the Class P Certificates will be entitled to all prepayment penalties received on the mortgage loans, and those amounts will not be available for distribution on the other classes of certificates.  Under certain circumstances, as described in the pooling and servicing agreement, the master servicer may waive the payment of any otherwise applicable prepayment penalty. Investors should conduct their own analysis of the effect, if any, that the prepayment penalties, and decisions by the master servicer with respect to the waiver thereof, may have on the prepayment performance of the mortgage loans. In addition, 192 of the Initial Mortgage Loans do not provide for any payments of principal for the first ten years following their origination.  These mortgage loans may involve a greater degree of risk than mortgage loans that amortize with each monthly payment because, if the related mortgagor defaults, the outstanding principal balance of that mortgage loan will be higher than for an amortizing mortgage loan.  During their interest-only periods, the mortgage loans may be less likely to prepay as the interest-only feature may reduce the perceived benefits of refinancing due to the smaller monthly payment.  However, as an interest-only mortgage loan approaches the end of its interest-only period, it may be more likely to be prepaid, even if market interest rates at the time are only slightly higher or lower than the interest rate on the interest-only mortgage loans as the related borrowers seek to avoid increases in their respective monthly mortgage payment.  The mortgage loans are subject to the "due-on-sale" provisions included therein. See *"The Mortgage Pool"* in this prospectus supplement.

Prepayments, liquidations and purchases of the mortgage loans will result in distributions on the certificates of principal amounts which would otherwise be distributed over the remaining terms of the mortgage loans. This includes any optional purchase by the master servicer of a defaulted mortgage loan and any optional repurchase of the remaining mortgage loans in connection with the termination of the issuing entity, in each case as described in this prospectus supplement. Since the rate of payment of principal of the mortgage loans will depend on future events and a variety of factors, no assurance can be given as to the rate of payment of principal of the mortgage loans or the rate of principal prepayments. The extent to which the yield to maturity of a class of certificates may vary from the anticipated yield will depend upon the degree to which the certificate is purchased at a discount or premium, and the degree to which the timing of payments thereon is sensitive to prepayments, liquidations and purchases of the mortgage loans. Further, an investor should consider the risk that, in the case of the principal only certificates and any other certificate purchased at a discount, a slower than anticipated rate of principal payments (including prepayments) on the mortgage loans could result in an actual yield to the investor that is lower than the anticipated yield and, in the case of a notional amount certificate or any certificate purchased at a premium, a faster than anticipated rate of principal payments could result in an actual yield to the investor that is lower than the anticipated yield.  Investors in the notional amount certificates should carefully consider the risk that a rapid rate of principal payments on the mortgage loans could result in the failure of the investors to recover their initial investment.

The rate of principal payments (including prepayments) on pools of mortgage loans may vary significantly over time and may be influenced by a variety of economic, geographic, social and other factors, including changes in mortgagors' housing needs, job transfers, unemployment, mortgagors' net equity in the mortgaged properties, servicing decisions, as well as the characteristics of the mortgage loans included in the mortgage pool as described under *"The Mortgage Pool — General"* and *"— Underwriting Process"* in this prospectus supplement.  In addition, Countrywide Home Loans' Streamlined Documentation Program may affect the rate of prepayments on the mortgage loans.  In general, if prevailing interest rates were to fall significantly below the mortgage rates on the mortgage loans, the mortgage loans could be subject to higher prepayment rates than if prevailing interest rates were to remain at or above the mortgage rates on the mortgage loans. Conversely, if prevailing interest rates were to rise significantly, the rate of prepayments on the mortgage loans would generally be expected to decrease. No assurances can be given as to the rate of prepayments on the mortgage loans in stable or changing interest rate environments. With respect to mortgage loans that are balloon loans, such balloon loans involve a greater degree of risk than fully amortizing mortgage loans because typically the mortgagor must be able to refinance the loan or sell the property to make the balloon payment at maturity.  The ability of the mortgagor to do this will depend on such factors as mortgage rates at the time of the sale or refinancing, the mortgagor's equity in the property, the relative strengths of the local housing market, the financial condition of the mortgagor and tax laws.  Furthermore, with respect to up to 50% of the Closing Date Mortgage Loans and 90% of the Supplemental Mortgage Loans, the depositor may deliver all or a portion of each related mortgage file to the trustee after the closing date or the related Supplemental Transfer

Date, as applicable.  Should Countrywide Home Loans or any other seller fail to deliver all or a portion of any mortgage files to the depositor or other designee of the depositor or, at the depositor's direction, to the trustee, within that period, Countrywide Home Loans will be required to use its best efforts to deliver a replacement mortgage loan for the related delayed delivery mortgage loan or repurchase the related delayed delivery mortgage loan. Any repurchases pursuant to this provision would also have the effect of accelerating the rate of prepayments on the mortgage loans.

As described under *"Description of the Certificates — Principal"* in this prospectus supplement, the Senior Prepayment Percentage of the applicable Non-PO Percentage of all principal prepayments will be initially distributed to the classes of senior certificates (other than the notional amount certificates and the Class PO Certificates) then entitled to receive principal prepayment distributions. This may result in all (or a disproportionate percentage) of the principal prepayments being distributed to holders of the classes of senior certificates and none (or less than their pro rata share) of the principal prepayments being distributed to holders of the subordinated certificates during the periods of time described in the definition of Senior Prepayment Percentage.  The Class A-5 and Class A-6 Certificates generally will not receive principal distributions for the first five years after the closing date.

The timing of changes in the rate of prepayments on the mortgage loans may significantly affect an investor's actual yield to maturity, even if the average rate of principal payments is consistent with an investor's expectation. In general, the earlier a prepayment of principal on the mortgage loans, the greater the effect on an investor's yield to maturity. The effect on an investor's yield as a result of principal payments occurring at a rate higher (or lower) than the rate anticipated by the investor during the period immediately following the issuance of the offered certificates may not be offset by a subsequent like decrease (or increase) in the rate of principal payments.

The tables in this *"Yield, Prepayment and Maturity Considerations"* section indicate the sensitivity of the pre-tax corporate bond equivalent yields to maturity of the illustrated class or classes of certificates to various constant percentages of the Prepayment Assumption and, in the case of the Inverse Floating Rate Certificates, to various levels of LIBOR. The yields set forth in the tables were calculated by determining the monthly discount rates that, when applied to the assumed streams of cash flows to be paid on the applicable class or classes of certificates, would cause the discounted present value of the assumed streams of cash flows to equal the assumed aggregate purchase prices of the applicable class or classes and converting the monthly rates to corporate bond equivalent rates. Those calculations do not take into account variations that may occur in the interest rates at which investors may be able to reinvest funds received by them as distributions on the certificates and consequently do not purport to reflect the return on any investment in any class of certificates when the reinvestment rates are considered.

**Mandatory Prepayment**

In the event that at the end of the Funding Period there are amounts on deposit in the Pre-funding Account, the holders of the senior certificates will receive an additional distribution allocable to principal in an amount equal to that amount on deposit in the Pre-funding Account at that time.

**Sensitivity of the Inverse Floating Rate Certificates**

The yield to investors on the Class A-2 Certificates (we sometimes refer to these certificates as the "Inverse Floating Rate Certificates") will be very sensitive to the level of LIBOR and the rate and timing of principal payments (including prepayments) of the mortgage loans, which can be prepaid at any time. As indicated in the table below, an increasing level of prepayments and/or LIBOR will have a negative effect on the yield to investors in the Inverse Floating Rate Certificates.

Changes in the level of LIBOR may not correlate with changes in prevailing mortgage interest rates. It is possible that lower prevailing mortgage interest rates, which might be expected to result in faster prepayments, could occur concurrently with an increased level of LIBOR.

The following table was prepared on the basis of the structuring assumptions and the assumptions that (i) the interest rate applicable to the Inverse Floating Rate Certificates for each applicable interest accrual period, subsequent to its initial interest accrual period, will be based on the indicated level of LIBOR and (ii) the purchase price of the Inverse Floating Rate Certificates (expressed as percentages of its initial notional amount) is as follows:

| Class | Price* |
|-------|--------|
| Class A-2 .................................................................. | 0.15625% |

_____
\* The price does not include accrued interest. Accrued interest has been added to the price in calculating the yields set forth in the table below.

### Sensitivity of the Class A-2 Certificates to Prepayments and LIBOR
### (Pre-Tax Yield to Maturity)

| LIBOR | Percentage of the Prepayment Assumption | | | | |
|-------|------|------|------|------|------|
|  | 0% | 50% | 100% | 125% | 150% |
| 5.13%................................................ | 347.4 % | 318.7% | 253.6% | 216.6% | 178.8% |
| 5.23%................................................ | 234.9% | 209.0% | 148.8% | 114.4% | 80.3% |
| 5.33%................................................ | 136.5% | 113.0% | 53.6% | 21.1% | (9.4)% |
| 5.43%................................................ | 51.7% | 31.2% | (39.4)% | (70.2)% | (95.9)% |
| 5.50% and above.................................. | ** | ** | ** | ** | ** |

_____
\*\*   Less than (99.9)%

It is highly unlikely that all of the mortgage loans will have the characteristics assumed or that those mortgage loans will prepay at the same rate until maturity or that all of the mortgage loans will prepay at the same rate or time. In addition, there can be no assurance that LIBOR will correspond to the levels shown herein and it is highly unlikely that the level of LIBOR will remain constant. As a result of these factors, the pre-tax yields on the Inverse Floating Rate Certificates are likely to differ from those shown in the table above, even if all of the mortgage loans prepay at the indicated percentages of the Prepayment Assumption and LIBOR is at the indicated level.  No representation is made as to the actual rate of principal payments on the mortgage loans, the level of LIBOR for any period or over the life of the Inverse Floating Rate Certificates or as to the yield on the Inverse Floating Rate Certificates. Investors must make their own decisions as to the appropriate combinations of prepayment assumptions and assumptions regarding the level of LIBOR to be used in deciding whether to purchase the Inverse Floating Rate Certificates.

## Sensitivity of the Class X Certificates

**As indicated in the following table, the yield to investors in the Class X Certificates will be sensitive to the rate of principal payments (including prepayments) on the Non-Discount mortgage loans (particularly those with high net mortgage rates), which generally can be prepaid at any time. On the basis of the structuring assumptions and price below, the yield to maturity on the Class X Certificates would be approximately 0% if prepayments of the Non-Discount mortgage loans were to occur at a constant rate of approximately 172% of the Prepayment Assumption.  If the actual prepayment rate of the Non-Discount mortgage loans were to exceed the foregoing level for as little as one month while equaling the level for the remaining months, the investors in the Class X Certificates would not fully recoup their initial investments.**

As described under *"Description of the Certificates — General,"* the pass-through rate of the Class X Certificates in effect from time to time is calculated by reference to the net mortgage rates of the Non-Discount mortgage loans. The Non-Discount mortgage loans will have higher net mortgage rates (and higher mortgage rates) than the other mortgage loans. In general, mortgage loans with higher mortgage rates tend to prepay at higher rates than mortgage loans with relatively lower mortgage rates in response to a given change in market interest rates. As a result, the Non-Discount mortgage loans may prepay at higher rates, thereby reducing the pass-through rate and notional amount of the Class X Certificates.

The information set forth in the following table has been prepared on the basis of the structuring assumptions and on the assumption that the purchase price of the Class X Certificates (expressed as a percentage of its initial notional amount) is as follows:

| Class | Price* |
|---|---|
| Class X.......................................................................... | 1.50000% |

_____

\* The price does not include accrued interest. Accrued interest has been added to the price in calculating the yields set forth in the table below.

### Sensitivity of the Class X Certificates
### to Prepayments
### (Pre-tax Yield to Maturity)

| Class | Percentage of the Prepayment Assumption | | | | |
|---|---|---|---|---|---|
| | 0% | 50% | 100% | 125% | 150% |
| Class X................................................ | 41.2% | 30.0% | 18.3% | 12.2% | 5.9% |

It is unlikely that the Non-Discount mortgage loans will have the precise characteristics described in this prospectus supplement or that the Non-Discount mortgage loans will all prepay at the same rate until maturity or that all of the Non-Discount mortgage loans will prepay at the same rate or time. As a result of these factors, the pre-tax yield on the Class X Certificates is likely to differ from that shown in the table above, even if all of the Non-Discount mortgage loans prepay at the indicated percentages of the Prepayment Assumption. No representation is made as to the actual rate of principal payments on the Non-Discount mortgage loans for any period or over the life of the Class X Certificates or as to the yield on the Class X Certificates. Investors must make their own decisions as to the appropriate prepayment assumptions to be used in deciding whether to purchase the Class X Certificates.

## Sensitivity of the Class PO Certificates

**The Class PO Certificates will be "principal only" certificates and will not bear interest. As indicated in the following table, a lower than anticipated rate of principal payments (including prepayments) on the Discount mortgage loans will have a negative effect on the yield to investors in the Class PO Certificates.**

As described above under *"Description of the Certificates — Principal"* in this prospectus supplement, the Class PO Principal Distribution Amount is calculated by reference to the principal payments (including prepayments) on the Discount mortgage loans. The Discount mortgage loans will have lower net mortgage rates (and lower mortgage rates) than the other mortgage loans. In general, mortgage loans with higher mortgage rates tend to prepay at higher rates than mortgage loans with relatively lower mortgage rates in response to a given change in market interest rates. As a result, the Discount mortgage loans may prepay at lower rates, thereby reducing the rate of payment of principal and the resulting yield of the Class PO Certificates.

The information set forth in the following table has been prepared on the basis of the structuring assumptions and on the assumption that the purchase price of the Class PO Certificates (expressed as a percentage of its initial Class Certificate Balance) is as follows:

| Class | Price |
|---|---|
| Class PO ...................................................... | 68.00% |

### Sensitivity of the Class PO Certificates to Prepayments
### (Pre-Tax Yield to Maturity)

| Class | Percentage of the Prepayment Assumption | | | | |
|---|---|---|---|---|---|
| | 0% | 50% | 100% | 125% | 150% |
| Class PO ................................. | 2.1% | 5.7% | 10.6% | 13.3% | 16.1% |

It is unlikely that the Discount mortgage loans will have the precise characteristics described in this prospectus supplement or that the Discount mortgage loans will all prepay at the same rate until maturity or that all of the Discount mortgage loans will prepay at the same rate or time. As a result of these factors, the pre-tax yield on the Class PO Certificates is likely to differ from those shown in the table above, even if all of the Discount mortgage loans prepay at the indicated percentages of the Prepayment Assumption. No representation is made as to the actual rate of principal payments on the Discount mortgage loans for any period or over the life of the Class PO Certificates or as to the yield on the Class PO Certificates. Investors must make their own decisions as to the appropriate prepayment assumptions to be used in deciding whether to purchase the Class PO Certificates.

In addition, the Class PO Certificates are likely to receive a prepayment on the first Distribution Date after the end of the Funding Period from the Pre-funding Account in respect of the excess PO Sublimit. It is unlikely that the entire PO Sublimit will be utilized in obtaining Supplemental Mortgage Loans. It is also possible that the entire PO Sublimit will be distributed as a prepayment if none of the Supplemental Mortgage Loans are Discount mortgage loans.

**Weighted Average Lives of the Offered Certificates**

The weighted average life of an offered certificate is determined by (a) multiplying the amount of the net reduction, if any, of the Class Certificate Balance or notional amount, as applicable, of the certificate on each Distribution Date by the number of years from the date of issuance to the Distribution Date, (b) summing the results and (c) dividing the sum by the aggregate amount of the net reductions in Class Certificate Balance or notional amount, as applicable, of the certificate referred to in clause (a).

For a discussion of the factors which may influence the rate of payments (including prepayments) of the mortgage loans, see *"— Prepayment Considerations and Risks"* in this prospectus supplement and *"Yield, Maturity and Prepayment Considerations"* in the prospectus.

In general, the weighted average lives of the offered certificates will be shortened if the level of prepayments of principal of the mortgage loans increases. However, the weighted average lives of the offered certificates will depend upon a variety of other factors, including the timing of changes in such rate of principal payments, the priority sequence of distributions of principal of the classes of certificates and the distribution of the amount available for distribution of principal to the classes of senior certificates (other than the notional amount certificates and the Class PO Certificates) in accordance with the rules governing the priorities of payment among the classes of senior certificates set forth in this prospectus supplement.  See *"Description of the Certificates — Principal"* in this prospectus supplement.

The interaction of the foregoing factors may have different effects on various classes of offered certificates and the effects on any class may vary at different times during the life of the class. Accordingly, no assurance can be given as to the weighted average life of any class of offered certificates. Further, to the extent the prices of the offered certificates represent discounts or premiums to their respective initial Class Certificate Balances or initial notional amounts, as the case may be, variability in the weighted average lives of the classes of offered certificates will result in variability in the related yields to maturity. For an example of how the weighted average lives of the classes of offered certificates may be affected at various constant percentages of the Prepayment Assumption, see the Decrement Tables under the next heading.

**Decrement Tables**

The following tables indicate the percentages of the initial Class Certificate Balances of the classes of offered certificates (other than the Class X Certificates) that would be outstanding after each of the dates shown at various constant percentages of the Prepayment Assumption and the corresponding weighted average lives of the classes. The tables have been prepared on the basis of the structuring assumptions. It is not likely that the mortgage loans will have the precise characteristics described in this prospectus supplement or that all of the mortgage loans will prepay at the constant percentages of the Prepayment Assumption specified in the tables or at any other constant rate. Moreover, the diverse remaining terms to maturity of the mortgage loans could produce slower or faster principal distributions than indicated in the tables, which have been prepared using the specified constant percentages of the Prepayment Assumption, even if the remaining term to maturity of the mortgage loans is consistent with the remaining terms to maturity of the mortgage loans specified in the structuring assumptions.

**Percent of Initial Class Certificate Balances Outstanding\***

| Distribution Date | Class A-1 and Class A-2† Percentage of the Prepayment Assumption | | | | | Class A-3 Percentage of the Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 50% | 100% | 125% | 150% | 0% | 50% | 100% | 125% | 150% |
| Initial ...................................................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| September 2007 ....................................... | 100 | 87 | 63 | 50 | 38 | 99 | 89 | 89 | 89 | 89 |
| September 2008 ....................................... | 100 | 70 | 22 | 1 | 0 | 97 | 77 | 77 | 77 | 58 |
| September 2009 ....................................... | 100 | 56 | 0 | 0 | 0 | 96 | 66 | 59 | 34 | 13 |
| September 2010 ....................................... | 100 | 44 | 0 | 0 | 0 | 94 | 54 | 28 | 2 | 0 |
| September 2011 ....................................... | 100 | 35 | 0 | 0 | 0 | 92 | 43 | 3 | 0 | 0 |
| September 2012 ....................................... | 100 | 31 | 0 | 0 | 0 | 90 | 31 | 0 | 0 | 0 |
| September 2013 ....................................... | 100 | 30 | 0 | 0 | 0 | 88 | 20 | 0 | 0 | 0 |
| September 2014 ....................................... | 100 | 30 | 0 | 0 | 0 | 86 | 10 | 0 | 0 | 0 |
| September 2015 ....................................... | 100 | 30 | 0 | 0 | 0 | 84 | 2 | 0 | 0 | 0 |
| September 2016 ....................................... | 100 | 26 | 0 | 0 | 0 | 82 | 0 | 0 | 0 | 0 |
| September 2017 ....................................... | 100 | 21 | 0 | 0 | 0 | 77 | 0 | 0 | 0 | 0 |
| September 2018 ....................................... | 100 | 15 | 0 | 0 | 0 | 72 | 0 | 0 | 0 | 0 |
| September 2019 ....................................... | 100 | 11 | 0 | 0 | 0 | 67 | 0 | 0 | 0 | 0 |
| September 2020 ....................................... | 100 | 7 | 0 | 0 | 0 | 61 | 0 | 0 | 0 | 0 |
| September 2021 ....................................... | 100 | 3 | 0 | 0 | 0 | 55 | 0 | 0 | 0 | 0 |
| September 2022 ....................................... | 100 | 0 | 0 | 0 | 0 | 48 | 0 | 0 | 0 | 0 |
| September 2023 ....................................... | 100 | 0 | 0 | 0 | 0 | 41 | 0 | 0 | 0 | 0 |
| September 2024 ....................................... | 100 | 0 | 0 | 0 | 0 | 33 | 0 | 0 | 0 | 0 |
| September 2025 ....................................... | 100 | 0 | 0 | 0 | 0 | 25 | 0 | 0 | 0 | 0 |
| September 2026 ....................................... | 100 | 0 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 0 |
| September 2027 ....................................... | 100 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 0 |
| September 2028 ....................................... | 96 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2029 ....................................... | 85 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2030 ....................................... | 72 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2031 ....................................... | 59 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2032 ....................................... | 45 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2033 ....................................... | 29 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2034 ....................................... | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2035 ....................................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2036 ....................................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)\*\* ....................................... | 25.5 | 5.5 | 1.4 | 1.1 | 0.9 | 14.6 | 4.4 | 3.1 | 2.5 | 2.1 |

---

\*     Rounded to the nearest whole percentage.
\*\*   Determined as specified under "Weighted Average Lives of the Offered Certificates" herein.
†     In the case of the Class A-2 Certificates, the decrement table indicates the percentage of its initial notional amount outstanding.

**Percent of Initial Class Certificate Balances Outstanding\***

| Distribution Date | Class A-4 and Class A-7 Percentage of the Prepayment Assumption | | | | | Class A-5 and Class A-6 Percentage of the Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 50% | 100% | 125% | 150% | 0% | 50% | 100% | 125% | 150% |
| Initial ................................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| September 2007 ................................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| September 2008 ................................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| September 2009 ................................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| September 2010 ................................... | 100 | 100 | 100 | 100 | 0 | 100 | 100 | 100 | 100 | 100 |
| September 2011 ................................... | 100 | 100 | 100 | 0 | 0 | 100 | 100 | 100 | 95 | 61 |
| September 2012 ................................... | 100 | 100 | 41 | 0 | 0 | 100 | 97 | 93 | 67 | 37 |
| September 2013 ................................... | 100 | 100 | 0 | 0 | 0 | 99 | 92 | 82 | 46 | 22 |
| September 2014 ................................... | 100 | 100 | 0 | 0 | 0 | 99 | 86 | 63 | 32 | 13 |
| September 2015 ................................... | 100 | 100 | 0 | 0 | 0 | 98 | 79 | 49 | 23 | 8 |
| September 2016 ................................... | 100 | 100 | 0 | 0 | 0 | 97 | 70 | 39 | 17 | 6 |
| September 2017 ................................... | 100 | 100 | 0 | 0 | 0 | 95 | 61 | 30 | 13 | 4 |
| September 2018 ................................... | 100 | 100 | 0 | 0 | 0 | 92 | 54 | 24 | 9 | 3 |
| September 2019 ................................... | 100 | 100 | 0 | 0 | 0 | 89 | 47 | 18 | 7 | 2 |
| September 2020 ................................... | 100 | 100 | 0 | 0 | 0 | 86 | 41 | 14 | 5 | 1 |
| September 2021 ................................... | 100 | 100 | 0 | 0 | 0 | 83 | 35 | 11 | 4 | 1 |
| September 2022 ................................... | 100 | 100 | 0 | 0 | 0 | 80 | 31 | 8 | 3 | 1 |
| September 2023 ................................... | 100 | 86 | 0 | 0 | 0 | 76 | 26 | 6 | 2 | 0 |
| September 2024 ................................... | 100 | 74 | 0 | 0 | 0 | 72 | 23 | 5 | 1 | 0 |
| September 2025 ................................... | 100 | 62 | 0 | 0 | 0 | 68 | 19 | 4 | 1 | 0 |
| September 2026 ................................... | 100 | 53 | 0 | 0 | 0 | 64 | 16 | 3 | 1 | 0 |
| September 2027 ................................... | 100 | 44 | 0 | 0 | 0 | 59 | 13 | 2 | 0 | 0 |
| September 2028 ................................... | 100 | 36 | 0 | 0 | 0 | 54 | 11 | 2 | 0 | 0 |
| September 2029 ................................... | 100 | 29 | 0 | 0 | 0 | 49 | 9 | 1 | 0 | 0 |
| September 2030 ................................... | 100 | 23 | 0 | 0 | 0 | 43 | 7 | 1 | 0 | 0 |
| September 2031 ................................... | 100 | 18 | 0 | 0 | 0 | 37 | 5 | 1 | 0 | 0 |
| September 2032 ................................... | 100 | 13 | 0 | 0 | 0 | 30 | 4 | 0 | 0 | 0 |
| September 2033 ................................... | 100 | 9 | 0 | 0 | 0 | 23 | 3 | 0 | 0 | 0 |
| September 2034 ................................... | 100 | 6 | 0 | 0 | 0 | 16 | 2 | 0 | 0 | 0 |
| September 2035 ................................... | 79 | 2 | 0 | 0 | 0 | 8 | 1 | 0 | 0 | 0 |
| September 2036 ................................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)\*\* ................................... | 29.4 | 21.1 | 5.9 | 4.5 | 3.7 | 21.7 | 13.8 | 10.1 | 7.8 | 6.1 |

\*    Rounded to the nearest whole percentage.

\*\*   Determined as specified under "Weighted Average Lives of the Offered Certificates" herein

**Percent of Initial Class Certificate Balances Outstanding***

| Distribution Date | Class PO Percentage of the Prepayment Assumption | | | | | Class A-R Percentage of the Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 50% | 100% | 125% | 150% | 0% | 50% | 100% | 125% | 150% |
| Initial ................................ | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| September 2007 ................................ | 99 | 91 | 83 | 79 | 75 | 0 | 0 | 0 | 0 | 0 |
| September 2008 ................................ | 98 | 81 | 66 | 59 | 52 | 0 | 0 | 0 | 0 | 0 |
| September 2009 ................................ | 96 | 72 | 52 | 43 | 36 | 0 | 0 | 0 | 0 | 0 |
| September 2010 ................................ | 95 | 64 | 41 | 32 | 25 | 0 | 0 | 0 | 0 | 0 |
| September 2011 ................................ | 94 | 56 | 32 | 24 | 17 | 0 | 0 | 0 | 0 | 0 |
| September 2012 ................................ | 92 | 50 | 25 | 17 | 12 | 0 | 0 | 0 | 0 | 0 |
| September 2013 ................................ | 90 | 44 | 20 | 13 | 8 | 0 | 0 | 0 | 0 | 0 |
| September 2014 ................................ | 89 | 39 | 16 | 9 | 6 | 0 | 0 | 0 | 0 | 0 |
| September 2015 ................................ | 87 | 34 | 12 | 7 | 4 | 0 | 0 | 0 | 0 | 0 |
| September 2016 ................................ | 85 | 30 | 10 | 5 | 3 | 0 | 0 | 0 | 0 | 0 |
| September 2017 ................................ | 82 | 26 | 7 | 4 | 2 | 0 | 0 | 0 | 0 | 0 |
| September 2018 ................................ | 80 | 23 | 6 | 3 | 1 | 0 | 0 | 0 | 0 | 0 |
| September 2019 ................................ | 78 | 20 | 4 | 2 | 1 | 0 | 0 | 0 | 0 | 0 |
| September 2020 ................................ | 75 | 18 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| September 2021 ................................ | 72 | 15 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2022 ................................ | 69 | 13 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2023 ................................ | 66 | 11 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2024 ................................ | 63 | 10 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2025 ................................ | 59 | 8 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2026 ................................ | 55 | 7 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2027 ................................ | 51 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2028 ................................ | 46 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2029 ................................ | 42 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2030 ................................ | 37 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2031 ................................ | 31 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2032 ................................ | 26 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2033 ................................ | 20 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2034 ................................ | 13 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2035 ................................ | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| September 2036 ................................ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)** ................................ | 19.5 | 7.9 | 4.4 | 3.5 | 2.9 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |

\*     Rounded to the nearest whole percentage.

\*\*    Determined as specified under "Weighted Average Lives of the Offered Certificates" herein.

**Percent of Initial Class Certificate Balances Outstanding***

| Distribution Date | Class M, Class B-1 and Class B-2 Percentage of the Prepayment Assumption | | | | |
|---|---|---|---|---|---|
| | 0% | 50% | 100% | 125% | 150% |
| Initial ...................................... | 100 | 100 | 100 | 100 | 100 |
| September 2007 ...................................... | 99 | 99 | 99 | 99 | 99 |
| September 2008 ...................................... | 99 | 99 | 99 | 99 | 99 |
| September 2009 ...................................... | 98 | 98 | 98 | 98 | 98 |
| September 2010 ...................................... | 98 | 98 | 98 | 98 | 98 |
| September 2011 ...................................... | 97 | 97 | 97 | 97 | 97 |
| September 2012 ...................................... | 96 | 93 | 90 | 88 | 87 |
| September 2013 ...................................... | 96 | 89 | 82 | 78 | 75 |
| September 2014 ...................................... | 95 | 83 | 71 | 65 | 60 |
| September 2015 ...................................... | 94 | 75 | 59 | 51 | 45 |
| September 2016 ...................................... | 93 | 67 | 46 | 38 | 31 |
| September 2017 ...................................... | 90 | 59 | 36 | 28 | 21 |
| September 2018 ...................................... | 88 | 51 | 28 | 20 | 14 |
| September 2019 ...................................... | 85 | 45 | 22 | 15 | 10 |
| September 2020 ...................................... | 83 | 39 | 17 | 11 | 7 |
| September 2021 ...................................... | 80 | 34 | 13 | 8 | 4 |
| September 2022 ...................................... | 76 | 29 | 10 | 6 | 3 |
| September 2023 ...................................... | 73 | 25 | 8 | 4 | 2 |
| September 2024 ...................................... | 69 | 22 | 6 | 3 | 1 |
| September 2025 ...................................... | 65 | 18 | 4 | 2 | 1 |
| September 2026 ...................................... | 61 | 15 | 3 | 1 | 1 |
| September 2027 ...................................... | 57 | 13 | 2 | 1 | 0 |
| September 2028 ...................................... | 52 | 11 | 2 | 1 | 0 |
| September 2029 ...................................... | 47 | 9 | 1 | 0 | 0 |
| September 2030 ...................................... | 41 | 7 | 1 | 0 | 0 |
| September 2031 ...................................... | 35 | 5 | 1 | 0 | 0 |
| September 2032 ...................................... | 29 | 4 | 0 | 0 | 0 |
| September 2033 ...................................... | 22 | 3 | 0 | 0 | 0 |
| September 2034 ...................................... | 15 | 2 | 0 | 0 | 0 |
| September 2035 ...................................... | 7 | 1 | 0 | 0 | 0 |
| September 2036 ...................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)** ...................................... | 20.9 | 13.4 | 10.5 | 9.6 | 9.0 |

---

\*     Rounded to the nearest whole percentage.

\*\*    Determined as specified under "Weighted Average Lives of the Offered Certificates" herein.

**Last Scheduled Distribution Date**

The Last Scheduled Distribution Date for each class of offered certificates is the Distribution Date in September 2036, which is the Distribution Date occurring in the month following the month in which the latest stated maturity for any mortgage loan occurs.  Since the rate of distributions in reduction of the Class Certificate Balance or notional amount of each class of offered certificates will depend on the rate of payment (including prepayments) of the mortgage loans, the Class Certificate Balance or notional amount of any class could be reduced to zero significantly earlier or later than the Last Scheduled Distribution Date. The rate of payments on the mortgage loans will depend on their particular characteristics, as well as on prevailing interest rates from time to time and other economic factors, and no assurance can be given as to the actual payment experience of the mortgage loans. See *"Yield, Prepayment and Maturity Considerations — Prepayment Considerations and Risks"* and *"— Weighted Average Lives of the Offered Certificates"* in this prospectus supplement and *"Yield, Maturity and Prepayment Considerations"* in the prospectus.

**The Subordinated Certificates**

The weighted average life of, and the yield to maturity on, each class of subordinated certificates, in increasing order of their numerical class designation, will be progressively more sensitive to the rate and timing of mortgagor defaults and the severity of ensuing losses on the mortgage loans. In particular, the rate and timing of mortgagor defaults and the severity of ensuing losses on the mortgage loans may be affected by the characteristics of the mortgage loans included in the mortgage pool as described under *"The Mortgage Pool — General"* and *"— Underwriting Process"* in this prospectus supplement.  If the actual rate and severity of losses on the mortgage loans is higher than those assumed by a holder of a subordinated certificate, the actual yield to maturity of the certificate may be lower than the yield expected by the holder based on the holder's assumptions. The timing of losses on mortgage loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of the mortgage pool are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized Losses on the mortgage loans will reduce the Class Certificate Balances of the applicable class of subordinated certificates to the extent of any losses allocated to it (as described under *"Description of the Certificates — Allocation of Losses"* in this prospectus supplement), without the receipt of cash attributable to the reduction. In addition, shortfalls in cash available for distributions on the subordinated certificates will result in a reduction in the Class Certificate Balance of the class of subordinated certificates then outstanding with the highest numerical class designation if and to the extent that the aggregate of the Class Certificate Balances of all classes of certificates, following all distributions and the allocation of Realized Losses on a Distribution Date, exceeds the pool principal balance as of the Due Date occurring in the month of the Distribution Date (after giving effect to principal prepayments received in the related Prepayment Period). As a result of the reductions, less interest will accrue on the class of subordinated certificates than otherwise would be the case. The yield to maturity of the subordinated certificates will also be affected by the disproportionate allocation of principal prepayments to the senior certificates, Net Interest Shortfalls, other cash shortfalls in Available Funds and distribution of funds to the Class PO Certificates otherwise available for distribution on the subordinated certificates to the extent of reimbursement for Class PO Deferred Amounts. See *"Description of the Certificates — Allocation of Losses"* in this prospectus supplement.

If on any Distribution Date, the Applicable Credit Support Percentage for any class of subordinated certificates (other than the class of subordinated certificates then outstanding with the highest priority of distribution) is less than its Original Applicable Credit Support Percentage, all partial principal prepayments and principal prepayments in full available for distribution on the subordinated certificates will be allocated solely to that class and all other classes of subordinated certificates with lower numerical class designations, thereby accelerating their amortization relative to that of the Restricted Classes and reducing the weighted average lives of the classes of subordinated certificates receiving the distributions. Accelerating the amortization of the classes of subordinated certificates with lower numerical class designations relative to the other classes of subordinated certificates is intended to preserve the availability of the subordination provided by the other classes.

For purposes of allocating losses and prepayments to the subordinated certificates, the Class M Certificates will be considered to have a lower numerical class designation and a higher distribution priority than each other class of subordinated certificates.  Within the Class B Certificates, the distribution priorities are in numerical order.

## Credit Enhancement

**Subordination**

Realized Losses allocable to the senior certificates will be allocated as set forth under *"Description of the Certificates — Allocation of Losses"* in this prospectus supplement.

The rights of the holders of the subordinated certificates to receive distributions with respect to the mortgage loans will be subordinated to the rights of the holders of the senior certificates and the rights of the holders of each class of subordinated certificates (other than the Class M Certificates) to receive the distributions will be further subordinated to the rights of the class or classes of subordinated certificates with higher distribution priorities, in each case only to the extent described in this prospectus supplement. The subordination of the subordinated certificates to the senior certificates and the subordination of the classes of subordinated certificates with lower distribution priorities to those with higher distribution priorities is intended to increase the likelihood of receipt, respectively, by the senior certificateholders and the holders of subordinated certificates with lower numerical class designations of the maximum amount to which they are entitled on any Distribution Date and to provide the holders protection against Realized Losses. The applicable Non-PO Percentage of Realized Losses, will be allocated to the class of subordinated certificates then outstanding with the lowest distribution priority. In addition, the Class Certificate Balance of the class of subordinated certificates with the lowest distribution priority will be reduced by the amount of distributions on the Class PO Certificates in reimbursement for Class PO Deferred Amounts.

For purposes of allocating Realized Losses to the subordinated certificates, the Class M Certificates will be considered to have a lower numerical class designation and a higher distribution priority than each other class of subordinated certificates. Within the Class B Certificates, the distribution priorities are in numerical order.

## Use of Proceeds

We expect the proceeds to the depositor from the sale of the offered certificates to be approximately $185,785,614, plus accrued interest, before deducting issuance expenses payable by the depositor. The depositor will apply the net proceeds from the sale of these classes of certificates against the purchase price of the Closing Date Mortgage Loans and to fund the Pre-funding Account and Capitalized Interest Account.

## Legal Proceedings

There are no legal proceedings against Countrywide Home Loans, the depositor, the trustee, the issuing entity or the master servicer, or to which any of their respective properties are subject, that is material to the certificateholders, nor is the depositor aware of any proceedings of this type contemplated by governmental authorities.

## Material Federal Income Tax Consequences

The following discussion and the discussion in the prospectus under the caption *"Material Federal Income Tax Consequences"* is the opinion of Sidley Austin LLP ("Tax Counsel") on the anticipated material federal income tax consequences of the purchase, ownership, and disposition of the offered certificates.  It is based on the current provisions and interpretations of the Internal Revenue Code of 1986, as amended (the "Code") and the accompanying Treasury regulations and on current judicial and administrative rulings.  All of these authorities are subject to change and any change can apply retroactively.

For federal income tax purposes, the issuing entity (exclusive of the Pre-funding Account and Capitalized Interest Account) will consist of one or more REMICs in a tiered structure.  The highest REMIC will be referred to as the "Master REMIC," and each REMIC below the Master REMIC (if any) will be referred to as an "underlying REMIC."  Each underlying REMIC (if any) will issue multiple classes of uncertificated, regular interests (the "underlying REMIC Regular Interests") that will be held by another REMIC above it in the tiered structure. The assets of the lowest underlying REMIC (or the Master REMIC if there is no underlying REMIC) will consist of the

mortgage loans and any other assets designated in the pooling and servicing agreement. The Master REMIC will issue the senior certificates and the subordinated certificates (together, excluding the Class A-R Certificate, the "Regular Certificates"). The Regular Certificates will be designated as the regular interests in the Master REMIC. The Class A-R Certificates (also, the "Residual Certificates") will represent the beneficial ownership of the residual interest in each underlying REMIC (if any) and the residual interest in the Master REMIC. Aggregate distributions on the underlying REMIC Regular Interests held by the Master REMIC (if any) will equal the aggregate distributions on the Regular Certificates issued by the Master REMIC. The Corridor Contracts and Corridor Contract Reserve Fund will not be part of any REMIC.

All classes of the Regular Certificates (except for the Class A-1 Certificates) will be treated as REMIC Regular Interests in the Master REMIC. The Class A-1 Certificates (hereafter, the "Benefited Regular Certificates") will be treated as representing interests in REMIC Regular Interests in the Master REMIC and entitlements to receive payments of Yield Supplement Amounts. Holders of Benefited Regular Certificates must allocate the purchase price for their Benefited Regular Certificates between the REMIC Regular Interest component and the Yield Supplement component.

**Taxation of the Regular Certificates and the REMIC Regular Interest Components of the Benefited Regular Certificates**

The Regular Certificates (and the REMIC Regular Interest components of the Benefited Regular Certificates) will be treated as debt instruments issued by the Master REMIC for federal income tax purposes. Income on the Regular Certificates (and the REMIC Regular Interest components of the Benefited Regular Certificates) must be reported under an accrual method of accounting. Under an accrual method of accounting, interest income may be required to be included in a holder's gross income in advance of the holder's actual receipt of that interest income.

The Class PO Certificates will be treated for federal income tax purposes as having been issued with an amount of Original Issue Discount ("OID") equal to the difference between their principal balance and their issue price. Although the tax treatment is not entirely certain, each notional amount certificate will be treated as having been issued with OID in an amount equal to the excess of (1) the sum of all expected payments on the certificate determined under the applicable prepayment assumption over (2) the price at which the certificate was issued. Although unclear, a holder of a notional amount certificate may be entitled to deduct a loss to the extent that its remaining basis exceeds the maximum amount of future payments to which the certificateholder would be entitled if there were no further prepayments of the mortgage loans. Certain other classes of Regular Certificates (including the REMIC Regular Interest components of the Benefited Regular Certificates) may also be treated as having been issued with OID. For purposes of determining the amount and rate of accrual of OID and market discount, the issuing entity intends to assume that there will be prepayments on the mortgage loans at a rate equal to 100% of the Prepayment Assumption. No representation is made that the mortgage loans will prepay at the foregoing rate or any other rate. See *"Yield, Maturity and Prepayment Considerations"* and *"Material Federal Income Tax Consequences"* in the prospectus. Computing accruals of OID in the manner described in the prospectus may (depending on the actual rate of prepayments during the accrual period) result in the accrual of negative amounts of OID on the certificates issued with OID in an accrual period. Holders will be entitled to offset negative accruals of OID only against future OID accruals on their certificates.

If the holders of any Regular Certificates are treated as acquiring their certificates at a premium, the holders are encouraged to consult their tax advisors regarding the election to amortize bond premium and the method to be employed. See "*Material Federal Income Tax Consequences — Taxation of Debt Securities — Premium*" in the prospectus.

**Disposition of Regular Certificates and REMIC Regular Interest Components of Benefited Regular Certificates**

Assuming that the Regular Certificates are held as "capital assets" within the meaning of section 1221 of the Code, gain or loss on the disposition of the Certificates (and gain or loss on the disposition of the REMIC Regular Interest component of a Benefited Regular Certificate) should result in capital gain or loss. Such gain, however, will be treated as ordinary income, to the extent it does not exceed the excess (if any) of:

(1)      the amount that would have been includible in the holder's gross income with respect to the Regular Certificate (or REMIC Regular Interest component) had income thereon accrued at a rate equal to 110% of the applicable federal rate as defined in section 1274(d) of the Code determined as of the date of purchase of the Certificate

over

(2)      the amount actually included in such holder's income.

**Tax Treatment For Certain Purposes**

As described more fully under *"Material Federal Income Tax Consequences"* in the prospectus, the Regular Certificates (and the REMIC Regular Interest components of the Benefited Regular Certificates) will represent "real estate assets" under Section 856(c)(5)(B) of the Code and qualifying assets under Section 7701(a)(19)(C) of the Code in the same proportion or greater that the assets of the issuing entity will be so treated, and income on the Regular Certificates (and the REMIC Regular Interest components of the Benefited Regular Certificates) will represent "interest on obligations secured by mortgages on real property or on interests in real property" under Section 856(c)(3)(B) of the Code in the same proportion or greater that the income on the assets of the issuing entity will be so treated.  The Regular Certificates (and the REMIC Regular Interest component of the Benefited Regular Certificates but not the Yield Supplement component) will represent qualifying assets under Section 860G(a)(3) of the Code if acquired by a REMIC within the prescribed time periods of the Code.

**Yield Supplement Amounts**

The following discussions assume that the rights of the holders of the Benefited Regular Certificates with respect to Yield Supplement Amounts will be treated as rights under a notional principal contract rather than as interests in a partnership for federal income tax purposes. If these rights were treated as representing interests in an entity taxable as a partnership for federal income tax purposes, then there could be different tax timing consequences to all such certificateholders and different withholding tax consequences on payments to certificateholders who are non-U.S. Persons.  Prospective investors in the Benefited Regular Certificates are encouraged to consult their tax advisors regarding their appropriate tax treatment.

**The Rights of the Benefited Regular Certificates With Respect to Yield Supplement Amounts**

For tax information reporting purposes, the trustee (1) will treat the Yield Supplement Amounts rights of the Benefited Regular Certificates as rights to receive payments under a notional principal contract (specifically, an interest rate corridor contract) and (2) anticipates assuming that these rights will have an insubstantial value relative to the value of the Regular Interest components of the Benefited Regular Certificates. The IRS could, however, successfully argue that the Yield Supplement component of the Benefited Regular Certificates has a greater value. Similarly, the trustee could determine that the Yield Supplement component of the Benefited Regular Certificates has a greater value.  In either case, the REMIC Regular Interest component of the Benefited Regular Certificates could be viewed as having been issued with either an additional amount of OID (which could cause the total amount of discount to exceed a statutorily defined de minimis amount) or with less premium (which would reduce the amount of premium available to be used as an offset against interest income). See *"Material Federal Income Tax Consequences — Taxation of the REMIC and Its Holders"* and *" — Taxation of the REMIC"* in the prospectus.  In addition, the Yield Supplement component could be viewed as having been purchased at a higher cost.  These changes could affect the timing and amount of income and deductions on the REMIC Regular Interest component and Yield Supplement component.

The portion of the overall purchase price of a Benefited Regular Certificate attributable to the Yield Supplement component must be amortized over the life of the Certificate, taking into account the declining balance of the related REMIC Regular Interest component. Treasury regulations concerning notional principal contracts provide alternative methods for amortizing the purchase price of an interest rate corridor contract. Under one method — the level yield constant interest method — the price paid for an interest rate corridor contract would be amortized over the life of the corridor contract as though it were the principal amount of a loan bearing interest at a reasonable

rate. Holders are urged to consult their tax advisors concerning the methods that can be employed to amortize the portion of the purchase price paid for the Yield Supplement component of a Benefited Regular Certificate.

Any payments received by a holder of a Benefited Regular Certificate as Yield Supplement Amounts will be treated as periodic payments received under a notional principal contract.  For any taxable year, to the extent the sum of the periodic payments received exceeds the amortization of the purchase price of the Yield Supplement component, such excess will be ordinary income. Conversely, to the extent the amortization of the purchase price exceeds the periodic payments, such excess will be allowable as an ordinary deduction. In the case of an individual, such deduction will be subject to the 2-percent floor imposed on miscellaneous itemized deductions under section 67 of the Code and may be subject to the overall limitation on itemized deductions imposed under section 68 of the Code.  In addition, miscellaneous itemized deductions are not allowed for purposes of computing the alternative minimum tax.

**Dispositions of the Yield Supplement Component**

Upon the sale, exchange, or other disposition of a Benefited Regular Certificate, the Benefited Regular Certificateholder must allocate the amount realized between the Regular Interest component and the Yield Supplement component based on the relative fair market values of those components at the time of sale. Assuming a Benefited Regular Certificate is held as a "capital asset" within the meaning of section 1221 of the Code,  any gain or loss on the disposition of the Yield Supplement component should be capital gain or loss.

**Tax Treatment For Certain Purposes**

The Yield Supplement components of the Benefited Regular Certificates will not qualify as assets described in Section 7701(a)(19)(C) of the Code or as real estate assets under Section 856(c)(5)(B) of the Code.  In addition, because of the Yield Supplement component, holders of the Benefited Regular Certificates are encouraged to consult with their tax advisors before resecuritizing those Certificates in a REMIC.

**Residual Certificates**

The holders of the Residual Certificates must include the taxable income of each underlying REMIC (if any) and the Master REMIC in their federal taxable income.  The resulting tax liability of the holders may exceed cash distributions to them during certain periods.  All or a portion of the taxable income from a Residual Certificate recognized by a holder may be treated as "excess inclusion" income, which, with limited exceptions, cannot be reduced by deductions (including net operating losses) and in all cases, is subject to U.S. federal income tax.

In computing alternative minimum taxable income, the special rule providing that taxable income cannot be less than the sum of the taxpayer's excess inclusions for the year does not apply.  However, a taxpayer's alternative minimum taxable income cannot be less than the sum of the taxpayer's excess inclusions for the year.  In addition, the amount of any alternative minimum tax net operating loss is determined without regard to any excess inclusions.

Effective August 1, 2006, temporary regulations issued by the Internal Revenue Service (the "Temporary regulations") have modified the general rule that excess inclusions from a REMIC residual interest are not includible in the income of a foreign person (or subject to withholding tax) until paid or distributed.  The new regulations accelerate the time both for reporting, and tax withholding on, excess inclusions allocated to the foreign equity holders of partnerships and certain other pass-through entities.  The new rules also provide that excess inclusions are United States sourced income.  The timing rules apply to a particular REMIC residual interest and a particular foreign person, if the first allocation of income from the residual interest to the foreign person occurs after July 31, 2006.  The source rules apply for taxable years ending after August 1, 2006.

Under the Temporary regulations, in the case of REMIC residual interests held by a foreign person through a partnership, the amount of excess inclusion income allocated to the foreign partner is deemed to be received by the foreign partner on the last day of the partnership's taxable year except to the extent that the excess inclusion was required to be taken into account by the foreign partner at an earlier time under section 860G(b) of the Code as a result of a distribution by the partnership to the foreign partner or a disposition in whole or in part of the foreign

partner's indirect interest in the REMIC residual interest. A disposition in whole or in part of the foreign partner's indirect interest in the REMIC residual interest may occur as a result of a termination of the REMIC, a disposition of the partnership's residual interest in the REMIC, a disposition of the foreign partner's interest in the partnership, or any other reduction in the foreign partner's allocable share of the portion of the REMIC net income or deduction allocated to the partnership.

Similarly, in the case of a REMIC residual interest held by a foreign person as a shareholder of a real estate investment trust or regulated investment company, as a participant in a common trust fund or as a patron in an organization subject to part I of subchapter T (cooperatives), the amount of excess inclusion allocated to the foreign person must be taken into income at the same time that other income from the trust, company, fund, or organization would be taken into account.

Under the Temporary regulations, excess inclusions allocated to a foreign person (whether as a partner or holder of an interest in a pass-through entity) are expressly made subject to withholding tax. In addition, in the case of excess inclusions allocable to a foreign person as a partner, the Temporary regulations eliminate an important exception to the withholding requirements under which a withholding agent unrelated to a payee is obligated to withhold on a payment only to the extent that the withholding agent has control over the payee's money or property and knows the facts giving rise to the payment.

Purchasers of a Residual Certificate (that is, one of the Class A-R Certificates) are encouraged to consider carefully the tax consequences of an investment in Residual Certificates discussed in the prospectus and consult their tax advisors with respect to those consequences. See *"Material Federal Income Tax Consequences — Taxation of Holders of Residual Interests — Excess Inclusions"* in the prospectus. In particular, prospective holders of Residual Certificates are encouraged to consult their tax advisors regarding whether a Residual Certificate will be treated as a "noneconomic" residual interest, as a "tax avoidance potential" residual interest or as both. Among other things, holders of Noneconomic Residual Certificates should be aware of REMIC regulations that govern the treatment of "inducement fees" and that may affect their ability to transfer their Residual Certificates. See *"Material Federal Income Tax Consequences —Taxation of the REMIC and Its Holders," "—Taxation of Holders of Residual Interests — Restrictions on Ownership and Transfer of Residual Interests,"* and *"— Tax Treatment of Foreign Investors," "Material Federal Income Tax Consequences — Taxation of Holders of Residual Interests — Mark to Market Rules," "— Excess Inclusions"* and *"— Treatment of Inducement Fees"* and *"— Foreign Investors"* in the prospectus.

Additionally, for information regarding Prohibited Transactions and Treatment of Realized Losses, see *"Material Federal Income Tax Consequences — Taxation of the REMIC— Prohibited Transactions and Contributions Tax"* in the prospectus.

As a result of the Economic Growth and Tax Relief Reconciliation Act of 2001 (the *"2001 Act"*), limitations imposed by Section 68 of the Code on claiming itemized deductions will be phased-out commencing in 2006, which will affect individuals holding Residual Certificates. In addition, as a result of the Jobs and Growth Tax Relief Reconciliation Act of 2003 (the "2003 Act") the backup withholding rate has been reduced to 28%. Unless they are amended, these provisions of the 2001 Act and the 2003 Act will no longer apply for taxable years beginning after December 31, 2010. See *"Material Federal Income Tax Consequences"* in the prospectus. Investors are encouraged to consult their tax advisors with respect to both statutes.

### Other Taxes

No representations are made regarding the tax consequences of the purchase, ownership or disposition of the certificates under any state, local or foreign tax law.

**All investors are encouraged to consult their tax advisors regarding the federal, state, local or foreign tax consequences of purchasing, owning or disposing of the certificates.**

**ERISA Considerations**

Any fiduciary of an employee benefit plan or other plan or arrangement (such as an individual retirement account or Keogh plan) that is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or to Section 4975 of the Code (a *"Plan"*), that proposes to cause the Plan to acquire any of the offered certificates (directly or indirectly through investment by an entity or account holding assets of the Plan) is encouraged to consult with its counsel with respect to the potential consequences of the Plan's acquisition and ownership of the certificates under ERISA and Section 4975 of the Code. See *"ERISA Considerations"* in the prospectus. Section 406 of ERISA prohibits "parties in interest" with respect to an employee benefit plan subject to ERISA from engaging in various different types of transactions involving the Plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes excise taxes on prohibited transactions involving "disqualified persons" and Plans described under that Section. ERISA authorizes the imposition of civil penalties for prohibited transactions involving Plans not subject to the requirements of Section 4975 of the Code.

Some employee benefit plans, including governmental plans and some church plans, are not subject to ERISA's requirements. Accordingly, assets of those plans may be invested in the offered certificates without regard to the ERISA considerations described in this prospectus supplement and in the prospectus, subject to the provisions of other applicable federal and state law. Any of those plans that is qualified and exempt from taxation under Sections 401(a) and 501(a) of the Code may be subject to the prohibited transaction rules set forth in Section 503 of the Code.

Investments by Plans or with assets of Plans that are subject to ERISA must satisfy ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a Plan's investments be made in accordance with the documents governing the Plan. A fiduciary that decides to invest the assets of a Plan in the offered certificates should consider, among other factors, the extreme sensitivity of the investment to the rate of principal payments (including prepayments) on the mortgage loans. It is anticipated that the certificates will constitute "equity interests" in the issuing entity and, in the case of the Class A-1 Certificates, in the supplemental interest trust, for the purpose of the Plan Assets Regulation.

The U.S. Department of Labor has granted to the underwriter an administrative exemption (the "Exemption") from some of the prohibited transaction rules of ERISA and the related excise tax provisions of Section 4975 of the Code with respect to the initial purchase, the holding and the subsequent resale by Plans of securities, including certificates, in pass-through trusts that consist of specified receivables, loans and other obligations that meet the conditions and requirements of the Exemption. The Exemption applies to mortgage loans such as the mortgage loans in the issuing entity. The Exemption extends exemptive relief to certificates, including subordinated certificates, rated in the four highest generic rating categories in certain designated transactions when the conditions of the Exemption, including the requirement that an investing Plan be an "accredited investor" as defined in Rule 501(a)(1) of Regulation D under the Securities Act of 1933, as amended, are met.

The Exemption provides exemptive relief to certain mortgage-backed and asset-backed securities transactions using a pre-funding account.  Mortgage loans or other secured receivables supporting payments to certificateholders, and having a value equal to no more than twenty-five percent (25%) of the total principal amount of the certificates being offered by the entity, may be transferred to the entity within a 90-day or three-month period following the closing date, instead of being required to be either identified or transferred on or before the closing date.  The relief is available when the pre-funding arrangements satisfy certain conditions.

For a general description of the Exemption and the conditions that must be satisfied for the Exemption to apply, see *"ERISA Considerations"* in the prospectus.

Except as provided below with regard to the supplemental interest trust, it is expected that the Exemption will apply to the acquisition and holding by Plans of the offered  certificates (other than the Class A-R Certificates) and that all conditions of the Exemption other than those within the control of the investors will be met. In addition, as of the date hereof, there is no single mortgagor that is the obligor on five percent (5%) of the mortgage loans included in the issuing entity by aggregate unamortized principal balance of the assets of the issuing entity.

The rating of a certificate may change. If a class of certificates no longer has a rating of at least BBB- or its equivalent from at least one of S&P or Fitch or Moody's, certificates of that class will no longer be eligible for relief under the Exemption (although a Plan that had purchased the certificate when it had an investment-grade rating would not be required by the Exemption to dispose of it).

**Because the characteristics of the Class A-R Certificates may not meet the requirements of the Exemption, or any other issued exemption under ERISA, a Plan may have engaged in a prohibited transaction giving rise to excise taxes or civil penalties if it purchases and holds Class A-R Certificates. Consequently, transfers of the Class A-R Certificates (and of certificates of any class that, because of a change of rating, no longer satisfy the rating requirement of the Exemption) will not be registered by the trustee unless the trustee receives:**

- **a representation from the transferee of the certificate, acceptable to and in form and substance satisfactory to the trustee, that the transferee is not a Plan, or a person acting on behalf of a Plan or using a Plan's assets to effect the transfer;**

- **a representation that the transferee is an insurance company which is purchasing the certificate with funds contained in an "insurance company general account" (as defined in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE 95-60") ) and that the purchase and holding of the certificate satisfy the requirements for exemptive relief under Sections I and III of PTCE 95-60; or**

- **an opinion of counsel satisfactory to the trustee that the purchase and holding of the certificate by a Plan, or a person acting on behalf of a Plan or using a Plan's assets, will not result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the trustee or the master servicer to any obligation in addition to those undertaken in the pooling and servicing agreement.**

Prospective Plan investors are encouraged to consult with their legal advisors concerning the impact of ERISA and the Code, the effect of the Plan Assets Regulation and the applicability of the Exemption described in the prospectus, and the potential consequences in their specific circumstances, before making an investment in any of the offered certificates. Moreover, each Plan fiduciary is encouraged to determine whether, under the general fiduciary standards of investment prudence and diversification, an investment in any of the offered certificates is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio.

The sale of certificates to a Plan is in no respect a representation by the issuing entity or any underwriter of the certificates that this investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that this investment is appropriate for Plans generally or any particular Plan.

**ERISA Considerations With Respect to the Corridor Contract**

For so long as the holder of a Class A-1 Certificate is entitled to receive payments under the Corridor Contracts from the supplemental interest trust, any person purchasing a Class A-1 Certificate otherwise eligible for purchase by Plans under the Exemption will be deemed to have acquired for purposes of ERISA and Section 4975 of the Code two assets: the right to receive payments from the issuing entity with respect to such certificate without taking into account the right to receive payments from the supplemental interest trust, together with the right to receive payments from the supplemental interest trust.  The Exemption will not apply to the acquisition, holding or resale of the right to receive payments from the supplemental interest trust by a Plan.  The right to receive such payments could also result in a prohibited transaction if the Corridor Contract Counterparty is a party in interest with respect to such Plan, unless another administrative exemption is available.

Accordingly, no Plan or other person using assets of a Plan may acquire or hold a Class A-1 Certificate otherwise eligible for the Exemption before the termination of the Corridor Contract, unless such acquisition or holding is eligible for the exemptive relief available under Department of Labor Prohibited Transaction Class Exemption 84-14 (for transactions by independent "qualified professional asset managers"), 91-38 (for transactions

by bank collective investment funds), 90-1 (for transactions by insurance company pooled separate accounts), 95-60 (for transactions by insurance company general accounts) or 96-23 (for transactions effected by "in-house asset managers") or the service provider exemption provided by Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code.  Plan fiduciaries should consult their legal counsel concerning this issue. Each beneficial owner of a Class A-1 Certificate or any interest therein, shall be deemed to have represented, by virtue of its acquisition or holding of the Class A-1 Certificate, or interest therein, that either (i) it is not a Plan or (ii) the acquisition and holding of such Certificate are eligible for the exemptive relief available under one of the five prohibited transaction class exemptions or a statutory exemption as required immediately above.

If any Class A-1 Certificate, or any interest therein, is acquired or held in violation of the provisions of the preceding paragraph, the next preceding permitted beneficial owner will be treated as the beneficial owner of that Class A-1 Certificate, retroactive to the date of transfer to the purported beneficial owner. Any purported beneficial owner whose acquisition or holding of a Class A-1 Certificate, or interest therein, was effected in violation of the provisions of the preceding paragraph shall indemnify to the extent permitted by law and hold harmless the trustee, the depositor, the sellers and the master servicer from and against any and all liabilities, claims, costs or expenses incurred by such parties as a result of such acquisition or holding.

### Method of Distribution

Subject to the terms and conditions set forth in the underwriting agreement between the depositor and Countrywide Securities Corporation, an affiliate of the depositor, the sellers and the master servicer ("CSC" or the "underwriter"), the depositor has agreed to sell the offered certificates to the underwriter.  CSC has agreed to purchase from the depositor the offered certificates (the "Underwritten Certificates").

Distribution of the Underwritten Certificates will be made by the underwriter from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. The underwriter may effect such transactions by selling the Underwritten Certificates to or through dealers and such dealers may receive from the underwriter, for which they act as agent, compensation in the form of underwriting discounts, concessions or commissions. The underwriter and any dealers that participate with the underwriter in the distribution of the Underwritten Certificates may be deemed to be underwriters, and any discounts, commissions or concessions received by them, and any profits on resale of the Underwritten Certificates purchased by them, may be deemed to be underwriting discounts and commissions under the Securities Act of 1933, as amended.

The depositor has been advised by the underwriter that it intends to make a market in the Underwritten Certificates purchased by it but the underwriter has no obligation to do so. There can be no assurance that a secondary market for the Underwritten Certificates will develop or, if it does develop, that it will continue or that it will provide certificateholders with a sufficient level of liquidity of investment.

The depositor has agreed to indemnify the underwriter against, or make contributions to the underwriter with respect to, liabilities, customarily indemnified against, including liabilities under the Securities Act of 1933, as amended.

### Legal Matters

The validity of the certificates, including their material federal income tax consequences, will be passed upon for the depositor by Sidley Austin LLP, New York, New York.  Certain legal matters will be passed upon for the underwriter by McKee Nelson LLP.

### Ratings

It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement.  The depositor has requested that Fitch, Moody's and S&P maintain ongoing surveillance of the ratings assigned to the offered certificates in accordance with their respective policies, but we cannot assure you that Fitch, Moody's or S&P will continue its surveillance of the ratings assigned to the offered certificates.

The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Fitch's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates. The ratings assigned by Fitch to the notional amount certificates do not address whether investors will recoup their initial investment. The rating assigned by Fitch to the principal only certificates only addresses the return of its Class Certificate Balance. The rating assigned by Fitch to the Class A-R Certificates only addresses the return of its Class Certificate Balance and interest thereon at its pass-through rate. The rating assigned by Fitch to the Class A-1 Certificates does not address the likelihood of any payments made pursuant to the Corridor Contract.

The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates. The ratings assigned by S&P to the notional amount certificates do not address whether investors will recoup their initial investment. The rating assigned by S&P to the principal only certificates only addresses the return of its Class Certificate Balance. The rating assigned by S&P to the Class A-R Certificates only addresses the return of its Class Certificate Balance and interest thereon at its pass-through rate. The rating assigned by S&P to the Class A-1 Certificates does not address the likelihood of any payments made pursuant to the Corridor Contract.

The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates. The ratings assigned by Moody's to the notional amount certificates do not address whether investors will recoup their initial investment. The rating assigned by Moody's to the principal only certificates only addresses the return of its Class Certificate Balance. The rating assigned by Moody's to the Class A-R Certificates only addresses the return of its Class Certificate Balance and interest thereon at its pass-through rate. The rating assigned by Moody's to the Class A-1 Certificates does not address the likelihood of any payments made pursuant to the Corridor Contract.

The ratings of the rating agencies listed above do not address the possibility that, as a result of principal prepayments, certificateholders may receive a lower than anticipated yield. The security ratings assigned to the offered certificates should be evaluated independently from similar ratings on other types of securities. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the rating agencies.

The depositor has not requested a rating of the offered certificates by any rating agency other than the rating agencies listed above; there can be no assurance, however, as to whether any other rating agency will rate the offered certificates or, if it does, what rating would be assigned by the other rating agency. The ratings assigned by the other rating agency to the offered certificates could be lower than the respective ratings assigned by the rating agencies listed above.

**Annex I**

## Global Clearance, Settlement And Tax Documentation Procedures

Except in certain limited circumstances, the Offered Certificates will be offered globally (the "***Global Securities***") and will be available only in book-entry form.  Investors in the Global Securities may hold Such Global Securities through any of The Depository Trust Company ("**DTC**") or Euroclear.  The Global Securities will be tradable as home market instruments in both the European and U.S. domestic markets.  Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors holding Global Securities through Euroclear will be conducted in the ordinary way in accordance with their normal rules and operating procedures and in accordance with conventional eurobond practice (i.e., seven calendar day settlement).

Secondary market trading between investors holding Global Securities through DTC will be conducted according to the rules and procedures applicable to U.S. corporate debt obligations.

Secondary cross-market trading between Euroclear and DTC Participants holding Certificates will be effected on a delivery-against-payment basis through the respective Depositaries of Euroclear (in such capacity) and as DTC Participants.

Non-U.S. holders (as described below) of Global Securities will be Subject to U.S. withholding taxes unless such holders meet certain requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their participants.

### Initial Settlement

All Global Securities will be held in book-entry form by DTC in the name of Cede & Co. as nominee of DTC.  Investors' interests in the Global Securities will be represented through financial institutions acting on their behalf as direct and indirect Participants in DTC.  As a result, Euroclear will hold positions on behalf of their participants through their respective Depositaries, which in turn will hold such positions in accounts as DTC Participants.

Investors electing to hold their Global Securities through DTC will follow the settlement practices applicable to conventional eurobonds, except that there will be no temporary global Security and no "lock-up" or restricted period.  Investor securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their Global Securities through Euroclear accounts will follow the settlement procedures applicable to conventional eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period.  Global Securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

### Secondary Market Trading

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

*Trading between DTC Participants.*  Secondary market trading between DTC Participants will be settled using the procedures applicable to prior mortgage loan asset-backed certificates issues in same-day funds.

*Trading between Euroclear Participants.*  Secondary market trading between Euroclear Participants will be settled using the procedures applicable to conventional eurobonds in same-day funds.

*Trading between DTC Seller and Euroclear purchaser.*  When Global Securities are to be transferred from the account of a DTC Participant to the account of a Euroclear Participant, the purchaser will send instructions to Euroclear through a Euroclear Participant at least one business day prior to settlement.  Euroclear will instruct its

Depositary to receive the Global Securities against payment.  Payment will include interest accrued on the Global Securities from and including the last coupon payment date to and excluding the settlement date, on the basis of a 360-day year and twelve 30-day months.  For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month.  Payment will then be made by the Depositary of the DTC Participant's account against delivery of the Global Securities.  After settlement has been completed, the Global Securities will be credited to Euroclear and by Euroclear, in accordance with its usual procedures, to the Euroclear Participant's account.  The Securities credit will appear the next day (European time) and the cash debt will be back-valued to, and the interest on the Global Securities will accrue from, the value date (which would be the preceding day when settlement occurred in New York).  If settlement is not completed on the intended value date (i.e., the trade fails), the Euroclear cash debt will be valued instead as of the actual settlement date.

Euroclear Participants will need to make available to the respective clearing systems the funds necessary to process same-day funds settlement.  The most direct means of doing so is to preposition funds for settlement, either from cash on hand or existing lines of credit, as they would for any settlement occurring within Clearstream or Euroclear.  Under this approach, they may take on credit exposure to Clearstream or Euroclear until the Global Securities are credited to their accounts one day later.

As an alternative, if Clearstream or Euroclear has extended at line of credit to them, Clearstream Participants or Euroclear Participants can elect not to preposition funds and allow that credit line to be drawn upon the finance settlement.  Under this procedure, Clearstream Participants or Euroclear Participants purchasing Global Securities would incur overdraft charges for one day, assuming they cleared the overdraft when the Global Securities were credited to their accounts.  However, interest on the Global Securities would accrue from the value date.  Therefore, in many cases the investment income on the Global Securities earned during that one-day period may substantially reduce or offset the amount of such overdraft charges, although this result will depend on each Clearstream Participant's or Euroclear Participant's particular cost of funds.

Since the settlement is taking place during New York business hours, DTC Participants can employ their usual procedures for sending Global Securities to the respective European Depositary for the benefit of Clearstream Participants or Euroclear Participants.  The sale proceeds will be available to the DTC seller on the settlement date.  Thus, to the DTC Participants a cross-market transaction will settle no differently than a trade between two DTC Participants.

*Trading between Clearstream or Euroclear Seller and DTC Purchaser.*  Due to time zone differences in their favor, Clearstream Participants and Euroclear Participants may employ their customary procedures for transactions in which Global Securities are to be transferred by the respective clearing system, through the respective Depositary, to a DTC Participant.  The seller will send instructions to Euroclear through a Euroclear Participant at least one business day prior to settlement.  In these cases Euroclear will instruct its Depositary to deliver the Global Securities to the DTC Participant's account against payment.  Payment will include interest accrued on the Global Securities from and including the last Coupon payment to and excluding the settlement date on the basis of a 360-day year and twelve 30-day months.  For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month.  The payment will then be reflected in the account of the Euroclear Participant the following day, and receipt of the cash proceeds in the Euroclear Participant's account would be back-valued to the value date (which would be the preceding day, when settlement occurred in New York).  Should the Euroclear Participant have a line of credit with its respective clearing system and elect to be in debt in anticipation of receipt of the sale proceeds in its account, the back-valuation will extinguish any overdraft incurred over that one-day period.  If settlement is not completed on the intended value date (i.e., the trade fails), receipt of the cash proceeds in the Euroclear Participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Euroclear and that purchase Global Securities from DTC Participants for delivery to Euroclear Participants should note that these trades would automatically fail on the sale side unless affirmative action were taken.  At least three techniques should be readily available to eliminate this potential problem:

> 1.   borrowing through Euroclear accounts) for one day (until the purchase side of the day trade is reflected in their Euroclear accounts) in accordance with Euroclear's Customary procedures;

2.   borrowing the Global Securities in the U.S. from a DTC Participant no later than one day prior to settlement, which would give the Global Securities sufficient time to be reflected in their Euroclear account in order to settle the sale side of the trade; or

3.   staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC Participant is at least one day prior to the value date for the sale to the Euroclear Participant.

**Certain U.S. Federal Income Tax Documentation Requirements**

A beneficial owner of Global Securities holding Securities through Euroclear (or through DTC if the holder has an address outside the U.S.) will be subject to the U.S. withholding tax that generally applies to payments of interest (including original issue discount) on registered debt issued by U.S. Persons, unless (i) each clearing system, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between Such beneficial owner and the U.S. entity required to withhold tax complies with applicable certification requirements and (ii) such beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate:

*Exemption for non-U.S. Persons (Form W-8BEN).* Beneficial owners of Global Securities that are non-U.S. Persons can obtain a complete exemption from the withholding tax by filing a signed Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Filing). Non-U.S. Persons that are Certificate Owners residing in a country that has a tax treaty with the United States can obtain an exemption or reduced tax rate (depending on the treaty terms) by filing Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding). If the information shown on Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of such change.

*Exemption for non-U.S. Persons with effectively connected income (Form W-8ECI).* A non-U.S. Person, including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the United States, can obtain an exemption from the withholding tax by filing Form W-8ECI (Certificate of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with the Conduct of a Trade or Business in the United States).

*Exemptions for U.S. Persons (Form W-9).* U.S. Persons can obtain a complete exemption from the withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

*U.S. Federal Income Tax Reporting Procedure.* The Certificate Owner of a Global Security files by submitting the appropriate form to the person through whom it holds (the clearing agency, in the case of persons holding directly on the books of the clearing agency). Form W-8BEN and Form W-8ECI are effective until the third succeeding calendar year from the date such form is signed.

The term "**U.S. Person**" means (i) a citizen or resident of the United States, (ii) a corporation, partnership or other entity treated as a corporation or partnership for United States federal income tax purposes organized in or under the laws of the United States or any state thereof or the District of Columbia (unless, in the case of a partnership, Treasury regulations provide otherwise) or (iii) an estate the income of which is includible in gross income for United States tax purposes, regardless of its source, or (iv) a trust if a Court within the United States is able to exercise primary Supervision over the administration of the trust and one or more United States persons have authority to control all substantial decisions of the trust. Notwithstanding the preceding sentence, to the extent provided in Treasury regulations, certain trusts in existence on August 20, 1996, and treated as United States persons prior to such date, that elect to continue to be treated as United States persons will also be a U.S. Person. This Summary does not deal with all aspects of U.S. Federal income tax withholding that may be relevant to foreign holders of the Global Securities. Investors are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of the Global Securities.

(This page intentionally left blank)

PROSPECTUS

# CWALT, INC.
**Depositor**

**Mortgage Backed Securities**
**(Issuable in Series)**

| |
|---|
| **Please carefully consider our discussion of some of the risks of investing in the securities under "Risk Factors" beginning on page 2.** <br><br> The securities will represent obligations of the related trust fund only and will not represent an interest in or obligation of CWALT, Inc., any seller, servicer, or any of their affiliates. |

## The Trusts

Each trust will be established to hold assets in its trust fund transferred to it by CWALT, Inc.  The assets in each trust fund will be specified in the prospectus supplement for the particular trust and will generally consist of:

- first lien mortgage loans secured by one- to four-family residential properties;

- mortgage loans secured by first liens on small multifamily residential properties, such as rental apartment buildings or projects containing five to fifty residential units;

- collections arising from one or more types of the loans described above which are not used to make payments on securities issued by a trust fund, including excess servicing fees and prepayment charges;

- mortgage pass-through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac; or

- mortgage-backed securities evidencing an interest in, or secured by, loans of the type that would otherwise be eligible to be loans included in a trust fund and issued by entities other than Ginnie Mae, Fannie Mae or Freddie Mac.

## The Securities

CWALT, Inc. will sell either certificates or notes pursuant to a prospectus supplement.  The securities will be grouped into one or more series, each having its own distinct designation.  Each series will be issued in one or more classes and each class will evidence beneficial ownership of (in the case of certificates) or a right to receive payments supported by (in the case of notes) a specified portion of future payments on the assets in the trust fund that the series relates to.  A prospectus supplement for a series will specify all of the terms of the series and of each of the classes in the series.

## Credit Enhancement

If the securities have any type of credit enhancement, the prospectus supplement for the related series will describe the credit enhancement.  The types of credit enhancement are generally described in this prospectus.

## Offers of Securities

The securities may be offered through several different methods, including offerings through underwriters.

————————

**These securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of this prospectus.  Any representation to the contrary is a criminal offense.**

August 29, 2006

(This page intentionally left blank)

**Table of Contents**

Important Notice About Information in This
   Prospectus and Each Accompanying
   Prospectus Supplement ....................................... 1
Risk Factors ...................................................... 2
   Limited Source Of Payments — No
   Recourse To Sellers, Depositor Or
   Servicer ........................................................... 2
   Credit Enhancement May Not Be
   Sufficient To Protect You From
   Losses ............................................................. 3
   Nature Of Mortgages ........................................ 3
   Your Risk Of Loss May Be Higher Than
   You Expect If Your Securities Are
   Backed By Multifamily Loans ....................... 7
   Impact Of World Events ................................... 7
   You Could Be Adversely Affected By
   Violations Of Environmental Laws ............. 8
   Ratings Of The Securities Do Not
   Assure Their Payment .................................... 9
   Book-Entry Registration ................................. 10
   Secondary Market For The Securities
   May Not Exist .............................................. 10
   Bankruptcy Or Insolvency May Affect
   The Timing And Amount Of
   Distributions On The Securities ................... 10
   The Principal Amount Of Securities
   May Exceed The Market Value Of
   The Trust Fund Assets ................................. 11
The Trust Fund ................................................. 12
   General ............................................................ 12
   The Loans ........................................................ 13
   Agency Securities ........................................... 16
   Non-Agency Mortgage-Backed
   Securities ...................................................... 21
   Substitution of Trust Fund Assets .................. 22
   Available Information ...................................... 23
   Incorporation of Certain Documents by
   Reference; Reports Filed with the
   SEC ................................................................ 23
   Reports to Securityholders ............................. 24
Use of Proceeds ............................................... 24
The Depositor ................................................... 24
Loan Program .................................................. 25
   Underwriting Standards .................................. 25
   Qualifications of Sellers ................................. 26
   Representations by Sellers; Repurchases ........ 26
Static Pool Data ............................................... 27
Description of the Securities .............................. 28
   General ............................................................ 28
   Distributions on Securities ............................. 30
   Advances ......................................................... 31
   Reports to Securityholders ............................. 32
   Categories of Classes of Securities ................ 33

Indices Applicable to Floating Rate and
   Inverse Floating Rate Classes ..................... 36
   Book-Entry Registration of Securities ............ 39
Credit Enhancement .......................................... 43
   General ............................................................ 43
   Subordination .................................................. 44
   Letter of Credit ............................................... 45
   Insurance Policies, Surety Bonds and
   Guaranties ..................................................... 45
   Overcollateralization and Excess Cash
   Flow .............................................................. 45
   Reserve Accounts ........................................... 46
   Special Hazard Insurance Policies .................. 46
   Bankruptcy Bonds .......................................... 47
   Pool Insurance Policies ................................... 47
   Financial Instruments ..................................... 49
   Cross Support .................................................. 49
Yield, Maturity and Prepayment
   Considerations ................................................ 49
   Prepayments on Loans .................................... 49
   Prepayment Effect on Interest ......................... 50
   Delays in Realization on Property;
   Expenses of Realization ............................... 50
   Optional Purchase .......................................... 51
   Prepayment Standards or Models .................... 51
   Yield ............................................................... 52
The Agreements ................................................ 52
   Assignment of the Trust Fund Assets ............. 52
   Payments On Loans; Deposits to
   Security Account .......................................... 54
   Pre-Funding Account ...................................... 56
   Investments in Amounts Held in
   Accounts ....................................................... 57
   Sub-Servicing by Sellers ................................ 58
   Collection Procedures ..................................... 59
   Hazard Insurance ............................................ 59
   Application of Liquidation Proceeds ............... 61
   Realization Upon Defaulted Loans ................. 62
   Servicing and Other Compensation and
   Payment of Expenses ................................... 64
   Evidence as to Compliance ............................. 64
   Certain Matters Regarding the Master
   Servicer and the Depositor ........................... 65
   Events of Default; Rights Upon Event of
   Default .......................................................... 66
   Amendment ..................................................... 68
   Termination; Optional Termination ................. 70
   The Trustee ..................................................... 70
Certain Legal Aspects of the Loans .................... 71
   General ............................................................ 71
   Foreclosure ...................................................... 72
   Environmental Risks ....................................... 74
   Rights of Redemption ..................................... 75

i

Anti-Deficiency Legislation and Other
    Limitations On Lenders ............................. 75
Due-On-Sale Clauses ...................................... 76
Enforceability of Prepayment and Late
    Payment Fees............................................... 77
Applicability of Usury Laws ........................... 77
Servicemembers Civil Relief Act.................... 77
Other Loan Provisions and Lender
    Requirements ............................................. 77
Consumer Protection Laws ............................. 78
Material Federal Income Tax Consequences.......... 79
General............................................................. 79
Taxation of Debt Securities............................. 80
Taxation of the REMIC and Its Holders ......... 84
REMIC Expenses; Single Class
    REMICs...................................................... 84
Taxation of the REMIC................................... 85
Taxation of Holders of Residual
    Interests...................................................... 86
Administrative Matters.................................... 90
Tax Status as a Grantor Trust.......................... 90
Sale or Exchange............................................. 92
Miscellaneous Tax Aspects............................. 92
New Reporting Regulations ............................ 93
Tax Treatment of Foreign Investors................ 93
Tax Characterization of the Trust Fund
    as a Partnership .......................................... 94
Tax Consequences to Holders of the
    Notes........................................................... 95
Tax Consequences to Holders of the
    Certificates................................................. 97
Other Tax Considerations.................................... 100
ERISA Considerations......................................... 100
Legal Investment ................................................. 104
Method of Distribution ........................................ 105
Legal Matters....................................................... 106
Financial Information .......................................... 106
Rating .................................................................. 106
Index to Defined Terms....................................... 108

**Important Notice About Information in This Prospectus and Each
Accompanying Prospectus Supplement**

Information about each series of securities is contained in two separate documents:

- this prospectus, which provides general information, some of which may not apply to a particular series; and

- the accompanying prospectus supplement for a particular series, which describes the specific terms of the securities of that series.

The prospectus supplement will contain information about a particular series that supplements the information contained in this prospectus, and you should rely on that supplementary information in the prospectus supplement.

You should rely only on the information in this prospectus and the accompanying prospectus supplement. We have not authorized anyone to provide you with information that is different from that contained in this prospectus and the accompanying prospectus supplement.

_____

If you require additional information, the mailing address of our principal executive offices is CWALT, Inc., 4500 Park Granada, Calabasas, California 91302 and the telephone number is (818) 225-3000.  For other means of acquiring additional information about us or a series of securities, see "The Trust Fund — Available Information" and "— Incorporation of Certain Documents by Reference; Reports Filed with the SEC" beginning on page 23.

**Risk Factors**

You should carefully consider the following information since it identifies significant risks associated with an investment in the securities.

**Limited Source Of Payments — No Recourse To Sellers, Depositor Or Servicer**

The applicable prospectus supplement may provide that securities will be payable from other trust funds in addition to their associated trust fund, but if it does not, they will be payable solely from their associated trust fund.  If the trust fund does not have sufficient assets to distribute the full amount due to you as a securityholder, your yield will be impaired, and perhaps even the return of your principal may be impaired, without your having recourse to anyone else.  Furthermore, at the times specified in the applicable prospectus supplement, certain assets of the trust fund may be released and paid out to other people, such as the depositor, a servicer, a credit enhancement provider, or any other person entitled to payments from the trust fund.  Those assets will no longer be available to make payments to you.  Those payments are generally made after other specified payments that may be set forth in the applicable prospectus supplement have been made.

You will not have any recourse against the depositor or any servicer if you do not receive a required distribution on the securities.  Nor will you have recourse against the assets of the trust fund of any other series of securities.

The securities will not represent an interest in the depositor, any servicer, any seller to the depositor, or anyone else except the trust fund.  The only obligation of the depositor to a trust fund comes from certain representations and warranties made by it about assets transferred to the trust fund.  If these representations and warranties turn out to be untrue, the depositor may be required to repurchase some of the transferred assets.  CWALT, Inc., which is the depositor, does not have significant assets and is unlikely to have significant assets in the future.  So if the depositor were required to repurchase a loan because of a breach of a representation, its only sources of funds for the repurchase would be:

- funds obtained from enforcing a corresponding obligation of a seller or originator of the loan, or

- funds from a reserve fund or similar credit enhancement established to pay for loan repurchases.

The only obligations of the master servicer to a trust fund (other than its master servicing obligations) comes from certain representations and warranties made by it in connection with its loan servicing activities.  If these representations and warranties turn out to be untrue, the master servicer may be required to repurchase or substitute for some of the loans.  However, the master servicer may not have the financial ability to make the required repurchase or substitution.

The only obligations to a trust fund of a seller of loans to the depositor comes from certain representations and warranties made by it in connection with its sale of the loans and certain document delivery requirements.  If these representations and warranties turn out to be untrue, or the seller fails to deliver required documents, it may be

required to repurchase or substitute for some of the loans.  However, the seller may not have the financial ability to make the required repurchase or substitution.

**Credit Enhancement May Not Be Sufficient To Protect You From Losses**

Credit enhancement is intended to reduce the effect of loan losses.  But credit enhancements may benefit only some classes of a series of securities and the amount of any credit enhancement will be limited as described in the related prospectus supplement.  Furthermore, the amount of a credit enhancement may decline over time pursuant to a schedule or formula or otherwise, and could be depleted from payments or for other reasons before the securities covered by the credit enhancement are paid in full.  In addition, a credit enhancement may not cover all potential sources of loss.  For example, a credit enhancement may or may not cover fraud or negligence by a loan originator or other parties.  Also, all or a portion of the credit enhancement may be reduced, substituted for, or even eliminated so long as the rating agencies rating the securities indicate that the change in credit enhancement would not cause them to change adversely their rating of the securities. Consequently, securityholders may suffer losses even though a credit enhancement exists and its provider does not default.

**Nature Of Mortgages**
*Cooperative Loans May Experience Relatively Higher Losses*

Cooperative loans are evidenced by promissory notes secured by security interests in shares issued by private corporations that are entitled to be treated as housing cooperatives under the Internal Revenue Code and in the related proprietary leases or occupancy agreements granting exclusive rights to occupy specific dwelling units in the corporations' buildings.

If there is a blanket mortgage (or mortgages) on the cooperative apartment building and/or underlying land, as is generally the case, the cooperative, as property borrower, is responsible for meeting these mortgage or rental obligations.  If the cooperative is unable to meet the payment obligations arising under a blanket mortgage, the mortgagee holding a blanket mortgage could foreclose on that mortgage and terminate all subordinate proprietary leases and occupancy agreements. A foreclosure by the holder of a blanket mortgage could eliminate or significantly diminish the value of any collateral held by the lender who financed an individual tenant-stockholder of cooperative shares or, in the case of the mortgage loans, the collateral securing the cooperative loans.

If there is an underlying lease of the land, as is the case in some instances, the cooperative is responsible for meeting the related rental obligations.  If the cooperative is unable to meet its obligations arising under its land lease, the holder of the land lease could terminate the land lease and all subordinate proprietary leases and occupancy agreements. The termination of the land lease by its holder could eliminate or significantly diminish the value of any collateral held by the lender who financed an individual tenant-stockholder of the cooperative shares or, in the case of the mortgage loans, the collateral securing the cooperative loans. A land lease also has an expiration date and the inability of the cooperative to extend its term or, in the alternative, to purchase the land could lead to termination of the cooperative's interest in the property and termination of all proprietary leases and occupancy agreements which could eliminate or significantly diminish the value of the related collateral.

In addition, if the corporation issuing the shares related to the cooperative loans fails to qualify as a cooperative housing corporation under the Internal Revenue Code, the value of the collateral securing the cooperative loan could be significantly impaired because the tenant-stockholders would not be permitted to deduct its proportionate share of certain interest expenses and real estate taxes of the corporation.

The cooperative shares and proprietary lease or occupancy agreement pledged to the lender are, in almost all cases, subject to restrictions on transfer, including obtaining the consent of the cooperative housing corporation prior to the transfer, which may impair the value of the collateral after a default by the borrower due to an inability to find a transferee acceptable to the related housing corporation.

*Declines in Property Values May Adversely Affect You*

The value of the properties underlying the loans held in the trust fund may decline over time.  Among the factors that could adversely affect the value of the properties are:

- an overall decline in the residential real estate market in the areas in which they are located,

- a decline in their general condition from the failure of borrowers to maintain their property adequately, and

- natural disasters that are not covered by insurance, such as earthquakes and floods.

If property values decline, the actual rates of delinquencies, foreclosures, and losses on all underlying loans could be higher than those currently experienced in the mortgage lending industry in general.  These losses, to the extent not otherwise covered by a credit enhancement, will be borne by the holder of one or more classes of securities.

*Delays in Liquidation May Adversely Affect You*

Even if the properties underlying the loans held in the trust fund provide adequate security for the loans, substantial delays could occur before defaulted loans are liquidated and their proceeds are forwarded to investors.  Property foreclosure actions are regulated by state statutes and rules and are subject to many of the delays and expenses of other lawsuits if defenses or counterclaims are made, sometimes requiring several years to complete.  Furthermore, an action to obtain a deficiency judgment is regulated by statutes and rules, and the amount or availability of a deficiency judgment may be limited by law. In the event of a default by a borrower, these restrictions may impede the ability of the servicer to foreclose on or to sell the mortgaged property or to obtain a deficiency judgment, to obtain sufficient proceeds to repay the loan in full.

In addition, the servicer will be entitled to deduct from liquidation proceeds all expenses reasonably incurred in attempting to recover on the defaulted loan, including legal and appraisal fees and costs, real estate taxes, and property maintenance and preservation expenses.

In the event that:

- the mortgaged properties fail to provide adequate security for the related loans,

4

- if applicable to a series as specified in the related prospectus supplement, excess cashflow (if any) and overcollateralization (if any) is insufficient to cover these shortfalls,

- if applicable to a series as specified in the related prospectus supplement, the subordination of certain classes are insufficient to cover these shortfalls, and

- with respect to the securities with the benefit of an insurance policy as specified in the related prospectus supplement, the credit enhancement provider fails to make the required payments under the related insurance policies,

you could lose all or a portion of the money you paid for the securities and could also have a lower yield than anticipated at the time you purchased the securities.

*Disproportionate Effect of Liquidation Expenses May Adversely Affect You*

Liquidation expenses of defaulted loans generally do not vary directly with the outstanding principal balance of the loan at the time of default. Therefore, if a servicer takes the same steps for a defaulted loan having a small remaining principal balance as it does for a defaulted loan having a large remaining principal balance, the amount realized after expenses is smaller as a percentage of the outstanding principal balance of the small loan than it is for the defaulted loan having a large remaining principal balance.

*Consumer Protection Laws May Adversely Affect You*

Federal, state and local laws extensively regulate various aspects of brokering, originating, servicing and collecting loans secured by consumers' dwellings.  Among other things, these laws may regulate interest rates and other charges, require disclosures, impose financial privacy requirements, mandate specific business practices, and prohibit unfair and deceptive trade practices.  In addition, licensing requirements may be imposed on persons that broker, originate, service or collect loans secured by consumers' dwellings.

Additional requirements may be imposed under federal, state or local laws on so-called "high cost mortgage loans," which typically are defined as loans secured by a consumer's dwelling that have interest rates or origination costs in excess of prescribed levels.  These laws may limit certain loan terms, such as prepayment charges, or the ability of a creditor to refinance a loan unless it is in the borrower's interest.  In addition, certain of these laws may allow claims against loan brokers or originators, including claims based on fraud or misrepresentations, to be asserted against persons acquiring the loans, such as the trust fund.

The federal laws that may apply to loans held in the trust fund include the following:

- the Truth in Lending Act and its regulations, which (among other things) require disclosures to borrowers regarding the terms of loans and provide consumers who pledged their principal dwelling as collateral in a non-purchase money transaction with a right of rescission that generally extends for three days after proper disclosures are given;

- the Home Ownership and Equity Protection Act and its regulations, which (among other things) imposes additional disclosure requirements and limitations on loan terms with respect to non-purchase money, installment loans secured by the consumer's principal dwelling that have interest rates or origination costs in excess of prescribed levels;

- the Real Estate Settlement Procedures Act and its regulations, which (among other things) prohibit the payment of referral fees for real estate settlement services (including mortgage lending and brokerage services) and regulate escrow accounts for taxes and insurance and billing inquiries made by borrowers;

- the Equal Credit Opportunity Act and its regulations, which (among other things) generally prohibit discrimination in any aspect of a credit transaction on certain enumerated basis, such as age, race, color, sex, religion, marital status, national origin or receipt of public assistance; and

- the Fair Credit Reporting Act, which (among other things) regulates the use of consumer reports obtained from consumer reporting agencies and the reporting of payment histories to consumer reporting agencies.

The penalties for violating these federal, state, or local laws vary depending on the applicable law and the particular facts of the situation. However, private plaintiffs typically may assert claims for actual damages and, in some cases, also may recover civil money penalties or exercise a right to rescind the loan. Violations of certain laws may limit the ability to collect all or part of the principal or interest on a loan and, in some cases, borrowers even may be entitled to a refund of amounts previously paid. Federal, state and local administrative or law enforcement agencies also may be entitled to bring legal actions, including actions for civil money penalties or restitution, for violations of certain of these laws.

Depending on the particular alleged misconduct, it is possible that claims may be asserted against various participants in secondary market transactions, including assignees that hold the loans, such as the trust fund. Losses on loans from the application of these federal, state and local laws that are not otherwise covered by one or more forms of credit enhancement will be borne by the holders of one or more classes of securities. Additionally, the trust may experience losses arising from lawsuits related to alleged violations of these laws, which, if not covered by one or more forms of credit enhancement or the related seller, will be borne by the holders of one or more classes of securities.

*Losses on Balloon Payment Mortgages Are Borne by You*

Some of the mortgage loans held in the trust fund may not be fully amortizing over their terms to maturity and, thus, will require substantial principal payments (that is, balloon payments) at their stated maturity. Loans with balloon payments involve a greater degree of risk than fully amortizing loans because typically the borrower must be able to refinance the loan or sell the property to make the balloon payment at maturity. The ability of a borrower to do this will depend on factors such as mortgage rates at the time of sale or refinancing, the borrower's equity in

the property, the relative strength of the local housing market, the financial condition of the borrower, and tax laws.  Losses on these loans that are not otherwise covered by a credit enhancement will be borne by the holders of one or more classes of securities.

**Your Risk Of Loss May Be Higher Than You Expect If Your Securities Are Backed By Multifamily Loans**

Multifamily lending may expose the lender to a greater risk of loss than single family residential lending.  Owners of multifamily residential properties rely on monthly lease payments from tenants to

- pay for maintenance and other operating expenses of those properties,

- fund capital improvements, and

- service any mortgage loan and any other debt that may be secured by those properties.

Various factors, many of which are beyond the control of the owner or operator of a multifamily property, may affect the economic viability of that property.

Changes in payment patterns by tenants may result from a variety of social, legal and economic factors.  Economic factors include the rate of inflation, unemployment levels and relative rates offered for various types of housing.  Shifts in economic factors may trigger changes in payment patterns including increased risks of defaults by tenants and higher vacancy rates.  Adverse economic conditions, either local or national, may limit the amount of rent that can be charged and may result in a reduction in timely lease payments or a reduction in occupancy levels.  Occupancy and rent levels may also be affected by construction of additional housing units, competition and local politics, including rent stabilization or rent control laws and policies.  In addition, the level of mortgage interest rates may encourage tenants to purchase single family housing.  We are unable to determine and have no basis to predict whether, or to what extent, economic, legal or social factors will affect future rental or payment patterns.

The location and construction quality of a particular building may affect the occupancy level as well as the rents that may be charged for individual units.  The characteristics of a neighborhood may change over time or in relation to newer developments.  The effects of poor construction quality will increase over time in the form of increased maintenance and capital improvements.  Even good construction will deteriorate over time if adequate maintenance is not performed in a timely fashion.

**Impact Of World Events**

The economic impact of the United States' military operations in Iraq and other parts of the world, as well as the possibility of any terrorist attacks domestically or abroad, is uncertain, but could have a material effect on general economic conditions, consumer confidence, and market liquidity.  We can give no assurance as to the effect of these events on consumer confidence and the performance of the loans held by trust fund.  Any adverse impact resulting from these events would be borne by the holders of one or more classes of the securities.

7

United States military operations also increase the likelihood of shortfalls under the Servicemembers Civil Relief Act or similar state laws (referred to as the "Relief Act" ).  The Relief Act provides relief to borrowers who enter active military service and to borrowers in reserve status who are called to active duty after the origination of their loan.  The Relief Act provides generally that these borrowers may not be charged interest on a loan in excess of 6% per annum during the period of the borrower's active duty.  These shortfalls are not required to be paid by the borrower at any future time and will not be advanced by the servicer, unless otherwise specified in the related prospectus supplement.  To the extent these shortfalls reduce the amount of interest paid to the holders of securities with the benefit of an insurance policy, unless otherwise specified in the related prospectus supplement, they will not be covered by the related insurance policy.  In addition, the Relief Act imposes limitations that would impair the ability of the servicer to foreclose on an affected loan during the borrower's period of active duty status, and, under some circumstances, during an additional period thereafter.

In addition, pursuant to the laws of various states, under certain circumstances, payments on mortgage loans by residents in such states who are called into active duty with the National Guard or the reserves will be deferred.  These state laws may also limit the ability of the servicer to foreclose on the related mortgaged property.  This could result in delays or reductions in payment and increased losses on the mortgage loans which would be borne by the securityholders.

**You Could Be Adversely Affected By Violations Of Environmental Laws**

Federal, state, and local laws and regulations impose a wide range of requirements on activities that may affect the environment, health, and safety.  In certain circumstances, these laws and regulations impose obligations on "owners" or "operators" of residential properties such as those that secure the loans held in the trust fund.  Failure to comply with these laws and regulations can result in fines and penalties that could be assessed against the trust if it were to be considered an "owner" or "operator" of the related property.  A property "owner" or "operator" can also be held liable for the cost of investigating and remediating contamination, regardless of fault, and for personal injury or property damage arising from exposure to contaminants.

In some states, a lien on the property due to contamination has priority over the lien of an existing mortgage.  Also, a mortgage lender may be held liable as an "owner" or "operator" for costs associated with the release of hazardous substances from a site, or petroleum from an underground storage tank under certain circumstances.  If the trust were to be considered the "owner" or "operator" of a property, it will suffer losses as a result of any liability imposed for environmental hazards on the property.

**Ratings Of The Securities Do Not Assure Their Payment**

Any class of securities issued under this prospectus and the accompanying prospectus supplement will be rated in one of the rating categories which signifies investment grade by at least one nationally recognized rating agency.  A rating is based on the adequacy of the value of the trust assets and any credit enhancement for that class, and reflects the rating agency's assessment of how likely it is that holders of the class of securities will receive the payments to which they are entitled.  A rating does not constitute an assessment of how likely it is that principal prepayments on the underlying loans will be made, the degree to which the rate of prepayments might differ from that originally anticipated, or the likelihood that the securities will be redeemed early.  A rating is not a recommendation to purchase, hold, or sell securities because it does not address the market price of the securities or the suitability of the securities for any particular investor.

A rating may not remain in effect for any given period of time and the rating agency could lower or withdraw the rating entirely in the future.  For example, the rating agency could lower or withdraw its rating due to:

- a decrease in the adequacy of the value of the trust assets or any related credit enhancement,

- an adverse change in the financial or other condition of a credit enhancement provider, or

- a change in the rating of the credit enhancement provider's long-term debt.

The amount, type, and nature of credit enhancement established for a class of securities will be determined on the basis of criteria established by each rating agency rating classes of the securities.  These criteria are sometimes based upon an actuarial analysis of the behavior of similar loans in a larger group.  That analysis is often the basis upon which each rating agency determines the amount of credit enhancement required for a class.  The historical data supporting any actuarial analysis may not accurately reflect future experience, and the data derived from a large pool of similar loans may not accurately predict the delinquency, foreclosure, or loss experience of any particular pool of mortgage loans.  Mortgaged properties may not retain their values.  If residential real estate markets experience an overall decline in property values such that the outstanding principal balances of the loans held in a particular trust fund and any secondary financing on the related mortgaged properties become equal to or greater than the value of the mortgaged properties, the rates of delinquencies, foreclosures, and losses could be higher than those now generally experienced in the mortgage lending industry.  In addition, adverse economic conditions may affect timely payment by mortgagors on their loans whether or not the conditions affect real property values and, accordingly, the rates of delinquencies, foreclosures, and losses in any trust fund.  Losses from this that are not covered by a credit enhancement will be borne, at least in part, by the holders of one or more classes of securities.

| | |
|---|---|
| **Book-Entry Registration**<br>*Limit on Liquidity* | Securities issued in book-entry form may have only limited liquidity in the resale market, since investors may be unwilling to purchase securities for which they cannot obtain physical instruments. |
| *Limit on Ability to Transfer or Pledge* | Transactions in book-entry securities can be effected only through The Depository Trust Company, its participating organizations, its indirect participants, and certain banks. Therefore, your ability to transfer or pledge securities issued in book-entry form may be limited. |
| *Delays in Distributions* | You may experience some delay in the receipt of distributions on book-entry securities since the distributions will be forwarded by the trustee to The Depository Trust Company for it to credit the accounts of its participants. In turn, these participants will then credit the distributions to your account either directly or indirectly through indirect participants. |
| **Secondary Market For The Securities May Not Exist** | The related prospectus supplement for each series will specify the classes in which the underwriter intends to make a secondary market, but no underwriter will have any obligation to do so. We can give no assurance that a secondary market for the securities will develop or, if it develops, that it will continue. Consequently, you may not be able to sell your securities readily or at prices that will enable you to realize your desired yield. The market values of the securities are likely to fluctuate. Fluctuations may be significant and could result in significant losses to you. |
| | The secondary markets for mortgage backed securities have experienced periods of illiquidity and can be expected to do so in the future. Illiquidity can have a severely adverse effect on the prices of securities that are especially sensitive to prepayment, credit or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors. |
| **Bankruptcy Or Insolvency May Affect The Timing And Amount Of Distributions On The Securities** | Each seller and the depositor will take steps to structure the transfer of the loans held in the trust fund by the seller to the depositor as a sale. The depositor and the trust fund will take steps to structure the transfer of the loans from the depositor to the trust fund as a sale. If these characterizations are correct, then if the seller were to become bankrupt, the loans would not be part of the seller's bankruptcy estate and would not be available to the seller's creditors. On the other hand, if the seller becomes bankrupt, its bankruptcy trustee or one of its creditors may attempt to recharacterize the sale of the loans as a borrowing by the seller, secured by a pledge of the loans. Presenting this position to a bankruptcy court could prevent timely payments on the securities and even reduce the payments on the securities. Additionally, if that argument is successful, the bankruptcy trustee could elect to sell the loans and pay down the securities early. Thus, you could lose the right to future payments of interest, and might suffer reinvestment losses in a lower interest rate environment. |
| | Similarly, if the characterizations of the transfers as sales are correct, then if the depositor were to become bankrupt, the loans would not be part of the depositor's bankruptcy estate and would not be available to the depositor's creditors. On the other hand, if the depositor becomes bankrupt, its bankruptcy trustee or one of its creditors may attempt to recharacterize the sale of the loans as a borrowing by the depositor, secured by a pledge of the loans. Presenting this position to a bankruptcy |

court could prevent timely payments on the securities and even reduce the payments on the securities.

If the master servicer becomes bankrupt, the bankruptcy trustee may have the power to prevent the appointment of a successor master servicer. Any related delays in servicing could result in increased delinquencies or losses on the loans. The period during which cash collections may be commingled with the master servicer's own funds before each distribution date for securities will be specified in the applicable prospectus supplement. If the master servicer becomes bankrupt and cash collections have been commingled with the master servicer's own funds, the trust fund will likely not have a perfected interest in those collections. In this case the trust might be an unsecured creditor of the master servicer as to the commingled funds and could recover only its share as a general creditor, which might be nothing. Collections that are not commingled but still in an account of the master servicer might also be included in the bankruptcy estate of the master servicer even though the trust may have a perfected security interest in them. Their inclusion in the bankruptcy estate of the master servicer may result in delays in payment and failure to pay amounts due on the securities.

Federal and state statutory provisions affording protection or relief to distressed borrowers may affect the ability of the secured mortgage lender to realize upon its security in other situations as well. For example, in a proceeding under the federal Bankruptcy Code, a lender may not foreclose on a mortgaged property without the permission of the bankruptcy court. And in certain instances a bankruptcy court may allow a borrower to reduce the monthly payments, change the rate of interest, and alter the mortgage loan repayment schedule for under-collateralized mortgage loans. The effect of these types of proceedings can be to cause delays in receiving payments on the loans underlying securities and even to reduce the aggregate amount of payments on the loans underlying securities.

**The Principal Amount Of Securities May Exceed The Market Value Of The Trust Fund Assets**

The market value of the assets relating to a series of securities at any time may be less than the principal amount of the securities of that series then outstanding, plus accrued interest. In the case of a series of notes, after an event of default and a sale of the assets relating to a series of securities, the trustee, the master servicer, the credit enhancer, if any, and any other service provider specified in the related prospectus supplement generally will be entitled to receive the proceeds of that sale to the extent of unpaid fees and other amounts owing to them under the related transaction document prior to distributions to securityholders. Upon any sale of the assets in connection with an event of default, the proceeds may be insufficient to pay in full the principal of and interest on the securities of the related series.

Certain capitalized terms are used in this prospectus to assist you in understanding the terms of the securities. The capitalized terms used in this prospectus are defined on the pages indicated under the caption "Index to Defined Terms" beginning on page 108.

## The Trust Fund

### General

The securities of each series will represent interests in the assets of the related trust fund, and the notes of each series will be secured by the pledge of the assets of the related trust fund.  The trust fund for each series will be held by the trustee for the benefit of the related securityholders.  Each trust fund will consist of the trust fund assets (the "Trust Fund Assets") consisting of:

- a pool comprised of loans as specified in the related prospectus supplement, together with payments relating to those loans as specified in the related prospectus supplement;

- a pool comprised of collections arising from one or more types of loans that would otherwise be eligible to be loans included in a trust fund;

- mortgage pass-through securities (the "Agency Securities") issued or guaranteed by Ginnie Mae, Fannie Mae or Freddie Mac; or

- other mortgage pass-through certificates or collateralized mortgage obligations (the "Non-Agency Mortgage-Backed Securities") evidencing an interest in, or secured by, loans of the type that would otherwise be eligible to be loans included in a trust fund.

The pool will be created on the first day of the month of the issuance of the related series of securities or on another date specified in the related prospectus supplement.  The securities will be entitled to payment from the assets of the related trust fund or funds or other assets pledged for the benefit of the securityholders, as specified in the related prospectus supplement and will not be entitled to payments in respect of the assets of any other trust fund established by the depositor.*

The Trust Fund Assets will be acquired by the depositor, either directly or through affiliates, from originators or sellers which may be affiliates of the depositor (the "Sellers"), and conveyed without recourse by the depositor to the related trust fund.  Loans acquired by the depositor will have been originated in accordance with the underwriting criteria specified below under "Loan Program — Underwriting Standards" or as otherwise described in the related prospectus supplement.  See "Loan Program — Underwriting Standards."

The depositor will cause the Trust Fund Assets to be assigned to the trustee named in the related prospectus supplement for the benefit of the holders of the securities of the related series.  The master servicer named in the related prospectus supplement will service the Trust Fund Assets, either directly or through other servicing institutions called sub-servicers, pursuant to a Pooling and Servicing Agreement (each, a "Pooling and Servicing Agreement") among the depositor, the master servicer and the trustee with respect to a series consisting of certificates, or a sale and servicing agreement (each, a "Sale and Servicing Agreement") between the trustee and the master servicer with respect to a series consisting of certificates and notes, and will receive a fee for these services.  The Pooling and Servicing Agreements and Sale and Servicing Agreements are also referred to as "Master Servicing Agreements") in this prospectus.  See "Loan Program" and "The Agreements." With respect to loans serviced by the master servicer through a sub-servicer, the master servicer will remain liable for its servicing obligations under the related Agreement as if the master servicer alone were servicing those loans.

---

*       Whenever the terms pool, certificates, notes and securities are used in this prospectus, those terms will be considered to apply, unless the context indicates otherwise, to one specific pool and the securities of one series including the certificates representing undivided interests in, and/or notes secured by the assets of, a single trust fund consisting primarily of the loans in that pool.  Similarly, the term "Pass- Through Rate" will refer to the pass-through rate borne by the certificates and the term interest rate will refer to the interest rate borne by the notes of one specific series, as applicable, and the term trust fund will refer to one specific trust fund.

If so specified in the related prospectus supplement, a trust fund relating to a series of securities may be a business trust, statutory trust or common law trust formed under the laws of the state specified in the related prospectus supplement pursuant to a trust agreement (each, a "Trust Agreement") between the depositor and the trustee of the trust fund.

As used herein, "Agreement" means, with respect to a series consisting of certificates, the Pooling and Servicing Agreement, and with respect to a series consisting of certificates and notes, the Trust Agreement, the Indenture and the Sale and Servicing Agreement, as the context requires.

With respect to each trust fund, prior to the initial offering of the related series of securities, the trust fund will have no assets or liabilities.  No trust fund is expected to engage in any activities other than acquiring, managing and holding the related Trust Fund Assets and other assets contemplated herein and specified in the related prospectus supplement and the proceeds thereof, issuing securities and making payments and distributions thereon and certain related activities.  No trust fund is expected to have any source of capital other than its assets and any related credit enhancement.

The applicable prospectus supplement may provide for additional obligations of the depositor, but if it does not, the only obligations of the depositor with respect to a series of securities will be to obtain certain representations and warranties from the sellers and to assign to the trustee for that series of securities the depositor's rights with respect to the representations and warranties. See "The Agreements — Assignment of the Trust Fund Assets." The obligations of the master servicer with respect to the loans will consist principally of its contractual servicing obligations under the related Agreement (including its obligation to enforce the obligations of the sub-servicers or sellers, or both, as more fully described herein under "Loan Program — Representations by Sellers; Repurchases" and "The Agreements — Sub-Servicing By Sellers" and "— Assignment of the Trust Fund Assets") and its obligation, if any, to make certain cash advances in the event of delinquencies in payments on or with respect to the loans in the amounts described herein under "Description of the Securities — Advances." The obligations of the master servicer to make advances may be subject to limitations, to the extent provided herein and in the related prospectus supplement.

The following is a brief description of the assets expected to be included in the trust funds.  If specific information regarding the Trust Fund Assets is not known at the time the related series of securities initially is offered, more general information of the nature described below will be provided in the related prospectus supplement, and specific information will be set forth in a report on Form 8-K to be filed with the Securities and Exchange Commission (the "SEC") after the initial issuance of the related securities (the "Detailed Description").  A copy of the Agreement with respect to each series of securities will be filed on Form 8-K after the initial issuance of the related securities and will be available for inspection at the corporate trust office of the trustee specified in the related prospectus supplement.  A schedule of the loans relating to the series will be attached to the Agreement delivered to the trustee upon delivery of the securities.

**The Loans**

*General.*  Loans will consist of single family loans or multifamily loans.  If so specified, the loans may include cooperative apartment loans ("cooperative loans") secured by security interests in shares issued by private, non-profit, cooperative housing corporations ("cooperatives") and in the related proprietary leases or occupancy agreements granting exclusive rights to occupy specific dwelling units in the cooperatives' buildings.  As more fully described in the related prospectus supplement, the loans may be "conventional" loans or loans that are insured or guaranteed by a governmental agency such as the Federal Housing Administration (the "FHA") or the Department of Veterans' Affairs (the "VA").

The applicable prospectus supplement may specify the day on which monthly payments on the loans in a pool will be due, but if it does not, all of the mortgage loans in a pool will have monthly payments due on the first day of each month.  The payment terms of the loans to be included in a trust fund will be described in the related prospectus supplement and may include any of the following features or combination thereof or other features described in the related prospectus supplement: