**Percent of Initial Class Certificate Balances Outstanding***

| Distribution Date | Class 2-A-4, Class 2-A-13, Class 2-A-14 and Class 2-A-15† Percentage of Related Prepayment Assumption | | | | | Class 2-A-5, Class 2-A-16, Class 2-A-17 and Class 2-A-18† Percentage of Related Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 50% | 100% | 150% | 200% | 0% | 50% | 100% | 150% | 200% |
| Initial ........................................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| January 2008 ................................. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| January 2009 ................................. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| January 2010 ................................. | 100 | 100 | 100 | 98 | 0 | 100 | 100 | 100 | 100 | 0 |
| January 2011 ................................. | 100 | 100 | 100 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| January 2012 ................................. | 100 | 100 | 49 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| January 2013 ................................. | 100 | 100 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| January 2014 ................................. | 100 | 100 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| January 2015 ................................. | 100 | 100 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| January 2016 ................................. | 100 | 100 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| January 2017 ................................. | 100 | 59 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| January 2018 ................................. | 100 | 0 | 0 | 0 | 0 | 100 | 75 | 0 | 0 | 0 |
| January 2019 ................................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| January 2020 ................................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| January 2021 ................................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| January 2022 ................................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| January 2023 ................................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| January 2024 ................................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| January 2025 ................................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| January 2026 ................................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| January 2027 ................................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| January 2028 ................................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| January 2029 ................................. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| January 2030 ................................. | 55 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| January 2031 ................................. | 0 | 0 | 0 | 0 | 0 | 44 | 0 | 0 | 0 | 0 |
| January 2032 ................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| January 2033 ................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| January 2034 ................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| January 2035 ................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| January 2036 ................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| January 2037 ................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)** ................................. | 23.1 | 10.1 | 5.0 | 3.1 | 2.3 | 24.0 | 11.3 | 5.5 | 3.4 | 2.4 |

---

* Rounded to the nearest whole percentage.

** Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

† In the case of the Class 2-A-15 and Class 2-A-18 Certificates, the decrement table indicates the percentage of their respective maximum initial notional amounts outstanding.

**Percent of Initial Class Certificate Balances Outstanding***

| Distribution Date | Class 2-A-6, Class 2-A-7 and Class 2-A-9 Percentage of Related Prepayment Assumption | | | | | Class 2-A-8 Percentage of Related Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 50% | 100% | 150% | 200% | 0% | 50% | 100% | 150% | 200% |
| Initial | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| January 2008 | 97 | 96 | 96 | 96 | 96 | 100 | 91 | 91 | 91 | 91 |
| January 2009 | 95 | 91 | 91 | 91 | 91 | 100 | 82 | 82 | 67 | 26 |
| January 2010 | 92 | 87 | 87 | 87 | 52 | 100 | 73 | 69 | 16 | 0 |
| January 2011 | 89 | 82 | 82 | 59 | 12 | 100 | 64 | 36 | 0 | 0 |
| January 2012 | 86 | 78 | 78 | 26 | 0 | 100 | 56 | 12 | 0 | 0 |
| January 2013 | 82 | 73 | 67 | 9 | 0 | 100 | 47 | 0 | 0 | 0 |
| January 2014 | 78 | 69 | 46 | 1 | 0 | 100 | 38 | 0 | 0 | 0 |
| January 2015 | 74 | 64 | 33 | 0 | 0 | 100 | 29 | 0 | 0 | 0 |
| January 2016 | 70 | 60 | 24 | 0 | 0 | 100 | 20 | 0 | 0 | 0 |
| January 2017 | 66 | 56 | 18 | 0 | 0 | 100 | 13 | 0 | 0 | 0 |
| January 2018 | 61 | 51 | 13 | 0 | 0 | 96 | 6 | 0 | 0 | 0 |
| January 2019 | 57 | 47 | 10 | 0 | 0 | 92 | 0 | 0 | 0 | 0 |
| January 2020 | 52 | 42 | 7 | 0 | 0 | 88 | 0 | 0 | 0 | 0 |
| January 2021 | 48 | 38 | 5 | 0 | 0 | 82 | 0 | 0 | 0 | 0 |
| January 2022 | 44 | 33 | 4 | 0 | 0 | 77 | 0 | 0 | 0 | 0 |
| January 2023 | 39 | 29 | 3 | 0 | 0 | 70 | 0 | 0 | 0 | 0 |
| January 2024 | 35 | 25 | 2 | 0 | 0 | 64 | 0 | 0 | 0 | 0 |
| January 2025 | 30 | 20 | 1 | 0 | 0 | 56 | 0 | 0 | 0 | 0 |
| January 2026 | 26 | 16 | 1 | 0 | 0 | 48 | 0 | 0 | 0 | 0 |
| January 2027 | 21 | 12 | 1 | 0 | 0 | 39 | 0 | 0 | 0 | 0 |
| January 2028 | 17 | 8 | 1 | 0 | 0 | 30 | 0 | 0 | 0 | 0 |
| January 2029 | 12 | 5 | 0 | 0 | 0 | 21 | 0 | 0 | 0 | 0 |
| January 2030 | 8 | 2 | 0 | 0 | 0 | 12 | 0 | 0 | 0 | 0 |
| January 2031 | 4 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 |
| January 2032 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| January 2033 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| January 2034 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| January 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| January 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| January 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)** | 13.4 | 11.4 | 7.2 | 4.2 | 3.0 | 18.3 | 5.7 | 3.4 | 2.3 | 1.7 |

\* Rounded to the nearest whole percentage.

\*\* Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

**Percent of Initial Class Certificate Balances Outstanding\***

| Distribution Date | 2-A-19 Percentage of Related Prepayment Assumption | | | | | Class PO Percentage of Related Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 50% | 100% | 150% | 200% | 0% | 50% | 100% | 150% | 200% |
| Initial ................................. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| January 2008................................. | 100 | 100 | 100 | 100 | 100 | 99 | 92 | 85 | 78 | 71 |
| January 2009................................. | 100 | 100 | 100 | 100 | 100 | 98 | 82 | 67 | 54 | 42 |
| January 2010................................. | 100 | 100 | 100 | 99 | 0 | 98 | 73 | 53 | 37 | 25 |
| January 2011................................. | 100 | 100 | 100 | 0 | 0 | 97 | 65 | 42 | 26 | 15 |
| January 2012................................. | 100 | 100 | 72 | 0 | 0 | 96 | 58 | 33 | 18 | 9 |
| January 2013................................. | 100 | 100 | 0 | 0 | 0 | 95 | 51 | 26 | 12 | 5 |
| January 2014................................. | 100 | 100 | 0 | 0 | 0 | 94 | 46 | 21 | 9 | 3 |
| January 2015................................. | 100 | 100 | 0 | 0 | 0 | 93 | 40 | 16 | 6 | 2 |
| January 2016................................. | 100 | 100 | 0 | 0 | 0 | 91 | 36 | 13 | 4 | 1 |
| January 2017................................. | 100 | 78 | 0 | 0 | 0 | 90 | 32 | 10 | 3 | 1 |
| January 2018................................. | 100 | 35 | 0 | 0 | 0 | 88 | 28 | 8 | 2 | 0 |
| January 2019................................. | 100 | 0 | 0 | 0 | 0 | 85 | 24 | 6 | 1 | 0 |
| January 2020................................. | 100 | 0 | 0 | 0 | 0 | 83 | 21 | 5 | 1 | 0 |
| January 2021................................. | 100 | 0 | 0 | 0 | 0 | 80 | 18 | 4 | 1 | 0 |
| January 2022................................. | 100 | 0 | 0 | 0 | 0 | 77 | 16 | 3 | 0 | 0 |
| January 2023................................. | 100 | 0 | 0 | 0 | 0 | 73 | 14 | 2 | 0 | 0 |
| January 2024................................. | 100 | 0 | 0 | 0 | 0 | 70 | 12 | 2 | 0 | 0 |
| January 2025................................. | 100 | 0 | 0 | 0 | 0 | 66 | 10 | 1 | 0 | 0 |
| January 2026................................. | 100 | 0 | 0 | 0 | 0 | 62 | 9 | 1 | 0 | 0 |
| January 2027................................. | 100 | 0 | 0 | 0 | 0 | 58 | 7 | 1 | 0 | 0 |
| January 2028................................. | 100 | 0 | 0 | 0 | 0 | 54 | 6 | 1 | 0 | 0 |
| January 2029................................. | 100 | 0 | 0 | 0 | 0 | 49 | 5 | 0 | 0 | 0 |
| January 2030................................. | 76 | 0 | 0 | 0 | 0 | 44 | 4 | 0 | 0 | 0 |
| January 2031................................. | 20 | 0 | 0 | 0 | 0 | 39 | 3 | 0 | 0 | 0 |
| January 2032................................. | 0 | 0 | 0 | 0 | 0 | 33 | 2 | 0 | 0 | 0 |
| January 2033................................. | 0 | 0 | 0 | 0 | 0 | 28 | 2 | 0 | 0 | 0 |
| January 2034................................. | 0 | 0 | 0 | 0 | 0 | 21 | 1 | 0 | 0 | 0 |
| January 2035................................. | 0 | 0 | 0 | 0 | 0 | 15 | 1 | 0 | 0 | 0 |
| January 2036................................. | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 |
| January 2037................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)\*\* ................................. | 23.5 | 10.7 | 5.2 | 3.2 | 2.3 | 20.4 | 8.1 | 4.5 | 3.1 | 2.3 |

---

\*   Rounded to the nearest whole percentage.

\*\*   Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

**Percent of Initial Class Certificate Balances Outstanding\***

| | Class A-R Percentage of Related Prepayment Assumption | | | | | Class M-A, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class B-1 and Class B-2 Percentage of Related Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Distribution Date** | **0%** | **50%** | **100%** | **150%** | **200%** | **0%** | **50%** | **100%** | **150%** | **200%** |
| Initial ............................................ | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| January 2008.................................... | 0 | 0 | 0 | 0 | 0 | 99 | 99 | 99 | 99 | 99 |
| January 2009.................................... | 0 | 0 | 0 | 0 | 0 | 99 | 99 | 99 | 99 | 99 |
| January 2010.................................... | 0 | 0 | 0 | 0 | 0 | 98 | 98 | 98 | 98 | 98 |
| January 2011.................................... | 0 | 0 | 0 | 0 | 0 | 97 | 97 | 97 | 97 | 97 |
| January 2012.................................... | 0 | 0 | 0 | 0 | 0 | 97 | 97 | 97 | 97 | 96 |
| January 2013.................................... | 0 | 0 | 0 | 0 | 0 | 96 | 93 | 90 | 86 | 83 |
| January 2014.................................... | 0 | 0 | 0 | 0 | 0 | 95 | 88 | 81 | 74 | 54 |
| January 2015.................................... | 0 | 0 | 0 | 0 | 0 | 94 | 82 | 71 | 60 | 33 |
| January 2016.................................... | 0 | 0 | 0 | 0 | 0 | 93 | 75 | 58 | 45 | 21 |
| January 2017.................................... | 0 | 0 | 0 | 0 | 0 | 92 | 66 | 46 | 32 | 13 |
| January 2018.................................... | 0 | 0 | 0 | 0 | 0 | 90 | 58 | 36 | 23 | 8 |
| January 2019.................................... | 0 | 0 | 0 | 0 | 0 | 87 | 51 | 28 | 16 | 5 |
| January 2020.................................... | 0 | 0 | 0 | 0 | 0 | 85 | 45 | 22 | 11 | 3 |
| January 2021.................................... | 0 | 0 | 0 | 0 | 0 | 82 | 39 | 17 | 8 | 2 |
| January 2022.................................... | 0 | 0 | 0 | 0 | 0 | 79 | 34 | 13 | 5 | 1 |
| January 2023.................................... | 0 | 0 | 0 | 0 | 0 | 76 | 29 | 10 | 4 | 1 |
| January 2024.................................... | 0 | 0 | 0 | 0 | 0 | 72 | 25 | 8 | 3 | 0 |
| January 2025.................................... | 0 | 0 | 0 | 0 | 0 | 69 | 22 | 6 | 2 | 0 |
| January 2026.................................... | 0 | 0 | 0 | 0 | 0 | 65 | 18 | 5 | 1 | 0 |
| January 2027.................................... | 0 | 0 | 0 | 0 | 0 | 61 | 16 | 4 | 1 | 0 |
| January 2028.................................... | 0 | 0 | 0 | 0 | 0 | 56 | 13 | 3 | 1 | 0 |
| January 2029.................................... | 0 | 0 | 0 | 0 | 0 | 51 | 11 | 2 | 0 | 0 |
| January 2030.................................... | 0 | 0 | 0 | 0 | 0 | 46 | 9 | 1 | 0 | 0 |
| January 2031.................................... | 0 | 0 | 0 | 0 | 0 | 41 | 7 | 1 | 0 | 0 |
| January 2032.................................... | 0 | 0 | 0 | 0 | 0 | 35 | 5 | 1 | 0 | 0 |
| January 2033.................................... | 0 | 0 | 0 | 0 | 0 | 29 | 4 | 0 | 0 | 0 |
| January 2034.................................... | 0 | 0 | 0 | 0 | 0 | 22 | 3 | 0 | 0 | 0 |
| January 2035.................................... | 0 | 0 | 0 | 0 | 0 | 15 | 2 | 0 | 0 | 0 |
| January 2036.................................... | 0 | 0 | 0 | 0 | 0 | 8 | 1 | 0 | 0 | 0 |
| January 2037.................................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)\*\* .................................. | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 20.8 | 13.4 | 10.5 | 9.1 | 7.6 |

---

\*    Rounded to the nearest whole percentage.

\*\*   Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

**Last Scheduled Distribution Date**

The Last Scheduled Distribution Date for each class of certificates is the Distribution Date in March 2037, which is the Distribution Date occurring in the month following the month in which the latest stated maturity for any mortgage loan occurs. Since the rate of distributions in reduction of the Class Certificate Balance or notional amount of each class of offered certificates will depend on the rate of payment (including prepayments) of the related mortgage loans, the Class Certificate Balance or notional amount of any class could be reduced to zero significantly earlier or later than the Last Scheduled Distribution Date. The rate of payments on the mortgage loans will depend on their particular characteristics, as well as on prevailing interest rates from time to time and other economic factors, and no assurance can be given as to the actual payment experience of the mortgage loans. See *"Yield, Prepayment and Maturity Considerations — Prepayment Considerations and Risks"* and *"— Weighted Average Lives of the Offered Certificates"* in this prospectus supplement and *"Yield, Maturity and Prepayment Considerations"* in the prospectus.

**The Subordinated Certificates**

The weighted average life of, and the yield to maturity on, the mezzanine certificates and the subordinated certificates, in increasing order of their numerical class designation, will be progressively more sensitive to the rate and timing of mortgagor defaults and the severity of ensuing losses on the mortgage loans in both loan groups. In particular, the rate and timing of mortgagor defaults and the severity of ensuing losses on the mortgage loans may be affected by the characteristics of the mortgage loans included in the mortgage pool as described under *"The Mortgage Pool — General"* and *"— Underwriting Process"* in this prospectus supplement. If the actual rate and severity of losses on the mortgage loans is higher than those assumed by a holder of a mezzanine certificates or subordinated certificate, the actual yield to maturity of the certificate may be lower than the yield expected by the holder based on the holder's assumptions. The timing of losses on mortgage loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of the mortgage pool are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized Losses on the mortgage loans will reduce the Class Certificate Balances of the applicable class of mezzanine certificates or subordinated certificates to the extent of any losses allocated to it (as described under *"Description of the Certificates — Allocation of Losses"* in this prospectus supplement), without the receipt of cash attributable to the reduction. In addition, shortfalls in cash available for distributions on the mezzanine certificates and the subordinated certificates will result in a reduction in the Class Certificate Balance of the class of mezzanine certificates and subordinated certificates then outstanding with the lowest distribution priority if and to the extent that the aggregate of the Class Certificate Balances of all classes of certificates, following all distributions and the allocation of Realized Losses on a Distribution Date, exceeds the pool principal balance as of the Due Date occurring in the month of the Distribution Date (after giving effect to principal prepayments received in the related Prepayment Period). This result may be more likely due to the multiple loan group structure and the provisions requiring Undercollateralized Distributions. As a result of the reductions, less interest will accrue on the class of mezzanine certificates or subordinated certificates than otherwise would be the case. The yield to maturity of the mezzanine certificates and the subordinated certificates will also be affected by the disproportionate allocation of principal prepayments to the senior certificates, Net Interest Shortfalls, other cash shortfalls in Available Funds and distribution of funds to the Class PO Certificates otherwise available for distribution on the mezzanine certificates and the subordinated certificates to the extent of reimbursement for Class PO Deferred Amounts. See *"Description of the Certificates — Allocation of Losses"* in this prospectus supplement.

If on any Distribution Date, the Applicable Credit Support Percentage for the mezzanine certificates or any class of subordinated certificates (other than the mezzanine certificates or the class of subordinated certificates then outstanding with the highest priority of distribution) is less than its Original Applicable Credit Support Percentage, all partial principal prepayments and principal prepayments in full available for distribution on the mezzanine certificates and the subordinated certificates will be allocated solely to the mezzanine certificates and all classes of subordinated certificates with higher distribution priorities than such class, thereby accelerating their amortization relative to that of the Restricted Classes and reducing the weighted average lives of the classes of mezzanine certificates and subordinated certificates receiving the distributions.  Accelerating the amortization of the classes of mezzanine certificates and subordinated certificates with higher distribution priorities relative to the other classes of subordinated certificates is intended to preserve the availability of the subordination provided by the other classes.

## Credit Enhancement

### Subordination

Realized Losses allocable to the senior certificates will be allocated as set forth under *"Description of the Certificates  — Allocation of Losses"* in this prospectus supplement.

The rights of the holders of the mezzanine certificates and the subordinated certificates to receive distributions with respect to the mortgage loans will be subordinated to the rights of the holders of the senior certificates, the rights of the holders of each class of subordinated certificates to receive distributions with respect to the mortgage loans will be subordinated to the rights of the mezzanine certificates, and the rights of the holders of each class of subordinated certificates (other than the Class M-1 Certificates) to receive the distributions will be further subordinated to the rights of the class or classes of subordinated certificates with higher distribution priorities, in each case only to the extent described in this prospectus supplement. The subordination of the mezzanine certificates and the subordinated certificates to the senior certificates, the subordination of the classes of subordinated certificates to the mezzanine certificates, and the subordination of the classes of subordinated certificates to the subordination of the classes of subordinated certificates with lower distribution priorities to those with higher distribution priorities is intended to increase the likelihood of receipt, respectively, by the senior certificateholders and the holders of mezzanine certificates and subordinated certificates with higher distribution priorities of the maximum amount to which they are entitled on any Distribution Date and to provide the holders protection against Realized Losses. The applicable Non-PO Percentage of Realized Losses will be allocated to the class of mezzanine certificates and subordinated certificates then outstanding with the lowest distribution priority.  In addition, the Class Certificate Balance of the class of mezzanine certificates or subordinated certificates with the lowest distribution priority will be reduced by the amount of distributions on the Class PO Certificates in reimbursement for Class PO Deferred Amounts.

## Use of Proceeds

We expect the proceeds to the depositor from the sale of the offered certificates (other than the Class PO and Class X Certificates) to be approximately $490,929,996, plus accrued interest, before deducting issuance expenses payable by the depositor. The depositor will apply the net proceeds from the sale of these classes of certificates against the purchase price of the mortgage loans.

## Legal Proceedings

There are no legal proceedings against Countrywide Home Loans, the depositor, the trustee, the issuing entity or the master servicer, or to which any of their respective properties are

subject, that is material to the certificateholders, nor is the depositor aware of any proceedings of this type contemplated by governmental authorities.

## Material Federal Income Tax Consequences

The following discussion and the discussion in the prospectus under the caption *"Material Federal Income Tax Consequences"* is the opinion of Sidley Austin LLP ("Tax Counsel") on the anticipated material federal income tax consequences of the purchase, ownership, and disposition of the offered certificates. It is based on the current provisions and interpretations of the Internal Revenue Code of 1986, as amended (the "Code") and the accompanying Treasury regulations and on current judicial and administrative rulings. All of these authorities are subject to change and any change can apply retroactively.

For federal income tax purposes, the issuing entity (exclusive of the Corridor Contract and the Corridor Contract Reserve Fund) will consist of one or more REMICs in a tiered structure. The highest REMIC will be referred to as the "Master REMIC," and each REMIC below the Master REMIC (if any) will be referred to as an "underlying REMIC." Each underlying REMIC (if any) will issue multiple classes of uncertificated, regular interests (the "underlying REMIC Regular Interests") that will be held by another REMIC above it in the tiered structure. The assets of the lowest underlying REMIC (or the Master REMIC if there is no underlying REMIC) will consist of the mortgage loans and any other assets designated in the pooling and servicing agreement. Upon closing, the Master REMIC will issue a residual interest (the "Master REMIC Residual Interest") and several classes of uncertificated regular interests (the "Master REMIC Regular Interests"), all of which will be held in trust (the "ES Trust"). The ES Trust will not constitute any part of any REMIC created under the pooling and servicing agreement. Aggregate distributions on the underlying REMIC Regular Interests held by the Master REMIC (if any) will equal the aggregate distributions on the uncertificated Master REMIC Regular Interests held by the ES Trust. The supplemental interest trust, Corridor Contract and Corridor Contract Reserve Fund will not constitute any part of any REMIC described in the pooling and servicing agreement.

For United States federal income tax purposes, the ES Trust will be classified as a trust (the "ES Trust"). All of the senior and subordinated certificates (the "Regular Certificates") will represent beneficial ownership of one or more of the uncertificated Master REMIC Regular Interests held by the ES Trust. Under Section 671 of the Code, the Holders of the Regular Certificates (including the Depositable Certificates and, after they have been received in return for Depositable Certificates, the Exchangeable Certificates) will be treated as owning the uncertificated Master REMIC Regular Interests that underlie their Regular Certificates.

The Class 2-A-1 Certificates (hereafter, the "Benefited Regular Certificates"), in addition to representing beneficial ownership of Master REMIC Regular Interests will also represent entitlements to receive payments of Yield Supplement Amounts. Holders of Benefited Regular Certificates must allocate the purchase price for their Benefited Regular Certificates between the REMIC Regular Interest component and the Yield Supplement component. The Class A-R Certificates (also, the "Residual Certificates") will represent the Master REMIC Residual Interest and beneficial ownership of the residual interest in each of any underlying REMIC.

To facilitate the exchange of the Depositable Certificates for the Exchangeable Certificates, the uncertificated Master REMIC Regular Interests that underlie a Depositable Certificate will consist of the individual components into which the Depositable Certificate may be severed whether or not the Depositable Certificate is ever exchanged for an Exchangeable Certificate. Consequently, the uncertificated Master REMIC Regular Interests that underlie a Depositable Certificate may consist of one or more principal-only REMIC Regular Interests, interest-only REMIC Regular Interests and principal and interest REMIC Regular Interests or any

combination of the foregoing.    Similarly, the uncertificated Master REMIC Regular Interests that underlie an Exchangeable Certificate may consist of one or more principal-only REMIC Regular Interests, interest-only REMIC Regular Interests and principal and interest REMIC Regular Interests or any combination of the foregoing.  The remaining discussion assumes that Depositable Certificates and Exchangeable Certificates will be equivalent, for tax purposes, to direct ownership of the components they represent.  For the federal income tax treatment of relinquishing Depositable Certificates in return for Exchangeable Certificates, see the discussion under the heading "*Depositable and Exchangeable Certificates*" below.

Upon the issuance of the Certificates, Tax Counsel will deliver its opinion concluding, assuming compliance with the pooling and servicing agreement, for federal income tax purposes, that each REMIC described in the pooling and servicing agreement will qualify as a REMIC within the meaning of Section 860D of the Code, and that the Regular Certificates will represent interests in regular interests in a REMIC.  Moreover, Tax Counsel will deliver an opinion concluding that the interests of the holders of the Benefited Regular Certificates with respect to Yield Supplement Amounts will represent, for federal income tax purposes, contractual rights coupled with regular interests within the meaning of Treasury regulations §1.860G-2(i).

**Taxation of the Regular Certificates and the REMIC Regular Interest Components of the Benefited Regular Certificates**

All classes of the Regular Certificates (and the REMIC Regular Interest components of the Benefited Regular Certificates) will be treated as one or more debt instruments issued by the Master REMIC for federal income tax purposes.  Income on the Regular Certificates (and the REMIC Regular Interest components of the Benefited Regular Certificates) must be reported under an accrual method of accounting.  Under an accrual method of accounting, interest income may be required to be included in a holder's gross income in advance of the holder's actual receipt of that interest income.

Each Class PO Certificate (and any underlying principal-only component of a Depositable or Exchangeable Certificate) will be treated for federal income tax purposes as having been issued with an amount of Original Issue Discount ("OID") equal to the difference between its principal balance and its issue price.  Although the tax treatment is not entirely certain, each notional amount certificate (and any underlying interest-only component of a Depositable or Exchangeable Certificate) will be treated as having been issued with OID in an amount equal to the excess of (1) the sum of all expected payments on the certificate determined under the applicable prepayment assumption over (2) the price at which the certificate was issued.  Although unclear, a holder of a notional amount certificate (or interest-only component) may be entitled to deduct loss to the extent that its remaining basis in the certificate (or such component) exceeds the maximum amount of future payments to which the certificate (or component) would be entitled if there were no further prepayments on the mortgage loans.  Certain other classes of Regular Certificates (or components, including the REMIC Regular Interest components of the Benefited Regular Certificates) may also be treated as having been issued with OID.  For purposes of determining the amount and rate of accrual of OID and market discount, the issuing entity intends to assume that there will be prepayments on the mortgage loans at a rate equal to 100% of the Prepayment Assumption. No representation is made that the mortgage loans will prepay at the foregoing rate or any other rate. See "*Yield, Prepayment and Maturity Considerations*" and "*Material Federal Income Tax Consequences*" in the prospectus. Computing accruals of OID in the manner described in the prospectus may (depending on the actual rate of prepayments during the accrual period) result in the accrual of negative amounts of OID on the certificates issued with OID in an accrual period. Holders will be entitled to offset negative accruals of OID only against future OID accruals on their certificates.

If the holders of any Regular Certificates (or REMIC Regular Interest components of the Benefited Regular Certificates) are treated as acquiring their certificates (or components) at a premium, the holders are encouraged to consult their tax advisors regarding the election to amortize bond premium and the method to be employed.  See *"Material Federal Income Tax Consequences — REMIC Certificates — a. Regular Certificates"* in the prospectus.

**Disposition of Regular Certificates and REMIC Regular Interest Components of Benefited Regular Certificates**

Assuming that the Regular Certificates are held as "capital assets" within the meaning of Section 1221 of the Code, gain or loss on the disposition of the Certificates (and gain or loss on the disposition of the REMIC Regular Interest component of a Benefited Regular Certificate) should result in capital gain or loss.  Such gain, however, will be treated as ordinary income, to the extent it does not exceed the excess (if any) of:

(1)      the amount that would have been includible in the holder's gross income with respect to the Regular Certificate (or REMIC Regular Interest component) had income thereon accrued at a rate equal to 110% of the applicable federal rate as defined in Section 1274(d) of the Code determined as of the date of purchase of the Certificate

over

(2)      the amount actually included in such holder's income.

**Tax Treatment For Certain Purposes**

As described more fully under *"Material Federal Income Tax Consequences"* in the prospectus, the  Regular Certificates (and the REMIC Regular Interest components of the Benefited Regular Certificates) will represent "real estate assets" under Section 856(c)(5)(B) of the Code and qualifying assets under Section 7701(a)(19)(C) of the Code in the same (or greater) proportion that the assets of the issuing entity will be so treated, and income on the Regular Certificates (and the REMIC Regular Interest components of the Benefited Regular Certificates) will represent "interest on obligations secured by mortgages on real property or on interests in real property" under Section 856(c)(3)(B) of the Code in the same (or greater) proportion that the income on the assets of the issuing entity will be so treated.  The Regular Certificates (and the REMIC Regular Interest components of the Benefited Regular Certificates but not the Yield Supplement components) will represent qualifying assets under Section 860G(a)(3) of the Code if acquired by a REMIC within the prescribed time periods of the Code.

**Yield Supplement Amounts**

The following discussions assume that the rights of the holders of the Benefited Regular Certificates with respect to Yield Supplement Amounts will be treated as rights under a notional principal contract rather than as interests in a partnership for federal income tax purposes. If these rights were treated as representing interests in an entity taxable as a partnership for federal income tax purposes, then there could be different tax timing consequences to all such certificateholders and different withholding tax consequences on payments to certificateholders who are non-U.S. Persons.  Prospective investors in the Benefited Regular Certificates are encouraged to consult their tax advisors regarding their appropriate tax treatment.

**The Rights of the Benefited Regular Certificates With Respect to Yield Supplement Amounts**

For tax information reporting purposes, the trustee (1) will treat the Yield Supplement Amounts rights of the Benefited Regular Certificates as rights to receive payments under a

notional principal contract (specifically, an interest rate corridor contract) and (2) anticipates assuming that these rights will have an insubstantial value relative to the value of the Regular Interest components of the Benefited Regular Certificates. The IRS could, however, successfully argue that the Yield Supplement components of the Benefited Regular Certificates have a greater value. Similarly, the trustee could determine that the Yield Supplement components of the Benefited Regular Certificates have a greater value. In either case, the REMIC Regular Interest components of the Benefited Regular Certificates could be viewed as having been issued with either additional amounts of OID (which could cause the total amount of discount to exceed a statutorily defined de minimis amount) or with less premium (which would reduce the amount of premium available to be used as an offset against interest income). See *"Material Federal Income Tax Consequences — Taxation of the REMIC and Its Holders"* and *"— Taxation of the REMIC"* in the prospectus. In addition, the Yield Supplement components could be viewed as having been purchased at a higher cost. These changes could affect the timing and amount of income and deductions on the REMIC Regular Interest components and Yield Supplement components.

The portion of the overall purchase price of a Benefited Regular Certificate attributable to the Yield Supplement component must be amortized over the life of the Certificate, taking into account the declining balance of the related REMIC Regular Interest component. Treasury regulations concerning notional principal contracts provide alternative methods for amortizing the purchase price of a notional principal contract. Under one method — the level yield constant interest method — the price paid for the Yield Supplement component would be amortized over the life of the Yield Supplement component as though it were the principal amount of a loan bearing interest at a reasonable rate. Holders are urged to consult their tax advisors concerning the methods that can be employed to amortize the portion of the purchase price paid for the Yield Supplement component of a Benefited Regular Certificate.

Any payments received by a holder of a Benefited Regular Certificate as Yield Supplement Amounts will be treated as periodic payments received under a notional principal contract. For any taxable year, to the extent the sum of the periodic payments received exceeds the amortization of the purchase price of the Yield Supplement component, such excess will be ordinary income. Conversely, to the extent the amortization of the purchase price exceeds the periodic payments, such excess will be allowable as an ordinary deduction. In the case of an individual, such deduction will be subject to the 2-percent floor imposed on miscellaneous itemized deductions under Section 67 of the Code and may be subject to the overall limitation on itemized deductions imposed under Section 68 of the Code. In addition, miscellaneous itemized deductions are not allowed for purposes of computing the alternative minimum tax.

**Dispositions of the Yield Supplement Component**

Upon the sale, exchange, or other disposition of a Benefited Regular Certificate, the Benefited Regular Certificateholder must allocate the amount realized between the Regular Interest component and the Yield Supplement component based on the relative fair market values of those components at the time of sale. Assuming a Benefited Regular Certificate is held as a "capital asset" within the meaning of Section 1221 of the Code, any gain or loss on the disposition of the Yield Supplement component should be capital gain or loss.

**Tax Treatment For Certain Purposes**

The Yield Supplement components of the Benefited Regular Certificates will not qualify as assets described in Section 7701(a)(19)(C) of the Code or as real estate assets under Section 856(c)(5)(B) of the Code. In addition, because of the Yield Supplement component, holders of the Benefited Regular Certificates are encouraged to consult with their tax advisors before resecuritizing those Certificates in a REMIC.

**Depositable and Exchangeable Certificates**

The uncertificated Master REMIC Regular Interests that underlie each Depositable Certificate or Exchangeable Certificate will be accounted for separately and will have the same tax consequences to the holder of the Depositable and Exchangeable Certificates as if such uncertificated Master REMIC Regular Interests were held separately outside the ES Trust.

In the case of a cash purchase of a Depositable Certificate or Exchangeable Certificate, if the Depositable Certificate or Exchangeable Certificate represents more than one underlying uncertificated Master REMIC Regular Interest, then the purchaser will have to establish its basis in each of the underlying uncertificated Master REMIC Regular Interests by allocating the cost of the Depositable Certificate or Exchangeable Certificate among the underlying uncertificated Master REMIC Regular Interests based on their relative fair market values as determined at the time the Depositable Certificate or Exchangeable Certificate is purchased.  Similarly, in the case of the cash sale of a Depositable Certificate or Exchangeable Certificate, if the Depositable Certificate or Exchangeable Certificate represents more than one underlying uncertificated Master REMIC Regular Interest, then the seller will have to establish the amount realized for each of the underlying uncertificated Master REMIC Regular Interests by allocating the sales price of the Depositable Certificate or Exchangeable Certificate among the uncertificated Master REMIC Regular Interests based on their relative fair market values as determined at the time the Depositable Certificate or Exchangeable Certificate is sold.

No gain or loss will be realized upon exchanging one or more Depositable Certificates for one or more Exchangeable Certificates.  Regardless of the value of the Exchangeable Certificate received, immediately after the exchange, each uncertificated Master REMIC Regular Interest underlying the Exchangeable Certificate (and formerly represented by one or more relinquished Depositable Certificates) will have the same basis as it did immediately before the exchange and will continue to be accounted for separately (that is, each uncertificated Master REMIC Regular Interest underlying an Exchangeable Certificate will continue to have a separate basis for federal income tax purposes, based on its acquisition cost, adjusted as necessary for accruals of discount and premium and payments with respect to that particular uncertificated Master REMIC Regular Interest).

No gain or loss will be realized upon exchanging one or more Exchangeable Certificate for one or more Depositable Certificates.  Regardless of the value of the Depositable Certificates received, immediately after the exchange, each uncertificated Master REMIC Regular Interest underlying the Depositable Certificates (and formerly represented by the relinquished Exchangeable Certificate) will have the same basis as it did immediately before the exchange and will continue to be accounted for separately (that is, each uncertificated Master REMIC Regular Interest underlying a Depositable Certificate will continue to have a separate basis for federal income tax purposes, based on its acquisition cost, adjusted as necessary for accruals of discount and premium and payments with respect to that particular uncertificated Master REMIC Regular Interest).

**Residual Certificates**

The holders of the Residual Certificates must include the taxable income of each underlying REMIC, if any, and the Master REMIC in their federal taxable income. The resulting tax liability of the holders may exceed cash distributions to them during certain periods. All or a portion of the taxable income from a Residual Certificate recognized by a holder may be treated as "excess inclusion" income, which, with limited exceptions, cannot be reduced by deductions (including net operating losses) and in all cases, is subject to U.S. federal income tax.

In computing alternative minimum taxable income, the special rule providing that taxable income cannot be less than the sum of the taxpayer's excess inclusions for the year does not

apply. However, a taxpayer's alternative minimum taxable income cannot be less than the sum of the taxpayer's excess inclusions for the year. In addition, the amount of any alternative minimum tax net operating loss is determined without regard to any excess inclusions.

Effective August 1, 2006, temporary regulations issued by the Internal Revenue Service (the "Temporary regulations") have modified the general rule that excess inclusions from a REMIC residual interest are not includible in the income of a foreign person (or subject to withholding tax) until paid or distributed.  The new regulations accelerate the time both for reporting, and tax withholding on, excess inclusions allocated to the foreign equity holders of partnerships and certain other pass-through entities.  The new rules also provide that excess inclusions are United States sourced income.  The timing rules apply to a particular REMIC residual interest and a particular foreign person, if the first allocation of income from the residual interest to the foreign person occurs after July 31, 2006.  The source rules apply for taxable years ending after August 1, 2006.

Under the Temporary regulations, in the case of REMIC residual interests held by a foreign person through a partnership, the amount of excess inclusion income allocated to the foreign partner is deemed to be received by the foreign partner on the last day of the partnership's taxable year except to the extent that the excess inclusion was required to be taken into account by the foreign partner at an earlier time under Section 860G(b) of the Code as a result of a distribution by the partnership to the foreign partner or a disposition in whole or in part of the foreign partner's indirect interest in the REMIC residual interest. A disposition in whole or in part of the foreign partner's indirect interest in the REMIC residual interest may occur as a result of a termination of the REMIC, a disposition of the partnership's residual interest in the REMIC, a disposition of the foreign partner's interest in the partnership, or any other reduction in the foreign partner's allocable share of the portion of the REMIC net income or deduction allocated to the partnership.

Similarly, in the case of a REMIC residual interest held by a foreign person as a shareholder of a real estate investment trust or regulated investment company, as a participant in a common trust fund or as a patron in an organization subject to part I of subchapter T (cooperatives), the amount of excess inclusion allocated to the foreign person must be taken into income at the same time that other income from the trust, company, fund, or organization would be taken into account.

Under the Temporary regulations, excess inclusions allocated to a foreign person (whether as a partner or holder of an interest in a pass-through entity) are expressly made subject to withholding tax.  In addition, in the case of excess inclusions allocable to a foreign person as a partner, the Temporary regulations eliminate an important exception to the withholding requirements under which a withholding agent unrelated to a payee is obligated to withhold on a payment only to the extent that the withholding agent has control over the payee's money or property and knows the facts giving rise to the payment.

**Purchasers of a Residual Certificate (that is, one of the Class A-R Certificates) are encouraged to consider carefully the tax consequences of an investment in Residual Certificates discussed in the prospectus and consult their tax advisors with respect to those consequences.**  See *"Material Federal Income Tax Consequences — Taxation of Holders of Residual Interests — Excess Inclusions"* in the prospectus. In particular, prospective holders of Residual Certificates are encouraged to consult their tax advisors regarding whether a Residual Certificate will be treated as a "noneconomic" residual interest, as a "tax avoidance potential" residual interest or as both. Among other things, holders of Noneconomic Residual Certificates should be aware of REMIC regulations that govern the treatment of "inducement fees" and that may affect their ability to transfer their Residual Certificates. See *Material Federal Income Tax Consequences —Taxation of the REMIC and Its Holders," "—Taxation of Holders of Residual*

*Interests — Restrictions on Ownership and Transfer of Residual Interests,*" and "*— Tax Treatment of Foreign Investors,*" "*Material Federal Income Tax Consequences — Taxation of Holders of Residual Interests — Mark to Market Rules,*" "*— Excess Inclusions*" and "*— Treatment of Inducement Fees*" and "*— Foreign Investors*" in the prospectus.

Additionally, for information regarding Prohibited Transactions and Treatment of Realized Losses, see "*Material Federal Income Tax Consequences — Taxation of the REMIC— Prohibited Transactions and Contributions Tax*" in the prospectus.

As a result of the Economic Growth and Tax Relief Reconciliation Act of 2001 (the "2001 Act"), limitations imposed by Section 68 of the Code on claiming itemized deductions will be phased-out commencing in 2006, which will affect individuals holding Residual Certificates. In addition, as a result of the Jobs and Growth Tax Relief Reconciliation Act of 2003 (the "2003 Act"), the backup withholding rate has been reduced to 28%. Unless they are amended, these provisions of the 2001 Act and the 2003 Act will no longer apply for taxable years beginning after December 31, 2010. See "*Material Federal Income Tax Consequences*" in the prospectus. Investors are encouraged to consult their tax advisors with respect to both statutes.

## Other Taxes

No representations are made regarding the tax consequences of the purchase, ownership or disposition of the certificates under any state, local or foreign tax law.

**All investors are encouraged to consult their tax advisors regarding the federal, state, local or foreign tax consequences of purchasing, owning or disposing of the certificates.**

## ERISA Considerations

Any fiduciary of an employee benefit plan or other plan or arrangement (such as an individual retirement account or Keogh plan) that is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or to Section 4975 of the Code (a "Plan"), that proposes to cause the Plan to acquire any of the offered certificates (directly or indirectly through investment by an entity or account holding assets of the Plan) is encouraged to consult with its counsel with respect to the potential consequences of the Plan's acquisition and ownership of the certificates under ERISA and Section 4975 of the Code. See "*ERISA Considerations*" in the prospectus. Section 406 of ERISA prohibits "parties in interest" with respect to an employee benefit plan subject to ERISA from engaging in various different types of transactions involving the Plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes excise taxes on prohibited transactions involving "disqualified persons" and Plans described under that Section. ERISA authorizes the imposition of civil penalties for prohibited transactions involving Plans not subject to the requirements of Section 4975 of the Code.

Some employee benefit plans, including governmental plans and some church plans, are not subject to ERISA's requirements. Accordingly, assets of those plans may be invested in the offered certificates without regard to the ERISA considerations described in this prospectus supplement and in the prospectus, subject to the provisions of other applicable federal and state law. Any of those plans that is qualified and exempt from taxation under Sections 401(a) and 501(a) of the Code may be subject to the prohibited transaction rules set forth in Section 503 of the Code.

Investments by Plans or with assets of Plans that are subject to ERISA must satisfy ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a Plan's investments be made in accordance with the

documents governing the Plan. A fiduciary that decides to invest the assets of a Plan in the offered certificates should consider, among other factors, the extreme sensitivity of the investment to the rate of principal payments (including prepayments) on the mortgage loans. It is anticipated that the certificates will constitute "equity interests" in the issuing entity and, in the case of the Class 2-A-1 Certificates, in the supplemental interest trust, for the purpose of the Plan Assets Regulation.

The U.S. Department of Labor has granted to the underwriter an administrative exemption (the "Exemption") from some of the prohibited transaction rules of ERISA and the related excise tax provisions of Section 4975 of the Code with respect to the initial purchase, the holding and the subsequent resale by Plans of securities, including certificates, in pass-through trusts that consist of specified receivables, loans and other obligations that meet the conditions and requirements of the Exemption. The Exemption applies to mortgage loans such as the mortgage loans in the issuing entity. The Exemption extends exemptive relief to certificates, including subordinated certificates, rated in the four highest generic rating categories in certain designated transactions when the conditions of the Exemption, including the requirement that an investing Plan be an "accredited investor" as defined in Rule 501(a)(1) of Regulation D under the Securities Act of 1933, as amended, are met.

For a general description of the Exemption and the conditions that must be satisfied for the Exemption to apply, see *"ERISA Considerations"* in the prospectus.

Except as provided below with regard to the supplemental interest trust, it is expected that the Exemption will apply to the acquisition and holding by Plans of the offered certificates (other than the Class PO, Class 1-X, Class 2-X and Class A-R Certificates) and that all conditions of the Exemption other than those within the control of the investors will be met. In addition, as of the date hereof, there is no single mortgagor that is the obligor on five percent (5%) of the mortgage loans included in the issuing entity by aggregate unamortized principal balance of the assets of the issuing entity.

The rating of a certificate may change. If a class of certificates no longer has a rating of at least BBB- (or its equivalent) from at least one of S&P, Fitch, or Moody's, certificates of that class will no longer be eligible for relief under the Exemption (although a Plan that had purchased the certificate when it had an investment-grade rating would not be required by the Exemption to dispose of it).

**Because the Class PO, Class 1-X and Class 2-X Certificates are not being purchased by any underwriter to whom an exemption similar to the Exemption has been granted, the Class PO, Class 1-X and Class 2-X Certificates do not currently meet the requirements of the Exemption or any comparable individual administrative exemption granted to any underwriter. Consequently, the Class PO, Class 1-X and Class 2-X Certificates may be transferred only if the conditions in the first or third bullet points in the next paragraph are met.**

**Because the characteristics of the Class A-R Certificates may not meet the requirements of the Exemption, or any other issued exemption under ERISA, a Plan may have engaged in a prohibited transaction giving rise to excise taxes or civil penalties if it purchases and holds Class A-R Certificates. Consequently, transfers of the Class A-R Certificates (and of certificates of any class that, because of a change of rating, no longer satisfy the rating requirement of the Exemption) will not be registered by the trustee unless the trustee receives:**

- **a representation from the transferee of the certificate, acceptable to and in form and substance satisfactory to the trustee, that the transferee is not a Plan, or a person acting on behalf of a Plan or using a Plan's assets to effect the transfer;**

- **a representation that the transferee is an insurance company which is purchasing the certificate with funds contained in an "insurance company general account" (as defined in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE 95-60") ) and that the purchase and holding of the certificate satisfy the requirements for exemptive relief under Sections I and III of PTCE 95-60; or**

- **an opinion of counsel satisfactory to the trustee that the purchase and holding of the certificate by a Plan, or a person acting on behalf of a Plan or using a Plan's assets, will not result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the trustee or the master servicer to any obligation in addition to those undertaken in the pooling and servicing agreement.**

**The first representation will be deemed to have been made by the transferee's acceptance of a Class PO, Class 1-X or Class 2-X Certificate. If the representation is not true, or any attempt to transfer to a Plan or person acting on behalf of a Plan or using a Plan's assets is initiated without the required opinion of counsel, the attempted transfer or acquisition shall be void.**

Prospective Plan investors are encouraged to consult with their legal advisors concerning the impact of ERISA and the Code, the effect of the Plan Assets Regulation and the applicability of the Exemption described in the prospectus, and the potential consequences in their specific circumstances, before making an investment in any of the offered certificates. Moreover, each Plan fiduciary is encouraged to determine whether, under the general fiduciary standards of investment prudence and diversification, an investment in any of the offered certificates is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio.

The sale of certificates to a Plan is in no respect a representation by the issuing entity or any underwriter of the certificates that this investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that this investment is appropriate for Plans generally or any particular Plan.

**ERISA Considerations With Respect to the Corridor Contract**

For so long as the holder of a Class 2-A-1 Certificate is entitled to receive payments under the Corridor Contract from the supplemental interest trust, any person purchasing a Class 2-A-1 Certificate otherwise eligible for purchase by Plans under the Exemption will be deemed to have acquired for purposes of ERISA and Section 4975 of the Code two assets: the right to receive payments from the issuing entity with respect to such Certificate without taking into account the right to receive payments from the supplemental interest trust, together with the right to receive payments from the supplemental interest trust. The Exemption may not apply to the acquisition, holding or resale of the right to receive payments from the supplemental interest trust by a Plan. The right to receive such payments could also result in a prohibited transaction if the Corridor Contract Counterparty is a party in interest with respect to such Plan, unless another administrative exemption is available.

Accordingly, no Plan or other person using assets of a Plan may acquire or hold a Class 2-A-1 Certificate otherwise eligible for the Exemption before the termination of the Corridor

Contract, unless such acquisition or holding is eligible for the exemptive relief available under Department of Labor Prohibited Transaction Class Exemption 84-14 (for transactions by independent "qualified professional asset managers"), 91-38 (for transactions by bank collective investment funds), 90-1 (for transactions by insurance company pooled separate accounts), 95-60 (for transactions by insurance company general accounts), 96-23 (for transactions effected by "in-house asset managers") or the service provider exemption provided by Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code.  Plan fiduciaries should consult their legal counsel concerning this issue. Each beneficial owner of a Class 2-A-1 Certificate or any interest therein, shall be deemed to have represented, by virtue of its acquisition or holding of the Class 2-A-1 Certificate, or interest therein, that either (i) it is not a Plan or (ii) the acquisition and holding of such Certificate are eligible for the exemptive relief available under one of the five prohibited transaction class exemptions or the statutory exemption as required immediately above.

If any Class 2-A-1 Certificate, or any interest therein, is acquired or held in violation of the provisions of the preceding paragraph, the next preceding permitted beneficial owner will be treated as the beneficial owner of that Class 2-A-1 Certificate, retroactive to the date of transfer to the purported beneficial owner. Any purported beneficial owner whose acquisition or holding of a Class 2-A-1 Certificate, or interest therein, was effected in violation of the provisions of the preceding paragraph shall indemnify to the extent permitted by law and hold harmless the trustee, the depositor, the sellers and the master servicer from and against any and all liabilities, claims, costs or expenses incurred by such parties as a result of such acquisition or holding.

## Method of Distribution

Subject to the terms and conditions set forth in the underwriting agreement among the depositor, Countrywide Securities Corporation, an affiliate of the depositor, the sellers and the master servicer ("CSC", or the "underwriter"), the depositor has agreed to sell to CSC and CSC has agreed to purchase from the depositor the Class A, Class M-A, Class M, Class B-1 and Class B-2 Certificates (the "Underwritten Certificates").

Distribution of the Underwritten Certificates will be made by the underwriter from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. The underwriter may effect such transactions by selling the Underwritten Certificates to or through dealers and such dealers may receive from the underwriter, for which it acts as agent, compensation in the form of underwriting discounts, concessions or commissions. The underwriter and any dealers that participate with the underwriter in the distribution of the Underwritten Certificates may be deemed to be underwriters, and any discounts, commissions or concessions received by them, and any profits on resale of the Underwritten Certificates purchased by them, may be deemed to be underwriting discounts and commissions under the Securities Act of 1933, as amended.

The depositor has been advised by the underwriter that it intends to make a market in the Underwritten Certificates purchased by it but no underwriter has any obligation to do so. There can be no assurance that a secondary market for the Underwritten Certificates will develop or, if it does develop, that it will continue or that it will provide certificateholders with a sufficient level of liquidity of investment.

The depositor has agreed to indemnify the underwriter against, or make contributions to the underwriter with respect to, liabilities, customarily indemnified against, including liabilities under the Securities Act of 1933, as amended.

From time to time, the underwriter or their affiliates may perform investment banking and advisory services for, and may provide general financing and banking services to, affiliates of the depositor.

The Class PO, Class 1-X and Class 2-X Certificates may be offered by Countrywide Home Loans or the depositor from time to time directly or through underwriters or agents (either of which may include CSC) in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale, in one or more separate transactions at prices to be negotiated at the time of each sale. Any underwriters or agents that participate in the distribution of the Class PO, Class 1-X and Class 2-X Certificates may be deemed to be "underwriters" within the meaning of the Securities Act of 1933 and any profit on the sale of those certificates by them and any discounts, commissions, concessions or other compensation received by any of them may be deemed to be underwriting discounts and commissions under the Securities Act.

## Legal Matters

The validity of the certificates, including their material federal income tax consequences, will be passed upon for the depositor by Sidley Austin LLP, New York, New York. Certain legal matters will be passed upon for the underwriter by McKee Nelson LLP.

## Ratings

It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement. The depositor has requested that Fitch Ratings ("Fitch"), Standard & Poor's, a division of the McGraw Hill Companies, Inc. ("S&P") and Moody's Investors Service, Inc. ("Moody's") maintain ongoing surveillance of the ratings assigned to the offered certificates in accordance with their respective policies, but we cannot assure you that Fitch, S&P or Moody's will continue its surveillance of the ratings assigned to the offered certificates.

The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates. The rating assigned by S&P to the notional amount certificates does not address whether investors will recoup their initial investment. The rating assigned by S&P to the Class PO Certificates only addresses the return of its Class Certificate Balance. The rating assigned by S&P to the Class A-R Certificates only addresses the return of its Class Certificate Balance and interest thereon at its pass-through rate. The rating assigned by S&P to the Class 2-A-1 Certificates does not address the likelihood of any payments made pursuant to the Corridor Contract.

The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Fitch's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates. The rating assigned by Fitch to the notional amount certificates does not address whether investors will recoup their initial investment. The rating assigned by Fitch to the Class PO Certificates only addresses the return of its Class Certificate Balance. The rating assigned by Fitch to the Class A-R Certificates only addresses the return of its Class Certificate Balance and interest thereon at its pass-through rate. The rating assigned by Fitch to the Class 2-A-1 Certificates does not address the likelihood of any payments made pursuant to the Corridor Contract.

The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which the certificates are issued. Moody's ratings take into

consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates.  The rating assigned by Moody's to the notional amount certificates does not address whether investors will recoup their initial investment. The rating assigned by Moody's to the Class PO Certificates only addresses the return of its Class Certificate Balance. The rating assigned by Moody's to the Class A-R Certificates only addresses the return of its Class Certificate Balance and interest thereon at its pass-through rate. The rating assigned by Moody's to the Class 2-A-1 Certificates does not address the likelihood of any payments made pursuant to the Corridor Contract.

The ratings of the rating agencies listed above do not address the possibility that, as a result of principal prepayments, certificateholders may receive a lower than anticipated yield.

The security ratings assigned to the offered certificates should be evaluated independently from similar ratings on other types of securities. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the rating agencies.

The depositor has not requested a rating of the offered certificates by any rating agency other than the rating agencies listed above; there can be no assurance, however, as to whether any other rating agency will rate the offered certificates or, if it does, what rating would be assigned by the other rating agency. The ratings assigned by the other rating agency to the offered certificates could be lower than the respective ratings assigned by the rating agencies listed above.

Annex A

## The Mortgage Pool

The following information sets forth certain characteristics of the mortgage loans in loan group 1 and loan group 2 as of the cut-off date. Other than with respect to rates of interest, percentages (approximate) are stated in each case by aggregate Stated Principal Balance of the mortgage loans in loan group 1 and loan group 2 as of the cut-off date. The sum in any column of the following tables may not equal the indicated value due to rounding.

### Loan Group 1

### Mortgage Rates[1]

| Mortgage Rate (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|
| 5.500 | 1 | $ 515,012.00 | 0.15% | 515,012.00 | 359 | 686 | 78.63 |
| 5.750 | 3 | 1,952,775.00 | 0.58 | 650,925.00 | 360 | 699 | 75.25 |
| 5.875 | 5 | 2,762,100.00 | 0.82 | 552,420.00 | 360 | 708 | 78.32 |
| 6.000 | 9 | 8,217,906.12 | 2.45 | 913,100.68 | 360 | 694 | 69.34 |
| 6.115 | 1 | 623,000.00 | 0.19 | 623,000.00 | 360 | 725 | 89.00 |
| 6.125 | 22 | 17,057,587.92 | 5.09 | 775,344.91 | 360 | 718 | 70.13 |
| 6.250 | 53 | 35,897,848.67 | 10.71 | 677,317.90 | 360 | 705 | 72.35 |
| 6.375 | 75 | 53,068,049.09 | 15.83 | 707,573.99 | 360 | 709 | 72.75 |
| 6.500 | 91 | 59,788,676.91 | 17.84 | 657,018.43 | 360 | 703 | 73.26 |
| 6.510 | 1 | 494,954.60 | 0.15 | 494,954.60 | 359 | 657 | 89.19 |
| 6.545 | 1 | 484,000.00 | 0.14 | 484,000.00 | 360 | 700 | 84.91 |
| 6.625 | 47 | 31,246,243.99 | 9.32 | 664,813.70 | 360 | 708 | 73.54 |
| 6.750 | 53 | 34,958,026.02 | 10.43 | 659,585.40 | 359 | 704 | 76.15 |
| 6.875 | 63 | 45,520,745.03 | 13.58 | 722,551.51 | 360 | 717 | 73.38 |
| 6.880 | 1 | 472,500.00 | 0.14 | 472,500.00 | 360 | 754 | 90.00 |
| 7.000 | 22 | 12,872,907.17 | 3.84 | 585,132.14 | 360 | 705 | 77.24 |
| 7.125 | 12 | 8,644,338.60 | 2.58 | 720,361.55 | 356 | 709 | 73.44 |
| 7.250 | 13 | 7,834,673.98 | 2.34 | 602,667.23 | 359 | 703 | 79.02 |
| 7.375 | 9 | 7,056,248.85 | 2.11 | 784,027.65 | 359 | 724 | 69.58 |
| 7.500 | 8 | 5,101,645.42 | 1.52 | 637,705.68 | 359 | 706 | 79.08 |
| 7.625 | 1 | 580,000.00 | 0.17 | 580,000.00 | 360 | 735 | 80.00 |
| Total | 491 | $ 335,149,239.37 | 100.00% | | | | |

(1) The lender acquired mortgage insurance mortgage loans in loan group 1 are shown in the preceding table at the mortgage rates net of interest premium charge by the related lenders. As of the cut-off date, the weighted average mortgage rate of the mortgage loans in loan group 1 (net of such premiums) was approximately 6.588% per annum. Without the adjustment, the weighted average mortgage rate of the mortgage loans in loan group 1 was approximately 6.591% per annum.

## Current Mortgage Loan Principal Balances[1]

| Range of Current Mortgage Loan Principal Balances ($) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 400,000.01 - 450,000.00............ | 59 | $ 25,659,268.29 | 7.66% | 434,902.85 | 6.614 | 360 | 700 | 77.27 |
| 450,000.01 - 500,000.00............ | 96 | 45,725,705.66 | 13.64 | 476,309.43 | 6.645 | 359 | 695 | 77.23 |
| 500,000.01 - 550,000.00............ | 70 | 36,809,686.56 | 10.98 | 525,852.67 | 6.542 | 359 | 708 | 76.65 |
| 550,000.01 - 600,000.00............ | 70 | 40,406,967.54 | 12.06 | 577,242.39 | 6.628 | 360 | 703 | 77.02 |
| 600,000.01 - 650,000.00............ | 48 | 30,124,798.24 | 8.99 | 627,599.96 | 6.565 | 360 | 699 | 77.81 |
| 650,000.01 - 700,000.00............ | 18 | 12,190,984.55 | 3.64 | 677,276.92 | 6.700 | 360 | 701 | 75.51 |
| 700,000.01 - 750,000.00............ | 17 | 12,378,153.89 | 3.69 | 728,126.70 | 6.636 | 359 | 701 | 72.19 |
| 750,000.01 - 1,000,000.00........... | 66 | 57,314,435.05 | 17.10 | 868,400.53 | 6.549 | 360 | 711 | 70.87 |
| 1,000,000.01 - 1,500,000.00....... | 33 | 42,496,239.59 | 12.68 | 1,287,764.84 | 6.566 | 360 | 710 | 71.98 |
| 1,500,000.01 - 2,000,000.00....... | 5 | 9,283,000.00 | 2.77 | 1,856,600.00 | 6.430 | 360 | 734 | 68.28 |
| 2,000,000.01 and Above............ | 9 | 22,760,000.00 | 6.79 | 2,528,888.89 | 6.639 | 360 | 746 | 57.98 |
| Total.......................... | 491 | $ 335,149,239.37 | 100.00% | | | | | |

(1) As of the cut-off date, the average current mortgage loan principal balance of the mortgage loans in loan group 1 was approximately $682,585.

S-A-2

## FICO Credit Scores[1]

| Range of FICO Credit Scores | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 619 and Below | 3 | $ 1,515,000.00 | 0.45% | 505,000.00 | 6.621 | 360 | 609 | 73.34 |
| 620 – 639 | 44 | 25,671,267.56 | 7.66 | 583,437.90 | 6.486 | 360 | 629 | 75.69 |
| 640 – 659 | 44 | 27,188,341.61 | 8.11 | 617,916.85 | 6.489 | 359 | 650 | 76.33 |
| 660 – 679 | 54 | 34,788,891.26 | 10.38 | 644,238.73 | 6.718 | 360 | 670 | 73.22 |
| 680 – 699 | 91 | 58,673,041.97 | 17.51 | 644,758.70 | 6.567 | 359 | 689 | 74.71 |
| 700 – 719 | 85 | 61,500,349.06 | 18.35 | 723,533.52 | 6.556 | 360 | 709 | 74.17 |
| 720 and Above | 170 | 125,812,347.91 | 37.54 | 740,072.63 | 6.627 | 360 | 756 | 72.00 |
| Total | 491 | $ 335,149,239.37 | 100.00% | | | | | |

(1)  As of the cut-off date, the weighted average FICO Credit Score of the mortgagors related to the mortgage loans in loan group 1 was approximately 708.

## Documentation Programs

| Type of Program | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| CLUES Plus | 16 | $ 10,159,594.07 | 3.03% | 634,974.63 | 6.452 | 359 | 680 | 73.76 |
| Full/Alternative | 115 | 78,677,437.20 | 23.48 | 684,151.63 | 6.540 | 360 | 676 | 74.01 |
| Preferred | 17 | 11,625,486.25 | 3.47 | 683,852.13 | 6.480 | 360 | 740 | 72.30 |
| Reduced | 343 | 234,686,721.85 | 70.02 | 684,217.85 | 6.620 | 360 | 718 | 73.58 |
| Total | 491 | $ 335,149,239.37 | 100.00% | | | | | |

Original Loan-to-Value Ratios[1][2]

| Range of Original Loan-to-Value Ratios (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 50.00 and Below | 17 | $ 15,525,621.24 | 4.63% | 913,271.84 | 6.445 | 360 | 729 | 40.22 |
| 50.01 - 55.00 | 6 | 8,451,751.00 | 2.52 | 1,408,625.17 | 6.623 | 360 | 777 | 53.26 |
| 55.01 - 60.00 | 8 | 9,470,934.09 | 2.83 | 1,183,866.76 | 6.482 | 360 | 705 | 58.24 |
| 60.01 - 65.00 | 24 | 23,972,210.77 | 7.15 | 998,842.12 | 6.607 | 359 | 711 | 62.66 |
| 65.01 - 70.00 | 48 | 39,173,974.43 | 11.69 | 816,124.47 | 6.586 | 360 | 705 | 68.72 |
| 70.01 - 75.00 | 49 | 36,145,546.80 | 10.78 | 737,664.22 | 6.557 | 360 | 710 | 73.89 |
| 75.01 - 80.00 | 322 | 192,688,435.62 | 57.49 | 598,411.29 | 6.608 | 360 | 704 | 79.58 |
| 80.01 - 85.00 | 4 | 2,129,950.00 | 0.64 | 532,487.50 | 6.486 | 360 | 690 | 84.63 |
| 85.01 - 90.00 | 12 | 7,155,815.42 | 2.14 | 596,317.95 | 6.726 | 360 | 699 | 88.68 |
| 90.01 - 95.00 | 1 | 435,000.00 | 0.13 | 435,000.00 | 7.000 | 359 | 641 | 94.46 |
| Total | 491 | $ 335,149,239.37 | 100.00% | | | | | |

(1) As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 1 was approximately 73.64%.
(2) Does not take into account any secondary financing on the mortgage loans in loan group 1 that may exist at the time of origination.

S-A-4

## Original Combined Loan-to-Value Ratios[1][2]

| Range of Original Combined Loan-to-Value Ratios (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 50.00 and Below................ | 14 | $ 12,528,347.99 | 3.74% | 894,882.00 | 6.421 | 360 | 727 | 38.17 |
| 50.01 - 55.00................ | 6 | 8,470,001.00 | 2.53 | 1,411,666.83 | 6.593 | 360 | 764 | 52.40 |
| 55.01 - 60.00................ | 8 | 7,452,684.09 | 2.22 | 931,585.51 | 6.327 | 359 | 702 | 57.11 |
| 60.01 - 65.00................ | 18 | 17,662,599.27 | 5.27 | 981,255.52 | 6.619 | 359 | 708 | 62.50 |
| 65.01 - 70.00................ | 41 | 36,587,610.51 | 10.92 | 892,380.74 | 6.623 | 360 | 712 | 67.61 |
| 70.01 - 75.00................ | 46 | 33,508,320.05 | 10.00 | 728,441.74 | 6.570 | 360 | 707 | 73.07 |
| 75.01 - 80.00................ | 157 | 98,651,799.44 | 29.44 | 628,355.41 | 6.591 | 360 | 696 | 78.63 |
| 80.01 - 85.00................ | 13 | 9,316,960.05 | 2.78 | 716,689.23 | 6.522 | 360 | 698 | 76.13 |
| 85.01 - 90.00................ | 69 | 45,722,115.04 | 13.64 | 662,639.35 | 6.604 | 359 | 708 | 79.52 |
| 90.01 - 95.00................ | 22 | 12,599,528.67 | 3.76 | 572,705.85 | 6.507 | 360 | 702 | 79.77 |
| 95.01 -100.00................ | 97 | 52,649,273.26 | 15.71 | 542,776.01 | 6.672 | 360 | 718 | 79.77 |
| Total.................... | 491 | $ 335,149,239.37 | 100.00% | | | | | |

(1)  As of the cut-off date, the weighted average original Combined Loan-to-Value Ratio of the mortgage loans in loan group 1 was approximately 79.36%.
(2)  Takes into account any secondary financing on the mortgage loans in loan group 1 that may exist at the time of origination.

S-A-5

## Geographic Distribution of Mortgaged Properties[1]

| State | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Arizona | 11 | $ 7,336,581.00 | 2.19% | 666,961.91 | 6.599 | 360 | 704 | 76.05 |
| California | 198 | 133,633,153.56 | 39.87 | 674,914.92 | 6.532 | 359 | 713 | 73.84 |
| Florida | 26 | 20,207,120.18 | 6.03 | 777,196.93 | 6.692 | 360 | 710 | 72.96 |
| Illinois | 18 | 11,468,133.57 | 3.42 | 637,118.53 | 6.719 | 360 | 701 | 70.62 |
| Maryland | 18 | 9,665,507.93 | 2.88 | 536,972.66 | 6.689 | 359 | 697 | 77.30 |
| Massachusetts | 10 | 7,325,596.74 | 2.19 | 732,559.67 | 6.853 | 360 | 701 | 70.32 |
| Nevada | 13 | 8,867,600.62 | 2.65 | 682,123.12 | 6.628 | 359 | 712 | 68.20 |
| New Jersey | 18 | 11,799,773.46 | 3.52 | 655,542.97 | 6.623 | 360 | 713 | 71.56 |
| New York | 37 | 29,925,848.47 | 8.93 | 808,806.72 | 6.579 | 360 | 702 | 72.39 |
| Oregon | 10 | 7,014,782.04 | 2.09 | 701,478.20 | 6.547 | 359 | 729 | 75.20 |
| Texas | 9 | 7,143,653.18 | 2.13 | 793,739.24 | 6.627 | 360 | 691 | 77.86 |
| Virginia | 25 | 13,855,974.43 | 4.13 | 554,238.98 | 6.555 | 360 | 704 | 77.82 |
| Other (less than 2%) | 98 | 66,905,514.19 | 19.96 | 682,709.33 | 6.616 | 360 | 702 | 73.70 |
| Total | 491 | $ 335,149,239.37 | 100.00% | | | | | |

(1) The Other row in the preceding table includes 27 other states and the District of Columbia with under 2% concentrations individually.  As of the cut-off date, no more than approximately 1.381% of the mortgage loans in loan group 1 were secured by mortgaged properties located in any one postal zip code area.

## Loan Purpose

| Loan Purpose | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Refinance (Cash-Out) | 179 | $ 126,033,860.97 | 37.61% | 704,099.78 | 6.622 | 360 | 695 | 70.61 |
| Purchase | 208 | 139,410,005.41 | 41.60 | 670,240.41 | 6.584 | 360 | 719 | 76.71 |
| Refinance (Rate/Term) | 104 | 69,705,372.99 | 20.80 | 670,243.97 | 6.549 | 359 | 709 | 72.98 |
| Total | 491 | $ 335,149,239.37 | 100.00% | | | | | |

**Types of Mortgaged Properties**

| Property Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 2 to 4 Family Residence............. | 20 | $ 16,501,441.68 | 4.92% | 825,072.08 | 6.547 | 360 | 716 | 74.56 |
| High-rise Condominium............... | 33 | 23,425,232.70 | 6.99 | 709,855.54 | 6.551 | 360 | 734 | 74.23 |
| Low-rise Condominium............... | 14 | 9,235,453.20 | 2.76 | 659,675.23 | 6.620 | 360 | 711 | 74.35 |
| Planned Unit Development ........ | 101 | 71,516,296.24 | 21.34 | 708,082.14 | 6.585 | 359 | 706 | 71.89 |
| Single Family Residence............. | 323 | 214,470,815.55 | 63.99 | 663,996.33 | 6.600 | 360 | 705 | 74.06 |
| Total.......................................... | 491 | $ 335,149,239.37 | 100.00% | | | | | |

**Occupancy Types[1]**

| Occupancy Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Investment Property ................... | 41 | $ 29,777,194.20 | 8.88% | 726,273.03 | 6.717 | 360 | 738 | 68.88 |
| Primary Residence...................... | 428 | 282,907,639.78 | 84.41 | 660,999.16 | 6.582 | 360 | 702 | 74.91 |
| Secondary Residence.................. | 22 | 22,464,405.39 | 6.70 | 1,021,109.34 | 6.537 | 360 | 739 | 64.01 |
| Total.......................................... | 491 | $ 335,149,239.37 | 100.00% | | | | | |

(1)  Based upon representations of the related borrowers at the time of origination.

## Remaining Terms to Maturity[1]

| Remaining Term to Maturity (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|
| 360 | 398 | $ 272,888,265.41 | 81.42% | 685,648.91 | 6.566 | 708 | 73.67 |
| 359 | 65 | 43,661,425.61 | 13.03 | 671,714.24 | 6.663 | 710 | 73.92 |
| 358 | 17 | 12,422,844.24 | 3.71 | 730,755.54 | 6.829 | 701 | 72.52 |
| 357 | 4 | 2,484,331.37 | 0.74 | 621,082.84 | 6.624 | 713 | 67.55 |
| 356 | 2 | 1,222,766.59 | 0.36 | 611,383.30 | 6.652 | 649 | 80.00 |
| 353 | 1 | 434,577.13 | 0.13 | 434,577.13 | 7.375 | 622 | 79.45 |
| 350 | 1 | 533,077.22 | 0.16 | 533,077.22 | 6.750 | 645 | 74.75 |
| 349 | 1 | 489,102.94 | 0.15 | 489,102.94 | 6.750 | 801 | 64.05 |
| 346 | 1 | 516,848.86 | 0.15 | 516,848.86 | 6.375 | 678 | 70.00 |
| 300 | 1 | 496,000.00 | 0.15 | 496,000.00 | 7.125 | 697 | 80.00 |
| Total | 491 | $ 335,149,239.37 | 100.00% | | | | |

(1)  As of the cut-off date, the weighted average remaining term to maturity of the mortgage loans in loan group 1 was approximately 360 months.

## Interest-Only Periods at Origination

| Interest-Only Period (months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0 | 256 | $ 178,160,071.69 | 53.16% | 695,937.78 | 6.583 | 360 | 708 | 73.39 |
| 120 | 235 | 156,989,167.68 | 46.84 | 668,039.01 | 6.600 | 360 | 708 | 73.93 |
| Total | 491 | $ 335,149,239.37 | 100.00% | | | | | |

**Prepayment Charge Periods at Origination**

| Prepayment Charge Period (months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 1 | Average Principal Balance Outstanding ($) | Weighted Average Current Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0 | 470 | $ 321,538,555.98 | 95.94% | 684,124.59 | 6.587 | 360 | 708 | 73.49 |
| 6 | 1 | 780,000.00 | 0.23 | 780,000.00 | 6.250 | 360 | 628 | 80.00 |
| 12 | 3 | 1,595,400.00 | 0.48 | 531,800.00 | 6.946 | 359 | 703 | 78.17 |
| 36 | 5 | 3,339,777.51 | 1.00 | 667,955.50 | 6.837 | 359 | 728 | 78.81 |
| 60 | 12 | 7,895,505.88 | 2.36 | 657,958.82 | 6.613 | 360 | 720 | 76.09 |
| Total | 491 | $ 335,149,239.37 | 100.00% | | | | | |

**Loan Group 2**

**Mortgage Rates[1]**

| Mortgage Rate (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|
| 5.500 | 1 | $ 478,500.00 | 0.29% | 478,500.00 | 360 | 650 | 80.00 |
| 5.750 | 1 | 820,000.00 | 0.50 | 820,000.00 | 360 | 667 | 69.79 |
| 5.875 | 7 | 4,203,889.92 | 2.55 | 600,555.70 | 360 | 655 | 66.93 |
| 5.995 | 1 | 462,070.00 | 0.28 | 462,070.00 | 360 | 641 | 84.01 |
| 5.999 | 1 | 507,300.00 | 0.31 | 507,300.00 | 360 | 668 | 71.72 |
| 6.000 | 8 | 5,939,450.00 | 3.60 | 742,431.25 | 360 | 685 | 69.69 |
| 6.125 | 17 | 10,963,730.72 | 6.65 | 644,925.34 | 360 | 719 | 68.99 |
| 6.155 | 1 | 499,000.00 | 0.30 | 499,000.00 | 360 | 640 | 89.83 |
| 6.250 | 32 | 20,759,844.00 | 12.60 | 648,745.13 | 360 | 712 | 72.95 |
| 6.375 | 22 | 13,231,936.90 | 8.03 | 601,451.68 | 360 | 700 | 71.40 |
| 6.500 | 34 | 19,671,870.00 | 11.94 | 578,584.41 | 360 | 703 | 75.80 |
| 6.585 | 1 | 510,000.00 | 0.31 | 510,000.00 | 360 | 650 | 85.00 |
| 6.625 | 30 | 23,887,400.00 | 14.49 | 796,246.67 | 360 | 718 | 74.08 |
| 6.750 | 26 | 16,276,714.57 | 9.88 | 626,027.48 | 360 | 700 | 74.73 |
| 6.875 | 26 | 20,202,043.00 | 12.26 | 777,001.65 | 360 | 715 | 72.96 |
| 7.000 | 13 | 10,201,199.00 | 6.19 | 784,707.62 | 360 | 709 | 78.29 |
| 7.125 | 3 | 2,052,000.00 | 1.25 | 684,000.00 | 360 | 692 | 78.46 |
| 7.250 | 11 | 10,030,740.61 | 6.09 | 911,885.51 | 360 | 728 | 74.65 |
| 7.375 | 2 | 1,612,400.00 | 0.98 | 806,200.00 | 343 | 675 | 72.65 |
| 7.500 | 3 | 1,462,932.00 | 0.89 | 487,644.00 | 360 | 713 | 80.00 |
| 7.625 | 2 | 1,040,000.00 | 0.63 | 520,000.00 | 360 | 677 | 77.35 |
| **Total** | **242** | **$ 164,813,020.72** | **100.00%** | | | | |

(1)  The lender acquired mortgage insurance mortgage loans in loan group 2 are shown in the preceding table at the mortgage rates net of interest premium charge by the related lenders. As of the cut-off date, the weighted average mortgage rate of the mortgage loans in loan group 2 (net of such premiums) was approximately 6.587% per annum. Without the adjustment, the weighted average mortgage rate of the mortgage loans in loan group 2 was approximately 6.590% per annum.

## Current Mortgage Loan Principal Balances[1]

| Range of Current Mortgage Loan Principal Balances ($) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 400,000.01 - 450,000.00 ........ | 35 | $ 15,237,078.72 | 9.25% | 435,345.11 | 6.631 | 360 | 697 | 78.25 |
| 450,000.01 - 500,000.00 ........ | 50 | 23,826,976.47 | 14.46 | 476,539.53 | 6.536 | 359 | 700 | 75.64 |
| 500,000.01 - 550,000.00 ........ | 37 | 19,411,219.92 | 11.78 | 524,627.57 | 6.616 | 360 | 688 | 75.88 |
| 550,000.01 - 600,000.00 ........ | 29 | 16,679,324.00 | 10.12 | 575,149.10 | 6.541 | 360 | 694 | 73.57 |
| 600,000.01 - 650,000.00 ........ | 28 | 17,655,528.00 | 10.71 | 630,554.57 | 6.499 | 360 | 720 | 73.76 |
| 650,000.01 - 700,000.00 ........ | 6 | 4,073,750.00 | 2.47 | 678,958.33 | 6.355 | 360 | 727 | 72.53 |
| 700,000.01 - 750,000.00 ........ | 9 | 6,582,000.00 | 3.99 | 731,333.33 | 6.443 | 360 | 704 | 74.04 |
| 750,000.01 - 1,000,000.00 ...... | 25 | 22,134,850.00 | 13.43 | 885,394.00 | 6.588 | 360 | 689 | 70.23 |
| 1,000,000.01 - 1,500,000.00 .... | 13 | 15,761,243.00 | 9.56 | 1,212,403.31 | 6.692 | 360 | 718 | 72.83 |
| 1,500,000.01 - 2,000,000.00 .... | 6 | 10,345,000.00 | 6.28 | 1,724,166.67 | 6.471 | 360 | 726 | 66.81 |
| 2,000,000.01 and Above .......... | 4 | 13,106,050.61 | 7.95 | 3,276,512.65 | 6.902 | 360 | 753 | 74.05 |
| Total ................................. | 242 | $ 164,813,020.72 | 100.00% | | | | | |

(1)  As of the cut-off date, the average current mortgage loan principal balance of the mortgage loans in loan group 2 was approximately $681,046.

## FICO Credit Scores[1]

| Range of FICO Credit Scores | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 620 - 639 | 14 | $ 7,335,869.92 | 4.45% | 523,990.71 | 6.409 | 356 | 629 | 73.72 |
| 640 - 659 | 20 | 11,944,406.90 | 7.25 | 597,220.35 | 6.362 | 360 | 647 | 75.92 |
| 660 - 679 | 32 | 18,654,420.00 | 11.32 | 582,950.63 | 6.637 | 360 | 669 | 73.29 |
| 680 - 699 | 66 | 41,285,163.72 | 25.05 | 625,532.78 | 6.541 | 360 | 689 | 73.21 |
| 700 - 719 | 37 | 26,906,041.00 | 16.33 | 727,190.30 | 6.645 | 360 | 708 | 73.20 |
| 720 and Above | 73 | 58,687,119.18 | 35.61 | 803,933.14 | 6.652 | 360 | 753 | 73.90 |
| Total | 242 | $ 164,813,020.72 | 100.00% | | | | | |

(1)  As of the cut-off date, the weighted average FICO Credit Score of the mortgagors related to the mortgage loans in loan group 2 was approximately 707.

## Documentation Programs

| Type of Program | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| CLUES Plus | 5 | $ 2,492,589.92 | 1.51% | 498,517.98 | 6.689 | 360 | 643 | 78.43 |
| Full/Alternative | 45 | 28,173,686.90 | 17.09 | 626,081.93 | 6.390 | 359 | 671 | 72.24 |
| Preferred | 5 | 3,180,000.00 | 1.93 | 636,000.00 | 6.276 | 360 | 724 | 68.88 |
| Reduced | 186 | 130,280,743.90 | 79.05 | 700,434.11 | 6.638 | 360 | 716 | 74.02 |
| Streamlined | 1 | 686,000.00 | 0.42 | 686,000.00 | 6.750 | 360 | 669 | 74.16 |
| Total | 242 | $ 164,813,020.72 | 100.00% | | | | | |

Original Loan-to-Value Ratios[1][2]

| Range of Original Loan-to-Value Ratios (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 50.00 or Less.................... | 4 | $ 2,748,700.00 | 1.67% | 687,175.00 | 6.320 | 360 | 724 | 44.73 |
| 50.01 - 55.00.................... | 6 | 5,038,500.00 | 3.06 | 839,750.00 | 6.339 | 360 | 723 | 52.99 |
| 55.01 - 60.00.................... | 13 | 9,754,100.00 | 5.92 | 750,315.38 | 6.429 | 360 | 696 | 58.49 |
| 60.01 - 65.00.................... | 13 | 8,066,815.29 | 4.89 | 620,524.25 | 6.405 | 360 | 714 | 62.63 |
| 65.01 - 70.00.................... | 27 | 25,487,843.00 | 15.46 | 943,994.19 | 6.585 | 360 | 714 | 68.83 |
| 70.01 - 75.00.................... | 25 | 23,201,587.51 | 14.08 | 928,063.50 | 6.718 | 360 | 706 | 73.64 |
| 75.01 - 80.00.................... | 150 | 88,504,404.92 | 53.70 | 590,029.37 | 6.612 | 360 | 706 | 79.54 |
| 80.01 - 85.00.................... | 2 | 972,070.00 | 0.59 | 486,035.00 | 6.518 | 360 | 646 | 84.53 |
| 85.01 - 90.00.................... | 2 | 1,039,000.00 | 0.63 | 519,500.00 | 6.885 | 360 | 635 | 89.92 |
| Total ............................ | 242 | $ 164,813,020.72 | 100.00% | | | | | |

(1)  As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 2 was approximately 73.68%.
(2)  Does not take into account any secondary financing on the mortgage loans in loan group 2 that may exist at the time of origination.

Original Combined Loan-to-Value Ratios[1][2]

| Range of Original Combined Loan-to-Value Ratios (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 50.00 and Below................ | 4 | $ 2,748,700.00 | 1.67% | 687,175.00 | 6.320 | 360 | 724 | 44.73 |
| 50.01 - 55.00................ | 5 | 4,248,500.00 | 2.58 | 849,700.00 | 6.355 | 360 | 729 | 52.88 |
| 55.01 - 60.00................ | 12 | 9,576,600.00 | 5.81 | 798,050.00 | 6.376 | 360 | 693 | 58.21 |
| 60.01 - 65.00................ | 11 | 6,624,815.29 | 4.02 | 602,255.94 | 6.402 | 360 | 725 | 62.53 |
| 65.01 - 70.00................ | 18 | 14,334,600.00 | 8.70 | 796,366.67 | 6.559 | 360 | 709 | 68.38 |
| 70.01 - 75.00................ | 21 | 18,453,127.51 | 11.20 | 878,720.36 | 6.720 | 360 | 698 | 72.79 |
| 75.01 - 80.00................ | 71 | 49,216,629.92 | 29.86 | 693,191.97 | 6.542 | 359 | 705 | 76.97 |
| 80.01 - 85.00................ | 13 | 9,506,280.00 | 5.77 | 731,252.31 | 6.619 | 360 | 703 | 77.00 |
| 85.01 - 90.00................ | 20 | 12,466,712.00 | 7.56 | 623,335.60 | 6.672 | 360 | 695 | 79.80 |
| 90.01 - 95.00................ | 11 | 6,959,214.00 | 4.22 | 632,655.82 | 6.853 | 360 | 712 | 78.37 |
| 95.01 -100.00................ | 56 | 30,677,842.00 | 18.61 | 547,818.61 | 6.664 | 360 | 715 | 79.55 |
| Total................ | 242 | $ 164,813,020.72 | 100.00% | | | | | |

(1)  As of the cut-off date, the weighted average original Combined Loan-to-Value Ratio of the mortgage loans in loan group 2 was approximately 80.07%.
(2)  Takes into account any secondary financing on the mortgage loans in loan group 2 that may exist at the time of origination.

## Geographic Distribution of Mortgaged Properties[1]

| State | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| California .............. | 96 | $ 65,837,647.57 | 39.95% | 685,808.83 | 6.509 | 360 | 720 | 73.92 |
| Colorado ............... | 1 | 4,046,840.61 | 2.46 | 4,046,840.61 | 7.250 | 359 | 752 | 72.68 |
| Connecticut ........... | 4 | 3,499,950.00 | 2.12 | 874,987.50 | 6.637 | 360 | 704 | 73.92 |
| Florida .................. | 13 | 9,981,056.90 | 6.06 | 767,773.61 | 6.658 | 360 | 711 | 75.71 |
| Illinois .................. | 14 | 9,676,400.00 | 5.87 | 691,171.43 | 6.793 | 360 | 697 | 76.32 |
| Maryland ............... | 8 | 4,704,869.92 | 2.85 | 588,108.74 | 6.470 | 360 | 667 | 75.76 |
| Massachusetts ........ | 8 | 5,799,800.00 | 3.52 | 724,975.00 | 6.362 | 360 | 694 | 67.60 |
| New Jersey ............ | 14 | 8,549,690.00 | 5.19 | 610,692.14 | 6.648 | 360 | 689 | 74.85 |
| New York .............. | 18 | 11,292,799.00 | 6.85 | 627,377.72 | 6.608 | 360 | 685 | 72.64 |
| Virginia ................. | 6 | 4,139,200.00 | 2.51 | 689,866.67 | 6.517 | 360 | 685 | 74.45 |
| Other (less than 2%) | 60 | 37,284,766.72 | 22.62 | 621,412.78 | 6.624 | 359 | 701 | 72.77 |
| Total ................. | 242 | $ 164,813,020.72 | 100.00% | | | | | |

(1)  The Other row in the preceding table includes 29 other states and the District of Columbia with under 2% concentrations individually.  As of the cut-off date, no more than approximately 2.455% of the mortgage loans in loan group 2 were secured by mortgaged properties located in any one postal zip code area.

## Loan Purpose

| Loan Purpose | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Refinance (Cash-Out) | 86 | $ 61,370,177.51 | 37.24% | 713,606.72 | 6.574 | 359 | 699 | 69.09 |
| Purchase ................ | 107 | 68,019,307.92 | 41.27 | 635,694.47 | 6.608 | 360 | 712 | 78.06 |
| Refinance (Rate/Term) | 49 | 35,423,535.29 | 21.49 | 722,929.29 | 6.583 | 360 | 710 | 73.23 |
| Total ................. | 242 | $ 164,813,020.72 | 100.00% | | | | | |

## Types of Mortgaged Properties

| Property Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 2 to 4 Family Residence | 11 | $ 8,369,500.00 | 5.08% | 760,863.64 | 6.885 | 360 | 715 | 77.33 |
| Cooperative | 1 | 540,000.00 | 0.33 | 540,000.00 | 7.125 | 360 | 630 | 90.00 |
| High-rise Condominium | 14 | 8,145,228.00 | 4.94 | 581,802.00 | 6.492 | 360 | 745 | 74.71 |
| Low-rise Condominium | 13 | 7,317,350.00 | 4.44 | 562,873.08 | 6.689 | 360 | 695 | 77.50 |
| Planned Unit Development | 42 | 34,922,828.51 | 21.19 | 831,495.92 | 6.651 | 359 | 708 | 73.30 |
| Single Family Residence | 161 | 105,518,114.21 | 64.02 | 655,392.01 | 6.544 | 360 | 704 | 73.09 |
| Total | 242 | $ 164,813,020.72 | 100.00% | | | | | |

## Occupancy Types[1]

| Occupancy Type | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| Investment Property | 20 | $ 14,085,408.00 | 8.55% | 704,270.40 | 6.686 | 360 | 722 | 69.73 |
| Primary Residence | 210 | 139,335,922.11 | 84.54 | 663,504.39 | 6.557 | 360 | 703 | 74.21 |
| Secondary Residence | 12 | 11,391,690.61 | 6.91 | 949,307.55 | 6.868 | 360 | 732 | 72.09 |
| Total | 242 | $ 164,813,020.72 | 100.00% | | | | | |

(1)  Based upon representations of the related borrowers at the time of origination.

S-A-16

## Remaining Terms to Maturity[1]

| Remaining Term to Maturity (Months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Mortgage Rate (%) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|
| 360 | 234 | $ 157,212,720.72 | 95.39% | 671,849.23 | 6.571 | 706 | 73.64 |
| 359 | 6 | 6,584,400.00 | 4.00 | 1,097,400.00 | 7.010 | 730 | 73.76 |
| 358 | 1 | 553,500.00 | 0.34 | 553,500.00 | 6.250 | 696 | 80.00 |
| 300 | 1 | 462,400.00 | 0.28 | 462,400.00 | 7.375 | 631 | 80.00 |
| Total | 242 | $ 164,813,020.72 | 100.00% | | | | |

(1) As of the cut-off date, the weighted average remaining term to maturity of the mortgage loans in loan group 2 was approximately 360 months.

## Interest-Only Periods at Origination

| Interest-Only Period (months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Current Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0 | 123 | $ 87,514,375.72 | 53.10% | 711,498.99 | 6.571 | 360 | 707 | 72.81 |
| 120 | 119 | 77,298,645.00 | 46.90 | 649,568.45 | 6.611 | 360 | 707 | 74.67 |
| Total | 242 | $ 164,813,020.72 | 100.00% | | | | | |

## Prepayment Charge Periods at Origination

| Prepayment Charge Period (months) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Mortgage Loans in Loan Group 2 | Average Principal Balance Outstanding ($) | Weighted Average Current Mortgage Rate (%) | Weighted Average Remaining Term to Maturity (Months) | Weighted Average FICO Credit Score | Weighted Average Original Loan-to-Value Ratio (%) |
|---|---|---|---|---|---|---|---|---|
| 0 | 237 | $ 156,128,180.11 | 94.73% | 658,768.69 | 6.563 | 360 | 706 | 73.54 |
| 60 | 5 | 8,684,840.61 | 5.27 | 1,736,968.12 | 7.075 | 360 | 728 | 76.28 |
| Total | 242 | $ 164,813,020.72 | 100.00% | | | | | |

This page intentionally left blank.

# Available Exchanges of Depositable Certificates for Exchangeable Certificates[(1)(2)]

| Classes of Depositable Certificates | | Related Classes of Exchangeable Certificates | | |
|---|---|---|---|---|
| Classes of Depositable Certificates | Original Certificate Balance | Classes of Exchangeable Certificates | Maximum Original Certificate Balance | Pass-Through Rate |
| Recombination 1 | | | | |
| Class 1-A-1(3) | $187,732,000 | Class 1-A-9 | $187,732,000 | 5.50% |
| | | Class 1-A-10 | $187,732,000 | 5.75% |
| | | Class 1-A-11 | $15,644,333(4) | 6.00% |
| Recombination 2 | | | | |
| Class 1-A-5(5) | $13,264,000 | Class 1-A-12 | $13,264,000 | 5.50% |
| | | Class 1-A-13 | $13,264,000 | 5.75% |
| | | Class 1-A-14 | $1,105,333(4) | 6.00% |
| Recombination 3 | | | | |
| Class 2-A-3(6) | $44,200,000 | Class 2-A-10 | $44,200,000 | 5.50% |
| | | Class 2-A-11 | $44,200,000 | 5.75% |
| | | Class 2-A-12 | $3,683,333(4) | 6.00% |
| Recombination 4 | | | | |
| Class 2-A-4(7) | $4,550,000 | Class 2-A-13 | $4,550,000 | 5.50% |
| | | Class 2-A-14 | $4,550,000 | 5.75% |
| | | Class 2-A-15 | $379,166(4) | 6.00% |
| Recombination 5 | | | | |
| Class 2-A-5(8) | $3,887,000 | Class 2-A-16 | $3,887,000 | 5.50% |
| | | Class 2-A-17 | $3,887,000 | 5.75% |
| | | Class 2-A-18 | $323,916(4) | 6.00% |
| Recombination 6 | | | | |
| Class 1-A-5 | $13,264,000 | Class 1-A-7(9) | $12,404,000 | 6.00% |
| | | Class 1-A-8(9) | $860,000 | 6.00% |
| Recombination 7 | | | | |
| Class 2-A-3 | $44,200,000 | Class 2-A-8 | $52,637,000 | 6.00% |
| Class 2-A-4 | $4,550,000 | | | |
| Class 2-A-5 | $3,887,000 | | | |
| Recombination 8 | | | | |
| Class 2-A-6 | $32,880,000 | Class 2-A-9 | $35,133,000 | 6.00% |
| Class 2-A-7 | $2,253,000 | | | |
| Recombination 9 | | | | |
| Class 2-A-4 | $4,550,000 | Class 2-A-19 | $8,437,000 | 6.00% |
| Class 2-A-5 | $3,887,000 | | | |

_____

(1)     Depositable Certificates and Exchangeable Certificates may be exchanged only in the proportions shown in this Annex I.  In any exchange, the relative proportions of the Depositable Certificates to be delivered (or, if applicable, received) in such exchange will equal the proportions reflected by

the outstanding Class Certificate Balances of the related Depositable Certificates at the time of exchange.

(2)    If, as a result of a proposed exchange, a certificateholder would hold a Depositable Certificate or Exchangeable Certificate of a class in an amount less than the applicable minimum denomination for that class, the certificateholder will be unable to effect the proposed exchange.  See "*Description of the Certificates— Book-Entry Certificates; Denominations*" in this prospectus supplement.

(3)    The Class 1-A-1 Certificates may be exchanged for either (i) the Class 1-A-9 and Class 1-A-11 Certificates or (ii) the Class 1-A-10 and Class 1-A-11 Certificates in such proportions that result in the principal and interest entitlements of the classes of certificates received being equal to the principal and interest entitlements of the Class 1-A-1 Certificates.

(4)    This class of certificates is a class of interest-only notional amount certificates.  The notional amount reflected in the table represents the maximum initial notional amount for this class of certificates.

(5)    The Class 1-A-5 Certificates may be exchanged for either (i) the Class 1-A-12 and Class 1-A-14 Certificates or (ii) the Class 1-A-13 and Class 1-A-14 Certificates in such proportions that result in the principal and interest entitlements of the classes of certificates received being equal to the principal and interest entitlements of the Class 1-A-5 Certificates.

(6)    The Class 2-A-3 Certificates may be exchanged for either (i) the Class 2-A-10 and Class 2-A-12 Certificates or (ii) the Class 2-A-11 and Class 2-A-12 Certificates in such proportions that result in the principal and interest entitlements of the classes of certificates received being equal to the principal and interest entitlements of the Class 2-A-3 Certificates.

(7)    The Class 2-A-4 Certificates may be exchanged for either (i) the Class 2-A-13 and Class 2-A-15 Certificates or (ii) the Class 2-A-14 and Class 2-A-15 Certificates in such proportions that result in the principal and interest entitlements of the classes of certificates received being equal to the principal and interest entitlements of the Class 2-A-4 Certificates.

(8)    The Class 2-A-5 Certificates may be exchanged for either (i) the Class 2-A-16 and Class 2-A-18 Certificates or (ii) the Class 2-A-17 and Class 2-A-18 Certificates in such proportions that result in the principal and interest entitlements of the classes of certificates received being equal to the principal and interest entitlements of the Class 2-A-5 Certificates.

(9)    The realized losses that would otherwise be allocated to the Class 1-A-7 Certificates will instead be allocated to the Class 1-A-8 Certificates, until its Class Certificate Balance is reduced to zero.

PROSPECTUS

# CWALT, INC.

**Depositor**

**Mortgage Backed Securities**
**(Issuable in Series)**

---

**Please carefully consider our discussion of some of the risks of investing in the securities under "Risk Factors" beginning on page 2.**

The securities will represent obligations of the related trust fund only and will not represent an interest in or obligation of CWALT, Inc., any seller, servicer, or any of their affiliates.

---

### The Trusts

Each trust will be established to hold assets in its trust fund transferred to it by CWALT, Inc.  The assets in each trust fund will be specified in the prospectus supplement for the particular trust and will generally consist of:

- first lien mortgage loans secured by one- to four-family residential properties;

- mortgage loans secured by first liens on small multifamily residential properties, such as rental apartment buildings or projects containing five to fifty residential units;

- collections arising from one or more types of the loans described above which are not used to make payments on securities issued by a trust fund, including excess servicing fees and prepayment charges;

- mortgage pass-through securities issued or guaranteed by Ginnie Mae, Fannie Mae, or Freddie Mac; or

- mortgage-backed securities evidencing an interest in, or secured by, loans of the type that would otherwise be eligible to be loans included in a trust fund and issued by entities other than Ginnie Mae, Fannie Mae or Freddie Mac.

### The Securities

CWALT, Inc. will sell either certificates or notes pursuant to a prospectus supplement.  The securities will be grouped into one or more series, each having its own distinct designation.  Each series will be issued in one or more classes and each class will evidence beneficial ownership of (in the case of certificates) or a right to receive payments supported by (in the case of notes) a specified portion of future payments on the assets in the trust fund that the series relates to.  A prospectus supplement for a series will specify all of the terms of the series and of each of the classes in the series.

### Credit Enhancement

If the securities have any type of credit enhancement, the prospectus supplement for the related series will describe the credit enhancement.  The types of credit enhancement are generally described in this prospectus.

### Offers of Securities

The securities may be offered through several different methods, including offerings through underwriters.

---

**These securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of this prospectus.  Any representation to the contrary is a criminal offense.**

November 14, 2006

[This page intentionally left blank.]

# Table of Contents

Important Notice About Information in This
  Prospectus and Each Accompanying
  Prospectus Supplement........................................ 1
Risk Factors ............................................................ 2
  Limited Source Of Payments — No
    Recourse To Sellers, Depositor Or
    Servicer............................................................. 2
  Credit Enhancement May Not Be
    Sufficient To Protect You From
    Losses ............................................................... 3
  Nature Of Mortgages............................................ 3
  Your Risk Of Loss May Be Higher Than
    You Expect If Your Securities Are
    Backed By Multifamily Loans...................... 7
  Impact Of World Events .................................... 7
  You Could Be Adversely Affected By
    Violations Of Environmental Laws ............. 8
  Ratings Of The Securities Do Not
    Assure Their Payment.................................... 9
  Book-Entry Registration .................................. 10
  Secondary Market For The Securities
    May Not Exist ................................................ 10
  Bankruptcy Or Insolvency May Affect
    The Timing And Amount Of
    Distributions On The Securities.................. 10
  The Principal Amount Of Securities
    May Exceed The Market Value Of
    The Trust Fund Assets ................................. 11
The Trust Fund ...................................................... 12
  General................................................................. 12
  The Loans............................................................. 13
  Agency Securities .............................................. 16
  Non-Agency Mortgage-Backed
    Securities ........................................................ 21
  Substitution of Trust Fund Assets ................... 23
  Available Information ........................................ 23
  Incorporation of Certain Documents by
    Reference; Reports Filed with the
    SEC.................................................................... 23
  Reports to Securityholders ............................... 24
Use of Proceeds ...................................................... 24
The Depositor .......................................................... 24
Loan Program ......................................................... 25
  Underwriting Standards .................................... 25
  Qualifications of Sellers.................................... 26
  Representations by Sellers; Repurchases ........ 26
Static Pool Data ...................................................... 27
Description of the Securities................................. 28
  General................................................................. 28
  Distributions on Securities ............................... 30
  Advances.............................................................. 31
  Reports to Securityholders ............................... 32
  Categories of Classes of Securities ................. 33

Indices Applicable to Floating Rate and
  Inverse Floating Rate Classes.................... 36
Book-Entry Registration of Securities ............ 39
Exchangeable Securities.................................... 43
Credit Enhancement .............................................. 45
  General................................................................. 45
  Subordination...................................................... 46
  Letter of Credit................................................... 47
  Insurance Policies, Surety Bonds and
    Guaranties ...................................................... 47
  Overcollateralization and Excess Cash
    Flow ................................................................. 47
  Reserve Accounts................................................ 48
  Special Hazard Insurance Policies ................... 48
  Bankruptcy Bonds.............................................. 49
  Pool Insurance Policies ..................................... 49
  Financial Instruments ........................................ 51
  Cross Support ..................................................... 51
Yield, Maturity and Prepayment
  Considerations................................................... 51
  Prepayments on Loans ....................................... 51
  Prepayment Effect on Interest.......................... 52
  Delays in Realization on Property;
    Expenses of Realization............................... 52
  Optional Purchase .............................................. 53
  Prepayment Standards or Models..................... 53
  Yield..................................................................... 54
The Agreements....................................................... 54
  Assignment of the Trust Fund Assets.............. 54
  Payments On Loans; Deposits to
    Security Account ........................................... 56
  Pre-Funding Account ......................................... 58
  Investments in Amounts Held in
    Accounts .......................................................... 59
  Sub-Servicing by Sellers .................................. 60
  Collection Procedures ....................................... 61
  Hazard Insurance................................................ 61
  Application of Liquidation Proceeds................ 63
  Realization Upon Defaulted Loans .................. 64
  Servicing and Other Compensation and
    Payment of Expenses.................................... 66
  Evidence as to Compliance ............................... 66
  Certain Matters Regarding the Master
    Servicer and the Depositor.......................... 67
  Events of Default; Rights Upon Event of
    Default ............................................................. 68
  Amendment.......................................................... 70
  Termination; Optional Termination ................ 72
  The Trustee .......................................................... 72
Certain Legal Aspects of the Loans.................... 73
  General................................................................. 73
  Foreclosure.......................................................... 74
  Environmental Risks.......................................... 76
  Rights of Redemption ....................................... 77

Anti-Deficiency Legislation and Other
    Limitations On Lenders .............................. 77
Due-On-Sale Clauses ...................................... 78
Enforceability of Prepayment and Late
    Payment Fees.............................................. 79
Applicability of Usury Laws ........................... 79
Servicemembers Civil Relief Act.................... 79
Other Loan Provisions and Lender
    Requirements.............................................. 79
Consumer Protection Laws ............................. 80
Material Federal Income Tax Consequences.......... 81
General............................................................. 81
Taxation of Debt Securities............................. 82
Taxation of the REMIC and Its Holders ......... 86
REMIC Expenses; Single Class
    REMICs...................................................... 86
Taxation of the REMIC................................... 87
Taxation of Holders of Residual
    Interests...................................................... 88
Administrative Matters.................................... 91
Tax Status as a Grantor Trust.......................... 91
Sale or Exchange............................................. 94
Miscellaneous Tax Aspects............................. 94
New Reporting Regulations ............................ 94
Tax Treatment of Foreign Investors................ 95
Tax Characterization of the Trust Fund
    as a Partnership.......................................... 96
Tax Consequences to Holders of the
    Notes........................................................... 96
Tax Consequences to Holders of the
    Certificates................................................. 98
Taxation of Classes of Exchangeable
    Securities ................................................. 102
Other Tax Considerations.................................... 102
ERISA Considerations......................................... 103
Legal Investment ................................................ 106
Method of Distribution ....................................... 107
Legal Matters...................................................... 108
Financial Information ......................................... 109
Rating ................................................................. 109
Index to Defined Terms....................................... 110

**Important Notice About Information in This Prospectus and Each
Accompanying Prospectus Supplement**

Information about each series of securities is contained in two separate documents:

- this prospectus, which provides general information, some of which may not apply to a particular series; and

- the accompanying prospectus supplement for a particular series, which describes the specific terms of the securities of that series.

The prospectus supplement will contain information about a particular series that supplements the information contained in this prospectus, and you should rely on that supplementary information in the prospectus supplement.

You should rely only on the information in this prospectus and the accompanying prospectus supplement. We have not authorized anyone to provide you with information that is different from that contained in this prospectus and the accompanying prospectus supplement.

_____

If you require additional information, the mailing address of our principal executive offices is CWALT, Inc., 4500 Park Granada, Calabasas, California 91302 and the telephone number is (818) 225-3000.  For other means of acquiring additional information about us or a series of securities, see "The Trust Fund — Available Information" and "— Incorporation of Certain Documents by Reference; Reports Filed with the SEC" beginning on page 23.

1

**Risk Factors**

You should carefully consider the following information since it identifies significant risks associated with an investment in the securities.

**Limited Source Of Payments — No Recourse To Sellers, Depositor Or Servicer**

The applicable prospectus supplement may provide that securities will be payable from other trust funds in addition to their associated trust fund, but if it does not, they will be payable solely from their associated trust fund.  If the trust fund does not have sufficient assets to distribute the full amount due to you as a securityholder, your yield will be impaired, and perhaps even the return of your principal may be impaired, without your having recourse to anyone else.  Furthermore, at the times specified in the applicable prospectus supplement, certain assets of the trust fund may be released and paid out to other people, such as the depositor, a servicer, a credit enhancement provider, or any other person entitled to payments from the trust fund.  Those assets will no longer be available to make payments to you.  Those payments are generally made after other specified payments that may be set forth in the applicable prospectus supplement have been made.

You will not have any recourse against the depositor or any servicer if you do not receive a required distribution on the securities.  Nor will you have recourse against the assets of the trust fund of any other series of securities.

The securities will not represent an interest in the depositor, any servicer, any seller to the depositor, or anyone else except the trust fund.  The only obligation of the depositor to a trust fund comes from certain representations and warranties made by it about assets transferred to the trust fund.  If these representations and warranties turn out to be untrue, the depositor may be required to repurchase some of the transferred assets.  CWALT, Inc., which is the depositor, does not have significant assets and is unlikely to have significant assets in the future.  So if the depositor were required to repurchase a loan because of a breach of a representation, its only sources of funds for the repurchase would be:

- funds obtained from enforcing a corresponding obligation of a seller or originator of the loan, or

- funds from a reserve fund or similar credit enhancement established to pay for loan repurchases.

The only obligations of the master servicer to a trust fund (other than its master servicing obligations) comes from certain representations and warranties made by it in connection with its loan servicing activities.  If these representations and warranties turn out to be untrue, the master servicer may be required to repurchase or substitute for some of the loans.  However, the master servicer may not have the financial ability to make the required repurchase or substitution.

The only obligations to a trust fund of a seller of loans to the depositor comes from certain representations and warranties made by it in connection with its sale of the loans and certain document delivery requirements.  If these representations and warranties turn out to be untrue, or the seller fails to deliver required documents, it may be

required to repurchase or substitute for some of the loans.  However, the seller may not have the financial ability to make the required repurchase or substitution.

**Credit Enhancement May Not Be Sufficient To Protect You From Losses**

Credit enhancement is intended to reduce the effect of loan losses.  But credit enhancements may benefit only some classes of a series of securities and the amount of any credit enhancement will be limited as described in the related prospectus supplement.  Furthermore, the amount of a credit enhancement may decline over time pursuant to a schedule or formula or otherwise, and could be depleted from payments or for other reasons before the securities covered by the credit enhancement are paid in full.  In addition, a credit enhancement may not cover all potential sources of loss.  For example, a credit enhancement may or may not cover fraud or negligence by a loan originator or other parties.  Also, all or a portion of the credit enhancement may be reduced, substituted for, or even eliminated so long as the rating agencies rating the securities indicate that the change in credit enhancement would not cause them to change adversely their rating of the securities. Consequently, securityholders may suffer losses even though a credit enhancement exists and its provider does not default.

**Nature Of Mortgages**
*Cooperative Loans May Experience Relatively Higher Losses*

Cooperative loans are evidenced by promissory notes secured by security interests in shares issued by private corporations that are entitled to be treated as housing cooperatives under the Internal Revenue Code and in the related proprietary leases or occupancy agreements granting exclusive rights to occupy specific dwelling units in the corporations' buildings.

If there is a blanket mortgage (or mortgages) on the cooperative apartment building and/or underlying land, as is generally the case, the cooperative, as property borrower, is responsible for meeting these mortgage or rental obligations.  If the cooperative is unable to meet the payment obligations arising under a blanket mortgage, the mortgagee holding a blanket mortgage could foreclose on that mortgage and terminate all subordinate proprietary leases and occupancy agreements. A foreclosure by the holder of a blanket mortgage could eliminate or significantly diminish the value of any collateral held by the lender who financed an individual tenant-stockholder of cooperative shares or, in the case of the mortgage loans, the collateral securing the cooperative loans.

If there is an underlying lease of the land, as is the case in some instances, the cooperative is responsible for meeting the related rental obligations.  If the cooperative is unable to meet its obligations arising under its land lease, the holder of the land lease could terminate the land lease and all subordinate proprietary leases and occupancy agreements. The termination of the land lease by its holder could eliminate or significantly diminish the value of any collateral held by the lender who financed an individual tenant-stockholder of the cooperative shares or, in the case of the mortgage loans, the collateral securing the cooperative loans. A land lease also has an expiration date and the inability of the cooperative to extend its term or, in the alternative, to purchase the land could lead to termination of the cooperative's interest in the property and termination of all proprietary leases and occupancy agreements which could eliminate or significantly diminish the value of the related collateral.

In addition, if the corporation issuing the shares related to the cooperative loans fails to qualify as a cooperative housing corporation under the Internal Revenue Code, the value of the collateral securing the cooperative loan could be significantly impaired because the tenant-stockholders would not be permitted to deduct its proportionate share of certain interest expenses and real estate taxes of the corporation.

The cooperative shares and proprietary lease or occupancy agreement pledged to the lender are, in almost all cases, subject to restrictions on transfer, including obtaining the consent of the cooperative housing corporation prior to the transfer, which may impair the value of the collateral after a default by the borrower due to an inability to find a transferee acceptable to the related housing corporation.

*Declines in Property Values May Adversely Affect You*

The value of the properties underlying the loans held in the trust fund may decline over time.  Among the factors that could adversely affect the value of the properties are:

- an overall decline in the residential real estate market in the areas in which they are located,

- a decline in their general condition from the failure of borrowers to maintain their property adequately, and

- natural disasters that are not covered by insurance, such as earthquakes and floods.

If property values decline, the actual rates of delinquencies, foreclosures, and losses on all underlying loans could be higher than those currently experienced in the mortgage lending industry in general.  These losses, to the extent not otherwise covered by a credit enhancement, will be borne by the holder of one or more classes of securities.

*Delays in Liquidation May Adversely Affect You*

Even if the properties underlying the loans held in the trust fund provide adequate security for the loans, substantial delays could occur before defaulted loans are liquidated and their proceeds are forwarded to investors.  Property foreclosure actions are regulated by state statutes and rules and are subject to many of the delays and expenses of other lawsuits if defenses or counterclaims are made, sometimes requiring several years to complete.  Furthermore, an action to obtain a deficiency judgment is regulated by statutes and rules, and the amount or availability of a deficiency judgment may be limited by law. In the event of a default by a borrower, these restrictions may impede the ability of the servicer to foreclose on or to sell the mortgaged property or to obtain a deficiency judgment, to obtain sufficient proceeds to repay the loan in full.

In addition, the servicer will be entitled to deduct from liquidation proceeds all expenses reasonably incurred in attempting to recover on the defaulted loan, including legal and appraisal fees and costs, real estate taxes, and property maintenance and preservation expenses.

In the event that:

- the mortgaged properties fail to provide adequate security for the related loans,

- if applicable to a series as specified in the related prospectus supplement, excess cashflow (if any) and overcollateralization (if any) is insufficient to cover these shortfalls,

- if applicable to a series as specified in the related prospectus supplement, the subordination of certain classes are insufficient to cover these shortfalls, and

- with respect to the securities with the benefit of an insurance policy as specified in the related prospectus supplement, the credit enhancement provider fails to make the required payments under the related insurance policies,

you could lose all or a portion of the money you paid for the securities and could also have a lower yield than anticipated at the time you purchased the securities.

*Disproportionate Effect of Liquidation Expenses May Adversely Affect You*

Liquidation expenses of defaulted loans generally do not vary directly with the outstanding principal balance of the loan at the time of default. Therefore, if a servicer takes the same steps for a defaulted loan having a small remaining principal balance as it does for a defaulted loan having a large remaining principal balance, the amount realized after expenses is smaller as a percentage of the outstanding principal balance of the small loan than it is for the defaulted loan having a large remaining principal balance.

*Consumer Protection Laws May Adversely Affect You*

Federal, state and local laws extensively regulate various aspects of brokering, originating, servicing and collecting loans secured by consumers' dwellings.  Among other things, these laws may regulate interest rates and other charges, require disclosures, impose financial privacy requirements, mandate specific business practices, and prohibit unfair and deceptive trade practices.  In addition, licensing requirements may be imposed on persons that broker, originate, service or collect loans secured by consumers' dwellings.

Additional requirements may be imposed under federal, state or local laws on so-called "high cost mortgage loans," which typically are defined as loans secured by a consumer's dwelling that have interest rates or origination costs in excess of prescribed levels.  These laws may limit certain loan terms, such as prepayment charges, or the ability of a creditor to refinance a loan unless it is in the borrower's interest.  In addition, certain of these laws may allow claims against loan brokers or originators, including claims based on fraud or misrepresentations, to be asserted against persons acquiring the loans, such as the trust fund.

The federal laws that may apply to loans held in the trust fund include the following:

- the Truth in Lending Act and its regulations, which (among other things) require disclosures to borrowers regarding the terms of loans and provide consumers who pledged their principal dwelling as collateral in a non-purchase money transaction with a right of rescission that generally extends for three days after proper disclosures are given;

5

- the Home Ownership and Equity Protection Act and its regulations, which (among other things) imposes additional disclosure requirements and limitations on loan terms with respect to non-purchase money, installment loans secured by the consumer's principal dwelling that have interest rates or origination costs in excess of prescribed levels;

- the Real Estate Settlement Procedures Act and its regulations, which (among other things) prohibit the payment of referral fees for real estate settlement services (including mortgage lending and brokerage services) and regulate escrow accounts for taxes and insurance and billing inquiries made by borrowers;

- the Equal Credit Opportunity Act and its regulations, which (among other things) generally prohibit discrimination in any aspect of a credit transaction on certain enumerated basis, such as age, race, color, sex, religion, marital status, national origin or receipt of public assistance; and

- the Fair Credit Reporting Act, which (among other things) regulates the use of consumer reports obtained from consumer reporting agencies and the reporting of payment histories to consumer reporting agencies.

The penalties for violating these federal, state, or local laws vary depending on the applicable law and the particular facts of the situation. However, private plaintiffs typically may assert claims for actual damages and, in some cases, also may recover civil money penalties or exercise a right to rescind the loan. Violations of certain laws may limit the ability to collect all or part of the principal or interest on a loan and, in some cases, borrowers even may be entitled to a refund of amounts previously paid. Federal, state and local administrative or law enforcement agencies also may be entitled to bring legal actions, including actions for civil money penalties or restitution, for violations of certain of these laws.

Depending on the particular alleged misconduct, it is possible that claims may be asserted against various participants in secondary market transactions, including assignees that hold the loans, such as the trust fund. Losses on loans from the application of these federal, state and local laws that are not otherwise covered by one or more forms of credit enhancement will be borne by the holders of one or more classes of securities. Additionally, the trust may experience losses arising from lawsuits related to alleged violations of these laws, which, if not covered by one or more forms of credit enhancement or the related seller, will be borne by the holders of one or more classes of securities.

*Losses on Balloon Payment Mortgages Are Borne by You*

Some of the mortgage loans held in the trust fund may not be fully amortizing over their terms to maturity and, thus, will require substantial principal payments (that is, balloon payments) at their stated maturity. Loans with balloon payments involve a greater degree of risk than fully amortizing loans because typically the borrower must be able to refinance the loan or sell the property to make the balloon payment at maturity. The ability of a borrower to do this will depend on factors such as mortgage rates at the time of sale or refinancing, the borrower's equity in

6

the property, the relative strength of the local housing market, the financial condition of the borrower, and tax laws. Losses on these loans that are not otherwise covered by a credit enhancement will be borne by the holders of one or more classes of securities.

**Your Risk Of Loss May Be Higher Than You Expect If Your Securities Are Backed By Multifamily Loans**

Multifamily lending may expose the lender to a greater risk of loss than single family residential lending. Owners of multifamily residential properties rely on monthly lease payments from tenants to

- pay for maintenance and other operating expenses of those properties,

- fund capital improvements, and

- service any mortgage loan and any other debt that may be secured by those properties.

Various factors, many of which are beyond the control of the owner or operator of a multifamily property, may affect the economic viability of that property.

Changes in payment patterns by tenants may result from a variety of social, legal and economic factors. Economic factors include the rate of inflation, unemployment levels and relative rates offered for various types of housing. Shifts in economic factors may trigger changes in payment patterns including increased risks of defaults by tenants and higher vacancy rates. Adverse economic conditions, either local or national, may limit the amount of rent that can be charged and may result in a reduction in timely lease payments or a reduction in occupancy levels. Occupancy and rent levels may also be affected by construction of additional housing units, competition and local politics, including rent stabilization or rent control laws and policies. In addition, the level of mortgage interest rates may encourage tenants to purchase single family housing. We are unable to determine and have no basis to predict whether, or to what extent, economic, legal or social factors will affect future rental or payment patterns.

The location and construction quality of a particular building may affect the occupancy level as well as the rents that may be charged for individual units. The characteristics of a neighborhood may change over time or in relation to newer developments. The effects of poor construction quality will increase over time in the form of increased maintenance and capital improvements. Even good construction will deteriorate over time if adequate maintenance is not performed in a timely fashion.

**Impact Of World Events**

The economic impact of the United States' military operations in Iraq and other parts of the world, as well as the possibility of any terrorist attacks domestically or abroad, is uncertain, but could have a material effect on general economic conditions, consumer confidence, and market liquidity. We can give no assurance as to the effect of these events on consumer confidence and the performance of the loans held by trust fund. Any adverse impact resulting from these events would be borne by the holders of one or more classes of the securities.

7

United States military operations also increase the likelihood of shortfalls under the Servicemembers Civil Relief Act or similar state laws (referred to as the "Relief Act" ).  The Relief Act provides relief to borrowers who enter active military service and to borrowers in reserve status who are called to active duty after the origination of their loan.  The Relief Act provides generally that these borrowers may not be charged interest on a loan in excess of 6% per annum during the period of the borrower's active duty.  These shortfalls are not required to be paid by the borrower at any future time and will not be advanced by the servicer, unless otherwise specified in the related prospectus supplement.  To the extent these shortfalls reduce the amount of interest paid to the holders of securities with the benefit of an insurance policy, unless otherwise specified in the related prospectus supplement, they will not be covered by the related insurance policy.  In addition, the Relief Act imposes limitations that would impair the ability of the servicer to foreclose on an affected loan during the borrower's period of active duty status, and, under some circumstances, during an additional period thereafter.

In addition, pursuant to the laws of various states, under certain circumstances, payments on mortgage loans by residents in such states who are called into active duty with the National Guard or the reserves will be deferred.  These state laws may also limit the ability of the servicer to foreclose on the related mortgaged property.  This could result in delays or reductions in payment and increased losses on the mortgage loans which would be borne by the securityholders.

**You Could Be Adversely Affected By Violations Of Environmental Laws**

Federal, state, and local laws and regulations impose a wide range of requirements on activities that may affect the environment, health, and safety.  In certain circumstances, these laws and regulations impose obligations on "owners" or "operators" of residential properties such as those that secure the loans held in the trust fund.  Failure to comply with these laws and regulations can result in fines and penalties that could be assessed against the trust if it were to be considered an "owner" or "operator" of the related property.  A property "owner" or "operator" can also be held liable for the cost of investigating and remediating contamination, regardless of fault, and for personal injury or property damage arising from exposure to contaminants.

In some states, a lien on the property due to contamination has priority over the lien of an existing mortgage.  Also, a mortgage lender may be held liable as an "owner" or "operator" for costs associated with the release of hazardous substances from a site, or petroleum from an underground storage tank under certain circumstances.  If the trust were to be considered the "owner" or "operator" of a property, it will suffer losses as a result of any liability imposed for environmental hazards on the property.