mortgage loans or certain delinquent mortgage loans in the related loan group,

- the rate and timing of payment defaults and losses on the related mortgage loans, and

- repurchases of mortgage loans in the related loan group for material breaches of representations and warranties.

Because distributions on the certificates are dependent upon the payments on the applicable mortgage loans, we cannot guarantee the amount of any particular payment or the amount of time that will elapse before the issuing entity is terminated.

The master servicer is permitted to purchase certain delinquent mortgage loans from the issuing entity as described under "*Description of the Certificates — Optional Purchase of Defaulted Loans and Certain Delinquent Loans*" in this prospectus supplement.  Many factors could affect the decision of the master servicer to exercise its option to purchase a mortgage loan that is eligible for purchase, including the master servicer's financial ability, the impact on the holders of the certificates and the state of the business relationship between the master servicer and the underlying seller, including whether the underlying seller of that mortgage loan is willing or able to purchase that mortgage loan.  The master servicer is not required to take your interests into account when deciding whether or not to exercise the option.

The master servicer may grant a third party, which may be a certificateholder, the right to direct the exercise of this option.  The exercise of this option to purchase defaulted mortgage loans could affect the level of the overcollateralization target amount and distributions to the holders of the certificates, which may adversely affect the market value of your certificates.  A third party is not required to take your interests into account when deciding whether or not to direct the exercise of this option and may direct the exercise of this option when the master servicer would not otherwise exercise it.  As a result, the performance of this transaction may differ from transactions in which this option was not granted to a third party.

See *"Description of the Certificates — Principal," and " — Optional Termination"* in this prospectus supplement for a description of the manner in which principal will be paid to the certificates. See "*Description of the Certificates — Optional Purchase of Defaulted Loans and Certain Delinquent Loans*" in this prospectus supplement for a description of the master servicer's option to purchase certain

mortgage loans.  See *"The Mortgage Pool — Assignment of the Mortgage Loans"* in this prospectus supplement for more information regarding the repurchase or substitution of mortgage loans.

**Subordinated Certificates Have a Greater Risk of Loss Because Of Subordination; Credit Enhancement May Not Be Sufficient To Protect Senior Certificates From Losses**

Except for the Class 3-A-2 Certificates, the certificates are not insured by any certificate guaranty insurance policy. When certain classes of certificates provide credit enhancement for other classes of certificates this is sometimes referred to as "subordination." The subordination feature is intended to enhance the likelihood that senior certificateholders will receive regular payments of interest and principal.

**Subordination.**  Credit enhancement will be provided for the certificates, first, by the right of the holders of more senior classes of certificates to receive payments of principal before the classes subordinated to them and, second, by the allocation of realized losses to subordinated classes in the reverse order of their priority of distribution.

This type of credit enhancement is provided by using collections on the mortgage loans in an aggregate loan group otherwise payable to the holders of the related subordinated classes to pay amounts due on the more senior classes related to the same aggregate loan group.  Realized losses on the mortgage loans in an aggregate loan group are allocated to the related classes of subordinated certificates, beginning with the related class of subordinated certificates with the lowest distribution priority, until the class certificate balance of that subordinated class has been reduced to zero.  With respect to aggregate loan group I, realized losses on the mortgage loans in aggregate loan group I will first be allocated to the Class B-5 Certificates, until its class certificate balance is reduced to zero. With respect to aggregate loan group II, this means that after the credit enhancement provided by excess cashflow and overcollateralization (if any) have been exhausted, realized losses on the mortgage loans in aggregate loan group II will first be allocated to the Class 3-B Certificates, until its class certificate balance is reduced to zero.  Subsequent realized losses will be allocated to the next most junior class of subordinated certificates in the same group, until its class certificate balance is reduced to zero.  If the aggregate class certificate balance of the subordinated certificates related to an aggregate loan group is reduced to zero, any realized losses on the mortgage loans in a loan group in that aggregate loan group will then be allocated on a pro rata basis to the related senior certificates.  However, realized losses on the mortgage loans in loan group 1 that would otherwise be allocated to the Class 1-A-1 Certificates will instead be

allocated to the Class 1-A-3 Certificates, until its class certificate balance is reduced to zero and realized losses on the mortgage loans in loan group 3 that would otherwise be allocated to the Class 3-A-4 Certificates will instead be allocated to the Class 3-A-5 Certificates, until its class certificate balance is reduced to zero. Investors in a class of super senior certificates should note that the original class certificate balance of the related senior support certificates is substantially smaller than the original class certificate balance of the class or classes of super senior certificates it supports. As a result, the senior support certificates will be available to absorb only a portion of the realized losses otherwise allocable to the super senior certificates. If the aggregate class certificate balance of the group I or group II subordinated certificates were to be reduced to zero, delinquencies and defaults on the mortgage loans would reduce the amount of funds available for monthly distributions to holders of the related senior certificates.

Any realized losses allocable to the Class 3-A-2 Certificates will be covered by the Class 3-A-2 policy. If the Class 3-A-2 insurer were to fail to perform its obligations under the Class 3-A-2 policy, then the holders of the certificates could experience a loss on their investment.

Additionally, investors in the group II subordinated certificates should note that amounts due to the Class 3-A-2 insurer for premiums and reimbursements for prior draws, including interest thereon, will be paid from interest and principal on the mortgage loans in aggregate loan group II prior to any payments on the group II subordinate certificates.

Among the group I subordinated certificates, the Class M Certificates are the least subordinated, that is, they have the highest distribution priority. The distribution priority for the Class B-1, Class B-2, Class B-3, Class B-4 and Class B-5 Certificates is in that numerical order. Among the group II subordinated certificates, the Class 3-M-1 Certificates are the least subordinated. The distribution priority for the Class 3-M-2, Class 3-M-3 and Class 3-B Certificates is in that order.

You should fully consider the risks of investing in a subordinated certificate, including the risk that you may not fully recover your initial investment as a result of realized losses. In addition, investors in a class of group II senior certificates should consider the risk that, after the credit enhancement provided by excess cashflow and overcollateralization (if any) have been exhausted, the subordination of the group II subordinated certificates may

not be sufficient to protect the group II senior certificates from losses.

See *"Description of the Certificates — Allocation of Losses"* in this prospectus supplement, and *"Credit Enhancement — Subordination"* in this prospectus supplement and in the prospectus.

**Excess Interest From Aggregate Loan Group II Mortgage Loans May Not Provide Adequate Credit Enhancement to the Group II Certificates**

The amount by which the aggregate stated principal balance of the mortgage loans in aggregate loan group II exceeds the aggregate class certificate principal balance of the group II certificates is called "***overcollateralization***."  The initial level of overcollateralization (that is, the overcollateralization on the closing date) is expected to equal the initial level of overcollateralization required by the pooling and servicing agreement.  The mortgage loans in aggregate loan group II are expected to generate more interest than is needed to pay interest on the group II certificates, because the weighted average interest rate on the mortgage loans in aggregate loan group II is expected to be higher than the weighted average pass-through rate on the group II certificates plus the weighted average expense fee rate for aggregate loan group II.  In the event that the level of overcollateralization is reduced, such "***excess interest***" will be used to make additional principal payments on the group II offered certificates to the extent described in this prospectus supplement.  Overcollateralization is intended to provide limited protection to the holders of the group II certificates by absorbing losses from liquidated mortgage loans in aggregate loan group II.  However, we cannot assure you that enough excess interest will be generated on the mortgage loans in aggregate loan group II to maintain the required level of overcollateralization.

The excess interest available on any distribution date will be affected by the actual amount of interest received, collected or advanced in respect of the mortgage loans in aggregate loan group II for that distribution date.  That amount will be influenced by changes in the weighted average of the mortgage rates resulting from prepayments and liquidations of the mortgage loans in aggregate loan group II.  The pass-through rate of each class of group II certificates is subject to a net rate cap which is based on the weighted average adjusted net mortgage rates of the mortgage loans in aggregate loan group II.  If the pass-through rate on one or more classes is limited by the net rate cap, it may be necessary to apply all or a portion of the interest funds available to distribute interest at the pass-through rate for each such class of certificates.  As a result, interest may be unavailable for any other purpose.

If the protection afforded by overcollateralization is insufficient, then the holders of the group II certificates could experience a loss on their investment.

**Excess Interest Will Also Be Reduced By Prepayments On The Mortgage Loans In Aggregate Loan Group II**

When a borrower makes a full or partial prepayment on a mortgage loan in aggregate loan group II, the amount of interest that the borrower is required to pay may be less than the amount of interest the related certificateholders would otherwise be entitled to receive with respect to that mortgage loan. The master servicer is required to reduce its master servicing fee to offset this shortfall, but the reduction for any distribution date is limited to one-half of the master servicing fee for the related month. If the aggregate amount of interest shortfalls resulting from prepayments exceeds the amount of the reduction in the master servicing fee, the amount of interest available to make distributions of interest to the group II certificates and to maintain or restore overcollateralization will be reduced.

**Certain Interest Shortfalls Will Be Allocated To The Certificates Which Could Result In Shortfalls On The Payments Of The Group I Certificates**

When a borrower makes a full or partial prepayment on a mortgage loan in aggregate loan group I, the amount of interest that the borrower is required to pay may be less than the amount of interest holders of certificates related to that mortgage loan would otherwise be entitled to receive with respect to the mortgage loan. The master servicer is required to reduce its master servicing fee to offset this shortfall, but the reduction for any distribution date is limited to an amount equal to the product of one-twelfth of 0.125% and the aggregate stated principal balance of the mortgage loans in that loan group as of the first day of the prior month.  If the aggregate amount of interest shortfalls resulting from prepayments on the mortgage loans exceeds the amount of the reduction in the master servicing fee, the interest entitlement for each class of related certificates will be reduced proportionately by the amount of this excess.

Group I certificates also may be subject to certain shortfalls in interest collections arising from the application of the Servicemembers Civil Relief Act and similar state laws (referred to as the Relief Act). The Relief Act limits the interest charged on a mortgage loan for certain borrowers in excess of 6% per annum during the period of the borrower's active duty. These shortfalls are not required to be paid by the borrower at any future time, will not be offset by a reduction in the master servicing fee and will reduce the accrued interest on each related class of certificates on a pro rata basis.  In addition, pursuant to the laws of various states, under certain circumstances, payments on mortgage loans by residents in such states who are called into active duty with the National Guard or the reserves will be deferred.  These state laws may also limit the ability of the servicer to

foreclose on the related mortgaged property. This could result in delays or reductions in payment and increased losses on the mortgage loans in aggregate loan group I which would be borne by the related certificateholders. See *"Risk Factors – Impact of World Events"* in the prospectus.

**Possible Prepayment On The Senior Certificates Due To Inability To Acquire Supplemental Mortgage Loans**

The ability of the issuing entity to acquire supplemental mortgage loans depends on the ability of Countrywide Home Loans to originate or acquire mortgage loans during the period ending no later than the last day of the calendar month following the month in which the closing date occurs that meet the eligibility criteria for supplemental mortgage loans in each loan group, described in this prospectus supplement. The ability of Countrywide Home Loans to originate or acquire eligible supplemental mortgage loans will be affected by a number of factors including prevailing interest rates, employment levels and economic conditions, generally.

If any of the amounts on deposit in the pre-funding account allocated to purchase supplemental mortgage loans for a loan group cannot be used for that purpose, those amounts will be distributed to holders of the related classes of senior certificates as a prepayment of principal no later than the second distribution date.

The ability of the issuing entity to acquire supplemental mortgage loans with particular characteristics will also affect the size of the principal prepayment to the Class PO Certificates. It is expected that there will be some principal prepayment on the Class PO Certificates on either the first or second distribution date.

See *"Description of the Certificates — Principal"* in this prospectus supplement.

**Certificates May Not Be Appropriate For Some Investors**

The offered certificates may not be an appropriate investment for investors who do not have sufficient resources or expertise to evaluate the particular characteristics of each applicable class of offered certificates. This may be the case because, among other things:

•   the yield to maturity of offered certificates purchased at a price other than par will be sensitive to the uncertain rate and timing of principal prepayments on the related mortgage loans;

•   the rate of principal distributions on and the weighted average lives of the offered certificates will be sensitive to the uncertain rate and timing of principal prepayments on the related mortgage loans. Accordingly, the offered certificates may be an inappropriate investment if you

require a distribution of a particular amount of principal on a specific date or an otherwise predictable stream of distributions;

• you may not be able to reinvest distributions on an offered certificate (which, in general, are expected to be greater during periods of relatively low interest rates) at a rate at least as high as the pass-through rate applicable to your certificate; or

• a secondary market for the offered certificates may not develop or provide certificateholders with liquidity of investment.

**The Class 2-A-1 and Class 2-A-6 Certificates Involve Counterparty Risk**

The Class 2-A-1 and Class 2-A-6 Certificates bear interest at floating pass-through rates. Although the Class 2-A-1 and Class 2-A-6 Certificates may receive the related yield supplement amount, collections on the mortgage loans cannot support these payments. Payment of these amounts are *solely* dependent upon the performance of the corridor contract counterparty under the related corridor contract. The likelihood of receipt of these amounts is not covered by the ratings of the Class 2-A-1 and Class 2-A-6 Certificates. Thus, the payment of these amounts involves counterparty risk.

Investors in the Class 2-A-6 Certificates should note that the long-term ratings of the corridor contract counterparty are lower than "AAA."

See *"Description of the Certificates — The Corridor Contract"* in this prospectus supplement.

**Geographic Concentration Increases Risk That Certificate Yields Could Be Impaired**

The tables under *"The Mortgage Pool — State Distribution of Mortgaged Properties"* in Annex A to this prospectus supplement set forth the geographic concentration of the mortgaged properties, including the percentage by principal balance of the mortgage loans in each loan group secured by mortgaged property located in California, Florida and New York. Homes in California are more susceptible than homes located in other parts of the country to certain types of uninsurable hazards, such as earthquakes, floods, mudslides and other natural disasters. Homes in Florida and other parts of the southeastern United States are more likely to suffer uninsurable damage from tropical storms and hurricanes than other parts of the country. In addition,

• economic conditions in states with significant concentrations (which may or may not affect real

property values) may affect the ability of borrowers to repay their loans on time;

- declines in the residential real estate markets in states with significant concentrations may reduce the values of properties located in these states, which would result in an increase in the loan-to-value ratios; and

- any increase in the market value of properties located in states with significant concentrations would reduce the loan-to-value ratios and could, therefore, make alternative sources of financing available to the borrowers at lower interest rates, which could result in an increased rate of prepayment of the mortgage loans.

**Inability To Replace Master Servicer Could Affect Collections And Recoveries On The Mortgage Loans**

The structure of the master servicing fee might affect the ability to find a replacement master servicer.  Although the trustee is required to replace the master servicer if the master servicer is terminated or resigns, if the trustee is unwilling (including, for example, because the master servicing fee is insufficient) or unable (including, for example, because the trustee does not have the systems to service mortgage loans), it may be necessary to appoint a replacement master servicer.  Because the master servicing fee is structured as a percentage of the stated principal balance of each mortgage loan, it may be difficult to replace the master servicer at a time when the balance of the mortgage loans has been significantly reduced because the fee may be insufficient to cover the costs associated with servicing the mortgage loans and related REO Properties remaining in the pool.  The performance of the mortgage loans may be negatively impacted, beyond the expected transition period during a servicing transfer, if a replacement master servicer is not retained within a reasonable amount of time.

**Additional Considerations Related to the Exchangeable Certificates**

The characteristics of the Class 1-A-5, Class 1-A-6, Class 1-A-7, Class 1-A-8, Class 1-A-9, Class 1-A-10, Class 1-A-11, Class 1-A-12, Class 1-A-13, Class 1-A-14, Class 1-A-15, Class 2-A-11, Class 2-A-12, Class 2-A-13, Class 2-A-14, Class 2-A-15, Class 2-A-16, Class 2-A-17, Class 2-A-18, Class 2-A-19, Class 2-A-20, Class 2-A-21, Class 2-A-22, Class 2-A-23, Class 2-A-24, Class 2-A-25, Class 2-A-26, Class 2-A-27, Class 2-A-28, Class 2-A-29, Class 2-A-30, Class 2-A-31, Class 2-A-32, Class 2-A-33, Class 2-A-34, Class 2-A-35, Class 2-A-36, Class 2-A-37, Class 2-A-38, Class 2-A-39, Class 2-A-40, Class 2-A-41, Class 2-A-42, Class 2-A-43 and Class 2-A-44 Certificates, which are referred to as exchangeable certificates will reflect, as applicable, the characteristics of the Class 1-A-1,
 Class 1-A-3, Class 1-A-4, Class 2-A-3, Class 2-A-4,
Class 2-A-5, Class 2-A-8, Class 2-A-9 and Class 2-A-10

Certificates, which are referred to as depositable certificates. Investors should also consider a number of factors that will limit a certificateholder's ability to exchange depositable certificates for exchangeable certificates and vice versa:

- At the time of the proposed exchange, a certificateholder must own certificates of the related class or classes in the exact proportions necessary to make the desired exchange and must pay the exchange fee.

- A certificateholder that does not own the certificates may be unable to obtain the necessary depositable certificates or exchangeable certificates.

- The certificateholder of needed certificates may refuse to sell them at a reasonable price (or any price) or may be unable to sell them.

- Certain certificates may have been purchased or placed into other financial structures and thus may be unavailable.

- Principal distributions will decrease the amounts available for exchange over time.

- Only the combinations listed on Annex II to this prospectus supplement are permitted.

- You must own the required class or classes of depositable certificates to participate in an exchange and receive the corresponding class or classes of exchangeable certificates.

- We make no statement as to the possible merits of any exchange.

**Recent Developments in the Residential Mortgage Market May Adversely Affect the Performance and Market Value of Your Securities**

Recently, the residential mortgage market in the United States has experienced a variety of difficulties and changed economic conditions that may adversely affect the performance and market value of your securities. Delinquencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase, particularly in the subprime sector. In addition, in recent months housing prices and appraisal values in many states have declined or stopped appreciating, after extended periods of significant appreciation. A continued decline or an extended flattening of those values may result in additional increases in delinquencies and losses on residential mortgage loans generally.

**Rights of the NIM Insurer**

If there is a NIM Insurer, pursuant to the pooling and servicing agreement, unless the NIM Insurer fails to make a required payment under the policy insuring the net interest margin securities and the failure is continuing or the NIM Insurer is the

subject of a bankruptcy proceeding (each such event, a "NIM Insurer Default"), the NIM Insurer will be entitled to exercise, among others, the following rights without the consent of holders of the offered certificates, and the holders of the offered certificates may exercise such rights only with the prior written consent of the NIM Insurer:

- the right to provide notices of master servicer defaults and the right to direct the trustee to terminate the rights and obligations of the master servicer under the pooling and servicing agreement upon a default by the master servicer,

- the right to remove the trustee or any custodian pursuant to the pooling and servicing agreement, and

- the right to direct the trustee to make investigations and take actions pursuant to the pooling and servicing agreement.

In addition, unless a NIM Insurer Default exists, such NIM Insurer's consent will be required before, among other things,

- any removal of the master servicer, any successor servicer or the trustee, any appointment of any co-trustee,

- any otherwise permissible waivers of prepayment charges or extensions of due dates for payment granted by the master servicer with respect to more than 5% of the mortgage loans, or

- any amendment to the pooling and servicing agreement.

Investors in the offered certificates should note that:

- any insurance policy issued by the NIM Insurer will not cover, and will not benefit in any manner whatsoever, the offered certificates,

- the rights granted to the NIM Insurer are extensive,

- the interests of the NIM Insurer may be inconsistent with, and adverse to, the interests of the holders of the offered certificates, and the NIM Insurer has no obligation or duty to consider the interests of the offered certificates in connection with the exercise or nonexercise of the NIM Insurer's rights, and

- the NIM Insurer's exercise of its rights and consents may negatively affect the offered certificates and the existence of the NIM Insurer's rights, whether or not exercised, may adversely affect the liquidity of the offered certificates, relative to other asset-backed certificates backed by

comparable mortgage loans and with comparable payment priorities and ratings.

*See "Rights of the NIM Insurer under Pooling and Servicing Agreement" in this prospectus supplement.*

**Some of the statements contained in or incorporated by reference in this prospectus supplement and the accompanying prospectus consist of forward-looking statements relating to future economic performance or projections and other financial items. These statements can be identified by the use of forward-looking words such as "may," "will," "should," "expects," "believes," "anticipates," "estimates," or other comparable words. Forward-looking statements are subject to a variety of risks and uncertainties that could cause actual results to differ from the projected results. Those risks and uncertainties include, among others, general economic and business conditions, regulatory initiatives and compliance with governmental regulations,  customer preferences and various other matters, many of which are beyond our control. Because we cannot predict the future, what actually happens may be very different from what we predict in our forward-looking statements.**

**The Mortgage Pool**

**General**

The Depositor, CWALT, Inc., will purchase the Mortgage Loans in the mortgage pool from Countrywide Home Loans, Inc. ("Countrywide Home Loans") and one or more other sellers affiliated with Countrywide Financial Corporation (each of which is referred to as a seller and together they are referred to as the "sellers") pursuant to a Pooling and Servicing Agreement (the "Pooling and Servicing Agreement") dated as of February 1, 2007 among the sellers, Countrywide Home Loans Servicing LP, as Master Servicer, the Depositor and The Bank of New York, as Trustee, and will cause the Mortgage Loans to be assigned to the Trustee for the benefit of the holders of the certificates. In this prospectus supplement, Mortgage Loans in Loan Group 1 are referred to as the "Group 1 Mortgage Loans," Mortgage Loans in Loan Group 2 are referred to as the "Group 2 Mortgage Loans" and Mortgage Loans in Loan Group 3 are referred to as the "Group 3 Mortgage Loans," and together they are referred to as the "Mortgage Loans". The Group 1 Mortgage Loans and Group 2 Mortgage Loans, together, are sometimes referred to as "Aggregate Loan Group I" and the Group 3 Mortgage Loans are sometimes referred to as "Aggregate Loan Group II." The Group 1 Mortgage Loans, the Group 2 Mortgage Loans and the Group 3 Mortgage Loans that are purchased by the Depositor and assigned to the Trustee on the Closing Date and that are listed in the tables in this section are referred to as the "Initial Mortgage Loans". The Initial Mortgage Loans in Loan Group 1, together with any other Mortgage Loans that are purchased by the Depositor and assigned to the Trustee for inclusion in Loan Group 1 on the Closing Date, are referred to as the "Group 1 Closing Date Mortgage Loans," the Initial Mortgage Loans in Loan Group 2, together with any other Mortgage Loans that are purchased by the Depositor and assigned to the Trustee for inclusion in Loan Group 2 on the Closing Date, are referred to as the "Group 2 Closing Date Mortgage Loans" and the Initial Mortgage Loans in Loan Group 3, together with any other Mortgage Loans that are purchased by the Depositor and assigned to the Trustee for inclusion in Loan Group 3 on the Closing Date, are referred to as the "Group 3 Closing Date Mortgage Loans." Each seller, other than Countrywide Home Loans, will be a special purpose entity established by Countrywide Financial Corporation or one or more of its subsidiaries, which will sell Mortgage Loans previously acquired from Countrywide Home Loans.

Under the Pooling and Servicing Agreement, Countrywide Home Loans will make certain representations, warranties and covenants to the Depositor relating to, among other things, the due execution and enforceability of the Pooling and Servicing Agreement and certain characteristics of the Mortgage Loans. In addition, each of the sellers will represent and warrant that, prior to the sale of the related Mortgage Loans to the Depositor, the applicable seller had good title to the Mortgage Loans sold by it, was the sole owner of those Mortgage Loans free and clear of any pledge, lien, encumbrance or other security interest and had full right and authority, subject to no interest or participation of, or agreement with, any other party, to sell and assign those Mortgage Loans pursuant to the Pooling and Servicing Agreement. Subject to the limitations described in the next sentence and under *"— Assignment of the Mortgage Loans,"* Countrywide Home Loans (or the related seller, in the case of the representation regarding good title) will be obligated to repurchase or substitute a similar Mortgage Loan for any Mortgage Loan as to which there exists deficient documentation or as to which there has been an uncured breach of any representation or warranty relating to the characteristics of the Mortgage Loans that materially and adversely affects the interests of the certificateholders in that Mortgage Loan. Countrywide Home Loans will represent and warrant to the Depositor in the Pooling and Servicing Agreement that the Mortgage Loans were selected from among the outstanding one- to four-family Mortgage Loans in Countrywide Home Loans' portfolio as to which the representations and warranties set forth in the Pooling and Servicing Agreement can be made and that the selection was not made in a manner intended to affect the interests of the certificateholders adversely. See *"Loan Program — Representations by Sellers; Repurchases"* in the prospectus.

Under the Pooling and Servicing Agreement, the Depositor will assign all its right, title and interest in the representations, warranties and covenants (including the sellers' repurchase or substitution obligation) to the Trustee for the benefit of the certificateholders.  The Depositor will represent that following the transfer of the Mortgage Loans to it by the sellers, the Depositor had good title to the Mortgage Loans and that each of the mortgage notes was subject to no offsets, defenses or counterclaims. The Depositor will make no other representations or warranties with respect to the Mortgage Loans and will have no obligation to repurchase or substitute Mortgage Loans with deficient documentation or which are otherwise defective.  The sellers are selling the Mortgage Loans without recourse and will have no obligation with respect to the certificates in their respective capacities as sellers other than the repurchase or substitution obligation described above.  The obligations of the Master Servicer with respect to the certificates are limited to the Master Servicer's contractual servicing obligations under the Pooling and Servicing Agreement.

The statistical information with respect to the Initial Mortgage Loans set forth in this prospectus supplement is based on the Stated Principal Balance of each Initial Mortgage Loan as of the later of (x) February 1, 2007 and (y) the date of origination of such Initial Mortgage Loan (referred to as, the "Initial Cut-off Date")  The Depositor believes that the information set forth in this prospectus supplement regarding the Initial Mortgage Loans as of the initial cut-off date is representative of the characteristics of the Mortgage Loans that will be delivered on the Closing Date. However, certain Initial Mortgage Loans may prepay or may be determined not to meet the eligibility requirements for inclusion in the final mortgage pool.  A limited number of Mortgage Loans may be substituted for the Initial Mortgage Loans described in this prospectus supplement and Mortgage Loans may be added to Loan Group 1, Loan Group 2 and Loan Group 3, although any addition or substitution will not result in a material difference in the mortgage pool on the Closing Date or the final mortgage pool at the end of the Funding Period.  As a result, the initial cut-off date information regarding the actual Mortgage Loans delivered on the Closing Date and the final mortgage pool delivered at the end of the Funding Period may vary somewhat from the initial cut-off date information regarding the Initial Mortgage Loans presented in this prospectus supplement.

As of the initial cut-off date, the aggregate of the Stated Principal Balance of the Initial Mortgage Loans was approximately $570,621,110, which is referred to as the "Initial Cut-off Date Pool Principal Balance".  These Initial Mortgage Loans have been divided into three groups of Mortgage Loans — Loan Group 1, which had a principal balance as of the initial cut-off date of approximately $183,324,109, Loan Group 2, which had a principal balance as of the initial cut-off date of approximately $188,119,677 and Loan Group 3, which had a principal balance as of the initial cut-off date of approximately $199,177,324. All of the Mortgage Loans to be included in the issuing entity will be evidenced by promissory notes secured by first lien deeds of trust, security deeds or mortgages on one- to four-family residential properties.  Substantially all the Initial Mortgage Loans have original terms to maturity of 30 years.

Whenever reference is made in this prospectus supplement to a percentage of some or all of the Initial Mortgage Loans, that percentage is determined on the basis of the Stated Principal Balance of such Initial Mortgage Loans as of the initial cut-off date, unless otherwise specified.  The Initial Cut-off Date Pool Principal Balance of the Mortgage Loans set forth above is subject to a variance of plus or minus five percent.

Set forth below are the originators of the listed approximate percentage of the Initial Mortgage Loans in each Loan Group by aggregate Stated Principal Balance of the Initial Mortgage Loans in that Loan Group as of the initial cut-off date are:

| Originator | % of Mortgage Loans in Loan Group 1 | % of Mortgage Loans in Loan Group 2 | % of Mortgage Loans in Loan Group 3 |
|---|---|---|---|
| American Home Mortgage Corp. | 3.87 | 24.12 | 13.35 |
| Countrywide Home Loans | 67.61 | 50.72 | 25.29 |
| SouthStar Funding LLC | 0.00 | 0.00 | 29.48 |

With the exception of 113, 168 and 251 Initial Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3, respectively, representing approximately 39.06%, 42.95% and 41.83% of the aggregate Stated Principal Balance of the Initial Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3, respectively, as of the initial cut-off date, all of the Initial Mortgage Loans, other than balloon loans, will provide for the amortization of the amount financed over a series of substantially equal monthly payments.  The terms of the remaining Initial Mortgage Loans only require the related mortgagor to pay interest on the principal balance of the Mortgage Loan for the first five or ten years after its origination, but require that the entire principal balance of the Mortgage Loan be fully amortized over the related remaining term of the Mortgage Loan following such interest only period.  Further, 19 Mortgage Loans in Loan Group 3 representing approximately 2.12% of the Stated Principal Balance of that Loan Group as of the initial cut-off date, provide for monthly payments of principal based on an amortization schedule significantly longer than the remaining term of those Mortgage Loans and a disproportionate principal payment at their stated maturities (the "balloon loans").  Substantially all of the Mortgage Loans will provide that payments are due on the first day of each month (the "Due Date").

Scheduled monthly payments made by the mortgagors on the Mortgage Loans (referred to as scheduled payments) either earlier or later than their scheduled Due Dates will not affect the amortization schedule or the relative application of the payments to principal and interest.  Except for approximately 8.84%, 8.84% and 38.05% of the Initial Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3, respectively, by aggregate Stated Principal Balance of the Initial Mortgage Loans in that Loan Group as of the initial cut-off date, the mortgagors may prepay their Mortgage Loans at any time without charge.  The prepayment charge period for those Mortgage Loans will be up to five years from origination.  The holders of the Class P or Class 3-P Certificates, as applicable, will be entitled to all prepayment charges received on the Mortgage Loans in the related aggregate loan group and those amounts will not be available for distribution on the other classes of certificates.  Under certain circumstances, as described in the Pooling and Servicing Agreement, the Master Servicer may waive the payment of any otherwise applicable prepayment charges.  Investors should conduct their own analysis of the effect, if any, that the prepayment charges, and decisions by the Master Servicer with respect to the waiver thereof, may have on the prepayment performance of the Mortgage Loans.  The Depositor makes no representation as to the effect that the prepayment charges, and decisions by the Master Servicer with respect to the waiver thereof, may have on the prepayment performance of the applicable Mortgage Loans.

The earliest first payment date and the earliest and latest stated maturity date of any Initial Mortgage Loan in each Loan Group is as follows:

| | Earliest First Payment Date | Earliest Stated Maturity Date | Latest Stated Maturity Date |
|---|---|---|---|
| Loan Group 1 | August 1, 2003 | July 1, 2021 | February 1, 2037 |
| Loan Group 2 | April 1, 2006 | June 1, 2026 | February 1, 2037 |
| Loan Group 3 | February 1, 2005 | November 1, 2021 | December 1, 2046 |

As of the Closing Date, all payments with respect to each Mortgage Loan due prior to the initial cut-off date have been made.

The following tables set forth the number of Initial Mortgage Loans, the aggregate Stated Principal Balance of those Initial Mortgage Loans and the percentage of the Initial Mortgage Loans in each Loan Group that have been delinquent for 30 or more days, one or more times in the twelve months preceding the initial cut-off date:

**Loan Group 1**

| Delinquency Status | Number of Initial Mortgage Loans | Aggregate Principal Balance of Initial Mortgage Loans | Percentage of Initial Mortgage Loans |
|---|---|---|---|
| 1 × 30 ......................... | 2 | $908,723 | 0.50% |

**Loan Group 2**

| Delinquency Status | Number of Initial Mortgage Loans | Aggregate Principal Balance of Initial Mortgage Loans | Percentage of Initial Mortgage Loans |
|---|---|---|---|
| 1 × 30 ......................... | 1 | $102,188 | 0.05% |

**Loan Group 3**

| Delinquency Status | Number of Initial Mortgage Loans | Aggregate Principal Balance of Initial Mortgage Loans | Percentage of Initial Mortgage Loans |
|---|---|---|---|
| 1 × 30 ......................... | 25 | $5,218,157 | 2.62% |
| 1 × 60 ......................... | 3 | $451,250 | 0.23% |
| 1 × 90 ......................... | 2 | $210,451 | 0.11% |
| 2 × 30 ......................... | 8 | $1,476,878 | 0.74% |
| 2 × 60 ......................... | 1 | $121,869 | 0.06% |

Delinquencies with respect to the Mortgage Loans will be recognized in accordance with the methodology used by the Mortgage Bankers Association of America.  Under this methodology, a Mortgage Loan is considered "30 days delinquent" if the borrower fails to make a scheduled monthly payment prior to the close of business on the day immediately preceding the Due Date for the next scheduled monthly payment.  A similar methodology is used for determining whether a Mortgage Loan is 60 days delinquent.  For example, a Mortgage Loan will be considered 30 days delinquent if the borrower fails to make a scheduled monthly payment originally due on March 1 by the close of business on March 31, and it will be considered 60 days delinquent if the borrower fails to make that scheduled monthly payment by the close of business on April 30.

As of the initial cut-off date, no Initial Mortgage Loan in any Loan Group was subject to a buydown agreement.

No Mortgage Loan in any Loan Group provides for deferred interest or negative amortization.

No Initial Mortgage Loan in any Loan Group had a Loan-to-Value Ratio at origination or on the Closing Date of more than 100%.  Generally, each Mortgage Loan with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac. The policy provides coverage in an amount equal to a specified percentage times the sum of the remaining principal balance of the related Mortgage Loan, the accrued interest thereon and the related foreclosure expenses. The specified coverage percentage for Mortgage Loans with terms to maturity between 25 and 30 years is generally,

• 12% for Loan-to-Value Ratios between 80.01% and 85.00%,

- 25% for Loan-to-Value Ratios between 85.01% and 90.00%,

- 30% for Loan-to-Value Ratios between 90.01% and 95.00%, and

- 35% for Loan-to-Value Ratios between 95.01% and 100%.

The specified coverage percentage for Mortgage Loans with terms to maturity of up to 20 years ranges from:

- 6% to 12% for Loan-to-Value Ratios between 80.01% and 85.00%,

- 12% to 20% for Loan-to-Value Ratios between 85.01% and 90.00%, and

- 20% to 25% for Loan-to-Value Ratios between 90.01% and 95.00%.

The required coverage percentage of mortgage insurance is determined by the type, term and Loan-to-Value Ratio of the Mortgage Loan and may also vary based on occupancy type. However, under certain circumstances, the specified coverage level may vary from the foregoing. With respect to 2, 3 and 29 Initial Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3, respectively, that will be identified on the Mortgage Loan schedules and representing approximately 0.43%, 0.48% and 4.27% of the aggregate Stated Principal Balance of the Initial Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3, respectively, as of the initial cut-off date, the lender (rather than the borrower) acquired the primary mortgage guaranty insurance and charged the related borrower an interest premium. Except for these lender acquired mortgage insurance Mortgage Loans, no primary mortgage guaranty insurance policy will be required with respect to any Mortgage Loan if maintaining the policy is prohibited by applicable law or after the date on which the related Loan-to-Value Ratio is 80% or less or, based on a new appraisal, the principal balance of the Mortgage Loan represents 80% or less of the new appraised value. The primary mortgage guaranty insurance policy will be maintained for the life of the lender acquired mortgage insurance Mortgage Loans, unless otherwise provided in the mortgage note or prohibited by law.

The "Loan-to-Value Ratio" of a Mortgage Loan at any given time is a fraction, expressed as a percentage, the numerator of which is the principal balance of the related Mortgage Loan at the date of determination and the denominator of which is the Collateral Value. The "Collateral Value" is,

- in the case of a purchase, the lesser of the selling price of the mortgaged property or its appraised value at the time of sale, or

- in the case of a refinance, the appraised value of the mortgaged property at the time of the refinance, except in the case of a Mortgage Loan underwritten pursuant to Countrywide Home Loans' Streamlined Documentation Program as described under *"—Underwriting Process."*

With respect to Mortgage Loans originated pursuant to the Streamlined Documentation Program,

- if the loan-to-value ratio at the time of the origination of the Mortgage Loan being refinanced was 80% or less and the loan amount of the new loan being originated is $650,000 or less, then the Loan-to-Value Ratio will be the ratio of the principal amount of the new Mortgage Loan being originated divided by the appraised value of the related mortgaged property at the time of the origination of the Mortgage Loan being refinanced, as reconfirmed by Countrywide Home Loans using an automated property valuation system; or

- if the loan-to-value ratio at the time of the origination of the Mortgage Loan being refinanced was greater than 80% or the loan amount of the new loan being originated is greater than

$650,000, then the Loan-to-Value Ratio will be the ratio of the principal amount of the new Mortgage Loan being originated divided by the appraised value of the related mortgaged property as determined by an appraisal obtained by Countrywide Home Loans at the time of the origination of the new Mortgage Loan. See *"— Underwriting Process"* in this prospectus supplement.

No assurance can be given that the value of any mortgaged property has remained or will remain at the level that existed on the appraisal or sales date.  If residential real estate values generally or in a particular geographic area decline, the Loan-to-Value Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to the Mortgage Loans.

Although all of the Mortgage Loans are secured by first liens, the tables set forth in Annex A include the Combined Loan-to-Value Ratios of certain Mortgage Loans.  The "Combined Loan-to-Value Ratio" of a Mortgage Loan originated by Countrywide Home Loans is a fraction, expressed as a percentage, the numerator of which is the sum of (i) the principal balance of the Mortgage Loan at origination and (ii) the outstanding principal balance at origination of the Mortgage Loan of any junior Mortgage Loan(s) originated by Countrywide Home Loans contemporaneously with the origination of the senior Mortgage Loan (or, in the case of any open-ended junior revolving home equity line of credit, the maximum available line of credit with respect to that junior Mortgage Loan), and the denominator of which is the Collateral Value.  If a Mortgage Loan was originated by Countrywide Home Loans in connection with the refinancing of an existing Mortgage Loan, the numerator of the Combined Loan-to-Value Ratio for that Mortgage Loan will also include the outstanding principal balance at origination of any junior Mortgage Loan(s) originated by Countrywide Home Loans during the 12 months following the origination of the Mortgage Loan being refinanced.

The Combined Loan-to-Value Ratio of a Mortgage Loan not originated by Countrywide Home Loans is the Loan-to-Value Ratio of that Mortgage Loan and accordingly does not reflect the presence or amount of any junior Mortgage Loan secured by the same mortgaged property.

For statistical information regarding certain characteristics of the Initial Mortgage Loans as of the initial cut-off date is set forth in Annex A hereto.

### Assignment of the Mortgage Loans

Pursuant to the Pooling and Servicing Agreement, on the Closing Date, the Depositor will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee in trust for the benefit of the certificateholders and the Class 3-A-2 Insurer all right, title and interest of the Depositor in and to each Group 1 Closing Date Mortgage Loan, each Group 2 Closing Date Mortgage Loan and each Group 3 Closing Date Mortgage Loan and all right, title and interest in and to all other assets included in Alternative Loan Trust 2007-J1, including all principal and interest received on or with respect to the Closing Date Mortgage Loans, but not any principal and interest due on or before the initial cut-off date, and amounts on deposit in the Pre-funding Account and the Capitalized Interest Account on the Closing Date.

In connection with the transfer and assignment of a Mortgage Loan, the Depositor will deliver or cause to be delivered to the Trustee, or a custodian for the Trustee, the mortgage file, which contains among other things,

- the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the Depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost;

S-55

- the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument;

- an assignment in recordable form of the mortgage or a copy of such assignment;

- the original or a copy of the title policy with respect to the related mortgaged property; and

- if applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the Trustee as soon as the same is available to the Depositor).

With respect to up to 50% of the Mortgage Loans in each Loan Group delivered on the Closing Date, the Depositor may deliver all or a portion of each related mortgage file to the Trustee not later than thirty days after the Closing Date and not later than twenty days after the relevant Supplemental Transfer Date (as defined below) with respect to up to 90% of the Supplemental Mortgage Loans (as defined below) in each Loan Group conveyed on such Supplemental Transfer Date.  Assignments of the Mortgage Loans to the Trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states where, in the opinion of counsel, recording is not required to protect the Trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the Depositor or any seller or a transferor, as the case may be.  The Depositor expects that substantially all of the assignments will not be recorded based on an opinion of counsel.

The Trustee will hold the Mortgage Loan documents in trust for the benefit of the holders of the certificates in accordance with its customary procedures, including storing the documents in fire-resistant facilities.  The Trustee will review each mortgage file relating to the Mortgage Loans delivered on the Closing Date within 90 days of the Closing Date (or promptly after the Trustee's receipt of any document permitted to be delivered after the Closing Date) and the documents relating to the Supplemental Mortgage Loans promptly after the Trustee's receipt thereof after the related Supplemental Transfer Date as described above, and if any document in a mortgage file is found to be missing or defective in a material respect and Countrywide Home Loans does not cure the defect within 90 days of notice of the defect from the Trustee (or within such longer period not to exceed 720 days after the Closing Date as provided in the Pooling and Servicing Agreement in the case of missing documents not returned from the public recording office), Countrywide Home Loans will be obligated to repurchase the related Mortgage Loan from the issuing entity at the purchase price described in the prospectus under "*Loan Program — Representations by Sellers; Repurchases.*"  Rather than repurchase the Mortgage Loan as provided above, Countrywide Home Loans may remove the Mortgage Loan (referred to as a deleted Mortgage Loan) from the issuing entity and substitute in its place another Mortgage Loan (referred to as a replacement Mortgage Loan); however, such a substitution is permitted only within two years of the Closing Date and may not be made unless an opinion of counsel is provided to the Trustee to the effect that such a substitution will not disqualify any REMIC or result in a prohibited transaction tax under the Internal Revenue Code of 1986, as amended (the "Code").  Any replacement Mortgage Loan generally will, on the date of substitution, among other characteristics set forth in the Pooling and Servicing Agreement,

- have a principal balance, after deduction of all scheduled payments due in the month of substitution, not in excess of, and not more than 10% less than, the Stated Principal Balance of the deleted Mortgage Loan (the amount of any shortfall to be deposited by Countrywide Home Loans in the Certificate Account and held for distribution to the certificateholders on the related Distribution Date (referred to as a "Substitution Adjustment Amount")),

- have a mortgage rate not lower than, and not more than 1% per annum higher than, that of the deleted Mortgage Loan,

- have a Loan-to-Value Ratio not higher than that of the deleted Mortgage Loan,

- have a remaining term to maturity not greater than, and not more than one year less than, that of the deleted Mortgage Loan, and

- comply with all of the representations and warranties set forth in the Pooling and Servicing Agreement as of the date of substitution.

This cure, repurchase or substitution obligation constitutes the sole remedy available to certificateholders or the Trustee for omission of, or a material defect in, a Mortgage Loan document.

Notwithstanding the foregoing, in lieu of providing the duly executed assignment of the mortgage to the Trustee or copies thereof and the original recorded assignment or assignments of the mortgage together with all interim recorded assignments of such mortgage or copies thereof, above, the Depositor may at its discretion provide evidence that the related mortgage is held through the MERS® System. In addition, the mortgages for some or all of the Mortgage Loans in the issuing entity that are not already held through the MERS® System may, at the discretion of the Master Servicer, in the future be held through the MERS® System. For any mortgage held through the MERS® System, the mortgage is recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, as nominee for the owner of the Mortgage Loan, and subsequent assignments of the mortgage were, or in the future may be, at the discretion of the Master Servicer, registered electronically through the MERS® System. For each of these Mortgage Loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the Trustee, and does not have any interest in the Mortgage Loan.

**Conveyance of Supplemental Mortgage Loans**

If the aggregate Stated Principal Balance of the Group 1 Closing Date Mortgage Loans, the Group 2 Closing Date Mortgage Loans or the Group 3 Closing Date Mortgage Loans, as of the initial cut-off date, is less than $185,518,431, $206,845,414 and $199,177,324, respectively, an account (the "Pre-funding Account") will be established with the Trustee on the Closing Date and funded in an amount equal to the excess of the related amount (the "Pre-funded Amount") set forth above over the balance of the aggregate Stated Principal Balance of the Group 1 Closing Date Mortgage Loans, the Group 2 Closing Date Mortgage Loans and Group 3 Closing Date Mortgage Loans, respectively, as of the initial cut-off date.  As of the date of this prospectus supplement, the Pre-funded Amount is expected to be approximately $28,203,654 of which approximately $2,194,322 will be allocated to Loan Group 1, approximately $18,725,738 will be allocated to Loan Group 2 and approximately $7,283,594 will be allocated to Loan Group 3, but the amount actually deposited in the Pre-funding Account on the Closing Date will equal the excess, if any, of the aggregate Class Certificate Balance of the certificates related to each of these Loan Groups as of the Closing Date, over the aggregate Stated Principal Balance of the applicable Closing Date Mortgage Loans as of the initial cut-off date.  Amounts on deposit in Pre-funding Account may be used to purchase Mortgage Loans after the Closing Date to be included in the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3.  Such Mortgage Loans are referred to as Supplemental Mortgage Loans ("Supplemental Mortgage Loans").

Any investment income earned from amounts in the Pre-funding Account will be paid to the Depositor and will not be available for payments on the certificates. During the period from the Closing Date to the earlier of the date on which the amount in the Pre-funding Account allocated to purchase Supplemental Mortgage Loans is less than $150,000 and March 31, 2007 (the "Funding Period"), the

Depositor is expected to purchase Supplemental Mortgage Loans from one or more of the sellers and sell those Supplemental Mortgage Loans to the issuing entity as described below. The purchase price for each Supplemental Mortgage Loan purchased by the trust after the Closing Date will equal the Stated Principal Balance of the Supplemental Mortgage Loan as of the later of the first day of the month of the transfer to the issuing entity and the date of origination of that Mortgage Loan (the related "Supplemental Cut-off Date") and will be paid from the Pre-funding Account. Accordingly, the purchase of Supplemental Mortgage Loans for a Loan Group will decrease the amount on deposit in the Pre-funding Account for that Loan Group and increase the Stated Principal Balance of the Mortgage Loans in the related Loan Group.

Because some of the Mortgage Loans may not be acquired by the issuing entity until after the Closing Date, there may not be sufficient interest collections from the Initial Mortgage Loans in those Loan Groups to pay all the interest due on the certificates, and with respect to the Class 3-A-2 Certificates, the Class 3-A-2 Premium, related to those Loan Groups on the first and possibly the second Distribution Dates. A capitalized interest account (the "Capitalized Interest Account") will be established and funded on the Closing Date from which funds (together with any investment earnings thereon) will be drawn upon to offset any interest shortfall on the Distribution Date during and, if necessary, immediately following the Funding Period as a result of the supplemental loan mechanism. Any amounts remaining in the Capitalized Interest Account after making distributions of interest and the Class 3-A-2 Premium on the first Distribution Date following the end of the Funding Period will be paid to Countywide Home Loans and will not thereafter be available for distribution to certificateholders.

Amounts on deposit in the Pre-funding Account and the Capitalized Interest Account will be invested in permitted investments.  The Pre-funding Account and the Capitalized Interest Account will not be assets of any REMIC.

Pursuant to the Pooling and Servicing Agreement and a supplemental transfer agreement (a "Supplemental Transfer Agreement") to be executed by the applicable seller, the Depositor and the Trustee, the conveyance of Supplemental Mortgage Loans may be made on any business day during the Funding Period (a "Supplemental Transfer Date"), subject to the fulfillment of certain conditions in the Pooling and Servicing Agreement, including that the Supplemental Mortgage Loans conveyed on the related Supplemental Transfer Date satisfy the same representations and warranties in the Pooling and Servicing Agreement applicable to all of the Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3, and that, as of the Supplemental Cut-off Date:

- the Supplemental Mortgage Loans conveyed on that Supplemental Transfer Date were selected in a manner reasonably believed not to be adverse to the interests of the certificateholders or the Class 3-A-2 Insurer,

- the Trustee receives an opinion of counsel with respect to the validity of the conveyance of the Supplemental Mortgage Loans conveyed on that Supplemental Transfer Date,

- the Supplemental Mortgage Loans conveyed on that Supplemental Transfer Date were originated in accordance with the underwriting standards described in this prospectus supplement,

- with respect to the Supplemental Mortgage Loans in Loan Group 1 and Loan Group 2, the aggregate of the PO Percentages of the Stated Principal Balances of all Supplemental Mortgage Loans in Loan Group 1 and Loan Group 2 (also referred to as the PO Sublimit) will be no greater than approximately $40,759 and $27,100, respectively,

- the conveyance of the Supplemental Mortgage Loans on that Supplemental Transfer Date will not result in a reduction or withdrawal of any ratings assigned to the offered certificates without regard to the Class 3-A-2 Policy, and

- following the conveyance of the Supplemental Mortgage Loans on that Supplemental Transfer Date to the issuing entity, the characteristics of Loan Group 1, Loan Group 2 and Loan Group 3 will not vary by more than the permitted variance specified below from the characteristics listed below; provided that for the purpose of making such calculations, the characteristics for any Group 1 Closing Date Mortgage Loan, Group 2 Closing Date Mortgage Loan or Group 3 Closing Date Mortgage Loan will be taken as of the initial cut-off date and the characteristics for any Supplemental Mortgage Loan will be taken as of the related Supplemental Cut-off Date:

**Loan Group 1**

| Characteristic | | Permitted Variance or Range |
|---|---|---|
| Average Stated Principal Balance | $617,000 | 10% |
| Weighted Average Mortgage Rate | 6.404% | 10 bps |
| Weighted Average Original Loan-to-Value Ratio | 69.00% | 5% |
| Weighted Average Remaining Term to Maturity | 357 months | 2 months |
| Weighted Average FICO Credit Score | 693 points | 10 points |

**Loan Group 2**

| Characteristic | | Permitted Variance or Range |
|---|---|---|
| Average Stated Principal Balance | $420,000 | 10% |
| Weighted Average Mortgage Rate | 7.076% | 10 bps |
| Weighted Average Original Loan-to-Value Ratio | 74.00% | 5% |
| Weighted Average Remaining Term to Maturity | 358 months | 2 months |
| Weighted Average FICO Credit Score | 689 points | 10 points |

**Loan Group 3**

| Characteristic | | Permitted Variance or Range |
|---|---|---|
| Average Stated Principal Balance | $284,000 | 10% |
| Weighted Average Mortgage Rate | 7.305% | 10 bps |
| Weighted Average Original Loan-to-Value Ratio | 78.00% | 5% |
| Weighted Average Remaining Term to Maturity | 357 months | 2 months |
| Weighted Average FICO Credit Score | 680 points | 10 points |

## Underwriting Process – Countrywide Home Loans, Inc.

### *General*

Approximately 67.61%, 50.72% and 25.29% of the Initial Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3, respectively, in each case by aggregate Stated Principal Balance of the Initial Mortgage Loans as of the initial cut-off date were originated by Countrywide Home Loans, Inc. or acquired by Countrywide Home Loans from correspondent lenders using Countrywide Home Loans' underwriting guidelines (the "Countrywide Mortgage Loans").  Countrywide Home Loans has been originating Mortgage Loans since 1969.

As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation.  Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.

In assessing a prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit Scores. "FICO Credit Scores" are statistical credit scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history.  FICO Credit Scores were not developed to predict the likelihood of default on Mortgage Loans and, accordingly, may not be indicative of the ability of a mortgagor to repay its Mortgage Loan.  FICO Credit Scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score.  Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit Scores, which indicate a more favorable credit history, and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years may be eligible for Countrywide Home Loans' processing program (the "Preferred Processing Program").  None of the Countrywide Mortgage Loans have been underwritten pursuant to Countrywide Home Loans' Preferred Processing Program.  Countrywide Home Loans may waive some documentation requirements for Mortgage Loans originated under the Preferred Processing Program.

Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for Mortgage Loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a Mortgage Loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire Mortgage Loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the Mortgage Loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a Mortgage Loan may not have been reviewed by Countrywide Home Loans before acquisition of the Mortgage Loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing Mortgage Loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the Mortgage Loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself.

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed Mortgage Loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.  The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each

prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs. Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

Countrywide Home Loans may provide secondary financing to a mortgagor contemporaneously with the origination of a Mortgage Loan, subject to the following limitations: the Loan-to-Value Ratio of the senior (i.e., first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%. Countrywide Home Loans' underwriting guidelines do not prohibit or otherwise restrict a mortgagor from obtaining secondary financing from lenders other than Countrywide Home Loans, whether at origination of the Mortgage Loan or thereafter.

The nature of the information that a borrower is required to disclose and whether the information is verified depends, in part, on the documentation program used in the origination process. In general under the Full Documentation Loan Program (the "Full Documentation Program"), each prospective borrower is required to complete an application which includes information with respect to the applicant's assets, liabilities, income, credit history, employment history and other personal information. Self-employed individuals are generally required to submit their two most recent federal income tax returns. Under the Full Documentation Program, the underwriter verifies the information contained in the application relating to employment, income, assets or mortgages.

A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both.  Countrywide Home Loans offers the following documentation programs as alternatives to its Full Documentation Program: an Alternative Documentation Loan Program (the "Alternative Documentation Program"), a Reduced Documentation Loan Program (the "Reduced Documentation Program"), a CLUES Plus Documentation Loan Program (the "CLUES Plus Documentation Program"), a No Income/No Asset Documentation Loan Program (the "No Income/No Asset Documentation Program"), a Stated Income/Stated Asset Documentation Loan Program (the "Stated Income/Stated Asset Documentation Program") and a Streamlined Documentation Loan Program (the "Streamlined Documentation Program").

For all Mortgage Loans originated or acquired by Countrywide Home Loans, Countrywide Home Loans obtains a credit report relating to the applicant from a credit reporting company. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure Mortgage Loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

Countrywide Home Loans requires title insurance on all of its Mortgage Loans secured by first liens on real property. Countrywide Home Loans also requires that fire and extended coverage casualty insurance be maintained on the mortgaged property in an amount at least equal to the principal balance of the related single-family Mortgage Loan or the replacement cost of the mortgaged property, whichever is less.

In addition to Countrywide Home Loans' standard underwriting guidelines (the "Standard Underwriting Guidelines"), which are consistent in many respects with the guidelines applied to Mortgage Loans purchased by Fannie Mae and Freddie Mac, Countrywide Home Loans uses underwriting guidelines featuring expanded criteria (the "Expanded Underwriting Guidelines"). The Standard Underwriting Guidelines and the Expanded Underwriting Guidelines are described further under the next two headings.

*Standard Underwriting Guidelines*

Countrywide Home Loans' Standard Underwriting Guidelines for Mortgage Loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance Mortgage Loans with original principal balances of up to $400,000, up to 90% for Mortgage Loans with original principal balances of up to $650,000, up to 75% for Mortgage Loans with original principal balances of up to $1,000,000, up to 65% for Mortgage Loans with original principal balances of up to $1,500,000, and up to 60% for Mortgage Loans with original principal balances of up to $2,000,000.

For cash-out refinance Mortgage Loans, Countrywide Home Loans' Standard Underwriting Guidelines for Mortgage Loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 75% and original principal balances ranging up to $650,000. The maximum "cash-out" amount permitted is $200,000 and is based in part on the original Loan-to-Value Ratio of the related Mortgage Loan. As used in this prospectus supplement, a refinance Mortgage Loan is classified as a cash-out refinance Mortgage Loan by Countrywide Home Loans if the borrower retains an amount greater than the lesser of 2% of the entire amount of the proceeds from the refinancing of the existing loan, or $2,000.

Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance Mortgage Loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 80% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).  On second homes, Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance Mortgage Loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii).  Countrywide Home Loans' Standard Underwriting Guidelines for conforming balance Mortgage Loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 75% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.

In connection with the Standard Underwriting Guidelines, Countrywide Home Loans originates or acquires Mortgage Loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Program, the CLUES Plus Documentation Program or the Streamlined Documentation Program.

The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived.  Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the Mortgage Loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the Mortgage Loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the Mortgage Loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the Mortgage Loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

The Streamlined Documentation Program is available for borrowers who are refinancing an existing Mortgage Loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the Mortgage Loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

*Expanded Underwriting Guidelines*

Mortgage Loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than Mortgage Loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide Home Loans' Expanded Underwriting Guidelines for Mortgage Loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance Mortgage Loans with original principal balances of up to $400,000, up to 90% for Mortgage Loans with original principal balances of up to $650,000, up to 80% for Mortgage Loans with original principal balances of up to $1,000,000, up to 75% for Mortgage Loans with original principal balances of up to $1,500,000 and up to 70% for Mortgage Loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money Mortgage Loans with original principal balances of up to $375,000.

For cash-out refinance Mortgage Loans, Countrywide Home Loans' Expanded Underwriting Guidelines for Mortgage Loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 90% and original principal balances ranging up to $1,500,000. The maximum "cash-out" amount permitted is $400,000 and is based in part on the original Loan-to-Value Ratio of the related Mortgage Loan.

Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance Mortgage Loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 100% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).  On second homes, Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance Mortgage Loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii).  Countrywide Home Loans' Expanded Underwriting Guidelines for conforming balance Mortgage Loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires Mortgage Loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines.

The same documentation and verification requirements apply to Mortgage Loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, Mortgage Loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to Mortgage Loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for Mortgage Loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some Mortgage Loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The

maximum Loan-to-Value Ratio, including secondary financing, for those Mortgage Loans ranges up to 85%.

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a Mortgage Loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage Loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Stated Income/Stated Asset Documentation Program, the Mortgage Loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage Loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Expanded Underwriting Guidelines, Countrywide Home Loans may also provide Mortgage Loans to borrowers who are not U.S. citizens, including permanent and non-permanent residents. The borrower is required to have a valid U.S. social security number or a certificate of foreign status (IRS form W-8). The borrower's income and assets must be verified under the Full Documentation Program or the Alternative Documentation Program. The maximum Loan-to-Value Ratio, including secondary financing, is 80%.

**Underwriting Process – American Home Mortgage Corp.**

*General*

Approximately 3.87%, 24.12% and 13.35% of the Initial Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3, respectively, in each case by aggregate Stated Principal Balance of the Initial Mortgage Loans as of the initial cut-off date were originated by American Home Mortgage Corp.

American Home Mortgage Corp. ("American Home"), also referred to in this prospectus supplement as an Originator and in this section as the Originator, is a New York corporation. The Originator conducts lending through retail and wholesale loan production offices and its correspondent channel as well as its direct-to-consumer channel supported by the Originator's call center. The Originator operates more than 550 retail and wholesale loan production offices located in 47 states and the District of Columbia and makes loans throughout all 50 states and the District of Columbia. The Originator has been originating mortgage loans since its incorporation in 1988, and has been originating fixed-rate mortgage loans since such date. The principal executive offices of the Originator are located at 538 Broadhollow Road, Melville, New York 11747.

The following table reflects the Originator's originations of first-lien, fixed-rate mortgage loans for the past three years:

| | Year Ended December 31, 2004 | Year Ended December 31, 2005 | Year Ended December 31, 2006 |
|---|---|---|---|
| Number of Loans | 59,630 | 96,953 | 120,410 |
| Principal Balance | $10,593,252,722 | $19,353,121,580 | $24,987,132,683 |

American Home is not aware of any material legal proceedings pending against it or against any of its property, including any proceedings known to be contemplated by governmental authorities material to the holders of the Certificates.

*Underwriting Criteria*

The following information generally describes American Home's underwriting guidelines with respect to mortgage loans originated pursuant to its "conforming" or "prime" underwriting guidelines and its Alt-A underwriting guidelines.

The Mortgage Loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home. Conforming conventional loans must generally be approved by the Desktop Underwriter and Loan Prospector automated underwriting systems of Fannie Mae and Freddie Mac. FHA and VA loans are generally approved by these same automated underwriting systems.

American Home's non-conforming underwriting guidelines are similar to those of the government sponsored enterprises Fannie Mae and Freddie Mac, but these loans are "non-conforming" in that they may not conform to the maximum loan amounts and in some cases to the underwriting guidelines of Fannie Mae and Freddie Mac. These non-conforming loans do not conform to and are not insurable by the Federal Housing Administration nor can they be guaranteed by the U.S. Department of Veterans Affairs.

American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations.  Exceptions to the underwriting standards may be permitted where compensating factors are present.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgage property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources.  With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes. Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

Non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac, in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other

liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. For these Alt-A products, the borrower may not be required to verify employment income, assets required to close or both.  For some other Alt-A products, the borrower is not required to provide any information regarding employment income, assets required to close or both.  Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

American Home obtains a credit report for each borrower that summarizes each borrower's credit history. The credit report contains information from the three major credit repositories, Equifax, Experian and TransUnion. These companies have developed scoring models to identify the comparative risk of delinquency among applicants based on characteristics within the applicant's credit report.  A borrower's credit score represents a comprehensive view of the borrower's credit history risk factors and is indicative of whether a borrower is likely to default on a loan. Some of the factors used to calculate credit scores are a borrower's incidents of previous delinquency, the number of credit accounts a borrower has, the amount of available credit that a borrower has utilized, the source of a borrower's existing credit, and recent attempts by a borrower to obtain additional credit. Applicants who have higher credit scores will, as a group, have fewer defaults than those who have lower credit scores. The minimum credit score allowed by American Home non-conforming loan guidelines for these loans is 620 and the average is typically over 700.  For American Home Alt-A products, the minimum credit score is generally 580. If the borrowers do not have a credit score they must have an alternative credit history showing at least three trade lines with no payments over 60 days past due in the last twelve months.

In addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history. In general, for non-conforming loans the borrower should not have made any mortgage payments over 30 days after the due date for the most recent twelve months. In general, for Alt-A loans, the borrower may have no more than one payment that was made over 30 days after the due date for the most recent twelve months.

In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter, Freddie Mac's Loan Prospector automated underwriting systems, a customized form of Fannie Mae's Desktop Underwriter called Custom Desktop Underwriter, or they have been manually underwritten by American Home's underwriters. American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis.  Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property

condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter.

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value. American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction, loans on second homes or loans on investment properties. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher coverage levels.  For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting.  Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation.   Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

**Underwriting Process – SouthStar Funding LLC**

*General*

Approximately 29.48% of the Initial Mortgage Loans in Loan Group 3 by aggregate Stated Principal Balance of the Initial Mortgage Loans as of the initial cut-off date were originated by SouthStar Funding LLC.

The information set forth below has been provided by SouthStar.

SouthStar Funding, LLC is a privately held Delaware limited liability company headquartered in Atlanta, Georgia.  SouthStar opened its doors for business in 1998 and has grown from a small non-prime mortgage lender operating in two states to a full service, nationwide originator with volume of approximately $6.3 billion in 2006.  SouthStar acquires mortgage loans through wholesale, correspondent and retail channels and sells them to mortgage loan purchasers.

The following table sets forth, by number and dollar amount of mortgage loans, SouthStars's residential Alt-A mortgage loan production for the periods indicated:

### ALT A PRODUCTION FOR 2004 to 2006

| | 2004 | | 2005 | | 2006 |
|---|---|---|---|---|---|
| Units | Volume | Units | Volume | Units | Volume |
| 5,060 | $ 1,038,000,000.00 | 6,095 | $ 1,280,000,000.00 | 6,105 | $ 1,364,000,000.00 |

The mortgage loans originated or acquired by SouthStar were generally in accordance with the underwriting criteria described in this section.

SouthStar guidelines are intended to evaluate the borrower's ability to repay the mortgage loan, evaluate the borrower's credit and evaluate the value and adequacy of the collateral.  SouthStar does not approve mortgage loans based solely on the value of the collateral.

Underwriters are required to approve mortgage loans based on the applicable guidelines.  Underwriters may on a case by case basis, based on compensating factors, approve mortgage loans that do not strictly comply with the guidelines.  In all instances, the borrowers must show the ability to repay the mortgage loan, have acceptable credit, and acceptable collateral.

SouthStar offers the following first lien terms:

• 15 / 30 year fixed rate terms; and

• 2 / 3 / 5 year adjustable rate terms with 30 and 40/30 year amortizations.

Documentation

SouthStar verifies the income of each borrower under the following documentation types:

*Full Documentation*.  Requires a 2 year employment history and a minimum of 12 months verified income.

*Stated Income*.  Employment history must be stated on the 1003 covering a 2 year period.  The income stated must be reasonable for the profession.  The following documentation is required:

• Verbal verification of employment

• Borrowers employment and income sources must be shown on the 1003

• Income must be reasonable and is subject to the underwriter's discretion

• If self-employed, a copy of the borrower's business license or other acceptable source of documentation must be supplied

• Minimum credit score of 620

No Documentation.  Income and employment are not disclosed on the 1003.

• Minimum credit score of 620

Acceptable Collateral

• Single family detached and attached dwellings

- Planned unit developments

- Condominiums (Warrantable, Non-Warrantable, Conversion, Condo-Hotel & Site/Detached)

- Townhomes

- Two-to-four family dwellings

- Modular Homes

Risk Categories

The following criteria must be met for borrower eligibility:

- Debt to income ratio not to exceed 55% on Full Documentation and Stated Income mortgage loans. Debt to income is not applicable for No Documentation.

- Minimum FICO Score

  600 for Full Documentation

  620 for Stated Income

  620 for No Documentation

- Valid credit score.  A minimum of 3 satisfactory rated trade lines, 2 opened for 24 months, 1 currently open and active and 1 with a minimum $2,500 high credit.

- Housing history:  0x30x12

*Appraisals*

SouthStar realizes the soundness of a portfolio depends to a significant extent on the quality and accuracy of the real estate appraisal.  SouthStar policy is to:

- Comply with rules of regulations set forth by state and federal agencies

- Use AVMs in the review process

- Field review requirements for specific mortgage loan amounts and products

- Have a chief appraiser on site

**Pending Proceedings**

There are no material legal or governmental proceedings currently pending or known to be contemplated by governmental authorities against SouthStar.  To the best of SouthStar knowledge, there are no material legal or governmental proceedings currently pending against them.

**Affiliation or Relationships between SouthStar and Parties to Securitization Transaction**

SouthStar is not affiliated with the sponsor, the depositor, the trustee, any servicer, the underwriter or the Corridor Contract Counterparty.

### Underwriting Process – General

The Mortgage Loans that will be transferred to the issuing entity, other than those originated by Countrywide Home Loans, Inc. American Home Mortgage Corp. or SouthStar Funding LLC, or acquired by Countrywide Home Loans, Inc. American Home Mortgage Corp. or SouthStar Funding LLC from correspondent lenders or other third party originators who applied the related underwriting guidelines set forth above, have been originated or acquired in accordance with the procedures set forth in the prospectus under *"Loan Program–Underwriting Standards."*

## Servicing of Mortgage Loans

### General

The Master Servicer will master service all of the Mortgage Loans in accordance with the terms set forth in the Pooling and Servicing Agreement. The Master Servicer has agreed to service and administer the Mortgage Loans in accordance with customary and usual standards of practice of prudent Mortgage Loan lenders. The Master Servicer has also agreed to represent and protect the interest of the Trustee in the Mortgage Loans in the same manner as it currently protects its own interest in Mortgage Loans in its own portfolio in any claim, proceeding or litigation regarding a Mortgage Loan. The Master Servicer is permitted to make a modification, waiver or amendment of a Mortgage Loan so long as the modification, waiver or amendment would comply with the general servicing standard described above, not cause any REMIC to fail to qualify as a REMIC, not result in the imposition of certain taxes and not extend the due date for a payment due on the related mortgage note for a period greater than 180 days. A modification, waiver or amendment may initially result in a reduction in the payments made under a Mortgage Loan, but it is expected that a modification, waiver or amendment will increase the payments made under the Mortgage Loan over the life of the Mortgage Loan.

The Master Servicer may perform any of its obligations under the Pooling and Servicing Agreement through one or more subservicers which may include Countrywide Home Loans. Set forth below are the direct servicers of the approximate percentages of the Mortgage Loans in each Loan Group by aggregate Stated Principal Balance of the Mortgage Loans in that Loan Group as of the cut-off date:

| Primary Servicer | Loan Group | % of Mortgage Loans |
| --- | --- | --- |
| Countrywide Home Loans | 1 | 99.80 |
| | 2 | 100.00 |
| | 3 | 99.76 |
| Provident Funding Associates, LP | 3 | 0.24 |
| SunTrust Mortgage Incorporated | 1 | 0.20 |

### Countrywide Home Loans Servicing LP

The principal executive offices of Countrywide Home Loans Servicing LP ("Countrywide Servicing") are located at 7105 Corporate Drive, Plano, Texas 75024. Countrywide Servicing is a Texas limited partnership directly owned by Countrywide GP, Inc. and Countrywide LP, Inc., each a Nevada corporation and a direct wholly owned subsidiary of Countrywide Home Loans. Countrywide GP, Inc.

owns a 0.1% interest in Countrywide Servicing and is the general partner. Countrywide LP, Inc. owns a 99.9% interest in Countrywide Servicing and is a limited partner.

Countrywide Home Loans established Countrywide Servicing in February 2000 to service Mortgage Loans originated by Countrywide Home Loans that would otherwise have been serviced by Countrywide Home Loans. In January and February, 2001, Countrywide Home Loans transferred to Countrywide Servicing all of its rights and obligations relating to Mortgage Loans serviced on behalf of Fannie Mae and Freddie Mac, respectively. In October 2001, Countrywide Home Loans transferred to Countrywide Servicing all of its rights and obligations relating to the bulk of its non-agency loan servicing portfolio (other than the servicing of home equity lines of credit), including with respect to those Mortgage Loans (other than home equity lines of credit) formerly serviced by Countrywide Home Loans and securitized by certain of its affiliates. While Countrywide Home Loans expects to continue to directly service a portion of its loan portfolio, it is expected that the servicing rights for most newly originated Countrywide Home Loans Mortgage Loans will be transferred to Countrywide Servicing upon sale or securitization of the related Mortgage Loans. Countrywide Servicing is engaged in the business of servicing Mortgage Loans and will not originate or acquire loans, an activity that will continue to be performed by Countrywide Home Loans. In addition to acquiring mortgage servicing rights from Countrywide Home Loans, it is expected that Countrywide Servicing will service Mortgage Loans for non-Countrywide Home Loans affiliated parties as well as subservice Mortgage Loans on behalf of other Master Servicers.

In connection with the establishment of Countrywide Servicing, certain employees of Countrywide Home Loans became employees of Countrywide Servicing. Countrywide Servicing has engaged Countrywide Home Loans as a subservicer to perform certain loan servicing activities on its behalf.

Countrywide Servicing is an approved Mortgage Loan servicer for Fannie Mae, Freddie Mac, Ginnie Mae, HUD and VA and is licensed to service Mortgage Loans in those states where a license is required. Its loan servicing activities are guaranteed by Countrywide Financial and Countrywide Home Loans (when required by the owner of the Mortgage Loans).

**Countrywide Home Loans**

Countrywide Home Loans, Inc., a New York corporation ("Countrywide Home Loans"), is the sponsor for the transaction and also a seller.  Countrywide Home Loans is a direct wholly owned subsidiary of Countrywide Financial Corporation, a Delaware corporation ("Countrywide Financial"). The principal executive offices of Countrywide Home Loans are located at 4500 Park Granada, Calabasas, California 91302. Countrywide Home Loans is engaged primarily in the mortgage banking business, and as part of that business, originates, purchases, sells and services Mortgage Loans. Countrywide Home Loans originates Mortgage Loans through a retail branch system and through Mortgage Loan brokers and correspondents nationwide. Mortgage Loans originated by Countrywide Home Loans are principally first-lien, fixed or adjustable rate Mortgage Loans secured by single-family residences.

Countrywide Home Loans has historically sold substantially all the Mortgage Loans that it has originated and purchased, generally through securitizations. Countrywide Home Loans does not always sell Mortgage Loans immediately after origination or acquisition, but may decide to sell certain Mortgage Loans in later periods as part of its overall management of interest rate risk.  Countrywide Home Loans has been involved in the securitization of Mortgage Loans since 1969 when it was approved as a Federal National Mortgage Association seller/servicer.  Countrywide Home Loans reviews the structure of its securitizations and discusses the structure with the related underwriters.

Except as otherwise indicated, reference in the remainder of this prospectus supplement to "Countrywide Home Loans" should be read to include Countrywide Home Loans and its consolidated subsidiaries, including Countrywide Servicing.  Countrywide Home Loans services substantially all of the Mortgage Loans it originates or acquires. In addition, Countrywide Home Loans has purchased in bulk the rights to service Mortgage Loans originated by other lenders. Countrywide Home Loans has in the past and may in the future sell to mortgage bankers and other institutions a portion of its portfolio of loan servicing rights. As of December 31, 2002, December 31, 2003, December 31, 2004, December 31, 2005 and December 31, 2006, Countrywide Home Loans provided servicing for Mortgage Loans with an aggregate principal balance of approximately $452.405 billion, $644.855 billion, $838.322 billion, $1,111.090 billion and $1,298.394 billion, respectively, substantially all of which were being serviced for unaffiliated persons.

## Mortgage Loan Production

The following table sets forth, by number and dollar amount of mortgage loans, the residential mortgage loan production of Countrywide Financial for the periods indicated.

### Consolidated Mortgage Loan Production

**Years Ended December 31,**

|  | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
|  | (Dollars in millions, except average loan amount) | | | | |
| **Conventional Conforming Loans** | | | | | |
| Number of Loans | 993,538 | 1,509,925 | 826,914 | 776,479 | 723,933 |
| Volume of Loans | $ 149,072 | $ 234,526 | $ 134,762 | $ 159,561 | $ 149,095 |
| Percent of Total Dollar Volume | 59.2% | 53.9% | 37.1% | 32.2% | 32.2% |
| **Conventional Non-conforming Loans** | | | | | |
| Number of Loans | 283,536 | 562,389 | 529,192 | 866,476 | 730,511 |
| Volume of Loans | $ 62,665 | $ 138,006 | $ 144,663 | $ 235,614 | $ 211,841 |
| Percent of Total Dollar Volume | 24.9% | 31.7% | 39.9% | 47.6% | 45.8% |
| **FHA/VA Loans** | | | | | |
| Number of Loans | 157,626 | 196,063 | 105,562 | 80,555 | 89,753 |
| Volume of Loans | $ 19,093 | $ 24,402 | $ 13,247 | $ 10,714 | $ 13,093 |
| Percent of Total Dollar Volume | 7.6% | 5.6% | 3.6% | 2.2% | 2.8% |
| **Prime Home Equity Loans** | | | | | |
| Number of Loans | 316,049 | 453,817 | 587,046 | 728,252 | 716,353 |
| Volume of Loans | $ 11,650 | $ 18,103 | $ 30,893 | $ 44,850 | $ 47,876 |
| Percent of Total Dollar Volume | 4.6% | 4.2% | 8.5% | 9.1% | 10.4% |
| **Nonprime Mortgage Loans** | | | | | |
| Number of Loans | 63,195 | 124,205 | 250,030 | 278,112 | 245,881 |
| Volume of Loans | $ 9,421 | $ 19,827 | $ 39,441 | $ 44,637 | $ 40,596 |
| Percent of Total Dollar Volume | 3.7% | 4.6% | 10.9% | 9.0% | 8.8% |
| **Total Loans** | | | | | |
| Number of Loans | 1,813,944 | 2,846,399 | 2,298,744 | 2,729,874 | 2,506,431 |
| Volume of Loans | $ 251,901 | $ 434,864 | $ 363,006 | $ 495,376 | $ 462,501 |
| Average Loan Amount | $ 139,000 | $ 153,000 | $ 158,000 | $ 181,000 | $ 185,000 |
| Non-Purchase Transactions(1) | 66% | 72% | 51% | 53% | 55% |
| Adjustable-Rate Loans(1) | 14% | 21% | 52% | 52% | 46% |

_____

(1)     Percentage of total mortgage loan production (excluding commercial real estate loans) based on dollar volume.

## Loan Servicing

Countrywide Servicing has established standard policies for the servicing and collection of mortgages. Servicing includes, but is not limited to:

- collecting, aggregating and remitting Mortgage Loan payments;

- accounting for principal and interest;

- holding escrow (impound) funds for payment of taxes and insurance;

- making inspections as required of the mortgaged properties;

- preparation of tax related information in connection with the Mortgage Loans;

- supervision of delinquent Mortgage Loans;

- loss mitigation efforts;

- foreclosure proceedings and, if applicable, the disposition of mortgaged properties; and

- generally administering the Mortgage Loans, for which it receives servicing fees.

Billing statements with respect to Mortgage Loans are mailed monthly by Countrywide Servicing. The statement details all debits and credits and specifies the payment due. Notice of changes in the applicable loan rate are provided by Countrywide Servicing to the mortgagor with these statements.

**Collection Procedures**

When a mortgagor fails to make a payment on a Mortgage Loan, Countrywide Servicing attempts to cause the deficiency to be cured by corresponding with the mortgagor. In most cases, deficiencies are cured promptly. Pursuant to Countrywide Servicing's servicing procedures, Countrywide Servicing generally mails to the mortgagor a notice of intent to foreclose after the loan becomes 61 days past due (three payments due but not received) and, generally within 59 days thereafter, if the loan remains delinquent, institutes appropriate legal action to foreclose on the mortgaged property. Foreclosure proceedings may be terminated if the delinquency is cured. Mortgage Loans to borrowers in bankruptcy proceedings may be restructured in accordance with law and with a view to maximizing recovery of the loans, including any deficiencies.

Once foreclosure is initiated by Countrywide Servicing, a foreclosure tracking system is used to monitor the progress of the proceedings. The system includes state-specific parameters to monitor whether proceedings are progressing within the time frame typical for the state in which the mortgaged property is located. During the foreclosure proceeding, Countrywide Servicing determines the amount of the foreclosure bid and whether to liquidate the Mortgage Loan.

If foreclosed, the mortgaged property is sold at a public or private sale and may be purchased by Countrywide Servicing. After foreclosure, Countrywide Servicing may liquidate the mortgaged property and charge-off the loan balance which was not recovered through liquidation proceeds.

Servicing and charge-off policies and collection practices with respect to Mortgage Loans may change over time in accordance with, among other things, Countrywide Servicing's business judgment, changes in the servicing portfolio and applicable laws and regulations.

**Servicing Compensation and Payment of Expenses**

The Expense Fees with respect to the mortgage pool are payable out of the interest payments on each Mortgage Loan. The Expense Fee Rate for the Mortgage Loans in all the Loan Groups varies from Mortgage Loan to Mortgage Loan.  As of the cut-off date, the weighted average Expense Fee Rate for the Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3 will be a per annum rate equal to approximately 0.215%, 0.228% and 0.276%, respectively.  The Expense Fees consist of:

- the master servicing fee payable to the Master Servicer in respect of its master servicing activities (the "Master Servicing Fee");

- fees payable to the Trustee in respect of its activities as Trustee under the Pooling and Servicing Agreement; and

- lender-paid mortgage insurance premiums, if any.

The master servicing fee for the Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3 will range from 0.175% to 0.375% per annum (the "Master Servicing Fee Rate") of the Stated Principal Balance of each Mortgage Loan in the related Loan Group, as applicable.  As of the cut-off date, the weighted average Master Servicing Fee Rate for the Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3 will be approximately 0.205%, 0.214% and 0.226% per annum, respectively.

The Master Servicer is obligated to pay some but not all ongoing expenses associated with the issuing entity and incurred by the Master Servicer in connection with its responsibilities under the Pooling and Servicing Agreement and those amounts will be paid by the Master Servicer out of the master servicing fee. The amount of the master servicing fee is subject to adjustment with respect to prepaid Mortgage Loans, as described under *"— Adjustment to Servicing Compensation in Connection with Certain Prepaid Mortgage Loans."*  The Master Servicer is also entitled to receive, as additional servicing compensation, amounts in respect of interest paid on principal prepayments received during that portion of a Prepayment Period from the Due Date in the same month as the Distribution Date to the end of the Prepayment Period ("Prepayment Interest Excess"), all late payment fees, assumption fees and other similar charges and all reinvestment income earned on amounts on deposit in the Certificate Account and Distribution Account and Excess Proceeds with respect to Mortgage Loans as described under *"Description of the Certificates —Fees and Expenses."*

The net mortgage rate of a Mortgage Loan is its mortgage rate (net of the interest premium charged by the related lenders for the lender acquired mortgage insurance Mortgage Loans, if any) less the sum of the master servicing fee and the Trustee fee on the Mortgage Loan (expressed as a per annum percentage of its Stated Principal Balance).

**Adjustment to Servicing Compensation in Connection with Certain Prepaid Mortgage Loans**

When a borrower prepays a Mortgage Loan between Due Dates, the borrower is required to pay interest on the amount prepaid only to the date of prepayment and not thereafter.  Except with respect to the month of the cut-off date, with respect to the Mortgage Loans directly serviced by Countrywide Servicing as set forth in the table under *"— General"* above), principal prepayments by borrowers received by Countrywide Servicing from the first day through the fifteenth day of a calendar month will be distributed to certificateholders on the Distribution Date in the same month in which the prepayments on these Mortgage Loans are received and, accordingly, no shortfall in the amount of interest to be distributed to certificateholders with respect to the prepaid Mortgage Loans results. Conversely, principal prepayments on these Mortgage Loans received by Countrywide Servicing from the sixteenth day (or, in

the case of the first Distribution Date, from February 1, 2007) through the last day of a calendar month and principal prepayments on the Mortgage Loans not directly serviced by Countrywide Servicing as set in the table under *"— General"* above), will be distributed to certificateholders on the Distribution Date in the month following the month of receipt and, accordingly, a shortfall in the amount of interest to be distributed to certificateholders with respect to the prepaid Mortgage Loans would result. Pursuant to the Pooling and Servicing Agreement, the master servicing fee for any month will be reduced, but not by more than an amount equal to the product of one-twelfth of 0.125% and the aggregate Stated Principal Balance of the Mortgage Loans in such Loan Group as of the first day of the prior month ("Compensating Interest"), by an amount sufficient to pass through to certificateholders the full amount of interest to which they would be entitled for each prepaid Mortgage Loan on the related Distribution Date.

If shortfalls in interest as a result of prepayments in any Prepayment Period exceed the Compensating Interest for the related Distribution Date, the amount of interest distributed to the Group I certificates will be reduced by the amount of the excess. For the Group II Certificates, any such shortfall will reduce the amount of excess cashflow available to maintain or restore overcollateralization among other uses. See *"Description of the Certificates – Interest"* in this prospectus supplement.

Any shortfalls in interest as a result of prepayments on the Mortgage Loans will not be covered by the Class 3-A-2 Policy and will be borne by the holders of the Class 3-A-2 Certificates.

**Advances**

Subject to the following limitations, on the business day prior to each Distribution Date, the Master Servicer will be required to advance from its own funds, or funds in the Certificate Account that are not required to be distributed on such Distribution Date, an amount equal to:

- the aggregate of payments of principal and interest on the Mortgage Loans (net of the master servicing fee) which were due on the related Due Date and which were delinquent on the related Determination Date; and

- an amount equivalent to interest (net of the master servicing fee) on each Mortgage Loan as to which the related mortgaged property has been acquired by the issuing entity through foreclosure or deed-in-lieu of foreclosure (net of any net income on the property).

any such advance, an "Advance" and the date of any such Advance, as described in this prospectus supplement, a "Master Servicer Advance Date".

The "Determination Date" is the 22nd day of each month or, if that day is not a business day, the preceding business day; provided that the Determination Date in each month will be at least two business days before the related Distribution Date.

Advances are intended to maintain a regular flow of scheduled interest and principal payments on the certificates rather than to guarantee or insure against losses. The Master Servicer is obligated to make advances with respect to delinquent payments of principal of or interest on each Mortgage Loan to the extent that the advances are, in its reasonable judgment, recoverable from future payments and collections or insurance payments or proceeds of liquidation of the related Mortgage Loan. If the Master Servicer determines on any Determination Date to make an advance, the advance will be included with the distribution to certificateholders on the related Distribution Date. Any failure by the Master Servicer to make a deposit in the Certificate Account as required under the Pooling and Servicing Agreement, including any failure to make an advance, will constitute an event of default under the Pooling and Servicing Agreement if the failure remains unremedied for five days after written notice of the event of default. If the Master Servicer is terminated as a result of the occurrence of an event of default, the

Trustee or the successor Master Servicer will be obligated to make any advance, in accordance with the terms of the Pooling and Servicing Agreement.

An advance will be reimbursed from the payments on the Mortgage Loan with respect to which the advance was made.  However, if an advance is determined to be nonrecoverable and the Master Servicer delivers an officer's certificate to the Trustee indicating that the advance is nonrecoverable, the Master Servicer will be entitled to withdraw from the Certificate Account an amount equal to the nonrecoverable advance.  Reimbursement for advances and nonrecoverable advances will be made prior to distributions on the certificates.

## Certain Modifications and Refinancings

Countrywide Home Loans will be permitted under the Pooling and Servicing Agreement to solicit borrowers for reductions to the mortgage rates of their respective Mortgage Loans. If a borrower requests such a reduction, the Master Servicer will be permitted to agree to the rate reduction provided that Countrywide Home Loans purchases the Mortgage Loan from the issuing entity immediately following the modification. Any purchase of a Mortgage Loan subject to a modification will be for a price equal to 100% of the Stated Principal Balance of that Mortgage Loan, plus accrued and unpaid interest on the Mortgage Loan up to the next Due Date at the applicable net mortgage rate, net of any unreimbursed advances of principal and interest on the Mortgage Loan made by the Master Servicer. Countrywide Home Loans will remit the purchase price to the Master Servicer for deposit into the Certificate Account within one business day of the purchase of that Mortgage Loan. Purchases of Mortgage Loans may occur when prevailing interest rates are below the interest rates on the Mortgage Loans and mortgagors request modifications as an alternative to refinancings. Countrywide Home Loans will indemnify the issuing entity against liability for any prohibited transactions taxes and related interest, additions or penalties incurred by any REMIC as a result of any modification or purchase.

## The Issuing Entity

In connection with the issuance of the certificates, the Depositor has formed Alternative Loan Trust 2007-J1, a common law trust created under the laws of the State of New York, pursuant to the Pooling and Servicing Agreement.  Alternative Loan Trust 2007-J1 is referred to in this prospectus supplement as the "Issuing Entity" and is referred to in the prospectus as the "trust" or "trust fund".  The Trustee serves as Trustee of the issuing entity and acts on behalf of the issuing entity as the issuing entity does not have any directors, officers or employees.  The fiscal year end of the issuing entity is December 31.

The issuing entity's activities are limited to the transactions and activities entered into in connection with the securitization described in this prospectus supplement, and except for those activities, the issuing entity is not authorized and has no power to borrow money or issue debt, merge with another entity, reorganize, liquidate or sell assets or engage in any business or activities.  Consequently, the issuing entity is not permitted to hold any assets, or incur any liabilities, other than those described in this prospectus supplement. Since the issuing entity is created pursuant to the Pooling and Servicing Agreement, the issuing entity and its permissible activities can only be amended or modified by amending the Pooling and Servicing Agreement.

Because the issuing entity is a common law trust, it may not be eligible for relief under the federal bankruptcy laws, unless it can be characterized as a *"business trust"* for purposes of the federal bankruptcy laws.  Bankruptcy courts look at various considerations in making this determination, so it is not possible to predict with any certainty whether or not the issuing entity would be characterized as a "business trust."

**Static Pool Data**

Certain static pool data with respect to the delinquency, cumulative loss and prepayment data for Countrywide Home Loans is available online at http://www.countrywidedealsdata.com?CWDD=01200702. This static pool data is not deemed part of the prospectus or the registration statement of which the prospectus is a part to the extent that the static pool data relates to:

- prior securitized pools of Countrywide Home Loans that do not include the Mortgage Loans and that were established before January 1, 2006; or

- in the case of information regarding the Mortgage Loans, information about the Mortgage Loans for periods before January 1, 2006.

We cannot assure you that the prepayment, loss or delinquency experience of the Mortgage Loans sold to the issuing entity will be comparable to the historical prepayment, loss or delinquency experience of any of the other securitized pools sponsored by the Countrywide Home Loans. In this regard, you should note how the characteristics of the Mortgage Loans in those securitized pools differ from the characteristics of the issuing entity's Mortgage Loans. Such differences, along with the varying economic conditions to which those securitized pools were subject, make it unlikely that the issuing entity's Mortgage Loans will perform in the same way that any of those pools has performed.

**Description of the Certificates**

**General**

The certificates will be issued pursuant to the Pooling and Servicing Agreement. We summarize below the material terms and provisions pursuant to which the certificates will be issued. The summaries are subject to, and are qualified in their entirety by reference to, the provisions of the Pooling and Servicing Agreement. When particular provisions or terms used in the Pooling and Servicing Agreement are referred to, the actual provisions (including definitions of terms) are incorporated by reference. We will file a final copy of the Pooling and Servicing Agreement after the issuing entity issues the certificates.

The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of CWALT, Inc., Countrywide Home Loans, Inc. (or any other seller), Countrywide Home Loans Servicing LP or any of their affiliates.

The Mortgage Pass-Through Certificates, Series 2007-J1 will consist of the Class 1-A-1, Class 1-A-2, Class 1-A-3, Class 1-A-4, Class 1-A-5, Class 1-A-6, Class 1-A-7, Class 1-A-8, Class 1-A-9, Class 1-A-10, Class 1-A-11, Class 1-A-12, Class 1-A-13, Class 1-A-14, Class 1-A-15, Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4, Class 2-A-5, Class 2-A-6, Class 2-A-7, Class 2-A-8, Class 2-A-9, Class 2-A-10, Class 2-A-11, Class 2-A-12, Class 2-A-13, Class 2-A-14, Class 2-A-15, Class 2-A-16, Class 2-A-17, Class 2-A-18, Class 2-A-19, Class 2-A-20, Class 2-A-21, Class 2-A-22, Class 2-A-23, Class 2-A-24, Class 2-A-25, Class 2-A-26, Class 2-A-27, Class 2-A-28, Class 2-A-29, Class 2-A-30, Class 2-A-31, Class 2-A-32, Class 2-A-33, Class 2-A-34, Class 2-A-35, Class 2-A-36, Class 2-A-37, Class 2-A-38, Class 2-A-39, Class 2-A-40, Class 2-A-41, Class 2-A-42, Class 2-A-43, Class 2-A-44, Class X, Class PO, Class A-R, Class M, Class B-1, Class B-2, Class B-3, Class B-4, Class B-5, Class P, Class 3-A-1, Class 3-A-2, Class 3-A-3, Class 3-A-4, Class 3-A-5, Class 3-A-R, Class 3-M-1, Class 3-M-2, Class 3-M-3, Class 3-B, Class 3-P and Class 3-C Certificates. Only the classes of certificates listed on the cover page hereof are offered by this prospectus supplement.

When describing the certificates in this prospectus supplement, we use the following terms:

| Designation | Classes of Certificates |
|---|---|
| Group 1 Senior Certificates | Class 1-A-1, Class 1-A-2, Class 1-A-3, Class 1-A-4 and Class A-R Certificates and Class X-1 and Class PO-1 Components |
| Group 2 Senior Certificates | Class  2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4, Class 2-A-5, Class 2-A-6, Class 2-A-7, Class 2-A-8, Class 2-A-9 and Class 2-A-10 Certificates and Class X-2 and Class PO-2 Components |
| Group 3 Senior Certificates and Group II Senior Certificates | Class 3-A-1, Class 3-A-2, Class 3-A-3, Class 3-A-4, Class 3-A-5 and Class 3-A-R Certificates |
| Group I Senior Certificates | Group 1 Senior Certificates and Group 2 Senior Certificates |
| Senior Certificate Group | Each of the Group 1 Senior Certificates, the Group 2 Senior Certificates and the Group 3 Senior Certificates |
| Senior Certificates | Group 1 Senior Certificates, Group 2 Senior Certificates and Group 3 Senior Certificates |
| Group I Subordinated Certificates | Class M and Class I-B Certificates |
| Group 3 Subordinated Certificates or Group II Subordinated Certificates | Class 3-M-1, Class 3-M-2, Class 3-M-3 and Class 3-B Certificates |
| Class 3-M Certificates | Class 3-M-1, Class 3-M-2 and Class 3-M-3 Certificates |
| Group I Certificates | Group I Senior Certificates and Group I Subordinated Certificates |
| Group II Certificates | Group II Senior Certificates and Group II Subordinated Certificates |
| LIBOR Certificates | Class 2-A-1, Class 2-A-2, Class 2-A-6 and Class 2-A-7 Certificates |
| Class A Certificates | Class 1-A-1, Class 1-A-2, Class 1-A-3, Class 1-A-4, Class 1-A-5, Class 1-A-6, Class 1-A-7, Class 1-A-8, Class 1-A-9, Class 1-A-10, Class 1-A-11, Class 1-A-12, Class 1-A-13, Class 1-A-14, Class 1-A-15, Class 2-A-1, Class 2-A-2, Class 2-A-3, Class 2-A-4, Class 2-A-5, Class 2-A-6, Class 2-A-7, Class 2-A-8, Class 2-A-9, Class 2-A-10, Class 2-A-11, Class 2-A-12, Class 2-A-13, Class 2-A-14, Class 2-A-15, Class 2-A-16, Class 2-A-17, Class 2-A-18, Class 2-A-19, Class 2-A-20, Class 2-A-21, Class 2-A-22, Class 2-A-23, Class 2-A-24, Class 2-A-25, Class 2-A-26, Class 2-A-27, Class 2-A-28, Class 2-A-29, Class 2-A-30, Class 2-A-31, Class 2-A-32, Class 2-A-33, Class 2-A-34, Class 2-A-35, Class 2-A-36, Class 2-A-37, Class 2-A-38, Class 2-A-39, Class 2-A-40, Class 2-A-41, Class 2-A-42, Class 2-A-43, Class 2-A-44, Class A-R, Class 3-A-1, Class 3-A-2, Class 3-A-3, Class 3-A-4, Class 3-A-5 and Class 3-A-R Certificates |
| Class I-B Certificates | Class B-1, Class B-2, Class B-3, Class B-4 and Class B-5 Certificates |
| Notional Amount Certificates | Class 1-A-7, Class 1-A-15, Class 2-A-2, Class 2-A-7,  Class 2-A-14, Class 2-A-18, Class 2-A-22, Class 2-A-26, Class 2-A-30, Class 2-A-34, Class 2-A-38, Class 2-A-42 and Class X Certificates |
| Depositable Certificates | Class 1-A-1, Class 1-A-3, Class 1-A-4, Class 2-A-3, Class 2-A-4, Class 2-A-5, Class 2-A-8, Class 2-A-9 and Class 2-A-10  Certificates |
| Exchangeable Certificates | Class 1-A-5, Class 1-A-6, Class 1-A-7, Class 1-A-8, Class 1-A-9, Class 1-A-10, Class 1-A-11, Class 1-A-12, Class 1-A-13, Class 1-A-14, Class 1-A-15, Class 2-A-11, Class 2-A-12, Class 2-A-13, Class 2-A-14, Class 2-A-15, Class 2-A-16, Class 2-A-17, Class 2-A-18, Class 2-A-19, Class 2-A-20, Class 2-A-21, Class 2-A-22, Class 2-A-23, Class 2-A-24, Class 2-A-25, Class 2-A-26, Class 2-A-27, Class 2-A-28, Class 2-A-29, Class 2-A-30, Class 2-A-31, Class 2-A-32, Class 2-A-33, Class 2-A-34, Class 2-A-35, Class 2-A-36, Class 2-A-37, Class 2-A-38, Class 2-A-39, Class 2-A-40, Class 2-A-41, Class 2-A-42, Class 2-A-43 and Class 2-A-44 Certificates |
| Offered Certificates | Class A, Class M, Class B-1, Class B-2, Class 3-M-1, Class 3-M-2, Class 3-M-3 and Class 3-B Certificates |

The certificates are generally referred to as the following types:

| Class | Type |
| --- | --- |
| *Offered Certificates* | |
| Class 1-A-1 | Senior/Fixed Pass-Through Rate/Super Senior/Depositable |
| Class 1-A-2 | Senior/Fixed Pass-Through Rate |
| Class 1-A-3 | Senior/Fixed Pass-Through Rate/Support/Depositable |
| Class 1-A-4 | Senior/Fixed Pass-Through Rate/NAS/Depositable |
| Class 1-A-5 | Senior/Fixed Pass-Through Rate/NAS/Exchangeable |
| Class 1-A-6 | Senior/Fixed Pass-Through Rate/NAS/Exchangeable |
| Class 1-A-7 | Senior/Fixed Pass-Through Rate/Notional Amount/Interest-Only/Exchangeable |
| Class 1-A-8 | Senior/Fixed Pass-Through Rate/NAS/Exchangeable |
| Class 1-A-9 | Senior/Principal Only/NAS/Exchangeable |
| Class 1-A-10 | Senior/Fixed Pass-Through Rate/NAS/Exchangeable |
| Class 1-A-11 | Senior/Fixed Pass-Through Rate/NAS/Exchangeable |
| Class 1-A-12 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 1-A-13 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 1-A-14 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 1-A-15 | Senior/Fixed Pass-Through Rate/Notional Amount/Interest-Only/Exchangeable |
| Class 2-A-1 | Senior/Floating Pass-Through Rate |
| Class 2-A-2 | Senior/Inverse Floating Pass-Through Rate/Notional Amount/Interest-Only |
| Class 2-A-3 | Senior/Fixed Pass-Through Rate/Depositable |
| Class 2-A-4 | Senior/Fixed Pass-Through Rate/Depositable |
| Class 2-A-5 | Senior/Fixed Pass-Through Rate/Depositable |
| Class 2-A-6 | Senior/Floating Pass-Through Rate |
| Class 2-A-7 | Senior/Inverse Floating Pass-Through Rate/Notional Amount/Interest-Only |
| Class 2-A-8 | Senior/Fixed Pass-Through Rate/Depositable |
| Class 2-A-9 | Senior/Fixed Pass-Through Rate/Depositable |
| Class 2-A-10 | Senior/Fixed Pass-Through Rate/Depositable |
| Class 2-A-11 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-12 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-13 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-14 | Senior/Fixed Pass-Through Rate/Notional Amount/Interest-Only/Exchangeable |
| Class 2-A-15 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-16 | Senior/Fixed Pass-Through Rate/Exchangeable |

| Class | Type |
|---|---|
| Class 2-A-17 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-18 | Senior/Fixed Pass-Through Rate/Notional Amount/Interest-Only/Exchangeable |
| Class 2-A-19 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-20 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-21 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-22 | Senior/Fixed Pass-Through Rate/Notional Amount/Interest-Only/Exchangeable |
| Class 2-A-23 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-24 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-25 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-26 | Senior/Fixed Pass-Through Rate/Notional Amount/Interest-Only/Exchangeable |
| Class 2-A-27 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-28 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-29 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-30 | Senior/Fixed Pass-Through Rate/Notional Amount/Interest-Only/Exchangeable |
| Class 2-A-31 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-32 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-33 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-34 | Senior/Fixed Pass-Through Rate/Notional Amount/Interest-Only/Exchangeable |
| Class 2-A-35 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-36 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-37 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-38 | Senior/Fixed Pass-Through Rate/Notional Amount/Interest-Only/Exchangeable |
| Class 2-A-39 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-40 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-41 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-42 | Senior/Fixed Pass-Through Rate/Notional Amount/Interest-Only/Exchangeable |
| Class 2-A-43 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class 2-A-44 | Senior/Fixed Pass-Through Rate/Exchangeable |
| Class X | Senior/Notional Amount/Interest Only/Variable Pass-Through Rate/Component |
| Class PO | Senior/Principal Only/ Component |

| Class | Type |
| --- | --- |
| Class M | Subordinate/Variable Pass-Through Rate |
| Class B-1 | Subordinate/Variable Pass-Through Rate |
| Class B-2 | Subordinate/Variable Pass-Through Rate |
| Class 3-A-1 | Senior/Fixed Pass-Through Rate |
| Class 3-A-2 | Senior/Fixed Pass-Through Rate |
| Class 3-A-3 | Senior/Fixed Pass-Through Rate |
| Class 3-A-4 | Senior/Fixed Pass-Through Rate/Super Senior/NAS |
| Class 3-A-5 | Senior/Fixed Pass-Through Rate/Support/NAS |
| Class A-R and Class 3-A-R | Senior/REMIC Residual |
| Group I Subordinated Certificates | Subordinate/Variable Pass-Through Rate |
| Group II Subordinated Certificates | Subordinate/Fixed Pass-Through Rate |
| Class 3-C | Residual |
| Class P and Class 3-P | Prepayment Charges |

The Class B-3, Class B-4, Class B-5, Class P, Class 3-P and Class 3-C Certificates are not being offered by this prospectus supplement. Any information presented in this prospectus supplement with respect to the Class B-3, Class B-4, Class B-5, Class P, Class 3-P and Class 3-C Certificates is provided only to permit a better understanding of the offered certificates. The initial Class 3-Certificate Balances and initial notional amounts are set forth in the *"Summary — Description of the Certificates."*

The Group I Senior Certificates will have an initial aggregate Class Certificate Balance of approximately $365,877,980, and will evidence in the aggregate an initial beneficial ownership interest of approximately 93.25% in Aggregate Loan Group I. The Group I Subordinated Certificates will each evidence the initial beneficial ownership interest in Aggregate Loan Group I set forth below:

| Class of Group I Subordinated Certificates | Initial Beneficial Ownership Interest |
| --- | --- |
| Class M | 3.35% |
| Class B-1 | 1.25% |
| Class B-2 | 0.80% |
| Class B-3 | 0.55% |
| Class B-4 | 0.45% |
| Class B-5 | 0.35% |

The Group II Senior Certificates will have an initial aggregate Class Certificate Balance of approximately $182,645,100, and will evidence in the aggregate an initial beneficial ownership interest of approximately 91.70% in Aggregate Loan Group II. The Group II Subordinated Certificates will each evidence the initial beneficial ownership interest in Aggregate Loan Group II set forth below:

| Class of Group II Subordinated Certificates | Initial Beneficial Ownership Interest |
|---|---|
| Class 3-M-1............................................ | 2.15% |
| Class 3-M-2............................................ | 1.45% |
| Class 3-M-3............................................ | 2.30% |
| Class 3-B.............................................. | 0.85% |

## Calculation of Class Certificate Balance

The "Class Certificate Balance" of any class of certificates (other than the notional amount certificates) as of any Distribution Date is the initial Class Certificate Balance of the class *reduced* by the sum of:

- all amounts previously distributed to holders of certificates of the class as payments of principal,

- the amount of Realized Losses or Applied Realized Loss Amounts, as applicable, allocated to the class, and

- in the case of any class of Group I Subordinated Certificates, any amounts allocated to the class in reduction of its Class Certificate Balance in respect of payments of Class PO Deferred Amounts, as described under *"— Allocation of Losses to the Group I Certificates,"*

provided, however, that to the extent Realized Losses or Applied Realized Loss Amounts, as applicable, have been allocated to the Class Certificate Balance of any class of certificates, the Class Certificate Balance thereof will be increased on each Distribution Date sequentially by class in the order of distribution priority (and pro rata among the related senior certificates) by the amount of Subsequent Recoveries (if any) on the Mortgage Loans in the applicable loan group collected during the period beginning on the second day of the calendar month preceding the calendar month in which such Distribution Date occurs and ending on the Due Date in the month in which such Distribution Date occurs (but not more than the amount of the Realized Losses allocated to that class or the amount of Unpaid Realized Loss Amount for that class, as applicable).  With respect to the Group II Certificates, after such allocation, a corresponding decrease will be made on such Distribution Date to the Unpaid Realized Loss Amount for any class of Group II Certificates that had its Class Certificate Balance increased by such allocation of Subsequent Recoveries. See "*The Agreements – Realization Upon Defaulted Loans*" in the prospectus.  To the extent a Realized Loss was covered under the Class 3-A-2 Policy the Class 3-A-2 Insurer's subrogation rights with respect to Subsequent Recoveries may entitle it to receipt of cash otherwise distributable to the Class 3-A-2 Certificates.  See "*Credit Enhancement—The Certificate Guaranty Insurance Policy*" in this prospectus supplement.

Although Subsequent Recoveries, if any, will be allocated to increase the Class Certificate Balance of a class of certificates, as described above, such Subsequent Recoveries will be included in the Available Funds for the related Loan Group and will be distributed in the priority set forth below under "*Description of the Certificates —Distributions,*" and therefore such Subsequent Recoveries may not to be used to make any principal payments on the class or classes of certificates for which the Class Certificate Balances have been increased by allocation of Subsequent Recoveries as described above. Additionally, holders of such certificates will not be entitled to any payment in respect of interest that would have accrued on the amount of the increase in Class Certificate Balance for any Interest Accrual Period preceding the Distribution Date on which such increase occurs.

In addition, the Class Certificate Balance of the class of Group I Subordinated Certificates then outstanding with the highest numerical class designation will be reduced if and to the extent that the aggregate Class Certificate Balance of all classes of Group I Certificates, following all distributions and the allocation of all Realized Losses on any Distribution Date, exceeds the aggregate Stated Principal Balance of the Mortgage Loans in Aggregate Loan Group I as of the Due Date occurring in the month of that Distribution Date (after giving effect to principal prepayments received in the related Prepayment Period).

**Component Classes**

Solely for purposes of calculating distributions and allocating losses, the Class PO Certificates will be made up of multiple components having the designations and initial component balances set forth below as of the Closing Date:

| Designation | Initial Component Balance[1] |
|---|---|
| Class PO-1 Component | $136,139 |
| Class PO-2 Component | $28,740 |

(1) Based on assumptions regarding the characteristics of the Initial Mortgage Loans and Supplemental Mortgage Loans for Loan Group 1 and Loan Group 2.

The component balance with respect to any component as of any Distribution Date is the initial component balance thereof on the Closing Date, reduced by all amounts applied and losses allocated in reduction of the principal balance of such component on all previous Distribution Dates.

The Class Certificate Balance of the Class PO Certificates on any Distribution Date will equal the aggregate of the component balances described above on that Distribution Date. The components comprising the Class PO Certificates will not be separately transferable from the Class PO Certificates. As used in this prospectus supplement, "Class PO Component" will mean the Class PO-1 Component or the Class PO-2 Component, as applicable.

Solely for purposes of calculating distributions, the Class X Certificates will be made up of two components: the Class X-1 and Class X-2 Components having initial notional component amounts of approximately $180,910,300 and $204,973,997, respectively.

The Class Certificate Balance of the Class X Certificates on any Distribution Date will be equal to the aggregate of its notional component amounts on that Distribution Date.  The components comprising the Class X Certificates will not be separately transferable from the Class X Certificates.

**Notional Amount Certificates**

The Class 1-A-7, Class 1-A-15, Class 2-A-2, Class 2-A-7, Class 2-A-14, Class 2-A-18, Class 2-A-22, Class 2-A-26, Class 2-A-30, Class 2-A-34, Class 2-A-38, Class 2-A-42 and Class X Certificates are notional amount certificates.

The notional amount for any Distribution Date and

- the Class 1-A-7 Certificates will equal the sum of (i) the product of (a) the Class Certificate Balance of the Class 1-A-5 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.50 and the denominator of which is 5.75 and (ii) the product of (a) the Class Certificate Balance of the Class 1-A-6 Certificates immediately prior

to such Distribution Date and (b) a fraction, the numerator of which is 0.25 and the denominator of which is 5.75.

- the Class 1-A-15 Certificates will equal the sum of (i) the product of (a) the Class Certificate Balance of the Class 1-A-13 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.50 and the denominator of which is 5.75 and (ii) the product of (a) the Class Certificate Balance of the Class 1-A-14 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.25 and the denominator of which is 5.75.

- the Class 2-A-2 Certificates will equal the Class Certificate Balance of the Class 2-A-1 Certificates immediately prior to such Distribution Date.

- the Class 2-A-7 Certificates will equal the Class Certificate Balance of the Class 2-A-6 Certificates immediately prior to such Distribution Date.

- the Class 2-A-14 Certificates will equal the sum of (i) the product of (a) the Class Certificate Balance of the Class 2-A-11 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.75 and the denominator of which is 6.00, (ii) the product of (a) the Class Certificate Balance of the Class 2-A-12 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.50 and the denominator of which is 6.00 and (iii) the product of (a) the Class Certificate Balance of the Class 2-A-13 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.25 and the denominator of which is 6.00.

- the Class 2-A-18 Certificates will equal the sum of (i) the product of (a) the Class Certificate Balance of the Class 2-A-15 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.75 and the denominator of which is 6.00, (ii) the product of (a) the Class Certificate Balance of the Class 2-A-16 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.50 and the denominator of which is 6.00 and (iii) the product of (a) the Class Certificate Balance of the Class 2-A-17 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.25 and the denominator of which is 6.00.

- the Class 2-A-22 Certificates will equal the sum of (i) the product of (a) the Class Certificate Balance of the Class 2-A-19 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.75 and the denominator of which is 6.00, (ii) the product of (a) the Class Certificate Balance of the Class 2-A-20 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.50 and the denominator of which is 6.00 and (iii) the product of (a) the Class Certificate Balance of the Class 2-A-21 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.25 and the denominator of which is 6.00.

- the Class 2-A-26 Certificates will equal the sum of (i) the product of (a) the Class Certificate Balance of the Class 2-A-23 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.75 and the denominator of which is 6.00, (ii) the product of (a) the Class Certificate Balance of the Class 2-A-24 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.50 and the denominator of which is 6.00 and (iii) the product of (a) the Class Certificate Balance of the Class 2-A-25 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.25 and the denominator of which is 6.00.

- the Class 2-A-30 Certificates will equal the sum of (i) the product of (a) the Class Certificate Balance of the Class 2-A-27 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.75 and the denominator of which is 6.00, (ii) the product of (a) the Class Certificate Balance of the Class 2-A-28 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.50 and the denominator of which is 6.00 and (iii) the product of (a) the Class Certificate Balance of the Class 2-A-29 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.25 and the denominator of which is 6.00.

- the Class 2-A-34 Certificates will equal the sum of (i) the product of (a) the Class Certificate Balance of the Class 2-A-31 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.75 and the denominator of which is 6.00, (ii) the product of (a) the Class Certificate Balance of the Class 2-A-32 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.50 and the denominator of which is 6.00 and (iii) the product of (a) the Class Certificate Balance of the Class 2-A-33 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.25 and the denominator of which is 6.00.

- the Class 2-A-38 Certificates will equal the sum of (i) the product of (a) the Class Certificate Balance of the Class 2-A-35 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.75 and the denominator of which is 6.00, (ii) the product of (a) the Class Certificate Balance of the Class 2-A-36 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.50 and the denominator of which is 6.00 and (iii) the product of (a) the Class Certificate Balance of the Class 2-A-37 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.25 and the denominator of which is 6.00.

- the Class 2-A-42 Certificates will equal the sum of (i) the product of (a) the Class Certificate Balance of the Class 2-A-39 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.75 and the denominator of which is 6.00, (ii) the product of (a) the Class Certificate Balance of the Class 2-A-40 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.50 and the denominator of which is 6.00 and (iii) the product of (a) the Class Certificate Balance of the Class 2-A-41 Certificates immediately prior to such Distribution Date and (b) a fraction, the numerator of which is 0.25 and the denominator of which is 6.00.

The notional component amount of the Class X-1 Component for the interest accrual period for any Distribution Date will be equal to the aggregate Stated Principal Balance of the Non-Discount Mortgage Loans in Loan Group 1 as of the Due Date in the preceding calendar month (after giving effect to prepayments received in the Prepayment Period related to that preceding Due Date). The notional component amount of the Class X-1 Component as of the Closing Date is expected to be approximately $180,910,300.

The notional component amount of the Class X-2 Component for the interest accrual period for any Distribution Date will be equal to the aggregate Stated Principal Balance of the Non-Discount Mortgage Loans in Loan Group 2 as of the Due Date in the preceding calendar month (after giving effect to prepayments received in the Prepayment Period related to that preceding Due Date). The notional component amount of the Class X-2 Component as of the Closing Date is expected to be approximately $204,973,997.

**Book-Entry Certificates; Denominations**

The offered certificates (other than the Class A-R and Class 3-A-R Certificates) will be book-entry certificates (the "Book-Entry Certificates"). The Class A-R and Class 3-A-R Certificates will each be issued as two certificates in fully registered certificated form in an aggregate denomination of $100. Persons acquiring beneficial ownership interests in the Book-Entry Certificates ("Certificate Owners") will hold their Book-Entry Certificates through the Depository Trust Company ("DTC") in the United States or the Euroclear System ("Euroclear"), in Europe, if they are participants of such systems, or indirectly through organizations which are participants in such systems. Each class of Book-Entry Certificates will be issued in one or more certificates that will equal the aggregate principal balance of the applicable Class of the Book-Entry Certificates and will initially be registered in the name of Cede & Co., the nominee of DTC. Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Euroclear's name on the book of its depositary which in turn will hold such positions in customers' securities accounts in the depositaries' names on the books of DTC. JPMorgan Chase will act as depositary for Euroclear (in such capacity the "Depository". Investors may hold such beneficial interests in the Book-Entry Certificates (other than the Class 1-A-2 Certificates) in minimum denominations representing an original principal amount or notional amount of $25,000 and integral multiples of $1 in excess thereof. Investors may hold the beneficial interests in the Class 1-A-2 Certificates in minimum denominations representing an original amount of $1,000 and integral multiples of $1.00 in excess thereof. Except as described below, no person acquiring a beneficial ownership in a Book-Entry Certificate (each, a "beneficial owner") will be entitled to receive a physical certificate representing such person's beneficial ownership interest in such Book-Entry Certificate (a "Definitive Certificate"). Unless and until Definitive Certificates are issued, it is anticipated that the only certificateholder of the Book-Entry Certificates will be Cede & Co., as nominee of DTC. Certificate Owners will not be certificateholders as that term is used in the Pooling and Servicing Agreement. Certificate Owners are only permitted to exercise their rights indirectly through the participating organizations that utilize the services of DTC, including securities brokers and dealers, banks and trust companies and clearing corporations and certain other organizations ("Participants") and DTC.

The beneficial owner's ownership of a Book-Entry Certificate will be recorded on the records of the brokerage firm, bank, thrift institution or other financial intermediary (each, a "Financial Intermediary") that maintains the beneficial owner's account for such purpose. In turn, the Financial Intermediary's ownership of such Book-Entry Certificate will be recorded on the records of DTC (or of a participating firm that acts as agent for the Financial Intermediary, whose interest will in turn be recorded on the records of DTC, if the beneficial owner's Financial Intermediary is not a DTC participant and on the records of Clearstream, Luxembourg or Euroclear, as appropriate).

Certificate Owners will receive all distributions of principal of, and interest on, the Offered Certificates from the Trustee through DTC and DTC participants. While the Offered Certificates are outstanding (except under the circumstances described below), under the rules, regulations and procedures creating and affecting DTC and its operations (the "Rules"), DTC is required to make book-entry transfers among Participants on whose behalf it acts with respect to the Offered Certificates and is required to receive and transmit distributions of principal of, and interest on, the Offered Certificates. Participants and organizations which have indirect access to the DTC system, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly ("Indirect Participants"), with whom Certificate Owners have accounts with respect to Offered Certificates are similarly required to make book-entry transfers and receive and transmit such distributions on behalf of their respective Certificate Owners. Accordingly, although Certificate Owners will not possess certificates, the Rules provide a mechanism by which Certificate Owners will receive distributions and will be able to transfer their interest.

Certificate Owners will not receive or be entitled to receive certificates representing their respective interests in the Offered Certificates, except under the limited circumstances described below. Unless and until Definitive Certificates are issued, Certificate Owners who are not Participants may transfer ownership of Offered Certificates only through Participants and Indirect Participants by instructing such Participants and Indirect Participants to transfer Book-Entry Certificates, by book-entry transfer, through DTC for the account of the purchasers of such Book-Entry Certificates, which account is maintained with their respective Participants. Under the Rules and in accordance with DTC's normal procedures, transfers of ownership of Book-Entry Certificates will be executed through DTC and the accounts of the respective Participants at DTC will be debited and credited. Similarly, the Participants and Indirect Participants will make debits or credits, as the case may be, on their records on behalf of the selling and purchasing Certificate Owners.

Because of time zone differences, credits of securities received Euroclear as a result of a transaction with a Participant will be made during, subsequent securities settlement processing and dated the business day following, the DTC settlement date.  Such credits or any transactions in such securities, settled during such processing will be reported to the relevant Euroclear Participants on such business day.  Cash received in Euroclear, as a result of sales of securities by or through a Euroclear Participant to a DTC Participant, will be received with value on the DTC settlement date but will be available in the Euroclear cash account only as of the business day following settlement in DTC.  For information with respect to tax documentation procedures, relating to the Offered Certificates, see "*Material Federal Income Tax Consequences — Tax Treatment of Foreign Investors*" in the prospectus and "*Global, Clearance, Settlement And Tax Documentation Procedures — Certain U.S. Federal Income Tax Documentation Requirements*" in Annex I hereto.

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Euroclear Participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of Euroclear by its Depositary; however, such cross market transactions will require delivery of instructions to Euroclear by the counterpart in such system in accordance with its rules and procedures and within its established deadlines (European time).  Euroclear will, if the transaction meets its settlement requirements, deliver instructions to its Depositary to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC.  Euroclear Participants may not deliver instructions directly to its Depositaries.

DTC, which is a New York-chartered limited purpose trust company, performs services for its participants, some of which (and/or their representatives) own DTC.  In accordance with its normal procedures, DTC is expected to record the positions held by each DTC participant in the Book-Entry Certificates, whether held for its own account or as a nominee for another person.  In general, beneficial ownership of Book-Entry Certificates will be subject to the rules, regulations and procedures governing DTC and DTC participants as in effect from time to time.

Euroclear was created in 1968 to hold securities for participants of Euroclear ("Euroclear Participants") and to clear and settle transactions between Euroclear Participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. Transactions may now be settled in any of 32 currencies, including United States dollars. Euroclear includes various other services, including securities lending and borrowing and interfaces with domestic markets in several countries generally similar to the arrangements for cross-market transfers with DTC described above. Euroclear is operated by the Brussels, Belgium office of the Euroclear Operator, under contract with Euroclear Clearance Systems S.C., a Belgian cooperative corporation (the "Cooperative"). All operations are conducted by the Euroclear Operator, and all Euroclear securities clearance accounts and Euroclear