In the event the option is exercised by the Master Servicer, the purchase will be made at a price equal to the sum of:

- 100% of the Stated Principal Balance of each Mortgage Loan in Aggregate Loan Group I (other than in respect of REO Property) plus accrued interest thereon at the applicable net mortgage rate, and

- the appraised value of any REO Property (up to the Stated Principal Balance of the related Mortgage Loan) in Aggregate Loan Group I.

Notice of any termination, specifying the Distribution Date on which certificateholders may surrender their Group I Certificates for payment of the final distribution and cancellation, will be given promptly by the Trustee by letter to related certificateholders mailed not earlier than the 10th day and no later than the 15th day of the month immediately preceding the month of the final distribution. The notice will specify (a) the Distribution Date upon which final distribution on the Group I Certificates will be made upon presentation and surrender of the certificates at the office therein designated, (b) the amount of the final distribution, (c) the location of the office or agency at which the presentation and surrender must be made, and (d) that the Record Date otherwise applicable to the Distribution Date is not applicable, distributions being made only upon presentation and surrender of the certificates at the office therein specified.

In the event a notice of termination is given, the Master Servicer will cause all funds in the Certificate Account in respect of Aggregate Loan Group II to be remitted to the Trustee for deposit in the Distribution Account on the Business Day prior to the applicable Distribution Date in an amount equal to the final distribution on the Group I Certificates. At or prior to the time of making the final payment on the Group I Certificates, the Master Servicer as agent of the Trustee will sell all of the assets of Aggregate Loan Group I to the Master Servicer for cash. Proceeds from a purchase will be distributed to the certificateholders in the priority described above under "— *Distributions*" and will reflect the current Class Certificate Balance and other entitlements of each class at the time of liquidation.

The proceeds from any sale in connection the exercise of the option may not be sufficient to distribute the full amount to which each class of Group I Certificates is entitled if the purchase price is based in part on the appraised value of any REO Property and that appraised value is less than the Stated Principal Balance of the related Mortgage Loan. Any purchase of the Mortgage Loans and REO Properties in Aggregate Loan Group I will result in an early retirement of the Group I Certificates. At the time of the making of the final payment on the Group I Certificates, the Trustee shall distribute or credit, or cause to be distributed or credited, to the holder of the Class A-R Certificates all cash on hand related to the Class A-R Certificates. Once the Group I Certificates are retired, certificateholders will not be entitled to receive any amounts that are recovered subsequent to such retirement.

*Aggregate Loan Group II*. The holder of the largest percentage interest in the Class 3-CCertificates (the "Directing Holder") will have the right to instruct the Trustee to conduct an auction of all of the remaining assets in Aggregate Loan Group II on any Distribution Date on or after the first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans and REO Properties in Aggregate Loan Group II is less than or equal to 10% of the sum of (1) the aggregate Stated Principal Balance of the Mortgage Loans in Aggregate Loan Group II as of the initial cut-off date and (2) the Pre-funded Amount with respect to Loan Group 3 (the "Optional Termination Date"). If the first auction is unsuccessful, the auction process may be repeated periodically at the direction of the Directing Holder until a successful auction is conducted. In addition, if the first auction is unsuccessful, or if the Directing Holder does not request an auction, then the Master Servicer will have the option to purchase all of the remaining assets in Aggregate Loan Group II. Any successful auction of all of the remaining assets

in Aggregate Loan Group II or any purchase of those remaining assets by the Master Servicer will result in the early retirement of the Group II Certificates.

Notwithstanding the foregoing, the Directing Holder may request an auction or the Master Servicer may purchase the remaining assets in Aggregate Loan Group II only if either (a) any such auction or purchase, as applicable, will not result in a draw upon the Class 3-A-2 Policy or (b) the Directing Holder or the Master Servicer, as applicable, obtains the consent of the Class 3-A-2 Insurer.

The Master Servicer is an affiliate of the sellers and the Depositor.

Any successful auction of the remaining assets in Aggregate Loan Group II or any purchase of those assets by the Master Servicer will require that the issuing entity receive a purchase price for those assets equal to the sum of:

- 100% of the Stated Principal Balance of each Mortgage Loan in Aggregate Loan Group II (other than in respect of REO Property) plus accrued interest thereon at the applicable Net Mortgage Rate, and

- the appraised value of any REO Property (up to the Stated Principal Balance of the related Mortgage Loan) in Aggregate Loan Group II;

provided, however, that unless the NIM Insurer otherwise consents, the purchase price will in no event be less than an amount that would result in a final distribution on any NIM Insurer guaranteed notes that is sufficient (x) to pay the notes in full and (y) to pay any amounts due and payable to the NIM Insurer pursuant to the indenture related to the notes.

The NIM Insurer may also have the right to purchase all remaining Mortgage Loans and REO Properties in Aggregate Loan Group II at the price set forth above (plus any unreimbursed Servicing Advances, and the principal portion of any unreimbursed Advances, made on the Mortgage Loans in Aggregate Loan Group II prior to the exercise of the option), subject to the same restrictions. The identity of any NIM Insurer is not known as of the date of this prospectus supplement.

Notice of any termination, specifying the Distribution Date on which certificateholders may surrender their Group II Certificates for payment of the final distribution and cancellation, will be given promptly by the Trustee by letter to related certificateholders mailed not earlier than the 10th day and no later than the 15th day of the month immediately preceding the month of the final distribution. The notice will specify (a) the Distribution Date upon which final distribution on the Group II Certificates will be made upon presentation and surrender of the certificates at the office therein designated, (b) the amount of the final distribution, (c) the location of the office or agency at which the presentation and surrender must be made, and (d) that the Record Date otherwise applicable to the Distribution Date is not applicable, distributions being made only upon presentation and surrender of the certificates at the office therein specified.

In the event a notice of termination is given, the Master Servicer will cause all funds in the Certificate Account with respect to Aggregate Loan Group II to be remitted to the Trustee for deposit in the Distribution Account on the Business Day prior to the applicable Distribution Date in an amount equal to the final distribution on the Group II Certificates. At or prior to the time of making the final payment on the Group II Certificates, the Master Servicer as agent of the Trustee will sell all of the assets in Aggregate Loan Group II to the Master Servicer for cash. Proceeds from a purchase will be distributed to the certificateholders in the priority described above under "— *Distributions*" and will reflect the current Class Certificate Balance and other entitlements of each class at the time of liquidation.

The proceeds from any sale in connection the exercise of the option may not be sufficient to distribute the full amount to which each class of Group II Certificates is entitled if the purchase price is based in part on the appraised value of any REO Property and that appraised value is less than the Stated Principal Balance of the related Mortgage Loan.  Any purchase of the Mortgage Loans and REO Properties in Aggregate Loan Group II will result in an early retirement of the Group II Certificates.  At the time of the making of the final payment on the Group II Certificates, the Trustee shall distribute or credit, or cause to be distributed or credited, to the holder of the Class 3-A-R Certificates all cash on hand related to the Class 3-A-R Certificates. Once the Group II Certificates are retired, certificateholders will not be entitled to receive any amounts that are recovered subsequent to such retirement.

**Events of Default; Remedies**

In addition to the Events of Default described in the prospectus, an Event of Default will consist of the failure by the Master Servicer to reimburse, in full, the Trustee not later than 6:00 p.m., New York City time, on the Business Day following the related Distribution Date for any Advance made by the Trustee together with accrued and unpaid interest.  If the Master Servicer fails to make the required reimbursement, so long as the Event of Default has not been remedied, the Trustee, but not the certificateholders, may terminate the Master Servicer, and the Trustee may do so without the consent of the certificateholders.  Additionally, if the Master Servicer fails to provide certain information or perform certain duties related to the Depositor's reporting obligations under the Exchange Act, with respect to the issuing entity, the Depositor, may, without the consent of any of the certificateholders terminate the Master Servicer.

Events of Default will be determined with respect to an Aggregate Loan Group and the related certificates rather than on a pool basis.

**Certain Matters Regarding the Master Servicer, the Depositor and the Sellers**

The prospectus describes the indemnification to which the Master Servicer and the Depositor (and their respective directors, officers, employees and agents) are entitled and also describes the limitations on any liability of the Master Servicer and the Depositor (and their respective directors, officers, employees and agents) to the issuing entity.  See *"The Agreements — Certain Matters Regarding the Master Servicer and the Depositor"* in the prospectus.  The Pooling and Servicing Agreement provides that these same provisions regarding indemnification and exculpation apply to each seller.

**The Trustee**

The Bank of New York will be the Trustee under the Pooling and Servicing Agreement.  The Bank of New York has been, and currently is, serving as indenture Trustee and Trustee for numerous securitization transactions and programs involving pools of residential mortgages.  The Depositor, Countrywide Home Loans and any affiliated seller may maintain other banking relationships in the ordinary course of business with the Trustee. The offered certificates may be surrendered at the corporate trust office of the Trustee located at 101 Barclay Street, 4W, New York, New York 10286, Attention: Corporate Trust Administration or another address that the Trustee may designate from time to time.

The Trustee will be liable for its own negligent action, its own negligent failure to act or its own willful misconduct.  However, the Trustee will not be liable, individually or as Trustee,

- for an error of judgment made in good faith by a responsible officer of the Trustee, unless the Trustee was negligent in ascertaining the pertinent facts,

- with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the holders of certificates evidencing not less than 25% of the Voting Rights of the certificates relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee under the Pooling and Servicing Agreement,

- for any action taken, suffered or omitted by it under the Pooling and Servicing Agreement in good faith and in accordance with an opinion of counsel or believed by the Trustee to be authorized or within the discretion or rights or powers that it has under the Pooling and Servicing Agreement, or

- for any loss on any investment of funds pursuant to the Pooling and Servicing Agreement (other than as issuer of the investment security).

The Trustee is also entitled to rely without further investigation upon any resolution, officer's certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

The Trustee and any successor Trustee will, at all times, be a corporation or association organized and doing business under the laws of a state or the United States of America, authorized under the laws of the United States of America to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000, subject to supervision or examination by a federal or state authority and with a credit rating that would not cause any of the Rating Agencies to reduce or withdraw their respective then-current ratings of any class of certificates (or having provided security from time to time as is sufficient to avoid the reduction). If the Trustee no longer meets the foregoing requirements, the Trustee has agreed to resign immediately.

The Trustee may at any time resign by giving written notice of resignation to the Depositor, the Master Servicer, each Rating Agency and the certificateholders, not less than 60 days before the specified resignation date. The resignation shall not be effective until a successor Trustee has been appointed. If a successor Trustee has not been appointed within 30 days after the Trustee gives notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee.

The Depositor or the Master Servicer may remove the Trustee and appoint a successor Trustee if:

- the Trustee ceases to meet the eligibility requirements described above and fails to resign after written request to do so is delivered to the Trustee by the Depositor,

- the Trustee becomes incapable of acting, or is adjudged as bankrupt or insolvent, or a receiver of the Trustee or of its property is appointed, or any public officer takes charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, or

- a tax is imposed with respect to the issuing entity by any state in which the Trustee or the issuing entity is located and the imposition of the tax would be avoided by the appointment of a different Trustee.

If the Trustee fails to provide certain information or perform certain duties related to the Depositor's reporting obligations under the Exchange Act with respect to the issuing entity, the Depositor

may terminate the Trustee without the consent of any of the certificateholders.  In addition, the holders of certificates evidencing at least 51% of the Voting Rights of the certificates may at any time remove the Trustee and appoint a successor Trustee.  Notice of any removal of the Trustee shall be given by the successor Trustee to each Rating Agency.

Any resignation or removal of the Trustee and appointment of a successor Trustee pursuant to any of the provisions described above will become effective upon acceptance of appointment by the successor Trustee.

A successor Trustee will not be appointed unless the successor Trustee meets the eligibility requirements described above and its appointment does not adversely affect the then-current ratings of the certificates.

**Voting Rights**

As of any date of determination with respect to the voting rights for the Group I Certificates or the Group II Certificates, as applicable:

- each related class of senior certificates with a notional amount will each be allocated 1% of all voting rights in respect of the applicable certificates,

- the other classes of the senior and subordinated certificates will be allocated the related remaining Voting Rights in proportion to their respective Class Certificate Balances, and

- each class of Exchangeable Certificates will be allocated a proportionate share of the Voting Rights allocated to the related classes of Depositable Certificates that have been deposited.

Voting Rights allocated to a class of certificates will be allocated among the certificates of that class in accordance with their respective percentage interests.  However, on any date on which any Class 3-A-2 Certificates are outstanding or any amounts are owed to the Class 3-A-2 Insurer under the Pooling and Servicing Agreement, the Class 3-A-2 Insurer will have all of the Voting Rights of the Class 3-A-2 Certificates unless the Class 3-A-2 Insurer defaults on its obligations under the Class 3-A-2 Policy

**Restrictions on Transfer of the Class A-R and Class 3-A-R Certificates**

The Class A-R and Class 3-A-R Certificates will be subject to the restrictions on transfer described in the prospectus under *"Material Federal Income Tax Consequences — Taxation of the REMIC and Its Holders," " — Taxation of Holders of Residual Interests – Restrictions on Ownership and Transfer of Residual Interests"*, and *"— Tax Treatment of Foreign Investors."*  The and Class 3-A-R Certificates (in addition to other ERISA- restricted classes of certificates, as described in the Pooling and Servicing Agreement) may not be acquired by a Plan.  See *"ERISA Considerations"* in this prospectus supplement. The and Class 3-A-R Certificates will contain a legend describing the foregoing restrictions.

**Ownership of the Class A-R and Class 3-A-R Certificates**

On the Closing Date, the Class A-R and Class 3-A-R Certificates (except as described below) will be acquired by Countrywide Securities Corporation, an affiliate of the Depositor, the sellers and the Master Servicer.

The Trustee will be initially designated as "tax matters person" under the Pooling and Servicing Agreement and in that capacity will hold each of the Class A-R and Class 3-A-R Certificates in the

amount of $0.01 each.  As the tax matters person, the Trustee will be the primary representative of the issuing entity with respect to any tax administrative or judicial matter.  As Trustee, the Trustee will be responsible for making a REMIC election with respect to each REMIC created under the Pooling and Servicing Agreement and for preparing and filing tax returns with respect to each REMIC.

## Restrictions on Investment, Suitability Requirements

An investment in the certificates may not be appropriate for all investors due to tax, ERISA or other legal requirements.  Investors should review the disclosure included in this prospectus supplement and the prospectus under *"Material Federal Income Tax Consequences," "ERISA Considerations"* and *"Legal Matters"* prior to any acquisition and are encouraged to consult with their advisors prior to purchasing the certificates.

## Yield, Prepayment and Maturity Considerations

### General

The effective yield to the holders of each interest-bearing class of certificates (other than the LIBOR Certificates) will be lower than the yield otherwise produced by the applicable rate at which interest is passed through to the holders and the purchase price of the certificates because monthly distributions will not be payable to the holders until the 25th day (or, if that day is not a business day, the following business day) of the month following the month in which interest accrues on the Mortgage Loans (without any additional distribution of interest or earnings on them for the delay).

Delinquencies on the Mortgage Loans that are not advanced by or on behalf of the Master Servicer (because amounts, if advanced, would be nonrecoverable) will adversely affect the yield on the related certificates.  Because of the priority of distributions, shortfalls resulting from delinquencies not so advanced will be borne first by the related classes of subordinated certificates, in the reverse order of their numerical class designations, and then by the senior certificates of the senior certificate group to which the shortfall relates. With respect to Aggregate Loan Group I, if, as a result of the shortfalls, the aggregate of the Class Certificate Balances of all classes of Group I Certificates exceeds the Stated Principal Balance of the Mortgage Loans in Aggregate Loan Group I, the Class Certificate Balance of the class of Group I Subordinated Certificates then outstanding with the highest numerical class designation will be reduced by the amount of the excess.

Additionally with respect to Aggregate Loan Group I, Net Interest Shortfalls will adversely affect the yields on the related certificates.  In addition, all losses initially will be borne by the related subordinated certificates, in the reverse order of their distribution priorities (either directly or through distributions in respect of Class PO Deferred Amounts on the Class PO Certificates). Moreover, since the Subordinated Principal Distribution Amount for each Distribution Date will be reduced by the amount of any distributions on the Distribution Date in respect of Class PO Deferred Amounts, the amount distributable as principal on each Distribution Date to each class of related subordinated certificates then entitled to a distribution of principal will be less than it otherwise would be in the absence of the Class PO Deferred Amounts. As a result, the yields on the related classes of certificates will depend on the rate and timing of Realized Losses.

For purposes of allocating losses and shortfalls resulting from delinquencies to the Group I Subordinated Certificates, the Class M Certificates will be considered to have a lower numerical class designation and a higher distribution priority than each other class of Group I Subordinated Certificates. Within the Class I-B Certificates, the distribution priorities are in numerical order.

**Prepayment Considerations and Risks**

The rate of principal payments on the certificates, the aggregate amount of distributions on the certificates and the yield to maturity of the certificates will be related to the rate and timing of payments of principal on the related Mortgage Loans. The rate of principal payments on the Mortgage Loans will in turn be affected by the amortization schedules (including their interest only periods) of the Mortgage Loans and by the rate of principal prepayments, including for this purpose, prepayments resulting from refinancing, liquidations of the Mortgage Loans due to defaults, casualties, condemnations and repurchases by the sellers or Master Servicer. Except for approximately 8.84%, 8.84% and 38.05% of the Initial Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3, respectively, in each case by aggregate Stated Principal Balance of the Initial Mortgage Loans in that Loan Group as of the initial cut-off date, which have a prepayment charge if the related mortgagor prepays such Mortgage Loan during a period ranging up to five years after origination, the Mortgage Loans may be prepaid by the mortgagors at any time without a prepayment charge. Because certain of the Mortgage Loans contain prepayment charges, the rate of principal prepayments may be less than the rate of principal prepayments for Mortgage Loans that did not have prepayment charges. The holders of the Class P and Class 3-P Certificates will be entitled to all prepayment charges received on the Mortgage Loans, and those amounts will not be available for distribution on the other classes of certificates. Under certain circumstances, as described in the Pooling and Servicing Agreement, the Master Servicer may waive the payment of any otherwise applicable prepayment charge. Investors should conduct their own analysis of the effect, if any, that the prepayment charges, and decisions by the Master Servicer with respect to the waiver thereof, may have on the prepayment performance of the Mortgage Loans. In addition, approximately 39.06%, 42.95% and 41.83% of the Initial Mortgage Loans in Loan Group 1, Loan Group 2 and Loan Group 3, respectively, in each case by aggregate Stated Principal Balance of the Initial Mortgage Loans in that Loan Group as of the initial cut-off date, do not provide for any payments of principal for the first five or ten years following their origination. These Mortgage Loans may involve a greater degree of risk than Mortgage Loans that amortize with each monthly payment because, if the related mortgagor defaults, the outstanding principal balance of that Mortgage Loan will be higher than for an amortizing Mortgage Loan. During their interest-only periods, the Mortgage Loans may be less likely to prepay as the interest-only feature may reduce the perceived benefits of refinancing due to the smaller monthly payment. However, as an interest-only Mortgage Loan approaches the end of its interest-only period, it may be more likely to be prepaid, even if market interest rates at the time are only slightly higher or lower than the interest rate on the interest-only Mortgage Loans as the related borrowers seek to avoid increases in their respective monthly mortgage payment. The Mortgage Loans are subject to the "due-on-sale" provisions included therein. See *"The Mortgage Pool"* in this prospectus supplement.

Prepayments, liquidations and purchases of the Mortgage Loans in a Loan Group will result in distributions on the certificates related to that Loan Group of principal amounts which would otherwise be distributed over the remaining terms of the Mortgage Loans. This includes any optional purchase by the Master Servicer of a defaulted Mortgage Loan and any optional repurchase of the remaining Mortgage Loans in an Aggregate Loan Group, in each case as described in this prospectus supplement. Since the rate of payment of principal of the Mortgage Loans will depend on future events and a variety of factors, no assurance can be given as to the rate of payment of principal of the Mortgage Loans or the rate of principal prepayments. The extent to which the yield to maturity of a class of certificates may vary from the anticipated yield will depend upon the degree to which the certificate is purchased at a discount or premium, and the degree to which the timing of payments thereon is sensitive to prepayments, liquidations and purchases of the Mortgage Loans in that Loan Group. Further, an investor should consider the risk that, in the case of the PO Certificates and any other certificate purchased at a discount, a slower than anticipated rate of principal payments (including prepayments) on the Mortgage Loans in that Loan Group could result in an actual yield to the investor that is lower than the anticipated yield and, in the case of the notional amount certificates or any other certificate purchased at a premium, a faster than

anticipated rate of principal payments could result in an actual yield to the investor that is lower than the anticipated yield. Investors in the notional amount certificates should carefully consider the risk that a rapid rate of principal payments on the Mortgage Loans in the related Loan Group could result in the failure of the investors to recover their initial investment.

The rate of principal payments (including prepayments) on pools of Mortgage Loans may vary significantly over time and may be influenced by a variety of economic, geographic, social and other factors, including changes in mortgagors' housing needs, job transfers, unemployment, mortgagors' net equity in the mortgaged properties, servicing decisions, as well as the characteristics of the Mortgage Loans included in the mortgage pool as described under *"The Mortgage Pool — General"* and *"— Underwriting Process"* in this prospectus supplement. In addition, Countrywide Home Loans' Streamlined Documentation Program may affect the rate of prepayments on the Mortgage Loans. In general, if prevailing interest rates were to fall significantly below the mortgage rates on the Mortgage Loans, the Mortgage Loans could be subject to higher prepayment rates than if prevailing interest rates were to remain at or above the mortgage rates on the Mortgage Loans. Conversely, if prevailing interest rates were to rise significantly, the rate of prepayments on the Mortgage Loans would generally be expected to decrease. No assurances can be given as to the rate of prepayments on the Mortgage Loans in stable or changing interest rate environments. With respect to Mortgage Loans that are balloon loans, such balloon loans involve a greater degree of risk than fully amortizing Mortgage Loans because typically the mortgagor must be able to refinance the loan or sell the property to make the balloon payment at maturity. The ability of the mortgagor to do this will depend on such factors as mortgage rates at the time of the sale or refinancing, the mortgagor's equity in the property, the relative strengths of the local housing market, the financial condition of the mortgagor's and tax laws. Furthermore, with respect to up to 50% of the Mortgage Loans in each Loan Group, the Depositor may deliver all or a portion of each related mortgage file to the Trustee after the Closing Date. Should Countrywide Home Loans or any other seller fail to deliver all or a portion of any mortgage files to the Depositor or other designee of the Depositor or, at the Depositor's direction, to the Trustee, within that period, Countrywide Home Loans will be required to use its best efforts to deliver a replacement Mortgage Loan for the related delayed delivery Mortgage Loan or repurchase the related delayed delivery Mortgage Loan. Any repurchases pursuant to this provision would also have the effect of accelerating the rate of prepayments on the Mortgage Loans.

With respect to Aggregate Loan Group I, as described under "*Description of the Certificates — Principal – Group I Certificates*" in this prospectus supplement, the Senior Prepayment Percentage of the applicable Non-PO Percentage of all principal prepayments on the Mortgage Loans in a Loan Group in Aggregate Loan Group I will be initially distributed to the classes of related senior certificates (other than the notional amount certificates and the related Class PO Component) then entitled to receive principal prepayment distributions. This may result in all (or a disproportionate percentage) of the principal prepayments being distributed to holders of the related classes of senior certificates and none (or less than their *pro rata* share) of the principal prepayments being distributed to holders of the related classes of subordinated certificates during the periods of time described in the definition of each Senior Prepayment Percentage. The Class 1-A-4, Class 1-A-5, Class 1-A-6, Class 1-A-8, Class 1-A-9, Class 1-A-10 and Class 1-A-11 Certificates generally will not receive principal distributions for the first five years after the Closing Date.

The yields to maturity on the Senior Certificates will reflect the prepayment experience on the Mortgage Loans in the related Loan Group, and the yields on the other certificates will reflect a combination of prepayment experience on the Mortgage Loans in the related Aggregate Loan Group. Since the Mortgage Loans in each Loan Group may exhibit different prepayment behavior either simultaneously or over time, it will be more difficult to estimate the possible prepayment experience on and the resulting effects on the yields to maturity of those certificates.

We cannot predict the level of prepayments that will be experienced by the issuing entity. See "*Yield, Maturity and Prepayment Considerations*" in the prospectus

The timing of changes in the rate of prepayments on the Mortgage Loans may significantly affect an investor's actual yield to maturity, even if the average rate of principal payments is consistent with an investor's expectation. In general, the earlier a prepayment of principal on the Mortgage Loans, the greater the effect on an investor's yield to maturity. The effect on an investor's yield as a result of principal payments occurring at a rate higher (or lower) than the rate anticipated by the investor during the period immediately following the issuance of the offered certificates may not be offset by a subsequent like decrease (or increase) in the rate of principal payments.

The tables in this "*Yield, Prepayment and Maturity Considerations*" section indicate the sensitivity of the pre-tax corporate bond equivalent yields to maturity of the illustrated class or classes of certificates to various constant percentages of the applicable Prepayment Assumption and, in the case of the Inverse Floating Rate Certificates, to various levels of LIBOR. The yields set forth in the tables were calculated by determining the monthly discount rates that, when applied to the assumed streams of cash flows to be paid on the applicable class or classes of certificates, would cause the discounted present value of the assumed streams of cash flows to equal the assumed aggregate purchase prices of the applicable class or classes and converting the monthly rates to corporate bond equivalent rates. Those calculations do not take into account variations that may occur in the interest rates at which investors may be able to reinvest funds received by them as distributions on the certificates and consequently do not purport to reflect the return on any investment in any class of certificates when the reinvestment rates are considered.

## Mandatory Prepayment

In the event that at the end of the Funding Period there are amounts on deposit in the Pre-funding Account, the holders of the group 1 senior certificates and group 2 senior certificates will receive an additional distribution allocable to principal in an amount equal to that amount on deposit in the Pre-funding Account with respect to the related Loan Group at that time.

## Sensitivity of the Inverse Floating Rate Certificates

The yields on the Class 2-A-2 and Class 2-A-7 Certificates (we sometimes refer to these certificates as "Inverse Floating Rate Certificates") will be very sensitive to the level of LIBOR and the rate and timing of principal payments (including prepayments) of the Mortgage Loans in Loan Group 2, which can be prepaid at any time. As indicated in the tables below, an increasing level of prepayments and/or LIBOR will have a negative effect on the yields to investors in the Inverse Floating Rate Certificates.

Changes in the level of LIBOR may not correlate with changes in prevailing mortgage interest rates. It is possible that lower prevailing mortgage interest rates, which might be expected to result in faster prepayments, could occur concurrently with an increased level of LIBOR.

The following tables were prepared on the basis of the structuring assumptions and the assumptions that (i) the interest rates applicable to the Inverse Floating Rate Certificates for each applicable Interest Accrual Period, subsequent to their initial Interest Accrual Period, will be based on the indicated level of LIBOR and (ii) the respective purchase prices of the Inverse Floating Rate Certificates (expressed as percentages of their initial notional amounts) are as follows:

| Class | Price* |
|-------|--------|
| Class 2-A-2 ................................................................... | 0.3125% |
| Class 2-A-7 ................................................................... | 0.0625% |

*     These prices do not include accrued interest. Accrued interest has been added to each such price in calculating the yields set forth in the tables below.

### Sensitivity of the Class 2-A-2 Certificates to Prepayments and LIBOR
### (Pre-Tax Yield to Maturity)

| LIBOR | Percentage of the Prepayment Assumption | | | | |
|-------|------|------|------|------|------|
|  | 0% | 50% | 100% | 125% | 150% |
| 5.00%.................................................. | 404.9% | 320.4% | 181.0% | 115.9% | 59.7% |
| 5.20%.................................................. | 280.9% | 209.8% | 81.9% | 26.6% | (18.8)% |
| 5.32%.................................................. | 214.1% | 149.7% | 27.5% | (21.8)% | (60.7)% |
| 5.50%.................................................. | 124.1% | 67.2% | (48.3)% | (87.8)% | ** |
| 5.52% and above.................................... | 114.8% | 58.5% | (56.4)% | (94.8)% | ** |

**   Less than (99.9)%

### Sensitivity of the Class 2-A-7 Certificates to Prepayments and LIBOR
### (Pre-Tax Yield to Maturity)

| LIBOR | Percentage of the Prepayment Assumption | | | | |
|-------|------|------|------|------|------|
|  | 0% | 50% | 100% | 125% | 150% |
| 5.20%.................................................. | 532.7% | 463.9% | 360.9% | 304.1% | 248.2% |
| 5.30%.................................................. | 219.8% | 176.4% | 91.4% | 47.6% | 8.3% |
| 5.32%.................................................. | 168.7% | 129.6% | 45.4% | 3.9% | (31.9)% |
| 5.36%.................................................. | 77.5% | 46.6% | (43.6)% | (79.3)% | ** |
| 5.40% and above.................................... | ** | ** | ** | ** | ** |

**   Less than (99.9)%

It is highly unlikely that the Mortgage Loans in Loan Group 2 will have the characteristics assumed or that those Mortgage Loans will all prepay at the same rate until maturity or that all of those Mortgage Loans will prepay at the same rate or time. In addition, there can be no assurance that LIBOR will correspond to the levels shown herein and it is highly unlikely that the level of LIBOR will remain constant. As a result of these factors, the pre-tax yields on the Inverse Floating Rate Certificates are likely to differ from those shown in the tables above, even if all of the Mortgage Loans in the related Loan Group prepay at the indicated percentages of the Prepayment Assumption and LIBOR is at the indicated level.  No representation is made as to the actual rate of principal payments on the Mortgage Loans in Loan Group 2, the level of LIBOR for any period or over the lives of the Inverse Floating Rate Certificates or as to the yields on the Inverse Floating Rate Certificates.  Investors must make their own decisions as to the appropriate combinations of prepayment assumptions and assumptions regarding the level of LIBOR to be used in deciding whether to purchase the Inverse Floating Rate Certificates.

**Sensitivity of the Class 1-A-7, Class 1-A-15, Class 2-A-14, Class 2-A-18, Class 2-A-22, Class 2-A-26, Class 2-A-30, Class 2-A-34, Class 2-A-38 and Class 2-A-42 Certificates**

**As indicated in the following tables, the yields to investors in the Class 1-A-7, Class 1-A-15, Class 2-A-14, Class 2-A-18, Class 2-A-22, Class 2-A-26, Class 2-A-30, Class 2-A-34, Class 2-A-38 and Class 2-A-42 Certificates will be sensitive to the rate of principal payments (including prepayments) of the Mortgage Loans in the related Loan Group, which can be prepaid at any time. On the basis of the structuring assumptions and prices below, the yields to maturity on the Class 1-**

**A-7, Class 1-A-15, Class 2-A-14, Class 2-A-18, Class 2-A-22, Class 2-A-26, Class 2-A-30, Class 2-A-34, Class 2-A-38 and Class 2-A-42 Certificates would be approximately 0% if prepayments of the Mortgage Loans in the related Loan Group were to occur at the following constant rates:**

| Class | CPR |
|---|---|
| Class 1-A-7 | 301% |
| Class 1-A-15 | 124% |
| Class 2-A-14 | 120% |
| Class 2-A-18 | 213% |
| Class 2-A-22 | 267% |
| Class 2-A-26 | 177% |
| Class 2-A-30 | 235% |
| Class 2-A-34 | 348% |
| Class 2-A-38 | 122% |
| Class 2-A-42 | 121% |

**If the actual prepayment rate of the Mortgage Loans in the related Loan Group were to exceed the foregoing level for as little as one month while equaling the level for the remaining months, the investors in the Class 1-A-7, Class 1-A-15, Class 2-A-14, Class 2-A-18, Class 2-A-22, Class 2-A-26, Class 2-A-30, Class 2-A-34, Class 2-A-38 and Class 2-A-42 Certificates, as applicable, would not fully recoup their initial investments.**

The information set forth in the following tables has been prepared on the basis of the structuring assumptions and on the assumption that the purchase prices of the Class 1-A-7, Class 1-A-15, Class 2-A-14, Class 2-A-18, Class 2-A-22, Class 2-A-26, Class 2-A-30, Class 2-A-34, Class 2-A-38 and Class 2-A-42 Certificates (expressed as percentages of their respective initial notional amounts) are as follows:

| Class | Price* |
|---|---|
| Class 1-A-7 | 15.0000% |
| Class 1-A-15 | 11.0000% |
| Class 2-A-14 | 15.0000% |
| Class 2-A-18 | 15.0000% |
| Class 2-A-22 | 15.0000% |
| Class 2-A-26 | 10.0000% |
| Class 2-A-30 | 12.0000% |
| Class 2-A-34 | 10.0000% |
| Class 2-A-38 | 16.0000% |
| Class 2-A-42 | 16.0000% |

*The prices do not include accrued interest. Accrued interest has been added to each price in calculating the yields set forth in the tables below.

**Pre-Tax Yield to Maturity**

| Class | Percentage of the Prepayment Assumption | | | | |
|---|---|---|---|---|---|
| | 0% | 50% | 100% | 125% | 150% |
| Class 1-A-7 ............................................. | 40.3% | 39.4% | 38.7% | 38.0% | 35.6% |
| Class 1-A-15 ........................................... | 55.0% | 37.6% | 13.5% | (0.2)% | (14.3)% |
| Class 2-A-14 ........................................... | 42.3% | 32.4% | 11.6% | (2.5)% | (17.5)% |
| Class 2-A-18 ........................................... | 42.4% | 42.4% | 37.9% | 31.9% | 24.5% |
| Class 2-A-22 ........................................... | 38.6% | 36.5% | 35.7% | 33.5% | 30.0% |
| Class 2-A-26 ........................................... | 65.3% | 53.5% | 41.8% | 30.0% | 16.3% |
| Class 2-A-30 ........................................... | 53.7% | 53.5% | 49.1% | 43.3% | 35.9% |
| Class 2-A-34 ........................................... | 62.2% | 60.2% | 59.6% | 58.2% | 55.6% |
| Class 2-A-38 ........................................... | 39.5% | 27.5% | 11.9% | (1.3)% | (15.6)% |
| Class 2-A-42 ........................................... | 39.5% | 30.4% | 11.2% | (2.0)% | (16.1)% |

It is unlikely that the Mortgage Loans will have the precise characteristics described in this prospectus supplement or that the Mortgage Loans in any Loan Group will all prepay at the same rate until maturity or that all of the Mortgage Loans in any Loan Group will prepay at the same rates or time. As a result of these factors, the pre-tax yields on the classes of certificates listed above are likely to differ from those shown in the tables above, even if all of the Mortgage Loans in the related Loan Group prepay at the indicated percentages of the Prepayment Assumption. No representation is made as to the actual rate of principal payments on the Mortgage Loans in any Loan Group for any period or over the lives of the classes of certificates listed above or as to the yields on those Certificates. Investors must make their own decisions as to the appropriate prepayment assumptions to be used in deciding whether to purchase the Class 1-A-7, Class 1-A-15, Class 2-A-14, Class 2-A-18, Class 2-A-22, Class 2-A-26, Class 2-A-30, Class 2-A-34, Class 2-A-38 and Class 2-A-42 Certificates.

**Sensitivity of the Class X Certificates**

**As indicated in the following table, the yield to investors in the Class X Certificates will be sensitive to the rate of principal payments (including prepayments) on the Non-Discount Mortgage Loans in Aggregate Loan Group I (particularly those with high net mortgage rates), which generally can be prepaid at any time. On the basis of the structuring assumptions and prices below, the yields to maturity on the Class X Certificates would be approximately 0% if prepayments of the Non-Discount Mortgage Loans in Aggregate Loan Group I were to occur at a constant rate of approximately 189% of the Prepayment Assumption. If the actual prepayment rate of the Non-Discount Mortgage Loans in Aggregate Loan Group I were to exceed the foregoing levels for as little as one month while equaling the levels for the remaining months, the investors in the Class X Certificates would not fully recoup their initial investments.**

As described under *"Description of the Certificates — General,"* the pass-through rate of the Class X Certificates in effect from time to time is calculated by reference to the net mortgage rates of the Non-Discount Mortgage Loans in Aggregate Loan Group I. The Non-Discount Mortgage Loans in Aggregate Loan Group I will have higher net mortgage rates (and higher mortgage rates) than the other Mortgage Loans Aggregate Loan Group I. In general, Mortgage Loans with higher mortgage rates tend to prepay at higher rates than Mortgage Loans with relatively lower mortgage rates in response to a given change in market interest rates. As a result, the Non-Discount Mortgage Loans in Aggregate Loan Group I may prepay at higher rates, thereby reducing the pass-through rate and notional amount of the Class X Certificates.

The information set forth in the following table has been prepared on the basis of the structuring assumptions and on the assumption that the purchase price of the Class X Certificates (expressed as a percentage of its initial notional amount) is as follows:

| Class | Price* |
|---|---|
| Class X......................................................................................... | 1.50000% |

* The price does not include accrued interest. Accrued interest has been added to the price in calculating the yields set forth in the table below.

### Sensitivity of the Class X Certificates
### to Prepayments
### (Pre-Tax Yields to Maturity)

| Class | Percentage of Related Prepayment Assumption | | | | |
|---|---|---|---|---|---|
| | 0% | 50% | 100% | 125% | 150% |
| Class X................................................. | 46.3% | 35.0% | 23.1% | 17.0% | 10.6% |

It is unlikely that the Non-Discount Mortgage Loans in Aggregate Loan Group I will have the precise characteristics described in this prospectus supplement or that the Non-Discount Mortgage Loans in Aggregate Loan Group I will all prepay at the same rate until maturity or that all of the Non-Discount Mortgage Loans in Aggregate Loan Group I will prepay at the same rate or time. As a result of these factors, the pre-tax yield on the Class X Certificates is likely to differ from that shown in the table above, even if all of the Non-Discount Mortgage Loans in Aggregate Loan Group I prepay at the indicated percentages of the Prepayment Assumption.  No representation is made as to the actual rate of principal payments on the Non-Discount Mortgage Loans in Aggregate Loan Group I for any period or over the lives of the Class X Certificates or as to the yields on those Certificates. Investors must make their own decisions as to the appropriate prepayment assumptions to be used in deciding whether to purchase the Class X Certificates.

### Sensitivity of the Class 1-A-9 and Class PO Certificates

**The Class 1-A-9 and Class PO Certificates will be "principal only" certificates and will not bear interest. As indicated in the following table, a lower than anticipated rate of principal payments (including prepayments) on the Discount Mortgage Loans, in the case of the Class PO Certificates, and all of the Mortgage Loans in Loan Group 1, in the case of the Class 1-A-9 Certificates, will have a negative effect on the yields to investors in the Class 1-A-9 and Class PO Certificates.**

As described above under *"Description of the Certificates — Principal"* in this prospectus supplement, each Class PO Principal Distribution Amount is calculated by reference to the principal payments (including prepayments) on the Discount Mortgage Loans in the related Loan Group. The Discount Mortgage Loans will have lower net mortgage rates (and lower mortgage rates) than the other Mortgage Loans. In general, Mortgage Loans with higher mortgage rates tend to prepay at higher rates than Mortgage Loans with relatively lower mortgage rates in response to a given change in market interest rates. As a result, the Discount Mortgage Loans may prepay at lower rates, thereby reducing the rate of payment of principal and the resulting yield of the Class PO Certificates.

The information set forth in the following table has been prepared on the basis of the structuring assumptions and on the assumption that the purchase prices of the Class 1-A-9 and Class PO Certificates (expressed as percentages of their respective initial Class Certificate Balances) are as follows:

| Class | Price |
|---|---|
| Class PO ........................................................................ | 70.00% |
| Class 1-A-9....................................................................... | 65.00% |

**Sensitivity of the Class 1-A-9 and Class PO Certificates to Prepayments**
**(Pre-Tax Yield to Maturity)**

| | Percentage of the Related Prepayment Assumption | | | | |
|---|---|---|---|---|---|
| Class | 0% | 50% | 100% | 125% | 150% |
| Class PO .................................... | 1.9% | 5.4% | 10.1% | 12.8% | 15.7% |
| Class 1-A-9............................... | 2.1% | 3.3% | 4.2% | 4.8% | 6.3% |

It is unlikely that the Mortgage Loans will have the precise characteristics described in this prospectus supplement or that the Mortgage Loans will all prepay at the same rate until maturity or that all of the applicable Mortgage Loans will prepay at the same rate or time. As a result of these factors, the pre-tax yields on the Class 1-A-9 and Class PO Certificates are likely to differ from those shown in the table above, even if all of the applicable Mortgage Loans prepay at the indicated percentages of the Prepayment Assumption. No representation is made as to the actual rate of principal payments on the Mortgage Loans for any period or over the lives of the Class 1-A-9 and Class PO Certificates or as to the yields on the Class 1-A-9 and Class PO Certificates. Investors must make their own decisions as to the appropriate prepayment assumptions to be used in deciding whether to purchase the 1-A-8 or Class PO Certificates.

**Weighted Average Lives of the Offered Certificates**

The weighted average life of an offered certificate is determined by (a) multiplying the amount of the net reduction, if any, of the Class Certificate Balance of the certificate on each Distribution Date by the number of years from the date of issuance to the Distribution Date, (b) summing the results and (c) dividing the sum by the aggregate amount of the net reductions in Class Certificate Balance or notional amount, as applicable, of the certificate referred to in clause (a).

For a discussion of the factors which may influence the rate of payments (including prepayments) of the Mortgage Loans, see *"— Prepayment Considerations and Risks"* in this prospectus supplement and *"Yield, Maturity and Prepayment Considerations"* in the prospectus.

In general, the weighted average lives of the offered certificates will be shortened if the level of prepayments of principal of the Mortgage Loans in the related Loan Group or Loan Groups increases. However, the weighted average lives of the offered certificates will depend upon a variety of other factors, including the timing of changes in such rate of principal payments, the priority sequence of distributions of principal of the related classes of certificates and the distribution of the amount available for distribution of principal to the related classes of senior certificates (other than the notional amount certificates and the related Class PO Component) in accordance with the rules governing the priorities of payment among the related classes of senior certificates set forth in this prospectus supplement. See *"Description of the Certificates — Principal"* in this prospectus supplement.

The interaction of the foregoing factors may have different effects on various classes of offered certificates and the effects on any class may vary at different times during the life of the class. Accordingly, no assurance can be given as to the weighted average life of any class of offered certificates. Further, to the extent the prices of the offered certificates represent discounts or premiums to their respective initial Class Certificate Balances or initial notional amounts, as the case may be, variability in the weighted average lives of the classes of offered certificates will result in variability in the related yields to maturity. For an example of how the weighted average lives of the classes of offered certificates

may be affected at various constant percentages of the Prepayment Assumption, see the Decrement Tables under the next heading.

**Decrement Tables**

The following tables indicate the percentages of the initial Class Certificate Balances of the classes of offered certificates (other than the Class X Certificates) that would be outstanding after each of the dates shown at various constant percentages of the Prepayment Assumption and the corresponding weighted average lives of the classes. The tables have been prepared on the basis of the structuring assumptions. It is not likely that the Mortgage Loans will have the precise characteristics described in this prospectus supplement or that all of the Mortgage Loans will prepay at the constant percentages of the Prepayment Assumption specified in the tables or at any other constant rate. Moreover, the diverse remaining terms to maturity of the Mortgage Loans could produce slower or faster principal distributions than indicated in the tables, which have been prepared using the specified constant percentages of the Prepayment Assumption even if the remaining term to maturity of the Mortgage Loans is consistent with the remaining terms to maturity of the Mortgage Loans specified in the structuring assumptions.

**Percent of Initial Class Certificate Balances Outstanding***

| | Class 1-A-1, Class 1-A-3, Class 1-A-12, Class 1-A-13, Class 1-A-14 and Class 1-A-15† | | | | | Class 1-A-2 | | | | |
| | Percentage of Prepayment Assumption | | | | | Percentage of Prepayment Assumption | | | | |
| Distribution Date | 0% | 50% | 100% | 125% | 150% | 0% | 50% | 100% | 125% | 150% |
|---|---|---|---|---|---|---|---|---|---|---|
| Initial........................................ | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2008 .................................. | 99 | 88 | 78 | 72 | 67 | 100 | 100 | 100 | 100 | 100 |
| February 2009 .................................. | 98 | 75 | 54 | 44 | 35 | 100 | 100 | 100 | 100 | 100 |
| February 2010 .................................. | 97 | 63 | 35 | 23 | 12 | 100 | 100 | 100 | 100 | 100 |
| February 2011 .................................. | 96 | 52 | 20 | 7 | 0 | 100 | 100 | 100 | 100 | 79 |
| February 2012 .................................. | 95 | 42 | 8 | 0 | 0 | 100 | 100 | 100 | 71 | 10 |
| February 2013 .................................. | 93 | 34 | 0 | 0 | 0 | 100 | 100 | 97 | 27 | 0 |
| February 2014 .................................. | 92 | 27 | 0 | 0 | 0 | 100 | 100 | 61 | 1 | 0 |
| February 2015 .................................. | 91 | 22 | 0 | 0 | 0 | 100 | 100 | 39 | 0 | 0 |
| February 2016 .................................. | 89 | 17 | 0 | 0 | 0 | 100 | 100 | 26 | 0 | 0 |
| February 2017 .................................. | 88 | 13 | 0 | 0 | 0 | 100 | 100 | 21 | 0 | 0 |
| February 2018 .................................. | 85 | 10 | 0 | 0 | 0 | 100 | 100 | 16 | 0 | 0 |
| February 2019 .................................. | 82 | 7 | 0 | 0 | 0 | 100 | 100 | 13 | 0 | 0 |
| February 2020 .................................. | 79 | 4 | 0 | 0 | 0 | 100 | 100 | 10 | 0 | 0 |
| February 2021 .................................. | 76 | 1 | 0 | 0 | 0 | 100 | 100 | 8 | 0 | 0 |
| February 2022 .................................. | 72 | 0 | 0 | 0 | 0 | 100 | 93 | 6 | 0 | 0 |
| February 2023 .................................. | 69 | 0 | 0 | 0 | 0 | 100 | 80 | 4 | 0 | 0 |
| February 2024 .................................. | 65 | 0 | 0 | 0 | 0 | 100 | 69 | 3 | 0 | 0 |
| February 2025 .................................. | 60 | 0 | 0 | 0 | 0 | 100 | 59 | 3 | 0 | 0 |
| February 2026 .................................. | 56 | 0 | 0 | 0 | 0 | 100 | 50 | 2 | 0 | 0 |
| February 2027 .................................. | 51 | 0 | 0 | 0 | 0 | 100 | 42 | 1 | 0 | 0 |
| February 2028 .................................. | 46 | 0 | 0 | 0 | 0 | 100 | 35 | 1 | 0 | 0 |
| February 2029 .................................. | 41 | 0 | 0 | 0 | 0 | 100 | 29 | 1 | 0 | 0 |
| February 2030 .................................. | 35 | 0 | 0 | 0 | 0 | 100 | 23 | 1 | 0 | 0 |
| February 2031 .................................. | 29 | 0 | 0 | 0 | 0 | 100 | 18 | 0 | 0 | 0 |
| February 2032 .................................. | 23 | 0 | 0 | 0 | 0 | 100 | 14 | 0 | 0 | 0 |
| February 2033 .................................. | 16 | 0 | 0 | 0 | 0 | 100 | 10 | 0 | 0 | 0 |
| February 2034 .................................. | 8 | 0 | 0 | 0 | 0 | 100 | 7 | 0 | 0 | 0 |
| February 2035 .................................. | 0 | 0 | 0 | 0 | 0 | 100 | 4 | 0 | 0 | 0 |
| February 2036 .................................. | 0 | 0 | 0 | 0 | 0 | 49 | 2 | 0 | 0 | 0 |
| February 2037 .................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)** ................................. | 18.8 | 5.1 | 2.5 | 2.0 | 1.6 | 29.0 | 19.9 | 8.6 | 5.6 | 4.4 |

---

\*    Rounded to the nearest whole percentage.

\*\*   Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

†    In the case of the Class 1-A-15 Certificates, the decrement table indicates the percentage of its initial notional amount outstanding.

**Percent of Initial Class Certificate Balances Outstanding\***

| Distribution Date | Class 1-A-4, Class 1-A-5, Class 1-A-6, Class 1-A-7†, Class 1-A-8, Class 1-A-9, Class 1-A-10 and Class 1-A-11 Percentage of Prepayment Assumption | | | | | Class 2-A-1 and Class 2-A-2† Percentage of Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 50% | 100% | 125% | 150% | 0% | 50% | 100% | 125% | 150% |
| Initial | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2008 | 100 | 100 | 100 | 100 | 100 | 100 | 70 | 27 | 6 | 0 |
| February 2009 | 100 | 100 | 100 | 100 | 100 | 100 | 44 | 0 | 0 | 0 |
| February 2010 | 100 | 100 | 100 | 100 | 100 | 100 | 24 | 0 | 0 | 0 |
| February 2011 | 100 | 100 | 100 | 100 | 100 | 100 | 8 | 0 | 0 | 0 |
| February 2012 | 100 | 100 | 100 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| February 2013 | 100 | 97 | 93 | 92 | 64 | 100 | 0 | 0 | 0 | 0 |
| February 2014 | 99 | 92 | 85 | 81 | 35 | 100 | 0 | 0 | 0 | 0 |
| February 2015 | 99 | 86 | 74 | 56 | 19 | 100 | 0 | 0 | 0 | 0 |
| February 2016 | 97 | 78 | 61 | 40 | 11 | 100 | 0 | 0 | 0 | 0 |
| February 2017 | 96 | 69 | 48 | 29 | 8 | 100 | 0 | 0 | 0 | 0 |
| February 2018 | 93 | 61 | 37 | 21 | 5 | 100 | 0 | 0 | 0 | 0 |
| February 2019 | 91 | 53 | 29 | 16 | 4 | 100 | 0 | 0 | 0 | 0 |
| February 2020 | 88 | 46 | 23 | 11 | 2 | 100 | 0 | 0 | 0 | 0 |
| February 2021 | 85 | 40 | 17 | 8 | 2 | 100 | 0 | 0 | 0 | 0 |
| February 2022 | 82 | 35 | 13 | 6 | 1 | 100 | 0 | 0 | 0 | 0 |
| February 2023 | 78 | 30 | 10 | 4 | 1 | 100 | 0 | 0 | 0 | 0 |
| February 2024 | 75 | 26 | 8 | 3 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2025 | 71 | 22 | 6 | 2 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2026 | 67 | 19 | 4 | 2 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2027 | 62 | 16 | 3 | 1 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2028 | 57 | 13 | 2 | 1 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2029 | 52 | 11 | 2 | 1 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2030 | 47 | 9 | 1 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2031 | 42 | 7 | 1 | 0 | 0 | 98 | 0 | 0 | 0 | 0 |
| February 2032 | 35 | 5 | 1 | 0 | 0 | 94 | 0 | 0 | 0 | 0 |
| February 2033 | 29 | 4 | 0 | 0 | 0 | 83 | 0 | 0 | 0 | 0 |
| February 2034 | 22 | 3 | 0 | 0 | 0 | 70 | 0 | 0 | 0 | 0 |
| February 2035 | 15 | 2 | 0 | 0 | 0 | 54 | 0 | 0 | 0 | 0 |
| February 2036 | 7 | 1 | 0 | 0 | 0 | 35 | 0 | 0 | 0 | 0 |
| February 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)\*\* | 21.4 | 13.7 | 10.7 | 9.3 | 7.1 | 27.8 | 2.0 | 0.7 | 0.6 | 0.5 |

---

\*      Rounded to the nearest whole percentage.

\*\*    Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

†      In the case of the Class 1-A-7 and Class 2-A-2 Certificates, the decrement table indicates the percentage of their respective initial notional amounts outstanding.

## Percent of Initial Class Certificate Balances Outstanding*

| Distribution Date | Class 2-A-3, Class 2-A-11, Class 2-A-12, Class 2-A-13 and Class 2-A-14† | | | | | Class 2-A-4, Class 2-A-15, Class 2-A-16, Class 2-A-17 and Class 2-A-18† | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Percentage of Prepayment Assumption | | | | | Percentage of Prepayment Assumption | | | | |
| | 0% | 50% | 100% | 125% | 150% | 0% | 50% | 100% | 125% | 150% |
| Initial | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2008 | 100 | 96 | 96 | 96 | 90 | 100 | 100 | 100 | 100 | 100 |
| February 2009 | 100 | 88 | 74 | 59 | 46 | 100 | 100 | 100 | 100 | 100 |
| February 2010 | 100 | 81 | 48 | 31 | 15 | 100 | 100 | 100 | 100 | 100 |
| February 2011 | 100 | 73 | 28 | 10 | 0 | 100 | 100 | 100 | 100 | 30 |
| February 2012 | 100 | 64 | 13 | 0 | 0 | 100 | 100 | 100 | 32 | 0 |
| February 2013 | 100 | 53 | 2 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| February 2014 | 100 | 44 | 0 | 0 | 0 | 100 | 100 | 15 | 0 | 0 |
| February 2015 | 100 | 37 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2016 | 100 | 31 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2017 | 100 | 25 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2018 | 97 | 20 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2019 | 95 | 16 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2020 | 92 | 12 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2021 | 89 | 9 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2022 | 85 | 7 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2023 | 81 | 5 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2024 | 77 | 3 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2025 | 72 | 2 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2026 | 66 | 1 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2027 | 60 | 0 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2028 | 54 | 0 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2029 | 47 | 0 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2030 | 39 | 0 | 0 | 0 | 0 | 100 | 98 | 0 | 0 | 0 |
| February 2031 | 31 | 0 | 0 | 0 | 0 | 100 | 78 | 0 | 0 | 0 |
| February 2032 | 24 | 0 | 0 | 0 | 0 | 100 | 60 | 0 | 0 | 0 |
| February 2033 | 16 | 0 | 0 | 0 | 0 | 100 | 44 | 0 | 0 | 0 |
| February 2034 | 8 | 0 | 0 | 0 | 0 | 100 | 31 | 0 | 0 | 0 |
| February 2035 | 0 | 0 | 0 | 0 | 0 | 100 | 18 | 0 | 0 | 0 |
| February 2036 | 0 | 0 | 0 | 0 | 0 | 1 | 8 | 0 | 0 | 0 |
| February 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)** | 20.9 | 7.2 | 3.1 | 2.5 | 2.0 | 28.5 | 25.9 | 6.7 | 4.9 | 3.9 |

---

\* Rounded to the nearest whole percentage.

\*\* Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

† In the case of the Class 2-A-14 and Class 2-A-18 Certificates, the decrement table indicates the percentage of their respective initial notional amounts outstanding.

**Percent of Initial Class Certificate Balances Outstanding\***

| Distribution Date | Class 2-A-5, Class 2-A-19, Class 2-A-20, Class 2-A-21 and Class 2-A-22† Percentage of Prepayment Assumption | | | | | Class 2-A-6 and Class 2-A-7† Percentage of Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 50% | 100% | 125% | 150% | 0% | 50% | 100% | 125% | 150% |
| Initial ............................................ | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2008 ................................. | 98 | 96 | 96 | 96 | 96 | 100 | 79 | 48 | 33 | 18 |
| February 2009 ................................. | 95 | 91 | 91 | 91 | 91 | 100 | 60 | 1 | 0 | 0 |
| February 2010 ................................. | 92 | 87 | 87 | 87 | 87 | 100 | 46 | 0 | 0 | 0 |
| February 2011 ................................. | 89 | 82 | 82 | 82 | 82 | 100 | 35 | 0 | 0 | 0 |
| February 2012 ................................. | 86 | 78 | 78 | 78 | 52 | 100 | 26 | 0 | 0 | 0 |
| February 2013 ................................. | 82 | 74 | 74 | 57 | 30 | 100 | 22 | 0 | 0 | 0 |
| February 2014 ................................. | 78 | 69 | 69 | 39 | 16 | 100 | 20 | 0 | 0 | 0 |
| February 2015 ................................. | 74 | 65 | 55 | 26 | 9 | 100 | 20 | 0 | 0 | 0 |
| February 2016 ................................. | 70 | 61 | 43 | 19 | 5 | 100 | 20 | 0 | 0 | 0 |
| February 2017 ................................. | 66 | 56 | 34 | 14 | 4 | 100 | 20 | 0 | 0 | 0 |
| February 2018 ................................. | 61 | 52 | 26 | 10 | 2 | 100 | 20 | 0 | 0 | 0 |
| February 2019 ................................. | 57 | 47 | 21 | 7 | 2 | 100 | 20 | 0 | 0 | 0 |
| February 2020 ................................. | 52 | 43 | 16 | 5 | 1 | 100 | 20 | 0 | 0 | 0 |
| February 2021 ................................. | 48 | 39 | 12 | 4 | 1 | 100 | 18 | 0 | 0 | 0 |
| February 2022 ................................. | 44 | 34 | 10 | 3 | 1 | 100 | 13 | 0 | 0 | 0 |
| February 2023 ................................. | 39 | 30 | 7 | 2 | 0 | 100 | 9 | 0 | 0 | 0 |
| February 2024 ................................. | 35 | 25 | 6 | 1 | 0 | 100 | 6 | 0 | 0 | 0 |
| February 2025 ................................. | 31 | 21 | 4 | 1 | 0 | 100 | 4 | 0 | 0 | 0 |
| February 2026 ................................. | 26 | 17 | 3 | 1 | 0 | 100 | 2 | 0 | 0 | 0 |
| February 2027 ................................. | 22 | 12 | 2 | 1 | 0 | 100 | 1 | 0 | 0 | 0 |
| February 2028 ................................. | 17 | 8 | 2 | 0 | 0 | 100 | 1 | 0 | 0 | 0 |
| February 2029 ................................. | 13 | 4 | 1 | 0 | 0 | 100 | 1 | 0 | 0 | 0 |
| February 2030 ................................. | 9 | 0 | 1 | 0 | 0 | 100 | 1 | 0 | 0 | 0 |
| February 2031 ................................. | 4 | 0 | 1 | 0 | 0 | 99 | 1 | 0 | 0 | 0 |
| February 2032 ................................. | 0 | 0 | 0 | 0 | 0 | 96 | 1 | 0 | 0 | 0 |
| February 2033 ................................. | 0 | 0 | 0 | 0 | 0 | 92 | 1 | 0 | 0 | 0 |
| February 2034 ................................. | 0 | 0 | 0 | 0 | 0 | 73 | 1 | 0 | 0 | 0 |
| February 2035 ................................. | 0 | 0 | 0 | 0 | 0 | 50 | 1 | 0 | 0 | 0 |
| February 2036 ................................. | 0 | 0 | 0 | 0 | 0 | 25 | 1 | 0 | 0 | 0 |
| February 2037 ................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)\*\* ................................. | 13.4 | 11.4 | 8.7 | 6.8 | 5.3 | 27.9 | 5.2 | 1.0 | 0.8 | 0.7 |

\*    Rounded to the nearest whole percentage.
\*\*   Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.
†    In the case of the Class 2-A-7 and Class 2-A-22 Certificates, the decrement table indicates the percentage of their respective initial notional amounts outstanding.

**Percent of Initial Class Certificate Balances Outstanding***

| Distribution Date | Class 2-A-8, Class 2-A-23, Class 2-A-24, Class 2-A-25 and Class 2-A-26† | | | | | Class 2-A-9, Class 2-A-27, Class 2-A-28, Class 2-A-29 and Class 2-A-30† | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Percentage of Prepayment Assumption | | | | | Percentage of Prepayment Assumption | | | | |
| | 0% | 50% | 100% | 125% | 150% | 0% | 50% | 100% | 125% | 150% |
| Initial | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2008 | 100 | 95 | 95 | 95 | 95 | 100 | 100 | 100 | 100 | 100 |
| February 2009 | 100 | 85 | 85 | 67 | 49 | 100 | 100 | 100 | 100 | 100 |
| February 2010 | 100 | 75 | 53 | 30 | 10 | 100 | 100 | 100 | 100 | 100 |
| February 2011 | 100 | 65 | 27 | 3 | 0 | 100 | 100 | 100 | 100 | 0 |
| February 2012 | 100 | 54 | 7 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| February 2013 | 100 | 44 | 0 | 0 | 0 | 100 | 100 | 23 | 0 | 0 |
| February 2014 | 100 | 34 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2015 | 100 | 24 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2016 | 100 | 16 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2017 | 99 | 10 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2018 | 97 | 3 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 |
| February 2019 | 93 | 0 | 0 | 0 | 0 | 100 | 74 | 0 | 0 | 0 |
| February 2020 | 90 | 0 | 0 | 0 | 0 | 100 | 26 | 0 | 0 | 0 |
| February 2021 | 85 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2022 | 81 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2023 | 76 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2024 | 70 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2025 | 64 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2026 | 57 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2027 | 49 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2028 | 41 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2029 | 32 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2030 | 22 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2031 | 12 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2032 | 1 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| February 2033 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 0 |
| February 2034 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)** | 19.2 | 5.6 | 3.2 | 2.5 | 2.1 | 25.7 | 12.5 | 5.8 | 4.4 | 3.5 |

---

\*   Rounded to the nearest whole percentage.

\*\*   Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

†   In the case of the Class 2-A-26 and Class 2-A-30 Certificates, the decrement table indicates the percentage of their respective initial notional amounts outstanding.

## Percent of Initial Class Certificate Balances Outstanding*

| Distribution Date | Class 2-A-10, Class 2-A-31, Class 2-A-32, Class 2-A-33 and Class 2-A-34† | | | | | Class 2-A-35, Class 2-A-36, Class 2-A-37, Class 2-A-38† and Class 2-A-44 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Percentage of Prepayment Assumption | | | | | Percentage of Prepayment Assumption | | | | |
| | 0% | 50% | 100% | 125% | 150% | 0% | 50% | 100% | 125% | 150% |
| Initial | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2008 | 98 | 96 | 96 | 96 | 96 | 100 | 95 | 95 | 95 | 95 |
| February 2009 | 96 | 92 | 92 | 92 | 92 | 100 | 86 | 86 | 70 | 54 |
| February 2010 | 93 | 89 | 89 | 89 | 89 | 100 | 77 | 57 | 36 | 18 |
| February 2011 | 91 | 85 | 85 | 85 | 75 | 100 | 68 | 33 | 12 | 0 |
| February 2012 | 88 | 81 | 81 | 71 | 44 | 100 | 58 | 15 | 0 | 0 |
| February 2013 | 85 | 77 | 77 | 49 | 26 | 100 | 49 | 2 | 0 | 0 |
| February 2014 | 82 | 74 | 61 | 33 | 14 | 100 | 40 | 0 | 0 | 0 |
| February 2015 | 78 | 70 | 47 | 23 | 7 | 100 | 31 | 0 | 0 | 0 |
| February 2016 | 74 | 66 | 36 | 16 | 4 | 100 | 24 | 0 | 0 | 0 |
| February 2017 | 71 | 62 | 29 | 12 | 3 | 99 | 18 | 0 | 0 | 0 |
| February 2018 | 67 | 59 | 22 | 9 | 2 | 97 | 12 | 0 | 0 | 0 |
| February 2019 | 63 | 55 | 18 | 6 | 1 | 94 | 7 | 0 | 0 | 0 |
| February 2020 | 59 | 51 | 14 | 5 | 1 | 91 | 2 | 0 | 0 | 0 |
| February 2021 | 56 | 47 | 11 | 3 | 1 | 87 | 0 | 0 | 0 | 0 |
| February 2022 | 52 | 44 | 8 | 2 | 0 | 83 | 0 | 0 | 0 | 0 |
| February 2023 | 48 | 40 | 6 | 2 | 0 | 78 | 0 | 0 | 0 | 0 |
| February 2024 | 44 | 36 | 5 | 1 | 0 | 73 | 0 | 0 | 0 | 0 |
| February 2025 | 41 | 32 | 4 | 1 | 0 | 67 | 0 | 0 | 0 | 0 |
| February 2026 | 37 | 28 | 3 | 1 | 0 | 61 | 0 | 0 | 0 | 0 |
| February 2027 | 33 | 25 | 2 | 0 | 0 | 54 | 0 | 0 | 0 | 0 |
| February 2028 | 29 | 21 | 2 | 0 | 0 | 46 | 0 | 0 | 0 | 0 |
| February 2029 | 25 | 17 | 1 | 0 | 0 | 38 | 0 | 0 | 0 | 0 |
| February 2030 | 22 | 14 | 1 | 0 | 0 | 29 | 0 | 0 | 0 | 0 |
| February 2031 | 18 | 11 | 1 | 0 | 0 | 19 | 0 | 0 | 0 | 0 |
| February 2032 | 14 | 8 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 |
| February 2033 | 10 | 6 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| February 2034 | 7 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2035 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2036 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)** | 15.4 | 13.5 | 8.4 | 6.5 | 5.1 | 19.8 | 6.2 | 3.4 | 2.7 | 2.2 |

---

\*    Rounded to the nearest whole percentage.

\*\*  Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

†    In the case of the Class 2-A-34 and Class 2-A-38 Certificates, the decrement table indicates the percentage of their respective initial notional amounts outstanding.

## Percent of Initial Class Certificate Balances Outstanding*

| Distribution Date | Class 2-A-39, Class 2-A-40, Class 2-A-41, Class 2-A-42† and Class 2-A-43 Percentage of Prepayment Assumption | | | | | Class PO Percentage of Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 50% | 100% | 125% | 150% | 0% | 50% | 100% | 125% | 150% |
| Initial | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2008 | 100 | 96 | 96 | 96 | 91 | 99 | 90 | 80 | 76 | 71 |
| February 2009 | 100 | 89 | 76 | 62 | 50 | 98 | 80 | 63 | 56 | 49 |
| February 2010 | 100 | 82 | 52 | 36 | 21 | 97 | 71 | 50 | 41 | 34 |
| February 2011 | 100 | 75 | 33 | 16 | 2 | 95 | 63 | 40 | 31 | 23 |
| February 2012 | 100 | 66 | 19 | 2 | 0 | 94 | 56 | 31 | 23 | 16 |
| February 2013 | 100 | 56 | 9 | 0 | 0 | 92 | 49 | 25 | 17 | 11 |
| February 2014 | 100 | 48 | 1 | 0 | 0 | 91 | 44 | 19 | 12 | 8 |
| February 2015 | 100 | 41 | 0 | 0 | 0 | 89 | 39 | 15 | 9 | 5 |
| February 2016 | 100 | 35 | 0 | 0 | 0 | 87 | 34 | 12 | 7 | 4 |
| February 2017 | 100 | 31 | 0 | 0 | 0 | 85 | 30 | 9 | 5 | 2 |
| February 2018 | 98 | 26 | 0 | 0 | 0 | 83 | 26 | 7 | 4 | 2 |
| February 2019 | 95 | 22 | 0 | 0 | 0 | 80 | 23 | 6 | 3 | 1 |
| February 2020 | 92 | 18 | 0 | 0 | 0 | 77 | 20 | 4 | 2 | 1 |
| February 2021 | 89 | 16 | 0 | 0 | 0 | 74 | 17 | 3 | 1 | 1 |
| February 2022 | 86 | 13 | 0 | 0 | 0 | 71 | 15 | 3 | 1 | 0 |
| February 2023 | 82 | 11 | 0 | 0 | 0 | 68 | 13 | 2 | 1 | 0 |
| February 2024 | 78 | 10 | 0 | 0 | 0 | 64 | 11 | 1 | 0 | 0 |
| February 2025 | 74 | 9 | 0 | 0 | 0 | 60 | 9 | 1 | 0 | 0 |
| February 2026 | 69 | 8 | 0 | 0 | 0 | 56 | 8 | 1 | 0 | 0 |
| February 2027 | 63 | 7 | 0 | 0 | 0 | 52 | 6 | 1 | 0 | 0 |
| February 2028 | 57 | 7 | 0 | 0 | 0 | 48 | 5 | 0 | 0 | 0 |
| February 2029 | 51 | 7 | 0 | 0 | 0 | 43 | 4 | 0 | 0 | 0 |
| February 2030 | 44 | 7 | 0 | 0 | 0 | 38 | 3 | 0 | 0 | 0 |
| February 2031 | 36 | 5 | 0 | 0 | 0 | 32 | 3 | 0 | 0 | 0 |
| February 2032 | 29 | 4 | 0 | 0 | 0 | 27 | 2 | 0 | 0 | 0 |
| February 2033 | 22 | 3 | 0 | 0 | 0 | 20 | 1 | 0 | 0 | 0 |
| February 2034 | 15 | 2 | 0 | 0 | 0 | 14 | 1 | 0 | 0 | 0 |
| February 2035 | 7 | 1 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 0 |
| February 2036 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| February 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)** | 21.4 | 8.5 | 3.4 | 2.6 | 2.2 | 19.0 | 7.7 | 4.3 | 3.4 | 2.8 |

\* Rounded to the nearest whole percentage.
\*\* Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.
† In the case of the Class 2-A-42 Certificates, the decrement table indicates the percentage of its initial notional amount outstanding.

## Percent of Initial Class Certificate Balances Outstanding*

| | Class A-R Percentage of Prepayment Assumption | | | | | Class M, Class B-1 and Class B-2 Percentage of Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Distribution Date** | **0%** | **50%** | **100%** | **125%** | **150%** | **0%** | **50%** | **100%** | **125%** | **150%** |
| Initial............................................ | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2008 ................................. | 0 | 0 | 0 | 0 | 0 | 99 | 99 | 99 | 99 | 99 |
| February 2009 ................................. | 0 | 0 | 0 | 0 | 0 | 99 | 99 | 99 | 99 | 99 |
| February 2010 ................................. | 0 | 0 | 0 | 0 | 0 | 98 | 98 | 98 | 98 | 98 |
| February 2011 ................................. | 0 | 0 | 0 | 0 | 0 | 97 | 97 | 97 | 97 | 97 |
| February 2012 ................................. | 0 | 0 | 0 | 0 | 0 | 96 | 96 | 96 | 96 | 96 |
| February 2013 ................................. | 0 | 0 | 0 | 0 | 0 | 95 | 92 | 89 | 88 | 86 |
| February 2014 ................................. | 0 | 0 | 0 | 0 | 0 | 94 | 88 | 81 | 77 | 74 |
| February 2015 ................................. | 0 | 0 | 0 | 0 | 0 | 93 | 81 | 70 | 64 | 59 |
| February 2016 ................................. | 0 | 0 | 0 | 0 | 0 | 92 | 74 | 58 | 51 | 44 |
| February 2017 ................................. | 0 | 0 | 0 | 0 | 0 | 91 | 66 | 46 | 37 | 30 |
| February 2018 ................................. | 0 | 0 | 0 | 0 | 0 | 89 | 58 | 36 | 27 | 21 |
| February 2019 ................................. | 0 | 0 | 0 | 0 | 0 | 86 | 50 | 28 | 20 | 14 |
| February 2020 ................................. | 0 | 0 | 0 | 0 | 0 | 84 | 44 | 21 | 15 | 10 |
| February 2021 ................................. | 0 | 0 | 0 | 0 | 0 | 81 | 38 | 17 | 11 | 6 |
| February 2022 ................................. | 0 | 0 | 0 | 0 | 0 | 78 | 33 | 13 | 8 | 4 |
| February 2023 ................................. | 0 | 0 | 0 | 0 | 0 | 75 | 29 | 10 | 5 | 3 |
| February 2024 ................................. | 0 | 0 | 0 | 0 | 0 | 71 | 25 | 8 | 4 | 2 |
| February 2025 ................................. | 0 | 0 | 0 | 0 | 0 | 68 | 21 | 6 | 3 | 1 |
| February 2026 ................................. | 0 | 0 | 0 | 0 | 0 | 64 | 18 | 4 | 2 | 1 |
| February 2027 ................................. | 0 | 0 | 0 | 0 | 0 | 60 | 15 | 3 | 1 | 1 |
| February 2028 ................................. | 0 | 0 | 0 | 0 | 0 | 55 | 13 | 2 | 1 | 0 |
| February 2029 ................................. | 0 | 0 | 0 | 0 | 0 | 51 | 10 | 2 | 1 | 0 |
| February 2030 ................................. | 0 | 0 | 0 | 0 | 0 | 46 | 8 | 1 | 0 | 0 |
| February 2031 ................................. | 0 | 0 | 0 | 0 | 0 | 40 | 7 | 1 | 0 | 0 |
| February 2032 ................................. | 0 | 0 | 0 | 0 | 0 | 34 | 5 | 1 | 0 | 0 |
| February 2033 ................................. | 0 | 0 | 0 | 0 | 0 | 28 | 4 | 0 | 0 | 0 |
| February 2034 ................................. | 0 | 0 | 0 | 0 | 0 | 22 | 3 | 0 | 0 | 0 |
| February 2035 ................................. | 0 | 0 | 0 | 0 | 0 | 14 | 2 | 0 | 0 | 0 |
| February 2036 ................................. | 0 | 0 | 0 | 0 | 0 | 7 | 1 | 0 | 0 | 0 |
| February 2037 ................................. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)**................................. | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 20.6 | 13.3 | 10.4 | 9.6 | 9.0 |

---

\*     Rounded to the nearest whole percentage.

\*\*   Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

**Percent of Initial Class Certificate Balances Outstanding\***

| Distribution Date | Class 3-A-1 Percentage of Prepayment Assumption | | | | | Class 3-A-2 Percentage of Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 50% | 75% | 100% | 125% | 150% | 50% | 75% | 100% | 125% | 150% |
| Initial | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2008 | 77 | 62 | 47 | 32 | 16 | 91 | 91 | 91 | 91 | 91 |
| February 2009 | 53 | 25 | 0 | 0 | 0 | 82 | 82 | 81 | 57 | 35 |
| February 2010 | 34 | 0 | 0 | 0 | 0 | 73 | 70 | 39 | 12 | 0 |
| February 2011 | 22 | 0 | 0 | 0 | 0 | 64 | 49 | 22 | 1 | 0 |
| February 2012 | 12 | 0 | 0 | 0 | 0 | 55 | 33 | 9 | 0 | 0 |
| February 2013 | 11 | 0 | 0 | 0 | 0 | 46 | 25 | 4 | 0 | 0 |
| February 2014 | 11 | 0 | 0 | 0 | 0 | 38 | 19 | 2 | 0 | 0 |
| February 2015 | 11 | 0 | 0 | 0 | 0 | 38 | 19 | 2 | 0 | 0 |
| February 2016 | 11 | 0 | 0 | 0 | 0 | 37 | 19 | 2 | 0 | 0 |
| February 2017 | 11 | 0 | 0 | 0 | 0 | 33 | 18 | 2 | 0 | 0 |
| February 2018 | 11 | 0 | 0 | 0 | 0 | 29 | 15 | 2 | 0 | 0 |
| February 2019 | 11 | 0 | 0 | 0 | 0 | 24 | 12 | 1 | 0 | 0 |
| February 2020 | 11 | 0 | 0 | 0 | 0 | 19 | 9 | 0 | 0 | 0 |
| February 2021 | 10 | 0 | 0 | 0 | 0 | 15 | 7 | 0 | 0 | 0 |
| February 2022 | 10 | 0 | 0 | 0 | 0 | 11 | 5 | 0 | 0 | 0 |
| February 2023 | 10 | 0 | 0 | 0 | 0 | 7 | 3 | 0 | 0 | 0 |
| February 2024 | 10 | 0 | 0 | 0 | 0 | 4 | 1 | 0 | 0 | 0 |
| February 2025 | 10 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| February 2026 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2027 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2028 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2029 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2030 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2031 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2032 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2033 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2034 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)\*\* | 4.1 | 1.4 | 1.0 | 0.8 | 0.6 | 7.2 | 5.3 | 3.1 | 2.2 | 1.8 |

\*    Rounded to the nearest whole percentage.
\*\*    Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

## Percent of Initial Class Certificate Balances Outstanding*

| | Class 3-A-3 Percentage of Prepayment Assumption | | | | | Class 3-A-4 and Class 3-A-5 Percentage of Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Distribution Date | 50% | 75% | 100% | 125% | 150% | 50% | 75% | 100% | 125% | 150% |
| Initial | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2008 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2009 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2010 | 100 | 100 | 100 | 100 | 0 | 100 | 100 | 100 | 100 | 89 |
| February 2011 | 100 | 100 | 100 | 100 | 0 | 93 | 90 | 89 | 88 | 67 |
| February 2012 | 100 | 100 | 100 | 0 | 0 | 86 | 82 | 78 | 66 | 42 |
| February 2013 | 100 | 100 | 100 | 0 | 0 | 77 | 69 | 61 | 45 | 26 |
| February 2014 | 100 | 100 | 100 | 0 | 0 | 67 | 55 | 46 | 31 | 16 |
| February 2015 | 100 | 100 | 100 | 0 | 0 | 45 | 37 | 31 | 21 | 9 |
| February 2016 | 100 | 100 | 100 | 0 | 0 | 29 | 22 | 21 | 14 | 5 |
| February 2017 | 100 | 100 | 100 | 0 | 0 | 19 | 11 | 13 | 9 | 2 |
| February 2018 | 100 | 100 | 100 | 0 | 0 | 12 | 5 | 7 | 5 | 0 |
| February 2019 | 100 | 100 | 100 | 0 | 0 | 7 | 3 | 3 | 3 | 0 |
| February 2020 | 100 | 100 | 100 | 0 | 0 | 4 | 1 | 1 | 1 | 0 |
| February 2021 | 100 | 100 | 73 | 0 | 0 | 3 | 1 | 0 | 0 | 0 |
| February 2022 | 100 | 100 | 44 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| February 2023 | 100 | 100 | 22 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| February 2024 | 100 | 100 | 5 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| February 2025 | 100 | 88 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2026 | 100 | 59 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2027 | 100 | 36 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2028 | 100 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2029 | 100 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2030 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2031 | 90 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2032 | 59 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2033 | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2034 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)** | 25.4 | 19.6 | 15.0 | 4.3 | 2.8 | 8.0 | 7.3 | 7.0 | 6.4 | 5.2 |

\* Rounded to the nearest whole percentage.

\*\* Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

**Percent of Initial Class Certificate Balances Outstanding***

| | Class 3-A-R Percentage of Prepayment Assumption | | | | | Class 3-M-1 Percentage of Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Distribution Date** | **50%** | **75%** | **100%** | **125%** | **150%** | **50%** | **75%** | **100%** | **125%** | **150%** |
| Initial | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2008 | 0 | 0 | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| February 2009 | 0 | 0 | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| February 2010 | 0 | 0 | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| February 2011 | 0 | 0 | 0 | 0 | 0 | 100 | 88 | 65 | 46 | 32 |
| February 2012 | 0 | 0 | 0 | 0 | 0 | 100 | 71 | 48 | 32 | 20 |
| February 2013 | 0 | 0 | 0 | 0 | 0 | 88 | 57 | 36 | 22 | 12 |
| February 2014 | 0 | 0 | 0 | 0 | 0 | 76 | 46 | 27 | 15 | 6 |
| February 2015 | 0 | 0 | 0 | 0 | 0 | 66 | 37 | 20 | 10 | 0 |
| February 2016 | 0 | 0 | 0 | 0 | 0 | 57 | 30 | 15 | 3 | 0 |
| February 2017 | 0 | 0 | 0 | 0 | 0 | 49 | 24 | 11 | 0 | 0 |
| February 2018 | 0 | 0 | 0 | 0 | 0 | 42 | 19 | 7 | 0 | 0 |
| February 2019 | 0 | 0 | 0 | 0 | 0 | 36 | 15 | 0 | 0 | 0 |
| February 2020 | 0 | 0 | 0 | 0 | 0 | 30 | 12 | 0 | 0 | 0 |
| February 2021 | 0 | 0 | 0 | 0 | 0 | 26 | 9 | 0 | 0 | 0 |
| February 2022 | 0 | 0 | 0 | 0 | 0 | 22 | 5 | 0 | 0 | 0 |
| February 2023 | 0 | 0 | 0 | 0 | 0 | 18 | 0 | 0 | 0 | 0 |
| February 2024 | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 0 | 0 | 0 |
| February 2025 | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 0 | 0 |
| February 2026 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 0 |
| February 2027 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 0 |
| February 2028 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 |
| February 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2030 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2031 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2032 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2033 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2034 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)** | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 11.1 | 7.7 | 5.7 | 4.7 | 4.2 |

---

\* Rounded to the nearest whole percentage.

\*\* Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

**Percent of Initial Class Certificate Balances Outstanding***

| Distribution Date | Class 3-M-2 Percentage of Prepayment Assumption | | | | | Class 3-M-3 Percentage of Prepayment Assumption | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 50% | 75% | 100% | 125% | 150% | 50% | 75% | 100% | 125% | 150% |
| Initial | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2008 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2009 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2010 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| February 2011 | 100 | 88 | 65 | 46 | 32 | 100 | 88 | 65 | 46 | 32 |
| February 2012 | 100 | 71 | 48 | 32 | 20 | 100 | 71 | 48 | 32 | 19 |
| February 2013 | 88 | 57 | 36 | 22 | 12 | 88 | 57 | 36 | 22 | 4 |
| February 2014 | 76 | 46 | 27 | 15 | 0 | 76 | 46 | 27 | 8 | 0 |
| February 2015 | 66 | 37 | 20 | 8 | 0 | 66 | 37 | 19 | 0 | 0 |
| February 2016 | 57 | 30 | 15 | 0 | 0 | 57 | 30 | 8 | 0 | 0 |
| February 2017 | 49 | 24 | 11 | 0 | 0 | 49 | 24 | 0 | 0 | 0 |
| February 2018 | 42 | 19 | 0 | 0 | 0 | 42 | 17 | 0 | 0 | 0 |
| February 2019 | 36 | 15 | 0 | 0 | 0 | 36 | 9 | 0 | 0 | 0 |
| February 2020 | 30 | 12 | 0 | 0 | 0 | 30 | 2 | 0 | 0 | 0 |
| February 2021 | 26 | 5 | 0 | 0 | 0 | 26 | 0 | 0 | 0 | 0 |
| February 2022 | 22 | 0 | 0 | 0 | 0 | 22 | 0 | 0 | 0 | 0 |
| February 2023 | 18 | 0 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 0 |
| February 2024 | 15 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 |
| February 2025 | 13 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 |
| February 2026 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2027 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2030 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2031 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2032 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2033 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2034 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| February 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)** | 11.0 | 7.6 | 5.6 | 4.6 | 4.1 | 10.7 | 7.3 | 5.5 | 4.5 | 3.9 |

*    Rounded to the nearest whole percentage.
**   Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

**Percent of Initial Class Certificate Balances Outstanding\***

| Distribution Date | Class 3-B Percentage of Prepayment Assumption | | | | |
|---|---|---|---|---|---|
| | 50% | 75% | 100% | 125% | 150% |
| Initial .............................................. | 100 | 100 | 100 | 100 | 100 |
| February 2008 ................................. | 100 | 100 | 100 | 100 | 100 |
| February 2009 ................................. | 100 | 100 | 100 | 100 | 100 |
| February 2010 ................................. | 100 | 100 | 100 | 100 | 100 |
| February 2011 ................................. | 100 | 88 | 65 | 46 | 32 |
| February 2012 ................................. | 100 | 71 | 48 | 31 | 0 |
| February 2013 ................................. | 88 | 57 | 36 | 2 | 0 |
| February 2014 ................................. | 76 | 46 | 16 | 0 | 0 |
| February 2015 ................................. | 66 | 37 | 0 | 0 | 0 |
| February 2016 ................................. | 57 | 25 | 0 | 0 | 0 |
| February 2017 ................................. | 49 | 8 | 0 | 0 | 0 |
| February 2018 ................................. | 42 | 0 | 0 | 0 | 0 |
| February 2019 ................................. | 36 | 0 | 0 | 0 | 0 |
| February 2020 ................................. | 27 | 0 | 0 | 0 | 0 |
| February 2021 ................................. | 14 | 0 | 0 | 0 | 0 |
| February 2022 ................................. | 3 | 0 | 0 | 0 | 0 |
| February 2023 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2024 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2025 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2026 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2027 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2028 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2029 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2030 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2031 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2032 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2033 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2034 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2035 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2036 ................................. | 0 | 0 | 0 | 0 | 0 |
| February 2037 ................................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (in years)\*\* ................................. | 10.1 | 6.9 | 5.1 | 4.1 | 3.6 |

---

\*     Rounded to the nearest whole percentage.
\*\*    Determined as specified under *"Weighted Average Lives of the Offered Certificates"* herein.

**Last Scheduled Distribution Date**

The Last Scheduled Distribution Date for each class of Group I Certificates is the Distribution Date in March 2037. The Last Scheduled Distribution Date for each class of Group II Certificates is the Distribution Date in November 2036. Since the rate of distributions in reduction of the Class Certificate Balance or notional amount of each class of offered certificates will depend on the rate of payment (including prepayments) of the related Mortgage Loans, the Class Certificate Balance or notional amount of any class could be reduced to zero significantly earlier or later than the Last Scheduled Distribution Date. The rate of payments on the Mortgage Loans will depend on their particular characteristics, as well as on prevailing interest rates from time to time and other economic factors, and no assurance can be given as to the actual payment experience of the Mortgage Loans. See *"Yield, Prepayment and Maturity Considerations — Prepayment Considerations and Risks"* and *"— Weighted Average Lives of the Offered Certificates"* in this prospectus supplement and *"Yield, Maturity and Prepayment Considerations"* in the prospectus.

**The Group I Subordinated Certificates**

The weighted average life of, and the yield to maturity on, each class of Group I Subordinated Certificates, in increasing order of their numerical class designation, will be progressively more sensitive to the rate and timing of mortgagor defaults and the severity of ensuing losses on the Mortgage Loans in Aggregate Loan Group I. In particular, the rate and timing of mortgagor defaults and the severity of ensuing losses on the Mortgage Loans in Aggregate Loan Group I may be affected by the characteristics of the Mortgage Loans included in Aggregate Loan Group I as described under *"The Mortgage Pool — General"* and *"— Underwriting Process"* in this prospectus supplement. If the actual rate and severity of losses on the Mortgage Loans in Aggregate Loan Group I is higher than those assumed by a holder of a Group I Subordinated Certificate, the actual yield to maturity of the certificate may be lower than the yield expected by the holder based on the holder's assumptions. The timing of losses on Mortgage Loans in Aggregate Loan Group I will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of Aggregate Loan Group I are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized Losses on the Mortgage Loans in Aggregate Loan Group I will reduce the Class Certificate Balances of the applicable class of Group I Subordinated Certificates to the extent of any losses allocated to it (as described under *"Description of the Certificates — Allocation of Losses—Group I Certificates"* in this prospectus supplement), without the receipt of cash attributable to the reduction. In addition, shortfalls in cash available for distributions on the Group I Subordinated Certificates will result in a reduction in the Class Certificate Balance of the class of Group I Subordinated Certificates then outstanding with the highest numerical class designation if and to the extent that the aggregate of the Class Certificate Balances of all classes of Group I Certificates, following all distributions and the allocation of Realized Losses on a Distribution Date, exceeds the aggregate Stated Principal Balance of the Mortgage Loans in Aggregate Loan Group I as of the Due Date occurring in the month of the Distribution Date (after giving effect to principal prepayments received in the related Prepayment Period). This result may be more likely due to the multiple Loan Group structure and the provisions requiring Undercollateralized Distributions. As a result of the reductions, less interest will accrue on the class of Group I Subordinated Certificates than otherwise would be the case. The yield to maturity of the Group I Subordinated Certificates will also be affected by the disproportionate allocation of principal prepayments to the Group I Senior Certificates, Net Interest Shortfalls, other cash shortfalls in Available Funds and distribution of funds to the Class PO Certificates otherwise available for distribution on the Group I Subordinated Certificates to the extent of reimbursement for Class PO Deferred Amounts. See *"Description of the Certificates — Allocation of Losses—Group I Certificates"* in this prospectus supplement.

If on any Distribution Date, the Applicable Credit Support Percentage for any class of Group I Subordinated Certificates (other than the class of Group I Subordinated Certificates then outstanding with the highest priority of distribution) is less than its Original Applicable Credit Support Percentage, all partial principal prepayments and principal prepayments in full available for distribution on the Group I Subordinated Certificates will be allocated solely to all classes of Group I Subordinated Certificates with lower numerical class designations than such class, thereby accelerating their amortization relative to that of the Restricted Classes and reducing the weighted average lives of the classes of Group I Subordinated Certificates receiving the distributions. Accelerating the amortization of the classes of Group I Subordinated Certificates with lower numerical class designations relative to the other classes of Group I Subordinated Certificates is intended to preserve the availability of the subordination provided by the other classes.

For purposes of allocating losses and prepayments to the Group I Subordinated Certificates, the Class M Certificates will be considered to have a lower numerical class designation and a higher distribution priority than each other class of Group I Subordinated Certificates. Within the Class I-B Certificates, the distribution priorities are in numerical order.

**The Group II Subordinated Certificates**

If the Class Certificate Balances of the Class 3-C Certificates and each class of Group II Subordinated Certificates with a lower distribution priority have been reduced to zero, the yield to maturity on the remaining class of Group II Subordinated Certificates with the lowest distribution priority will become extremely sensitive to losses (and the timing thereof) on the Mortgage Loans in Aggregate Loan Group II, because the entire amount of any Realized Losses (to the extent not covered by Excess Cashflow), will be allocated to those certificates.

Investors in the Group II Subordinated Certificates should fully consider the risk that realized losses on the Mortgage Loans in Aggregate Loan Group II could result in the failure of such investors to fully recover their investments. In addition, once Realized Losses have been allocated to a class of Group II Subordinated Certificates, such amounts with respect to such certificates will no longer accrue interest and will not be reinstated thereafter (except to the extent of Subsequent Recoveries) and no amounts in respect thereof will be distributable to the holders of those Certificates. However, Unpaid Realized Loss Amounts may be paid to the holders of the applicable Group II Subordinated Certificates from Excess Cashflow in the priorities set forth under "*Description of the Certificates—Overcollateralization Provisions.*"

The Group II Subordinated Certificates will not be entitled to any principal distributions until the Stepdown Date or during any period in which a Trigger Event is in effect, unless the aggregate Class Certificate Balance of the Group II Senior Certificates has been reduced to zero. As a result, the weighted average lives of the Group II Subordinated Certificates will be longer than would otherwise be the case if distributions of principal were allocated on a pro rata basis among the Group II Senior Certificates and the Group II Subordinated Certificates. As a result of the longer weighted average lives of the Group II Subordinated Certificates, the holders of such certificates have a greater risk of suffering a loss on their investments. Further, because a Trigger Event may be based on delinquencies, it is possible for the Group II Subordinated Certificates to receive no principal distributions (unless the aggregate Class Certificate Balance of the Group II Senior Certificates has been reduced to zero) on and after the Stepdown Date even if no losses have occurred on the Mortgage Loans in Aggregate Loan Group II.

## Credit Enhancement

**Subordination**

Any Realized Losses on the Mortgage Loans in a Loan Group will be allocated as described under "*Description of the Certificates — Allocation of Losses*" in this prospectus supplement.

The rights of the holders of the subordinated certificates to receive distributions with respect to the Mortgage Loans in the related Aggregate Loan Group will be subordinated to the rights of the holders of the related classes of Senior Certificates and, with respect to the Group II Subordinated Certificates, the Class 3-A-2 Insurer, and the rights of the holders of each related class of subordinated certificates (other than the related class of subordinated certificates with the highest distribution priority) to receive the distributions will be further subordinated to the rights of the related class or classes of subordinated certificates with higher distribution priorities, in each case only to the extent described in this prospectus supplement. The subordination of the subordinated certificates to the related classes of senior certificates and, with respect to the Group II Subordinated Certificates, the Class 3-A-2 Insurer, and the subordination of the related classes of subordinated certificates with lower distribution priorities to those with higher distribution priorities is intended to increase the likelihood of receipt, respectively, by the senior certificateholders and the Class 3-A-2 Insurer and the holders of subordinated certificates with lower numerical class designations of the maximum amount to which they are entitled on any Distribution Date and to provide the holders protection against Realized Losses. With respect to Aggregate Loan Group I, the applicable Non-PO Percentage of Realized Losses, will be allocated to the class of Group I Subordinated Certificates then outstanding with the lowest distribution priority.  In addition, the Class Certificate Balance of the class of Group I Subordinated Certificates with the lowest distribution priority will be reduced by the amount of distributions on the Class PO Certificates in reimbursement for Class PO Deferred Amounts.

**Overcollateralization**

On the Closing Date, it is expected that the aggregate stated principal balance of the Mortgage Loans in Aggregate Loan Group II will exceed the initial aggregate class certificate balance of the Group II Certificates.  This excess is called "overcollateralization" and is approximately equal to the initial level of overcollateralization required by the Pooling and Servicing Agreement.

On any Distribution Date, the amount of overcollateralization (if any) will be available to absorb the losses from liquidated Mortgage Loans in Aggregate Loan Group II that would otherwise be allocated to the related classes of certificates, if those losses are not otherwise covered by excess cashflow (if any) from the Mortgage Loans in Aggregate Loan Group II.  The required level of overcollateralization may change over time.

**The Certificate Guaranty Insurance Policy**

The following summary of terms of the certificate guaranty insurance policy to be issued by MBIA Insurance Corporation, which is referred to herein as the "Class 3-A-2 Insurer", does not purport to be complete and is qualified in its entirety by reference to the Class 3-A-2 Policy.

The Class 3-A-2 Insurer does not accept any responsibility for the accuracy or completeness of this prospectus supplement or any information or disclosure contained in or omitted from this prospectus supplement, other than with respect to the accuracy of the information regarding the Class 3-A-2 Policy and the Class 3-A-2 Insurer set forth under the headings "*Credit Enhancement—The Certificate Guaranty Insurance Policy*" and "*—The Class 3-A-2 Insurer*" in this prospectus supplement.  Additionally, the

Class 3-A-2 Insurer makes no representation regarding the Class 3-A-2 Certificates or the advisability of investing in the Class 3-A-2 Certificates.

The Class 3-A-2 Insurer, in consideration of the payment of a premium and subject to the terms of the Class 3-A-2 Policy, thereby unconditionally and irrevocably guarantees to any Class 3-A-2 Certificateholder that an amount equal to each full and complete Insured Payment will be received by the Trustee, or its successors, as trustee for the Class 3-A-2 Certificateholders, on behalf of the Class 3-A-2 Certificateholders from the Class 3-A-2 Insurer, for distribution by the Trustee to each Class 3-A-2 Certificateholder of that Certificateholder's proportionate share of the Insured Payment.

The Class 3-A-2 Insurer's obligations under the Class 3-A-2 Policy, with respect to a particular Insured Payment, will be discharged to the extent funds equal to the applicable Insured Payment are received by the Trustee, whether or not those funds are properly applied by the Trustee.  Insured Payments will be made only at the time set forth in the Class 3-A-2 Policy, and no accelerated Insured Payments will be made regardless of any acceleration of the Class 3-A-2 Certificates, unless the acceleration is at the sole option of the Class 3-A-2 Insurer.

Notwithstanding the foregoing paragraph, the Class 3-A-2 Policy does not cover shortfalls, if any, attributable to the liability of the issuing entity, any REMIC or the Trustee for withholding taxes, if any (including interest and penalties in respect of any liability for withholding taxes).  The Class 3-A-2 Policy will not provide credit enhancement for any Class of Certificates other than the Class 3-A-2 Certificates.

The Class 3-A-2 Insurer will pay any Insured Payment that is a Preference Amount on the Business Day following receipt on a Business Day by the Class 3-A-2 Insurer's fiscal agent of the following:

- a certified copy of the order requiring the return of a preference payment;

- an opinion of counsel satisfactory to the Insurer that the order is final and not subject to appeal;

- an assignment in a form that is reasonably required by the Class 3-A-2 Insurer, irrevocably assigning to the Class 3-A-2 Insurer all rights and claims of the Class 3-A-2 Certificateholder relating to or arising under the Class 3-A-2 Certificates against the debtor which made the preference payment or otherwise with respect to the preference payment; and

- appropriate instruments to effect the appointment of the Class 3-A-2 Insurer as agent for the Class A Certificateholder in any legal proceeding related to the preference payment, which instruments are in a form satisfactory to the Class 3-A-2 Insurer;

provided that if these documents are received after 12:00 p.m., New York City time, on that Business Day, they will be deemed to be received on the following Business Day.  Payments by the Class 3-A-2 Insurer will be disbursed to the receiver or the trustee in bankruptcy named in the final order of the court exercising jurisdiction on behalf of the Class 3-A-2 Certificateholder and not to any Class 3-A-2 Certificateholder directly unless such Class 3-A-2 Certificateholder has returned principal or interest paid on the Class 3-A-2 Certificates to the receiver or trustee in bankruptcy, in which case that payment will be disbursed to such Class 3-A-2 Certificateholder.

The Class 3-A-2 Insurer will pay any other amount payable under the Class 3-A-2 Policy no later than 12:00 p.m., New York City time, on the later of the Distribution Date on which the related

Deficiency Amount is due or the third Business Day following receipt in New York, New York on a Business Day by U.S. Bank Trust National Association, as fiscal agent for the Class 3-A-2 Insurer, or any successor fiscal agent appointed by the Class 3-A-2 Insurer of a notice from the Trustee specifying the Insured Payment which is due and owing on the applicable Distribution Date, provided that if the notice is received after 12:00 p.m., New York City time, on that Business Day, it will be deemed to be received on the following Business Day.  If any notice received by the Class 3-A-2 Insurer's fiscal agent is not in proper form or is otherwise insufficient for the purpose of making a claim under the Class 3-A-2 Policy, it will be deemed not to have been received by the Class 3-A-2 Insurer's fiscal agent for the purposes of this paragraph, and the Class 3-A-2 Insurer or the fiscal agent, as the case may be, will promptly so advise the Trustee and the Trustee may submit an amended notice.

Insured Payments due under the Class 3-A-2 Policy, unless otherwise stated therein, will be disbursed by the Class 3-A-2 Insurer's fiscal agent to the Trustee on behalf of the Class 3-A-2 Certificateholders by wire transfer of immediately available funds in the amount of the Insured Payment less, in respect of Insured Payments related to Preference Amounts, any amount held by the Trustee for the payment of the Insured Payment and legally available therefore.

The fiscal agent is the agent of the Class 3-A-2 Insurer only and the fiscal agent will in no event be liable to Class 3-A-2 Certificateholders for any acts of the fiscal agent or any failure of the Class 3-A-2 Insurer to deposit, or cause to be deposited, sufficient funds to make payments due under the Class 3-A-2 Policy.

Subject to the terms of the Pooling and Servicing Agreement, the Class 3-A-2 Insurer shall be subrogated to the rights of each Class 3-A-2 Certificateholder to receive payments under the Class 3-A-2 Certificates to the extent of any payment by the Class 3-A-2 Insurer under the Class 3-A-2 Policy.

As used in the Class 3-A-2 Policy, the following terms shall have the following meanings:

"Class 3-A-2 Available Funds"  means, with respect to any Distribution Date, funds allocated from amounts available pursuant to the Pooling and Servicing Agreement to make distributions on the Class 3-A-2 Certificates on such Distribution Date, including without limitation amounts on deposit in the Distribution Account.

"Deficiency Amount"  means, with respect to any Distribution Date, the excess, if any, of Required Distributions for such Distribution Date over Class 3-A-2 Available Funds.

"Final Scheduled Distribution Date" means the Distribution Date occurring in the month following the month of the scheduled maturity date of the Group 3 Mortgage Loan having the latest scheduled maturity date.

"Insured Payment" means (i) as of any Distribution Date, any Deficiency Amount and (ii) any Preference Amount.

"Preference Amount" means any amount previously distributed to a Class 3-A-2 Certificateholder on the Class 3-A-2 Certificates that is recoverable and sought to be recovered as a voidable preference by a trustee in bankruptcy pursuant to the United States Bankruptcy Code (11 U.S.C.), as amended from time to time, in accordance with a final nonappealable order of a court having competent jurisdiction.

"Required Distributions"  means, (a) with respect to any Distribution Date, the sum of (i) the amount of interest that has accrued on the Class 3-A-2 Certificates at the applicable Pass-Through Rate during the applicable Interest Accrual Period with respect to the Class 3-A-2 Certificates, net of any

interest shortfalls resulting from Prepayment Interest Shortfalls and any interest shortfalls resulting from the application of the Servicemembers Civil Relief Act, or similar state or local laws and (ii) if such Distribution Date is not the Final Scheduled Distribution Date, the amount of any Applied Realized Loss Amounts, if any, allocated to the Class 3-A-2 Certificates and (b) on the Final Scheduled Distribution Date, the Class Certificate Balance of the Class 3-A-2 Certificates (after giving effect to all distributions to be made on such Distribution Date).  Required Distributions do not include any Net Rate Carryover.

Capitalized terms used in the Class 3-A-2 Policy and not otherwise defined in the Class 3-A-2 Policy shall have the meanings set forth in the Pooling and Servicing Agreement as of the date of execution of the Class 3-A-2 Policy, without giving effect to any subsequent amendment or modification to the Pooling and Servicing Agreement unless such amendment or modification has been approved in writing by the Class 3-A-2 Insurer.

The Class 3-A-2 Policy is being issued under and pursuant to, and will be construed under, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

**THE INSURANCE PROVIDED BY THE CLASS 3-A-2 POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.**

The Class 3-A-2 Policy is not cancelable for any reason.  The premium on the Class 3-A-2 Policy is not refundable for any reason including payment, or provision being made for payment, prior to the maturity of the Class 3-A-2 Certificates.

**The Class 3-A-2 Insurer**

The following information has been supplied by MBIA Insurance Corporation, the Class 3-A-2 Insurer, for inclusion in this prospectus supplement.

The Class 3-A-2 Insurer is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company (the "Company"). The Company is not obligated to pay the debts of or claims against the Class 3-A-2 Insurer. The Class 3-A-2 Insurer is domiciled in the State of New York and licensed to do business in and subject to regulation under the laws of all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the Virgin Islands of the United States, and the Territory of Guam. The Class 3-A-2 Insurer, either directly or through subsidiaries, is licensed to do business in the Republic of France, the United Kingdom, and the Kingdom of Spain and is subject to regulation under the laws of those jurisdictions.

The principal executive offices of the Class 3-A-2 Insurer are located at 113 King Street, Armonk, New York 10504 and the main telephone number at that address is (914) 273-4545.

*Regulation.*

As a financial guaranty insurance company licensed to do business in the State of New York, the Class 3-A-2 Insurer is subject to the New York Insurance Law which, among other things, prescribes minimum capital requirements and contingency reserves against liabilities for the Class 3-A-2 Insurer, limits the classes and concentrations of investments that are made by the Class 3-A-2 Insurer and requires the approval of policy rates and forms that are employed by the Class 3-A-2 Insurer. State law also regulates the amount of both the aggregate and individual risks that may be insured by the Class 3-A-2 Insurer, the payment of dividends by the Class 3-A-2 Insurer, changes in control with respect to the Class 3-A-2 Insurer and transactions among the Class 3-A-2 Insurer and its affiliates.

The Class 3-A-2 Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

Financial Strength Ratings of the Class 3-A-2 Insurer.

Moody's Investors Service, Inc. ("Moody's") rates the financial strength of the Class 3-A-2 Insurer "Aaa."

Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P") rates the financial strength of the Class 3-A-2 Insurer "AAA."

Fitch Ratings rates the financial strength of the Class 3-A-2 Insurer "AAA."

Each rating of the Class 3-A-2 Insurer should be evaluated independently. The ratings reflect the respective rating agency's current assessment of the creditworthiness of the Class 3-A-2 Insurer and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell, or hold the Class 3-A-2 Certificates, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the Class 3-A-2 Certificates. The Class 3-A-2 Insurer does not guaranty the market price of the Class 3-A-2 Certificates nor does it guaranty that the ratings on the Class 3-A-2 Certificates will not be revised or withdrawn.

*MBIA Financial Information.*

The tables below present selected financial information of the Class 3-A-2 Insurer determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities ("SAP") as well as selected information of the Class 3-A-2 Insurer on a consolidated basis determined in accordance with accounting principles generally accepted in the United States of America ("GAAP")

| In millions | SAP September 30, 2006 (Unaudited) | December 31, 2005 (Audited) |
|---|---|---|
| Admitted Assets | $11,500 | $11,037 |
| Liabilities | 7,039 | 7,237 |
| Capital and Surplus | 4,461 | 3,800 |

| In millions | GAAP September 30, 2006 (Unaudited) | December 31, 2005 (Audited) |
|---|---|---|
| Assets | $13,947 | $13,506 |
| Liabilities | 6,597 | 6,426 |
| Equity | 7,350 | 7,080 |

For further information concerning the Class 3-A-2 Insurer, see the consolidated financial statements of the Class 3-A-2 Insurer and its subsidiaries as of December 31, 2005 and December 31, 2004 and for each of the three years in the period ended December 31, 2005, prepared in accordance with generally accepted accounting principles, included in the Annual Report on Form 10-K of the Company for the year ended December 31, 2005 and the consolidated financial statements of the Class 3-A-2

Insurer and its subsidiaries as of September 30, 2006 and for the nine month periods ended September 30, 2006 and September 30, 2005 included in the Quarterly Report on Form 10-Q of the Company for the period ended September 30, 2006, which are hereby incorporated by reference into this prospectus supplement and shall be deemed to be a part hereof.

Copies of the statutory financial statements filed by the Class 3-A-2 Insurer with the State of New York Insurance Department are available over the Internet at the Company's web site at http://www.mbia.com and at no cost, upon request to the Class 3-A-2 Insurer at its principal executive offices.

Incorporation of Certain Documents by Reference.

The following documents filed by the Company with the Securities and Exchange Commission (the "SEC") are incorporated by reference into this prospectus supplement:

(1)     The Company's Annual Report on Form 10-K for the year ended December 31, 2005; and

(2)     The Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2006.

Any documents, including any financial statements of the Class 3-A-2 Insurer and its subsidiaries that are included therein or attached as exhibits thereto, filed by the Company pursuant to Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act after the date of the Company's most recent Quarterly Report on Form 10-Q or Annual Report on Form 10-K, and prior to the termination of the offering of the Class A Certificates offered hereby shall be deemed to be incorporated by reference in this prospectus supplement and to be a part hereof from the respective dates of filing such documents. Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this prospectus supplement, shall be deemed to be modified or superseded for purposes of this prospectus supplement to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this prospectus supplement.

The Company files annual, quarterly and special reports, information statements, and other information with the SEC under File No. 1-9583. Copies of the Company's SEC filings (including (1) the Company's Annual Report on Form 10-K for the year ended December 31, 2005, and (2) the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2006, June 30, 2006 and September 30, 2006) are available (i) over the Internet at the SEC's web site at http://www.sec.gov; (ii) at the SEC's public reference room in Washington D.C.; (iii) over the Internet at the Company's web site at http://www.mbia.com; and (iv) at no cost, upon request to the Class 3-A-2 Insurer at its principal executive offices.

**Additional Considerations Concerning the Class 3-A-2 Policy and the Class 3-A-2 Insurer**

The Class 3-A-2 Insurer shall be fully subrogated to the rights of each holder of a Class 3-A-2 Certificate to receive principal and interest distributions from the issuing entity on those Class 3-A-2 Certificates to the extent the Class 3-A-2 Insurer makes payments, directly or indirectly, on the account of principal or interest on any Class 3-A-2 Certificates under the Class 3-A-2 Policy.  To the extent that the Class 3-A-2 Insurer has paid any amounts with respect to interest and principal, the Class 3-A-2 Insurer

will be subrogated to the Class 3-A-2 Certificates with respect to such amounts and will be entitled to those amounts on a pro rata basis with the Class 3-A-2 Certificates as subrogee.

Pursuant to the terms of the pooling and servicing agreement, unless the Class 3-A-2 Insurer defaults in its obligations under the Class 3-A-2 Policy (an "MBIA Default"), the Class 3-A-2 Insurer will be entitled to exercise the voting rights of the Class 3-A-2 Certificateholders, without the consent of the Class 3-A-2 Certificateholders, and the Class 3-A-2 Certificateholders may exercise such rights only with the prior written consent of the Class 3-A-2 Insurer.

"Class 3-A-2 Premium" means the amount payable to the Class 3-A-2 Insurer on each Distribution Date, calculated at the Class 3-A-2 Premium Rate on a balance equal to the Class Certificate Balance of the Class 3-A-2 Certificates immediately prior to such Distribution Date. The Class 3-A-2 Premium will be computed on the basis of a 360–day year consisting of twelve 30–day months.

"Class 3-A-2 Premium Rate" means 0.07% per annum.

The Class 3-A-2 Policy will be filed with the SEC as an Exhibit to a Current Report on Form 8-K after the closing date.

## Use of Proceeds

We expect the proceeds to the Depositor from the sale of the offered certificates to be approximately $570,643,240, plus accrued interest, before deducting issuance expenses payable by the Depositor. The Depositor will apply the net proceeds from the sale of these classes of certificates against the purchase price of the Closing Date Mortgage Loans and to fund the Pre-funding Account and Capitalized Interest Account.

## Legal Proceedings

There are no legal proceedings against Countrywide Home Loans, the Depositor, the Trustee, the issuing entity or the Master Servicer, or to which any of their respective properties are subject, that is material to the certificateholders, nor is the Depositor aware of any proceedings of this type contemplated by governmental authorities.

## Material Federal Income Tax Consequences

The following discussion and the discussion in the prospectus under the caption "*Material Federal Income Tax Consequences*" is the opinion of Sidley Austin LLP ("***Tax Counsel***") on the anticipated material federal income tax consequences of the purchase, ownership, and disposition of the offered certificates.  It is based on the current provisions and interpretations of the Internal Revenue Code of 1986, as amended (the "***Code***") and the accompanying Treasury regulations and on current judicial and administrative rulings.  All of these authorities are subject to change and any change can apply retroactively.

For federal income tax purposes, the issuing entity (exclusive of the Carryover Reserve Fund, the Prefunding Account and the Capitalized Interest Account) will be composed of multiple entities consisting of a trust (the "***ES Trust***") beneath which are two chains of tiered REMICs.  The highest REMIC in any particular chain will be referred to as the "***Master REMIC***," and each REMIC below the Master REMIC will be referred to as an "***underlying REMIC***."  Each underlying REMIC will issue multiple classes of uncertificated, regular interests (the "***underlying REMIC Regular Interests***") that will be held by another REMIC above it in the tiered chain. The assets of the lowest underlying REMIC will

consist of the mortgage loans in its designated group or groups and any other assets specified in the pooling and servicing agreement.  Upon closing, each Master REMIC will issue a residual interest (the "*Master REMIC Residual Interest*") and several classes of uncertificated regular interests (the "*Master REMIC Regular Interests*"), all of which will be held in the ES Trust.  The ES Trust will not constitute any part of any REMIC created under the pooling and servicing agreement.  Aggregate distributions on the underlying REMIC Regular Interests held by any Master REMIC will equal the aggregate distributions on that Master REMICs uncertificated Regular Interests held by the ES Trust.  The supplemental interest trust, corridor contracts and corridor contract reserve fund will not constitute any part of any REMIC described in the pooling and servicing agreement.

For federal income tax purposes, the ES Trust will be classified as a trust. All of the senior and subordinated certificates (the "*Regular Certificates*") will represent beneficial ownership of one or more of the uncertificated Master REMIC Regular Interests held by the ES Trust.  Under Section 671 of the Code, the Holders of the Regular Certificates (including the Depositable Certificates and, after they have been received in return for Depositable Certificates, the Exchangeable Certificates) will be treated as owning the uncertificated Master REMIC Regular Interests that underlie their Regular Certificates.

The Class 2-A-1 and Class 2-A-6 Certificates (hereafter, the "*Class 2 Benefited Regular Certificates*") in addition to representing beneficial ownership of Master REMIC Regular Interests will also represent entitlements to receive payments of Yield Supplement Amounts.  Holders of Benefited Regular Certificates must allocate the purchase price for their Class 2 Benefited Regular Certificates between the REMIC Regular Interest component and the Yield Supplement component.  The Class 3 Certificates other than the Class 3-A-R Certificates (hereafter, the "*Class 3 Benefited Regular Certificates*") in addition to representing beneficial ownership of Master REMIC Regular Interests will also represent entitlements to receive payments of Net Rate Carryover.  Holders of Class 3 Benefited Regular Certificates must allocate the purchase price for their Class 3 Benefited Regular Certificates between the REMIC Regular Interest component and the Net Rate Carryover component.

The Class A-R Certificates (also, "*Residual Certificates*") will represent the Master REMIC Residual Interest and beneficial ownership of the residual interest in each underlying REMIC with respect to one chain of REMICs and the Class 3-A-R Certificates (also, "*Residual Certificates*") will represent the Master REMIC Residual Interest and beneficial ownership of the residual interest in each underlying REMIC with respect to the other chain of REMICs.

To facilitate the exchange of the Depositable Certificates for the Exchangeable Certificates, the uncertificated Master REMIC Regular Interests that underlie a Depositable Certificate will consist of the individual components into which the Depositable Certificate may be severed whether or not the Depositable Certificate is ever exchanged for an Exchangeable Certificate.  Consequently, the uncertificated Master REMIC Regular Interests that underlie a Depositable Certificate may consist of one or more principal-only REMIC Regular Interests, interest-only REMIC Regular Interests and principal and interest REMIC Regular Interests or any combination of the foregoing.   Similarly, the uncertificated Master REMIC Regular Interests that underlie an Exchangeable Certificate may consist of one or more principal-only REMIC Regular Interests, interest-only REMIC Regular Interests and principal and interest REMIC Regular Interests or any combination of the foregoing.  The remaining discussion assumes that Depositable Certificates and Exchangeable Certificates will be equivalent, for tax purposes, to direct ownership of the components they represent.  For the federal income tax treatment of relinquishing Depositable Certificates in return for Exchangeable Certificates, see the discussion under the heading "*Depositable and Exchangeable Certificates*" below.

Upon the issuance of the Certificates, Tax Counsel will deliver its opinion concluding, assuming compliance with the pooling and servicing agreement, for federal income tax purposes, that each REMIC

described in the pooling and servicing agreement will qualify as a REMIC within the meaning of Section 860D of the Code, and that the Regular Certificates will represent interests in regular interests in a REMIC.  Moreover, Tax Counsel will deliver an opinion concluding that the interests of the holders of the Class 2 Benefited Regular Certificates and Class 3 Benefited Regular Certificates with respect to Yield Supplement Amounts and Net Rate Carryover, respectively, will represent, for federal income tax purposes, contractual rights coupled with regular interests within the meaning of Treasury regulations §1.860G-2(i).

**Taxation of the Regular Certificates and the REMIC Regular Interest Components of the Benefited Regular Certificates**

The Regular Certificates (and the REMIC Regular Interest components of the Class 2 and Class 3 Benefited Regular Certificates) will be treated as debt instruments issued by the Master REMIC for federal income tax purposes.  Income on the Regular Certificates (and the REMIC Regular Interest components of the Class 2 and Class 3 Benefited Regular Certificates) must be reported under an accrual method of accounting.  Under an accrual method of accounting, interest income may be required to be included in a holder's gross income in advance of the holder's actual receipt of that interest income.

The Class PO Certificates (and any underlying principal-only component of a Depositable or Exchangeable Certificate) will be treated for federal income tax purposes as having been issued with an amount of Original Issue Discount ("**OID**") equal to the difference between their principal balance and their issue price.  Although the tax treatment is not entirely certain, each notional amount certificate (and any underlying interest-only component of a Depositable or Exchangeable Certificate) will be treated as having been issued with OID in an amount equal to the excess of (1) the sum of all expected payments on the certificate (or interest-only component of a Depositable or Exchangeable Certificate) determined under the applicable prepayment assumption over (2) the price at which the certificate (or interest-only component of a Depositable or Exchangeable Certificate) was issued.  Although unclear, a holder of a notional amount certificate (or interest-only component of a Depositable or Exchangeable Certificate) may be entitled to deduct a loss to the extent that its remaining basis exceeds the maximum amount of future payments to which the certificateholder (or interest only component) would be entitled if there were no further prepayments on the mortgage loans.  Certain other classes of Regular Certificates (including the REMIC Regular Interest components of the Class 2 and Class 3 Benefited Regular Certificates and the principal and interest components of a Depositable or Exchangeable Certificate) may also be treated as having been issued with OID.  For purposes of determining the amount and rate of accrual of OID and market discount, the issuing entity intends to assume that there will be prepayments on the mortgage loans at a rate equal to 300% of the Prepayment Assumption. No representation is made that the mortgage loans will prepay at the foregoing rate or any other rate. See "*Yield, Prepayment and Maturity Considerations*" and "*Material Federal Income Tax Consequences*" in the prospectus. Computing accruals of OID in the manner described in the prospectus may (depending on the actual rate of prepayments during the accrual period) result in the accrual of negative amounts of OID on the certificates issued with OID in an accrual period. Holders will be entitled to offset negative accruals of OID only against future OID accruals on their certificates.

If the holders of any Regular Certificates are treated as acquiring their certificates (or REMIC Regular Interest components of Class 2 and Class 3 Benefited Regular Certificates or principal and interest components of a Depositable or Exchangeable Certificate) at a premium, the holders are encouraged to consult their tax advisors regarding the election to amortize bond premium and the method to be employed.  See "*Material Federal Income Tax Consequences — Taxation of Debt Securities — Premium*" in the prospectus.

**Disposition of Regular Certificates and REMIC Regular Interest Components of Benefited Regular Certificates**

Assuming that the Regular Certificates are held as "capital assets" within the meaning of Section 1221 of the Code, gain or loss on the disposition of the Certificates (and gain or loss on the disposition of the REMIC Regular Interest component of a Class 2 or Class 3 Benefited Regular Certificate) should result in capital gain or loss.  Such gain, however, will be treated as ordinary income, to the extent it does not exceed the excess (if any) of:

(1)      the amount that would have been includible in the holder's gross income with respect to the Regular Certificate (or REMIC Regular Interest component) had income thereon accrued at a rate equal to 110% of the applicable federal rate as defined in Section 1274(d) of the Code determined as of the date of purchase of the Certificate

over

(2)      the amount actually included in such holder's income.

**Tax Treatment For Certain Purposes**

As described more fully under "*Material Federal Income Tax Consequences*" in the prospectus, the  Regular Certificates (and the REMIC Regular Interest components of the Benefited Regular Certificates) will represent "real estate assets" under Section 856(c)(5)(B) of the Code and qualifying assets under Section 7701(a)(19)(C) of the Code in the same (or greater) proportion that the assets of the issuing entity will be so treated, and income on the Regular Certificates (and the REMIC Regular Interest components of the Class 2 and Class 3 Benefited Regular Certificates) will represent "interest on obligations secured by mortgages on real property or on interests in real property" under Section 856(c)(3)(B) of the Code in the same (or greater) proportion that the income on the assets of the issuing entity will be so treated.  The Regular Certificates (and the REMIC Regular Interest component of the Class 2 and Class 3 Benefited Regular Certificates but not the Yield Supplement or Net rate Carryover components) will represent qualifying assets under Section 860G(a)(3) of the Code if acquired by a REMIC within the prescribed time periods of the Code.

**Yield Supplement Amounts and Net Rate Carryover Payments**

The following discussions assume that the rights of the holders of the Class 2 and Class 3 Benefited Regular Certificates with respect to Yield Supplement Amounts and Net Rate Carryover payments, respectively, will be treated as rights under a notional principal contract rather than as interests in a partnership for federal income tax purposes. If these rights were treated as representing interests in an entity taxable as a partnership for federal income tax purposes, then there could be different tax timing consequences to all such certificateholders and different withholding tax consequences on payments to certificateholders who are non-U.S. Persons.  Prospective investors in the Class 2 and Class 3 Benefited Regular Certificates are encouraged to consult their tax advisors regarding their appropriate tax treatment.

**The Rights of the Class 2 Benefited Regular Certificates With Respect to Yield Supplement Amounts**

For tax information reporting purposes, the trustee (1) will treat the Yield Supplement Amounts rights of the Class 2 Benefited Regular Certificates as rights to receive payments under a notional principal contract and (2) anticipates assuming that these rights will have an insubstantial value relative to the value of the Regular Interest component of the Class 2 Benefited Regular Certificates. The IRS could,

S-178

however, successfully argue that the Yield Supplement component of the Class 2 Benefited Regular Certificates has a greater value. Similarly, the trustee could determine that the Yield Supplement component of the Class 2 Benefited Regular Certificates has a greater value. In either case, the REMIC Regular Interest component of the Class 2 Benefited Regular Certificates could be viewed as having been issued with either an additional amount of OID (which could cause the total amount of discount to exceed a statutorily defined de minimis amount) or with less premium (which would reduce the amount of premium available to be used as an offset against interest income). See "*Material Federal Income Tax Consequences — Taxation of the REMIC and Its Holders*" and "*— Taxation of the REMIC*" in the prospectus. In addition, the Yield Supplement component could be viewed as having been purchased at a higher cost. These changes could affect the timing and amount of income and deductions on the REMIC Regular Interest component and Yield Supplement component.

The portion of the overall purchase price of a Class 2 Benefited Regular Certificate attributable to the Yield Supplement component must be amortized over the life of the Certificate, taking into account the declining balance of the related REMIC Regular Interest component. Treasury regulations concerning notional principal contracts provide alternative methods for amortizing the purchase price of a notional principal contract. Under one method — the level yield constant interest method — the price paid for the Yield Supplement component would be amortized over the life of the Yield Supplement component as though it were the principal amount of a loan bearing interest at a reasonable rate. Holders are urged to consult their tax advisors concerning the methods that can be employed to amortize the portion of the purchase price paid for the Yield Supplement component of a Class 2 Benefited Regular Certificate.

Any payments received by a holder of a Class 2 Benefited Regular Certificate as Yield Supplement Amounts will be treated as periodic payments received under a notional principal contract. For any taxable year, to the extent the sum of the periodic payments received exceeds the amortization of the purchase price of the Yield Supplement component, such excess will be ordinary income. Conversely, to the extent the amortization of the purchase price exceeds the periodic payments, such excess will be allowable as an ordinary deduction. In the case of an individual, such deduction will be subject to the 2 percent floor imposed on miscellaneous itemized deductions under Section 67 of the Code and may be subject to the overall limitation on itemized deductions imposed under Section 68 of the Code. In addition, miscellaneous itemized deductions are not allowed for purposes of computing the alternative minimum tax.

**Dispositions of the Yield Supplement Component**

Upon the sale, exchange, or other disposition of a Class 2 Benefited Regular Certificate, the Class 2 Benefited Regular Certificateholder must allocate the amount realized between the Regular Interest component and the Yield Supplement component based on the relative fair market values of those components at the time of sale. Assuming a Class 2 Benefited Regular Certificate is held as a "capital asset" within the meaning of Section 1221 of the Code, any gain or loss on the disposition of the Yield Supplement component should be capital gain or loss.

**Tax Treatment of Yield Supplement Components For Certain Purposes**

The Yield Supplement components of the Benefited Regular Certificates will not qualify as assets described in Section 7701(a)(19)(C) of the Code or as real estate assets under Section 856(c)(5)(B) of the Code. In addition, because of the Yield Supplement component, holders of the Benefited Regular Certificates are encouraged to consult with their tax advisors before resecuritizing those Certificates in a REMIC.

**The Rights of the Class 3 Benefited Regular Certificates With Respect to Net Rate Carryover Payments**

For tax information reporting purposes, the trustee (1) will treat the Net Rate Carryover payment rights of the Class 3 Benefited Regular Certificates as rights to receive payments under a notional principal contract and (2) anticipates assuming that these rights will have an insubstantial value relative to the value of the Regular Interest component of the Class 3 Benefited Regular Certificates. The IRS could, however, successfully argue that the Net Rate Carryover component of the Class 3 Benefited Regular Certificates has a greater value.  Similarly, the trustee could determine that the Net Rate Carryover component of the Class 3 Benefited Regular Certificates has a greater value.  In either case, the REMIC Regular Interest component of the Class 3 Benefited Regular Certificates could be viewed as having been issued with either an additional amount of OID (which could cause the total amount of discount to exceed a statutorily defined de minimis amount) or with less premium (which would reduce the amount of premium available to be used as an offset against interest income). See "*Material Federal Income Tax Consequences — Taxation of the REMIC and Its Holders*" and "*— Taxation of the REMIC*" in the prospectus.  In addition, the Net Rate Carryover component could be viewed as having been purchased at a higher cost.  These changes could affect the timing and amount of income and deductions on the REMIC Regular Interest component and Net Rate Carryover component.

The portion of the overall purchase price of a Class 3 Benefited Regular Certificate attributable to the Net Rate Carryover component must be amortized over the life of the Certificate, taking into account the declining balance of the related REMIC Regular Interest component. Treasury regulations concerning notional principal contracts provide alternative methods for amortizing the purchase price of a notional principal contract. Under one method — the level yield constant interest method — the price paid for the Net Rate Carryover component would be amortized over the life of the Net Rate Carryover component as though it were the principal amount of a loan bearing interest at a reasonable rate. Holders are urged to consult their tax advisors concerning the methods that can be employed to amortize the portion of the purchase price paid for the Net Rate Carryover component of a Class 3 Benefited Regular Certificate.

Any payments received by a holder of a Class 3 Benefited Regular Certificate as Net Rate Carryover will be treated as periodic payments received under a notional principal contract.  For any taxable year, to the extent the sum of the periodic payments received exceeds the amortization of the purchase price of the Net Rate Carryover component, such excess will be ordinary income. Conversely, to the extent the amortization of the purchase price exceeds the periodic payments, such excess will be allowable as an ordinary deduction. In the case of an individual, such deduction will be subject to the 2 percent floor imposed on miscellaneous itemized deductions under Section 67 of the Code and may be subject to the overall limitation on itemized deductions imposed under Section 68 of the Code.  In addition, miscellaneous itemized deductions are not allowed for purposes of computing the alternative minimum tax.

**Dispositions of the Net Rate Carryover Component**

Upon the sale, exchange, or other disposition of a Class 3 Benefited Regular Certificate, the Class 3 Benefited Regular Certificateholder must allocate the amount realized between the Regular Interest component and the Net Rate Carryover component based on the relative fair market values of those components at the time of sale.  Assuming a Class 3 Benefited Regular Certificate is held as a "capital asset" within the meaning of Section 1221 of the Code, any gain or loss on the disposition of the Net Rate Carryover component should be capital gain or loss.

**Tax Treatment of Net Rate Carryover Components For Certain Purposes**

The Net Rate Carryover components of the Benefited Regular Certificates will not qualify as assets described in Section 7701(a)(19)(C) of the Code or as real estate assets under Section 856(c)(5)(B) of the Code.  In addition, because of the Net Rate Carryover component, holders of the Benefited Regular Certificates are encouraged to consult with their tax advisors before resecuritizing those Certificates in a REMIC.

**Depositable and Exchangeable Certificates**

The uncertificated Master REMIC Regular Interests that underlie each Depositable Certificate or Exchangeable Certificate will be accounted for separately and will have the same tax consequences to the holder of the Depositable and Exchangeable Certificates as if such uncertificated Master REMIC Regular Interests were held separately outside the ES Trust.

In the case of a cash purchase of a Depositable Certificate or Exchangeable Certificate, if the Depositable Certificate or Exchangeable Certificate represents more than one underlying uncertificated Master REMIC Regular Interest, then the purchaser will have to establish its basis in each of the underlying uncertificated Master REMIC Regular Interests by allocating the cost of the Depositable Certificate or Exchangeable Certificate among the underlying uncertificated Master REMIC Regular Interests based on their relative fair market values as determined at the time the Depositable Certificate or Exchangeable Certificate is purchased.  Similarly, in the case of the cash sale of a Depositable Certificate or Exchangeable Certificate, if the Depositable Certificate or Exchangeable Certificate represents more than one underlying uncertificated Master REMIC Regular Interest, then the seller will have to establish the amount realized for each of the underlying uncertificated Master REMIC Regular Interests by allocating the sales price of the Depositable Certificate or Exchangeable Certificate among the uncertificated Master REMIC Regular Interests based on their relative fair market values as determined at the time the Depositable Certificate or Exchangeable Certificate is sold.

No gain or loss will be realized upon exchanging one or more Depositable Certificates for one or more Exchangeable Certificates.  Regardless of the value of the Exchangeable Certificates received, immediately after the exchange, each uncertificated Master REMIC Regular Interest underlying the Exchangeable Certificate (and formerly represented by one or more relinquished Depositable Certificates) will have the same basis as it did immediately before the exchange and will continue to be accounted for separately (that is, each uncertificated Master REMIC Regular Interest underlying an Exchangeable Certificates will continue to have a separate basis for federal income tax purposes, based on its acquisition cost, adjusted as necessary for accruals of discount and premium and payments with respect to that particular uncertificated Master REMIC Regular Interest).

No gain or loss will be realized upon exchanging one or more Exchangeable Certificate for one or more Depositable Certificates.  Regardless of the value of the Depositable Certificates received, immediately after the exchange, each uncertificated Master REMIC Regular Interest underlying the Depositable Certificates (and formerly represented by one or more relinquished Exchangeable Certificates) will have the same basis as it did immediately before the exchange and will continue to be accounted for separately (that is, each uncertificated Master REMIC Regular Interest underlying a Depositable Certificate will continue to have a separate basis for federal income tax purposes, based on its acquisition cost, adjusted as necessary for accruals of discount and premium and payments with respect to that particular uncertificated Master REMIC Regular Interest).

**Residual Certificates**

The holders of a Class of Residual Certificates must include in their federal taxable income the taxable income of the Master REMIC and each underlying REMIC in the chain of REMICs that corresponds to their Class of Residual Interests. The resulting tax liability of the holders may exceed cash distributions to them during certain periods. All or a portion of the taxable income from a Residual Certificate recognized by a holder may be treated as "excess inclusion" income, which, with limited exceptions, cannot be reduced by deductions (including net operating losses) and in all cases, is subject to U.S. federal income tax.

In computing alternative minimum taxable income, the special rule providing that taxable income cannot be less than the sum of the taxpayer's excess inclusions for the year does not apply. However, a taxpayer's alternative minimum taxable income cannot be less than the sum of the taxpayer's excess inclusions for the year. In addition, the amount of any alternative minimum tax net operating loss is determined without regard to any excess inclusions.

Effective August 1, 2006, temporary regulations issued by the Internal Revenue Service (the "***Temporary regulations***") have modified the general rule that excess inclusions from a REMIC residual interest are not includible in the income of a foreign person (or subject to withholding tax) until paid or distributed. The new regulations accelerate the time both for reporting, and tax withholding on, excess inclusions allocated to the foreign equity holders of partnerships and certain other pass-through entities. The new rules also provide that excess inclusions are United States sourced income. The timing rules apply to a particular REMIC residual interest and a particular foreign person, if the first allocation of income from the residual interest to the foreign person occurs after July 31, 2006. The source rules apply for taxable years ending after August 1, 2006.

Under the Temporary regulations, in the case of REMIC residual interests held by a foreign person through a partnership, the amount of excess inclusion income allocated to the foreign partner is deemed to be received by the foreign partner on the last day of the partnership's taxable year except to the extent that the excess inclusion was required to be taken into account by the foreign partner at an earlier time under Section 860G(b) of the Code as a result of a distribution by the partnership to the foreign partner or a disposition in whole or in part of the foreign partner's indirect interest in the REMIC residual interest. A disposition in whole or in part of the foreign partner's indirect interest in the REMIC residual interest may occur as a result of a termination of the REMIC, a disposition of the partnership's residual interest in the REMIC, a disposition of the foreign partner's interest in the partnership, or any other reduction in the foreign partner's allocable share of the portion of the REMIC net income or deduction allocated to the partnership.

Similarly, in the case of a REMIC residual interest held by a foreign person as a shareholder of a real estate investment trust or regulated investment company, as a participant in a common trust fund or as a patron in an organization subject to part I of subchapter T (cooperatives), the amount of excess inclusion allocated to the foreign person must be taken into income at the same time that other income from the trust, company, fund, or organization would be taken into account.

Under the Temporary regulations, excess inclusions allocated to a foreign person (whether as a partner or holder of an interest in a pass-through entity) are expressly made subject to withholding tax. In addition, in the case of excess inclusions allocable to a foreign person as a partner, the Temporary regulations eliminate an important exception to the withholding requirements under which a withholding agent unrelated to a payee is obligated to withhold on a payment only to the extent that the withholding agent has control over the payee's money or property and knows the facts giving rise to the payment.

**Purchasers of a Residual Certificate (that is, one of the Class A-R Certificates) are encouraged to consider carefully the tax consequences of an investment in Residual Certificates discussed in the prospectus and consult their tax advisors with respect to those consequences**. See "*Material Federal Income Tax Consequences — Taxation of Holders of Residual Interests — Excess Inclusions*" in the prospectus. In particular, prospective holders of Residual Certificates are encouraged to consult their tax advisors regarding whether a Residual Certificate will be treated as a "noneconomic" residual interest, as a "tax avoidance potential" residual interest or as both. Among other things, holders of Noneconomic Residual Certificates should be aware of REMIC regulations that govern the treatment of "inducement fees" and that may affect their ability to transfer their Residual Certificates. See "*Material Federal Income Tax Consequences —Taxation of the REMIC and Its Holders*," "—T*axation of Holders of Residual Interests — Restrictions on Ownership and Transfer of Residual Interests*," and "*— Tax Treatment of Foreign Investors*," "*Material Federal Income Tax Consequences — Taxation of Holders of Residual Interests — Mark to Market Rules*," "*— Excess Inclusions*" and "*— Treatment of Inducement Fees*" and "*— Foreign Investors*" in the prospectus.

Additionally, for information regarding Prohibited Transactions and Treatment of Realized Losses, see "*Material Federal Income Tax Consequences — Taxation of the REMIC— Prohibited Transactions and Contributions Tax*" in the prospectus.

As a result of the Economic Growth and Tax Relief Reconciliation Act of 2001 (the "*2001 Act*"), limitations imposed by Section 68 of the Code on claiming itemized deductions will be phased-out commencing in 2006, which will affect individuals holding Residual Certificates. In addition, as a result of the Jobs and Growth Tax Relief Reconciliation Act of 2003 (the "*2003 Act*"), the backup withholding rate has been reduced to 28%. Unless they are amended, these provisions of the 2001 Act and the 2003 Act will no longer apply for taxable years beginning after December 31, 2010. See "*Material Federal Income Tax Consequences*" in the prospectus. Investors are encouraged to consult their tax advisors with respect to both statutes.

**Other Taxes**

No representations are made regarding the tax consequences of the purchase, ownership or disposition of the certificates under any state, local or foreign tax law.

All investors are encouraged to consult their tax advisors regarding the federal, state, local or foreign tax consequences of purchasing, owning or disposing of the certificates.**.**

**ERISA Considerations**

Any fiduciary of an employee benefit plan or other plan or arrangement (such as an individual retirement account or Keogh plan) that is subject to the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), or to Section 4975 of the Code (a "*Plan*"), that proposes to cause the Plan to acquire any of the offered certificates (directly or indirectly through investment by an entity or account holding assets of the Plan) is encouraged to consult with its counsel with respect to the potential consequences of the Plan's acquisition and ownership of the certificates under ERISA and Section 4975 of the Code. See "*ERISA Considerations*" in the prospectus. Section 406 of ERISA prohibits "parties in interest" with respect to an employee benefit plan subject to ERISA from engaging in various different types of transactions involving the Plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes excise taxes on prohibited transactions involving "disqualified persons" and Plans described under that Section. ERISA authorizes the imposition of civil penalties for prohibited transactions involving Plans not subject to the requirements of Section 4975 of the Code.

Some employee benefit plans, including governmental plans and some church plans, are not subject to ERISA's requirements. Accordingly, assets of those plans may be invested in the offered certificates without regard to the ERISA considerations described in this prospectus supplement and in the prospectus, subject to the provisions of other applicable federal and state law. Any of those plans that is qualified and exempt from taxation under Sections 401(a) and 501(a) of the Code may be subject to the prohibited transaction rules set forth in Section 503 of the Code.

Investments by Plans or with assets of Plans that are subject to ERISA must satisfy ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a Plan's investments be made in accordance with the documents governing the Plan. A fiduciary that decides to invest the assets of a Plan in the offered certificates should consider, among other factors, the extreme sensitivity of the investment to the rate of principal payments (including prepayments) on the Mortgage Loans. It is anticipated that the certificates will constitute "equity interests" in the issuing entity and, in the case of the Class 2-A-1 and Class 2-A-6 Certificates, in the supplemental interest trust, for the purpose of the Plan Assets Regulation.

The U.S. Department of Labor has granted to the underwriter an administrative exemption (the "Exemption") from some of the prohibited transaction rules of ERISA and the related excise tax provisions of Section 4975 of the Code with respect to the initial purchase, the holding and the subsequent resale by Plans of securities, including certificates, in pass through trusts that consist of specified receivables, loans and other obligations that meet the conditions and requirements of the Exemption. The Exemption applies to Mortgage Loans such as the Mortgage Loans in the issuing entity. The Exemption extends exemptive relief to certificates, including subordinated certificates, rated in the four highest generic rating categories in certain designated transactions when the conditions of the Exemption, including the requirement that an investing Plan be an "accredited investor" as defined in Rule 501(a)(1) of Regulation D under the Securities Act of 1933, as amended, are met.

The Exemption provides exemptive relief to certain mortgage backed and asset backed securities transactions using a pre funding account. Mortgage Loans or other secured receivables supporting payments to certificateholders, and having a value equal to no more than twenty five percent (25%) of the total principal amount of the certificates being offered by the entity, may be transferred to the entity within a 90 day or three month period following the Closing Date, instead of being required to be either identified or transferred on or before the Closing Date. The relief is available when the pre funding arrangements satisfy certain conditions.

For a general description of the Exemption and the conditions that must be satisfied for the Exemption to apply, see "*ERISA Considerations*" in the prospectus.

Except as provided below with regard to the supplemental interest trust, it is expected that the Exemption will apply to the acquisition and holding by Plans of the offered certificates (other than the Class A R Certificates) and that all conditions of the Exemption other than those within the control of the investors will be met. In addition, as of the date hereof, there is no single mortgagor that is the obligor on five percent (5%) of the Mortgage Loans included in the issuing entity by aggregate unamortized principal balance of the assets of the issuing entity.

The rating of a certificate may change. If a class of certificates no longer has a rating of at least BBB (or its equivalent) from at least one of S&P, Fitch, or Moody's, certificates of that class will no longer be eligible for relief under the Exemption (although a Plan that had purchased the certificate when it had an investment grade rating would not be required by the Exemption to dispose of it).

**Because the characteristics of the Class A R Certificates may not meet the requirements of the Exemption, or any other issued exemption under ERISA, a Plan may have engaged in a prohibited transaction giving rise to excise taxes or civil penalties if it purchases and holds Class A R Certificates. Consequently, transfers of the Class A R Certificates (and of certificates of any class that, because of a change of rating, no longer satisfy the rating requirement of the Exemption) will not be registered by the Trustee unless the Trustee receives:**

- **a representation from the transferee of the certificate, acceptable to and in form and substance satisfactory to the Trustee, that the transferee is not a Plan, or a person acting on behalf of a Plan or using a Plan's assets to effect the transfer;**

- **a representation that the transferee is an insurance company which is purchasing the certificate with funds contained in an "insurance company general account" (as defined in Section V(e) of Prohibited Transaction Class Exemption 95 60 ("PTCE 95 60") ) and that the purchase and holding of the certificate satisfy the requirements of exemptive relief under Sections I and III of PTCE 95 60; or**

- **an opinion of counsel satisfactory to the Trustee that the purchase and holding of the certificate by a Plan, or a person acting on behalf of a Plan or using a Plan's assets, will not result in a non exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Trustee or the Master Servicer to any obligation in addition to those undertaken in the Pooling and Servicing Agreement.**

Prospective Plan investors are encouraged to consult with their legal advisors concerning the impact of ERISA and the Code, the effect of the Plan Assets Regulation and the applicability of the Exemption described in the prospectus, and the potential consequences in their specific circumstances, before making an investment in any of the offered certificates. Moreover, each Plan fiduciary is encouraged to determine whether, under the general fiduciary standards of investment prudence and diversification, an investment in any of the offered certificates is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio.

The sale of certificates to a Plan is in no respect a representation by the issuer or any underwriter of the certificates that this investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that this investment is appropriate for Plans generally or any particular Plan.

**ERISA Considerations With Respect to the Corridor Contracts**

For so long as the holder of a Class 2-A-1 and Class 2-A-6 Certificate is entitled to receive payments under the applicable Corridor Contract from the supplemental interest trust, any person purchasing a Class 2-A-1 and Class 2-A-6 Certificate otherwise eligible for purchase by Plans under the Exemption will be deemed to have acquired for purposes of ERISA and Section 4975 of the Code two assets: the right to receive payments from the issuing entity with respect to such Certificate without taking into account the right to receive payments from the supplemental interest trust, together with the right to receive payments from the supplemental interest trust. The Exemption may not apply to the acquisition, holding or resale of the right to receive payments from the supplemental interest trust by a Plan. The right to receive such payments could also result in a prohibited transaction if the Corridor Contract Counterparty is a party in interest with respect to such Plan, unless another administrative exemption is available.

Accordingly, no Plan or other person using assets of a Plan may acquire or hold a Class 2-A-1 and Class 2-A-6 Certificate otherwise eligible for the Exemption before the termination of the related Corridor Contract, unless such acquisition or holding are eligible for the exemptive relief available under Department of Labor Prohibited Transaction Class Exemption ("PTCE") 84 14 (for transactions effected by independent "qualified professional asset managers", PTCE 90-1 (for transactions by  insurance company pooled separate accounts), PTCE 91 38 (for transactions by bank collective investment funds), PTCE 95-60 (for transactions by insurance company general accounts), PTCE 96-23 (for transactions effected by "in-house asset managers") or the service provider exemption provided by Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code (collectively, the "Investor-Based Exemptions") or a similar exemption.  It should be noted, however, that even if the conditions specified in one or more Investor–Based Exemptions are met, the scope of relief may not necessarily cover all acts that might be construed as prohibited transactions.  Plan fiduciaries should consult legal counsel concerning these issues.  Each beneficial owner of a Class 2-A-1 and Class 2-A-6 Certificate or any interest therein, shall be deemed to have represented, by virtue of its acquisition or holding of the Class 2-A-1 and Class 2-A-6 Certificate, or interest therein, that either (i) it is not a Plan or (ii) the acquisition and holding of such Certificate are eligible for the exemptive relief available under one of the five prohibited transaction class exemptions as required immediately above.

If any Class 2-A-1 and Class 2-A-6 Certificate, or any interest therein, is acquired or held in violation of the provisions of the preceding paragraph, the next preceding permitted beneficial owner will be treated as the beneficial owner of that Class 2-A-1 and Class 2-A-6 Certificate, retroactive to the date of transfer to the purported beneficial owner. Any purported beneficial owner whose acquisition or holding of a Class 2-A-1 and Class 2-A-6 Certificate, or interest therein, was effected in violation of the provisions of the preceding paragraph shall indemnify to the extent permitted by law and hold harmless the Trustee, the Depositor, the sellers and the Master Servicer from and against any and all liabilities, claims, costs or expenses incurred by such parties as a result of such acquisition or holding.

## Method of Distribution

Subject to the terms and conditions set forth in the underwriting agreement between the Depositor and Countrywide Securities Corporation, an affiliate of the Depositor, the sellers and the Master Servicer ("CSC" or the "underwriter"), the Depositor has agreed to sell the offered certificates to the underwriter. CSC has agreed to purchase from the Depositor the offered certificates (the "Underwritten Certificates").

Distribution of the Underwritten Certificates will be made by the underwriter from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. The underwriter may effect such transactions by selling the Underwritten Certificates to or through dealers and such dealers may receive from the underwriter, for which they act as agent, compensation in the form of underwriting discounts, concessions or commissions. The underwriter and any dealers that participate with the underwriter in the distribution of the Underwritten Certificates may be deemed to be underwriters, and any discounts, commissions or concessions received by them, and any profits on resale of the Underwritten Certificates purchased by them, may be deemed to be underwriting discounts and commissions under the Securities Act of 1933, as amended.

The Depositor has been advised by the underwriter that it intends to make a market in the Underwritten Certificates purchased by it but the underwriter has no obligation to do so. There can be no assurance that a secondary market for the Underwritten Certificates will develop or, if it does develop, that it will continue or that it will provide certificateholders with a sufficient level of liquidity of investment.

The Depositor has agreed to indemnify the underwriter against, or make contributions to the underwriter with respect to, liabilities, customarily indemnified against, including liabilities under the Securities Act of 1933, as amended.

## Legal Matters

The validity of the certificates, including their material federal income tax consequences, will be passed upon for the Depositor by Sidley Austin LLP, New York, New York.  Certain legal matters will be passed upon for the underwriter by McKee Nelson LLP.

## Experts

The financial statements, financial statement schedules and management's assessment of the effectiveness of internal control over financial reporting (which is included in Management's Report on Internal Control Over Financial Reporting) of MBIA Inc. and subsidiaries and the financial statements of MBIA Insurance Corporation and subsidiaries incorporated in this prospectus supplement by reference to MBIA Inc.'s Annual Report on Form 10-K for the year ended December 31, 2005 have been so incorporated in reliance on the reports of PricewaterhouseCoopers LLP, an independent registered public accounting firm, given on the authority of said firm as experts in auditing and accounting.

## Ratings

It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement..  The Depositor has requested that Fitch Ratings ("Fitch"), Standard & Poor's, a division of the McGraw Hill Companies, Inc. ("S&P") and Moody's Investors Service, Inc. ("Moody's") maintain ongoing surveillance of the ratings assigned to the offered certificates in accordance with their respective policies, but we cannot assure you that Fitch, S&P or Moody's will continue its surveillance of the ratings assigned to the offered certificates.

The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued.  Fitch's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates. The rating assigned by Fitch to the notional amount certificates does not address whether investors will recoup their initial investment. The rating assigned by Fitch to the principal only certificates only addresses the return of its Class Certificate Balance. The rating assigned by Fitch to the Residual Certificates only addresses the return of its Class Certificate Balance and interest thereon at its pass-through rate.  The ratings assigned by Fitch to the Class 2-A-1 and Class 2-A-6 Certificates do not address the likelihood of any payments made pursuant to the Corridor Contracts.

The ratings assigned by S&P to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued. S&P's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates. The rating assigned by S&P to the notional amount certificates does not address whether investors will recoup their initial investment. The rating assigned by S&P to the principal only certificates only addresses the return of its Class Certificate Balance. The rating assigned by S&P to the Residual Certificates only addresses the return of its Class Certificate Balance and interest thereon at its pass-through rate.  The ratings assigned by S&P to the Class 2-A-1 and Class 2-A-6

Certificates do not address the likelihood of any payments made pursuant to the Corridor Contracts.  The rating assigned by S&P to the Class 3-A-2 Certificates is without regard to the Class 3-A-2 Policy.

The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the Mortgage Loans by the related certificateholders under the agreements pursuant to which the certificates are issued.  Moody's ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates. The rating assigned by Moody's to the notional amount certificates does not address whether investors will recoup their initial investment. The rating assigned by Moody's to the principal only certificates only addresses the return of its Class Certificate Balance. The rating assigned by Moody's to the Residual Certificates only addresses the return of its Class Certificate Balance and interest thereon at its pass-through rate.  The rating assigned by Moody's to the Class 3-A-2 Certificates is without regard to the Class 3-A-2 Policy.

The ratings of the rating agencies listed above do not address the possibility that, as a result of principal prepayments, certificateholders may receive a lower than anticipated yield.

The security ratings assigned to the offered certificates should be evaluated independently from similar ratings on other types of securities. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the rating agencies.

The Depositor has not requested a rating of the offered certificates by any rating agency other than the rating agencies listed above; there can be no assurance, however, as to whether any other rating agency will rate the offered certificates or, if it does, what rating would be assigned by the other rating agency. The ratings assigned by the other rating agency to the offered certificates could be lower than the respective ratings assigned by the rating agencies listed above.