**Notes to Financial Statements** *(unaudited)* **(continued)**

| (in thousands) | Less than 12 Months | | Greater than 12 Months | | Total | |
|---|---|---|---|---|---|---|
| | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| State or local agency obligations | $ 47,230 | $ (4,090) | $ 210,882 | $ (57,473) | $ 258,112 | $ (61,563) |
| MBS: | | | | | | |
|   U.S. agency | 86,841 | (543) | 27,335 | (217) | 114,176 | (760) |
|   Government-sponsored enterprises | 203,411 | (10,977) | 519,862 | (8,869) | 723,273 | (19,846) |
|   Private label | 2,414,231 | (853,951) | 3,699,546 | (1,205,387) | 6,113,777 | (2,059,338) |
| Total MBS | 2,704,483 | (865,471) | 4,246,743 | (1,214,473) | 6,951,226 | (2,079,944) |
| Total | $2,751,713 | $ (869,561) | $4,457,625 | $ (1,271,946) | $7,209,338 | $ (2,141,507) |

*December 31, 2008*

*Securities Transferred.* On June 30, 2009, the Bank transferred certain private label MBS from its held-to-maturity portfolio to available-for-sale portfolio. The private label MBS transferred had an other-than-temporary impairment loss recognized during the quarter ended June 30, 2009, which the Bank believes constitutes evidence of a significant decline in the issuer's creditworthiness. The Bank transferred the securities to the available-for-sale portfolio to increase financial flexibility to sell these securities if management determines it is prudent to do so. See Note 4 for additional information.

*State or Local Housing Finance Agency Obligations.* Management has reviewed its investments in state or local housing finance agency obligations and has determined that the unrealized losses shown are the result of the current interest-rate environment and illiquidity in the credit markets. The Bank has determined that all unrealized losses reflected above are temporary given the creditworthiness of the issuers and the underlying collateral. Because the decline in market value is attributable to changes in interest rates and not to a deterioration in the fundamental credit quality of these obligations, and because the Bank does not intend to sell these securities nor is it more likely than not the Bank would be required to sell the security before its anticipated recovery, the Bank does not consider these investments to be other-than-temporarily impaired at June 30, 2009 and December 31, 2008.

*Mortgage-Backed Securities.* The Bank invests in MBS, which are rated AAA at the time of purchase with the exception of one of the restricted securities related to the Shared Funding Program. This security was rated AA at the time of purchase. Each of the securities may contain one or more forms of credit protection/enhancements, including but not limited to guarantee of principal and interest, subordination, over-collateralization, and excess interest and insurance wrap.

Credit protection/enhancement for the Bank's MBS consist primarily of either guarantee of principal and interest in the case of U.S. government-guaranteed MBS and GSE MBS, or credit enhancement for private label residential MBS. Credit enhancements for private label MBS primarily consist of senior-subordinated features, which results in the prioritization of payments to senior classes over junior classes. The Bank primarily invests in senior classes of GSE and private label MBS. The Bank has higher exposure to the risk of loss on its investments in MBS when the loans backing the MBS exhibit high rates of delinquency and foreclosure and high losses on the sale of foreclosed properties. With respect to its GSE MBS holdings, the Bank has concluded that despite the ongoing deterioration in the nation's housing markets, the guarantee of principal and interest on the Bank's GSE MBS by Fannie Mae and Freddie Mac is still assured, and therefore the securities are not other-than-temporarily impaired.

*Other-than-Temporary Impairment Analysis on Private Label MBS Held-to-Maturity Securities.* The Bank evaluates its individual held-to-maturity investment securities holdings for OTTI on at least a quarterly basis. As part of this process, the Bank considers its intent to sell each debt security and whether it is more likely than not the Bank will be required to sell the security before its anticipated recovery. If either of these conditions is met, the Bank recognizes an OTTI in earnings equal to the entire difference between the security's amortized cost basis and its fair value at the balance sheet date. For securities that meet neither of these conditions, the Bank performs analysis to determine if any of these securities are at risk for OTTI. To determine which individual securities are at risk for OTTI and should be quantitatively evaluated utilizing a detailed cash flow analysis, the Bank uses

**Notes to Financial Statements** *(unaudited)* **(continued)**

indicators, or "screens" which consider various characteristics of each security including, but not limited to, the following: the credit rating; the duration and level of the unrealized loss; and certain other collateral-related characteristics such as delinquency rates, the security's performance and the ratio of credit enhancement to expected collateral losses. For these purposes, expected collateral losses are those that are implied by current delinquencies, taking into account a default probability based on the state of delinquency and a loss severity assumption based on product and vintage. The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment.

To assess whether the entire amortized cost bases of its private label residential MBS will be recovered, the Bank performed a cash flow analysis for each of its private label MBS that were determined to be other-than-temporarily impaired in a previous reporting period as well as those that met certain screens as discussed above. In performing the cash flow analysis for each of these securities classified as prime, Alt-A and subprime, the Bank used two third party models. The first model considered borrower characteristics and the particular attributes of the loans underlying the Bank's securities, in conjunction with assumptions about future changes in home prices and interest rates, to project prepayments, defaults and loss severities. A significant input to the first model was the forecast of future housing price changes which were forecasted for the relevant states and core-based statistical areas (CBSAs), based upon an assessment of the individual housing markets. The term CBSA refers collectively to metropolitan and micropolitan statistical areas as defined by the U.S. Office of Management and Budget; as currently defined, a CBSA must contain at least one urban area of 10,000 or more people. The Bank's housing price forecast assumed current-to-trough home price declines ranging from 0% to 20% over the next nine to fifteen months (resulting in peak-to-trough home price declines of up to 51%). Thereafter, home prices are projected to increase 1% in the first year, 3% in the second year and 4% in each subsequent year. The month-by-month projections of future loan performance derived from the first model, which reflect the projected prepayments, defaults and loss severities, were then input into a second model that allocated the projected loan level cash flows and losses to the various security classes in the securitization structure in accordance with its prescribed cash flow and loss allocation rules. The Bank's cash flow analysis of securities classified as HELOCs is not significant to the results of the Bank.

For those securities for which an OTTI was determined to have occurred as of June 30, 2009 (that is, a determination was made that the entire amortized cost bases will not likely be recovered), the following table presents a summary of the significant inputs used to measure the amount of the credit loss recognized in earnings during the three months ended June 30, 2009. The CUSIP classification (prime, Alt-A and subprime) is based on the model used to run the estimated cash flows for the CUSIP and not the classification at the time of issuance. This table includes all securities with a credit loss and does not separately present those classified as available-for-sale

88

## Notes to Financial Statements *(unaudited)* **(continued)**

and held-to-maturity. However, no securities which remained classified as held-to-maturity as of June 30, 2009 incurred a credit loss during the second quarter of 2009.

| (dollars in millions) | | | Significant Inputs | | | | | | Current Credit Enhancement | |
| | | | Prepayment Rates | | Default Rates | | Loss Severities | | | |
| Year of Securitization | Number of CUSIPs | Unpaid Principal Balance | Weighted Avg % | Range% | Weighted Avg % | Range% | Weighted Avg % | Range% | Weighted Avg % | Range % |
|---|---|---|---|---|---|---|---|---|---|---|
| Prime: | | | | | | | | | | |
| 2007 | 2 | $ 579.3 | 21.9 | 15.7-28.1 | 22.5 | 8.3-36.8 | 41.3 | 41.2-41.4 | 7.1 | 7.1-7.2 |
| Alt-A: | | | | | | | | | | |
| 2007 | 6 | $ 603.7 | 14.9 | 13.8-17.1 | 37.0 | 17.1-51.7 | 38.7 | 33.8-41.6 | 11.3 | 8.8-16.8 |
| 2006 | 10 | 807.6 | 15.9 | 11.2-20.1 | 31.5 | 7.2-66.3 | 39.5 | 33.7-46.9 | 9.4 | 4.0-13.5 |
| 2005 | 3 | 101.1 | 16.2 | 12.5-16.9 | 33.5 | 21.7-43.4 | 38.4 | 31.8-41.9 | 8.8 | 6.0-10.1 |
| 2004 and prior | 1 | 14.8 | 19.0 | n/a | 1.3 | n/a | 10.0 | n/a | 4.3 | n/a |
| | 20 | $ 1,527.2 | 15.6 | 11.2-20.1 | 33.5 | 1.3-66.3 | 38.8 | 10.0-46.9 | 10.1 | 4.0-16.8 |
| Subprime: | | | | | | | | | | |
| 2004 and Prior | 1 | $ 3.3 | 18.1 | n/a | 9.1 | n/a | 56.4 | n/a | 18.4 | n/a |
| Total | 23 | $ 2,109.8 | 17.3 | 11.2-28.1 | 30.5 | 1.3-66.3 | 39.5 | 10.0-56.4 | 9.3 | 4.0-18.4 |

*n/a — not applicable*

The table below summarizes the held-to-maturity securities for which an OTTI has been recognized during the life of the security as of June 30, 2009.

| (in thousands) | Unpaid Principal Balance | | Amortized Cost | | Net Unrealized Gains/Losses | | Fair Value | |
|---|---|---|---|---|---|---|---|---|
| Other-than-temporarily impaired held-to-maturity securities: | | | | | | | | |
| Private label MBS: | | | | | | | | |
| - Prime | $ | 177,790 | $ | 173,926 | $ | (40,880) | $ | 133,046 |
| - Alt-A | | 147,787 | | 141,019 | | (59,813) | | 81,206 |
| Total other-than-temporarily impaired held-to-maturity securities | $ | 325,577 | $ | 314,945 | $ | (100,693) | $ | 214,252 |
| Held-to-maturity MBS not other-than-temporarily impaired | | | | 7,533,499 | | (1,057,232) | | 6,476,267 |
| Total held-to-maturity MBS | | | $ | 7,848,444 | $ | (1,157,925) | $ | 6,690,519 |
| All other held-to-maturity securities | | | | 5,365,850 | | (14,209) | | 5,351,641 |
| Total held-to-maturity securities | | | $ | 13,214,294 | $ | (1,172,134) | $ | 12,042,160 |

## Notes to Financial Statements *(unaudited)* (continued)

The table below summarizes the impact of OTTI credit losses recorded on held-to-maturity securities for the three and six months ended June 30, 2009. As previously discussed, the Bank transferred certain held-to-maturity securities to available-for-sale on June 30, 2009, after the credit loss was incurred. See Note 4 for additional information.

| (in thousands) | For the Three Months Ended June 30, 2009 | | | For the Six Months Ended June 30, 2009 | | |
|---|---|---|---|---|---|---|
| | OTTI Related to Credit Loss | OTTI Related to Noncredit Loss | Total OTTI Losses | OTTI Related to Credit Loss | OTTI Related to Noncredit Loss | Total OTTI Losses |
| Private label RMBS | | | | | | |
|   - Prime | $ 17,234 | $ 352,574 | $369,808 | $ 18,525 | $ 385,422 | $403,947 |
|   - Alt-A | 21,840 | 66,698 | 88,538 | 51,009 | 328,198 | 379,207 |
|   - Subprime | 291 | 1,605 | 1,896 | 291 | 1,605 | 1,896 |
| Total OTTI on held-to-maturity securities | $ 39,365 | $ 420,877 | $460,242 | $ 69,825 | $ 715,225 | $785,050 |
| Components of OTTI: | | | | | | |
| OTTI on securities transferred to available-for-sale | $ 39,365 | $ 420,877 | $460,242 | $ 62,382 | $ 615,885 | $678,267 |
| OTTI on securities remaining as held-to-maturity | - | - | - | 7,443 | 99,340 | 106,783 |

The following table presents the rollforward of the amounts related to credit losses recognized during the life of the security for which a portion of the OTTI charges was recognized in other comprehensive loss.

| (in thousands) | For the Three Months Ended June 30, 2009 |
|---|---|
| Balance as of March 31, 2009 | $ 40,499 |
|   Additions: | |
|     Credit losses for which other-than-temporary impairment was not previously recognized | 19,736 |
|     Additional other-than-temporary impairment credit losses for which an other-than-temporary impairment charge was previously recognized | 19,629 |
|   Reductions: | |
|     Credit losses on securities transferred to available-for-sale | (71,649) |
| Balance as of June 30, 2009 | $ 8,215 |

| (in thousands) | For the Six Months Ended June 30, 2009 |
|---|---|
| Balance as of January 1, 2009[1] | $ 10,039 |
|   Additions: | |
|     Credit losses for which other-than-temporary impairment was not previously recognized | 43,296 |
|     Additional other-than-temporary impairment credit losses for which an other-than-temporary impairment charge was previously recognized | 26,529 |
|   Reductions: | |
|     Credit losses on securities transferred to available-for-sale | (71,649) |
| Balance as of June 30, 2009 | $ 8,215 |

*Note:*

[1] The Bank adopted FSP 115-2 as of January 1, 2009 and recognized the cumulative effect of initially applying FSP 115-2, totaling $253.1 million for held-to-maturity securities, as an adjustment to retained earnings at January 1, 2009, with a corresponding offsetting adjustment to accumulated other comprehensive income (loss).

## Notes to Financial Statements *(unaudited)* (continued)

The remainder of the held-to-maturity securities portfolio experienced unrealized losses and a decrease in fair value due to interest rate volatility, illiquidity in the marketplace, and credit deterioration in the U.S. mortgage markets. However, the decline is considered temporary as the Bank does not intend to sell these nor is it more likely than not the Bank would be required to sell the security before its anticipated recovery.

Because there is a continuing risk that further declines in the fair value of the Bank's private label MBS may occur and that the Bank may record additional material OTTI charges in future periods, the Bank's earnings and retained earnings and its ability to pay dividends and repurchase or redeem capital stock could be adversely affected.

*Redemption Terms.* The amortized cost and estimated fair value of held-to-maturity securities by contractual maturity are shown below. Expected maturities of some securities will differ from contractual maturities because borrowers may have the right to call or prepay obligations with or without call or prepayment fees.

| (in thousands) Year of Maturity | June 30, 2009 | | | December 31, 2008 | | |
|---|---|---|---|---|---|---|
| | Amortized Cost | Carrying Value | Estimated Fair Value | Amortized Cost | Carrying Value | Estimated Fair Value |
| Due in one year or less | $ 4,705,868 | $ 4,705,868 | $ 4,707,750 | $ 2,800,000 | $ 2,800,000 | $ 2,804,536 |
| Due after one year through five years | 78,364 | 78,364 | 83,346 | 885,059 | 885,059 | 899,260 |
| Due after five years through ten years | 101,008 | 101,008 | 100,891 | 105,209 | 105,209 | 106,170 |
| Due after ten years | 480,610 | 480,610 | 459,654 | 501,515 | 501,515 | 440,555 |
| | 5,365,850 | 5,365,850 | 5,351,641 | 4,291,783 | 4,291,783 | 4,250,521 |
| MBS | 7,848,444 | 7,727,327 | 6,690,519 | 10,626,262 | 10,626,262 | 8,574,820 |
| Total | $13,214,294 | $13,093,177 | $12,042,160 | $14,918,045 | $14,918,045 | $12,825,341 |

The amortized cost of the Bank's MBS classified as held-to-maturity includes net discounts of $69.8 million and $343.5 million at June 30, 2009 and December 31, 2008, respectively. These balances included discounts related to recognized credit losses during the life of the security of $8.2 million and $94.3 million as of June 30, 2009 and December 31, 2008, respectively. This decrease was due to the transfer of certain other-than-temporarily impaired securities from held-to-maturity to available-for-sale at June 30, 2009 as well as the adoption of FSP 115-2 effective January 1, 2009.

*Interest Rate Payment Terms.* The following table details interest rate payment terms for held-to-maturity securities at June 30, 2009 and December 31, 2008.

| (in thousands) | June 30, 2009 | | December 31, 2008 |
|---|---|---|---|
| Amortized cost of held-to-maturity securities other than MBS: | | | |
| Fixed-rate | $ | 4,894,054 | $ 3,815,779 |
| Variable-rate | | 471,796 | 476,004 |
| | | 5,365,850 | 4,291,783 |
| Amortized cost of held-to-maturity MBS: | | | |
| Pass through securities: | | | |
| Fixed-rate | | 2,625,583 | 4,552,525 |
| Variable-rate | | 1,096,825 | 581,359 |
| Collateralized mortgage obligations: | | | |
| Fixed-rate | | 3,526,458 | 5,057,353 |
| Variable-rate | | 599,578 | 435,025 |
| | | 7,848,444 | 10,626,262 |
| Total held-to-maturity securities | $ | 13,214,294 | $ 14,918,045 |

*Note:* Certain MBS securities have a fixed-rate component for a specified period of time, then have a rate reset on a given date. When the rate is reset, the security is then considered variable-rate. Examples of this type of instrument would include securities supported by underlying 5/1, 7/1, and 10/1 hybrid adjustable-rate mortgages (ARMs). For purposes of the table above, these securities are reported as fixed-rate until the rate reset date is hit. At that point, the security is then considered to be variable-rate.

## Notes to Financial Statements *(unaudited)* **(continued)**

*Realized Gains and Losses.*  There were no sales of held-to-maturity securities and, therefore, no realized gains or losses on sales for the three and six months ended June 30, 2009 and 2008.

Changes in circumstances may cause the Bank to change its intent to hold a certain security to maturity without calling into question its intent to hold other debt securities to maturity in the future, as noted above in the Securities Transferred discussion. Thus, the sale or transfer of a held-to-maturity security due to certain changes in circumstances, such as evidence of significant deterioration in the issuer's creditworthiness or changes in regulatory requirements, is not considered to be inconsistent with its original classification. Other events that are isolated, nonrecurring, and unusual for the Bank that could not have been reasonably anticipated may cause the Bank to sell or transfer a held-to-maturity security without necessarily calling into question its intent to hold other debt securities to maturity.

## Note 6 – Loans to Members

*Redemption Terms.*  At June 30, 2009, the Bank had loans to members outstanding including AHP loans at interest rates ranging from 0% to 8.56% as summarized below. AHP subsidized loans have interest rates ranging between 0% and 6.50%.

| | June 30, 2009 | | December 31, 2008 | |
| | | Weighted | | Weighted |
| (dollars in thousands) | | Average | | Average |
| Year of Contractual Maturity | Amount | Interest Rate | Amount | Interest Rate |
|---|---|---|---|---|
| Due in 1 year or less | $  15,536,721 | 2.84% | $  22,032,873 | 2.46% |
| Due after 1 year through 2 years | 10,721,859 | 4.05% | 12,337,582 | 4.47% |
| Due after 2 years through 3 years | 3,138,995 | 3.44% | 5,504,010 | 3.64% |
| Due after 3 years through 4 years | 4,388,132 | 4.04% | 4,916,316 | 3.68% |
| Due after 4 years through 5 years | 1,219,333 | 4.48% | 4,099,048 | 3.79% |
| Due after 5 years through 6 years | 2,233,799 | 5.34% | 1,550,681 | 5.00% |
| Thereafter | 6,893,375 | 5.17% | 9,124,890 | 5.22% |
| Total par value | 44,132,214 | 3.83% | 59,565,400 | 3.66% |
| Discount on AHP loans to members | (1,003) | | (1,097) | |
| Deferred prepayment fees | (70) | | (102) | |
| SFAS 133 hedging adjustments | 1,668,470 | | 2,589,240 | |
| Total book value | $  45,799,611 | | $  62,153,441 | |

Index amortizing loans require repayment according to predetermined amortization schedules linked to the level of various indices. Usually, as market interest rates rise (fall), the maturity of an index amortizing loan to member extends (contracts).

The Bank offers loans to members that may be prepaid on pertinent dates (call dates) without incurring prepayment or termination fees (returnable loans). Other loans to members may only be prepaid by paying a fee (prepayment fee) to the Bank that makes the Bank financially indifferent to the prepayment of the loan. At June 30, 2009 and December 31, 2008, the Bank had returnable loans of $1.7 billion and $3.6 billion, respectively. The

92

## Notes to Financial Statements (*unaudited*) (continued)

following table summarizes loans to members by year of contractual maturity or next call date for returnable loans to members.

| (in thousands)<br>Year of Contractual Maturity or Next Call Date | June 30,<br>2009 | December 31,<br>2008 |
|---|---|---|
| Due in 1 year or less | $17,202,721 | $25,607,873 |
| Due after 1 year through 2 years | 10,571,859 | 12,147,582 |
| Due after 2 years through 3 years | 3,138,995 | 5,349,010 |
| Due after 3 years through 4 years | 4,006,132 | 4,514,316 |
| Due after 4 years through 5 years | 1,201,333 | 3,224,048 |
| Due after 5 years through 6 years | 1,981,799 | 1,457,681 |
| Thereafter | 6,029,375 | 7,264,890 |
| Total par value | $44,132,214 | $59,565,400 |

The Bank also offers convertible loans. With a convertible loan, the Bank purchases an option from the member that allows the Bank to convert the interest rate from fixed to floating by terminating the fixed loan, which the Bank normally would exercise when interest rates increase, and offering a floating-rate loan. At June 30, 2009 and December 31, 2008, the Bank had convertible loans outstanding of $7.2 billion and $7.4 billion, respectively. The following table summarizes loans to members by year of contractual maturity or next convertible date for convertible loans.

| (in thousands)<br>Year of Contractual Maturity or Next Convertible Date | June 30,<br>2009 | December 31,<br>2008 |
|---|---|---|
| Due in 1 year or less | $21,508,721 | $28,169,793 |
| Due after 1 year through 2 years | 9,641,209 | 11,368,362 |
| Due after 2 years through 3 years | 2,715,895 | 5,084,560 |
| Due after 3 years through 4 years | 3,241,132 | 4,156,316 |
| Due after 4 years through 5 years | 1,005,083 | 3,424,048 |
| Due after 5 years through 6 years | 2,021,799 | 1,289,431 |
| Thereafter | 3,998,375 | 6,072,890 |
| Total par value | $44,132,214 | $59,565,400 |

***Credit Risk.*** While the Bank has never experienced a credit loss on a loan to a member, the expansion of collateral for CFIs provides the potential for additional credit risk for the Bank. Deterioration in real estate values in various markets, with a resulting decline in the value of certain mortgage loans and mortgage securities pledged as collateral, also pose the potential for additional risk. The management of the Bank has policies and procedures in place to manage this credit risk. Accordingly, the Bank has not provided any allowances for credit losses on loans to members.

The Bank's potential credit risk from loans to members is concentrated in commercial banks and thrift institutions. As of June 30, 2009, the Bank had loans to members of $28.2 billion outstanding to the five largest borrowers, which represented 63.9% of total loans outstanding. Of these five, three each had outstanding loan balances in excess of 10% of the total portfolio at June 30, 2009. As of December 31, 2008, the Bank had loans to members of $37.6 billion outstanding to the five largest borrowers, which represented 63.2% of total loans outstanding. Of these five, three each had outstanding loan balances in excess of 10% of the total portfolio at December 31, 2008. The Bank held sufficient collateral to secure loans to members and the Bank does not expect to incur any losses on these loans. See Note 11 for further information on transactions with related parties.

## Notes to Financial Statements *(unaudited)* (continued)

***Interest Rate Payment Terms.***  The following table details interest rate payment terms for loans to members.

| (In thousands) | June 30, 2009 | | December 31, 2008 | |
|---|---|---|---|---|
| Fixed rate – overnight | $ | **190,625** | $ | 2,269,643 |
| Fixed rate – term: | | | | |
| Due in 1 year or less | | **15,046,869** | | 19,435,466 |
| Thereafter | | **25,049,625** | | 30,627,579 |
| Variable-rate: | | | | |
| Due in 1 year or less | | **299,227** | | 327,763 |
| Thereafter | | **3,545,868** | | 6,904,949 |
| Total par value | $ | **44,132,214** | $ | 59,565,400 |

## Note 7 – Mortgage Loans Held for Portfolio

Under the MPF Program, the Bank invests in mortgage loans which it purchases from its participating members. The total loans represent held-for-portfolio loans under the MPF Program whereby the Bank's members originate, service, and credit enhance residential mortgage loans that are then sold to the Bank. In the past, the Bank has sold participation interests in some of its MPF Program loans to other FHLBanks and purchased participation interests from other FHLBanks. See Note 11 for further information regarding transactions with related parties.

The following table presents information as of June 30, 2009 and December 31, 2008 on mortgage loans held for portfolio.

| (in thousands) | June 30, 2009 | | December 31, 2008 | |
|---|---|---|---|---|
| Fixed medium-term single-family mortgages [1] | $ | **975,874** | $ | 1,067,503 |
| Fixed long-term single-family mortgages [1] | | **4,590,503** | | 5,049,825 |
| Total par value | | **5,566,377** | $ | 6,117,328 |
| Premiums | | **53,031** | | 60,596 |
| Discounts | | **(20,560 )** | | (22,375 ) |
| SFAS 133 hedging adjustments | | **14,970** | | 14,018 |
| Total mortgage loans held for portfolio | $ | **5,613,818** | $ | 6,169,567 |

*Note:*

[1] Medium-term is defined as a term of 15 years or less. Long-term is defined as greater than 15 years.

## Notes to Financial Statements *(unaudited)* (continued)

The following tables detail the par value of mortgage loans held for portfolio outstanding categorized by type and by maturity.

| (in thousands) | June 30, 2009 | | December 31, 2008 |
|---|---|---|---|
| Government-guaranteed/insured loans | $ | **421,497** | $ 449,416 |
| Conventional loans | | **5,144,880** | 5,667,912 |
| Total par value | $ | **5,566,377** | $ 6,117,328 |
| Year of maturity | | | |
| Due within one year | $ | **5** | $ 21 |
| Due after one year through five years | | **5,183** | 4,313 |
| Due after five years | | **5,561,189** | 6,112,994 |
| Total par value | $ | **5,566,377** | $ 6,117,328 |

## Note 8 – Derivatives and Hedging Activities

***Nature of Business Activity.*** The Bank is exposed to interest rate risk primarily from the effect of interest rate changes on its interest-earning assets and liabilities.

Consistent with Finance Agency policy, the Bank enters into derivatives to manage the interest-rate risk exposures inherent in otherwise unhedged assets and funding positions, to achieve the Bank's risk management objectives, and to act as an intermediary between its members and counterparties. Finance Agency regulation and the Bank's risk management policy prohibit trading in or the speculative use of these derivative instruments and limit credit risk arising from these instruments. The Bank may only use derivatives to reduce funding costs for consolidated obligations and to manage interest-rate risk, mortgage prepayment risk and foreign currency risk positions. Interest-rate exchange agreements (also referred to as derivatives) are an integral part of the Bank's financial management strategy.

The most common ways in which the Bank uses derivatives are to:

- reduce the interest-rate sensitivity and repricing gaps of assets, liabilities, and interest-rate exchange agreements;

- reduce funding costs by combining a derivative with a consolidated obligation as the cost of a combined funding structure can be lower than the cost of a comparable consolidated obligation bond;

- preserve a favorable interest-rate spread between the yield of an asset (e.g., a loan to member) and the cost of the related liability (e.g., the consolidated obligation bond used to fund the loan to member). Without the use of derivatives, this interest-rate spread could be reduced or eliminated when a change in the interest rate on the advance does not match a change in the interest rate on the bond;

- mitigate the adverse earnings effects of the shortening or extension of certain assets (e.g., loans to members or mortgage assets) and liabilities;

- protect the value of existing asset or liability positions or of anticipated transactions;

- manage embedded options in assets and liabilities; and

- as part of its overall asset/liability management.

***Types of Interest-Rate Exchange Agreements.*** The Bank's risk management policy establishes guidelines for its use of interest-rate exchange agreements. The Bank can use the following instruments to manage exposure to

95

## Notes to Financial Statements *(unaudited)* (continued)

interest rate risks inherent in the normal course of the Bank's business lending, investment, and funding activities and to reduce funding costs:

- interest-rate swaps;
- interest-rate swaptions; and
- interest-rate caps or floors.

The goal of the Bank's interest rate risk management strategy is not to eliminate interest rate risk, but to manage it within appropriate limits. One strategy the Bank uses to manage interest rate risk is to acquire and maintain a portfolio of assets and liabilities which, together with their associated interest rate derivatives limit the Bank's risk exposure. The Bank may use interest rate derivatives to adjust the effective maturity, repricing frequency, or option characteristics of financial instruments (such as loans to members, MPF loans, MBS, and consolidated obligations) to achieve risk management objectives.

*Interest-Rate Swaps.* An interest-rate swap is an agreement between two entities to exchange cash flows in the future. The agreement sets the dates on which the cash flows will be paid and the manner in which the cash flows will be calculated. One of the simplest forms of an interest-rate swap involves the promise by one party to pay cash flows equivalent to the interest on a notional principal amount at a predetermined fixed rate for a given period of time. In return for this promise, this party receives cash flows equivalent to the interest on the same notional principal amount at a variable-rate index for the same period of time. The variable rate received by the Bank in most interest-rate exchange agreements is LIBOR.

*Swaptions.* A swaption is an option on a swap that gives the buyer the right to enter into a specified interest-rate swap at a certain time in the future. When used as a hedge, a swaption can protect the Bank when it is planning to lend or borrow funds in the future against future interest rate changes. From time to time, the Bank purchases both payer swaptions and receiver swaptions. A payer swaption is the option to make fixed interest payments at a later date and a receiver swaption is the option to receive fixed interest payments at a later date.

*Interest-Rate Caps and Floors.* In a cap agreement, a cash flow is generated if the price or rate of an underlying variable rises above a certain threshold (or "cap") price. In a floor agreement, a cash flow is generated if the price or rate of an underlying variable falls below a certain threshold (or "floor") price. Caps may be used in conjunction with liabilities and floors may be used in conjunction with assets. Caps and floors are designed as protection against the interest rate on a variable-rate asset or liability rising above or falling below a certain level.

***Application of Interest-Rate Exchange Agreements.*** *General.* The Bank uses these derivatives to adjust the effective maturity, repricing frequency or option characteristics of financial instruments in order to achieve risk management and funding objectives. Derivative financial instruments are used by the Bank in three ways:

- by designating them as a fair-value or cash-flow hedge of an associated financial instrument, a firm commitment or an anticipated transaction;
- in asset/liability management (i.e., non-SFAS 133 "economic" hedges); or
- by acting as an intermediary.

The Bank reevaluates its hedging strategies from time to time and may change the hedging techniques it uses or adopt new strategies.

Bank management uses derivatives when they are considered to be the most cost-effective alternative to achieve the Bank's financial and risk management objectives. Accordingly, the Bank may enter into derivatives that do not necessarily qualify for hedge accounting (economic hedges).

***Types of Assets and Liabilities Hedged.*** The Bank documents at inception all relationships between derivatives designated as hedging instruments and hedged items, its risk management objectives and strategies for undertaking various hedge transactions, and its method of assessing effectiveness. This process includes linking all derivatives that are designated as fair value or cash flow hedges to (1) assets and liabilities on the Statement of

## Notes to Financial Statements *(unaudited)* (continued)

Condition, (2) firm commitments, or (3) forecasted transactions. The Bank also formally assesses (both at the hedge's inception and at least quarterly) whether the derivatives that it uses in hedging transactions have been effective in offsetting changes in the fair value or cash flows of hedged items and whether those derivatives may be expected to remain effective in future periods. The Bank uses regression analyses to assess the effectiveness of its hedges.

*Consolidated Obligations.*  While consolidated obligations are the joint and several obligations of the FHLBanks, each FHLBank has consolidated obligations for which it is the primary obligor. To date, no FHLBank has ever had to assume or pay the consolidated obligations of another FHLBank. The Bank enters into derivatives to hedge the interest rate risk associated with its specific debt issuances. The Bank manages the risk arising from changing market prices and volatility of a consolidated obligation by matching the cash inflow on the interest-rate exchange agreement with the cash outflow on the consolidated obligation.

For instance, in a typical transaction, fixed-rate consolidated obligations are issued by the Bank, and the Bank simultaneously enters into a matching derivative in which the counterparty pays fixed cash flows designed to mirror, in timing and amount, the cash outflows that the Bank pays on the consolidated obligation. The Bank pays a variable cash flow that closely matches the interest payments it receives on short-term or variable-rate loans to members (typically one- or three-month LIBOR). The fixed-rate consolidated obligation and matching derivative are treated as fair-value hedges under SFAS 133. The Bank may issue variable-rate consolidated obligation — bonds indexed to LIBOR, the U.S. Prime rate, or Federal funds rate and simultaneously execute interest-rate swaps to hedge the basis risk of the variable-rate debt.

This strategy of issuing bonds while simultaneously entering into interest rate exchange agreements enables the Bank to offer a wider range of attractively priced loans to members and may allow the Bank to reduce its funding costs. The continued attractiveness of such debt depends on yield relationships between the bond and interest rate exchange markets. If conditions in these markets change, the Bank may alter the types or terms of the bonds that it issues. By acting in both the capital and the swap markets, the Bank can generally raise funds at lower costs than through the issuance of simple fixed- or variable-rate consolidated obligations in the capital markets alone.

*Loans to Members.*  The Bank offers a wide array of loans to members structures to meet members' funding needs. These loans to members may have maturities up to 30 years with variable or fixed rates and may include early termination features or options. The Bank may use derivatives to adjust the repricing and/or options characteristics of loans to members in order to more closely match the characteristics of the funding liabilities. In general, whenever a member executes a fixed-rate loan to member or a variable-rate loan to member with embedded options, the Bank will simultaneously execute a derivative with terms that offset the terms and embedded options, if any, in the loan to member. For example, the Bank may hedge a fixed-rate loan to member with an interest-rate swap where the Bank pays a fixed-rate coupon and receives a variable-rate coupon, effectively converting the fixed-rate loans to members to variable-rate. This type of hedge is treated as a fair-value hedge under SFAS 133.

When issuing convertible loans to members, the Bank may purchase put options from a member that allow the FHLBank to convert the loan from a fixed rate to a variable rate if interest rates increase. A convertible loan to member carries an interest rate lower than a comparable-maturity fixed-rate loan to member that does not have the conversion feature. With a putable loan to member, the Bank effectively purchases a put option from the member that allows the Bank to put or extinguish the fixed-rate loan to member, which the Bank normally would exercise when interest rates increase, and the borrower may elect to enter into a new loan. The Bank may hedge these loans to members by entering into a cancelable interest-rate exchange agreement.

*Mortgage Loans.*  The Bank invests in fixed-rate mortgage loans. The prepayment options embedded in mortgage loans can result in extensions or contractions in the expected repayment of these investments, depending on changes in estimated prepayment speeds. The Bank manages the interest-rate and prepayment risks associated with mortgages through a combination of debt issuance and derivatives. The Bank issues both callable and noncallable debt and prepayment linked consolidated obligations to achieve cash flow patterns and liability durations similar to those expected on the mortgage loans.

## Notes to Financial Statements *(unaudited)* (continued)

The Bank may also purchase interest-rate caps and floors, swaptions, and callable swaps to minimize the prepayment risk embedded in the mortgage loans. Although these derivatives are valid economic hedges against the prepayment risk of the loans, they are not specifically linked to individual loans and, therefore, do not receive either fair-value or cash-flow hedge accounting. The derivatives are marked-to-market through earnings.

*Firm Commitment Strategies.* In accordance with SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities* (SFAS 149), certain mortgage purchase commitments are considered derivatives. When the mortgage purchase commitment derivative settles, the current market value of the commitment is included with the basis of the mortgage loan and amortized accordingly.

The Bank may also hedge a firm commitment for a forward starting loan to member through the use of an interest-rate swap. In this case, the swap will function as the hedging instrument for both the firm commitment and the subsequent loan to member. Because the firm commitment ends at the same exact time that the loan to member is settled, the basis movement associated with the firm commitment is effectively rolled into the basis of the advance.

*Investments.* The Bank primarily invests in U.S. agency obligations, mortgage-backed securities, and the taxable portion of state or local housing finance agency obligations, which may be classified as held-to-maturity, available-for-sale or trading securities. The interest-rate and prepayment risks associated with these investment securities is managed through a combination of debt issuance and from time to time, derivatives. The Bank may manage the prepayment and interest rate risks by funding investment securities with consolidated obligations that have call features or by hedging the prepayment risk with caps or floors, callable swaps or swaptions. The Bank may manage duration risk by funding investment securities with consolidated obligations that contain call features. The Bank may also manage the risk arising from changing market prices and volatility of investment securities by matching the cash outflow on the interest-rate exchange agreements with the cash inflow on the investment securities. The derivatives held by the Bank that may be associated with trading securities, carried at fair value, and held-to-maturity securities, carried at amortized cost, are designated as economic hedges. The changes in fair values of these derivatives are recorded in current-period earnings.

*Anticipated Debt Issuance.* The Bank may enter into interest-rate swaps for the anticipated issuance of fixed-rate consolidated obligations — bonds to lock in the cost of funding. The interest-rate swap is terminated upon issuance of the fixed-rate consolidated obligations — bond, with the realized gain or loss on the interest-rate swap recorded in other comprehensive income (loss). Realized gains and losses reported in accumulated other comprehensive income (loss) are recognized as earnings in the periods in which earnings are affected by the cash flows of the fixed-rate consolidated obligations — bonds.

*Intermediation.* To meet the asset/liability management needs of their members, the Bank may enter into interest-rate exchange agreements with their members and offsetting interest-rate exchange agreements with other counterparties. Under these agreements, the Bank acts as an intermediary between members and other counterparties. This intermediation grants smaller members indirect access to the derivatives market. The derivatives used in intermediary activities do not receive SFAS 133 hedge accounting treatment and are separately marked-to-market through earnings. The net result of the accounting for these derivatives does not significantly affect the operating results of the Bank.

***Managing Credit Risk on Derivatives.*** The Bank is subject to credit risk due to nonperformance by counterparties to the derivative agreements. The degree of counterparty risk depends on the extent to which master netting arrangements are included in such contracts to mitigate the risk. The Bank manages counterparty credit risk through credit analysis, collateral requirements and adherence to the requirements set forth in FHLBank policies and regulations. The recent deterioration in the credit/financial markets has heightened the Bank's awareness to derivative default risk. In response, the Bank has created a task force which has worked toward lessening this risk by (1) attempting to negotiate revised ISDA Master Agreement terms, when necessary, that should help to mitigate losses in the event of a counterparty default and (2) verifying that the derivative counterparties are in full compliance with existing ISDA requirements through enhanced monitoring efforts. The Bank's ISDA Master

98

## Notes to Financial Statements *(unaudited)* (continued)

Agreements typically require segregation of the Bank's collateral posted with the counterparty and do not permit rehypothecation.

The contractual or notional amount of derivatives reflects the involvement of the Bank in the various classes of financial instruments. The notional amount of derivatives does not measure the credit risk exposure of the Bank, and the maximum credit exposure of the Bank is substantially less than the notional amount. The Bank requires collateral agreements on all derivatives that establish collateral delivery thresholds. The maximum credit risk is defined as the estimated cost of replacing interest-rate swaps, forward interest-rate agreements, mandatory delivery contracts for mortgage loans, and purchased caps and floors that have a net positive market value, assuming the counterparty defaults and the related collateral, if any, is of no value to the Bank.

At June 30, 2009 and December 31, 2008, the Banks' maximum credit risk, as defined above, was approximately $56.6 million and $38.7 million, respectively. These totals include $7.9 million and $10.2 million of net accrued interest receivable, respectively. In determining maximum credit risk, the Bank considers accrued interest receivables and payables, and the legal right to offset derivative assets and liabilities by counterparty. The Bank held cash of $43.5 million and $9.8 million as collateral at June 30, 2009 and December 31, 2008, respectively. Additionally, collateral related to derivatives with member institutions includes collateral assigned to the Bank, as evidenced by a written security agreement and held by the member institution for the benefit of the Bank.

Certain of the Bank's derivative instruments contain provisions that require the Bank to post additional collateral with its counterparties if there is deterioration in its credit rating. If the Bank's credit rating is lowered by a major credit rating agency, the Bank would be required to deliver additional collateral on derivative instruments in net liability positions. The aggregate fair value of all derivative instruments with credit-risk-related contingent features that were in a net liability position at June 30, 2009 was $1.3 billion for which the Bank has posted cash and securities collateral of approximately $0.9 billion in the normal course of business. If the Bank's credit ratings had been lowered one notch (i.e., from its current rating to the next lower rating), the Bank would have been required to deliver up to an additional $314.6 million of collateral to its derivative counterparties at June 30, 2009. However, none of the Bank's credit ratings have changed during the previous 12 months.

The Bank transacts most of its derivatives with large banks and major broker-dealers. Some of these banks and broker-dealers or their affiliates buy, sell, and distribute consolidated obligations. Note 13 discusses assets pledged by the Bank to these counterparties. The Bank is not a derivative dealer and thus does not trade derivatives for short-term profit.

***Financial Statement Effect and Additional Financial Information.*** *Derivative Notional Amounts.*  The notional amount of derivatives serves as a factor in determining periodic interest payments or cash flows received and paid.

The notional amount of derivatives represents neither the actual amounts exchanged nor the overall exposure of the Bank to credit and market risk. The overall amount that could potentially be subject to credit loss is much smaller. Notional values are not meaningful measures of the risks associated with derivatives. The risks of derivatives can be measured meaningfully on a portfolio basis. This measurement must take into account the derivatives, the item being hedged and any offsets between the two.

## Notes to Financial Statements *(unaudited)* (continued)

The following tables summarize the notional and fair value of derivative instruments as of June 30, 2009 and December 31, 2008. For purposes of this disclosure, the derivative values include fair value of derivatives and related accrued interest.

### Fair Values of Derivative Instruments

| (in thousands) | June 30, 2009 | | |
| --- | --- | --- | --- |
| | Notional Amount of Derivatives | Derivative Assets | Derivative Liabilities |
| **Derivatives designated as hedging instruments under SFAS 133** | | | |
| Interest rate swaps | $51,869,554 | $ 613,395 | $ 1,835,238 |
| Interest rate forward settlement agreements | 10,000 | - | 190 |
| **Total derivatives in SFAS 133 hedging relationships** | **$51,879,554** | **$ 613,395** | **$ 1,835,428** |
| | | | |
| **Derivatives not designated as hedging instruments under SFAS 133** | | | |
| Interest rate swaps | $ 540,400 | $ 74 | 2,941 |
| Interest rate caps or floors | 309,250 | 2,345 | - |
| Mortgage delivery commitments | 13,254 | 181 | 10 |
| **Total derivatives not designated as hedging instruments under SFAS 133** | **$ 862,904** | **$ 2,600** | **$ 2,951** |
| | | | |
| **Total derivatives before netting and collateral adjustments** | **$52,742,458** | **$ 615,995** | **$ 1,838,379** |
| | | | |
| Netting adjustments | | (559,384 ) | (559,384 ) |
| Cash collateral and related accrued interest | | (43,467 ) | (620,997 ) |
| **Total collateral and netting adjustments** [1] | | **(602,851 )** | **(1,180,381 )** |
| | | | |
| **Derivative assets and derivative liabilities as reported on the Statement of Condition** | | **$ 13,144** | **$ 657,998** |

100

## Notes to Financial Statements *(unaudited)* (continued)

|  | December 31, 2008 | | |
|---|---|---|---|
| (in thousands) | Notional Amount of Derivatives | Derivative Assets | Derivative Liabilities |
| Derivatives designated as hedging instruments under SFAS 133 | | | |
| Interest rate forward settlement agreements | $57,813,315 | $ 907,940 | $ 2,655,150 |
| Total derivatives in SFAS 133 hedging relationships | $57,813,315 | $ 907,940 | $ 2,655,150 |
| | | | |
| Derivatives not designated as hedging instruments under SFAS 133 | | | |
| Interest rate swaps | $    553,836 | $        155 | $        5,704 |
| Interest rate caps or floors | 225,000 | 3,379 | - |
| Mortgage delivery commitments | 31,206 | 427 | 1 |
| Total derivatives not designated as hedging instruments under SFAS 133 | $    810,042 | $    3,961 | $    5,705 |
| | | | |
| Total derivatives before netting and collateral adjustments | $58,623,357 | $ 911,901 | $ 2,660,855 |
| | | | |
| Netting adjustments | | (873,183  ) | (873,183  ) |
| Cash collateral and related accrued interest | | (9,830  ) | (1,432,658  ) |
| Total collateral and netting adjustments(1) | | $(883,013  ) | $(2,305,841  ) |
| | | | |
| Derivative assets and derivative liabilities as reported on the Statement of Condition | | $   28,888 | $   355,014 |

*Note:*

(1) Amounts represent the effect of legally enforceable master netting agreements that allow the Bank to settle positive and negative positions and also cash collateral held or placed with the same counterparties.

## Notes to Financial Statements *(unaudited)* (continued)

The following table presents the components of net gains (losses) on derivatives and hedging activities as presented in the statement of income.

| (in thousands) | For the Three Months Ended June 30, 2009 Gain (Loss) | | For the Three Months Ended June 30, 2008 Gain (Loss) | | For the Six Months Ended June 30, 2009 Gain (Loss) | | For the Six Months Ended June 30, 2008 Gain (Loss) | |
|---|---|---|---|---|---|---|---|---|
| Derivatives and hedged items in SFAS 133 fair value hedging relationships | | | | | | | | |
| Interest rate swaps | $ | 12,117 | $ | (557) | $ | 10,321 | $ | 5,398 |
| Total net gain (loss) related to fair value hedge ineffectiveness | $ | 12,117 | $ | (557) | $ | 10,321 | $ | 5,398 |
| Derivatives not designated as hedging instruments under SFAS 133 | | | | | | | | |
| Economic hedges | | | | | | | | |
| Interest rate swaps | $ | 1,305 | $ | 1,627 | $ | 2,750 | $ | 273 |
| Interest rate swaptions | | - | | (96) | | - | | (108) |
| Interest rate caps or floors | | (1,598) | | (417) | | (2,939) | | (697) |
| Net interest settlements | | (797) | | (666) | | (2,294) | | (896) |
| Mortgage delivery commitments | | 1,162 | | (567) | | 3,014 | | (473) |
| Intermediary transactions | | | | | | | | |
| Interest rate swaps | | - | | - | | - | | (1) |
| Other | | 238 | | (13) | | 373 | | 159 |
| Total net gain (loss) related to derivatives not designated as hedging instruments under SFAS 133 | $ | 310 | $ | (132) | $ | 904 | $ | (1,743) |
| Net gains (losses) on derivatives and hedging activities | $ | 12,427 | $ | (689) | $ | 11,225 | $ | 3,655 |

102

## Notes to Financial Statements *(unaudited)* (continued)

The following table presents, by type of hedged item, the gains (losses) on derivatives and the related hedged items in fair value hedging relationships and the impact of those derivatives on the Bank's net interest income for the three and six months ended June 30, 2009.

| (in thousands) | Gain/(Loss) on Derivative | Gain/(Loss) on Hedged Item | Net Fair Value Hedge Ineffectiveness | Effect of Derivatives on Net Interest Income[1] |
|---|---|---|---|---|
| **For the three months ended June 30, 2009:** | | | | |
| Hedged item type: | | | | |
| Loans to members | $576,273 | $(566,288 ) | $9,985 | $(281,196 ) |
| Consolidated obligations - bonds | (111,558 ) | 113,690 | 2,132 | 96,789 |
| Total | $464,715 | $(452,598 ) | $12,117 | $(184,407 ) |
| **For the six months ended June 30, 2009:** | | | | |
| Hedged item type: | | | | |
| Loans to members | $900,174 | $(909,372 ) | $(9,198 ) | $(532,763 ) |
| Consolidated obligations - bonds | (181,932 ) | 201,451 | 19,519 | 204,607 |
| Total | $718,242 | $(707,921 ) | $10,321 | $(328,156 ) |

*Note:*

[1] Represents the net interest settlements on derivatives in fair value hedge relationships presented in the interest income/expense line item of the respective hedged item.

The following table presents, by type of hedged item, the gains (losses) on derivatives and the related hedged items in fair value hedging relationships and the impact of those derivatives on the Bank's net interest income for the three and six months ended June 30, 2008.

| (in thousands) | Gain/(Loss) on Derivative | Gain/(Loss) on Hedged Item | Net Fair Value Hedge Ineffectiveness | Effect of Derivatives on Net Interest Income[1] |
|---|---|---|---|---|
| For the three months ended June 30, 2008: | | | | |
| Hedged item type: | | | | |
| Loans to members | $ 1,102,396 | $ (1,106,963) | $ (4,567 ) | $ (187,384 ) |
| Consolidated obligations - bonds | (405,775 ) | 409,785 | 4,010 | 108,419 |
| Total | $ 696,621 | $ (697,178) | $ (557 ) | $ (78,965 ) |
| For the six months ended June 30, 2008: | | | | |
| Hedged item type: | | | | |
| Loans to members | $ 40,846 | $ (45,147) | $ (4,301 ) | $ (238,749 ) |
| Consolidated obligations - bonds | (34,114 ) | 43,813 | 9,699 | 147,444 |
| Total | $ 6,732 | $ (1,334) | $ 5,398 | $ (91,305 ) |

*Note*:

[1] Represents the net interest settlements on derivatives in fair value hedge relationships presented in the interest income/expense line item of the respective hedged item.

The Bank had no active cash flow hedging relationships during the three or six months ended June 30, 2009 and 2008. The losses reclassified from accumulated other comprehensive loss into income for the effective portion of

## Notes to Financial Statements *(unaudited)* (continued)

the previously terminated cash flow hedges are presented in the tables below for the three and six months ended June 30, 2009 and 2008. This activity was reported in Interest Expense — Consolidated Obligation-Bonds in the Bank's Statement of Operations.

| (in thousands) | | Losses Reclassified from AOCI into Income |
|---|---|---|
| **For the three months ended June 30, 2009** | $ | **(579)** |
| **For the six months ended June 30, 2009** | | **(693)** |
| For the three months ended June 30, 2008 | $ | (144) |
| For the six months ended June 30, 2008 | | (1,799) |

As of June 30, 2009, the deferred net gains on derivative instruments accumulated in other comprehensive income (loss) expected to be reclassified to earnings during the next twelve months are not material.

## Note 9 – Consolidated Obligations

Detailed information regarding consolidated obligations including general terms and interest rate payment terms can be found in Note 15 to the audited financial statements in the Bank's 2008 Annual Report filed on Form 10-K.

The following table details interest rate payment terms for consolidated obligation bonds as of June 30, 2009 and December 31, 2008.

| (in thousands) | June 30, 2009 | December 31, 2008 |
|---|---|---|
| **Par value of consolidated bonds:** | | |
| Fixed-rate | **$39,646,227** | $43,003,621 |
| Step-up | **85,000** | 470,000 |
| Floating-rate | **13,730,000** | 16,615,000 |
| Zero coupon | **900,000** | 1,728,000 |
| Range bonds | **-** | 210,000 |
| Conversion bonds: | | |
|    Fixed to floating | **-** | 15,000 |
|    Floating to fixed | **15,000** | 25,000 |
| Total par value | **$54,376,227** | $62,066,621 |
|    Bond premiums | **26,250** | 36,142 |
|    Bond discounts | **(711,255)** | (1,312,533) |
|    SFAS 133 hedging adjustments | **399,277** | 608,457 |
| Total book value | **$54,090,499** | $61,398,687 |

## Notes to Financial Statements *(unaudited)* (continued)

*Maturity Terms.* The following is a summary of the Bank's participation in consolidated obligation bonds outstanding by year of contractual maturity as of June 30, 2009 and December 31, 2008.

| (dollars in thousands) Year of Contractual Maturity | June 30, 2009 Amount | Weighted Average Interest Rate | December 31, 2008 Amount | Weighted Average Interest Rate |
|---|---|---|---|---|
| Due in 1 year or less | $26,424,000 | 1.40% | $27,669,100 | 3.04% |
| Due after 1 year through 2 years | 7,767,000 | 2.70% | 6,663,000 | 3.97% |
| Due after 2 years through 3 years | 3,346,000 | 3.84% | 4,723,000 | 3.95% |
| Due after 3 years through 4 years | 3,641,000 | 4.62% | 4,415,000 | 4.84% |
| Due after 4 years through 5 years | 2,502,000 | 4.76% | 4,017,000 | 4.56% |
| Thereafter | 6,187,500 | 4.23% | 9,496,500 | 4.11% |
| Index amortizing notes | 4,508,727 | 4.99% | 5,083,021 | 4.98% |
| Total par value | $54,376,227 | 2.73% | $62,066,621 | 3.76% |

The following table presents the Bank's consolidated obligation bonds outstanding between noncallable and callable as of June 30, 2009 and December 31, 2008.

| (in thousands) | June 30, 2009 | December 31, 2008 |
|---|---|---|
| **Par value of consolidated bonds:** | | |
| Noncallable | $ 46,520,727 | $ 47,755,121 |
| Callable | 7,855,500 | 14,311,500 |
| Total par value | $ 54,376,227 | $ 62,066,621 |

The following table summarizes consolidated obligation bonds outstanding by year of contractual maturity or next call date as of June 30, 2009 and December 31, 2008.

| (in thousands) Year of Contractual Maturity or Next Call Date | June 30, 2009 | December 31, 2008 |
|---|---|---|
| Due in 1 year or less | $ 32,068,000 | $ 37,683,100 |
| Due after 1 year through 2 years | 9,531,000 | 9,610,000 |
| Due after 2 years through 3 years | 2,568,000 | 3,424,000 |
| Due after 3 years through 4 years | 1,832,000 | 1,865,000 |
| Due after 4 years through 5 years | 1,661,000 | 1,865,000 |
| Thereafter | 2,207,500 | 2,536,500 |
| Index amortizing notes | 4,508,727 | 5,083,021 |
| Total par value | $ 54,376,227 | $ 62,066,621 |

*Consolidated Discount Notes.* Consolidated discount notes are issued to raise short-term funds. Discount notes are consolidated obligations with original maturities up to 365 days. These notes are issued at less than their face amount and redeemed at par value when they mature. The following table details the Bank's participation in consolidated discount notes, all of which are due within one year, as of June 30, 2009 and December 31, 2008.

| (dollars in thousands) | June 30, 2009 | December 31, 2008 |
|---|---|---|
| Book value | $ 15,538,119 | $ 22,864,284 |
| Par value | 15,540,097 | 22,883,813 |
| Weighted average interest rate | 0.17% | 0.90% |

See Note 13 for discussion regarding the Bank's Lending Agreement with the U.S. Treasury.

105

## Notes to Financial Statements *(unaudited)* (continued)

### Note 10 – Capital

The following table demonstrates the Bank's compliance with its regulatory capital requirements at June 30, 2009 and December 31, 2008.

| (dollars in thousands) | June 30, 2009 | | December 31, 2008 | |
| --- | --- | --- | --- | --- |
| | Required | Actual | Required | Actual |
| Regulatory capital requirements: | | | | |
| Risk-based capital | $3,574,059 | $ 4,450,187 | $3,923,143 | $4,156,856 |
| Total capital-to-asset ratio | 4.0% | 5.8% | 4.0% | 4.6% |
| Total regulatory capital | 3,056,064 | 4,450,938 | $3,632,237 | $4,170,882 |
| Leverage ratio | 5.0% | 8.7% | 5.0% | 6.9% |
| Leverage capital | 3,820,080 | 6,676,032 | $4,540,296 | $6,249,310 |

On August 3, 2009, the Bank received final notification that it was considered adequately capitalized for the quarter ended March 31, 2009; however, the Finance Agency has raised concerns regarding the ratio of the Bank's level of accumulated other comprehensive loss to retained earnings and the ratio of the Bank's market value of equity to the par value of capital stock. As of the date of this filing, the Bank has not received a notice from the Finance Agency regarding its capital classification for the quarter ended June 30, 2009. On August 4, 2009, the Finance Agency issued its final Prompt Corrective Action Regulation (PCA Regulation) incorporating the terms of the Interim Final Regulation issued on January 30, 2009. See the "Legislative and Regulatory Developments" discussion in Item 2. Management's Discussion and Analysis in this report filed on Form 10-Q for additional Information.

*Capital Concentrations.* The following table presents member holdings of 10% or more of the Bank's total capital stock including mandatorily redeemable capital stock outstanding as of June 30, 2009 and December 31, 2008.

| (dollars in thousands) | June 30, 2009 | | December 31, 2008 | |
| --- | --- | --- | --- | --- |
| | | Percent of | | Percent of |
| Member | Capital Stock | Total | Capital Stock | Total |
| Sovereign Bank, Reading PA | $ 644,438 | 16.1 | $ 644,438 | 16.2 |
| Ally Bank, Midvale UT[1] | 496,090 | 12.4 | 496,090 | 12.4 |
| ING Bank, FSB, Wilmington, DE | 478,637 | 11.9 | 478,637 | 12.0 |
| PNC Bank, N.A. | 442,417 | 11.0 | 442,417 | 11.1 |

*Note*:

[1] Formerly known as GMAC Bank. For Bank membership purposes, principal place of business is Horsham, PA.

The Bank suspended excess capital stock repurchases in December 2008; therefore, the capital stock balances for the members presented above did not decline from December 31, 2008 to June 30, 2009. In addition, the members noted above did not increase their borrowings with the Bank during the first six months of 2009, and therefore, additional stock purchases were not required. Members are currently required to purchase Bank stock with a value of 4.75% of member loans outstanding and 0.75% of unused borrowing capacity. Effective May 1, 2009, there was an increase in the stock purchase requirement percentage for AMA activity from 0.0% to 4.0% on a prospective basis only.

At June 30, 2009 and December 31, 2008, the Bank had $8.2 million and $4.7 million in capital stock subject to mandatory redemption with payment subject to a five-year waiting period and the Bank meeting its minimum regulatory capital requirements. For the six months ended June 30, 2009, the Bank did not pay any dividends on mandatorily redeemable capital stock. For the three and six months ended June 30, 2008, respectively, dividends on mandatorily redeemable capital stock in the amount of $37 thousand and $86 thousand were recorded as interest expense.

### Notes to Financial Statements *(unaudited)* (continued)

As of June 30, 2009, the total mandatorily redeemable capital stock reflected combined balances for six institutions. One institution was in receivership and one had notified the Bank of its intention to voluntarily redeem its capital stock and withdraw from membership. In addition, one institution's charter was dissolved, and it was merged into a nonmember. One institution was taken over by the FDIC, and its charter was dissolved. The remaining two institutions were merged out of district and are considered nonmembers. These redemptions were not complete as of June 30, 2009. The following table shows the amount of mandatorily redeemable capital stock by contractual year of redemption.

| (in thousands) | June 30, 2009 | December 31, 2008 |
|---|---|---|
| Due in 1 year or less | $ 3,450 | $ 667 |
| Due after 1 year through 2 years | 10 | 3,899 |
| Due after 2 years through 3 years | 5 | 11 |
| Due after 3 years through 4 years | 2 | 6 |
| Due after 4 years through 5 years | 4,729 | 94 |
| Thereafter | 3 | 7 |
| Total | $ 8,199 | $ 4,684 |

The year of redemption in the table above is the later of the end of the five-year redemption period or the maturity date of the activity the stock is related to, if the capital stock represents the activity-based stock purchase requirement of a nonmember (former member that withdrew from membership, merged into a nonmember or was otherwise acquired by a nonmember).

Effective December 23, 2008, repurchases of excess capital stock have been suspended until further notice. The Bank's repurchases of capital stock related to out-of-district mergers were immaterial for the three and six months ended June 30, 2008.

The following table provides the number of stockholders and the related dollar amounts for activities recorded in mandatorily redeemable stock for the six months ended June 30, 2009 and 2008.

| (dollars in thousands) | 2009 Number of Stockholders | Amount | 2008 Number of Stockholders | Amount |
|---|---|---|---|---|
| Balance, beginning of the year | 5 | $ 4,684 | 3 | $ 3,929 |
| Capital stock subject to mandatory redemption reclassified from equity due to withdrawals, net | 2 | 4,178 | 1 | 53,663 |
| Transfer of mandatorily redeemable capital stock to capital stock due to mergers | (1) | (663) | - | - |
| Redemption of mandatorily redeemable capital stock due to withdrawal | - | - | (1) | (53,663) |
| Balance, end of the period | 6 | $ 8,199 | 3 | $ 3,929 |

Additional discussions regarding mandatorily redeemable stock, members' capital requirements and the restrictions on capital stock redemption can be found in Note 18 of the footnotes to the audited financial statements in the Bank's 2008 Annual Report filed on Form 10-K.

***Dividends, Retained Earnings and Accumulated Other Comprehensive Income (Loss).*** At June 30, 2009, retained earnings stood at $434.9 million, representing an increase of $264.4 million, or 155.1%, from December 31, 2008. This increase is primarily due to the early adoption of FSP 115-2 effective January 1, 2009. This adoption resulted in a $255.9 million increase in retained earnings as a result of a cumulative effect

107

**Notes to Financial Statements** *(unaudited)* **(continued)**

adjustment as of January 1, 2009. Additional information regarding FSP 115-2 is available in Note 2 to the unaudited financial statements in this report filed on Form 10-Q.

The Finance Agency has issued regulatory guidance to the FHLBanks relating to capital management and retained earnings. The guidance directs each FHLBank to assess, at least annually, the adequacy of its retained earnings with consideration given to future possible financial and economic scenarios. The guidance also outlines the considerations that each FHLBank should undertake in assessing the adequacy of the Bank's retained earnings.

All dividend payments are subject to Board approval. Dividends may be paid in either capital stock or cash; historically, the Bank has paid cash dividends only. In September 2008, the Bank revised its retained earnings policy and added a new capital adequacy metric, including a floor and target for this metric and a requirement to establish an implementation plan to reach the target and restrict dividend payments during the period the plan is in place. As announced on December 23, 2008, the Bank has suspended dividend payments until further notice.

## Notes to Financial Statements *(unaudited)* (continued)

The following table summarizes the changes in accumulated other comprehensive loss for the periods indicated:

| (in thousands) | Net Unrealized Losses on Available-for-Sale | Noncredit OTTI Losses on Available-for-Sale | Noncredit OTTI Losses on Held-to-Maturity | Net Unrealized Losses on Hedging Activities | Pension and Post Retirement Plans | Total |
|---|---|---|---|---|---|---|
| Balance, December 31, 2007 | $ (1,921) | $ - | $ - | $ (2,916) | $ (1,467) | $ (6,304) |
| Net unrealized loss | (9,789) | - | - | - | - | (9,789) |
| Reclassification adjustment for losses included in net income | - | - | - | 1,794 | - | 1,794 |
| Other | - | - | - | - | 443 | 443 |
| Net change | (9,789) | - | - | 1,794 | 443 | (7,552) |
| Balance as of June 30, 2008 | $ (11,710) | $ - | $ - | $ (1,122) | $ (1,024) | $ (13,856) |
| | | | | | | |
| Balance, December 31, 2008 | $ (14,543) | $ - | $ - | $ (885) | $ (1,877) | $ (17,305) |
| Cumulative effect adjustments to opening balance 115-2 | - | (2,842) | (253,119) | | | (255,961) |
| Net unrealized gain (loss) | (187) | 472 | - | - | - | 285 |
| Net unrealized gain on securities transferred from held-to-maturity to available-for-sale | - | (797,950) | 820,385 | - | - | 22,435 |
| Noncredit component of other-than-temporarily impaired securities | - | - | (731,308) | - | - | (731,308) |
| Reclassification adjustment for losses included in net income relating to held-to-maturity for noncredit portion | - | - | 16,083 | - | - | 16,083 |
| Accretion of noncredit portion of impairment losses | - | - | 26,842 | - | - | 26,842 |
| Reclassification adjustment for losses included in net income | - | - | - | 681 | - | 681 |
| Pension and post-retirement benefits | - | - | - | - | 72 | 72 |
| Net change excluding cumulative effect adjustment | (187) | (797,478) | 132,002 | 681 | 72 | (664,910) |
| Balance as of June 30, 2009 | $ (14,730) | $ (800,320) | $ (121,117) | $ (204) | $ (1,805) | $ (938,176) |

## Notes to Financial Statements *(unaudited)* (continued)

## Note 11 – Transactions with Related Parties

The following table includes significant outstanding related party member balances.

| (in thousands) | June 30, 2009 | December 31, 2008 |
|---|---|---|
| Investments | $ 419,075 | $ 427,485 |
| Loans to members | 27,839,346 | 34,505,362 |
| Deposits | 21,502 | 15,354 |
| Capital stock | 2,139,916 | 2,260,791 |
| MPF loans | 151,381 | 123,670 |

The following table includes the MPF activity of the related party members.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| (in thousands) | 2009 | 2008 | 2009 | 2008 |
| Total MPF loan volume purchased | $5,920 | $2,604 | $ 11,685 | $4,961 |

The following table summarizes the Statement of Operations effects corresponding to the above related party member balances.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| (in thousands) | 2009 | 2008 | 2009 | 2008 |
| Interest income on investments | $ 2,775 | $ 2,430 | $ 5,791 | $ 5,181 |
| Interest income on loans to members | 300,235 | 454,829 | 662,732 | 962,602 |
| Interest expense on deposits | 6 | 2,904 | 11 | 5,190 |
| Interest income on MPF loans | 2,192 | 1,760 | 4,428 | 3,555 |

The following table summarizes the effect of the MPF activities with FHLBank of Chicago.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| (in thousands) | 2009 | 2008 | 2009 | 2008 |
| Servicing fee expense | $132 | $ 63 | $ 262 | $ 125 |
| Interest income on MPF deposits | 1 | 11 | 2 | 42 |

| (in thousands) | June 30, 2009 | December 31, 2008 |
|---|---|---|
| Interest-earning deposits maintained with FHLBank of Chicago | $ 3,356 | $ 2,393 |

## Notes to Financial Statements *(unaudited)* (continued)

From time to time, the Bank may borrow from or lend to other FHLBanks on a short-term uncollateralized basis. The following table includes gross amounts transacted under these arrangements for the three and six months ended June 30, 2009 and 2008.

| (in millions) | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2009** | 2008 | **2009** | 2008 |
| Borrowed from other FHLBanks | $    - | $ 8.1 | $    - | $  12.8 |
| Repaid to other FHLBanks | - | 8.1 | - | 12.8 |
| Loaned to other FHLBanks | - | - | - | - |
| Repaid by other FHLBanks | - | - | - | 500.0 |

Subject to mutually agreed upon terms, on occasion, an FHLBank may transfer its primary debt obligations to another FHLBank, which becomes the primary obligor on the transferred debt upon completion of the transfer. During the six months ended June 30, 2009, there were no transfers of debt between the Bank and another FHLBank. During the six months ended June 30, 2008, the Bank assumed the debt of other FHLBanks having a total par value of $300 million and total fair value of $314 million.

From time to time, a member of one FHLBank may be acquired by a member of another FHLBank. When such an acquisition occurs, the two FHLBanks may agree to transfer at fair value the loans of the acquired member to the FHLBank of the surviving member. The FHLBanks may also agree to the purchase and sale of any related hedging instrument. The Bank had no such activity during the six months ended June 30, 2009 and 2008. Additional discussions regarding related party transactions including the definition of related parties can be found in Note 20 of the footnotes to the audited financial statements in the Bank's 2008 Annual Report filed on Form 10-K.

## Note 12 – Estimated Fair Values

The Bank adopted SFAS 157 and SFAS 159 on January 1, 2008. SFAS 157 provides a single definition of fair value, establishes a framework for measuring fair value, and requires expanded disclosures about fair value. SFAS 157 applies under other accounting pronouncements that require or permit fair value measurements, but does not change existing guidance as to whether or not an instrument is carried at fair value. SFAS 159 provides companies with an option to elect fair value as an alternative measurement for selected financial assets, financial liabilities, unrecognized firm commitments, and written loan commitments not previously carried at fair value. It requires entities to display the fair value of those assets and liabilities for which the company has chosen to use fair value on the face of the balance sheet. Under SFAS 159, fair value is used for both the initial and subsequent measurement of the designated assets, liabilities and commitments, with the changes in fair value recognized in net income. The Bank has not elected the fair value option on any financial assets or liabilities under SFAS 159.

The Bank records trading securities, available-for-sale securities and derivatives at fair value. According to SFAS 157, fair value is defined as the price that would be received to sell an asset, or paid to transfer a liability, (i.e., an exit price) in an orderly transaction between market participants at the measurement date. The transaction to sell the asset or transfer the liability is a hypothetical transaction at the measurement date, considered from the perspective of a market participant that holds the asset or owes the liability. In general, the transaction price will equal the exit price and, therefore, represents the fair value of the asset or liability at initial recognition. In determining whether a transaction price represents the fair value of the asset or liability at initial recognition, the Bank is required to consider factors specific to the asset or liability, the principal or most advantageous market for the asset or liability, and market participants with whom the Bank would transact in that market.

***Fair Value Hierarchy.*** SFAS 157 established a fair value hierarchy to prioritize the inputs of valuation techniques used to measure fair value. The inputs are evaluated and an overall level for the fair value measurement is determined. This overall level is an indication of the market observability of the fair value measurement. SFAS 157 clarifies fair value in terms of the price in an orderly transaction between market participants to sell an asset or

## Notes to Financial Statements *(unaudited)* (continued)

transfer a liability in the principal (or most advantageous) market for the asset or liability at the measurement date (an exit price). In order to determine the fair value or the exit price, the Bank must determine the unit of account (i.e., item being measured for financial statement purposes), highest and best use, principal market, and market participants. These determinations allow the Bank to define the inputs for fair value and level within the fair value hierarchy.

Outlined below is the application of the fair value hierarchy established by SFAS 157 to the Bank's financial assets and financial liabilities that are carried at fair value.

**Level 1** – defined as those instruments for which inputs to the valuation methodology are quoted prices (unadjusted) for identical assets or liabilities in active markets. An active market for the asset or liability is a market in which the transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis. Certain of the Bank's trading securities, which consist of publicly traded mutual funds, are considered Level 1 instruments.

**Level 2** – defined as those instruments for which inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument. The Bank's derivative instruments, TLGP securities and Treasury bills are generally considered Level 2 instruments based on the inputs utilized to derive fair value.

**Level 3** – defined as those instruments for which inputs to the valuation methodology are unobservable and significant to the fair value measurement. Unobservable inputs are those supported by little or no market activity or by the entity's own assumptions. As a result of the current market conditions and the use of significant unobservable inputs, the mortgage-related securities in the Bank's available-for-sale portfolio are considered Level 3 instruments.

The Bank utilizes valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs. If quoted market prices or market-based prices are not available, fair value is determined based on valuation models that use market-based information available to the Bank as inputs to the models.

***Fair Value on a Recurring Basis.*** The following tables present for each SFAS 157 hierarchy level, the Bank's assets and liabilities that are measured at fair value on a recurring basis on its Statement of Condition at June 30, 2009 and December 31, 2008.

| (in thousands) | Level 1 | Level 2 | Level 3 | Netting Adjustment[1] | Total |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Trading securities: | | | | | |
| Treasury bills | $ - | $ 678,637 | $ - | $ - | $ 678,637 |
| TLGP securities | - | 250,101 | - | - | 250,101 |
| Mutual funds offsetting deferred compensation | 5,970 | - | - | - | 5,970 |
| Available-for-sale securities: | | | | | |
| Private label MBS | - | - | 1,252,968 | - | 1,252,968 |
| Derivative assets | - | 615,995 | - | (602,851) | 13,144 |
| Total assets at fair value | $ 5,970 | $1,544,733 | $1,252,968 | $ (602,851) | $2,200,820 |
| | | | | | |
| **Liabilities** | | | | | |
| Derivative liabilities | $ - | $1,838,379 | $ - | $ (1,180,381) | $ 657,998 |
| Total liabilities at fair value | $ - | $1,838,379 | $ - | $ (1,180,381) | $ 657,998 |

(Column group header: **June 30, 2009**)

112

## Notes to Financial Statements *(unaudited)* (continued)

| (in thousands) | Level 1 | Level 2 | Level 3 | Netting Adjustment[1] | Total |
|---|---|---|---|---|---|
| | | | December 31, 2008 | | |
| Assets: | | | | | |
| Trading securities | $ 6,194 | $ 500,613 | $ - | $ - | $506,807 |
| Available-for-sale securities | - | - | 19,653 | - | 19,653 |
| Derivative assets | - | 911,901 | - | (883,013) | 28,888 |
| Total assets at fair value | $ 6,194 | $1,412,514 | $19,653 | $ (883,013) | $555,348 |
| | | | | | |
| Liabilities: | | | | | |
| Derivative liabilities | $ - | $2,660,855 | $ - | $ (2,305,841) | $355,014 |
| Total liabilities at fair value | $ - | $2,660,855 | $ - | $ (2,305,841) | $355,014 |

*Note:*

[1] Amounts represent the effect of legally enforceable master netting agreements that allow the Bank to settle positive and negative positions and also cash collateral held or placed with the same counterparties.

For instruments carried at fair value, the Bank reviews the fair value hierarchy classifications on a quarterly basis. Changes in the observability of the valuation attributes may result in a reclassification of certain financial assets or liabilities. Such reclassifications are reported as transfers in/out of Level 3 at fair value in the quarter in which the changes occur. The following tables present a reconciliation of all assets and liabilities that are measured at fair value on the Statement of Condition using significant unobservable inputs (Level 3) for the three and six months ended June 30, 2009 and 2008.

| (in thousands) | Available-for-Sale Securities - Private Label MBS for the Three Months Ended June 30, 2009 | Available-for-Sale Securities - Private Label MBS for the Three Months Ended June 30, 2008 |
|---|---|---|
| Balance at March 31 | $ 17,651 | $ 3,736 |
| Total gains or losses (realized/unrealized): | | |
| Included in net gains (losses) on changes in fair value | - | - |
| Included in other comprehensive income (loss) | 191 | - |
| Purchase, issuances and settlements | (1,952) | - |
| Transfers in and/or out of Level 3 | - | (3,736) |
| Transfers of OTTI securities from held-to-maturity to available-for-sale | 1,237,078 | - |
| Balance at June 30 | $ 1,252,968 | $ - |
| | | |
| Total amount of gains or losses for the three month period included in earnings attributable to the change in unrealized gains or losses relating to assets and liabilities still held at June 30 | $ - | $ - |

113

## Notes to Financial Statements *(unaudited)* (continued)

| (in thousands) | Available-for-Sale Securities - Private Label MBS For the Six Months Ended June 30, 2009 | Available-for-Sale Securities - Private Label MBS For the Six Months Ended June 30, 2008 |
|---|---|---|
| Balance at January 1 | $ 19,653 | $ 24,916 |
| Total gains or losses (realized/unrealized): | | |
| Included in net gains (losses) on changes in fair value | - | - |
| Included in other comprehensive income (loss) | 286 | (1,073) |
| Purchase, issuances and settlements | (4,049) | (309) |
| Transfers in and/or out of Level 3 | - | (23,534) |
| Transfers of OTTI securities from held-to-maturity to available-for-sale | 1,237,078 | - |
| Balance at June 30 | $ 1,252,968 | $ - |
| Total amount of gains or losses for the three month period included in earnings attributable to the change in unrealized gains or losses relating to assets and liabilities still held at June 30 | $ - | $ - |

On June 30, 2009, the Bank transferred certain private label MBS from its held-to-maturity portfolio to its available-for-sale portfolio. Because reclassifications are reported as such in the quarter in which they occur, the OTTI recognized on these securities is not reflected in the tables above. Further details, including the OTTI charges relating to this transfer, are presented in Note 4.

*Estimated Fair Values.* The following estimated fair value amounts have been determined by the Bank using available market information and the Bank's best judgment of appropriate valuation methods. These estimates are based on pertinent information available to the Bank as of June 30, 2009 and December 31, 2008. Although the Bank uses its best judgment in estimating the fair value of these financial instruments, there are inherent limitations in any estimation technique or valuation methodology. For example, because an active secondary market does not exist for a majority of the Bank's financial instruments, in certain cases fair values are not subject to precise quantification or verification and may change as economic and market factors and evaluation of those factors change. Therefore, these estimated fair values are not necessarily indicative of the amounts that would be realized in current market transactions, although they do reflect the Bank's judgment of how a market participant would estimate the fair values. In addition to these estimated fair value limitations on specific assets and liabilities, no value has been ascribed to the future business opportunities of the Bank which would be included in an overall valuation of the Bank as a going concern.

*Subjectivity of Estimates.* Estimates of the fair value of loans to members with options, mortgage instruments, derivatives with embedded options and consolidated obligations bonds with options using the methods described below and other methods are highly subjective and require judgments regarding significant matters such as the amount and timing of future cash flows, prepayment speed assumptions, expected interest rate volatility, methods to determine possible distributions of future interest rates used to value options, and the selection of discount rates that appropriately reflect market and credit risks. Changes in these judgments often have a material effect on the fair value estimates. Since these estimates are made as of a specific point in time, they are susceptible to material near term changes.

*Cash and Due from Banks.* The estimated fair value approximates the recorded book balance.

*Interest-Earning Deposits and Investment Securities.* The estimated fair value of non-mortgage-related securities and interest earning deposits is determined based on quoted market prices, when available. When quoted

114

## Notes to Financial Statements *(unaudited)* (continued)

market prices are not available, the Bank estimates the fair value of these instruments by calculating the present value of the expected future cash flows and reducing the amount for accrued interest receivable.

The Bank obtains prices for mortgage-related securities from three third-party pricing services. Typically, these prices are derived using a modified matrix pricing approach. The valuation inputs for matrix pricing basically consist of transaction data relating to other securities whose prices are more readily ascertainable in the market which is used to produce a hypothetical value based on the estimated spread relationship between the securities. In some instances, the fair value of certain securities cannot be determined solely through the use of matrix pricing due to the lack of relevant market data. As a result, the use of unobservable inputs and other qualitative factors is necessary in determining the fair value of these securities. Using the prices received from the third-party pricing services, and in some cases, other available information, the Bank follows an established framework of criteria to determine and validate the fair values. In certain limited instances (e.g., not all third-party services provide a price, etc.), the Bank may derive an internally modeled price that is deemed appropriate after consideration of all relevant facts and circumstances.

*Federal Funds Sold and Loans to Other FHLBanks.* The estimated fair value is determined by calculating the present value of the expected future cash flows. The discount rates used in these calculations are the rates for instruments with similar terms.

*Mutual Funds Offsetting Deferred Compensation.* Fair values for publicly traded mutual funds are based on quoted market prices.

*Loans to Members.* The Bank determines the estimated fair value of loans to members by calculating the present value of expected future cash flows from the loans and excluding the amount for accrued interest receivable. The discount rates used in these calculations are the replacement loan rates for loans to members with similar terms. Under Finance Agency regulations, loans to members with a maturity or repricing period greater than six months require a prepayment fee sufficient to make the Bank financially indifferent to the borrower's decision to prepay the loans. Therefore, the estimated fair value of loans to members does not assign a value to the ability of the member to prepay the advance.

*Mortgage Loans Held For Portfolio.* The estimated fair values for mortgage loans are determined based on quoted market prices of similar mortgage instruments. These prices, however, can change rapidly based upon market conditions.

*Accrued Interest Receivable and Payable.* The estimated fair value approximates the recorded book value. Derivative accrued interest receivable and payable are excluded and are valued as described below.

*Derivative Assets/Liabilities.* The Bank bases the estimated fair values of derivatives with similar terms on available market prices including derivative accrued interest receivable and payable. However, active markets do not exist for many types of financial instruments. Consequently, fair values for these instruments must be estimated using techniques such as discounted cash flow analysis and comparisons to similar instruments. Estimates developed using these methods are highly subjective and require judgment regarding significant matters such as the amount and timing of future cash flows, volatility of interest rates and the selection of discount rates that appropriately reflect market and credit risks. Changes in these judgments often have a material effect on the fair value estimates. Because these estimates are made as of a specific point in time, they are susceptible to material near-term changes. The Bank is subject to credit risk in derivatives transactions due to potential nonperformance by the derivatives counterparties. To mitigate this risk, the Bank enters into master-netting agreements for interest-rate-exchange agreements with highly-rated institutions. In addition, the Bank has entered into bilateral security agreements with all active derivatives dealer counterparties that provide for delivery of collateral at specified levels tied to counterparty credit ratings to limit the Bank's net unsecured credit exposure to these counterparties. The Bank has evaluated the potential for the fair value of the instruments to be impacted by counterparty credit risk and has determined that no adjustments were significant or necessary to the overall fair value measurements. If these netted amounts are positive, they are classified as an asset and if negative, a liability.

*BOB Loans.* The estimated fair value approximates the carrying value.

115

## Notes to Financial Statements *(unaudited)* (continued)

***Deposits.*** The Bank determines estimated fair values of Bank deposits by calculating the present value of expected future cash flows from the deposits and reducing this amount for accrued interest payable. The discount rates used in these calculations are the cost of deposits with similar terms.

***Consolidated Obligations.*** The Bank's internal valuation model determines fair values of consolidated obligations bonds and discount notes by calculating the present value of expected cash flows using market-based yield curves. Adjustments may be necessary to reflect the FHLBanks' credit quality when valuing consolidated obligations bonds measured at fair value. Due to the joint and several liability of consolidated obligations, the Bank monitors its own creditworthiness and the creditworthiness of the other FHLBanks to determine whether any credit adjustments are necessary in its fair value measurement of consolidated obligations. The credit ratings of the FHLBanks and any changes to these credit ratings are the basis for the Bank to determine whether the fair values of consolidated obligations have been significantly affected during the reporting period by changes in the instrument-specific credit risk. Either no adjustment or an immaterial adjustment was made during the three and six months ended June 30, 2009, as deemed appropriate by the Bank.

***Mandatorily Redeemable Capital Stock.*** The fair value of capital stock subject to mandatory redemption is equal to par value. Capital stock can be acquired by members only at par value and may be redeemed or repurchased at par value. Capital stock is not traded and no market mechanism exists for the exchange of stock outside the cooperative structure of the Bank.

***Commitments.*** The estimated fair value of the Bank's unrecognized commitments to extend credit, including standby letters of credit, was immaterial at June 30, 2009 and December 31, 2008. For fixed-rate loan commitments, fair value also considers the difference between current levels of interest rates and the committed rates. The estimated fair value of standby letters of credit is based on the present value of fees currently charged for similar agreements or on the estimated cost to terminate them or otherwise settle the obligations with the counterparties.

***Commitments to Extend Credit for Mortgage Loans.*** Certain mortgage loan purchase commitments are recorded as derivatives at their fair value.

The carrying value and estimated fair values of the Bank's financial instruments at June 30, 2009 and December 31, 2008 are presented in the tables below.

**Notes to Financial Statements** *(unaudited)* **(continued)**

**Fair Value Summary Table**

| (in thousands) | June 30, 2009 | | December 31, 2008 | |
|---|---|---|---|---|
| | Carrying Value | Estimated Fair Value | Carrying Value | Estimated Fair Value |
| **Assets** | | | | |
| Cash and due from banks | $ **69,553** | **$69,553** | $ 67,577 | $ 67,577 |
| Interest-earning deposits | **8,663,383** | **8,663,341** | 5,103,671 | 5,103,632 |
| Federal funds sold | **500,000** | **499,997** | 1,250,000 | 1,249,981 |
| Trading securities | **934,708** | **934,708** | 506,807 | 506,807 |
| Available-for-sale securities | **1,252,968** | **1,252,968** | 19,653 | 19,653 |
| Held-to-maturity securities | **13,093,177** | **12,042,160** | 14,918,045 | 12,825,341 |
| Loans to members | **45,799,611** | **45,820,136** | 62,153,441 | 61,783,968 |
| Mortgage loans held for portfolio, net | **5,607,486** | **5,782,419** | 6,165,266 | 6,303,065 |
| BOB loans | **11,370** | **11,370** | 11,377 | 11,377 |
| Accrued interest receivable | **338,149** | **338,149** | 434,017 | 434,017 |
| Derivative assets | **13,144** | **13,144** | 28,888 | 28,888 |
| **Liabilities** | | | | |
| Deposits | $ **2,097,215** | **$2,097,360** | $ 1,486,377 | $ 1,486,539 |
| Consolidated obligations: | | | | |
| Discount notes | **15,538,119** | **15,538,152** | 22,864,284 | 22,882,625 |
| Bonds | **54,090,499** | **54,773,586** | 61,398,687 | 62,202,614 |
| Mandatorily redeemable capital stock | **8,199** | **8,199** | 4,684 | 4,684 |
| Accrued interest payable | **300,432** | **300,432** | 494,078 | 494,078 |
| Derivative liabilities | **657,998** | **657,998** | 355,014 | 355,014 |

## Note 13 – Commitments and Contingencies

As described in Note 9, the twelve FHLBanks have joint and several liability for all the consolidated obligations issued on their behalf. Accordingly, should one or more of the FHLBanks be unable to repay its participation in the consolidated obligations, each of the other FHLBanks could be called upon to repay all or part of such obligations, as determined or approved by the Finance Agency. The Finance Agency, in its discretion and notwithstanding any other provision, may at any time order any FHLBank to make principal or interest payments due on any consolidated obligation, even in the absence of default by the primary obligor. No FHLBank has ever been asked or required to repay the principal or interest on any consolidated obligation on behalf of another FHLBank, and as of June 30, 2009 and through the filing date of this report, the Bank does not believe that it is probable that they will be asked to do so.

The FHLBanks considered the guidance under FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, an interpretation of FASB Statements No. 5, 57 and 107 and rescission of FASB Interpretation No. 34* (FIN 45), and determined it was not necessary to recognize the fair value of the FHLBanks' joint and several liability for all of the consolidated obligations. The Bank considers the joint and several liability as a related party guarantee. Related party guarantees meet the recognition scope exceptions in FIN 45. Accordingly, the Bank has not recognized a liability for its joint and several obligation related to other FHLBanks' consolidated obligations at June 30, 2009 and December 31, 2008. The par amounts of the FHLBanks' consolidated obligations for which the Bank is jointly and severally liable were approximately $1.1 trillion and $1.3 trillion at June 30, 2009 and December 31, 2008, respectively.

During the third quarter of 2008, the Bank entered into a Lending Agreement with the U.S. Treasury in connection with the U.S. Treasury's establishment of the Government Sponsored Enterprise Credit Facility

## Notes to Financial Statements *(unaudited)* (continued)

(GSECF), as authorized by the Housing Act. The GSECF is designed to serve as a contingent source of liquidity for the housing GSEs, including each of the twelve FHLBanks. Any borrowings by one or more of the FHLBanks under GSECF are considered consolidated obligations with the same joint and several liability as all other consolidated obligations. The terms of any borrowings are agreed to at the time of issuance. Loans under the Lending Agreement are to be secured by collateral acceptable to the U.S. Treasury, which consists of Bank loans to members that have been collateralized in accordance with regulatory standards and mortgage-backed securities issued by Fannie Mae or Freddie Mac. The Bank is required to submit to the Federal Reserve Bank of New York, acting as fiscal agent of the U.S. Treasury, a list of eligible collateral, updated on a weekly basis. As of June 30, 2009, the Bank had provided the U.S. Treasury with listings of loans to members collateral amounting to $18.3 billion, which provides for maximum borrowings of $15.9 billion. The amount of collateral can be increased or decreased (subject to the approval of the U.S. Treasury) at any time through the delivery of an updated listing of collateral. As of June 30, 2009, the Bank has not drawn on this available source of liquidity and has no immediate plans to do so.

Commitments that legally bind and unconditionally obligate the Bank for additional loans to members, including BOB loans, totaled approximately $11.6 million and $4.4 million at June 30, 2009 and December 31, 2008, respectively. Commitments can be for periods of up to twelve months. Standby letters of credit are executed for members for a fee. A standby letter of credit is generally a short-term financing arrangement between the Bank and its member. If the Bank is required to make payment for a beneficiary's draw, these amounts are converted into a collateralized loan to the member. Outstanding standby letters of credit were as follows:

| (in millions) | June 30, 2009 | | December 31, 2008 |
|---|---|---|---|
| Outstanding notional | $ | 10,763.6 | $        10,002.3 |

The Bank monitors the creditworthiness of its standby letters of credit based on an evaluation of the member. The Bank has established parameters for the review, assessment, monitoring and measurement of credit risk related to these standby letters of credit, similar to the process applied to loans to members.

Based on management's credit analyses, collateral requirements, and adherence to the requirements set forth in Bank policy and Finance Agency regulations, the Bank has not recorded any additional liability on loans to members commitments and standby letters of credit. Excluding BOB, commitments and standby letters of credit are collateralized at the time of issuance. The Bank does record a liability with respect to BOB commitments, which is reflected in other liabilities on the Statement of Condition.

Commitments that unconditionally obligate the Bank to purchase mortgage loans totaled $13.3 million and $31.2 million at June 30, 2009 and December 31, 2008, respectively. Delivery commitments are generally for periods not to exceed 45 days. In accordance with Statement of Financial Accounting Standards No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities* (SFAS 149), such commitments are recorded as derivatives at their fair value.

The Bank generally executes derivatives with major banks and broker-dealers and generally enters into bilateral collateral agreements. As of June 30, 2009, the Bank has pledged total collateral approximating $901.8 million, including cash of $620.9 million and securities that cannot be sold or repledged with a carrying value of $280.9 million, to certain of its derivative counterparties. The Bank had $1.4 billion of cash collateral pledged at December 31, 2008. As previously noted, the Bank's ISDA Master Agreements typically require segregation of the Bank's collateral posted with the counterparty. The Bank reported $280.9 million of the collateral as trading securities as of June 30, 2009. There were no securities pledged as of December 31, 2008.

The Bank had committed to issue or purchase consolidated obligations totaling $1.5 billion and $635.0 million at June 30, 2009 and December 31, 2008, respectively.

The Bank charged to operating expense net rental costs of approximately $0.5 million and $0.6 million for the three months ended June 30, 2009 and 2008, respectively. For the six months ended June 30, 2009 and 2008, the Bank charged to operating expense net rental costs of approximately $1.0 million and $1.2 million, respectively.

118

**Notes to Financial Statements** *(unaudited)* **(continued)**

Lease agreements for Bank premises generally provide for increases in the basic rentals resulting from increases in property taxes and maintenance expenses. Such increases are not expected to have a material effect on the Bank.

The Bank terminated all of its derivative contracts with LBSF. Related to the termination of these contracts, the Bank had a receivable due from LBSF in the amount of $41.5 million as of June 30, 2009. The Bank filed an adversary proceeding against LBSF and JP Morgan to return the cash collateral posted by the Bank associated with the derivative contracts. See discussion within Item 3. Legal Proceedings in the Bank's 2008 Annual Report filed on Form 10-K for more information with respect to the proceeding. In its Third Quarter 2008 Form 10-Q and its 2008 Annual Report filed on Form 10-K, the Bank disclosed that it was probable that a loss has been incurred with respect to this receivable. However, the Bank had not recorded a reserve with respect to the receivable from LBSF because the Bank was unable to reasonably estimate the amount of loss that had been incurred. There have been continuing developments in the adversary proceeding, that have occurred since the filing of the Bank's Form 10-K. The discovery phase of the adversary proceeding is now underway, which has provided management information related to its claim. Based on this information, management's most probable estimated loss is $35.3 million, which was recorded in first quarter 2009. As of June 30, 2009, the Bank maintained a reserve of $35.3 million on this receivable as this remains the most probable estimated loss.

During discovery in the Bank's adversary proceeding against LBSF, the Bank learned that LBSF had failed to keep the Bank's posted collateral in a segregated account in violation of the Master Agreement between the Bank and LBSF. In fact, the posted collateral was held in a general operating account of LBSF the balances of which were routinely swept to other Lehman Brother entities, including Lehman Brothers Holdings, Inc. among others. After discovering that the Bank's posted collateral was transferred to other Lehman entities and not held by JP Morgan, the Bank agreed to discontinue the LBSF adversary proceeding against JP Morgan. JP Morgan was dismissed from the Bank's proceeding on June 26, 2009. In addition, the Bank is prepared to discontinue its LBSF adversary proceeding against LBSF, as that claim can be satisfactorily proved in the LBSF bankruptcy through the proof of claim process, which makes pursuing the adversary proceeding against LBSF unnecessary.

The Bank has filed a new complaint against Lehman Brothers Holding, Inc., Lehman Brothers, Inc., Lehman Brothers Commercial Corporation, Woodlands Commercial Bank, formerly known as Lehman Brothers Commercial Bank, and Aurora Bank FSB (Aurora), formerly known as Lehman Brothers Bank FSB, alleging unjust enrichment, constructive trust, and conversion claims. Aurora is a member of the Bank. Aurora did not hold more than 5% of the Bank's capital stock as of June 30, 2009.

## Note 14 – Subsequent Events

The Bank evaluated subsequent events through the date of this filing on August 12, 2009 and did not identify any items that would require adjustment or additional disclosure within this report filed on Form 10-Q.

## Item 3: Quantitative and Qualitative Disclosures about Market Risk

See the Risk Management section of "Management's Discussion and Analysis of Results of Operations and Financial Condition" in Part I. Item 2 of this Form 10-Q.

## Item 4T: Controls and Procedures

**Disclosure Controls and Procedures**

Under the supervision and with the participation of the Bank's management, including the chief executive officer and chief financial officer, the Bank conducted an evaluation of its disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended. Based on this evaluation, the Bank's chief executive officer and chief financial officer concluded that the Bank's disclosure controls and procedures were effective as of June 30, 2009.

**Internal Control Over Financial Reporting**

There have been no changes in internal control over financial reporting that occurred during the second quarter of 2009 that have materially affected, or are reasonably likely to materially affect, the Bank's internal control over financial reporting.

# PART II – OTHER INFORMATION

## Item 1: Legal Proceedings

As discussed in "Current Financial and Mortgage Market Events and Trends" in Item 7. Management's Discussion and Analysis section of the Bank's 2008 Annual Report filed on Form 10-K, the Bank terminated multiple interest rate swap transactions with Lehman Brothers Special Financing, Inc. (LBSF) effective September 19, 2008. On October 7, 2008, the Bank filed an adversary proceeding against J.P. Morgan Chase Bank, N.A. (JP Morgan) and LBSF in the United States Bankruptcy Court in the Southern District of New York alleging constructive trust, conversion, breach of contract, unjust enrichment and injunction claims (Complaint) relating to the right of the Bank to the return of the $41.5 million in Bank posted cash collateral held by JP Morgan in a custodial account established by LBSF as a fiduciary for the benefit of the Bank. Chase Bank USA, N.A. (Chase Bank), an affiliate of JP Morgan, is a Bank member and was a greater than 5% shareholder as of October 6, 2008.

During discovery in the Bank's adversary proceeding against LBSF, the Bank learned that LBSF had failed to keep the Bank's posted collateral in a segregated account in violation of the Master Agreement between the Bank and LBSF. In fact, the posted collateral was held in a general operating account of LBSF the balances of which were routinely swept to other Lehman Brother entities, including Lehman Brothers Holdings, Inc. among others. After discovering that the Bank's posted collateral was transferred to other Lehman entities and not held by JP Morgan, the Bank agreed to discontinue the LBSF adversary proceeding against JP Morgan. JP Morgan was dismissed from the Bank's proceeding on June 26, 2009. In addition, the Bank is prepared to discontinue its LBSF adversary proceeding against LBSF, as that claim can be satisfactorily proved in the LBSF bankruptcy through the proof of claim process, which makes pursuing the adversary proceeding against LBSF unnecessary.

The Bank has filed a new complaint against Lehman Brothers Holding Inc., Lehman Brothers, Inc., Lehman Brothers Commercial Corporation, Woodlands Commercial Bank, formerly known as Lehman Brothers Commercial Bank, and Aurora Bank FSB (Aurora), formerly known as Lehman Brothers Bank FSB, alleging unjust enrichment, constructive trust, and conversion claims. Aurora is a member of the Bank. Aurora did not hold more than 5% of the Bank's capital stock as of June 30, 2009.

The Bank may be subject to various legal proceedings arising in the normal course of business. After consultation with legal counsel, management is not aware of any other proceedings that might have a material effect on the Bank's financial condition or results of operations.

## Item 1A: Risk Factors

For a complete discussion of Risk Factors, see Item 1A. Risk Factors in the Bank's 2008 Annual Report filed on Form 10-K. Other than as noted below, management believes that there have been no material changes from the Risk Factors disclosed in the 2008 Form 10-K.

The following table presents the Moody's and S&P ratings for the FHLBank System and each of the FHLBanks within the System as of August 7, 2009. There were no material changes; the only change was related to the debt rating for the FHLBank of Chicago.

|  | Moody's Investor Service | Standard & Poor's |
|---|---|---|
| Consolidated obligation discount notes | P-1 | A-1+ |
| Consolidated obligation bonds | Aaa | AAA |

| FHLBank | Moody's Senior Unsecured Long-Term Debt Rating/Outlook | S&P Senior Unsecured Long-Term Debt Rating/Outlook |
|---|---|---|
| Atlanta | Aaa/Stable | AAA/Stable |
| Boston | Aaa/Stable | AAA/Stable |
| Chicago | Aaa/Stable | AA+/Stable |
| Cincinnati | Aaa/Stable | AAA/Stable |
| Dallas | Aaa/Stable | AAA/Stable |
| Des Moines | Aaa/Stable | AAA/Stable |
| Indianapolis | Aaa/Stable | AAA/Stable |
| New York | Aaa/Stable | AAA/Stable |
| Pittsburgh | Aaa/Stable | AAA/Stable |
| San Francisco | Aaa/Stable | AAA/Stable |
| Seattle | Aaa/Stable | AA+/Stable |
| Topeka | Aaa/Stable | AAA/Stable |

The following represents updates to the "exposure to member and counterparty risk" and "loss of significant Bank members" Risk Factors. The risks described below, elsewhere in this report and in the Bank's Annual Report filed on Form 10-K are not the only risks facing the Bank. Additional risks and uncertainties not currently known to the Bank or that the Bank currently deems immaterial may also materially affect the Bank.

***The Bank is subject to credit risk due to default, including failure or ongoing instability of any of the Bank's member, derivative, money market or other counterparties, which could adversely affect its profitability or financial condition.***

and

***The loss of significant Bank members or borrowers may have a negative impact on the Bank's loans and capital stock outstanding and could result in lower demand for its products and service, lower dividends paid to members and higher borrowing costs for remaining members, all which may affect the Bank's profitability and financial condition.***

The continuing instability of the financial markets has resulted in many financial institutions becoming significantly less creditworthy, exposing the Bank to increased member and counterparty risk and risk of default. In the first six months of 2009, 45 FDIC-insured institutions have failed across the country. The financial services industry has experienced an increase in both the number of financial institution failures and the number of mergers and consolidations. If member institution failures and mergers or consolidations occur affecting the Bank's district, particularly out-of-district acquirers, this activity may reduce the number of current and potential members in the Bank's district. The resulting loss of business could negatively impact the Bank's financial condition and results of operations, as well as the Bank's operations in general. Additionally, if Bank members fail and the FDIC or the member (or another applicable entity) does not either (1) promptly repay all of the failed institution's obligations to the Bank or (2) assume the outstanding advances, the Bank may be required to liquidate the collateral pledged by the failed institution in order to satisfy its obligations to the Bank. If that were the case, the proceeds realized from the liquidation of pledged collateral may not be sufficient to fully satisfy the amount of the failed institution's obligations and the operational cost of liquidating the collateral.

The Bank faces credit risk on loans to members. The Bank protects against credit risk on loans to members through credit underwriting standards and collateralization. In addition, the Bank can call for additional or substitute collateral during the life of a loan to protect its security interest. The Act defines eligible collateral as certain investment securities, residential mortgage loans, deposits with the Bank, and other real estate related assets. All capital stock of the Bank owned by the borrower is also available as supplemental collateral. The types of collateral pledged by members are evaluated and assigned a borrowing capacity, generally based on a percentage of the collateral's value. This value can either be based on book value or market value, depending on the nature and form of the collateral being pledged. The volatility of market prices and interest rates could affect the value of the

122

Table of Contents

collateral held by the Bank as security for the obligations of Bank members as well as the ability of the Bank to liquidate the collateral in the event of a default by the obligor. Volatility within collateral indices may affect the method used in determining collateral weightings, which would ultimately affect the eventual collateral value. On loans to members, the Bank's policies require the Bank to be over-collateralized. In addition, all loans to members are current and no loss has ever been incurred in the portfolio. Based on these factors, no allowance for credit losses on loans to members is required. The Bank has policies and procedures in place to manage the collateral positions; these are subject to ongoing review, evaluation and enhancements as necessary.

In addition, see updated discussions regarding bankruptcy "cramdown" legislation, the Bank's OTTI assessment process and regulatory capital requirements and compliance in Item 2. Management's Discussion and Analysis in this report filed on Form 10-Q.

## Item 2: Unregistered Sales of Equity Securities and Use of Proceeds

Not applicable.

## Item 3: Defaults upon Senior Securities

None.

## Item 4: Submission of Matters to a Vote of Security Holders

None.

## Item 5: Other Information

None.

123

## Item 6: Exhibits

| | |
|---|---|
| Exhibit 31.1 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 for the Chief Executive Officer |
| Exhibit 31.2 | Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 for the Chief Financial Officer |
| Exhibit 32.1 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 for the Chief Executive Officer |
| Exhibit 32.2 | Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 for the Chief Financial Officer |

# SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal Home Loan Bank of Pittsburgh
(Registrant)


Date:  August 12, 2009


By:  /s/  Kristina K. Williams
Kristina K. Williams
Chief Financial Officer

125

Exhibit 31.1

**Certification Pursuant to Section 302**
**of the Sarbanes-Oxley Act of 2002**
**for the Chief Executive Officer**

I, John R. Price, certify that:

1. I have reviewed this quarterly report on Form 10-Q of the Federal Home Loan Bank of Pittsburgh (the registrant);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 12, 2009

/s/  JOHN R. PRICE
_____
Name: John R. Price
Title:        President & Chief Executive Officer

126

Exhibit 31.2

**Certification Pursuant to Section 302**
**of the Sarbanes-Oxley Act of 2002**
**for the Chief Financial Officer**

I, Kristina K. Williams, certify that:

1. I have reviewed this quarterly report on Form 10-Q of the Federal Home Loan Bank of Pittsburgh (the registrant);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 12, 2009

/s/  KRISTINA K. WILLIAMS
_____

Name: Kristina K. Williams

Title:            Chief Financial Officer

127

Exhibit 32.1

**Certification Pursuant to 18 U.S.C. Section 1350,
as Adopted Pursuant to Section 906
of the Sarbanes-Oxley Act of 2002 for the Chief Executive Officer**

I, John R. Price, state and attest that:

1. I am the Chief Executive Officer of the Federal Home Loan Bank of Pittsburgh (the registrant).

2. I hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

- the Quarterly Report on Form 10-Q of the registrant for the quarter ended June 30, 2009 (the periodic report) containing financial statements fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

- the information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the registrant as of, and for, the periods presented.

Date: August 12, 2009

/s/ JOHN R. PRICE
_____
Name: John R. Price

Title:        President & Chief Executive Officer

A signed original of this written statement required by Section 906 has been provided to the Federal Home Loan Bank of Pittsburgh and will be retained by the Federal Home Loan Bank of Pittsburgh and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 32.2

**Certification Pursuant to 18 U.S.C. Section 1350,**
**as Adopted Pursuant to Section 906**
**of the Sarbanes-Oxley Act of 2002 for the Chief Financial Officer**

I, Kristina K. Williams, state and attest that:

1. I am the Chief Financial Officer of the Federal Home Loan Bank of Pittsburgh (the registrant).

2. I hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

- the Quarterly Report on Form 10-Q of the registrant for the quarter ended June 30, 2009 (the periodic report) containing financial statements fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

- the information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the registrant as of, and for, the periods presented.

Date: August 12, 2009

/s/  KRISTINA K. WILLIAMS
_____
Name: Kristina K. Williams
Title:              Chief Financial Officer

A signed original of this written statement required by Section 906 has been provided to the Federal Home Loan Bank of Pittsburgh and will be retained by the Federal Home Loan Bank of Pittsburgh and furnished to the Securities and Exchange Commission or its staff upon request.

129